## 25-4033

# United States Court of Appeals for the Fourth Circuit



UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

-against-

CHRISTOPHER KENJI BENDANN,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

# JOINT APPENDIX
# VOLUME I OF VI (Pages JA1-JA563)

DAVID BORNSTEIN, ESQ.
OFFICE OF THE U.S. ATTORNEY
DISTRICT OF MARYLAND
36 S. Charles Street
Baltimore, Maryland 21201
(410) 209-4800
*david.bornstein@usdoj.gov*

*Counsel for Plaintiff-Appellee*

ALLEN H. ORENBERG, ESQ.
THE ORENBERG LAW FIRM, LLC
200-A Monroe Street, Suite 233
Rockville, Maryland 20850
(301) 807-3847
*aorenberg@orenberglaw.com*

*Counsel for Defendant-Appellant*



# TABLE OF CONTENTS

*Page(s)*

U.S. District Court Docket Sheet ....................................................JA1-JA24

Memorandum and Order, dated May 10, 2024 ..............................JA25-JA31

Superseding Indictment, dated May 29, 2024 ...............................JA32-JA42

Motion to Suppress Evidence Obtained through Search
Warrants, dated February 12, 2024 ...............................................JA43-JA48

Motion to Suppress Evidence Obtained from Cellphone,
dated February 12, 2024 ................................................................JA49-JA52

Redacted Government's Consolidated Response to
Defense Pre-Trial Motions .............................................................JA53-JA76

Motion for Psychiatric Examination for the Determination
of Mental Competency to Stand Trial, dated August 21,
2024 ................................................................................................JA77-JA79

Verdict Form, dated August 28, 2024 ...........................................JA80-JA81

Sentencing Memorandum ...............................................................JA82-JA90

    Exhibit 1a – Student Notes to Mr. Bendann .....................JA91-JA128

    Exhibit 1b – Student Notes to Mr. Bendann ...................JA129-JA155

    Exhibit 1c – Student Notes to Mr. Bendann ...................JA156-JA183

    Exhibit 1d – Student Notes to Mr. Bendann ...................JA184 JA215

    Exhibit 2 – Statement of Facts .......................................JA216-JA218

    Exhibit 3 – Letters .........................................................JA219-JA229

i

*Table of Contents(cont'd)*                                              *Page(s)*

Memorandum and Order, dated January 17, 2025....................................JA230-JA232

Transcript of Proceedings, held on August 22, 2024...............................JA233-JA394

Transcript of Proceedings, held on August 22, 2024...............................JA395-JA705

Redacted Transcript of Proceedings, held on August 24,
2024.......................................................................................JA706-JA886

Redacted Transcript of Proceedings, held on August 26,
2024.......................................................................................JA887-JA1201

   *Stacey Halpert*
      Direct (by Ms. McGuinn)................................................JA895-JA905
      Cross (by Mr. Nieto) ...................................................JA906-JA909

   *Christopher Feiss*
      Direct (by Ms. Hagan)..................................................JA910-JA916
      Cross (by Mr. Proctor) ................................................JA917-JA921

   *Jack Stuzin*
      Direct (by Ms. Hagan)..................................................JA922-JA930
      Cross (by Mr. Nieto) ...................................................JA931-JA936
      Redirect (by Ms. Hagan) ..............................................JA937-JA938

   *Tyler Witherspoon*
      Direct (by Ms. Hagan)..................................................JA939-JA947
      Cross (by Mr. Proctor) ................................................JA948-JA952
      Redirect (by Ms. Hagan) ..............................................JA953-JA954

   *DeAnna Komber-Hoyle*
      Direct (by Ms. McGuinn)................................................JA955-JA966
      Cross (by Mr. Proctor) ................................................JA967-JA969

ii

*Table of Contents(cont'd)*                           *Page(s)*

*Shannon Markel*
Direct (by Ms. Hagan)................................................JA970-JA989
Cross (by Mr. Nieto) ................................................JA990-JA999

*Eric J. Oberly*
Direct (by Ms. McGuinn)...........................................JA1000-JA1060

*Agent Walker*
Direct (by Ms. McGuinn)...........................................JA1063 JA1119
Cross (by Mr. Nieto) ...............................................JA1120-JA1133
Redirect (by Ms. McGuinn) ......................................JA1134-JA1138

Transcript of Proceedings, held on August 27, 2024............JA1202-JA1504

*Wallace Halpert*
Direct (by Ms. McGuinn)...........................................JA1207-JA1224
Cross (by Mr. Proctor) ............................................JA1225-JA1230
Redirect (by Ms. McGuinn) ......................................JA1231-JA1232

*William Godine*
Direct (by Ms. Hagan)..............................................JA1233-JA1245
Cross (by Mr. Proctor) ............................................ JA1246
Redirect (by Ms. Hagan) ..........................................JA1247-JA1248

*James Schloeder*
Direct (by Ms. McGuinn)...........................................JA1249-JA1265
Cross (by Mr. Nieto) ...............................................JA1266-JA1283
Redirect (by Ms. McGuinn) ......................................JA1284-JA1288

*Charlotte Hoffberger*
Direct (by Ms. Hagan)..............................................JA1289-JA1302
Cross (by Mr. Nieto) ...............................................JA1303-JA1304

iii

*Table of Contents(cont'd)*                                                    *Page(s)*

*Riley Seelert*
    Direct (by Ms. McGuinn)................................................JA1305-JA1323
    Cross (by Mr. Nieto) ...................................................JA1324-JA1339

*Agent Walker*
    Direct (by Ms. Hagan)..................................................JA1340-JA1408
    Cross (by Mr. Nieto) ...................................................JA1433-JA1434
    Redirect (by Ms. Hagan)..............................................JA1435-JA1437

Transcript of Proceedings, held on May 9, 2024 ................................JA1505-JA1610

*Shannon Markel*
    Direct (by Ms. Hagan)..................................................JA1511-JA1540
    Cross (by Mr. Nieto) ...................................................JA1541-JA1555
    Redirect (by Ms. Hagan)..............................................JA1556-JA1558

*Jon Shumway*
    Direct (by Ms. Hagan)..................................................JA1559-JA1569
    Cross (by Mr. Nieto) ...................................................JA1570-JA1574

*Patrick Win*
    Direct (by Ms. Hagan)..................................................JA1575-JA1578

Transcript of Proceedings, held on January 21, 2025 ..........................JA1611-JA1681

Judgment, dated January 21, 2025 ...........................................JA1682-JA1689

Notice of Appeal ...........................................................JA1690

**_Sealed Volume_**

Motion to Suppress Evidence Obtained through Search
Warrants ..................................................................JA1691-JA1718

iv

*Table of Contents(cont'd)*                                                                    *Page(s)*

Motion to Suppress Evidence Obtained from Cellphone ....................JA1719-JA1724

Government's Consolidated Response to Defense Pre-Trial
Motions ........................................................................................JA1725-JA1750

Transcript of Proceedings, held on August 21, 2024...........................JA1751-JA1796

Redacted Transcript of Proceedings, held on August 23,
2024...............................................................................................JA1797-JA2132

   *Ms. XXX*
      Direct (by Ms. McGuinn).......................................................JA1836-JA1869
      Cross (by Mr. Nieto) ...........................................................JA1870-JA1879
      Direct (by Ms. Hagan)..........................................................JA1880-JA1892
      Direct (by Ms. McGuinn).......................................................JA1893-JA1978
      Cross (by Mr. Nieto) ...........................................................JA1979-JA2019
      Redirect (by Ms. McGuinn) ...................................................JA2020-JA2022

   *Angela Johnson*
      Direct (by Ms. Hagan)..........................................................JA2023-JA2027
      Cross (by Mr. Proctor) .........................................................JA2028-JA2033
      Redirect (by Ms. Hagan) .......................................................JA2034-JA2035

   *Henry Smith*
      Direct (by Ms. McGuinn).......................................................JA2036-JA2048
      Cross (by Mr. Nieto) ...........................................................JA2049-JA2056
      Redirect (by Ms. McGuinn) ...................................................JA2057-JA2065

Transcript of Proceedings, held on August 23, 2024...........................JA2133-JA2431

   *Ms. XXX*
      Direct (by Ms. McGuinn).......................................................JA2172-JA2205
      Cross (by Mr. Nieto) ...........................................................JA2206-JA2215
      Direct (by Ms. Hagan)..........................................................JA2216-JA2228

*Table of Contents(cont'd)*                                                          *Page(s)*

    Direct (by Ms. McGuinn)...........................................................JA2229-JA2314
    Cross (by Mr. Nieto) ...............................................................JA2315-JA2355
    Redirect (by Ms. McGuinn) ...................................................JA2356-JA2358

  *Angela Johnson*
    Direct (by Ms. Hagan)............................................................JA2359-JA2363
    Cross (by Mr. Proctor) ...........................................................JA2364-JA2369
    Redirect (by Ms. Hagan) ........................................................JA2370-JA2371

  *Henry Smith*
    Direct (by Ms. McGuinn)...........................................................JA2372-JA2384
    Cross (by Mr. Nieto) ...............................................................JA2385-JA2392
    Redirect (by Ms. McGuinn) ...................................................JA2393-JA2401

Transcript of Proceedings, held on August 24, 2024...........................JA2432-JA2585

Transcript of Proceedings, held on August 26, 2024...........................JA2586-JA2865

  *Stacey Halpert*
    Direct (by Ms. McGuinn)...........................................................JA2594-JA2604
    Cross (by Mr. Nieto) ...............................................................JA2605-JA2608

  *Christopher Feiss*
    Direct (by Ms. Hagan)............................................................JA2609-JA2615
    Cross (by Mr. Proctor) ...........................................................JA2616-JA2620

  *Jack Stuzin*
    Direct (by Ms. Hagan)............................................................JA2621-JA2629
    Cross (by Mr. Nieto) ...............................................................JA2630-JA2635
    Redirect (by Ms. Hagan) ........................................................JA2636-JA2637

  *Tyler Witherspoon*
    Direct (by Ms. Hagan)............................................................JA2638-JA2646
    Cross (by Mr. Proctor) ...........................................................JA2647-JA2651

*Table of Contents(cont'd)*                                                      *Page(s)*

Redirect (by Ms. Hagan) ...............................................................JA2652-JA2653

*DeAnna Komber-Hoyle*
Direct (by Ms. McGuinn)............................................................JA2654-JA2665
Cross (by Mr. Proctor) ................................................................JA2666-JA2668

*Shannon Markel*
Direct (by Ms. Hagan)..................................................................JA2669-JA2688
Cross (by Mr. Nieto) ...................................................................JA2689-JA2698

*Eric J. Oberly*
Direct (by Ms. McGuinn)............................................................JA2699-JA2759

*Agent Walker*
Direct (by Ms. McGuinn)............................................................JA2762-JA2818
Cross (by Mr. Nieto) ...................................................................JA2819-JA2832
Redirect (by Ms. McGuinn) .......................................................JA2833-JA2837

Transcript of Proceedings, held on August 27, 2024............................JA2866-JA3133

*Wallace Halpert*
Direct (by Ms. McGuinn)............................................................JA2871-JA2888
Cross (by Mr. Proctor) ................................................................JA2889-JA2894
Redirect (by Ms. McGuinn) .......................................................JA2895-JA2896

*William Godine*
Direct (by Ms. Hagan)..................................................................JA2897-JA2909
Cross (by Mr. Proctor) ...................................................................... JA2910
Redirect (by Ms. Hagan) ............................................................JA2911-JA2912

*James Schloeder*
Direct (by Ms. McGuinn)............................................................JA2913-JA2929
Cross (by Mr. Nieto) ...................................................................JA2930-JA2947
Redirect (by Ms. McGuinn) .......................................................JA2948-JA2952

vii

*Table of Contents(cont'd)*                                                    *Page(s)*

### Charlotte Hoffberger
Direct (by Ms. Hagan)................................................JA2953-JA2966
Cross (by Mr. Nieto) ...............................................JA2967-JA2968

### Riley Seelert
Direct (by Ms. McGuinn)............................................JA2969-JA2987
Cross (by Mr. Nieto) ...............................................JA2988-JA3003

### Agent Walker
Direct (by Ms. Hagan)................................................JA3004-JA3072
Cross (by Mr. Nieto) ...............................................JA3097-JA3098
Redirect (by Ms. Hagan) ...........................................JA3099-JA3101

Pretrial Conference, held on August 9, 2024 .......................JA3134-JA3224

Transcript of Proceedings, held on January 21, 2025 ...........JA3225-JA3295

Presentence Investigation Report....................................JA3296-JA3324

Motion to Strike Impermissible Victim Impact Statements,
dated January 8, 2025..............................................JA3325-JA3330

Statement of Reasons ..............................................JA3331-JA3334

**Query**   **Reports**   **Utilities**   **Help**   **Log Out**

APPEAL,CLOSED

# U.S. District Court
## District of Maryland (Baltimore)
### CRIMINAL DOCKET FOR CASE #: 1:23-cr-00278-JKB-1

Case title: USA v. Bendann

Date Filed: 08/16/2023

Date Terminated: 01/23/2025

---

Assigned to: Judge James K Bredar

Appeals court case number: 25-4033 USCA

### Defendant (1)

**Christopher Kenji Bendann**
*TERMINATED: 01/23/2025*

represented by **Allen Howard Orenberg**
The Orenberg Law Firm, LLC
200-A Monroe Street
Suite 233
Rockville, MD 20850
301-807-3847
Fax: 240-238-6701
Email: aorenberg@orenberglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Carlos Nieto**
Nieto Law Office
233 E Redwood St
Ste 1000c
21202-5977, Ste 1000c
Baltimore, MD 21202-5977
443-863-8189
Fax: 443-378-5723
Email: cnieto@nietolawoffice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Gary Edward Proctor**
Law Offices of Gary E. Proctor LLC
233 E. Redwood Street
Suite 1000c
Baltimore, MD 21202
410-444-1500
Email: garyeproctor@gmail.com
*ATTORNEY TO BE NOTICED*

**Kobie Flowers**

**JA1**

Flowers Keller LLP
1601 Connecticut Avenue Northwest
20009
Washington, DC 20009
202-521-8742
Email: kflowers@flowerskeller.com
*TERMINATED: 09/21/2023*
*Designation: Retained*

**Michael Abrams**
Brown Goldstein & Levy
120 E. Baltimore St.
Suite 2500
Baltimore, MD 21202
410-962-1030
Email: mabrams@browngold.com
*TERMINATED: 09/21/2023*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:2251(a) SEXUAL EXPLOITATION OF A CHILD (1-5) | |
| 18:2251(a) SEXUAL EXPLOITATION OF A CHILD (1s-5s) | 30 years as to Count ls; 30 years as to Count 2s to be served concurrently with the sentence imposed as to Count ls; 30 years as to Count 3s to be served concurrently with the sentences imposed as to Counts ls and 2s; 30 years as to Count 4s to be served concurrently with the sentences imposed as to Counts ls, 2s, and 3s; 30 years as to Count 5s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, and 4s; 10 years as to Count 6s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, 4s, and 5s; 10 years as to Count 7s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, 4s, 5s, and 6s; 10 years as to Count 8s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, 4s, 5s, 6s, and 7s; and 5 years as to Count 9s to be served consecutively to the sentences imposed as to Counts ls, 2s, 3s, 4s, 5s, 6s, 7s, and 8s for a total term of 35 years; SUPERVISED RELEASE for ife as to Counts ls, 2s, 3s, 4s, and 5s and 3 years as to Counts 6s, 7s, 8s, and 9s, all running concurrently, for a total term of life; ASSESSMENT $900.00 |
| 18:2252A(a)(5)(B) & 2256 POSSESSION OF CHILD PORNOGRAPHY | |

(6)

30 years as to Count ls; 30 years as to Count 2s to be served concurrently with the sentence imposed as to Count ls; 30 years as to Count 3s to be served concurrently with the sentences imposed as to Counts ls and 2s; 30 years as to Count 4s to be served concurrently with the sentences imposed as to Counts ls, 2s, and 3s; 30 years as to Count 5s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, and 4s; 10 years as to Count 6s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, 4s, and 5s; 10 years as to Count 7s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, 4s, 5s, and 6s; 10 years as to Count 8s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, 4s, 5s, 6s, and 7s; and 5 years as to Count 9s to be served consecutively to the sentences imposed as to Counts ls, 2s, 3s, 4s, 5s, 6s, 7s, and 8s for a total term of 35 years; SUPERVISED RELEASE for ife as to Counts ls, 2s, 3s, 4s, and 5s and 3 years as to Counts 6s, 7s, 8s, and 9s, all running concurrently, for a total term of life; ASSESSMENT $900.00

18:2252A(a)(5)(B) & 2256 POSSESSION OF CHILD PORNOGRAPHY
(6s-8s)

18:2261A(2) & 2261(b)(5) CYBERSTALKING
(9s)

30 years as to Count ls; 30 years as to Count 2s to be served concurrently with the sentence imposed as to Count ls; 30 years as to Count 3s to be served concurrently with the sentences imposed as to Counts ls and 2s; 30 years as to Count 4s to be served concurrently with the sentences imposed as to Counts ls, 2s, and 3s; 30 years as to Count 5s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, and 4s; 10 years as to Count 6s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, 4s, and 5s; 10 years as to Count 7s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, 4s, 5s, and 6s; 10 years as to Count 8s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, 4s, 5s, 6s, and 7s; and 5 years as to Count 9s to be served consecutively to the sentences imposed as to Counts ls, 2s, 3s, 4s, 5s, 6s, 7s, and 8s for a total term of 35 years; SUPERVISED RELEASE for ife as to Counts ls, 2s, 3s, 4s, and 5s and 3 years as to Counts 6s, 7s, 8s, and 9s, all running

**JA3**

concurrently, for a total term of life; ASSESSMENT $900.00

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

---

**Plaintiff**

| **USA** | represented by | **Colleen Elizabeth McGuinn** |
| --- | --- | --- |

represented by **Colleen Elizabeth McGuinn**
U.S. Attorney s Office - District of MD (USA/FPD)
36 S. Charles Street
Baltimore, MD 21201
4102094823
Email: Colleen.McGuinn@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Anatoly Smolkin**
United States Attorney's Office
District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
410-209-4800
Fax: 410-962-3124
Email: asmolkin@gejlaw.com
*TERMINATED: 08/16/2024*
*Designation: Assistant US Attorney*

**Kim Y. Hagan**
U.S. Attorney s Office (USA/FPD)
36 S. Charles Street
4th Floor
Baltimore, MD 21201
410-209-4800
Email: kim.hagan@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**JA4**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/16/2023 | 1 | SEALED INDICTMENT as to Christopher Kenji Bendann (1) count(s) 1-5, 6. (hmls, Deputy Clerk) (Entered: 08/16/2023) |
| 08/16/2023 | 3 | Motion & Order to Seal as to Christopher Kenji Bendann. Signed by Magistrate Judge Brendan Abell Hurson on 8/16/2023. (hmls, Deputy Clerk) (Entered: 08/16/2023) |
| 08/18/2023 | 5 | Order to Unseal Criminal Case Indictment and Arrest Warrant as to Christopher Kenji Bendann. Signed by Magistrate Judge Brendan Abell Hurson on 8/18/2023. (dass, Deputy Clerk) (Entered: 08/18/2023) |
| 08/18/2023 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Christopher Kenji Bendann. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 8/18/2023. An interpreter will not be needed. Detention Hearing set for 8/21/2023 10:00 AM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge J. Mark Coulson.(McGuinn, Colleen) (Entered: 08/18/2023) |
| 08/18/2023 | 6 | Initial Appearance as to Christopher Kenji Bendann (Defendant informed of Rights.) held on 8/18/2023 before Magistrate Judge Brendan Abell Hurson.(FTR Gold: C. Barnickel-Courtroom 7B.) (cb5s, Deputy Clerk) (Entered: 08/18/2023) |
| 08/18/2023 | 7 | EXHIBIT LIST by Christopher Kenji Bendann (cb5s, Deputy Clerk) (Entered: 08/18/2023) |
| 08/18/2023 | 8 | Stipulation re: Return of Exhibits to Counsel (cb5s, Deputy Clerk) (Entered: 08/18/2023) |
| 08/18/2023 | 9 | ORDER OF TEMPORARY DETENTION as to Christopher Kenji Bendann.. Signed by Magistrate Judge Brendan Abell Hurson on 8/18/2023. (cb5s, Deputy Clerk) (Entered: 08/18/2023) |
| 08/18/2023 | 11 | ORDER pursuant to Fed R Crim P 5(f) and the Due Process Protections Act as to Christopher Kenji Bendann. Signed by Magistrate Judge Brendan Abell Hurson on 8/18/2023. (cb5s, Deputy Clerk) (Entered: 08/18/2023) |
| 08/18/2023 | 12 | NOTICE OF ATTORNEY APPEARANCE: Kobie Flowers as Retained Counsel appearing for Christopher Kenji Bendann(Flowers, Kobie) (Entered: 08/18/2023) |
| 08/18/2023 | 13 | NOTICE OF ATTORNEY APPEARANCE: Michael Ross Abrams, I as Retained Counsel appearing for Christopher Kenji Bendann(Abrams, Michael) (Entered: 08/18/2023) |
| 08/18/2023 | 21 | Arrest Warrant Returned Executed on 08/18/2023 in case as to Christopher Kenji Bendann(kb3s, Deputy Clerk) (Entered: 08/23/2023) |
| 08/20/2023 | 14 | PRETRIAL MEMORANDUM *in Support of Pretrial Detention* by Christopher Kenji Bendann (Attachments: # 1 Exhibit)(McGuinn, Colleen) (Entered: 08/20/2023) |
| 08/20/2023 | 15 | MOTION to Seal by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(McGuinn, Colleen) (Entered: 08/20/2023) |
| 08/20/2023 | 16 | **SEALED DOCUMENT** (McGuinn, Colleen) Modified on 8/9/2024 (kb3s, Deputy Clerk). (Entered: 08/20/2023) |
| 08/21/2023 | 17 | MOTION Opposition to Government's Request for Pretrial Detention by Christopher Kenji Bendann. (Attachments: # 1 Christopher Bendann's Defense Exhibit List, # 2 [PROPOSED] Order re Pretrial Detention)(Flowers, Kobie) Modified on 8/9/2024 (kb3s, Deputy Clerk). (Entered: 08/21/2023) |

**JA5**

| | | |
|---|---|---|
| 08/21/2023 | 18 | Detention Hearing as to Christopher Kenji Bendann held on 8/21/2023 before Magistrate Judge J. Mark Coulson.(FTR Gold, CRD: Caitlyn Wilson, CTRM: 7B) (cw6s, Deputy Clerk) (Entered: 08/21/2023) |
| 08/21/2023 | 19 | Arraignment as to Christopher Kenji Bendann (1) Count 1-5,6 held on 8/21/2023. Plea entered by Christopher Kenji Bendann Not Guilty on counts 1, 2, 3, 4, 5, and 6, before Magistrate Judge J. Mark Coulson.(FTR Gold, CRD: Caitlyn Wilson, CTRM: 7B) (cw6s, Deputy Clerk) (Entered: 08/21/2023) |
| 08/21/2023 | 20 | ORDER OF DETENTION as to Christopher Kenji Bendann.. Signed by Magistrate Judge J. Mark Coulson on 8/21/2023. (cw6s, Deputy Clerk) (Entered: 08/21/2023) |
| 09/01/2023 | 22 | MOTION for Review of Order re 20 Order of Detention / Temporary Detention by Christopher Kenji Bendann. (Attachments: # 1 Exhibit Detention Order, # 2 Exhibit Home Detention Order, # 3 Exhibit State Pretrial Memo re Compliance, # 4 Exhibit SWAT Raid Photos, # 5 Exhibit Character Letters, # 6 Text of Proposed Order)(Flowers, Kobie) (Entered: 09/01/2023) |
| 09/05/2023 | 23 | PAPERLESS ORDER as to Christopher Kenji Bendann re 22 MOTION for Review of Order re 20 Order of Detention / Temporary Detention filed by Christopher Kenji Bendann. The Government shall file their brief in response to the Defendant's Motion (ECF No. 22) on or before Wednesday, September 6, 2023, at 5:00 PM. This matter is set in for a hearing pursuant to 18 USC Section 3145(b) on Thursday, September 7, 2023, at 9:30 AM. The Defendant is required to be present. The Government shall prepare the appropriate notices and come up. Signed by Chief Judge James K. Bredar on 9/5/2023. (vdcs, Chambers) (Entered: 09/05/2023) |
| 09/06/2023 | 24 | PAPERLESS ORDER as to Christopher Kenji Bendann. The REVIEW OF DETENTION HEARING that was previously set in for 9/7/23 at 9:30 a.m. is RESCHEDULED to 11:00 a.m. on the same date in Courtroom 5A. Counsel for the government is directed to prepare the appropriate notices. Signed by Chief Judge James K. Bredar on 9/6/2023. (vdcs, Chambers) (Entered: 09/06/2023) |
| 09/06/2023 | 25 | NOTICE OF ATTORNEY APPEARANCE Kim Y. Hagan appearing for USA.(Hagan, Kim) (Entered: 09/06/2023) |
| 09/06/2023 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Christopher Kenji Bendann. *Review of Detention Hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 9/6/2023. An interpreter will not be needed. Hearing set for 9/7/2023 11:00 AM in Courtroom 5A, 101 West Lombard Street, Baltimore, Maryland 21201, before Chief Judge James K. Bredar.(Hagan, Kim) (Entered: 09/06/2023) |
| 09/06/2023 | 26 | RESPONSE in Opposition by USA as to Christopher Kenji Bendann re 22 MOTION for Review of Order re 20 Order of Detention / Temporary Detention (McGuinn, Colleen) (Entered: 09/06/2023) |
| 09/06/2023 | 27 | REPLY TO RESPONSE to Motion by Christopher Kenji Bendann re 22 MOTION for Review of Order re 20 Order of Detention / Temporary Detention (Attachments: # 1 Exhibit June 2023 Social Media Post)(Flowers, Kobie) (Entered: 09/06/2023) |
| 09/07/2023 | 28 | Detention Hearing as to Christopher Kenji Bendann held on 9/7/2023 before Chief Judge James K. Bredar.(Court Reporter: Kassandra McPherson) (jh2s, Deputy Clerk) (Entered: 09/07/2023) |
| 09/07/2023 | 29 | MOTION for Protective Order *Governing Disclosure of Information* by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(McGuinn, Colleen) (Entered: 09/07/2023) |

| 09/07/2023 | 30 | MEMORANDUM AND ORDER granting 22 Motion for Review of Order re 22 MOTION for Review of Order re 20 Order of Detention / Temporary Detention filed by Christopher Kenji Bendann as to Christopher Kenji Bendann (1). Signed by Chief Judge James K. Bredar on 9/7/2023. (Attachments: # 1 Attachment Draft Release Order) (vdcs, Chambers) (Entered: 09/07/2023) |
|---|---|---|
| 09/08/2023 | 31 | MOTION to Continue *Release Conditions Hearing* by Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(Flowers, Kobie) (Entered: 09/08/2023) |
| 09/08/2023 | 32 | ORDER granting 29 MOTION for Protective Order Governing Disclosure of Information as to Christopher Kenji Bendann (1). Signed by Chief Judge James K. Bredar on 9/7/2023. (kb3s, Deputy Clerk) (Entered: 09/08/2023) |
| 09/08/2023 | 33 | ORDER granting 31 MOTION to Continue Release Conditions Hearing as to Christopher Kenji Bendann (1). Signed by Chief Judge James K. Bredar on 9/8/2023. (kb3s, Deputy Clerk) (Entered: 09/08/2023) |
| 09/08/2023 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Christopher Kenji Bendann. *Release Conditions Hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 9/8/2023. An interpreter will not be needed. Hearing set for 9/14/2023 02:15 PM in Courtroom 5A, 101 West Lombard Street, Baltimore, Maryland 21201, before Chief Judge James K. Bredar.(McGuinn, Colleen) (Entered: 09/08/2023) |
| 09/14/2023 | 34 | Review of Detention Hearing as to Christopher Kenji Bendann held on 9/14/2023 before Chief Judge James K. Bredar. (Court Reporter: Kassandra McPherson) (rm2s, Deputy Clerk) (Entered: 09/14/2023) |
| 09/15/2023 | 35 | NOTICE OF ATTORNEY APPEARANCE Anatoly Smolkin appearing for USA. (Smolkin, Anatoly) (Entered: 09/15/2023) |
| 09/15/2023 | 37 | (FILED IN ERROR-WRONG CASE)SCHEDULING ORDER as to Christopher Kenji Bendann. Signed by Chief Judge James K. Bredar on 9/14/2023. (kb3s, Deputy Clerk) Modified on 9/18/2023 (kb3s, Deputy Clerk). (Entered: 09/18/2023) |
| 09/15/2023 | 38 | SCHEDULING ORDER as to Christopher Kenji Bendann. Signed by Chief Judge James K. Bredar on 9/14/2023. (kb3s, Deputy Clerk) (Entered: 09/18/2023) |
| 09/18/2023 | 36 | MOTION in Limine *to admit evidence pursuant to FRE 414 and 404(b)* by USA as to Christopher Kenji Bendann. (McGuinn, Colleen) (Entered: 09/18/2023) |
| 09/19/2023 | 39 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Christopher Kenji Bendann held on 8/18/2023, before Judge Bredan A. Hurson. Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Total number of pages filed: 36. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 10/10/2023. Redacted Transcript Deadline set for 10/20/2023. Release of Transcript Restriction set for 12/18/2023. Redaction Request due 10/10/2023. Redacted Transcript Deadline set for 10/20/2023. Release of Transcript Restriction set for 12/18/2023. (rt, Court Reporter) (Entered: 09/19/2023) |
| 09/19/2023 | 40 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Christopher Kenji Bendann held on 8/21/2023, before Judge J. Mark Coulson. Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Total number of pages filed: 69. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through |

**JA7**

| | | |
|---|---|---|
| | | PACER. Redaction Request due 10/10/2023. Redacted Transcript Deadline set for 10/20/2023. Release of Transcript Restriction set for 12/18/2023. Redaction Request due 10/10/2023. Redacted Transcript Deadline set for 10/20/2023. Release of Transcript Restriction set for 12/18/2023. (rt, Court Reporter) (Entered: 09/19/2023) |
| 09/19/2023 | 41 | MOTION to Withdraw as Attorney by Kobie Flowers and Michael Abrams by Christopher Kenji Bendann. (Attachments: # 1 [PROPOSED] Order - Motion to Withdraw as Counsel)(Flowers, Kobie) (Entered: 09/19/2023) |
| 09/19/2023 | 42 | PAPERLESS ORDER as to Christopher Kenji Bendann re 41 MOTION to Withdraw as Attorney by Kobie Flowers and Michael Abrams filed by Christopher Kenji Bendann. The Government is directed to respond to Defendant's motion by 4:00 PM today, September 19, 2023. Signed by Chief Judge James K. Bredar on 9/19/2023. (vdcs, Chambers) (Entered: 09/19/2023) |
| 09/19/2023 | 43 | RESPONSE to Motion by USA as to Christopher Kenji Bendann re 41 MOTION to Withdraw as Attorney by Kobie Flowers and Michael Abrams (McGuinn, Colleen) (Entered: 09/19/2023) |
| 09/19/2023 | 44 | REPLY TO RESPONSE to Motion by Christopher Kenji Bendann re 41 MOTION to Withdraw as Attorney by Kobie Flowers and Michael Abrams (Flowers, Kobie) (Entered: 09/19/2023) |
| 09/19/2023 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Christopher Kenji Bendann. *Attorney Inquiry Hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 9/19/2023. An interpreter will not be needed. Hearing set for 9/20/2023 01:30 PM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge Brendan Abell Hurson.(McGuinn, Colleen) (Entered: 09/19/2023) |
| 09/19/2023 | 45 | MARGINAL ORDER Regarding 43 Response to Motion filed by USA. Signed by Chief Judge James K. Bredar on 9/19/2023. (kb3s, Deputy Clerk) (Entered: 09/19/2023) |
| 09/19/2023 | 46 | ORDER re: Attorney Inquiry Hearing as to Christopher Kenji Bendann. Signed by Magistrate Judge Brendan Abell Hurson on 9/19/2023. (kb3s, Deputy Clerk) (Entered: 09/19/2023) |
| 09/20/2023 | 47 | Attorney Inquiry Hearing as to Christopher Kenji Bendann held on 9/20/2023 before Magistrate Judge Brendan Abell Hurson.(FTR Gold: C. Barnickel-Courtroom 7B.) (cb5s, Deputy Clerk) (Entered: 09/20/2023) |
| 09/20/2023 | 48 | CJA 23 Financial Affidavit by Christopher Kenji Bendann (cb5s, Deputy Clerk) (Entered: 09/20/2023) |
| 09/20/2023 | 49 | NOTICE OF ATTORNEY APPEARANCE: Christopher Carlos Nieto as CJA Appointment appearing for Christopher Kenji Bendann(Nieto, Christopher) (Entered: 09/20/2023) |
| 09/21/2023 | 50 | PAPERLESS ORDER as to Christopher Kenji Bendann. A STATUS TELEPHONE CONFERENCE is set in for 9/22/23 at 10:00 AM. Counsel for the Government is directed to arrange for and distribute conference call information to counsel and Judge Bredar's chambers. Signed by Chief Judge James K. Bredar on 9/21/2023. (vdcs, Chambers) (Entered: 09/21/2023) |
| 09/21/2023 | 51 | ORDER granting 41 Motion to Withdraw as Attorney. Michael Abrams and Kobie Flowers withdrawn from case. as to Christopher Kenji Bendann (1). Signed by Magistrate Judge Brendan Abell Hurson on 9/21/2023. (kb3s, Deputy Clerk) (Entered: 09/21/2023) |

**JA8**

| 09/22/2023 | | Telephone Status Conference as to Christopher Kenji Bendann held on 9/22/2023 before Chief Judge James K. Bredar. (jks, Deputy Clerk) (Entered: 09/22/2023) |
|---|---|---|
| 09/22/2023 | 52 | SUPPLEMENTAL SCHEDULING ORDER as to Christopher Kenji Bendann. Signed by Chief Judge James K. Bredar on 9/22/2023. (kb3s, Deputy Clerk) (Entered: 09/22/2023) |
| 09/22/2023 | 53 | MOTION to Vacate *the Current Scheduling Order* by Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(Nieto, Christopher) (Entered: 09/22/2023) |
| 09/22/2023 | 54 | Consent MOTION to Exclude *Time* by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(McGuinn, Colleen) (Entered: 09/22/2023) |
| 09/22/2023 | 55 | MARGINAL ORDER Granting 53 Motion to Vacate as to Christopher Kenji Bendann (1). Signed by Chief Judge James K. Bredar on 9/22/2023. (kb3s, Deputy Clerk) (Entered: 09/22/2023) |
| 09/22/2023 | 56 | ORDER granting 54 Consent MOTION to Exclude Time as to Christopher Kenji Bendann (1). Signed by Chief Judge James K. Bredar on 9/22/2023. (kb3s, Deputy Clerk) (Entered: 09/22/2023) |
| 11/15/2023 | 57 | MOTION for Leave to File *Additional Motions* by Christopher Kenji Bendann. (Nieto, Christopher) (Entered: 11/15/2023) |
| 11/15/2023 | 58 | MARGINAL ORDER Denying as moot 57 MOTION for Leave to File Additional Motions as to Christopher Kenji Bendann (1). Signed by Chief Judge James K. Bredar on 11/15/2023. (kb3s, Deputy Clerk) (Entered: 11/16/2023) |
| 11/20/2023 | 59 | ORDER Directing the Government to file a report with the court, wherein it shall STATE with clarity whether its representatives, officers, and/or agents shared sealed information in any manner consistent with the description in Mr. Flowers's letter. as to Christopher Kenji Bendann. Signed by Chief Judge James K. Bredar on 11/20/2023. (kb3s, Deputy Clerk) (Entered: 11/20/2023) |
| 11/22/2023 | 60 | MOTION for Leave to File *Additional Motions* by Christopher Kenji Bendann. (Nieto, Christopher) Modified on 11/30/2023 (kb3s, Deputy Clerk). (Entered: 11/22/2023) |
| 11/29/2023 | | Telephone Conference re: Scheduling as to Christopher Kenji Bendann held on 11/29/2023 before Chief Judge James K. Bredar. (jks, Deputy Clerk) (Entered: 11/30/2023) |
| 11/30/2023 | 61 | SECOND SUPPLEMENTAL SCHEDULING ORDER as to Christopher Kenji Bendann, ORDER Denying as Moot 60 MOTION for Leave to File *Additional Motions* filed by Christopher Kenji Bendann. Signed by Chief Judge James K. Bredar on 11/29/2023. (kb3s, Deputy Clerk) (Entered: 11/30/2023) |
| 11/30/2023 | 62 | Consent MOTION to Exclude *Time* by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(McGuinn, Colleen) (Entered: 11/30/2023) |
| 11/30/2023 | 63 | ORDER granting 62 Consent MOTION to Exclude Timeas to Christopher Kenji Bendann (1). Signed by Chief Judge James K. Bredar on 11/30/2023. (kb3s, Deputy Clerk) (Entered: 11/30/2023) |
| 12/01/2023 | 64 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Christopher Kenji Bendann held on 09/07/2023, before Judge James K. Bredar. Court Reporter Kassandra L. McPherson, Telephone number (410) 962-4544 Kassandra_McPherson@mdd.uscourts.gov. Total number of pages filed: 61. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 12/22/2023. |

**JA9**

| | | Redacted Transcript Deadline set for 1/2/2024. Release of Transcript Restriction set for 2/29/2024. Redaction Request due 12/22/2023. Redacted Transcript Deadline set for 1/2/2024. Release of Transcript Restriction set for 2/29/2024. (km10, Court Reporter) (Entered: 12/01/2023) |
|---|---|---|
| 12/06/2023 | 65 | -SEALED- MOTION to Seal by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(McGuinn, Colleen) (Entered: 12/06/2023) |
| 12/06/2023 | 66 | **SEALED DOCUMENT** (McGuinn, Colleen) Modified on 12/8/2023 (kb3s, Deputy Clerk). (Entered: 12/06/2023) |
| 12/06/2023 | 67 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Attachment)(McGuinn, Colleen) (Entered: 12/06/2023) |
| 12/07/2023 | 68 | CJA 20 as to Christopher Kenji Bendann: Appointment of Attorney Christopher Carlos Nieto for Christopher Kenji Bendann. Signed by Chief Judge James K. Bredar on 9/20/2023. (kb3s, Deputy Clerk) (Entered: 12/07/2023) |
| 12/08/2023 | 69 | -SEALED-ORDER granting 65 Motion to Seal as to Christopher Kenji Bendann (1). Signed by Chief Judge James K. Bredar on 12/8/2023. (kb3s, Deputy Clerk)(c/e Colleen Elizabeth McGuinn 12.8.23) (Entered: 12/08/2023) |
| 12/15/2023 | 70 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Christopher Kenji Bendann held on 09/14/2023, before Judge James K. Bredar. Court Reporter Kassandra L. McPherson, Telephone number (410) 962-4544 Kassandra_McPherson@mdd.uscourts.gov. Total number of pages filed: 26. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 1/5/2024. Redacted Transcript Deadline set for 1/16/2024. Release of Transcript Restriction set for 3/14/2024. Redaction Request due 1/5/2024. Redacted Transcript Deadline set for 1/16/2024. Release of Transcript Restriction set for 3/14/2024. (km10, Court Reporter) (Entered: 12/15/2023) |
| 01/09/2024 | 71 | NOTICE OF ATTORNEY APPEARANCE: Gary Edward Proctor as CJA Appointment appearing for Christopher Kenji Bendann(Proctor, Gary) (Entered: 01/09/2024) |
| 01/09/2024 | 72 | CJA 20 as to Christopher Kenji Bendann: Appointment of Attorney Gary Edward Proctor for Christopher Kenji Bendann.. Signed by Chief Judge James K. Bredar on 1/8/2024. (kk5s, Deputy Clerk) (Entered: 01/09/2024) |
| 02/08/2024 | 73 | -SEALED- MOTION to Seal by Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(Nieto, Christopher) (Entered: 02/08/2024) |
| 02/08/2024 | 74 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Nieto, Christopher) (Entered: 02/08/2024) |
| 02/08/2024 | 75 | **PROPOSED SEALED DOCUMENT** (Nieto, Christopher) (Entered: 02/08/2024) |
| 02/08/2024 | 76 | MOTION for Leave to File *Additional Motions* by Christopher Kenji Bendann. (Nieto, Christopher) (Entered: 02/08/2024) |
| 02/09/2024 | 77 | ORDER denying 73 Motion to Seal as to Christopher Kenji Bendann (1). Signed by Chief Judge James K. Bredar on 2/8/2024. (kb3s, Deputy Clerk)(c/e C. Nieto 2.9.24) Modified on 2/13/2024 (kb3s, Deputy Clerk). (Entered: 02/09/2024) |
| 02/12/2024 | 78 | MOTION to Suppress *Evidence Obtained from Search Warrants* by Christopher Kenji Bendann. (Nieto, Christopher) (Entered: 02/12/2024) |

**JA10**

| 02/12/2024 | 79 | MOTION to Suppress *Evidence Obtained from Cellphone* by Christopher Kenji Bendann. (Nieto, Christopher) (Entered: 02/12/2024) |
| 02/12/2024 | 80 | -SEALED- MOTION to Seal by Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(Nieto, Christopher) (Entered: 02/12/2024) |
| 02/12/2024 | 81 | **SEALED DOCUMENT** (Attachments: # 1 Exhibit 2)(Nieto, Christopher) Modified on 2/13/2024 (kb3s, Deputy Clerk). (Entered: 02/12/2024) |
| 02/13/2024 | 82 | -SEALED-ORDER granting 80 Motion to Seal as to Christopher Kenji Bendann (1). Signed by Chief Judge James K. Bredar on 2/12/2024. (kb3s, Deputy Clerk)(c/e to Christopher Carlos Nieto 2.13.24) (Entered: 02/13/2024) |
| 02/13/2024 | 83 | Consent MOTION to Exclude *Time* by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(McGuinn, Colleen) (Entered: 02/13/2024) |
| 02/14/2024 | 84 | ORDER granting 83 Consent MOTION to Exclude Time as to Christopher Kenji Bendann (1). Signed by Chief Judge James K. Bredar on 2/14/2024. (kb3s, Deputy Clerk) (Entered: 02/15/2024) |
| 02/14/2024 | 85 | THIRD SUPPLEMENTAL SCHEDULING ORDER as to Christopher Kenji Bendann. Signed by Chief Judge James K. Bredar on 2/14/2024. (kb3s, Deputy Clerk) (Entered: 02/15/2024) |
| 02/15/2024 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Christopher Kenji Bendann. *Motions Hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 2/15/2024. An interpreter will not be needed. Hearing set for 4/23/2024 10:00 AM in Courtroom 5A, 101 West Lombard Street, Baltimore, Maryland 21201, before Chief Judge James K. Bredar.(McGuinn, Colleen) (Entered: 02/15/2024) |
| 02/15/2024 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Christopher Kenji Bendann. *Pretrial Conference* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 2/15/2024. An interpreter will not be needed. Hearing set for 8/9/2024 10:00 AM in Courtroom 5A, 101 West Lombard Street, Baltimore, Maryland 21201, before Chief Judge James K. Bredar.(McGuinn, Colleen) (Entered: 02/15/2024) |
| 02/15/2024 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Christopher Kenji Bendann. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 2/15/2024. An interpreter will not be needed. Jury Trial set for 8/21/2024 09:30 AM in Courtroom 5A, 101 West Lombard Street, Baltimore, Maryland 21201, before Chief Judge James K. Bredar.(McGuinn, Colleen) (Entered: 02/15/2024) |
| 03/07/2024 | 86 | RESPONSE to Motion by USA as to Christopher Kenji Bendann re 78 MOTION to Suppress *Evidence Obtained from Search Warrants*, 79 MOTION to Suppress *Evidence Obtained from Cellphone* (McGuinn, Colleen) (Entered: 03/07/2024) |
| 03/07/2024 | 87 | -SEALED- MOTION to Seal by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(McGuinn, Colleen) (Entered: 03/07/2024) |
| 03/07/2024 | 88 | **SEALED DOCUMENT** (McGuinn, Colleen) Modified on 3/7/2024 (kb3s, Deputy Clerk). (Entered: 03/07/2024) |
| 03/07/2024 | 89 | -SEALED-ORDER granting 87 Motion to Seal as to Christopher Kenji Bendann (1). Signed by Chief Judge James K. Bredar on 3/7/2024. (kb3s, Deputy Clerk)(c/e Colleen Elizabeth McGuinn 3/7/24) (Entered: 03/07/2024) |

**JA11**

| | | |
|---|---|---|
| 03/08/2024 | 90 | PAPERLESS ORDER modifying ECF No. 85 THIRD SUPPLEMENTAL SCHEDULING ORDER. The Motions Hearing currently set in for April 23, 2024 at 10:00 a.m. conflicts with a religious holiday. Accordingly, the Motions Hearing will be CONTINUED to 11:00 a.m. on April 26, 2024. Signed by Chief Judge James K. Bredar on 3/8/2024. (lags, Chambers) (Entered: 03/08/2024) |
| 04/01/2024 | | Amended PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Christopher Kenji Bendann. *Amended to Reflect New Date and Time- Motions Hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 4/1/2024. An interpreter will not be needed. Hearing set for 4/26/2024 11:00 AM in Courtroom 5A, 101 West Lombard Street, Baltimore, Maryland 21201, before Chief Judge James K. Bredar.(McGuinn, Colleen) (Entered: 04/01/2024) |
| 04/15/2024 | 91 | PAPERLESS ORDER as to Christopher Kenji Bendann modifying ECF No. 85 THIRD SUPPLEMENTAL SCHEDULING ORDER. MOTIONS HEARING currently set in for 4/26/24 at 11:00 a.m. is CONTINUED to 5/9/24 at 10:00 a.m.. Signed by Chief Judge James K. Bredar on 4/15/2024. (vdcs, Chambers) (Entered: 04/15/2024) |
| 04/15/2024 | | Amended PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Christopher Kenji Bendann. *Amended to Reflect New Date and Time- Motions Hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 4/15/2024. An interpreter will not be needed. Hearing set for 5/9/2024 10:00 AM in Courtroom 5A, 101 West Lombard Street, Baltimore, Maryland 21201, before Chief Judge James K. Bredar.(McGuinn, Colleen) (Entered: 04/15/2024) |
| 05/09/2024 | 92 | Motion Hearing as to Christopher Kenji Bendann held on 5/9/2024 re 78 MOTION to Suppress *Evidence Obtained from Search Warrants* filed by Christopher Kenji Bendann, 79 MOTION to Suppress *Evidence Obtained from Cellphone* filed by Christopher Kenji Bendann before Judge James K. Bredar. (Court Reporter: Amanda Longmore) (jh2s, Deputy Clerk) Modified on 2/3/2025 (km10). (Entered: 05/09/2024) |
| 05/09/2024 | 93 | GOVERNMENT'S EXHIBIT LIST by USA as to Christopher Kenji Bendann (jh2s, Deputy Clerk) (Entered: 05/09/2024) |
| 05/09/2024 | 94 | GOVERNMENT'S WITNESS LIST by USA as to Christopher Kenji Bendann (jh2s, Deputy Clerk) (Entered: 05/09/2024) |
| 05/13/2024 | 95 | MEMORANDUM AND ORDER denying 78 MOTION to Suppress Evidence Obtained from Search Warrants as to Christopher Kenji Bendann (1); denying 79 MOTION to Suppress Evidence Obtained from Cellphone as to Christopher Kenji Bendann (1). Signed by Judge James K. Bredar on 5/10/2024. (kb3s, Deputy Clerk) (Entered: 05/13/2024) |
| 05/29/2024 | 96 | SUPERSEDING INDICTMENT as to Christopher Kenji Bendann (1) count(s) 1s-5s, 6s-8s, 9s. (mg3s, Deputy Clerk) (Entered: 05/30/2024) |
| 05/29/2024 | 98 | Redlined Superseding Indictment filed by USA on 5/29/2024as to Christopher Kenji Bendann. (mg3s, Deputy Clerk) (Entered: 05/30/2024) |
| 06/06/2024 | 99 | PAPERLESS ORDER as to Christopher Kenji Bendann. A STATUS TELEPHONE CONFERENCE is set in for 6/11/24 at 10:30 a.m. Counsel for the Government is directed to arrange for and distribute conference call information to counsel and Judge Bredar's chambers. Court anticipates discussing (1) the need for an arraignment on newly filed charges, (2) the trial length, and (3) the Government's scheduling request received in chambers via email on 6/4/24. Signed by Judge James K. Bredar on 6/6/2024. (vdcs, Chambers) (Entered: 06/06/2024) |

| 06/07/2024 | 100 | PAPERLESS ORDER as to Christopher Kenji Bendann. The STATUS TELEPHONE CONFERENCE that was previously set in for 6/11/24 at 10:30 a.m. is RESCHEDULED to 5:00 p.m. on the same date. Counsel for the Government is directed to arrange for and distribute conference call information to counsel and Judge Bredar's chambers. Signed by Judge James K. Bredar on 6/7/2024. (vdcs, Chambers) (Entered: 06/07/2024) |
|---|---|---|
| 06/11/2024 | | Telephone Status Conference as to Christopher Kenji Bendann held on 6/11/2024 before Judge James K. Bredar. (jks, Deputy Clerk) (Entered: 06/11/2024) |
| 07/02/2024 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Christopher Kenji Bendann. *Initial Appearance and Arraignment* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 7/2/2024. An interpreter will not be needed. Initial Appearance set for 8/9/2024 09:00 AM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge Charles D. Austin. (McGuinn, Colleen) (Entered: 07/02/2024) |
| 07/23/2024 | 101 | MOTION in Limine *to Admit Evidence Under Rule 414, 413, 404 and 401* by USA as to Christopher Kenji Bendann. (Attachments: # 1 SEALED Exhibit)(McGuinn, Colleen) Modified on 8/8/2024 (heps, Deputy Clerk). (Additional attachment(s) added on 8/8/2024: # 2 Redacted Exhibit A) (heps, Deputy Clerk). (Entered: 07/23/2024) |
| 07/23/2024 | 102 | -SEALED- MOTION to Seal by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(McGuinn, Colleen) (Entered: 07/23/2024) |
| 07/23/2024 | 103 | **SEALED DOCUMENT** (McGuinn, Colleen) Modified on 7/24/2024 (kb3s, Deputy Clerk). (Entered: 07/23/2024) |
| 07/24/2024 | 104 | -SEALED-ORDER granting 102 Motion to Seal as to Christopher Kenji Bendann (1). Signed by Judge James K. Bredar on 7/23/2024. (kb3s, Deputy Clerk)(c/e Colleen Elizabeth McGuinn 7.24.24) (Entered: 07/24/2024) |
| 07/24/2024 | 105 | MOTION in Limine *to Preclude Certain Evidence* by USA as to Christopher Kenji Bendann. (Hagan, Kim) (Entered: 07/24/2024) |
| 07/24/2024 | 106 | QC NOTICE: 101 Motion in Limine filed by USA, 105 Motion in Limine filed by USA was filed incorrectly. *****Please file a proposed order for both motions. Use the event > Other Filings> Notices> Notice(Other) and link to the motion. Please file two separate entries. (kb3s, Deputy Clerk) (Entered: 07/24/2024) |
| 07/24/2024 | 107 | NOTICE by USA re 101 MOTION in Limine *to Admit Evidence Under Rule 414, 413, 404 and 401* (McGuinn, Colleen) (Entered: 07/24/2024) |
| 07/24/2024 | 108 | NOTICE by USA re 105 MOTION in Limine *to Preclude Certain Evidence* (Hagan, Kim) (Entered: 07/24/2024) |
| 08/01/2024 | 109 | MOTION in Limine *Objecting to Inadmissible Photographs* by Christopher Kenji Bendann. (Attachments: # 1 Exhibit)(Proctor, Gary) (Entered: 08/01/2024) |
| 08/02/2024 | 110 | Proposed Voir Dire by Christopher Kenji Bendann (Proctor, Gary) (Entered: 08/02/2024) |
| 08/02/2024 | 111 | Proposed Jury Instructions by Christopher Kenji Bendann (Attachments: # 1 Attachment Proposed Final Jury Instructions)(Proctor, Gary) (Entered: 08/02/2024) |
| 08/02/2024 | 112 | MOTION in Limine *Objecting to Images Being Introduced Absent an Admissible Chain of Custody* by Christopher Kenji Bendann. (Proctor, Gary) (Entered: 08/02/2024) |
| 08/05/2024 | 113 | QC NOTICE: 112 Motion in Limine filed by Christopher Kenji Bendann was filed incorrectly.***Please file a proposed order using the event > Other Filings> Notices > Notice(Other) and link to Motion. (kb3s, Deputy Clerk) (Entered: 08/05/2024) |

**JA13**

| 08/06/2024 | 114 | RESPONSE to Motion by USA as to Christopher Kenji Bendann re 109 MOTION in Limine *Objecting to Inadmissible Photographs* (Hagan, Kim) (Entered: 08/06/2024) |
| 08/06/2024 | 115 | RESPONSE to Motion by USA as to Christopher Kenji Bendann re 112 MOTION in Limine *Objecting to Images Being Introduced Absent an Admissible Chain of Custody* (Hagan, Kim) (Entered: 08/06/2024) |
| 08/06/2024 | 116 | Proposed VERDICT (McGuinn, Colleen) (Entered: 08/06/2024) |
| 08/06/2024 | 117 | RESPONSE in Opposition by Christopher Kenji Bendann re 101 MOTION in Limine *to Admit Evidence Under Rule 414, 413, 404 and 401*, 36 MOTION in Limine *to admit evidence pursuant to FRE 414 and 404(b)* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Nieto, Christopher) (Entered: 08/06/2024) |
| 08/08/2024 | 118 | MEMORANDUM AND ORDER denying without prejudice 109 Motion in Limine as to Christopher Kenji Bendann (1); denying without prejudice 112 Motion in Limine as to Christopher Kenji Bendann (1). Signed by Senior District Judge James K Bredar on 8/7/2024. (kb3s, Deputy Clerk) (Entered: 08/08/2024) |
| 08/08/2024 | 119 | -SEALED- MOTION to Seal by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit)(McGuinn, Colleen) (Entered: 08/08/2024) |
| 08/08/2024 | 120 | -SEALED- Request for Rule 17 Subpoena by Christopher Kenji Bendann (Attachments: # 1 Text of Proposed Order, # 2 Attachment Proposed Subpoena, # 3 Attachment Proposed Subpoena)(Proctor, Gary) (Entered: 08/08/2024) |
| 08/08/2024 | 121 | MOTION in Limine *to Preclude Evidence under Rule 412* by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(McGuinn, Colleen) (Entered: 08/08/2024) |
| 08/08/2024 | 123 | -SEALED-ORDER granting 119 Motion to Seal as to Christopher Kenji Bendann (1). Signed by Senior District Judge James K Bredar on 8/8/2024. (heps, Deputy Clerk) (Entered: 08/08/2024) |
| 08/09/2024 | 124 | MEMORANDUM AND ORDER Denying as moot 121 MOTION in Limine to Preclude Evidence under Rule 412 as to Christopher Kenji Bendann (1). Signed by Senior District Judge James K Bredar on 8/8/2024. (kb3s, Deputy Clerk) (Entered: 08/09/2024) |
| 08/09/2024 | 125 | Initial Appearance as to Christopher Kenji Bendann (Defendant informed of Rights) held on 8/9/2024. Arraignment as to Christopher Kenji Bendann (1) held on 8/9/2024. Plea of Not Guilty entered as to Counts 1s - 9s before Magistrate Judge Charles D. Austin. (Russell Carrick - Courtroom 7B)(Court Reporter: FTR) (rc2s, Deputy Clerk) (Entered: 08/09/2024) |
| 08/09/2024 | 126 | Sealed Document (kb3s, Deputy Clerk)(c/e to Gary Edward Proctor 8.9.24) (Entered: 08/09/2024) |
| 08/09/2024 | 127 | (1) Motions Hearing as to Christopher Kenji Bendann held on 8/9/2024 re 101 MOTION in Limine *to Admit Evidence Under Rule 414, 413, 404 and 401* filed by USA, 112 MOTION in Limine *Objecting to Images Being Introduced Absent an Admissible Chain of Custody* filed by Christopher Kenji Bendann, 105 MOTION in Limine *to Preclude Certain Evidence* filed by USA, 36 MOTION in Limine *to admit evidence pursuant to FRE 414 and 404(b)* filed by USA; (2) Pretrial Conference as to Christopher Kenji Bendann also held on 8/9/2024 before Senior District Judge James K Bredar. (Court Reporter: Kassandra McPherson) (rm2s, Deputy Clerk) (Additional attachment(s) added on 8/9/2024: # 1 Attachment AMENDED MINUTES) (rm2s, Deputy Clerk). (Additional attachment(s) added on 8/9/2024: # 2 Attachment Amended (x2) Minutes) (rm2s, Deputy Clerk). (Entered: 08/09/2024) |

**JA14**

| 08/09/2024 | 128 | MOTION to Withdraw as Attorney by Anatoly Smolkin by USA as to Christopher Kenji Bendann. (Smolkin, Anatoly) (Entered: 08/09/2024) |
|---|---|---|
| 08/09/2024 | 129 | -SEALED- Request for Rule 17 Subpoena by Christopher Kenji Bendann (Attachments: # 1 Text of Proposed Order, # 2 Exhibit, # 3 Exhibit)(Proctor, Gary) (Entered: 08/09/2024) |
| 08/09/2024 | 130 | ORDER granting 76 Motion for Leave to File Additional Motions as to Christopher Kenji Bendann (1); granting in part and denying in part 101 Motion in Limine to Admit Evidence Under Rule 414, 413, 404 and 401 as to Christopher Kenji Bendann ; granting in part and denying in part 36 MOTION in Limine to admit evidence pursuant to FRE 414 and 404(b)(1); granting 105 Motion in Limine to Preclude Certain Evidence as to Christopher Kenji Bendann; (1); granting 15 Motion to Seal. Signed by Senior District Judge James K Bredar on 8/9/2024. (kb3s, Deputy Clerk) (Entered: 08/09/2024) |
| 08/13/2024 | 131 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Christopher Kenji Bendann held on 08/09/2024, before Judge James K. Bredar. Court Reporter Kassandra L. McPherson, Telephone number (410) 962-4544 Kassandra_McPherson@mdd.uscourts.gov. Total number of pages filed: 90. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 9/3/2024. Redacted Transcript Deadline set for 9/13/2024. Release of Transcript Restriction set for 11/12/2024. Redaction Request due 9/3/2024. Redacted Transcript Deadline set for 9/13/2024. Release of Transcript Restriction set for 11/12/2024. (km10, Court Reporter) (Entered: 08/13/2024) |
| 08/13/2024 | 132 | Sealed Document (km10, Court Reporter) (Entered: 08/13/2024) |
| 08/13/2024 | 133 | Sealed Document (kb3s, Deputy Clerk)(c/e to Christopher Carlos Nieto 8.13.24) (Entered: 08/13/2024) |
| 08/14/2024 | 134 | Sealed Document (kb3s, Deputy Clerk) (c/e to Christopher Carlos Nieto & Proctor 8.15.24) (Entered: 08/15/2024) |
| 08/14/2024 | 135 | Sealed Document (kb3s, Deputy Clerk)(c/e to Christopher Carlos Nieto & Proctor 8.15.24) (Entered: 08/15/2024) |
| 08/14/2024 | 136 | Sealed Document (kb3s, Deputy Clerk)(c/e to Christopher Carlos Nieto & Proctor 8.15.24) (Entered: 08/15/2024) |
| 08/16/2024 | 137 | MARGINAL ORDER granting 128 Motion to Withdraw as Attorney. Anatoly Smolkin withdrawn from case. as to Christopher Kenji Bendann (1). Signed by Senior District Judge James K Bredar on 8/15/2024. (kb3s, Deputy Clerk) (Entered: 08/16/2024) |
| 08/21/2024 | 138 | ORDER DIRECTING the United States Marshal to FORTHWITH deliver the Defendant to the Motz Ceremonial Courtroom in the United States Courthouse in Baltimore so that the long-scheduled jury trial in this matter may commence as to Christopher Kenji Bendann. Signed by Senior District Judge James K Bredar on 8/21/2024. (c/e:USMS) (hmls, Deputy Clerk) (Entered: 08/21/2024) |
| 08/21/2024 | 139 | MOTION to Determine Competency to Stand Trial by Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(Proctor, Gary) (Entered: 08/21/2024) |
| 08/21/2024 | 140 | Jury Trial (Day 1 - Jury Selection) as to Christopher Kenji Bendann held on 8/21/2024 before Senior District Judge James K Bredar. (Court Reporter: Ronda Thomas) (rm2s, Deputy Clerk) (Entered: 08/21/2024) |

**JA15**

| 08/21/2024 | 149 | DEFENDANT'S EXHIBIT LIST re: Motion for Competency Evaluation. (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/22/2024 | 141 | Jury Trial (Day 2 - Jury Selection, Continued) as to Christopher Kenji Bendann held on 8/22/2024 before Senior District Judge James K Bredar. (Court Reporter: Ronda Thomas) (rm2s, Deputy Clerk) (Additional attachment(s) added on 8/23/2024: # 1 Attachment Amended Minutes) (rm2s, Deputy Clerk). (Entered: 08/22/2024) |
| 08/23/2024 | 142 | Jury Trial (Day 3 - Evidence Entered) as to Christopher Kenji Bendann held on 8/23/2024 before Senior District Judge James K Bredar. (Court Reporter: Ronda Thomas) (rm2s, Deputy Clerk) (Entered: 08/23/2024) |
| 08/26/2024 | 143 | Jury Trial (Day 4 - Evidence Entered, Continued) as to Christopher Kenji Bendann held on 8/26/2024 before Senior District Judge James K Bredar. (Court Reporter: Ronda Thomas) (rm2s, Deputy Clerk) (Entered: 08/26/2024) |
| 08/27/2024 | 144 | Jury Instructions as to Christopher Kenji Bendann (Attachments: # 1 Jury Instructions,Verdict Sheet)Signed by Senior District Judge James K Bredar on 8/27/2024 (kb3s, Deputy Clerk) (Entered: 08/27/2024) |
| 08/27/2024 | 145 | Jury Trial (Day 5 - Evidence Entered, Continued) as to Christopher Kenji Bendann held on 8/27/2024 before Senior District Judge James K Bredar. (Court Reporter: Ronda Thomas) (rm2s, Deputy Clerk) (Entered: 08/27/2024) |
| 08/28/2024 | 146 | SECOND NOTICE AS TO JURY INSTRUCTIONS as to Christopher Kenji Bendann. Signed by Senior District Judge James K Bredar on 8/28/2024. (Attachments: # 1 Jury Instructions, # 2 Verdict Form) (bas, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 147 | Sealed Document (bas, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 148 | Jury Trial (Day 6 - Closing Arguments/Jury Instructions/Verdict) as to Christopher Kenji Bendann held on 8/28/2024 before Senior District Judge James K Bredar. (Court Reporter: Ronda Thomas) (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 150 | GOVERNMENT'S WITNESS LIST by USA. (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 151 | GOVERNMENT'S EXHIBIT LIST by USA. (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 152 | DEFENDANT'S EXHIBIT LIST by Christopher Kenji Bendann. (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 153 | JOINT EXHIBIT LIST by USA and Christopher Kenji Bendann. (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 154 | COURT'S EXHIBIT LIST. (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 155 | Jury Note #1 (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 156 | -SEALED- Jury Note #2 (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 157 | -SEALED- Court's Response to Jury Note #2 (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 158 | Court's Exhibit #4. (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 159 | Jury Note #3. (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 160 | Stipulation re: Certification of Exhibits Submitted to the Jury. (rm2s, Deputy Clerk) (Entered: 08/28/2024) |

**JA16**

| 08/28/2024 | 161 | JURY VERDICT as to Christopher Kenji Bendann (1): Defendant found "Guilty" on Counts 1s-5s, 6s-8s, and 9s of the Superseding Indictment. (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 162 | -SEALED- JURY VERDICT - Signed. (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 163 | Stipulation re: Return of Exhibits to Counsel. (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/28/2024 | 164 | ORDER OF DETENTION PENDING SENTENCING as to Christopher Kenji Bendann.. Signed by Senior District Judge James K Bredar on 8/28/2024. (Copies via CM/ECF to AUSA McGuinn, AUSA Hagan, CJA Nieto, CJA Proctor; copy to USMS via email 8/28/2024) (rm2s, Deputy Clerk) (Entered: 08/28/2024) |
| 08/29/2024 | 165 | -SEALED- MOTION to Seal by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit)(McGuinn, Colleen) (Entered: 08/29/2024) |
| 08/29/2024 | 166 | Regular Sentencing Order as to Christopher Kenji Bendann. Signed by Senior District Judge James K Bredar on 8/29/2024. (kb3s, Deputy Clerk) (Entered: 08/29/2024) |
| 08/29/2024 | 167 | -SEALED-ORDER granting 165 Motion to Seal as to Christopher Kenji Bendann (1). Signed by Senior District Judge James K Bredar on 8/29/2024. (kb3s, Deputy Clerk) (C/E to Colleen Elizabeth McGuinn 8.29.24) (Entered: 08/29/2024) |
| 01/07/2025 | 170 | -SEALED- MOTION to Seal by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(McGuinn, Colleen) (Entered: 01/07/2025) |
| 01/07/2025 | 171 | **SEALED DOCUMENT** (Attachments: # 1 Exhibit, # 2 Exhibit)(McGuinn, Colleen) Modified on 1/8/2025 (kb3s). (Entered: 01/07/2025) |
| 01/07/2025 | 172 | -SEALED- MOTION to Seal by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(McGuinn, Colleen) (Entered: 01/07/2025) |
| 01/07/2025 | 173 | SENTENCING MEMORANDUM by USA as to Christopher Kenji Bendann (McGuinn, Colleen) (Entered: 01/07/2025) |
| 01/07/2025 | 174 | -SEALED- MOTION to Seal by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order, # 2 Attachment)(McGuinn, Colleen) (Entered: 01/07/2025) |
| 01/07/2025 | 175 | (VACATED PER ECF NO.176)ORDER granting 172 Motion to Seal as to Christopher Kenji Bendann (1). Signed by Judge James K Bredar on 1/7/2025. (kb3s, Deputy Clerk) (C/E TO Colleen Elizabeth McGuinn 1/7/25) Modified on 1/8/2025 (kb3s). Modified on 1/8/2025 (kb3s). (Entered: 01/07/2025) |
| 01/08/2025 | 176 | MEMORANDUM AND ORDER granting 170 Motion to Seal ; HELD IN ABEYANCE 174 MOTION to Seal ; VACATING 175 ORDER as to Christopher Kenji Bendann (1). Signed by Judge James K Bredar on 1/8/2025. (kb3s, Deputy Clerk) (Entered: 01/08/2025) |
| 01/08/2025 | 177 | MOTION to Strike *Impermissible Victim Impact Statements* by Christopher Kenji Bendann. (Proctor, Gary) (Entered: 01/08/2025) |
| 01/09/2025 | 178 | QC NOTICE: 177 Motion to Strike filed by Christopher Kenji Bendann was filed incorrectly. ***Please file a proposed order using the event > Other Filings > Notice > Notice(Other) and link it to the motion. (kb3s, Deputy Clerk) (Entered: 01/09/2025) |
| 01/09/2025 | 179 | NOTICE re 177 MOTION to Strike Impermissible Victim Impact Statements, *Proposed Order* (Proctor, Gary) Modified on 1/10/2025 (kb3s). (Entered: 01/09/2025) |
| 01/09/2025 | 180 | RESPONSE re 176 Memorandum and Order, Order on Motion to Seal filed by USA. (Attachments: # 1 Text of Proposed Order, # 2 Attachment)(McGuinn, Colleen) (Entered: |

| | | |
|---|---|---|
| | | 01/09/2025) |
| 01/09/2025 | 181 | (FILED IN ERROR) MOTION to Seal by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit, # 3 Exhibit)(McGuinn, Colleen) Modified on 1/10/2025 (kb3s). (Entered: 01/09/2025) |
| 01/10/2025 | 182 | QC NOTICE: 181 Motion to Seal filed by USA was filed incorrectly. *It has been noted as FILED IN ERROR, and the document link has been disabled.* ***Please refile the motion as the main document and the proposed order as an attachment. There should be a second filing using the event > Other Filings > Other Documents> Proposed Sealed Document. All SEALED documents should be filed using that event.(kb3s, Deputy Clerk) (Entered: 01/10/2025) |
| 01/10/2025 | 183 | MOTION to Seal by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order, # 2 Attachment, # 3 Attachment)(McGuinn, Colleen) (Entered: 01/10/2025) |
| 01/10/2025 | 184 | **SEALED DOCUMENT** (McGuinn, Colleen) Modified on 1/14/2025 (kb3s). (Entered: 01/10/2025) |
| 01/13/2025 | 185 | SENTENCING MEMORANDUM by Christopher Kenji Bendann (Attachments: # 1 Exhibit 1a, # 2 Exhibit 1b, # 3 Exhibit 1c, # 4 Exhibit 1d, # 5 Exhibit 2, # 6 Exhibit 3) (Nieto, Christopher) (Entered: 01/13/2025) |
| 01/13/2025 | 186 | MOTION to Seal by Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(Nieto, Christopher) (Entered: 01/13/2025) |
| 01/13/2025 | 187 | **SEALED DOCUMENT** (Attachments: # 1 Exhibit 1b, # 2 Exhibit 1c, # 3 Exhibit 1d) (Nieto, Christopher) Modified on 1/14/2025 (kb3s). (Entered: 01/13/2025) |
| 01/13/2025 | 188 | (FILED IN ERROR PER COUNSEL)SENTENCING MEMORANDUM by Christopher Kenji Bendann (Proctor, Gary) Modified on 1/14/2025 (kb3s). (Entered: 01/13/2025) |
| 01/14/2025 | 189 | RESPONSE re 173 Sentencing Memorandum. (Proctor, Gary) (Entered: 01/14/2025) |
| 01/14/2025 | 190 | MOTION to Seal by Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(Proctor, Gary) (Entered: 01/14/2025) |
| 01/14/2025 | 191 | **SEALED DOCUMENT** (Proctor, Gary) Modified on 1/14/2025 (kb3s). (Entered: 01/14/2025) |
| 01/14/2025 | 192 | MEMORANDUM AND ORDER granting in part and denying as moot 174 Motion to Seal as to Christopher Kenji Bendann (1); granting 183 Motion to Seal as to Christopher Kenji Bendann (1); granting 186 Motion to Seal as to Christopher Kenji Bendann (1); granting 190 Motion to Seal as to Christopher Kenji Bendann (1). Signed by Judge James K Bredar on 1/14/2025. (kb3s, Deputy Clerk) (Entered: 01/14/2025) |
| 01/15/2025 | 193 | MOTION for Forfeiture of Property *for Preliminary Order of Forfeiture* by USA as to Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order for Preliminary Order of Forfeiture)(McGuinn, Colleen) (Entered: 01/15/2025) |
| 01/16/2025 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Christopher Kenji Bendann. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 1/16/2025. An interpreter will not be needed. Sentencing set for 1/21/2025 01:00 PM in Courtroom 5A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge James K Bredar.(McGuinn, Colleen) (Entered: 01/16/2025) |
| 01/17/2025 | 194 | MEMORANDUM AND ORDER denying 177 MOTION to Strike Impermissible Victim Impact Statements as to Christopher Kenji Bendann (1). Signed by Judge James K Bredar |

| | | |
|---|---|---|
| | | on 1/17/2025. (kb3s, Deputy Clerk) (Entered: 01/17/2025) |
| 01/21/2025 | 195 | Sentencing as to Christopher Kenji Bendann held on 1/21/2025 before Judge James K Bredar. (Court Reporter: Patricia "Trish" Mitchell) (Rebecca Maldeis, Deputy Clerk - Courtroom 5A) (Entered: 01/21/2025) |
| 01/21/2025 | 196 | Sealed Document. (Attachments: # 1 Attachment 1, # 2 Attachment 2) (c/em 1/22/25) (hmls, Deputy Clerk) (Entered: 01/22/2025) |
| 01/21/2025 | 197 | PRELIMINARY ORDER OF FORFEITURE as to Christopher Kenji Bendann. Signed by Judge James K Bredar on 1/21/2025. (hmls, Deputy Clerk) (Entered: 01/22/2025) |
| 01/23/2025 | 198 | JUDGMENT as to Christopher Kenji Bendann (1), Count(s) 1s-5s, 6s-8s, 9s, 30 years as to Count ls; 30 years as to Count 2s to be served concurrently with the sentence imposed as to Count ls; 30 years as to Count 3s to be served concurrently with the sentences imposed as to Counts ls and 2s; 30 years as to Count 4s to be served concurrently with the sentences imposed as to Counts ls, 2s, and 3s; 30 years as to Count 5s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, and 4s; 10 years as to Count 6s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, 4s, and 5s; 10 years as to Count 7s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, 4s, 5s, and 6s; 10 years as to Count 8s to be served concurrently with the sentences imposed as to Counts ls, 2s, 3s, 4s, 5s, 6s, and 7s; and 5 years as to Count 9s to be served consecutively to the sentences imposed as to Counts ls, 2s, 3s, 4s, 5s, 6s, 7s, and 8s for a total term of 35 years; SUPERVISED RELEASE for ife as to Counts ls, 2s, 3s, 4s, and 5s and 3 years as to Counts 6s, 7s, 8s, and 9s, all running concurrently, for a total term of life; ASSESSMENT $900.00. Signed by Judge James K Bredar on 1/23/2025. (hmls, Deputy Clerk) (Entered: 01/23/2025) |
| 01/23/2025 | 200 | NOTICE OF APPEAL by Christopher Kenji Bendann Fee Status: CJA. (Nieto, Christopher) (Entered: 01/23/2025) |
| 01/24/2025 | 201 | Transmission of Notice of Appeal and Docket Sheet as to Christopher Kenji Bendann to US Court of Appeals re 200 Notice of Appeal - Final Judgment (av4s, Deputy Clerk) (Entered: 01/24/2025) |
| 01/27/2025 | 202 | USCA Case Number 25-4033 as to Christopher Kenji Bendann for 200 Notice of Appeal - Final Judgment filed by Christopher Kenji Bendann. Case Manager - Shari A. Batchleor. (av4s, Deputy Clerk) (Entered: 01/28/2025) |
| 01/28/2025 | 203 | ORDER of USCA appointing Allen Howard Orenberg as counsel for Christopher Kenji Bendann as to Christopher Kenji Bendann re 200 Notice of Appeal - Final Judgment (av4s, Deputy Clerk) (Entered: 01/30/2025) |
| 02/06/2025 | 204 | ORDER that by February 14, 2025, the parties SHALL STATE their positions as to weather an unredacted transcript may be provided to the third parties.as to Christopher Kenji Bendann. Signed by Judge James K Bredar on 2/6/2025. (kb3s, Deputy Clerk) (Entered: 02/06/2025) |
| 02/10/2025 | 205 | Correspondence re: ECF 204 (Nieto, Christopher) (Entered: 02/10/2025) |
| 02/12/2025 | 206 | TRANSCRIPT ORDER ACKNOWLEDGEMENT by Christopher Kenji Bendann for proceedings held on 9/14/23, 8/9/24 before Judge James K. Bredar, Transcript due by 3/21/2025 (Court Reporter: Kassandra McPherson). (av4s, Deputy Clerk) (Entered: 02/12/2025) |

**JA19**

| 02/12/2025 | 207 | TRANSCRIPT ORDER ACKNOWLEDGEMENT by Christopher Kenji Bendann for proceedings held on 8/18/23, 8/21/23, 8/9/24, 9/20/23 before Judge James K. Bredar, Transcript due by 3/21/2025 (Court Reporter: FTR). (av4s, Deputy Clerk) (Entered: 02/12/2025) |
| 02/12/2025 | 208 | TRANSCRIPT ORDER ACKNOWLEDGEMENT by Christopher Kenji Bendann for proceedings held on 1/23/25 before Judge James K. Bredar, Transcript due by 3/21/2025 (Court Reporter: Trish Mitchell). (av4s, Deputy Clerk) (Entered: 02/12/2025) |
| 02/12/2025 | 209 | TRANSCRIPT ORDER ACKNOWLEDGEMENT by Christopher Kenji Bendann for proceedings held on 8/21/24 - 8/23/24, 8/26/24 - 8/28/24 before Judge James K. Bredar, Transcript due by 3/21/2025 (Court Reporter: Ronda Thomas). (av4s, Deputy Clerk) (Entered: 02/12/2025) |
| 02/12/2025 | 210 | TRANSCRIPT ORDER ACKNOWLEDGEMENT by Christopher Kenji Bendann for proceedings held on 5/9/24 before Judge James K. Bredar, Transcript due by 3/21/2025 (Court Reporter: Amanda Longmore). (av4s, Deputy Clerk) (Entered: 02/12/2025) |
| 02/12/2025 | 211 | Correspondence re: ECF 204 (McGuinn, Colleen) (Entered: 02/12/2025) |
| 02/19/2025 | 212 | NOTICE OF ATTORNEY APPEARANCE: Allen Howard Orenberg as CJA Appointment appearing for Christopher Kenji Bendann(Orenberg, Allen) (Entered: 02/19/2025) |
| 02/20/2025 | 213 | MOTION to Unseal Document *TRANSCRIPT FROM COURT PROCEEDINGS CONDUCTED ON SEPTEMBER 20, 2023* by Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(Orenberg, Allen) (Entered: 02/20/2025) |
| 02/20/2025 | 214 | ORDER granting 213 MOTION to Unseal Document TRANSCRIPT FROM COURT PROCEEDINGS CONDUCTED ON SEPTEMBER 20, 2023 as to Christopher Kenji Bendann (1). Signed by Judge James K Bredar on 2/20/2025. (kb3s, Deputy Clerk) (Entered: 02/20/2025) |
| 03/10/2025 | 215 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Christopher Kenji Bendann for dates of 1/21/2025, Sentencing before Judge James K. Bredar, re 200 Notice of Appeal - Final Judgment Court Reporter Patricia G. Mitchell, 410-962-3858, trish_mitchell@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 3/31/2025. Redacted Transcript Deadline set for 4/10/2025. Release of Transcript Restriction set for 6/9/2025. Redaction Request due 3/31/2025. Redacted Transcript Deadline set for 4/10/2025. Release of Transcript Restriction set for 6/9/2025. (Entered: 03/10/2025) |
| 03/10/2025 | 216 | Sealed Document (Entered: 03/10/2025) |
| 03/12/2025 | 217 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT FTR as to Christopher Kenji Bendann for dates of 08/09/2024 before Judge J. Mark Coulson, re 200 Notice of Appeal - Final Judgment Court Reporter/Transcriber Kassandra L. McPherson, Telephone number (410) 962-4544; Kassandra_McPherson@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/2/2025. Redacted Transcript Deadline set for 4/14/2025. Release of Transcript Restriction set for 6/10/2025. (km10, Court Reporter) (Entered: 03/12/2025) |

| 03/12/2025 | 218 | [FILED IN ERROR]Sealed Document (km10, Court Reporter) Modified on 3/12/2025 (km10). (Entered: 03/12/2025) |
| 03/12/2025 | 219 | Sealed Document (km10, Court Reporter) (Entered: 03/12/2025) |
| 03/12/2025 | 220 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (FTR) as to Christopher Kenji Bendann for dates of 08/21/2023 before Judge J. Mark Coulson, re 200 Notice of Appeal - Final Judgment Court Reporter/Transcriber Kassandra L. McPherson, Telephone number (410) 962-4544; Kassandra_McPherson@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 4/2/2025. Redacted Transcript Deadline set for 4/14/2025. Release of Transcript Restriction set for 6/10/2025. (km10, Court Reporter) (Entered: 03/12/2025) |
| 03/12/2025 | 221 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (FTR) as to Christopher Kenji Bendann for dates of 08/18/2023 before Judge Brendan A. Hurson, re 200 Notice of Appeal - Final Judgment Court Reporter/Transcriber Kassandra L. McPherson, Telephone number (410) 962-4544; Kassandra_McPherson@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 4/2/2025. Redacted Transcript Deadline set for 4/14/2025. Release of Transcript Restriction set for 6/10/2025. (km10, Court Reporter) (Entered: 03/12/2025) |
| 03/19/2025 | 222 | [FILED IN ERROR] Transcript of Voir Dire Day 1 Proceedings as to Christopher Kenji Bendann held on 8/21/2024, before Judge James K. Bredar. Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 4/7/2025. Redacted Transcript Deadline set for 4/16/2025. Release of Transcript Restriction set for 6/16/2025. Redaction Request due 4/7/2025. Redacted Transcript Deadline set for 4/16/2025. Release of Transcript Restriction set for 6/16/2025. Modified on 6/5/2025 (rt). (Entered: 03/19/2025) |
| 03/19/2025 | 223 | Transcript of Voir Dire Day 2 Proceedings as to Christopher Kenji Bendann held on 8/22/2024, before Judge James K. Bredar. Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 4/7/2025. Redacted Transcript Deadline set for 4/16/2025. Release of Transcript Restriction set for 6/16/2025. Redaction Request due 4/7/2025. Redacted Transcript Deadline set for 4/16/2025. Release of Transcript Restriction set for 6/16/2025. (Entered: 03/19/2025) |
| 03/19/2025 | 224 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Proceedings as to Christopher Kenji Bendann for dates of 8/21/2024 before Judge James K. Bredar, re 200 Notice of Appeal - Final Judgment Court Reporter/Transcriber Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/9/2025. Redacted Transcript Deadline set for 4/21/2025. |

**JA21**

| | | |
|---|---|---|
| | | Release of Transcript Restriction set for 6/17/2025. Redaction Request due 4/9/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/17/2025. (Entered: 03/19/2025) |
| 03/19/2025 | 225 | [FILED IN ERROR] NOTICE OF FILING OF OFFICIAL TRANSCRIPT Trial Day 1 as to Christopher Kenji Bendann for dates of 8/23/2024 before Judge James K. Bredar, re 200 Notice of Appeal - Final Judgment Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/9/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/17/2025. Redaction Request due 4/9/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/17/2025. Modified on 6/5/2025 (rt). Modified on 6/5/2025 (rt). (Entered: 03/19/2025) |
| 03/19/2025 | 226 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Trial Day 2 as to Christopher Kenji Bendann for dates of 8/26/2024 before Judge James K. Bredar, re 200 Notice of Appeal - Final Judgment Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/9/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/17/2025. Redaction Request due 4/9/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/17/2025. (Entered: 03/19/2025) |
| 03/19/2025 | 227 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Trial Day 3 as to Christopher Kenji Bendann for dates of 8/27/2024 before Judge James K. Bredar, re 200 Notice of Appeal - Final Judgment Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 4/9/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/17/2025. Redaction Request due 4/9/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/17/2025. (Entered: 03/19/2025) |
| 03/19/2025 | 228 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Day 4 as to Christopher Kenji Bendann for dates of 8/28/2024 before Judge James K. Bredar, re 200 Notice of Appeal - Final Judgment Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 4/9/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/17/2025. Redaction Request due 4/9/2025. Redacted Transcript Deadline set for 4/21/2025. Release of Transcript Restriction set for 6/17/2025. Modified on 3/19/2025 (rt). (Entered: 03/19/2025) |
| 03/19/2025 | 229 | Sealed Document (Entered: 03/19/2025) |
| 03/19/2025 | 230 | Sealed Document (Entered: 03/19/2025) |

**JA22**

| 03/19/2025 | 231 | Sealed Document (Entered: 03/19/2025) |
|---|---|---|
| 03/19/2025 | 232 | Sealed Document (Entered: 03/19/2025) |
| 03/22/2025 | 233 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (Motions Hearing) as to Christopher Kenji Bendann for dates of 05/09/2024 before Judge James K. Bredar, re 200 Notice of Appeal - Final Judgment Court Reporter Amanda Longmore, Telephone number 410-962-4474; amanda_longmore@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 4/14/2025. Redacted Transcript Deadline set for 4/22/2025. Release of Transcript Restriction set for 6/20/2025. Redaction Request due 4/14/2025. Redacted Transcript Deadline set for 4/22/2025. Release of Transcript Restriction set for 6/20/2025. (al6, Court Reporter) (Entered: 03/22/2025) |
| 06/05/2025 | 234 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Christopher Kenji Bendann for dates of 8/21/2024 before Judge James K. Bredar, re 200 Notice of Appeal - Final Judgment Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 6/26/2025. Redacted Transcript Deadline set for 7/7/2025. Release of Transcript Restriction set for 9/3/2025. Redaction Request due 6/26/2025. Redacted Transcript Deadline set for 7/7/2025. Release of Transcript Restriction set for 9/3/2025. (Entered: 06/05/2025) |
| 06/05/2025 | 235 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Christopher Kenji Bendann for dates of 8/23/2024 before Judge James K. Bredar, re 200 Notice of Appeal - Final Judgment Court Reporter Ronda Thomas, Telephone number 410-962-4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 6/26/2025. Redacted Transcript Deadline set for 7/7/2025. Release of Transcript Restriction set for 9/3/2025. Redaction Request due 6/26/2025. Redacted Transcript Deadline set for 7/7/2025. Release of Transcript Restriction set for 9/3/2025. (Entered: 06/05/2025) |
| 07/14/2025 | 236 | MOTION for Forfeiture of Property *for Final Order of Forfeiture* by USA as to Christopher Kenji Bendann. (Attachments: # 1 Exhibit Declaration of Publication, # 2 Text of Proposed Order for Final Order of Forfeiture)(McGuinn, Colleen) Modified on 8/19/2025 (kb3s). (Entered: 07/14/2025) |
| 08/19/2025 | 237 | Final Order of Forfeiture as to Christopher Kenji Bendann. Signed by Judge James K Bredar on 8/19/2025. (kb3s, Deputy Clerk) (Entered: 08/19/2025) |
| 09/07/2025 | 238 | Consent MOTION MOTION FOR ACCESS TO SEALED DOCKET ENTRIES, SEALED PLEADINGS AND SEALED TRANSCRIPTS by Christopher Kenji Bendann. (Attachments: # 1 Text of Proposed Order)(Orenberg, Allen) (Entered: 09/07/2025) |
| 09/08/2025 | 239 | ORDER granting 238 Consent MOTION MOTION FOR ACCESS TO SEALED DOCKET ENTRIES, SEALED PLEADINGS AND SEALED TRANSCRIPTS as to Christopher Kenji Bendann (1). Signed by Judge James K Bredar on 9/8/2025. (kb3s, Deputy Clerk) Modified on 9/11/2025 (kb3s).(Sealed documents mailed via Fed ex per order 9.11.25) (Entered: 09/09/2025) |

**JA23**

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 09/22/2025 09:28:45 | | |
| **PACER Login:** | Db00092016 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cr-00278-JKB |
| **Billable Pages:** | 25 | **Cost:** | 2.50 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| UNITED STATES OF AMERICA | * |
| v. | * |
| CHRISTOPHER KENJI BENDANN, | *  Crim. No. JKB-23-278 |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>**MEMORANDUM AND ORDER**</u>

Pending before the Court are Defendant Christopher Kenji Bendann's Motion to Suppress Evidence Obtained from Search Warrants (ECF No. 78) and Motion to Suppress Evidence Obtained from Cellphone (ECF No. 79). The Court held a hearing on May 9, 2024 regarding these Motions and denied both Motions in open court, promising a written opinion and order to follow. For the reasons previously stated in open court, and those provided below, both Motions will be denied.

## I.    MOTION TO SUPPRESS EVIDENCE OBTAINED FROM SEARCH WARRANTS

Defendant's home, electronic devices, and various electronic accounts were search by state and/or federal officials pursuant to two search warrants, one signed by Baltimore County District Judge Karen Pilarski and one signed by United States Magistrate Judge for the District of Maryland Beth Gesner. (*See* ECF Nos. 81, 81-1.) Defendant contends that the search of his house and subsequent searches of his electronic devices and accounts pursuant to these warrants were unlawful because the warrants were deficient. (ECF No. 78.) Specifically, Defendant argues that the supporting affidavits (which the Parties treat as largely identical for both the state and federal

warrants) did not set out probable cause that evidence of a crime would be found at the time of the execution of the warrants or that, if such probable cause had once existed, it had become stale and therefore no longer supported the searches.

Reviewing courts "afford a magistrate's determination of probable cause great deference, declining to defer only when the finding was not supported by substantial evidence in the record or when the basis of the determination was a knowingly or recklessly false affidavit." *United States v. Davis*, 94 F.4th 310, 316 (4th Cir. 2024) (quotation omitted). Further, under *United States v. Leon*, evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant" is not subject to the exclusionary rule unless (1) the magistrate issuing the warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) the magistrate issuing the warrant "wholly abandoned his judicial role" and functioned as a rubber stamp for law enforcement; (3) the warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized"—such that "the executing officers cannot reasonably presume it to be valid." 468 U.S. 897, 922–23 (1984) (citations and quotations omitted).

The evidence obtained pursuant to the search warrants is, at a minimum, admissible under *Leon*. Having reviewed the search warrants and supporting affidavits (ECF Nos. 81, 81-1) the Court finds that they are not misleading, nor "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," nor "facially deficient," nor did either Judge Pilarski or Magistrate Judge Gesner "wholly abandon [the] judicial role" when signing them. *See*

*Leon*, 468 U.S. at 922–23. Any reasonable officer would have relied on the warrants in good faith. *See id.* Accordingly, suppression of evidence is not warranted.

In any case, probable cause is amply demonstrated in the affidavits. They contain detailed allegations from the complaining witness, including a description of on-going criminal activity over the course of years. (*See* ECF Nos. 81 at 6–10, 81-1 at 28–15.) While illegal acts described largely occurred years prior, in this context, that lapse of time is insufficient to erode probable cause. As described in the affidavits, collectors of child pornography typically maintain their gallery for years, and even if they have attempted to delete the contraband, it may still be recoverable years later. (*See* ECF Nos. 81 at 15–17, 81-1 at 4–7.) Accordingly, in this context, the Court finds that the information contained in the affidavits was not stale and that the affidavits contained probable cause that evidence of a crime would be located pursuant to the warrants when they were executed in 2023. Therefore, Defendant's Motion to Suppress Evidence Obtained from Search Warrants (ECF No. 78) will be denied.

## II.    MOTION TO SUPPRESS EVIDENCE OBTAINED FROM CELLPHONE

Having heard the testimony of the Government's witnesses, and viewed the Government's evidence presented in open court, in particular the body-worn camera video entered as Exhibit 3, the Court makes the following findings of fact regarding the sequence of events and circumstances surrounding acquisition of evidence from Defendant's cell phone. Federal and state officials arrived at Defendant's home to execute a search warrant just after 5:00 a.m. The tactical team executing the warrant arrived at Defendant's residence with visible weapons, riot shields, and a battering ram, waking up the Defendant, who was in a state of undress. The Defendant was placed in flex-cuffs and supervised while the tactical team secured the residence. After the residence was

secured, the flex-cuffs were removed and then-Detective Shannon Markel arrived.[1]  Detective

Markel advised the Defendant of his rights and explained that they were executing a sealed warrant

and that, while Defendant would not be permitted to review the warrant at that time, the warrant

extended to the use of Defendant's face and hands to unlock his electronic devices.  The Defendant

invoked his right to remain silent.  When Detective Markel recovered Defendant's cell phone and

placed it in front of the Defendant's face to use his biometric data to unlock the phone, the phone

requested entry of Defendant's passcode.  Detective Markel did not say anything to the Defendant

at that time and Defendant, unprompted, entered the six-digit passcode into the cellphone within

Detective Markel's view.  Watching him, Detective Markel ascertained the first four digits of the

code and, based on those four digits, was able to deduce the final two digits of the passcode because

the six-digit code comprised the Defendant's date of birth.[2]

Defendant contends that, in the totality of the circumstances, entering the passcode into his

phone in view of Detective Markel was not voluntary, and therefore the exclusionary rule bars

admission of the contents of the phone.  Specifically, the Defendant highlighted the early hour, the

fact that he had recently been awakened, the number of officers and agents present at the time

(more than 12), the Defendant's recent state of physical restriction and undress, and Detective

Markel's statement to the Defendant that the warrant also allowed law enforcement to use

Defendant's face and hands to unlock the phone.

---

[1] Shannon Markel has since been promoted to the rank of corporal, but because Markel was a detective at the time, the Court will use that rank for simplicity.

[2] After this exchange, now-former FBI Agent Jon Shumway went to access a part of the phone for which the passcode again needed to be entered.  When he did so, Detective Markel confirmed the passcode with the Defendant by saying it aloud, prompting the Defendant to confirm.  The Court, however, need not decide if this subsequent exchange was lawful (and it likely was not) because Detective Markel had already deduced the passcode based on having viewed the Defendant type it in.  Therefore, based on the testimony, video footage, and applicable law, the Court finds that whether the code was obtained lawfully depends entirely on the initial exchange between Detective Markel and the Defendant.  Defense counsel did not disagree with this assessment from the Court during the May 9, 2024 hearing.  Accordingly, the Court will examine only the lawfulness of the initial exchange during which the Defendant entered his passcode.

4

**JA28**

After a person in custody has invoked their right to remain silent, "the police may not question him." *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475. The government must prove any waiver was voluntary by a "preponderance of the evidence." *United States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005). "[T]he exclusionary rule bars admission of the nontestimonial physical fruits of statements obtained in violation of *Miranda* when those statements are involuntary, and statements obtained in violation of *Miranda* are presumptively involuntary." *United States v. Alston*, 941 F.3d 132, 137 (4th Cir. 2019). Voluntariness depends on whether the statement was "the product of an essentially free and unconstrained choice by its maker" or whether the defendant's "will has been overborne and his capacity for self-determination critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). The court should assess "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* at 226.

Having considered the video evidence as well as the testimony presented by the Government, which the Defendant characterized differently but did not dispute, the Court concludes that the Defendant voluntarily entered his passcode into his phone and therefore the exclusionary rule does not apply. *See United States v. Patane*, 542 U.S. 630, 632–43 (2004) ("[B]ecause police cannot violate the Self–Incrimination Clause by taking unwarned though voluntary statements, an exclusionary rule cannot be justified by reference to a deterrence effect on law enforcement."). The circumstances in which the Defendant entered his passcode are, admittedly, concerning and maybe approach the border of coercive. However, the Court concludes

5

that, in the totality of the circumstances, the Defendant's choice to enter his passcode was "the product of an essentially free and unconstrained choice by its maker." *See Schneckloth*, 412 U.S. at 225. Detective Markel's behavior, while it may have been intended to take advantage of an opportunity, was not unlawfully calculated to elicit information. Detective Markel did not lie to or mislead the Defendant, nor was the Defendant subjected to shocking scare tactics, like flash bangs or a no-knock warrant. The video footage depicts the Defendant sitting peacefully, speaking calmly with Detective Markel. When the phone is placed in front of his face, the Defendant voluntarily, perhaps even reflexively, enters the passcode. He may have assumed that he was supposed to do so, but his will was not "overborne." Accordingly, the Court finds that, even though entering the passcode implicates the protections of *Miranda*, the exclusionary rule does not apply because in the totality of the circumstances, the Defendant's will was not overborne and he entered the passcode voluntarily.[3]

## III.    CONCLUSION

For the reasons above and stated on the record in open court, it is ORDERED that:

1. Defendant's Motion to Suppress Evidence Obtained from Search Warrants (ECF No. 78) is DENIED;

2. Defendant's Motion to Suppress Evidence Obtained from Cellphone (ECF No. 79) is DENIED; and

3. The Parties SHALL FILE a joint status report with the Court no later than June 10, 2024.

---

[3] The Court also notes that, even if the Defendant did not voluntarily enter the passcode, if "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means" then the exclusionary rule does not apply. *Nix v. Williams*, 467 U.S. 431, 444 (1984). Here, the passcode was the Defendant's birthday, and it was reasonably likely that law enforcement would have tried such a commonly used passcode when attempting to unlock the phone. However, because the Court has concluded that the Defendant entered the passcode voluntarily, the Court need not make any factual findings regarding the inevitable discovery exception.

6

**JA30**

DATED this _10_ day of May, 2024.

BY THE COURT:

James K. Bredar
United States District Judge

**JA31**

CEM/KYH USAO# 2023R00541

FILED
LOGGED
ENTERED
RECEIVED

MAY 29 2024

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO.  JKB-23-278** |
| v. | **(Sexual Exploitation of a Child, 18 U.S.C. § 2251(a); Possession of Child Pornography, 18 U.S.C. § 2252A(a)(5)(B); Cyberstalking, 18 U.S.C. § 2261A(2); Forfeiture, 18 U.S.C. §§ 1467, 2253 and 2428)** |
| **CHRISTOPHER KENJI BENDANN,** | |
| **Defendant.** | |

## SUPERSEDING INDICTMENT

### COUNT ONE
### (Sexual Exploitation of a Child)

The Grand Jury for the District of Maryland charges that:

On or about September 16, 2017, in the District of Maryland, the defendant,

### CHRISTOPHER KENJI BENDANN,

knowingly attempted to and did employ, use, persuade, induce, entice, and coerce Minor Victim to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2), for the purpose of producing visual depiction of such conduct, knowing and having reason to know that such a visual depiction was produced and transmitted using materials that were mailed, shipped, and transported in interstate and foreign commerce by any means, including by computer, and such visual depiction was actually transported and transmitted using any means and facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, that is, a video file titled, "IMG_6965.mov," depicting the Minor Victim's genitals, said video file having been made with an iPhone 7 and stored on the iCloud account associated with DSID: 105474467 and cbendann@gmail.com.

18 U.S.C. § 2251(a)

1

**JA32**

## COUNT TWO
### (Sexual Exploitation of a Child)

The Grand Jury for the District of Maryland further charges that:

On or about June 21, 2018, in the District of Maryland, the defendant,

### CHRISTOPHER KENJI BENDANN,

knowingly attempted to and did employ, use, persuade, induce, entice, and coerce Minor Victim
to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2),
for the purpose of producing visual depiction of such conduct, knowing and having reason to know
that such a visual depiction was produced and transmitted using materials that were mailed,
shipped, and transported in interstate and foreign commerce by any means, including by computer,
and such visual depiction was actually transported and transmitted using any means and facility of
interstate and foreign commerce and in and affecting interstate and foreign commerce, that is, three
video files titled, "IMG_6966.mov," "IMG_6967.mov," and "IMG_6968.mov" depicting the
Minor Victim's genitals, said video files having been made with an iPhone 7 and stored on the
iCloud account associated with DSID: 105474467 and cbendann@gmail.com.

18 U.S.C. § 2251(a)

**JA33**

## COUNT THREE
### (Sexual Exploitation of a Child)

The Grand Jury for the District of Maryland further charges that:

On or about August 26, 2018, in the District of Maryland, the defendant,

**CHRISTOPHER KENJI BENDANN,**

knowingly attempted to and did employ, use, persuade, induce, entice, and coerce Minor Victim,

to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2),

for the purpose of producing visual depiction of such conduct, knowing and having reason to know

that such a visual depiction was produced and transmitted using materials that were mailed,

shipped, and transported in interstate and foreign commerce by any means, including by computer,

and such visual depiction was actually transported and transmitted using any means and facility of

interstate and foreign commerce and in and affecting interstate and foreign commerce, that is, two

video files titled, "IMG_6974.mov" and "IMG_6975.mov," depicting the Minor Victim's genitals,

said video files having been made with an iPhone 7 and stored on the iCloud account associated

with DSID: 105474467 and cbendann@gmail.com.

18 U.S.C. § 2251(a)

3

**JA34**

## COUNT FOUR
### (Sexual Exploitation of a Child)

The Grand Jury for the District of Maryland further charges that:

On or about January 2, 2019, in the District of Maryland, the defendant,

**CHRISTOPHER KENJI BENDANN,**

knowingly attempted to and did employ, use, persuade, induce, entice, and coerce Minor Victim,

to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2),

for the purpose of producing visual depiction of such conduct, knowing and having reason to know

that such a visual depiction was produced and transmitted using materials that were mailed,

shipped, and transported in interstate and foreign commerce by any means, including by computer,

and such visual depiction was actually transported and transmitted using any means and facility of

interstate and foreign commerce and in and affecting interstate and foreign commerce, that is, a

video file titled, "IMG_6969.mov," depicting the defendant touching Minor Victim's genitals, said

video file having been made with an iPhone 7 and stored on the iCloud account associated with

DSID: 105474467 and cbendann@gmail.com.

18 U.S.C. § 2251(a)

4

**JA35**

## COUNT FIVE
### (Sexual Exploitation of a Child)

The Grand Jury for the District of Maryland further charges that:

On or about February 9, 2019, in the District of Maryland, the defendant,

### CHRISTOPHER KENJI BENDANN,

knowingly attempted to and did employ, use, persuade, induce, entice, and coerce Minor Victim,

to engage in sexually explicit conduct as defined in Title 18, United States Code, Section 2256(2),

for the purpose of producing visual depiction of such conduct, knowing and having reason to know

that such a visual depiction was produced and transmitted using materials that were mailed,

shipped, and transported in interstate and foreign commerce by any means, including by computer,

and such visual depiction was actually transported and transmitted using any means and facility of

interstate and foreign commerce and in and affecting interstate and foreign commerce, that is, a

video file titled, "IMG_6976.mov," depicting the defendant touching Minor Victim's genitals, said

video file having been made with an iPhone XS and stored on the iCloud account associated with

DSID: 105474467 and cbedann@gmail.com.

18 U.S.C. § 2251(a)

**JA36**

## COUNT SIX
### (Possession of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

In and between September 1, 2017 and January 23, 2023, in the District of Maryland, the

defendant,

### CHRISTOPHER KENJI BENDANN,

did knowingly possess any material that contained an image of child pornography, as defined in

Title 18, United States Code, Section 2256(8), which image had been mailed, shipped and

transported using any means or facility of interstate and foreign commerce and in and effecting

interstate and foreign commerce by any means, including by computer, and that was produced

using materials that had been mailed, shipped and transported in and affecting interstate and

foreign commerce by any means, including by computer, that is, an internet-based iCloud account

associated with DSID: 105474467 and cbedann@gmail.com containing one or more visual

depictions of a minor engaged in sexually explicit conduct.

18 U.S.C. §§ 2252A(a)(5)(B) & 2256

6

**JA37**

## COUNT SEVEN
### (Possession of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about February 3, 2023, in the District of Maryland, the defendant,

### CHRISTOPHER KENJI BENDANN,

did knowingly possess any material that contained an image of child pornography, as defined in Title 18, United States Code, Section 2256(8), which image had been mailed, shipped and transported using any means or facility of interstate and foreign commerce and in and effecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by computer, that is, Dell Inspiron 15 laptop, service tag HWSNXN2, containing one or more visual depictions of a minor engaged in sexually explicit conduct.

18 U.S.C. §§ 2252A(a)(5)(B) & 2256

7

**JA38**

## COUNT EIGHT
### (Possession of Child Pornography)

The Grand Jury for the District of Maryland further charges that:

On or about February 3, 2023, in the District of Maryland, the defendant,

### CHRISTOPHER KENJI BENDANN,

did knowingly possess any material that contained an image of child pornography, as defined in Title 18, United States Code, Section 2256(8), which image had been mailed, shipped and transported using any means or facility of interstate and foreign commerce and in and effecting interstate and foreign commerce by any means, including by computer, and that was produced using materials that had been mailed, shipped and transported in and affecting interstate and foreign commerce by any means, including by computer, that is, Sony Vaio laptop, serial number 3109183, containing one or more visual depictions of a minor engaged in sexually explicit conduct.

18 U.S.C. §§ 2252A(a)(5)(B) & 2256

8

**JA39**

## COUNT NINE
### (Cyberstalking)

The Grand Jury for the District of Maryland further charges that:

In and between May 2022 through December 2022, in the District of Maryland, the defendant,

### CHRISTOPHER KENJI BENDANN,

did, with intent to harass and intimidate another person, use interactive computer services, electronic communication services, and electronic communication systems of interstate commerce, to engage in a course of conduct that caused, attempted to cause, and would be reasonably expect to cause substantial emotional distress to a person to wit: **BENDANN** sent electronic messages by way of cellular phone to Minor Victim demanding contact and explicit images of Minor Victim, and threatening to expose sexually explicit images of Minor Victim publicly if Minor Victim did not comply.

18 U.S.C. §§ 2261A(2) & 2261(b)(5)

**JA40**

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 2253, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendant's convictions on any of the offense charged in Counts One through Eight of this Superseding Indictment.

### Sexual Exploitation of Children and Possession of Child Pornography Forfeiture

2.      Upon conviction of any of the offenses set forth in Counts One through Eight of this Superseding Indictment, the defendant,

### CHRISTOPHER KENJI BENDANN,

shall forfeit to the United States, pursuant to 18 U.S.C. § 2253(a):

a.      any visual depiction described in Title 18, United States Code, Sections, 2251, 2251A, 2252, or 2252A, 2252B, or 2260 or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped, received, or possessed in violation of Title 18, United States Code, Chapter 110;

b.      any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense; and

c.      any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property.

### Property Subject to Forfeiture

3.      The property to be forfeited includes, but is not limited to, the following items seized from the defendant's residence in Baltimore, Maryland, on or about February 3, 2023:

10

    a.  Apple iPhone model: A1549, IMEI: 354405069758749;

    b.  White Apple iPhone and clear Gilman case;

    c.  Apple iPhone 11 Pro, s/n: C39CK3CRN6XR;

    d.  Sony Vaio Notebook laptop, serial number 3109183; and

    e.  Dell Inspiron 15 laptop, service tag: HWSNXN2

## Substitute Assets

5.  If any of the property described above, as a result of any act or omission of the

    defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property that cannot be subdivided without

         difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C.

§ 853(p), as incorporated by 18 U.S.C. § 2253(b) and 28 U.S.C. § 2461(c).

18 U.S.C. §§ 1467, 2253, 2428
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

*Erek C Barron [signature]*

Erek L. Barron
United States Attorney

A TRUE BILL:

## SIGNATURE REDACTED

FOREPERSON

Date    05 29 24

11

**JA42**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| **v.** | *    **Criminal Case No. JKB-23-0278** |
| **CHRISTOPHER BENDANN** | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

<u>**MOTION TO SUPPRESS EVIDENCE OBTAINED THROUGH SEARCH WARRANTS**</u>

COMES NOW the defendant, Christopher Bendann, through counsel, Christopher C. Nieto, who hereby moves this Court to suppress any tangible and derivative evidence obtained and seized by law enforcement in connection with the issuance and execution of two search warrants in February of 2023.    In support thereof, he states as follows:

1.    The defendant, Christopher Bendann, is charged in a multi-count indictment with five counts of Sexual Exploitation of a Minor and one count of Possession of Child Pornography, in violation of 18 U.S.C.§ 2251(a) and §2252A(a)(5)(B).

2.    According to discovery materials, Baltimore County police were contacted on January 21, 2023 regarding Christopher Bendann and Gilman School. Specifically, police were told that Mr. Bendann allegedly provided alcohol to students and requested that they run naked at St. Paul's School and Meadowood Park in July and August of 2021. Subsequent investigation by law enforcement revealed a specific incident of alleged alcohol purchasing and associated naked running in September of 2021, as well as allegations of sexual exploitation of a minor from 2016 to 2019[1].

---

1 The complaining witness turned eighteen years old in 2019.

–1–

**JA43**

2.      Based on these allegations of misconduct some two to seven years prior to February 2023, both federal and state law enforcement sought search and seizure warrants against Mr. Bendann. Baltimore County police sought and obtained a search warrant for Mr. Bendann's house, car and person on February 1, 2023. *See Exhibit 1.* Federal law enforcement sought and obtained a similar warrant on February 9, 2023 for the electronic devices obtained during the execution of the state search warrant the week prior. *See Exhibit 2.*

3.      Mr. Bendann respectfully submits that these state and federal warrants were issued without probable cause and in violation of Mr. Bendann's rights under the Fourth Amendment to the United States Constitution. Specifically, the affidavit in support of the search warrants did not establish probable cause that evidence of a crime would be found on these devices in February of 2023. Additionally, the affidavit in support of these search warrants were based on stale information that does not justify a finding of probable cause. Accordingly, the evidence obtained from these illegal searches should be suppressed.

4.      The Fourth Amendment prohibits governmental intrusions into private dwellings without a warrant supported by probable cause, subject to only a few carefully delineated exceptions. *Thompson v. Louisiana*, 469 U.S. 17, 19-20, 105 S.Ct. 409, 410-11, 83 L.Ed.2d 246 (1984); *United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir. 1996).    "In terms that apply equally to seizures of property and to persons, the Fourth Amendment has drawn a firm line at the entrance to the house." *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75, 91 S.Ct. 2022, 2042-43, 29 L.Ed. 564 (1971).   The warrant requirement serves to interpose between the police and an individual's personal privacy; an orderly procedure involving a magistrate that is neutral and detached. *Johnson v. United States*, 333 U.S. 10, 14 (1948).   The warrant process is intended to avoid

–2–

**JA44**

allowing the determination of probable cause to rest with the zealous actions of the police who are "engaged in the competitive enterprise of ferreting out crime." *Id.*

5.      In order for the magistrate to make an informed and knowing judgment, "the affidavit presented must contain adequate facts about the underlying circumstances to show that probable cause exists for the issuance of a warrant." *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996). Probable cause to issue a search warrant is found by looking at the "totality of the circumstances" contained within the four corners of the affidavit. *Illinois v. Gates*, 462 U.S. 213, 237 (1983). A failure to ensure that affidavits contain more than "bare bones" conclusions is an abdication of the duty of the issuing judge. *Gates*., at 239.

6.      "In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993) (affirming District Court's holding that search warrant was invalid because there was no nexus between defendant's drug activity and his residence.)

7.      A police officer seeking the issuance of a search warrant must present an affidavit containing facts sufficient to "provide the magistrate with a substantial basis for determining the existence of probable cause." *Gates* at 239. The supporting affidavit must make it apparent, that there is some nexus between the items to be seized and the criminal activity being investigated. *See Warden v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). *See Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000) ("The fundamental constitutional principle that search warrants must be founded upon the probable cause derives from the language of the Fourth Amendment itself, which provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or

–3–

**JA45**

affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'")

8.    Although there is no specific time requirement for a finding of probable cause to issue a search warrant, "it is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *Sgro v. United States*, 287 U.S. 206, 210 (1932).   If the affidavit supporting the search warrant sworn to contains stale information and was facially deficient as to the location in question, that cannot justify a finding of probable cause. *Id.*

9.    In this case, the police failed to establish sufficient probable cause to support a search warrant for the residence, electronic devices, car or person of Mr. Bendann. The affidavit submitted to the Baltimore County District Court falls short because the only allegations of illegal conduct contained within the affidavit allegedly occurred years prior. There had been no allegations of any criminality since September of 2021, with the bulk of the alleged criminal conduct to have occurred prior to 2019, and there no support for ongoing criminal activity at the time and for the place for which the warrant was issued.

10.    Moreover, the affidavit was so deficient that no objectively reasonable officer would have relied in good faith on the legality of the search warrant. *See United States v. Leon*, 468 U.S. 897, 923 (1984) (when warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" it cannot be relied upon in good faith) (quotation omitted). The good faith exception of Leon does not save the warrant. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Leon,* the Supreme Court held that evidence obtained by "officers reasonably relying on a warrant issued by a detached and neutral magistrate" is

–4–

**JA46**

admissible, 468 U.S. 897, 913 (1984). However, this "good faith" exception does not apply in four situations: first, when the warrant is based on an affidavit containing "knowing or reckless falsity"; second, when the magistrate has simply acted as a "rubber stamp" for the police; third, when the affidavit does not "provide the magistrate with a substantial basis for determining the existence of probable cause"; and finally, when the warrant is so "facially deficient" that an officer could not reasonably rely on it, *Leon* at 923. We submit that here the state and federal Judges, in essence, acted as a "rubber stamp" and that the Affidavits failed to provide the Judge with any basis by which to determine the existence of probable cause.

WHEREFORE, Mr. Bendann respectfully requests that this Court issue a pre-trial ruling barring the government from admitting at trial in this case any evidence obtained in connection with the unlawful search warrants.

Respectfully submitted,

_____/S/_____
CHRISTOPHER C. NIETO
The Law Office of Christopher C. Nieto, LLC
1 North Charles Street, Suite 1301
Baltimore, Maryland 21201
Tel: (443) 863-8189
Fax: (443) 378-5723
Email: cnieto@nietolawoffice.com

## **REQUEST FOR HEARING**

Pursuant to Rule 105.6 of the Local Rules of the United States District Court for the District

–5–

**JA47**

of Maryland, Mr. Bendann requests a hearing on this motion.

_____/s/_____
CHRISTOPHER C. NIETO
Attorney for Mr. Bendann

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 12th day of February, 2024, a copy of the foregoing

Motion to Suppress Evidence was delivered, via ECF, to Colleen McGuinn and Kimberly Hagan,

Assistant United States Attorneys.

_____/s/_____
CHRISTOPHER C. NIETO
Attorney for Mr. Bendann

–6–

**JA48**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Criminal Case No. JKB-23-0278** |
| **CHRISTOPHER BENDANN** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### MOTION TO SUPPRESS EVIDENCE OBTAINED FROM CELLPHONE

COMES NOW the defendant, Christopher Bendann, through counsel, Christopher C. Nieto, who hereby moves this Court to suppress any tangible and derivative evidence obtained and seized by law enforcement from Mr. Bendann's cell phone. In support thereof, he states as follows:

1.      The defendant, Christopher Bendann, is charged in a multi-count indictment with five counts of Sexual Exploitation of a Minor and one count of Possession of Child Pornography, in violation of 18 U.S.C.§ 2251(a) and §2252A(a)(5)(B).

2.      According to discovery materials, state and federal agents assisted in the execution of a search warrant at Mr. Bendann's home on February 3, 2023 around 5:20am. Upon entry into the home, Mr. Bendann was placed in custody and read his Miranda Rights. Mr. Bendann indicated that he understood and invoked his right to remain silent without his attorney present.

3.      During the execution of this warrant, agents located a cellphone on the dresser next to the bed. The device had facial recognition biometrics engaged on the phone, so law enforcement placed the phone in front of Mr. Bendann's face[1]. The phone then prompted Mr. Bendann to enter his passcode.

---

[1] In their search warrant application, Baltimore County police sought and received permission from the Court to utilize biometric features to unlock electronic devices. They knew that the opportunity to unlock a device this way

**JA49**

4.    Despite the invocation of his right to remain silent, Baltimore County Detective Merkel directed and compelled Mr. Bendann to enter his passcode into the phone. He was in custody, surrounded by law enforcement, and was not free to leave. His compliance with this request was involuntarily.

5.    In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court decided that certain prophylactic warnings are necessary to safeguard a defendant's right against self-incrimination. If a person in custody indicates that he wants to remain silent, he may not be questioned further unless he initiates communication, or (1) a significant period of time has passed after the initial questioning ceased, (2) the suspect is given a fresh set of Miranda warnings, and (3) the second interrogation concerns a crime that was not a subject of the first interrogation. *Michigan v Mosley*, 423 U.S. 96, 106 (1975). If the suspect invokes the right to counsel, questioning may resume when an attorney has been provided or the suspect has knowingly and voluntarily relinquished his right to counsel. *Edwards v. Arizona*,451 U.S. 477, 482 (1981).

6.    Any statement made in police custody, in response to questions, is inadmissible unless the record clearly shows that the entire series of warnings was provided and that the defendant knowingly and intelligently waived these rights. The government has the burden of showing that any waiver of rights was knowingly, voluntary and intelligent. Because Mr. Bendann did not knowingly, voluntarily or intelligently waive his Miranda rights, his entering of the passcode to this phone should be suppressed, as well as any fruit of this violation of his constitutional rights. *Wong-Sun v. United States*, 371 U.S. 471 (1963).

---

may exist for only a short period of time. Law enforcement had not anticipated the need for a passcode, in addition to the facial recognition, when putting the phone in front of Mr. Bendann's face.

7.      The test for voluntariness is whether the statement is "the product of an essentially free and unconstrained choice by it's maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). The Court must determine whether Mr. Bendann's entry of the passcode was "the product of an essentially free and unconstrained choice by its maker," *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961), and to do so upon a view of the "'totality of the circumstances.'" *Wyrick v. Fields*, 459 U.S. 42, 47 (1982) (quoting *Edwards v. Arizona*, 451 U.S. 477, 483 (1981)).

WHEREFORE, Mr. Bendann respectfully requests that this Court issue a pre-trial ruling barring the government from admitting at trial in this case any evidence obtained in connection with the passcode-aided search of this cell phone.

Respectfully submitted,

_____/S/_____
CHRISTOPHER C. NIETO
The Law Office of Christopher C. Nieto, LLC
1 North Charles Street, Suite 1301
Baltimore, Maryland 21201
Tel: (443) 863-8189
Fax: (443) 378-5723
Email: cnieto@nietolawoffice.com

## **REQUEST FOR HEARING**

Pursuant to Rule 105.6 of the Local Rules of the United States District Court for the District of Maryland, Mr. Bendann requests a hearing on this motion.

_____/s/_____
CHRISTOPHER C. NIETO

–3–

Attorney for Mr. Bendann


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of February, 2024, a copy of the foregoing

Motion to Suppress Evidence was delivered, via ECF, to Colleen McGuinn and Kimberly Hagan,

Assistant United States Attorneys.


_____/s/_____
CHRISTOPHER C. NIETO
Attorney for Mr. Bendann


–4–


**JA52**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. JKB-23-278** |
| | * | |
| **CHRISTOPHER KENJI BENDANN,** | * | |
| **Defendant.** | * | |
| | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*

## GOVERNMENT'S CONSOLIDATED RESPONSE
## TO DEFENSE PRE-TRIAL MOTIONS

The United States of America respectfully submits this consolidated response to the following two pre-trial motions filed by Christopher Kenji Bendann ("Bendann" or "Defendant") in this matter:

1. Defense Motion to Suppress Evidence Obtained Through Search Warrants (ECF No. 78);

2. Defense Motion to Suppress Evidence Obtained from Cellphone (ECF No. 79);

## I.   PROCEDURAL BACKGROUND

On February 1, 2023, Baltimore County District Court Judge Karen Pilarski signed a residential search warrant for Bendann's home in Baltimore, Maryland.  In addition to Bendann's residence, the warrant authorized the search of Bendann's person, Bendann's Honda CRV, and the search and seizure of multiple electronic devices[1].  On February 3, 2023, law enforcement executed the warrant and arrested and charged Bendann in the District Court for Baltimore County with Sexual Child Abuse (Md. Ann. Code Crim. § 3-602), Second Degree Rape (Md. Ann. Code

---

[1] This warrant is included as Defendant's Exhibit 1 with Defendant's Motion to Suppress (ECF 78).  The government will refer to the same exhibits in this response.

1

**JA53**

Crim. § 3-304), Third Degree Sexual Offense (Md. Ann. Code Crim. § 3-307), Fourth Degree

Sexual Offense (Md. Ann. Code Crim. § 3-308) and Perverted Practice (Md. Ann. Code Crim. §3-

322), all against Minor Victim.  Case No. D-08-CR-23-14083. On February 27, 2023, the Grand

Jury sitting for Baltimore County returned a 16-count indictment, charging Bendann with Sexual

Child Abuse, Second Degree Rape, Second Degree Sexual Offense, Third Degree Sexual Offense,

and Solicitation of a Minor.    Baltimore County Circuit Court Case No C-03-CR-23-00938.

On February 9, 2023, after the execution of the residential search warrant and prior to the

state indictment, United States District Court Magistrate Judge Beth Gesner issued a search

warrant for the eighteen digital devices that were seized by law enforcement on February 3, 2023

as well as various online accounts maintained by Bendann.  Specifically, the federal warrant

authorized the search of the following online accounts maintained by Bendann:  Google

(cbendann@gmail.com), Snap (username: ckbend); Instagram (usernames ckbenda and fd_tch),

and Apple iCloud (cbendann@gmail.com).

The Federal Bureau of Investigation (FBI) took custody of the devices to search them for

digital evidence based upon Minor Victim's statement that Bendann took sexually explicit videos

and images of him.   By order of this Court, filed under seal in BPG-23-446 (now MJM-23-446),

the FBI ceased their search of the electronic devices on March 14, 2023.[2]  Over the next several

months, the parties engaged in filings and litigation under seal in MJM-23-446, and the

examination of the digital evidence remained stalled.   On August 10, 2023, the search of the

electronic devices and the Apple iCloud account resumed by order of this Court.  On August 16,

---

[2] The government made the decision to include the iCloud account cbendann@gmail.com as part of the proceedings in MJM-23-446.  The iCloud account was obtained pursuant to a separate warrant and not part of the Court's March 14, 2023 order.  Because the contents of the iCloud account could likely include some of the same evidence that may be found on Bendann's Apple devices, the government also stopped searching the iCloud account.

2

2023, the Grand Jury returned a six-count indictment charging Bendann with five counts of Sexual Exploitation of a Minor (18 U.S.C. § 2251(a)) and one count of Possession of Child Pornography (18 U.S.C. § 2252(a)(5)(B)) based on materials recovered from Bendann's iCloud account. (ECF 1). Agents arrested Bendann on August 18, 2023, and the case was unsealed (ECF 5).

On February 12, 2024, the Defendant filed two pretrial motions in this matter (ECF 78 & 79). The government respectfully submits this consolidated response to Defendant's pretrial motions. A motions hearing is scheduled for April 23, 2024, and a jury trial is set for August 21, 2024.

## II.   SUMMARY OF FACTS

The investigation into the Defendant began on January 21, 2023, when the Baltimore County Department of Social Services ("DSS") received a report that a middle school teacher at the Gilman School ("Gilman") had provided alcohol to students. The report specified that the teacher, Bendann, drove students to the area of St. Paul's School and Meadowood Regional Park in Baltimore County, requested that the students remove their clothing, and had the students run around the park area, naked, in front of Bendann. The report alleged that this occurred more than once, and that the incidents occurred in July and August of 2021. On January 16, 2023, Gilman placed Bendann on administrative leave, and he was subsequently terminated on January 20, 2023. Upon receipt of the DSS report, Baltimore County Police ("BCPD") began their investigation into the allegations involving Bendann.

Victim 1

On January 26, 2023, a student from Gilman was interviewed at the Baltimore County Child Advocacy Center ("CAC"). This student, born in December 2005, is referred to as Victim

1 in the Baltimore County search warrant (Def. Ex. 1).  Victim 1 disclosed during the recorded interview that Bendann had been his middle school advisor.  Victim 1 reported that Bendann housesat or babysat for several Gilman families including Victim 1's parents, who employed Bendann to watch Victim 1 and his siblings on weekends when they were out of town.  On these occasions, Victim 1 stated that Bendann allowed Victim 1 to drink alcohol and allowed Victim 1's friends to drink as well.  Bendann bought alcohol for Victim 1 and his friends, and in return Bendann instructed Victim 1 and his friends to do "naked laps."  Victim 1 described "naked laps" as removing all clothing and running around in front of Bendann.   Victim 1 described a specific instance when after requiring Victim 1 and his friends to run "naked laps," Bendann drove Victim 1 and his friends to Bendann's home and directed them do "naked laps" at his home.  Victim 1 said Bendann had a Ring doorbell camera on his porch and that it may have captured this incident.

Victim 1 described another occasion when Bendann was housesitting at Victim 1's home in Baltimore County in 2021.  Victim 1 had gone to a party and had been drinking.  Bendann picked Victim 1up from the party.  Victim 1 and Bendann returned to Victim 1's home alone, and Victim 1 began watching television.  After eating food prepared by Bendann, Victim1 described that he "blacked out," and when he woke up, he was naked in his bed with only the living room blanket covering his genitals.  Bendann told Victim 1 he was sleep walking and dancing and had removed his own clothing.  Victim 1 did not feel he had consumed enough alcohol to render himself incapacitated in this way.

Victim 1 also disclosed that Bendann  made friend-requests to students on social media platforms such as Instagram and Snapchat and described Bendann as very persistent about

contacting students. Victim 1 stated that Bendann became upset if the students did not respond to him.

### Minor Victim

On January 30, 2023, Minor Victim was forensically interviewed at the CAC.[3] This interview was audio and video recorded. Minor Victim disclosed that Bendann had sexually abused him and had taken explicit images and videos of him. Minor Victim stated that he met Bendann when Minor Victim attended middle school at Gilman. Bendann was his student-advisor during this time. According to Minor Victim, when he was in 8th or 9th grade, Bendann would give Minor Victim and his friends rides home after they had been drinking. In exchange for the ride, Bendann made Minor Victim and his friends run naked at Meadowood Regional Park and at the hill at St. Paul's School. Minor Victim stated that this went on for over a year.

On one occasion, when Minor Victim was a freshman or sophomore in high school at Gilman, Bendann drove a long way to pick Minor Victim from a party. On the drive home, Bendann stopped at McDonald's and bought Minor Victim something to eat. Bendann then told Minor Victim that Minor Victim "owed him" for having Bendann drive such a long way. Bendann told Minor Victim to get naked and masturbate. Minor Victim was 15 or 16 years-old at the time. Minor Victim complied with Bendann's request. Minor Victim described Bendann's car as a silver Honda CRV. Over the course of the following year, Bendann continued to demand that Minor Victim remove his clothes and masturbate during their drives,

---

[3] Minor Victim is the person who is the subject of the Indictment in this case. In the Baltimore County search warrant, Def. Ex. A., Minor Victim is identified as Victim 2. Minor Victim, born in March 2001, was 16 and 17 years old at the time of the offenses, but was 21 years old at the time of the interview.

and at some point, during these encounters, Bendann began to touch Minor Victim's genitals. The first touching began in Bendann's car when Bendann picked Minor Victim up from a party. The abusive acts intensified, and, as Minor Victim described, "things got worse."

Bendann had Minor Victim join him while housesitting for Gilman families where he would sexually abuse Minor Victim. Bendann also sexually abused Minor Victim at Minor Victim's home. Bendann recorded these instances of abuse, which often occurred in showers in the residences of Gilman families and in Minor Victim's home. During his interview at the CAC, Minor Victim provided specific details about these instances of abuse and the locations and addresses where they occurred.

Minor Victim also disclosed that Bendann would contact Minor Victim via text message and over social media platforms such as Snapchat and Instagram, demanding that Minor Victim send naked videos and images of himself to Bendann. Minor Victim stated that Bendann reached out to him on Snapchat and started "making deals" with Minor Victim. Specifically, Bendann repeatedly threatened Minor Victim with exposure if Minor Victim did not produce a certain number of nude images. Bendann told Minor Victim how to pose and became mad if Minor Victim was not smiling in the images. If Minor Victim tried to block Bendann on social media, Bendann harassed Minor Victim's friends and threatened Minor Victim with exposure of the nude images. Minor Victim estimated he sent hundreds of videos and thousands of images of himself naked or engaged in masturbation to Bendann through Snapchat. Minor Victim also said that Bendann had a black iPhone in a white phone case that contained a hidden folder in the camera roll of that phone.

When Minor Victim left the Baltimore area for college in 2020, Bendann created an Instagram account with the username, "FD_TCH" that contained naked images of Minor Victim from high school. Bendann used this Instagram account to send friend requests to Minor Victim's friends.

Minor Victim gave law enforcement his cell phone and iPad with written consent that they could search his devices. Investigators located text messages between Bendann and Minor Victim. Minor Victim had Bendann listed as "Mr. Bendann" in his devices, and the following chat occurred on December 7, 2022:[4]

| Bendann: | [Minor Victim's name] Boy |
| Bendann: | Puppy fucking answer |
| Bendann: | [Minor Victim's name] |
| Bendann: | Why does [Minor Victim's friend] keep adding me |
| Bendann: | Puppy^ |
| Bendann: | Puppy respond |
| Bendann: | Puppets |
| Bendann: | Pup really? Snap back you are down to one a day and it is a big problem |
| Bendann: | Hey |
| Bendann: | Snap again |

Minor Victim also disclosed that Bendann contacted him on January 16, 2023 when Bendann was first placed on administrative leave by Gilman. Bendann asked if Minor Victim was

---

[4] This portion of a chat occurred about 8 weeks prior to the residential search warrant by BCPD on February 3, 2023, and is contained in the affidavit of that warrant.

the person who reported Bendann to Gilman. Bendann then stated to Minor Victim that he was deleting everything.

### III.    MOTION TO SUPPRESS EVIDENCE OBTAINED FROM SEARCH WARRANTS (ECF 78) 1.

Bendann argues that the state search warrant issued on February 1, 2023, and the federal search warrant issued on February 9, 2023, failed to establish that there was probable cause to believe that evidence of a crime would be found on the stated devices. ECF 78 at 2. With respect to his claim that there was insufficient probable cause to establish that evidence of a crime would be found, Bendann seems to only challenge the warrants' probable cause as to the *devices*. ECF 78 at 2 ¶ 3. As discussed below, probable cause also existed to believe that evidence of a crime would be found in Bendann's residence, vehicle, online accounts and about his person. Additionally, Bendann argues that the warrants were based on stale information. *Id*. Bendann further argues that the *Leon* exception does not apply because both the state and federal judges who granted these warrants acted as a "rubber stamp," meaning both judges granted the warrants without considering whether or not probable cause existed. (ECF 78 at 4). Bendann is incorrect on all claims.

The search warrants were constitutional as both affidavits contained sufficient details to establish with specificity and particularity that evidence would be found on Bendann's devices. Furthermore, the search warrants were not based on stale information as the crimes being investigated involved prolonged criminal activity over the course of years. Even assuming *arguendo*, that there was insufficient probable cause in the affidavits (which there was not), the good faith exception applies because any reasonable officer would have relied on the sufficiency of the search warrants authorized by Baltimore County District Court Judge Karen Pilarski and

8

United States Magistrate Judge Beth Gesner in this case. Neither judge acted as a "rubber stamp" for the police. Bendann's motion to suppress all evidence derived from search warrants should be denied.

    **A.**    **The Warrants Contained Sufficient Probable Cause To Believe That Evidence Would Be Found on Bendann's Electronic Devices and in Other Specified Locations**

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., Amend. IV. Evidence obtained from Bendann's residence, his vehicles, his person, his electronic devices, and his iCloud and other online accounts should not be suppressed because the evidence was seized pursuant to facially valid search warrants, supported by probable cause, and issued by a neutral magistrate.

> In reviewing a search warrant application, a magistrate judge must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 238 (1983).

"To begin with, warrant affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Clenney*, 631 F.3d 658, 665 (4th Cir. 2011) (internal citation and quotation marks omitted). A court reviewing a judge's assessment of probable cause must accord his or her decision "great deference," and should not "invalidate a warrant 'by interpreting [an] affidavi[t] in a hypertechnical, rather than a commonsense, manner.'" *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir.), *cert. denied*, 510 U.S. 983 (1993) (quoting *Gates*, 462 U.S. at 236). "So long as the magistrate had a 'substantial basis for . . . conclud[ing]'

9

that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

A commonsense reading of the statement of probable cause contained in the original and subsequent affidavits demonstrates that both the state district court judge and the magistrate judge had a substantial basis for concluding the warrants were supported by sufficient probable cause. The affidavits set forth enough information to form a considerable basis that a search would uncover evidence of wrongdoing – namely, that the initial residential search warrant would uncover the iPhone described by Minor Victim, and the iPhone (and other devices) as well as the iCloud would lead to evidence relating to the Sexual Exploitation of Children, Coercion and Enticement, Possession of Child Pornography.

The law does not require a high level of evidentiary proof at the warrant-application stage. The law does require only that an affidavit demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Doyle*, 650 F.3d 460, 472 (4th Cir. 2011) (*quoting United States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983). That standard is amply satisfied here.

"Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. The probable cause standard does not require officers "to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause." *Taylor v. Farmer*, 13 F.3d 117, 121–22 (4th Cir. 1993). The probable

10

**JA62**

cause standard is "not a high bar," *United States v. Blakeney*, 949 F.3d 851, 859–61 (4th Cir. 2020), and the highly specific details the Defendant demands are not required.

Probable cause may be established through information from any reliable source or sources, *Draper v. United States*, 358 U.S. 307, 313 (1959), or even through an anonymous tip which has been corroborated, *Gates*, 462 U.S. at 241. Further, an affidavit may be based in whole or in part on hearsay information, so long as there is a sufficient indicia of reliability. *See, e.g., United States v. Ventresca*, 380 U.S. 102, 103 (1965); *United States v. McKenzie-Gude*, 671 F.3d 452, 459–60 (4th Cir. 2011); *Hurwitz*, 459 F.3d at 473*; United States v. Dequasie*, 373 F.3d 509, 518 (4th Cir. 2004); Hodge, 354 F.3d at 309; *United States v. Chavez*, 902 F.2d 259, 265 (4th Cir. 1990); and Fed. R. Crim. P. 41(c)(1).

Here, the affidavits included detailed statements about the nature of Bendann's crimes and Bendann's use of electronic devices in the commission of those crimes. Bendann's use of a cellphone to communicate with Minor Victim via text message, Snapchat, and Instagram as well as Bendann's use of devices to photograph and record the sexual abuse established probable cause to believe that evidence of the crimes would be found on his devices. At Bendann's request, Minor Victim stated that he sent Bendann "hundreds of videos and thousands of images." When interviewed, Minor Victim provided his own cellphone and iPad which contained evidence to support not only that Bendann had been sexually exploiting and abusing Minor Victim, but that Bendann had used electronic devices in the commission of those crimes. In a text exchange dated December 8, 2022, less than two months before the execution of the state search warrant, Bendann threatened Minor Victim. Then on January 16, 2023, Bendann told Minor Victim that he was

11

**JA63**

"deleting everything." Minor Victim also gave investigators information about a hidden folder on Bendann's iPhone, which he described as black in a white phone case.

The federal warrant also included information provided by Minor Victim about a specific Instagram account (username: "fd_tch") that contained nude photographs of Minor Victim. According to Minor Victim, Bendann used this account to send friend requests to Minor Victim's friends. Minor Victim also stated that Bendann's Snap and Instagram usernames were "ckbend" or "ckbenda." Follow up investigation confirmed that Bendann did in fact have the following online accounts: "cbendann@gmail.com" through Google, "ckbend" through Snap, "ckbenda" and "fd_tch" through Instagram.

Both warrants established sufficient probable cause to believe that evidence of these crimes would be found on Bendann's devices and within his online accounts.

There was also ample probable cause in the state warrant affidavit to believe that evidence of a crime would be located in Bendann's residence in Baltimore, his Honda CRV and on his person. First, the affidavit details the manner in which sexual offenders collect, maintain and store sexually explicit material and that storage locations typically include homes, vehicles, commercial storage facilities, on persons, and within computers and media devices. Second, the affidavit detailed incidents in which Bendann committed certain acts in various locations to include his own residence, residences of other Gilman families, and his Honda CRV.

**B.     Probable Cause Was Not Stale.**

Bendann complains that probable cause was stale as it pertained to the search of his house, car, person, and electronic devices, arguing that the affidavits alleged "misconduct" that occurred "some two to seven years prior to February 2023." (ECF 78 at 2). Bendann states that there is no

probable cause that the devices would include fruits, instrumentalities or evidence of a crime dating back nearly "two to seven years prior." In other words, Bendann contends the warrants lack particularity in terms of time. To be sure, particularity does "forbid fishing expeditions while simultaneously preserving the flexibility of law enforcement to adapt to unforeseen circumstances that arise in an investigation predicated on incomplete information." *United States v. Dargan*, 738 F.3d 643,547 (4th Cir. 2013).

"In the context of child pornography cases, courts have largely concluded that a delay, even a substantial delay, between distribution and the issuance of a search warrant does not render the underlying information stale." *United States v. Richardson*, 607 F.3d at 370 (concluding that lapse of four months did not render probable cause to search for child pornography "stale"); *see, e.g. United States v. Newsom*, 402 F.3d 780, 783 (7th Cir. 2005) ("Information a year old is not necessarily stale as a matter of law, especially where child pornography is concerned."); *United States v. Carroll,* 750 F.3d 700, 707 (7th Cir. 2014) (concluding that an affidavit to search five years after a child pornography crime has occurred was not stale because it remained reasonable to expect "images of child pornography would still be present on defendant's computer or other digital storage device or, if deleted, that the images could be recoverable."); *United States v. Harvey*, 2 F.3d 1318, 1323 (3d Cir. 1993) (concluding that two to fifteen months does not render information stale); *see also United States v. Bosyk*, 933 F.3d 319, 330–32 (4th Cir. 2019) (rejecting defendant's staleness argument), *cert. denied*, 140 S. Ct. 1124 (2020); *United States v. Farmer*, 370 F.3d 435, 438–40 (4th Cir.), *cert. denied*, 543 U.S. 1022 (2004); and *United States v. Rhynes*, 196 F.3d 207, 234 (4th Cir. 1999).

Child sexual abuse and child pornography crimes are not static or immobile. It takes time to coerce, entice, and solicit victims; the crimes themselves are continuing in nature. Criminal actors often amass collections of child pornography and save digital files of their victims for several years. This conduct can span extended periods of time. In fact, in the state warrant, the affiant stated that she knows through her training, knowledge, and experience that people who engage in child pornography and child exploitation "keepsake the images and videos and often times retain them indefinitely." Def. Ex. 1, p. 15. Similarly, in the federal search warrant, the affiant stated that "individuals who have a sexual interest in children or images of children often maintain their collections that are in digital or electronic format in a safe, secure, and private environment, such as a computer or cellphone, and in the surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence." Def. Ex. 2., p. 4. The affiant asserts that "computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools." *Id.* at p. 7.

Here, Bendann contacted Minor Victim in January 2023 and stated he was actively "deleting everything," which implies that Bendann had evidence to delete "two to seven years" after the allegations of sexual abuse and exploitation. Law enforcement had access to chats between the Bendann and Minor Victim from December 2022 that confirm Minor Victim's disclosure that the exploitation and abusive conduct by Bendann continued into Minor Victim's young adulthood. In that December 2022 chat, Bendann refers to Minor Victim as "Puppy" which

14

**JA66**

agents recognized as terminology that "refers to a dominance and submission... in an erotic lifestyle.  This reference is indicative of one person having power and control over another party within a sexual relationship."  (Def. Ex. 1, p. 10 and Def. Ex. 2, p. 15, footnote 2).

In this investigation, detectives had information that Bendann had exploitive sexual contact with Victim 1 as late as September 2021, 16 months prior to the search warrants in this case. Further, detectives were shown continuing contact between Minor Victim and Bendann about 4 weeks prior to the search warrants in this case.    Most compellingly, detectives had information from just days prior to the search warrants that Bendann questioned who had reported his conduct to Gilman and told Minor Victim that he was "deleting everything."  The probable cause for these warrants was not stale, and the affiants provided sufficient explanations as to why these search warrants were temporal in particularity.

### C.    Officers Relied Upon the Search Warrants in Good Faith

The affidavits in each warrant provide properly detailed probable cause.  But even if their statements of probable cause were deficient, Bendann's motion would still fail because officers relied on the warrants in good faith.  When officers seize evidence in good faith in reliance on a facially valid warrant issued by a judge, and the affidavit is later found to lack probable cause, the evidence is not subject to exclusion.  *See United States v. Leon*, 468 U.S. 897 (1984) (affidavit of experienced narcotics officer who acted in reliance on information provided by informant of "unproven reliability" held to lack probable cause, but evidence seized by agent who acted in good faith reliance on the facially valid warrant was not subject to suppression); *see also United States v. Edwards*, 798 F.2d 686, 690 (4th Cir. 1986). When applying the good faith exception, courts "should examine the totality of the information presented to the magistrate in deciding whether an

15

**JA67**

officer's reliance on the warrant could have been reasonable." *United States v. Legg*, 18 F.3d 240, 244 n.1 (4th Cir. 1994).

There are "four situations in which an officer's reliance on a search warrant would not be reasonable," that is, where the "good faith exception" would not apply: (1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth; (2) the magistrate wholly abandoned his detached and neutral judicial role; (3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid. *United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995) (*quoting Leon*, 468 U.S. at 923).

Bendann claims that the good faith exception does not apply because the search warrants were (in the Defendant's view) granted by the state and federal judges acting as a "rubber stamp" and that the Affidavits failed to provide the judges with any basis by which to determine the existence of probable cause (ECF 78 at 5). Defendant's argument is meritless.

On February 1, 2023, Baltimore County District Court Judge Karen Pilarski reviewed BCPD Detective Shannon Markel's applications and affidavit in support of search warrants for the following:

     i.      the Defendant's home in Baltimore County;

     ii.     the Defendant's person; and

     iii.    the Defendant's vehicle:  2009 Honda CRV

**JA68**

Judge Pilarski determined that she "was satisfied that there is probable cause" to search the Bendann's home, vehicle, and person, "and that probable cause for issuance of the Search and Seizure Warrant exists, as stated in the Application and Affidavit attached to this warrant." Def. Ex. 1, p. 21.

Judge Pilarski also determined that there was probable cause to believe that there was evidence relating to the Maryland state crimes of Sex Abuse of a Minor (Md Ann. Code, Crim. Law, §3-602(b)(1)), Child Pornography (Md. Ann. Code, Crim. Law, §11-207(a))), and Possession of Child Pornography (Md. Ann. Code, Crim. Law, § 11-208)). Specifically, Judge Pilarski determined that she was satisfied with the items to be seized, the breadth of the search of those places, and the method law enforcement would use to conduct those searches. *Id.* at pp. 21 and 22.

Detective Markel relied upon the authorized search warrants and executed them accordingly. She, and other law enforcement members, did seize evidence including the eighteen electronic devices. The seizure of these electronics on February 3, 2023, occurred two weeks after the Defendant was notified his employment at Gilman had terminated. Federal Bureau of Investigation ("FBI") sought the subsequent search warrant for electronic devices and the Defendant's Apple iCloud and other online account to assist with the investigation. Further, based on Minor Victim's disclosure, probable cause existed that the Defendant had committed the federal crimes of Sexual Exploitation of a Minor (18 U.S.C. §2251(a)) and Possession of Child Pornography (18 U.S.C. 2252A(a)(5)(B)).

On February 9, 2023, United States Magistrate Judge Beth Gesner reviewed FBI Special Agent Rachel Corn's applications and affidavit in support of search warrants for the following:

    i.     the Defendant's Google account associated with cbendann@gmail.com;

    ii.    the Defendant's Snap account, username "ckbend;"

    iii.   the Defendant's Instagram account "ckbenda" and account "fd_tch;"

    iv.   the Defendant's Apple account associated with cbendann@gmail.com; and

    v.    the Defendant's 18 digital devices seized from his home on February 3, 2023.

Magistrate Judge Gessner determined that she found "that the affidavit(s)… establish probable cause to search and seize" the above listed accounts. Def. Ex. 2, pp. 2, 5, 8, 11 and 14.

       Magistrate Judge Gesner also determined that there was probable cause to believe there evidence relating to the crimes of Sexual Exploitation of Children (18 U.S.C. §2251(a)), Coercion and Enticement (18 U.S.C. § 2422(b)), Distribution and Receipt of Child Pornography (18 U.S.C. § 2252A(a)(2)), and Possession of Child Pornography (18 U.S.C. § 2252A(a)(5)(B)) within Google, Snap, Instagram, and Apple business records for the accounts described above and the eighteen digital devices. Specifically, Magistrate Judge Gesner determined that she was satisfied with the items to be seized within those accounts, the breadth of the search of those accounts, and the method law enforcement would use to conduct those searches. *Id.* at Attachments B-1 through B-5.

       Special Agent Corn relied upon the authorized search warrants and executed them accordingly. She, and other law enforcement members, did seize and search this evidence in accordance with the parameters authorized by this Court.

       This "rubber stamp" argument merely reprises Bendann's assertion that the warrant affidavits were deficient. As explained, the affidavits and warrants were valid, and it was reasonable for law enforcement to rely on them in good faith. Indeed, the facts in each affidavit

clearly establish probable cause that evidence related to Sexual Child Abuse (Md. Ann. Code, Crim. Law, §3-602) and Sexual Exploitation of a Minor (18 U.S.C. § 2251(a)), and related state and federal crimes, will be found at Bendann's home, person, and vehicle, and subsequently within Bendann's electronic devices and online accounts.  Each affidavit and warrant have particularity and specificity as to the places to be searched and the things to be seized; each affidavit was based on temporally fresh or current probable cause.

Detective Shannon Markel and Special Agent Rachel Corn both acted in good faith in securing and executing the respective warrants and had every reason to plausibly rely on the warrants authorized by Baltimore County District Judge Pilarski and Magistrate Judge Gessner. The Defendants' Motion to Suppress Evidence Obtained from Search Warrants should be denied.

**2.    Defendant's Motion to Suppress Evidence Obtained From Cellphone (ECF 79)**

The Baltimore County Search Warrant (Def. Ex. 1) contained language that granted law enforcement permission to unlock any secured electronic devices using biometrics:  facial recognition and fingerprints.  Upon entry in the home, officers located Bendann upstairs and escorted him to his downstairs dining room and kitchen area.  A Baltimore County police officer who remained just inside the front entrance to the residence captured this time on  his body worn camera.[5]  Officers had Bendann sit in a chair, he was not handcuffed, and he was provided additional clothes to change into.  Approximately 7 minutes and 55 seconds into the body worn camera footage, Detective Markel verbally advised Bendann of his Miranda rights, and he invoked his right to have an attorney present.  Bendann did ask Detective Markel what it means for a

---

[5] The government will play this video during the motions hearing and will submit the video as Government Exhibit 1.

warrant to be sealed, and she explained that process to him. She also explained that pursuant to the warrant, she may need his "face or hands" at some point "for certain things." Other than routine questions regarding who to contact for him or what clothes he wanted retrieved, Bendann was not subjected to a custodial interrogation at any time. Although an agent can be seen standing near Bendann engaging in conversation with him while the search warrant is executed, the agent will testify that the conversation was not related to the investigation and that they spoke about baking, plants, espresso machines, and puzzles.

Approximately 29 minutes and 15 seconds into the video and as authorized by the state court warrant, Detective Markel brought Bendann's iPhone to him and held it in front of his face. The phone prompted the user to enter a passcode. Bendann on his own volition and without a request from anyone, entered a six-digit passcode, and the phone unlocked. While Bendann typed in his code, Detective Markel observed the first four digits (███) that Bendann entered. Detective Markel did not ask for the passcode nor did Bendann state his passcode to her. Det. Markel gave the cell phone to the FBI Digital Forensics examiner on scene, Jon Shumway, who put the cellphone in airplane mode. Mr. Shumway then opened the "Password" setting on the iPhone phone in an attempt to access all of the stored passwords to various apps contained within the phone. This required another biometric entry. Mr. Shumway approached Bendann again and used the facial recognition feature. The phone prompted Mr. Shumway for the numeric passcode. Mr. Shumway entered the kitchen and showed Detective Markel that he needed a second biometric entry or the numeric passcode. Mr. Shumway will testify that Bendann turned to them and stated, "it's my birthday, ███" Detective Markel can be heard on the body worn camera footage repeating, "███?" Bendann replied, "Yes."

Detective Markel will testify that when she initially saw Bendann enter the first four digits of the passcode as ███, she thought she recognized that as his date of birth but wanted to check the search warrant operations plan, which was on the kitchen counter, to confirm. Detective Markel entered the kitchen area and as she was checking the search warrant operations plan, Agent Shumway entered the room and advised that he needed the passcode. Detective Markel stated to Bendann, "████████" to which Bendann replied, "Yes."

Bendann argues that Detective Markel "directed and compelled" him to enter his passcode into the phone and that as a result, the Government should be precluded from admitting any evidence obtained in connection with the "passcode-aided search of his phone." ECF 79 at 2-3. Bendann's argument, citing *Miranda, Edwards,* and *Wong-Sun* is erroneous[6].

In *United States v. Oloyede*, 933 F.3d 302 (4th Cir. 2019), the Petitioner sought to suppress the search of her cell phone based on her own entry of her passcode into her phone. The FBI agent on scene handed the cellphone for the Petitioner and asked, "Could you please unlock your iPhone?" The Petitioner took the phone, entered her passcode, and handed the phone back to the agent. The trial judge found that the entry of the passcode to unlock the phone "was not a 'communicative response' and was therefore not a testimonial statement subject to *Miranda.*" *Id.* at 308. The search was upheld on appeal. "Unlike a circumstance, for example, in which she gave the passcode to the agent for the agent to enter, here she simply used the unexpressed contents of her mind to type in the passcode herself." *Id*. at 309.

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966); *Edwards v. Arizona*, 451 U.S. 477 (1981) and *Won-Sun v. United States*, 371 U.S. 471 (1963).

21

Here, even though Bendann was in custody and had invoked his right to have an attorney present before answering any questions posed to him by law enforcement, his action to input his passcode was voluntary.  The admission of data from Bendann's phone – the fruit of him opening it – presented no risk that coerced statements would be used against him at trial.  *See Oloyede, id. See also United States v. Patane,* 542 U.S. 630, 632-633 (2004) ("Admission of nontestimonial physical fruits (the pistol here) does not run the risk of admitting into trial an accused's coerced incriminating statements against himself.  In light of reliable physical evidence's important probative value, it is doubtful that exclusion can be justified by a deterrence rationale sensitive to both law enforcement interests and a suspect's rights during an in-custody interrogation.") Although the government cannot use the voluntary act of inputting the passcode *as evidence of Bendann's ownership of the phone*, it can use the contents of the phone seized pursuant to a valid search warrant when Bendann voluntarily accessed it.   The action did not violate the Bendann's *Miranda* rights or Fifth Amendment privilege against self-incrimination.

Even if the passcode to the Defendant's phone was compelled such that the content of the cell phone was illegally obtained, which it was not, the evidence from the cell phone may "nevertheless be admitted if the government can establish by preponderance of the evidence that the information ultimately or inevitably obtained would have been discovered by lawful means." *Nix v. Williams,* 467 U.S. 431, 444 (1984). *See also United States v. Bullette*, 854 F.3d 261 (4th Cir., 2017) ("Whether law enforcement would have inevitably discovery the evidence by lawful means is a question of fact.") *See also United States v. Will*, 2015 WL3822599 (4th Cir., 2015) (The content of the cell phone would have been ultimately discovered, even without the cellphone

passcode provided by the Petitioner, and thus the inevitable discovery exception to the exclusionary rule applies).

Det. Markel already saw the first four digits to the passcode when Bendann entered it willingly into the touchscreen. Seeing Bendann enter ███, Detective Markel will testify that she recognized the numbers as Bendann's possible day and month of birth and surmised that the last two digits were likely the year of his birth, prompting her to check the search warrant paperwork for the year of his birth. Det. Markel will testify that *even if* Bendann did not verbally confirm the last two digits of his passcode to be ██, she inevitably would have checked his date of birth in the search warrant operations plan and deduced that his complete passcode was in fact ████.

Based on this, assuming *arguendo* that Bendann's passcode was compelled, the forensic analysis would have uncovered the same content even if Bendann had not provide his passcode. Law enforcement had a valid search warrant for the contents of the phone which would have been inevitably discovered with or without a passcode.

**Conclusion**

Wherefore, the government respectfully requests that this Court deny Defendant's motions to suppress evidence obtained from search warrants and evidence obtained from cell phone.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:    _____

Colleen Elizabeth McGuinn
Kim Y. Hagan
Assistant United States Attorneys

23

**JA75**

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a copy of the foregoing document was served electronically via ECF to counsel of record for the defendant.

Colleen Elizabeth McGuinn
Assistant United States Attorneys

24

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Crim. No. JKB 23-0278** |
| **CHRISTOPHER K. BENDANN** | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

**MOTION FOR PSYCHIATRIC**
**EXAMINATION FOR THE DETERMINATION OF MENTAL**
**COMPETENCY TO STAND TRIAL**

The Defendant, Christopher K. Bendann, through counsel, Gary E. Proctor and Christopher Nieto, hereby moves for a psychiatric examination for the determination of mental competency to stand trial, and in support of the motion alleges the following:

1.      Trial in this matter is due to begin today, August 21, 2024.  As of the date of this filing the Defendant is refusing to come to Court.  Further, the Government has recently provided counsel for the Defendant with a jail call by the Defendant in which he alludes to suicide and an inability to assist counsel going forward.

2.      Counsel believes there is reasonable cause to believe that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him, or to assist properly in his defense.

3.      Counsel requests that this Court order that a psychiatric examination of the defendant be conducted and that a report be filed with the Court pursuant to the provisions of 18 U.S.C. § 4241(b).

5.      Defense Counsel requests that the examination be conducted pursuant to 18 U.S.C. § 4247(b) and (c) and that the defendant be committed to the custody of the Attorney General for a

reasonable period, not to exceed thirty (30) days, for the purposes of conducting the psychiatric

examination.  Counsel agrees that any time spent conducting and adjudicating said examination is

excludable under 18 U.S.C. § 3161(h)(1)(A).


WHEREFORE, it is requested that this Honorable Court grant an order providing for a

psychiatric examination to determine mental competency to stand trial.


Respectfully submitted,



_____/s/_____
Gary E. Proctor
Bar Roll Number 27936
Law Offices of Gary E. Proctor, LLC
233 E. Redwood St, Suite 1000C
Baltimore, Maryland 21202
Tel:    410.444.1500
Fax:    443.836.9162

**JA78**

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 21st day of August 20, 2024, a copy of the foregoing Motion for Psychiatric Examination for the Determination of Mental Competency to Stand Trial was served on counsel of record via ECF.

<div align="center">

_____/s/_____
GARY E. PROCTOR

</div>

<div align="center">3</div>

USDC - BALTIMORE
'24 AUG 28 PM6:34

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

CHRISTOPHER KENJI BENDANN,

Defendant.

**CASE NO:    JKB-23-278**

## VERDICT FORM

1. How do you find defendant **CHRISTOPHER KENJI BENDANN** as to **COUNT ONE** – Sexual Exploitation of a Child, on or about September 16, 2017?

   Not Guilty _____        Guilty *guilty*

2. How do you find defendant **CHRISTOPHER KENJI BENDANN** as to **COUNT TWO** – Sexual Exploitation of a Child, on or about June 21, 2018?

   Not Guilty _____        Guilty *guilty*

3. How do you find defendant **CHRISTOPHER KENJI BENDANN** as to **COUNT THREE** – Sexual Exploitation of a Child on or about August 26, 2018?

   Not Guilty _____        Guilty *guilty*

4. How do you find defendant **CHRISTOPHER KENJI BENDANN** as to **COUNT FOUR** – Sexual Exploitation of a Child on or about January 2, 2019?

   Not Guilty _____        Guilty *guilty*

5. How do you find defendant **CHRISTOPHER KENJI BENDANN** as to **COUNT FIVE** – Sexual Exploitation of a Child on or about February 9, 2019?

   Not Guilty _____        Guilty *guilty*

1

**JA80**

6. How do you find the defendant **CHRISTOPHER KENJI BENDANN** as to **COUNT SIX** – Possession of Child Pornography (iCloud account), on or about September 1, 2017, through on or about January 23, 2023?

   Not Guilty _____     Guilty _guilty_

7. How do you find the defendant **CHRISTOPHER KENJI BENDANN** as to **COUNT SEVEN** – Possession of Child Pornography (Dell Inspiron laptop), on or about February 3, 2023?

   Not Guilty _____     Guilty _guilty_

8. How do you find the defendant **CHRISTOPHER KENJI BENDANN** as to **COUNT EIGHT** – Possession of Child Pornography (Sony Vaio laptop), on or about February 3, 2023?

   Not Guilty _____     Guilty _guilty_

9. How do you find the defendant **CHRISTOPHER KENJI BENDANN** as to **COUNT NINE** – Cyberstalking, from May 2022 through December 2022?

   Not Guilty _____     Guilty _guilty_

The foregoing constitutes the unanimous verdict of the jury.

_8/28/24_
DATE



2



<div align="center">

**NIETO LAW OFFICE**

</div>

233 East Redwood Street
Suite 1000C
Baltimore, MD 21202

O: 443.863.8189
F: 443.378.5723
cnieto@nietolawoffice.com

January 13, 2025

The Honorable James K. Bredar
United States District Court Chief Judge
District of Maryland
101 West Lombard Street
Baltimore, MD 21201

Re:    *United States v. Christopher Bendann*
       <u>Criminal Case No. JKB-23-0278</u>

Dear Judge Bredar:

On August 28, 2024, Mr. Bendann was found guilty by a jury to all counts of the Superseding Indictment. He will be present before Your Honor on January 21, 2025 at 1:00pm to receive his sentence. In anticipation of this hearing, we respectfully submit this letter to outline the reasons why we believe that concurrent sentences of in the aggregate of **twenty (20) years** are warranted in this individual case. We submit that these proposed sentences are "sufficient but not greater than necessary" to satisfy the purposes of sentencing enumerated in 18 U.S.C. § 3553(a)(2).

<u>**INTRODUCTION**</u>

We acknowledge that our proposed recommended sentence is different than the calculated advisory guideline range. However, as this Court understands fully, the sentencing guidelines are simply advisory and are just one of the many factors for the Court to consider in fashioning an individualized sentence. In this type of case, the guidelines often provide little actual guidance to the Court regarding the determination of a sufficient, but not greater than necessary, sentence. The guidelines in this case, as currently constructed, provide an adjusted level of 43, which is a life sentence. Mr. Bendann does not warrant a life sentence for these offenses, and neither the Government nor the United States Probation Office believe that type of sentence is warranted either.

Sentencing is a difficult art, much more difficult in cases such as these, and there always exists the temptation to fall prey to a comfortable mechanical case evaluation afforded us by a matrix like the United States Sentencing Guidelines. Some courts find solace in brightline rules, as it makes the subtleties of sentencing moot,

<div align="center">

**JA82**

</div>

The Honorable James K. Bredar
January 13, 2025

but this Court is not one of those. As the Honorable Judge Grimm used to say, "the problem with the Guidelines is that it turns lawyers into accountants." This Court knows it is not beholden to the guidelines, and His Honor enjoys the freedom to look beyond them. In doing so, the Court will see Christopher Kenji Bendann as a living, breathing human being, as well as review the entirety of his life's contributions, prior to determining his fate. In other words, "fashioning a just sentence cannot be reduced to a mere arithmetical exercise and that reliance solely on numbers, quantities, offense levels, criminal history categories and matrices produces an illusory precision that obscures the fact that sentencing, in the end, must involve the exercise of judgment." *United States v. Biheri*, 356 F. Supp. 2d 589 (E.D. Va. 2005). It is this exercise of judgment that garners its strength from the factors set forth in 18 U.S.C. § 3553(a).

Mr. Bendann is a 40-year-old man who dedicated his entire life to the Gilman community. His adoptive father David "Lance" Bendann was a graduate from this prestigious school, and Mr. Bendann followed in his father's footsteps. This community has been Christopher's home for the entirety of his life[1]. And although not necessarily appreciated by non-native residents of Maryland, the Gilman school is considered one of the best educational institutions in the area. Members of this community proudly celebrate their Gilman acumen, as it both opens doors professionally and financially, and Mr. Bendann too is a Gilman graduate. However, in lieu of monetizing this education like so many others strive to do, Mr. Bendann was different: he only wanted to give back to this community by dedicating his adult life to teaching at this school.[2] By every account, he was an amazing teacher and well-respected by everyone he met. It is therefore all that more saddening that, based on the evidence adduced at trial, all the good Christopher Bendann achieved at that school has been forever tarnished and vilified by the conduct adduced at trial.

We respectfully submit that a sentence of 20 years is sufficient but not greater than necessary to achieve the aims of sentencing. The Government has recommended a sentence of 35 years for Mr. Bendann, which is the length of sentence often imposed for people convicted of murder or more dangerous conduct. The sentence the Government recommends is tantamount to a life sentence. It is simply a fact that inmates have shortened life expectancies. *See United States v. Taveras*, 436 F.Supp.2d 493, 500 (E.D.N.Y. 2006) (acknowledging that life expectancy within federal prison is "considerably shortened," *vacated in part on other grounds sub nom. United States v. Pepin*, 514 F.3d 193 (2d Cir. 2008)). The United States Sentencing Commission considers 470 months (37.5 years) of incarceration to be the equivalent of a *de facto* life sentence. *United States v. Nelson*, 491 F.3d 344, 349-50 (7th Cir. 2012) (citing Sourcebook of Federal Sentencing Statistics, Appendix A, at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/AppendixA.pdf (last visited January 10, 2025)). "This figure reflects the average life expectancy of federal defendants at the time of sentencing as determined by the United States Census Bureau." 491 F.3d at 350.

In fact, Courts routinely look to such tables and take life expectancy into account to make determinations like the one now before the court. *See, e.g., United States v. Nelson*, 491 F.3d 344, 350 (7th Cir. 2007); *United States v. Martin*, 100 F.3d 46, 47 (7th Cir. 1996) (also holding that good-time credits should not be considered by sentencing court in determining whether sentence imposed exceeded life expectancy); *People v. Rainer*, 2013 WL 1490107, *13, n. 6 (Colo. 2013) (state cert. granted Dec. 22, 2014); *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013); *People v. J.I.A.*, 127 Cal. Rptr.3d 141, 149 (2012).

---

1  Mr. Bendann is a life-long resident of Baltimore that only left the state to attend college in New York before returning four years later, before he even officially graduated college. He has no family outside of Baltimore nor any other place to call home

2  As was referenced during trial, Mr. Bendann began housesitting and babysitting for members of the Gilman community to supplement his income.

The Honorable James K. Bredar
January 13, 2025

Mr. Bendann's convictions warrant a significant penalty, to be sure, but in federal court, that length of sentence is inconsistent with similar cases, and imposition of such a sentence would create an unwarranted sentencing disparity, which § 3553(a) specifically mandates against. The Court must fashion an appropriate sentence, taking into consideration all relevant § 3553(a) factors, that is no longer than necessary to further the aims of federal sentencing. Important in that calculus is the fact that Mr. Bendann has lived a life full of public service and good deeds. He has never been arrested or charged with breaking the law in any capacity throughout his life, and we submit that the criminal conduct in this case does not encapsulate the sum of his life's work. Appreciating the importance of judicial economy, Mr. Bendann would simply like to highlight some factors that are relevant in determining an appropriate sentence now, but would respectfully request the right to delve deeper into all other relevant details and arguments on the day of his sentencing if necessary.

## PRE-SENTENCE REPORT AND ADVISORY GUIDELINES

According to the Presentence Report (PSR) prepared by USPO Manisha Garner, Mr. Bendann's advisory guideline range is Life. These numbers are based on a total offense level of forty-eight (48) and a criminal history category of I.  It is the defense's position that this advisory guideline range is inaccurate., and Mr. Bendann respectfully objects to several of the proposed sentencing enhancements.

1. **USSG § 2G2.1(b)(5)**

With regards to the guidelines for the Sexual Exploitation of a Child offenses, the PSR contemplates a two-level increase to the base offense level because they incorrectly assume that the victim was under the custody, control or supervisory control of Mr. Bendann at the times the videos were created. In support, the PSR references aspects of Mr. Bendann's connection to the victim as an intermediary between school and home.[3] However, there was no evidence adduced at trial or in the Government's submissions that establishes that any of these videos were created during the time in which the victim was in the custody or care of Mr. Bendann. Indeed, the evidence from trial established that Count One and Two were created when Mr. Bendann acted as a taxi service for the victim. He was not tasked by the victim's family to do this nor was he accepting custody of the victim; this was solely part of the friendship that existed amongst members of this friend group. Indeed, Mr. Bendann did not seek out opportunities to pick up the victim from various parties late at night, but rather the victim would contact Mr. Bendann himself to ask for a ride home.

Additionally, this enhancement should not apply for the remaining counts either. In Counts Three and Four, there is no evidence that Mr. Bendann was entrusted to "serve as the guardian" for the victim when these videos were created, as the victim did not stay at these other houses during the time the videos were created nor was Mr. Bendann supervising him. And in Count Five, pertaining to a video that depicted activity at the victim's home, there was no evidence that Mr. Bendann was supervising the victim in any capacity at the time it was created. Based on the time stamp for this specific video, the victim was approximately one month away from turning 18 years old, and the testimony at trial from the victim's

---

3  This argument made in the PSR is almost identical to what the Government argued in their sentencing filing. It is believed that the basis for the PSR's conclusions were based solely on conversations with the Government.

The Honorable James K. Bredar
January 13, 2025

parents was that they never asked Mr. Bendann to housesit or babysit the victim. Accordingly, we respectfully submit that this enhancement should not apply.

2. **USSG § 2G2.1(b)(6)(B)**

The PSR also includes a two-level enhancement because Mr. Bendann used his cell phone service and Snapchat to communicate with the victim. However, it is important to note that the sentencing guideline enhancements are designed to increase the punishment of defendants for aggravating factors in their case. For example, the guidelines in fraud cases are driven by loss amounts, which makes sense because the more money you steal, the worse your crime is. In drug cases, the quantity of drugs or criminal history serve as enhancers as well; this is predicated on the theory that selling kilograms of drugs is worse than selling grams, and having a recidivist history of breaking the law is worse than someone who is a first-time offender.

But this specific enhancement, § 2G2.1(b)(6)(B), is an antiquated and arcane enhancement that is not an aggravating factor in this case. While it may have been warranted prior to the proliferation of cell phone use throughout the world, it currently has no bearing in the modern world of technology. Counsel struggles to recall a case involving violations of 18 U.S.C. § 2251(a) that did NOT contain this enhancement because everyone in today's age communicates via interactive computer services.[4] Notwithstanding this reality, Congress has not endeavored to either revisit this enhancement to determine its applicability in the 21st century or simply change the base offense level for these offenses by adding two levels and removing this enhancement entirely. Accordingly, we respectfully request that the Court not apply this enhancement as its application results in an offense level that overrepresents the conduct in this case.

Consequently, Mr. Bendann submits that the appropriate adjusted offense level for Counts 1 through 5 should be thirty-four (34) in lieu of the proposed thirty-eight (38).

3. **USSG § 2G2.2(b)(7)(D) and USSG § 4B1.5(b)(1)**

With regards to the Possession of Child Pornography charges, Counts 6-8, the PSR applies a five level increase because the defendant engaged in a pattern of activity involving the sexual abuse of a minor. This sizeable increase to the guidelines is then increased again with another additional 5 levels due to a multiple count adjustment for the same pattern of conduct. Then, via the Chapter Four enhancement for engaging a pattern of activity involving prohibited sexual conduct, the guidelines are increased a third time with another five levels.

The applicable guidelines in this case are increased two- or three-fold for the precise same conduct, and this creates an impermissible number of enhancements that render these guidelines arbitrary and capricious. As the Court knows, in cases involving drug distribution, gun possession and the customary § 924(c) charge, the guidelines do not add a 5-level enhancement to the drug guidelines for possessing a gun during the commission of the crime; that aggravating aspect of the crime is already addressed by the other charge. However, in child pornography cases, the guidelines are absolutely unforgiving and

---

4  Interestingly, this same type of enhancement is applied in the guideline computation for the Possession of Child Pornography counts. Specifically, there is a two-level increase because Mr. Bendann was adjudged to have used a computer to possess and access the imagery.

The Honorable James K. Bredar
January 13, 2025

draconian in their computation, and they do not provide any consideration for the duplicative punishments inherent in these calculations.

If the guidelines were computed without the duplicative 5-level increases and 2-level increases for use of a computer device, they would provide this Court with some true guidance as to an appropriate sentence. Indeed, with adjusted offense levels of 34, 27 and 20, the advisory guideline range would be 38, with a suggested 235-293 months. That range is fully in-line with our requested sentence of 240 months.

Consequently, Mr. Bendann objects to these various sentencing enhancements and respectfully submits that they should not apply to his guideline computation.

**RELEVANT § 3553A FACTORS TO CONSIDER**

**1. PERSONAL HISTORY AND CHARACTERISTICS OF CHRISTOPHER BENDANN**

As indicated earlier, Christopher Bendann was raised in Baltimore by his two loving parents, Lance and Annie. He was born in Seoul, South Korea and was adopted by the Bendanns when he was less than 6 months old. Growing up, Mr. Bendann was told he was adopted because his father, a married Japanese man, wanted nothing to do with the child he created with a South Korean woman out of wedlock. Although raised in a loving household, Mr. Bendann never really felt a part of his new community. Being Asian-American in an environment where there were not many other South Koreans with whom he could connect, Mr. Bendann struggled with that adjustment into this community. He looked different, he felt different and he knew he was different.

With children, being popular or liked by your peers can seem to be the most important aspect of their lives; it is very important to most children to have friends and to fit-in as they develop their identities. Mr. Bendann suffered from social ostracization when he was young. Indeed, one of Mr. Bendann's most salient memories as a child was when he asked a girl on a date, and she rejected him solely because he was Asian. An interaction like that, at such a young age, has lasting effects, and that one interaction summed up all of Mr. Bendann's fears and confirmed them to be a reality: he was different and felt alone.

Notwithstanding his being a stranger in a strange land, the Bendann family was a Gilman family. The Bendanns were deeply involved in that community and saw the value in that education and community. Gilman looks after their own, and if a young man were lucky enough to be admitted to this school, a myriad of previously-closed doors would be open to him. Accordingly, Mr. Bendann attended Gilman just as his father had done before him. He did well during his time at this school with regards to his grades, but as he got older, he struggled with the toxic masculinity that permeated the student body that did not fit in with his own worldview and lived experiences.

Despite these adolescent issues, Mr. Bendann very much enjoyed the Gilman community. His father was actively involved, the teachers at the school were interactive and spent time with each student, and there were always Gilman-related events to attend. Despite feeling like an outsider, this was the only community he knew. Additionally, Mr. Bendann was also extremely close with his mother; she treated him like she was her biological son, and he craved her attention[5].

---

5  Mr. Bendann's origin story, in essence, is that he was a mistake, and that his biological father was ashamed of him. Counsel imagines that this may have contributed to Mr. Bendann's feeling of isolation and his craving for approval.

The Honorable James K. Bredar
January 13, 2025

After graduation, Mr. Bendann matriculated to Skidmore College in New York. It was there that he truly began to appreciate how special his Baltimore/Gilman community was. He was now interacting with people from outside Gilman, and he did not connect very much or adjust well with the other members of the student body. To be sure, he was friends with some female roommates during his junior and senior year, but he found that he did not really acclimate with the college guys on campus. They were different from that to which what he was accustomed, and his college experience suffered from this lack of friendships throughout college.

After four years at college, he returned home to start teaching at Gilman. He had not yet technically graduated because he had not completed his senior thesis, but the Gilman school employed him and allowed him to work on his eventual graduation. Mr. Bendann was appreciative of their willingness to work with him and felt that this was a good example of what he was missing: support and care.

Mr. Bendann threw himself into his work. The Gilman community became almost the entirety of his life. In addition to teaching students, he made sure he was active in other aspects of the school. He was the middle school coordinator and served on the school alumni board. He won an Advisor award in 2018 and 2019 and headed up the mentoring program at the school. He was dedicated to making Gilman as great as it could be, and he was succeeding. He was adored and revered by the student body, and he was well-respected by the teachers and parents alike. *See Exhibit 1a-1d: Student Notes to Mr. Bendann.*

Things changed for Mr. Bendann when his beloved mother was suddenly diagnosed with pancreatic cancer in November of 2012. Christopher was 28 years old. Due to the aggressive and fatal nature of this specific cancer, she passed away less than two months later. Such a sudden, tragic death of his ever-supporting and loving mother was crippling to Mr. Bendann. His biggest supporter and friend was gone, and Mr. Bendann began to feel alone all over again.

Mr. Bendann could not regroup after the passing of his mother. He had struggled with isolation for most of his life and now his pillar of strength was gone. He missed her love and affection tremendously and sought out something similar outside of his family. Due to his dedication to his job, the only places to seek this missing component of his life was from the Gilman community. It was the only place he knew to find solace. This need for acceptance led Mr. Bendann to misinterpret his mentorship of students as more serious friendships and relationships. We submit that this facet of his life contributed to the arrest and conviction for the conduct alleged in this case.

## 2. UNWARRANTED SENTENCING DISPARITIES

Pursuant to 18 U.S.C. §3553(a)(6), one of the aims at sentencing is to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. Indeed, there have been a few teacher-student related child pornography cases prosecuted in this federal court, and the sentences imposed were less than what the Government is recommending for Mr. Bendann:

*United States v. Evan Thomas Harris Frock*, BAH-22-0373: In this case, the defendant received a 17-year sentence for sexual exploitation of a child. He was a Carroll County substitute teacher and volleyball coach. From 2021 through May 2022, he pretended to be a minor on social media. There were 8 minor victims, ages 9-17 years, who he had send him nudes and in one instance distributed one of the minors' nudes to other minors to coerce them to send him nudes. In addition to these text messages, there were images of child

**JA87**

The Honorable James K. Bredar
January 13, 2025

sexual abuse material found on his devices, including toddlers, violence, and bestiality.

_United States v. Lewis Ismael Blandon_, MJM- 21-428: Mr. Blandon was a middle school music teacher in Baltimore City with no prior convictions. He began exploiting children in 2002 when he started grooming a minor victim, who was just 12 years old when the grooming began and he began sexually abusing him for years. They began by playing video games together, then Mr. Blandon began showing him pornography, began masturbating in front of him and encouraging him to do the same. Finally, he began touching the minor victim and engaging in sex acts with him. It came to the point where anytime the minor victim was with Mr. Blandon, he was expected to engage in sexual acts. Further, Mr. Blandon specifically sought out minor victims online, sharing links to child pornography that showed pre-pubescent children being raped, ball gagged and restrained. He coerced naked pictures and engaged in explicit conversations with these boys. He engaged in sex acts with another minor victim in Maryland and even traveled to New Jersey to meet another minor and engage in sex acts. The defendant also had engaged in hands on abuse with his younger cousin 20 years prior. Government counsel requested a sentence of 25 years, and the Honorable Judge Maddox imposed a 19-year sentence.

_United States v. Kenneth Brian Fisher_, RDB-18-0100: Mr. Fisher was a Carroll County teacher who was caught in a sting operation planning to meet a 14-year-old to engage in sex acts. He sent 4 pictures of his erect penis and admitted to having sexual contact with minors for 5 years and exchanging sexually explicit material. He started meeting underage males in 2013 or 2014 and used the internet to engage with approximately 7 minors in sexual acts. He even met a 14-year-old from Pennsylvania, traveled to him and engaged in anal sex before videotaping them masturbating each other. He received a 22-year sentence.

a. **United States vs. Davante Harrison, JKB-22-0439**

Additionally, this Court presided over the case involving Davante Harrison aka "YGG Tay." Undersigned counsel is familiar with this individual because his name emerged during the 2018 prosecution of Montana Baronnette and the enterprise "TTG." During that case, it was established that YGG Tay was the financier for murders throughout Baltimore for years. Indeed, he was responsible for financing many of Barronette's murders and even murdered a cooperating federal informant.[6] He was unapologetic about his actions and made the bulk of his money from music and drug dealing. His songs glorified his conduct and showed a complete lack of remorse. Eventually, he was prosecuted for drug distribution and gun possession and went to trial. He was convicted and received 180 months.[7] While serving that sentence, he was federally indicted again, this time in a RICO prosecution, case no. JKB-22-0439, involving a slew of murders. It was established that after Barronette was arrested and convicted, YGG Tay no longer had someone who would kill people at his behest. He then reached out to David Warren to fill this void in 2018, bragging at one point on Instagram that he had "just signed the top shooter in the city to a deal." For this conduct, YGG Tay received a sentence of 25 years, concurrent to his existing 15-year sentence that he was already serving.[8] While there is no doubt that the conduct for which Mr. Bendann was convicted was serious, there can be equally little doubt that Mr. Bendann merits a sentence more than that received by the murderous YGG Tay.[9]

---

6  https://www.baltimoresun.com/2018/09/18/feds-tell-judge-baltimore-rapper-ygg-tay-offered-20000-bounty-on-witness-but-he-hasnt-been-charged/

7  https://www.justice.gov/usao-md/pr/davante-harrison-ygg-tay-sentenced-15-years-federal-prison-drug-conspiracy-and-related

8  Interestingly, the statement of facts for David Warren's plea agreement contains a myriad of additional criminal conduct that YGG Tay committed. Although not included in YGG Tay's plea agreement, Warren's fact pattern includes additional murder-for-hires that the Government knew YGG Tay financed. _See Exhibit 2: David Warren Statement of Facts._ YGG Tay is "Co-Conspirator 3".

9  Moreover, according to the Bureau of Prisons, YGG Tay is currently ten years younger than Mr. Bendann and thus will be released

The Honorable James K. Bredar
January 13, 2025

**<u>CONCLUSION</u>**

On behalf of Mr. Bendann, we respectfully request the imposition of a 240-month sentence as sufficient but not greater than necessary to further the aims of federal sentencing. We respectfully submit that this is a sufficient, but not greater than necessary, sentence that encapsulates the convicted conduct while taking into consideration the relevant §3553(a) factors.

In this specific case, it is the defense's position that the guidelines provide no true guidance to the Court in fashioning an appropriate sentence. As indicated earlier, neither the United States Probation Office nor the United States Attorney's Office are requesting a guideline sentence, and we have endeavored to outline the arithmetical and antiquated aspects of these guidelines in support of our request. We submit that although the conduct for which Mr. Bendann was convicted was horrible and a lengthy sentence is appropriate, the Government's and Probation's recommendations do not take into consideration all the relevant 3553(a) factors.

Mr. Bendann is 40-years old and has never known anywhere other than Baltimore as his home. Due to this conviction, and associated publicity, he can never return to Baltimore and expect to live a normal life ever. His father is approximately 78-years old and is the only real family member that Christopher has. Upon the completion of this sentence, it is unknown how healthy his father will be or whether he will even live into his late 90s. In fact, sadly, it is highly probable that Mr. Bendann will be alone in this world when released, just as he always feared we would be since he was a child. He has lost everything he struggled so hard to earn and maintain both professionally and personally.

Additionally, due to these offenses, every single student with whom Mr. Bendann interacted and helped now believes that this attention was simply to groom and assault them too. Nothing could be further from the truth, but that is the prevailing sentiment within the Gilman community. As an educator and mentor, one who took those responsibilities seriously, the fact that students would feel like they were a target is devastating to him. The name Bendann, a name that precedes Christopher by generations of quality men, will forever be tarnished as reminder of this horrible chapter at the Gilman school. This reality, one that affects not only him but his father's legacy, is a significant part of Mr. Bendann's punishment. It is one that cannot ever be lessened.

Respectfully, the proposed sentence of 240 months will do as much, if not more, to "protect the public from future crimes of the defendant" than a lengthier sentence of incarceration would. Primarily, Mr. Bendann is almost 41 years old. With the imposition of this proposed sentence, one for which he will serve a minimum of 85%, it is unlikely that he will be released until he is almost 60. Aging is associated with decreased criminal behavior, and sexual offenses are no exception to that association. The mitigating effect of aging for sexual recidivism has been studied for decades and, in a large multi-state study, individuals with a history of sexual offending released over the age of 60 had a recidivism rate of just 3.8%, whereas the overall rate across all age bands was 17.5%[10]. Indeed, there seems to be a consensus

---

at a much younger age. By the same token, he will face much less onerous forms of supervised release as he will not be subject to SORNA requirements.

[10]

https://www.researchgate.net/publication/347110032_Are_Civilly_Detained_and_Committed_Sexually_Violent_Persons_Released_After_Age_60_Low_Risk

**JA89**

The Honorable James K. Bredar
January 13, 2025

that recidivism drops after the age of 60. Consequently, the relevance of an individual's age at release has been emphasized in actuarial assessments of sexual reoffense risk.

Mr. Bendann will also be on federal supervision at the conclusion of his sentence. With the mandatory, standard, and proposed conditions of supervision, there will be additional safeguards to prevent any illegalities from occurring for the remainder of Mr. Bendann's life. His internet access would be curtailed and monitored, thereby assuaging all the Court's concerns about potential communications. He will have to register, both federally and locally, in whatever state he resides; he will never be able to shirk the stigma associated with this case. We submit that these factors should provide the Court with additional assurances that a lengthier prison sentence is not necessary to address the relevant 3553(a) factors pertaining to this crime.

Based on these arguments, and additional arguments to be made at the time of the hearing, we submit that the proposed sentence is sufficient but not longer than necessary sentence to further the aims of 3553(a). In anticipation of the sentencing hearing, we wish to advise the Court that Mr. Bendann's father may wish to address the Court directly prior to the imposition of sentence in this matter. There are other friends and family members who wish to provide additional information regarding Mr. Bendann but cannot attend this proceeding in person. Accordingly, we also submit various character letters from them to provide the Court with additional information about who he really is. *See Exhibit 3: Character Letters.*

Sincerely,

_____/s/_____
Christopher C. Nieto, Esq.
Nieto Law Office
233 E. Redwood Street, Suite 1000C
Baltimore, MD 21202
(443) 863-8189  Office
(443) 378-5723  Fax
cnieto@nietolawoffice.com

CC:  AUSAs Colleen McGuinn and Kim Hagan
     USPO Manisha Garner

EXHIBITS:
   1. Notes/Messages from students to Mr. Bendann during his time at the Gilman school
   2. Statement of Facts from David Warren's plea agreement in JKB-22-0439
   3. Character Letters from friends and family









Bendann

Hey Mr. Bendann,

Thank you for being a great teacher, friend, and mentor. Your love for the students is known throughout the school and it has made you one of the most liked and respected teachers at Gilman. You have taught me so much during this retreat and I will take the lessons and apply them to my own personal life and family. Also thanks for the stories which made retreat not only a life lesson but an extremely enjoyable time.

Thanks,

[redacted]
















Benjamin

Mr. Benjamin,

Thank you for being
such a nice person
to not only me, but
everyone else. You made
the transfer to Gilman
a lot easier and I
appreciate that you are
very selfless, and can
fit in to many different
crowds, which is a plus.
Thanks for being a
leader and I wish
everything goes well
in your family. Good
luck with teaching
and everything else.



Mr. Bendann,

I know that I was not
the best kid in middle school,
but I've grown up a lot since
then, and I'm really glad you got
to know the real me on this
retreat. I'm really glad to now
be able to call you a friend. You
opened up to all of us, and told
us so much, and I really
ad mire that. You always listened
to what we had to say, and you
picked up on things that went
unsaid, which I admire. This showed
us that you really heard what
we were saying. You were a
great leader, and I wouldn't
want to have anyone else lead
our group. You did a great
job, and all of us appreciate
your honesty and care. I look





Mr. Bardann,
I had heard stories about
how you were a really cool
adult and how you would
feel up witch and things like
that, but I'm really glad I
got to actually get to know
you on a personal level and
see my already high
expectations be exceeded.
I feel like the one thing that
speaks best to who you
are like I said last night
is that you just heard Tyler
and I talking about mint oreos
and how we prefer double stuff,
and sure enough next day
you brought us both which is
incredible. The actually oreos
are insignificant but what
they represent, the way
you listen to others and

Bardann



Now you're also just a selfless people pleaser. I am honored to have had the opportunity to work together with you on this retreat and I really want to keep in close contact in the future.

Thanks,

T

---

My dearest Bartar!

Haha! I wrote Combo—Thank you! Hana! I wrote they—Combo—Thank you!

Thank you so much for making me come to retreat! I am officially drinking the Kool-Aid. Retreat is amazing & so worthwhile.

The only reason I felt confident enough to come was because I knew I had my bestie backing me up.

You have been an awesome friend over the past 5 years and a

Bartar













Thank you so much for being this friend to me.

Mr. Bowdoin

Mr. Bowdoin, I have found in a new friend we respect of what you have gone through and who you are. In listening to your speeches and introductions I feel I can't meant similarities I too enjoy God, stuffed animals. I even kept score on People like you but unlike me, you are striving to no longer keep tallies, I look up to you as who I can be and thank you for setting an example of the values of letting go. Thank you. ☺

-PK





M Benahan

During this trip I have really gotten to know you and respect you. I've always known you are funny but I did not know your personal story. As I said in the small group, you are one of the strongest people I know, despite calling yourself a "sit." Thank you so much for being such a great leader and opening up to us. Also, thank you so much for being there for me when I was at my low points. I can't wait for this retreat to grow and prosper as time goes on.

Love you Young Papa Chris,

M███
R███



M. Brogdon

I DON'T THINK THERE'S COULD
HAVE BEEN A BETTER TEACHER IN
THIS GROUP. YOU WERE LOVING AND
CARING WHICH I LOVED. WHENEVER I NEED
PEOPLE THAT I HAD YOU, THEY
WOULD SAY THAT I AM SO LUCKY,
AND NOW, I HAVE FINALLY
SEEN HOW LUCKY I ACTUALLY
AM. YOU ARE THE G.O.A.T.

- A█
W█



Dear young pup Chris:

I simply don't know where to start. Well, let me just say first that it has most definitely been a pleasure to get to know you better over the course of the retreat. You are a very warmhearted person and I wished there were more people like you in this world. The very joy and comfort for us is my reassuring and comfort. Of course just as you've said, let's meet up once or twice later this year and I will definitely invite you to my parents' restaurant so that we can chomp down these dollars fool together.

Warm regards,
M







Mr. Benham,

Thank you for an amazing retreat. Even though I never had you as a teacher or as my own advisor, you're still a role model in my life. You happy attitude and zest for life always has cheered me up. You also indirectly showed me that its important and good to be emotional. I used to hide myself out of fear of vulnerability, but I am now am not.

Thank you,
M____
B____











Mr. Bordean

Mr. Bordean

I've got to tell you that you're
one of the best teachers that I've
ever had at Gilman & not the best
I admire how smart every conversation
I have with you is and how of
a kindhearted and genuine person you
are. You're one like to the fullest,
and I will forever envy you for
that. Thanks for filling us your glass
and thanks for always telling
to me and the other junior's. We all
appreciate it. I'm excited for next
year when the current junior's get
to run the program and I'm excited
for you to be there.
Thanks for everything.

14









Badaan

Brah!!! Dear Mr.B, I have enjoyed
getting to know you more on a
personal level through this retreat.
I always enjoy the stories you tell that
made me learn more about the ins and
outs of B'lmen. I will always cherish
the moments in the art room with
MrA, that was a good time during
study halls and I won't forget those
moments.



Benoham

Mr. Benoham,
I'm really grateful that I
got to be apart of your group
on this retreat. You're someone
that uses comedy as a fun outlet
but also know when a situation
is serious. I have alot of respect
for you I also your open-minded
opinion towards my faith. Again,
I'm always grateful I won't forget
do say hi.

Much Respect,



Brendan

Mr. Brendann,
I am so glad I have been able
to get to know you the past few
years and through this retreat. I
appreciate your ability to make light
of darker situations so much and
you always manage to make me laugh.
Even still, I feel I've learned so many
important things from you like thinking
more critically about who I am
friends with.

—W.



Bardeen

Mr Bardann,

I am so thankful that you were our Faculty leader last year's retreat. Though I didn't have the pleasure of knowing you previously as I didn't come through the middle school I felt we immediately connected through your siege (?) ... Your Digital honesty over when our faculty softeners; made it much easier for us to open up and really relaxed our experience. Thank you so much.











Brandon

The ageless Mr. B,
Words can't express the
magic you possess the
extent to which, past presence
is felt. Even in middle school
you have this vibe that
super contagious. You relate
your life to ours consistently.
Thank you for opening up
for us!

Best,
S



Bordano

Mr. Berdann,

Where to begin... I'll start by saying that you and I are more similar than I ever realized. Our humor, attention to detail, and inclination towards art and music are eerily similar. Being in your homeroom was a unique experience to say the least... but I loved every second of it. Thank you for keeping an eye out for ███ that kid is trouble. I will miss you, your handshakes, color-coordinated pastel outfits, dry sarcasm, deep empathy, loving nature, and enthusiasm next year.

- A███



Bendann

Hey Mr. B, I know this is either my
some as a surprise as I haven't spent
much time with you on retreat, but I
couldn't pass up this chance at expressing
my feelings towards you. You, your teaching style,
and your class have had such a positive effect
on who I am as a student and for
that I am grateful. Looking back I
can remember see why students who were
flocked with Coach Gilman careers made an
effect to visit from class to class, talk
night study sessions that you got pizza for,
you always encouraged my growth as a student,
you are an excellent teacher (a wonderful
personality) and an embodiment of everything
Gilman stands for. Thanks for everything!









Bandera

It has been a great time to meet with you for the first time in this retreat. Before this experience, I have heard you as a kind and helpful person who always look out for his students. Even after their graduation. Your balance between funny and serious talks has always been able to draw students to you and I can see you enjoying these experiences. Your feedbacks to me and other students in the final interviews show me that you are a careful person who want to make sure everyone is comfortable in your group. Lastly I hope you a better year!





Brandonn

Mr. Bernhann,
First, I am very, very
thankful for you. Middle school
was very hard for me, but
you kept me in check. When
I started to go off of my
path, I always kept when I
think back to you close, and
I cringe at how munchy of
our enjoyment at Eddie's. Both
memories somehow invoke you, Mr.
and my Mother. Eve talks about
you often, and I always reminisce
happy when we talk about you.
I will come to you more often
now, especially considering that
you are such an important person
in my life.
Thank you,



Brandon

Mr. Brandon, you are the reason I enjoyed this visit so much. I have never felt so comfortable in the presence of a teacher. Although I have known you for a while we haven't connected on a level as deep as we did these last few days. I have always wished to be like you in the way I connect & relationships with so many people. I have not so believe since I graduated middle school and it has made me so much happier. You are a special teacher that others can only dream of and I wish I have you done everything is blessed to have and I wish I have you done teaching this class I appreciate you so much

#youtubeacoolteacher #aniceguy  #dontbeatho no flauor





Braedan

I've always been jealous that all of us kids I've known since middle school, as well as my brother have gotten the chance to get to know you. I've never gotten opportunities to interact with you, and I definitely had every right to be jealous. You're a really well rounded guy. Though I'll always be mad that you didn't tell me you were bringing Popeyes sandwiches. I loved to hear that we both share a love for fried chicken, and that we have similar opinions on what other people think is good fried chicken is actual good fried chicken. You made this richest better than I imagined it would be. Thank you





















Mr. Brockman,

I hope that I was a great time for you. You were always a positive influence for many us in the middle school. I hope you can find room to grow as a person and strive to become better in everything you do. I hope the best for you and your future.

Sincerely,











Dear Mr. Bordan,

Lita I said yesterday the only memories I had of you in middle school before this retreat were your assistant teaching days and your sprinting during track practice. But after hearing your speeches I've gotten to know you a lot better, and I've seen another side of you that I wouldn't have been able to have seen had it not been before this retreat. You are a very funny guy, but you also have a very philosophical side to you. Listening to you speak, I always hear good advice and insight from you, all of which I will make use of. You have been an amazing

Chris Bordan





Dear Mr. Christy,
I thought I would try to find a happy medium by calling you first. Since I can remember we have always been very friendly. I have always thought you were very funny and have enjoyed your company. I have loved hearing your jokes over the years and its reate and level. I am so sorry for the loss of your brother, but the way you have reacted to it is amazing. You are so unbelievably strong and I admire you so much. You have taught me many life lessons throughout the retreat and I appreciate it so much. I look forward to continuing our friendship and getting to know you over better.

Sincerely,

I apologize this letter has been so [ ] reciprocal [ ] its because I struggle to funnel all of my thoughts and pose. I write this letter with sad [ ] conviction that [ ] post on writing is the sad result.

Thank you again [ ] I feel like we share a close to need [ ] you up to the med of Peto [ ] I empathize w/ your love of animals. The loss of my cat mirrored the loss if I [ ] Jojo for you. Since we share a [ ] love of [ ] w/ we shall [ ] animals keep in [ ]

Chris Bardcan



Chris Benson

Thank you for sharing your home with us this retreat. I loved it! It is difficult to interrupt everything and get off for the longest center, so I really appreciate it, especially since it is not required for teachers.

But more than just that, I am grateful for the stories you shared from your own life. You seem to have a never-ending supply of them, and they always fit perfectly with what the question is. The difficulty of talking about these difficult times, without stopping you, and that strength of an inspiration.

I hope I would have been ready to have had you as a teacher. Even in these four days, you taught me what it means to be a caring adult, a good role model, and a true guide.

















Mr Bensham,

I did not know you before
this week but you made
me feel like a fraud from
the start. I see why every
Columbus student loved and
respects you and I think
you for our conversations the
week.

Bensham









Dear Mr. Bendann

There is soo much I want to say, but I honestly don't think there is enough time in the day to describe how much I care about you. There is a reason why you are the school wide favorite teacher? You are unbelievably kind to every single person and you are the perfect person to come to for any situation. You are the reason I go to school when I am "having" a problem with my friends and the reason I go as well as the only reason I go to when I am craving dinner from Bakemart. words can not express how much you do for me. I appreciate every thing you do for me and my friends. whether it be making us vegiterian BBQ's or watching spiderman with us, I can not thank you enough. The one moment that stood out to me



how much you care is when
mike and I were eating in
Belvedere and you drove by us.
You immediately pulled over t
waved and moved on a last
immediately pulled over a. But you
immediately pulled over & come
talk to us. That made me
so happy. Thank you for being
so hot guy and making such
an influence on me.

- G



SUBJECT Boudreau

DATE

Hi Mr Boudreau

I've seen a lot of people getting real excited when seeing you. I guess I don't know who you are, so I never really responded, but now I know a lot more about you. We don't choose o what life we are born into, but you definitely have lived your life well, and you can easily bring positive influence to people near you — I know you love anime, but life is short and we better not any regrets. Japan and korea (edited ne?) are beautiful places. If you get a chance please visit these places. And if you are worried about your brother, bring him too. Enjoy ur time there. Life always







SUBJECT Bndam

DATE

Hey Mr. Bardam when
I was coming to retreat
I was excited because
I heard you were my
teacher leader
but I didn't expect you
to help me in the way
that you did when I
left the room after the
talent show I'm very
grateful for the fact that
you told me to share
how I felt during that
and just talking to me
in general about something
that was clearly making
me feel better
Mr. B. Same.
God is thanking you











Brandann

Hey man! I had no clue who you were coming into retreat but have given me some clarity. You are one of the coolest faculty members Brillman has to offer. In my opinion and I am grateful to have had such an amazing leader. You are a pretty genuine guy just as all of the other's in our group are. Keep it real B.B.! You've made this retreat really fun. B Sexy with your sexiest species!

Love
B.





Bradann

The men, the myth, the legend .. I've heard so many cool stories about you, nothing weird but after coming on senior retreat with you those stories and things I heard about you are spot on .. you are truly a great guy and I wish we grew closer over the next few months. I'll have to make some trips to the middle school or dinner at your house, or something like that. Thank you for supporting me throughout this experience and letting me open to you next year. I tell you bit I wanted to tell you part of my story because there











Chris Barclay

Oh Mr. Benton, your
laugh is contagious. Nothing
beats when you draw a
"gur" in cards Against Humanity.
Although we haven't really
known eachother before the
retreat I think we have
drawn close. I am excited
for future trips to FoGo
where we can continue
to grow our relationship.
You are a faithful and caring
man who has a big
heart. Thank you for being
an awesome leader.

Sincerely,

[REDACTED]
D.









Chris Bendann

Mr. Bendann
This is my first time meeting you! I've literally heard stories of your legacy from my friends so when I actually got to meet you, I was very excited. I've learned that you have a lot to give, through work and your actions/one of the feel things that you brought to our group was experience. Hearing your stories made me realize that you've been through a lot that I/we has shaped you up to today. You gave on my a few years older then my brother and that has made it much easier for me to connect with you, I can now confidently say that we're friends. So when I look into



The future I know that
you are someone I can
count on + talk to and
hang out with. Thanks for
everything y street has been
a blessing.

—2▇▇▇

Mr. Bondani!

It was great having you as a
middle school teacher and even
more amazing getting to know
you on Senior retreat. Your
passion for Ganman and your
job is inspiring and contagious.
Thanks for helping to make
senior retreat a memorable
one for me. Wishing you
the best.

Cheers!

Chris Bondani

▇▇



Chris Bendann

Mr. Bendann,

As you are already aware,
I was in your 6th grade Geography
class and I can honestly say
that through your class I
acquired the foundation of
good organization and the ability
to process my thoughts in a way
that I could clearly express
them on paper. You are still
the same fun and witty guy that
I knew five years ago. I hope
to see you next year on retreat.
You never knew I could be in
your group next year too.



I really appreciate how you've been a part of my life over the past six years. We seem to have had a bit of the contact that we need to have. At some point I think I was to have closer to you than I was to my father. I always enjoyed such activities as football, you tennis, peeling, you golf-battle, frisbee & ride, page & class, annoying Torban, stalking Torban, and camp more. I will sincerely do my best to keep in touch when in college because I truly value our friendship. I look up to you.

Chris Bordean





Brendan

Chris,
I enjoyed getting to
hear your story. You have
a talent for connecting with
many different people. I can
confidently say that you have
made an impact in your lives
of many boys that will go through
OYRNON. As are a father
teacher because you have
being a part of your community
and it shows. Thank you for
your hard work and dedication
to being Gilmer.

Q







Kenji Berdann

What up ken, how's it goin? Our geography class in 6th grade was one of the fondest memories I have had in my Gilman experience. I know I joke a lot with you, but that is the way I show respect and the way I am very happy to have show I admire you. I The privelage to have developed a relationship with you. Thank you for being such a nice person.

-B



Chris Brockman

It's been a pleasure
getting to know you
He last few days.
Thank you for everything
You said about me
last night, it means
the world to me.

- █ M.

My complete admiration with
Yourself
I thank you for your help.
I know that Snow you last un-isten
Was sent I am Sorry but will
not Shields I really
admire your saying that.
Best of luck █
S█







Chris Burdeau

I was really excited when I found
out that you were my twin. because
you were young and you always seemed
like a really cool dude. I was right.
Through we only had a few days I found
out that we really do have a lot in
common. from Disney songs to Top to our
dads, it was really cool to get to know
you and prove myself that I was
right about you. I can't thank you
enough for what you have taught me
on this retreat. and I will carry
your words for the rest of my life.
I am glad to say that I now
know who you are, and I am proud
to consider you a friend.

Chris Burdeau







Mr. Basham

You always seemed that
happy middle school teacher
I saw in passing.

But on this retreat it has
been a great privilege to
see you have a true life of
the school and the students.
I can easily see why the
kids respect and like you.
So much - you really do
care about them.

Thank You
Kimberly Hammer







✓ FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

1:13 pm, Jul 10 2024

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

**ATTACHMENT A**
**STATEMENT OF FACTS**

*The undersigned parties stipulate and agree that, if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The Black Guerilla Family, also known as "Jamaa" or "J," is a nationwide gang operating in prisons and on the streets of various cities throughout the United States. Founded in California in the 1960s, BGF first appeared in the Maryland correctional system in the 1990s. Although nominally still a prison gang, BGF has long been involved in criminal activity, including murder, murder for hire, robbery, drug trafficking, obstruction of justice and witness tampering throughout communities in Baltimore City.

The Defendant, David Warren, was a member of BGF throughout the period of the charged conspiracy in this case. The Defendant agreed to conduct and participate in BGF's affairs through a pattern of racketeering activity that included conspiracy to distribute controlled substances, possession with intent to distribute controlled substances, robbery, and murder.

The Defendant agrees that the "Overt Acts" in which he is named in the Indictment represent an accurate sample of his activities in furtherance of the racketeering enterprise.

The Defendant admits that he participated in BGF meetings at an office leased by Safe Streets, a violence reduction program operated by Living Classrooms in collaboration with the city of Baltimore. Two BGF members who attended the meetings were employed by Safe Streets as "violence interrupters," *i.e.*, "trusted messengers" who were tasked with "encouraging positive changes in individual behavior." The Defendant admits that during the late spring and summer of 2015, he and other BGF members utilized the Safe Streets office in the 2300 block of East Monument Street as a de facto BGF clubhouse, where they stored drugs and firearms and plotted acts of violence on behalf of the gang.

In or about May 2015, acting at the direction of Co-Conspirator 1, the Defendant and others fired upon a group of rivals who were attending a candlelight vigil for a deceased rival near the intersection of North Rose and East Monument Streets. S.R. was shot during the attack. S.R. sustained life-threatening injuries but survived. The Defendant admits that the attack was planned by Co-Conspirator 1 and others at the Safe Streets Office in the 2300 block of Monument Street.

The Defendant further admits that on or about May 14, 2016, again at the direction of Co-Conspirator 1, the Defendant and Co-Conspirator 2 conspired and attempted to murder D.C. in the 1800 block of North Caroline Street. D.C. was shot four times during the attack. He sustained life-threatening injuries but survived. The Defendant admits that Co-Conspirator 1 later received

1

$8,000 as payment for the attack on D.C. from one of Co-Conspirator 1's drug suppliers. Co-Conspirator 1 shared portions of the payment with the Defendant and Co-Conspirator 2.

Approximately two weeks later, on or about May 30, 2016, the Defendant attempted to murder T.M., a rival drug dealer, in the 4300 block of Old York Road. T.M. and others were attending a barbeque. During the attack, the Defendant shot T.M., and four additional victims, J.W., B.L., A.W., and M.H. The victims survived but sustained life-threatening injuries.

In or about 2018, Co-Conspirator 3 solicited the Defendant's services as a hitman. Between February and August 2018, the Defendant and others conspired to murder, and in fact attempted to murder, three of Co-Conspirator 3's rivals in exchange for payments from Co-Conspirator 3. The targeted rivals included: (i) J.A., a BGF member who burglarized Co-Conspirator 3's residence in November 2013; and (ii) two members of a rival organization, R.Br. and R.Be., who publicly accused Co-Conspirator 3 of cooperating with law enforcement.

The Defendant admits that on or about February 23, 2018, he and an unindicted co-conspirator attempted to murder J.A., who was sitting inside his parked vehicle in the 6700 block of Bonnie Ridge Drive. J.A. was shot during the attack. He survived but sustained life-threatening injuries. Within minutes of the attempted murder, the Defendant sent a text message that read, "Job √."

The Defendant further admits that on or about April 4, 2018, the Defendant and unindicted co-conspirators sought to locate and murder R.Be., a rival of Co-Conspirator 3, at a residence on Gorman Avenue occupied by R.Be.'s mother and sister, Chanette Neal and Justice Allen. Not finding R.Be. in the residence, the Defendant and the unindicted co-conspirators murdered Neal and Allen using a .357 caliber handgun. Also on April 4, 2018, the Defendant messaged a female associate and wrote that he was "waiting on the bag,"—i.e. payment from Co-Conspirator 3 for the murders of Neal and Allen. The Defendant was later paid by Co-Conspirator 3.

The Defendant further admits, that on or about June 27, 2018, in the 8500 block of Glen Michael Lane in Randallstown, Maryland, the Defendant attempted to murder J.B. using a Glock 22 .40 caliber handgun. J.B. survived but sustained life-threatening injuries.

The Defendant admits that on or about August 7, 2018, in the 4500 block of Woodlea Avenue, he and two co-conspirators, including Co-Conspirator 4, attempted to murder R.Br. The attack took place at a home that R.Br. owned and was having renovated. A construction crew was on site at the time. During the attack, Co-Conspirator 4 and the unindicted co-conspirator murdered one of the construction workers, Bryan McKemy, using a .40 caliber handgun. They also shot a second construction worker, R.P., in the head. R.P. survived the attack. The Defendant admits that he participated in the conspiracy to commit murder that resulted in the death of McKemy.

On or about August 7, 2018, the Defendant exchanged text messages with a female associate regarding the attempted murder of R.Br., the murder of Bryan McKemy, and the non-fatal shooting of R.P. The associate remarked, "got busy huh." The Defendant responded that he was "waiting on a bag," i.e., that he was expecting payment from Co-Conspirator 3 for his role in

Rev. August 2018

**JA217**

facilitating the attack.  Over the following three days – between August 7, 2018 and August 9, 2018 – the Defendant and Co-Conspirator 4 exchanged messages with a now-deceased member of Co-Conspirator 3's inner circle, in which they made arrangements to collect payment from Co-Conspirator 3 for their role in the attack at R.Br.'s home.

SO STIPULATED:

_____
Ari D. Evans
Patricia C. McLane
Kim Y. Hagan
Assistant United States Attorneys

_____
David Warren
Defendant

_____
John M. McKenna, Esq.
Counsel for Defendant

Rev. August 2018

3

**JA218**

December 30, 2024

Honorable James K. Bredar
United States District Court Judge
United States District Court
101 West Lombard Street, Chambers 5A
Baltimore, MD 21201

Dear Judge Bredar

My son, Christopher Bendann, will be sentenced by you on January 21, 2025.
Christopher cannot undo what he has done, what reprehensible crimes that he
has committed. A fair trial has determined his guilt, and he should be and will
be punished. But, in fact, my son has already lost everything that he achieved
and possessed: friends, family, integrity, house, reputation, career, legacy, car,
honor......EVERYTHING. Yet, as harmful as his transgressions were to the
victims and larger community, they do not fully define Chris as a human being.
Nor do they define his character.

Chris has been a loving and dependable son since he was handed to my late,
dear wife and me at BWI airport on a cold and rainy December night in 1984
in the presence of almost 50 cheering friends and family. He was 5 months
old. Coming full circle, he was a great deal of help to me and his mother when
she was diagnosed with Pancreatic cancer in November of 2012. Chris helped
support her and me until she passed on January 4, 2013.

Although he followed his professional calling as a teacher, much of Chris' work
experience was in the adult world and not working directly with younger
students. At Gilman, in addition to teaching, he was the Middle School
Admissions Co-Ordinator, which involved parental engagement, and he served
for years on the School Alumni Board. Even in college, he took a leadership
role in the admissions office, giving tours and doing student interviews. He
also headed up his Senior Class gift, surpassing all previous classes annual
fund drives. I bring up these ancillary school activities as they represent his
comfort in the adult world and indicate that with his intelligence, education,
experience and talent, he is fully capable of making a difference and being
productive in the adult world absent children. But he needs to be given the
time and opportunity to do so. The time and opportunity, after he finishes
paying his debt to society for his crimes. Time and opportunity, when he can
demonstrate that his criminal actions do not wholly define him. I am hopeful

**JA219**

that you will see his potential and limit his incarceration to the least, rather the most extent possible. The longer his sentence, the least amount of time he will have to demonstrate that there is more to him than what these crimes indicate. Humans are complex and complicated animals. And so is Chris. He can contribute positively to society. He has already demonstrated that.

It is striking to me that I am writing this letter in the midst of our national and personal mourning over the loss of former President Jimmy Carter. Here was a man of great intellect, talent and ambition, who achieved the highest level of his chosen profession, only to be vilified as a failure, when he left office at the end of his political career. And considered by many at that time as the worst President in U.S. history.

But we know the rest of the story. President Carter was given the good fortune of time and opportunity to re-direct himself as a man of service. His humanitarian work over the last 45 years serves is a fitting model to all of us that "it ain't over, 'til it's over". With dedication, connections and hard work, President Carter re-focused the character traits that were always present. He just found another use for them, because he was given the time to do so. While the comparison to Chris is not exact, the model is instructive. Chris will always carry his criminal failures, but I believe there is more to him than the terrible crimes he made committed, and the victims that have and will suffer, as a result. The court can provide him with the time to demonstrate the good man that he is.

Respectively

Lance Bendann



**THE LIVING WATER**

i n c l u s i v e   c a t h o l i c   c o m m u n i t y

January 6, 2025

Honorable James K. Bredar, Judge
United States District Court for Maryland
101 West Lombard Street
Baltimore MD 21201

Dear Judge Bredar,

I am writing on behalf of **Christopher Bendann** who will be sentenced on January 21. I'm a friend of the family, and pastor to Chris's parents, Lance and Anne (deceased).

I've known more *of* Chris than I know him personally. Lance and Anne adopted him at about the same time that I adopted my own two children. So I can speak best to the parenting Chris has received, parenting that I believe still grounds him, no matter what demons he's been wrestling with in his adult life.

I know Chris was adopted from Korea at an early age, and that attachment disorder is common among those adoptees. While that disorder is not an excuse, it can be seen as an explanation for a child (or man) who simply cannot ever have enough love surrounding him. Repressed feelings of shame and abandonment can result in an overwhelming need for controlling "love." And I fear that's what Chris has been living in, albeit I'm not convinced he's aware of the depths of the disorder.

My own adoptive children have the same disorder. So I know how deeply ingrained it can be, and how hard parents have to work to help their children function as members of society. I was lucky with my girls; Lance and Anne were not so with Chris. But their loving parenting remains, and I'm sure Chris is still grounded in that.

I guess we all know Chris will be spending time in prison. But he's a bright, gifted, compassionate young man with years ahead of him. I'm hopeful that with guidance and therapy and some meaningful work to do while incarcerated, Chris can come out of prison a more whole human being than the broken man who went in.

I hope you can take all these things into your consideration, Your Honor, as you sentence Chris on January 21.

In gratitude & with respect,

Rev. Gloria R. Carpeneto, D.Min., Ph.D.
Co-Pastor, Living Water Inclusive Catholic Community

Hon. James K. Bredar
United States District Court for Maryland
101 West Lombard Street
Baltimore, MD 21201

Dear Judge Bredar,

My name is John Claster. I am writing this letter on behalf of Christopher Bendann as you approach the sentencing of Christopher on January 21, 2025.

I have known Christopher almost his entire life. I have known him as both a young man and an adult. I have been close to his family for over 60 years. I have witnessed Christopher in numerous situations. I had dinner frequently with the Bendann's and particularly with Christopher and his Mom (until her passing ) and his Dad. At all times, I found Christopher to be courteous, smart, caring, and generous of spirit. It was no surprise to me that Christopher chose to go into teaching. And once he went into teaching, I was fully aware of his career as I was a trustee on the Executive Committee of the Board at Gilman School. I saw Christopher frequently on campus, and I was aware that he was highly thought of as a teacher at Gilman. Students seemed to gravitate to Christopher and respected what and how he was teaching them. Christopher was truly dedicated to his craft and he was intensely interested in the success of his middle school students.

I am deeply saddened by what has transpired, but I would urge you to lean toward giving Christopher a second chance at life. I think he can be a very productive person after he has paid his price to society. Chris is very educated, extremely well read, has always been interested in imparting his knowledge to others. I think there are any number of arenas where he could make a vital contribution to society. He could be very instrumental in working in the senior community, or working with people who are interested in seeking adult education, or he could be quite helpful in consulting with city and state educators to help design better curriculums for middle and upper school students. I would urge you to not waste these talents, but allow Christopher to return to society at a time in his life when he can use his talents for the betterment of others. In the core of his soul, Christopher is a good person who made a mistake, but I would hope you can see your way clear to allowing Christopher to once again be the person he was for years when he was incredibly well thought of as an intelligent and dedicated member of the teaching profession.

With deepest respect,
John Claster

January 3, 2025

Honorable Judge James K. Bredar
United States District Court for Maryland
101 West Lombard Street
Baltimore, MD 21201

Dear Judge Bredar:

I am writing on behalf of Christopher Kenji Bendann to request consideration of
leniency in the sentencing scheduled for January 21, 2025. I have known
Christopher since he was three years old. Christopher attended preschool, prefirst,
elementary, middle, and high school with our eldest son. Our families spent many
hours together over the years at our homes, taking trips, and hosting each other for
holidays and other events.

I recognize the seriousness of the offences for which Christopher was indicted and
do not wish to diminish the seriousness of the offenses in any way. At the same
time, I have observed Christopher demonstrating several strengths over the years.
Examples include establishing respectful relationships with adults; maintaining
reciprocal relationships with peers; communicating about personal feelings;
listening to others' feelings; standing up for values and principles; pursuing
personal interests in history and other topics; identifying with his family, schools,
and college.

Christopher will need a sense of hope to make use of his strengths and contribute
to his environment in a productive and meaningful way. Thank you for reading
this letter and considering what has been written.

Respectfully,

Margaret Grady Kidder, Ph.D.
314 Alabama Road
Towson, MD 21204
(410) 493-8516

TO: Honorable James K. Bredar
Judge United States District Court of Maryland
101 West Lombard St
Baltimore, MD 21201

My name is Mary Catherine Savage and I have known Christopher Bendann since he arrived at
BWI airport on December 5, 1984 to be adopted by our friends Anne and Lance Bendann. He
was welcomed to a warm and happy home by two people who loved him in ways that devoted
and caring parents would.

Throughout the years since then we have been part of Christopher's life, celebrating his July
birthday as well as his December 5 "Happy Day", with his extended family of aunts, uncles and
many cousins. We have followed his journey as a student through Gilman School, Skidmore
College, and his many years of teaching at Gilman School.

In first grade his teacher Betsy McDonald described Chris as "the ideal first grader ".
I knew Betsy well and this is not a compliment she would offer out freely. At Skidmore he was
selected to be an admissions ambassador. He was very enthusiastic about the school and his
upbeat, welcoming manner was perfect for the job.

My husband and I saw Chris often during his years of teaching at Gilman. He was a hard worker
and very conscientious about whatever job he undertook. In high school he worked at the Farm
Store and usually was responsible for closing and taking charge of the cash register. He also
worked for a company that interviewed and gave surveys on various topics. He had the energy,
discipline and work ethic that was impressive to me.

Even as a Gilman student his goal was to come back and be hired as a teacher. He was thrilled
to be hired, and worked hard to do a good job.

With his discipline and frugality he was able to purchase a house in Rodgers Forge and become
independent from his family. He was very proud of this accomplishment, as he should have
been.

Chris had many friends throughout his life, both contemporaries as well as adults like myself. He
was smart, funny and intellectually interesting. I always enjoyed our conversations and hearing
about what he was doing.

Chris was a leader at Gilman. He was asked to chaperone student trips both locally and abroad.

Even while incarcerated I understand some of the other prisoners have asked his advice or
sought him as a spokesperson.

**JA224**

It seems clear he has made some mistakes, but I feel comfortable saying he could make positive contributions in the community and be a responsible citizen if given the opportunity.

Respectfully,
Mary Catherine Savage

Hon. James K. Bredar, Judge
United States District Court for Maryland
101 West Lombard Street
Baltimore, Md. 21201

Dear Judge Bredar,

I am writing to you to let you know why I believe Christopher (Chris) Bendann can make a positive contribution to society.

First, I have known Chris his entire life. I met him shortly after he arrived in the United States when he was six months old. I have seen him and talked with him on more than two or three occasions every year since then. We have talked about a wide variety of subjects, including education policy and practice, politics, history and travel. From these conversations, I know Chris has an ability to see many sides of different issues and understand different perspectives on the same issue.

Chris is a very intelligent, articulate, and hard-working young man. He has a proven track record of being an excellent teacher, someone who was interested in his subject matter, and able to communicate his interest to his students. He was also viewed as a leader by Gilman, as evidenced by the fact that he was asked to lead student trips both within the United States and abroad, and given many admissions responsibilities.

In addition, between 2020-2023 (prior to his legal troubles), I met a number of different adults in different settings who in the course of conversation mentioned that they knew Chris Bendann and told me completely unsolicited how much they liked him, respected him and thought he had much to offer. These interpersonal skills that Chris possesses, along with his intelligence and work ethic, mean to me there are a lot of different settings in which Chris could contribute to the betterment of our society. Some that come to mind immediately are teaching adults in adult education settings, or teaching people in the prison system, or helping settle disputes between people. He could also be a wonderful travel guide for adults taking guided trips in this country or in Europe.

While I understand the Court must consider what an appropriate punishment is for Chris, I believe it would be a loss to our society if we can't find a way to make use of Christopher's many talents.

Very truly yours,
Frederick G. Savage

# JOHN PHILIP MILLER

12 Beechdale Road
Baltimore, Maryland 21210

January 6, 2025

Re: Christopher Bendann

Dear Judge Bredar:

I write to you regarding the upcoming sentencing of Christopher Bendann scheduled for January 21, 2025. I have known Christopher since he joined his parents over forty years ago. Our families have been friends over many years. In fact, for approximately 15 years our families spent summer vacations together in Cooperstown NY. Our son and Christopher spent much time together during this period.

I have followed Christopher through his schooling and growth into manhood and I know that he possesses many positive skills. I have always found him to be extremely polite and respectful to all persons with whom he had any contact.  Obviously, his recent conviction is a great shock to everyone who has known Christopher throughout his life.

I greatly appreciate your responsibility in sentencing to balance punishment for the criminal acts committed with the need for the victims to feel that there has been appropriate responsibility imposed for the wrongdoer's actions.

Christopher and his family have also suffered greatly for his actions. I sincerely hope that your sentence will allow Christopher to, at some point, with appropriate supervision, rejoin his family and society and to make a positive contribution to the world. I trust that this will be possible. Thank you for considering the above in your decisionmaking in this matter.

Very truly yours,

John Philip Miller

HON. JAMES K. BREDAR, JUDGE
UNITED STATES DISTRICT COURT FOR MARYLAND
101 WEST LOMBARD STREET
BALTIMORE, MD 21201

Dear Judge Bredar,

Christopher Bendann and his parents lived two doors away from my family while Christopher was in school. I have known Christopher well since he was about eleven years old. My daughter who is the same age as Christopher became, and remains, a good friend of his. Chris was always welcome in our home. He quite often joined us for dinner. I consider him to be like a nephew.

I have seen so very much good in Christopher! He was always ready to step in and help with anything that arose. He showed compassion, good humor, and care to my elderly mother and mother-in-law. I have seen him offer advice and suggestions to parents facing behavior or education issues with their children. Over the years so many people have told me that Christopher had helped them.

My hope is that you can find a way for Christopher to be in a situation where he can use his many talents for good. Thank you for your consideration.

Respectfully,

Kathleen Brosi

HON. JAMES K. BREDAR, JUDGE

UNITED STATES DISTRICT COURT FOR MARYLAND

101 WEST LOMBARD STREET

BALTIMORE, MD 21201

Dear Judge Bredar,

I have known Christopher Bendann for 30 years. We lived a few houses apart growing up and spent countless hours together throughout our middle and high school years. We went on family vacations together and to all our schools' social events at Bryn Mawr and Gilman. He is like a cousin to me and his parents were like a loving aunt and uncle. My children refer to him as Uncle Chris.

The sorrow I and other close friends feel at not having been able to identify and stop his downward spiral is crushing. That a person we love so much and who has so much goodness and compassion in him acted to harm others so deeply is devastating.

I still believe that many of his good qualities remain core parts of him. His gregarious nature, his generous giving disposition, and his ability to meet others' challenges with empathy have been cornerstones of his personality throughout his life.

My hope is that he will be able to use these qualities to make a positive impact on his community. For example, he has always loved cooking and bringing people together around food (I can remember many nights from my childhood when he would excitedly discuss recipes and help my mom make dinner while I shot hoops in the driveway). I could see him using these qualities in the future to create a welcoming and supportive community kitchen that nourishes those in need and helps them build positive networks of support. I hope that he is able to continue his education while incarcerated, perhaps earning a certificate or degree in business, so that he has additional skills to make positive change.

Sincerely,

Evelyn Semenza

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| v. | * | Crim. No. JKB-23-0278 |
| CHRISTOPHER KENJI BENDANN, | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM AND ORDER

Sentencing in this matter is scheduled for Tuesday, January 21, 2025. (ECF No. 166 at 3.) Now before the Court is Defendant's Motion to Strike Impermissible Victim Impact Statements. (ECF No. 177.) The Motion will be denied.

In his Motion, Defendant offers essentially three arguments as to why the Court should not consider certain of the Government's anticipated victim-impact statements, in whole or in part, at sentencing. First, he argues that several of the putative victims are not "victims" under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, and consequently have no right to offer their statements to the Court. (*See* ECF No. 177 at 3–5.) Second, he argues that several of the putative victims' statements inappropriately weigh in on sentencing. (*See id.*) Third, he argues that several of the statements inappropriately impugn Defendant's character. (*See id.*)

Separate and apart from crime victims' rights under the CVRA,[1] the primary statute that governs what a court may consider at sentencing is 18 U.S.C. § 3661. That statute provides that there is "[n]o limitation . . . on the information concerning the background, character, and conduct

---

[1] The CVRA provides, in relevant part, that "[a] crime victim has . . . [t]he right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding." 18 U.S.C. § 3771(a)(4). It defines a "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense." *Id.* § 3771(e)(2)(A).

of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. On the contrary, a sentencing court "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information [it] may consider, or the source from which it may come." *United States v. Foutz*, 865 F.2d 617, 620 (4th Cir. 1989) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)); *accord United States v. Phillips*, 204 F. App'x 230, 232 (4th Cir. 2006) ("[S]entencing courts have always maintained the power to consider the broad context of a defendant's conduct . . . ."). This broad authority promotes "the general principle that a sentence should be appropriately tailored to account for all information available to the sentencing court at the time a sentence is imposed." *See United States v. Rumley*, 952 F.3d 538, 546 (4th Cir. 2020).

Because 18 U.S.C. § 3661 places no significant limits on what the Court may consider at sentencing, the issue of who qualifies as a "victim" is moot, as are Defendant's arguments about the content and tone of the anticipated statements. Indeed, for precisely that reason, the Fourth Circuit has repeatedly declined to consider similar arguments about victim-impact statements in other cases.[2] *See, e.g., United States v. Spiwak*, 377 F. App'x 319, 323–24 & n.3 (4th Cir. 2010) ("Bearing in mind the considerable latitude that district courts enjoy at sentencing, as authorized by [§ 3661], we cannot say that the district court abused its discretion [in considering a putative victim's statement]." (citation omitted)); *United States v. Myers*, 402 F. App'x 844, 845 (4th Cir. 2010) ("We need not determine . . . whether the witness was a crime victim under [§ 3771], as it is clear that her statement was admissible for the purpose of imposing an appropriate sentence under [§ 3661]."); *see also United States v. Craig*, 321 F. App'x 322, 323–24 (4th Cir. 2009);

---

[2] Defendant cites to two cases that discuss restrictions on what a sentencing jury may hear in capital cases. (*See* ECF No. 177 at 2 (first citing *United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.D. Iowa 2005), and then citing *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016)). But the Supreme Court has made clear that these restrictions are "expressly limited to that particular type of victim impact testimony." *Bosse*, 580 U.S. at 2 (cleaned up) (citation omitted).

2

**JA231**

*United States v. Kennedy*, 292 F. App'x 240, 243 (4th Cir. 2008).

      Accordingly, it is hereby ORDERED that Defendant's Motion to Strike, (ECF No. 177), is DENIED.

DATED this _____17th_____ day of January, 2025.

<div style="margin-left:40%">

BY THE COURT:

/s/ JAMES K. BREDAR
_____

James K. Bredar
United States District Judge

</div>

3

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
2                      NORTHERN DIVISION

3   _____
                                    )
4   UNITED STATES OF AMERICA,       )
                                    )
5        Plaintiff,                 )
                                    )Criminal No. 23-cr-0278-JKB
6   vs.                             )
                                    )
7   CHRISTOPHER KENJI BENDANN,      )
                                    )
8        Defendant.                 )
    _____)
9

10

11        TRANSCRIPT OF PROCEEDINGS - JURY VOIR DIRE DAY 1
               BEFORE THE HONORABLE JAMES K. BREDAR
12                 AUGUST 22, 2024 AT 1:57 p.m.

13

14  APPEARANCES:

15       ON BEHALF OF THE PLAINTIFF:
             COLLEEN E. MCGUINN, ESQUIRE
16           KIM Y. HAGAN, ESQUIRE

17       ON BEHALF OF THE DEFENDANT:
             CHRISTOPHER C. NIETO, ESQUIRE
18           GARY E. PROCTOR, ESQUIRE

19       ALSO PRESENT:
             CALISTA WALKER, FBI SPECIAL AGENT
20           VICTORIA LIU, PARALEGAL

21

22       (Computer-aided transcription of stenotype notes)

23                      Reported by:
                   Ronda J. Thomas, RMR, CRR
24                 Federal Official Reporter
               101 W. Lombard Street, 4th Floor
25                 Baltimore, Maryland 21201
```

1    (1:57 p.m.)

2           THE COURT:   Good afternoon.   Be seated, please.   Once

3    situated, the clerk will call the role of potential jurors.

4           THE CLERK:   Members of the petit jury, as I call your

5    juror number, will you please stand, orally acknowledge your

6    presence, and be seated, please.

7           THE CLERK:   Juror No. 363.

8           PROSPECTIVE JUROR:   Here.

9           THE CLERK:   Juror No. 361.

10          PROSPECTIVE JUROR:   Here.

11          THE CLERK:   Juror No. 352.

12          PROSPECTIVE JUROR:   Here.

13          THE CLERK:   Juror No. 347.

14          PROSPECTIVE JUROR:   Here.

15          THE CLERK:   Juror No. 341.

16          PROSPECTIVE JUROR:   Here.

17          THE CLERK:   Juror No. 339.

18          PROSPECTIVE JUROR:   Here.

19          THE CLERK:   Juror No. 333.

20          PROSPECTIVE JUROR:   Here.

21          THE CLERK:   Juror No. 329.

22          PROSPECTIVE JUROR:   Here.

23          THE CLERK:   Juror No. 321.

24          PROSPECTIVE JUROR:   Here.

25          THE CLERK:   Juror No. 318.

| | |
|---|---|
| 1 | **PROSPECTIVE JUROR:** Here. |
| 2 | **THE CLERK:** Juror No. 311. |
| 3 | **PROSPECTIVE JUROR:** Here. |
| 4 | **THE CLERK:** Juror No. 307. |
| 5 | **PROSPECTIVE JUROR:** Here. |
| 6 | **THE CLERK:** Juror No. 302. |
| 7 | **PROSPECTIVE JUROR:** Here. |
| 8 | **THE CLERK:** Juror No. 296. |
| 9 | **PROSPECTIVE JUROR:** Here. |
| 10 | **THE CLERK:** Juror No. 293. |
| 11 | **PROSPECTIVE JUROR:** Here. |
| 12 | **THE CLERK:** Juror No. 287. |
| 13 | **PROSPECTIVE JUROR:** Here. |
| 14 | **THE CLERK:** Juror No. 282. |
| 15 | **PROSPECTIVE JUROR:** Here. |
| 16 | **THE CLERK:** Juror No. 276. |
| 17 | **PROSPECTIVE JUROR:** Here. |
| 18 | **THE CLERK:** Juror No. 267. |
| 19 | **PROSPECTIVE JUROR:** Here. |
| 20 | **THE CLERK:** Juror No. 264. |
| 21 | **PROSPECTIVE JUROR:** Here. |
| 22 | **THE CLERK:** Juror No. 256. |
| 23 | **PROSPECTIVE JUROR:** Here. |
| 24 | **THE CLERK:** Juror No. 255. |
| 25 | **PROSPECTIVE JUROR:** Here. |

```
 1              THE CLERK:  Juror No. 241.

 2         PROSPECTIVE JUROR:  Here.

 3              THE CLERK:  Juror No. 236.

 4         PROSPECTIVE JUROR:  Here.

 5              THE CLERK:  Juror No. 234.

 6         PROSPECTIVE JUROR:  Here.

 7              THE CLERK:  Juror No. 232.

 8         PROSPECTIVE JUROR:  Here.

 9              THE CLERK:  Juror No. 226.

10         PROSPECTIVE JUROR:  Here.

11              THE CLERK:  Juror No. 219.

12         PROSPECTIVE JUROR:  Here.

13              THE CLERK:  Juror No. 218.

14         PROSPECTIVE JUROR:  Here.

15              THE CLERK:  Juror No. 216.

16         PROSPECTIVE JUROR:  Here.

17              THE CLERK:  Juror No. 205.

18         PROSPECTIVE JUROR:  Here.

19              THE CLERK:  Juror No. 204.

20         PROSPECTIVE JUROR:  Here.

21              THE CLERK:  Juror No. 202.

22         PROSPECTIVE JUROR:  Here.

23              THE CLERK:  Juror No. 200.

24         PROSPECTIVE JUROR:  Here.

25              THE CLERK:  Juror No. 198.
```

```
 1          PROSPECTIVE JUROR:   Here.

 2          THE CLERK:   Juror No. 197.

 3          PROSPECTIVE JUROR:   Here.

 4          THE CLERK:   Jury number 192.

 5          PROSPECTIVE JUROR:   Here.

 6          THE CLERK:   Juror No. 188.

 7          PROSPECTIVE JUROR:   Here.

 8          THE CLERK:   Juror No. 184.

 9          PROSPECTIVE JUROR:   Here.

10          THE CLERK:   Juror No. 176.

11          PROSPECTIVE JUROR:   Here.

12          THE CLERK:   Juror No. 175.

13          PROSPECTIVE JUROR:   Here.

14          THE CLERK:   Juror No. 165.

15          PROSPECTIVE JUROR:   Here.

16          THE CLERK:   Juror No. 162.

17          PROSPECTIVE JUROR:   Here.

18          THE CLERK:   Juror No. 151.

19          PROSPECTIVE JUROR:   Here.

20          THE CLERK:   Juror No. number 150.

21          PROSPECTIVE JUROR:   Here.

22          THE CLERK:   Juror No. 146.

23          PROSPECTIVE JUROR:   Here.

24          THE CLERK:   Juror No. 130.

25          PROSPECTIVE JUROR:   Here.
```

1          THE CLERK:  Juror No. 128.

2          PROSPECTIVE JUROR:  Here.

3          THE CLERK:  Juror No. 126.

4          PROSPECTIVE JUROR:  Here.

5          THE CLERK:  Juror No. 117.

6          PROSPECTIVE JUROR:  Here.

7          THE CLERK:  Juror No. 108.

8          PROSPECTIVE JUROR:  Here.

9          THE CLERK:  Juror No. 107.

10          PROSPECTIVE JUROR:  Here.

11          THE CLERK:  Juror No. 101.

12          PROSPECTIVE JUROR:  Here.

13          THE CLERK:  Juror No. 98.

14          PROSPECTIVE JUROR:  Here.

15          THE CLERK:  Juror No. 96.

16          PROSPECTIVE JUROR:  Here.

17          THE CLERK:  Juror No. 91.

18          PROSPECTIVE JUROR:  Here.

19          THE CLERK:  Juror No. 83.

20          PROSPECTIVE JUROR:  Here.

21          THE CLERK:  Juror No. 78.

22          PROSPECTIVE JUROR:  Here.

23          THE CLERK:  Juror No. 76.

24          PROSPECTIVE JUROR:  Here.

25          THE CLERK:  Juror No. 71.

| | |
|---|---|
| 1 | **PROSPECTIVE JUROR:**  Here. |
| 2 | **THE CLERK:**  Juror No. 67. |
| 3 | **PROSPECTIVE JUROR:**  Here. |
| 4 | **THE CLERK:**  Juror No. 65. |
| 5 | **PROSPECTIVE JUROR:**  Here. |
| 6 | **THE CLERK:**  Juror No. 62. |
| 7 | **PROSPECTIVE JUROR:**  Here. |
| 8 | **THE CLERK:**  Juror No. 56. |
| 9 | **PROSPECTIVE JUROR:**  Here. |
| 10 | **THE CLERK:**  Juror No. 51. |
| 11 | **PROSPECTIVE JUROR:**  Here. |
| 12 | **THE CLERK:**  Juror No. 49. |
| 13 | **PROSPECTIVE JUROR:**  Here. |
| 14 | **THE CLERK:**  Juror No. 48. |
| 15 | **PROSPECTIVE JUROR:**  Here. |
| 16 | **THE CLERK:**  Juror No. 46. |
| 17 | **PROSPECTIVE JUROR:**  Here. |
| 18 | **THE CLERK:**  Juror No. 49. |
| 19 | **PROSPECTIVE JUROR:**  Here. |
| 20 | **THE CLERK:**  Juror No. 37. |
| 21 | **PROSPECTIVE JUROR:**  Here. |
| 22 | **THE CLERK:**  Juror No. 33. |
| 23 | **PROSPECTIVE JUROR:**  Here. |
| 24 | **THE CLERK:**  Juror No. 26. |
| 25 | **PROSPECTIVE JUROR:**  Here. |

1          THE CLERK:  Juror No. 21.

2          PROSPECTIVE JUROR:  Here.

3          THE CLERK:  Juror No. 16.

4          PROSPECTIVE JUROR:  Here.

5          THE CLERK:  Juror No. 11.

6          PROSPECTIVE JUROR:  Here.

7          THE CLERK:  Juror No. 5.

8          PROSPECTIVE JUROR:  Here.

9          THE CLERK:  And Juror No. 1.

10          PROSPECTIVE JUROR:  Here.

11          THE CLERK:  Are there any other jurors present whose

12     number I have not called?  No response.

13          Can you all please stand and raise your right hand for me,

14     please.

15          (Jury venire sworn.)

16          THE CLERK:  Thank you.  You may be seated.

17          THE COURT:  Well, good afternoon, ladies and

18     gentlemen.  You've been brought to this courtroom to

19     participate in the selection of a jury that will hear and

20     decide a criminal case.

21          In this case, a grand jury has indicted a defendant and

22     charged him with the commission of the crimes of sexual

23     exploitation of a child, possession of child pornography and

24     cyberstalking.  The offenses are alleged to have occurred on

25     various dates between September 1, 2017 and February 3, 2023,

1   in Maryland.

2       The defendant has entered pleas of not guilty to each of

3   these charges.  I'm now going to ask you a series of questions.

4   Your answers to these questions will aid me in the process me

5   of selecting the persons who will serve as the jurors in this

6   case.  Please listen carefully to the questions and follow

7   along on your answer sheet which has been provided to each of

8   you.

9       Please stop right now and write your juror number in the

10  space indicated on your answer sheet.  Your personal juror

11  number.

12      Then, as I read the questions, please write down whether

13  you have a "yes" or "no" answer to each question posed.  After

14  you have supplied a "yes" or "no" answer to the question, you

15  may wish to add a comment or two that will allow me to prompt

16  your memory later when we meet in person and I ask you to

17  explain your answer.

18      After I have asked all of my questions and you have

19  recorded your respective answers, then you will leave the

20  courtroom as a group, and you will wait in a room nearby.

21  Actually, it's another courtroom.  And then, you will be

22  brought back to this courtroom one by one to meet with me and

23  to review the answers that you've provided on your answer

24  sheet.

25      Once you are back in this courtroom, your fellow jurors

1  will not be present, but the parties, their lawyers, members of

2  the public, court staff and I will be here, and we'll hear your

3  individual answers to the questions.

4      Now, that said, we will exclude the public from hearing

5  your answers on any particularly personal topics or issues.  We

6  are ready to begin with the process.  Ready to begin with the

7  questions.

8      Here's the first question.  Open up your answer sheet.

9  You'll be able to see the question as I'm asking.

10      Number one:  My name is James K. Bredar.  I am the judge

11  who will be presiding during the trial of this case.  Do any of

12  you know me or any member of your family?  I better get that

13  right.  Do any of you know me or any member of my family?  I

14  assume you do know the members of your own family.  I'm going

15  to give you credit for that.

16      (Laughter).

17      Do you know me or do you know any member of my family?

18      Now, you look down there and there's a place for you to

19  mark either "yes" or "no" and you mark it.  And if there's

20  something you need to elaborate on then you scribble a little

21  note that will prompt me to remind you that you had something

22  more to say.  Now, we're not going to speak to you individually

23  right now.  We're going to move on to the next question.

24      So you record your answer and now we're ready to move on

25  to the next question.

1    Number two:  This case is styled or titled, The United
2  States of America v. Christopher Kenji Bendann.  Case Number
3  JKB-23-278.  Have any of you ever heard or read of this case?
4  Have any of you ever read or heard of this case?
5    Number three:  Would counsel for the Government please
6  rise and turn and face the jury venire, first in the jury box
7  and then in the gallery.
8    The United States Government is represented by Assistant
9  United States Attorneys Colleen E. McGuinn and Kim Y. Hagan.
10  They are the lawyers who will prosecute this case.  Do you know
11  or have you had any dealings with Ms. McGuinn or Ms. Hagan?
12    Counsel, you may be seated.
13    Would counsel for the Defendant please rise and face the
14  jury box and then the gallery.  Christopher Kenji Bendann is
15  represented by Gary E. Proctor, raise your hand, Mr. Proctor,
16  who practices law in the law firm of the Offices of Gary E.
17  Proctor, and by Christopher C. Nieto who practices law in the
18  firm of Nieto Law Offices.  Do you know or have you had any
19  dealings with either Mr. Proctor or his firm?  Do you know or
20  have you had any dealings with either Mr. Nieto or his law
21  firm?
22    Thank you, counsel, you may be seated.
23    Would the Defendant please rise and face the jury box and
24  then in the gallery.  Ladies and gentlemen, the Defendant in
25  this case is Christopher Kenji Bendann.  Do you know or have

1  you had any dealings with the Defendant Christopher Kenji
2  Bendann or, to your knowledge, any member of his family or his
3  friends or his associates?
4       Thank you, Mr. Bendann.  You may be seated.
5       Question six:  Ladies and gentlemen, are you, any member
6  of your family or any close associates, related to any judge,
7  law clerk or court personnel of this federal court?  I'm not
8  asking you if you're connected with or know a judge in any
9  court or someone who works in the circuit court for Baltimore
10 County or something like that.  That's not the question.
11      The question is whether you, any member of your family or
12 any of your closest associates is related to any judge, law
13 clerk or court personnel of this federal court, the United
14 States District Court for the District of Maryland?
15      Number seven:  Ladies and gentlemen, the following people
16 may be witnesses in this case or may be mentioned by witnesses.
17 Please listen carefully and see if you recognize any of these
18 names.  If you do, mark "yes" and then scribble down the name
19 that you think you heard or that you think you might know.
20 We'll go through the list twice so you have every opportunity
21 to hear the names.  There are 20 names that I'm going to now
22 read.  I'll start now.                .              .  Angela
23 Johnson.  Henry Smyth.  Chris Feiss, F-E-I-S-S.  Stacy Halpert.
24 Detective Shannon Markel, BCPD.  DF William Paulemon,
25 P-A-U-L-E-M-A-N, FBI.  Jeff John Byram, FBI, Quantico.  Agent

1  Eric Oberly, FBI.  DeAnna Komber, K-O-M-B-E-R, employed by
2  Apple.  Agent Calista Walker, FBI.              .  James
3  Schroeder.  Will Godine or Godine, G-O-D-I-N-E.  Jack Stuzin,
4  S-T-U-Z-I-N.  Tyler Witherspoon, Charlotte Hoffberger.  Wallace
5  Halpert.  Riley Seelert, S-E-E-L-E-R-T.
6      I'm going to say the names a second time.              .
7              .  Angela Johnson.  Henry Smyth.  Christopher
8  Feiss.  Stacy Halpert.  Detective Shannon Markel.  DF William
9  Paulemon.  Jeff John Byram.  Agent Eric Oberly.  DeAnna Komber.
10  Agent Calista Walker.              .  James Schroeder.  Will
11  Godine.  Jack Stuzin.  Tyler Witherspoon.  Charlotte
12  Hoffberger.  Wallace Halpert.  Riley Seelert.
13      If you think you recognize one of those names as someone
14  that you may know, mark "yes" and scribble down the name.
15      Question eight:  Some of you may have previously served as
16  jurors in the trials of criminal or civil cases in either state
17  or federal court.  If you are selected to serve in this case,
18  it would be your obligation to put aside and not be influenced
19  by anything that happened when you served as a juror in an
20  earlier case.
21      If you have previously served as a juror, is there
22  anything about that prior experience that would make it
23  difficult for you or that would influence you in your
24  deliberations if you served as a juror in this case?
25      Is there anything about that prior experience as a juror

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA245**

1  that would make it difficult for you or that would influence

2  you in your deliberations if you served as a juror in this

3  case?

4      Question nine:  Similarly, some of you may have previously

5  served on a grand jury in either state or federal court.  If

6  you are selected to serve in this case, it would be your

7  obligation to put aside and not be influenced by anything that

8  happened when you served on a grand jury.  If you have

9  previously served on a grand jury, is there anything about that

10 prior experience that would make it difficult for you or that

11 would influence you in your deliberations if you served as a

12 juror in this case?

13     If you have previously served on a grand jury, is there

14 anything about that prior experience that would make it

15 difficult for you or that would influence you in your

16 deliberations if you served as a juror in this case?

17     Question 10:  A few minutes ago you heard me give a very

18 brief description of this case.  Is there anything in that

19 brief description that made you realize it would be difficult

20 for you to keep an open mind and to serve as a fair and

21 impartial juror in the trial of this case?

22     Question 11:  Do you know Erek L. Barron, the United

23 States Attorney for the District of Maryland, or any of the

24 assistant United States attorneys for this district, or any

25 other employees of the United States Attorney's Office?

```
 1        Question 12:  Have you or has any member of your immediate
 2   family or any of your closest associates ever been employed by
 3   the United States Department of Justice, the Office of the
 4   State's Attorney, the Maryland State Attorney General's Office,
 5   or any state, local or federal law enforcement agency?
 6        Now, let me remind you that this question pertains only to
 7   members of your immediate family or any of your closest
 8   associates, however you define that.  But we are searching for
 9   close associations.
10        So, once again, have you or has any member of your
11   immediate family or any of your closest associates ever been
12   employed by the U.S. Department of Justice, the Office of the
13   State's Attorney, the Maryland State Attorney General's Office,
14   or any state, local, or federal law enforcement agency?
15        If you're wondering what I'm doing, I'm watching to see if
16   people have stopped writing.  And I don't want to start the
17   next question while many people are still writing.  So I think
18   we're good.
19        Thirteen:  Have you, any member of your immediate family
20   or any of your closest associates ever worked for a private
21   agency or company with police, security or investigative
22   functions, such as, a private investigative firm or a company
23   that provides security services?  You, any member of your
24   immediate family or any of your closest associates.
25        Okay, 14:  Have you, any member of your immediate family,
```

```
 1  any of your closest associates ever been employed by a state or
 2  federal court, the Federal Public Defender, a state public
 3  defender, a private criminal defense attorney, or a
 4  court-related agency, such as a sheriff's office, a clerk's
 5  office, probation and parole office, United States marshal's
 6  office, pretrial services, bail agency, or similar department
 7  or organization.  That's you, any member of your immediate
 8  family or any of your closest associates.
 9       Question 15:  Have you or has any member of your immediate
10  family or your closest associates ever been involved in a legal
11  dispute with the Government, with a law enforcement agency, or
12  with any specific law enforcement officer or agent?
13       Ever been involved in a legal dispute with the government,
14  with a law enforcement agency, or with any specific law
15  enforcement officer or agent?
16       Okay.  So, ladies and gentlemen, this next question is a
17  little bit different.  It has many parts to it.  Please listen
18  carefully.
19       Next I'm going to ask several questions together.  And if
20  you have a "yes" answer to any of these questions that are
21  contained within 16, then please mark "yes" for this question
22  on page 12, which is three pages further.
23       If you turn over to page 12, you'll see that only then is
24  there a spot to mark "yes" or "no" in the middle of page 12.
25       But backing up to page 9 where we were, Question 16.  The
```

1   subquestions I'm going to ask you are lettered.  And if you

2   have a "yes" or "no" answer, you should have a "yes" or "no"

3   answer to each one of these, probably best to go ahead and

4   write "yes" or "no" right at the end of the sentence on your

5   answer sheet there.  And then, if you have a "yes" answer, a

6   little explanatory note if that would help you later.  You

7   don't have to write that note but if you want to you can.

8   Okay.

9        So Question 16A, here we go:  Have you or has any member

10  of your immediate family or your closest associates ever been

11  the victim of a crime?  Write a quick "yes" or "no" right after

12  the sentence.  And then if you have some elaboration you can

13  write a little note there.  Don't try to describe huge, large

14  events.  just something so if I read it and read it back to

15  you, it'll trigger your memory and then you can tell me about

16  it.

17       For instance, maybe your car was broken into at some

18  point.  You would just write car break in.  And then we would

19  hear about it in greater detail later.

20       Okay.  Question 16B:  Have you or has any member of your

21  immediate family or your closest associates ever been a witness

22  to a crime?

23       16C:  Have you or any member of your immediate family or

24  your closest associates ever been accused of criminal conduct,

25  been the subject of a criminal investigation, or been convicted

Ronda J. Thomas, RMR, CRR – Federal Official Reporter

of committing a crime?

Have you or has any member of your immediate family or your closest associates ever been accused of criminal conduct, been the subject of a criminal investigation, or been convicted of committing a crime?

16D:  Have you or any member of your immediate family or close associates ever been a witness for the prosecution or for the defense in the investigation or the trial of a criminal case?

16E:  Specifically, in this case, the allegations include those of sexual abuse.  Has any member of your immediate family or closest associates ever been a victim, a witness, accused or convicted of a crime of a sexual nature?

Any member of your immediate family or closest associates ever been a victim, a witness, been accused or convicted of a crime of a sexual nature?

16F:  The Defendant in this case is Asian American.  Do you hold any beliefs related to race, color, religion, national origin or other personal attributes that would make it difficult for you to render a fair and impartial verdict based solely on the evidence and the law.

16G:  Do you hold any beliefs as to sexual orientation that would make it difficult for you to render a fair and impartial verdict based sole on the evidence and the law?

16H:  Do you hold any beliefs as to crimes involving

1  children that would make it difficult for you to render a fair
2  and impartial verdict based solely on the evidence and the law?
3      16I:  As part of the evidence in this case, you may see
4  images of a sexual nature that are graphic.  Is there anything
5  about viewing such images that would make it difficult for you
6  to render a fair and impartial verdict based solely on the
7  evidence and the law?
8      16J:  The allegations in this case occurred when both the
9  Defendant and the alleged victim were either employed by or a
10  student at the Gilman School on Roland Avenue in Baltimore
11  City.  Have any of you or a family member or a close associate
12  attended, been employed by or otherwise been associated with
13  the Gilman School?
14      Have you or a family member or a close associate attended,
15  been employed by or otherwise been associated with the Gilman
16  School?
17      Now, ladies and gentlemen, if you had a "yes" answer to
18  any of the questions under number 16, please go ahead and mark
19  here "yes."  If you had no "yes" answers to any of the
20  subquestions under 16, simply mark "no" here.
21      Question 17:  Has any member of your immediate family or
22  closest associates ever attended law school, studied the law or
23  criminal justice or had legal training?
24      18:  Do you hold any philosophical, religious or moral
25  views that would prevent you from judging the conduct of

another person?

19:   Do you have any views concerning the administration of the criminal justice system, including the courts, that would affect your ability to render a fair and impartial verdict if you were selected to serve as a juror in this case?

20:   Do you, any member of your family or any of your close friends belong to any group that advocates a change in our criminal justice system or our criminal sentencing guidelines, including any group which advocates a position on the question of whether prison sentences for offenses involving children should be lengthened or shortened?

21:   Do you or any member of your family or closest associates belong to or participate in any crime prevention groups, such as neighborhood watch organizations?

22:   Would you tend to give greater or lesser weight to the testimony of a law enforcement officer or agent simply because that person was a law enforcement officer or agent?

23:   Do you have any concerns or beliefs about laws relating to crimes that involve children or laws relating to crimes that involve sexual exploitation that would affect your ability to render a fair and impartial verdict in this case?

24:   The defendant may choose to testify or may exercise his constitutional right not to testify.  If he elects not to testify, that cannot be held against him or even considered by you in your deliberations.

1    Would the defendant's decision to testify or not to

2 testify affect your ability to be fair and impartial in serving

3 as a juror in this case?

4    25:  Do you believe that just because the defendant has

5 been indicted he or she must be guilty of something.

6    26:  A defendant is presumed innocent unless and until a

7 jury unanimously finds him guilty beyond a reasonable doubt.

8 Are you unable to accept that principle?

9    Listen carefully to the question.

10    A defendant is presumed innocent unless and until a jury

11 unanimously finds him guilty beyond a reasonable doubt.  Are

12 you unable to accept that principle?  If you're unable, then

13 you check "yes."  If you are able to accept that principle of

14 our law then you check "no."

15    27:  At the end of the trial, I will instruct the jury on

16 the law that they must follow as they decide this case.  Jurors

17 must follow the court's instructions on the law, even if they

18 personally do not agree with the law as the court describes it.

19    If a juror has an opinion about what the law should be but

20 that opinion is different from the judge's instructions on what

21 the law is, the juror is required to follow the judge's

22 instructions.

23    If selected to serve as a juror, would you be unable to

24 follow my instruction on the law?  If you're unable to follow

25 the judge's instructions you should mark "yes."  But if you're

1  able to follow the judge's instructions on the law then you

2  mark "no."

3      Now, forgive me while I speak up on the next question,

4  you'll understand why.  Do you have any hearing or sight

5  impairment?  Do you have any hearing or sight impairment?

6      29:  Do you have any difficulty reading, writing or

7  understanding the English language such that it would impair

8  your ability to understand what you hear in court or such that

9  it would impair your ability to read any documents submitted as

10 evidence?

11     And here we take one unusual step.  Anyone not speak

12 English?  Please stand if you do not speak English.   No

13 positive responses.

14     30:  Ladies and gentlemen, I anticipate that this trial

15 will last approximately two weeks.  The court will not sit on

16 Labor Day.  Obviously it won't sit on the weekends.  We do,

17 otherwise, sit Monday through Friday.  Do you have any medical,

18 physical or other condition or reason that would make it

19 difficult for you to give your full attention, and fair,

20 impartial and complete considering if you were selected to

21 serve as a juror in this case?

22     Two more questions, ladies and gentlemen.  The next one's

23 a long one.  If you are selected as a juror in this case you

24 will be required to decide this case solely based on the sworn

25 testimony you hear from witnesses in this courtroom and in the

1  exhibits that are presented to you as evidence.  You will be

2  forbidden from looking for or considering information that is

3  potentially available from other sources.  During the trial you

4  may not communicate with others about the trial or discuss it

5  with family, friends or anyone else.  This includes online

6  discussions or postings on blogs or on internet sites such as

7  Facebook, Twitter, YouTube, Snapchat, Instagram, TikTok,

8  LinkedIn or similar means of communication.

9       You may not do any personal research of your own about the

10 case, the attorneys, the parties, or the issues in the case.

11 This prohibition includes internet research of any type,

12 whether on a computer, a cell phone, a smartphone, a smart

13 watch, a tablet, a laptop, a desktop, any electronic device.

14      For instance, during the trial you may not conduct a

15 Google search of any of the persons, facts or subjects that you

16 hear about in the case.  As well, you may not consult any

17 printed material, including books, dictionaries, encyclopedias,

18 newspapers or magazines, whether they're in print or online,

19 frankly, in reference to the people, places and issues that

20 you'll hear about in this case.

21      Now, here's the question:  Are you unable to abide by

22 these restrictions if you are selected as a juror in this case?

23 If you are unable to comply with those rules then you mark

24 "yes."  If you are able to follow that instruction and comply

25 with that rule then you mark "no."

24

1    All right.  Ladies and gentlemen, this last question is
2    the catchall question.  It shows the seriousness with which we
3    take this process.
4        32:  Is there anything else, something I have already
5    asked you about, or something that I've not asked you about,
6    that upon reflection you believe would interfere with your
7    ability to serve as a fair and impartial juror in this case?
8    If there is something then mark "yes" and tell me about it when
9    we meet in person.  But if there's not something then you mark
10   "no."
11       Last page, we're ready now to begin the next part of this
12   process, so in a very orderly way -- we'll give you
13   instructions in just have a second -- we will have you slowly
14   file out of the courtroom.  You'll be leaving through this door
15   over here to my right.
16       When it is your time to line up and proceed towards that
17   door, your first destination will be this grocery cart that you
18   see the clerk pushing, and you'll separate your answer sheet
19   from your clipboard.  Your clipboard will be dropped in the
20   grocery cart.  And then you'll walk up to the door and you'll
21   hand the clerk your answer sheet.
22       It's very important to our process that you stay in order
23   and that we receive the answer sheets in order.  So, today we
24   are using the numbers in reverse from highest number to lowest.
25   We switch as the days go by just to keep the process as random

1  as possible.  But make sure that you stay in order as this

2  process begins.

3      The first five of you to leave the courtroom with

4  Ms. Cohen will stop at a room on your left, which is very close

5  here, because you'll be the first ones brought back in here.

6  Those after number five will follow Ms. Cohen into courtroom

7  1B, which is behind this wall with all of the paintings on it.

8  And that's where you will assemble until it's your turn to come

9  back into the courtroom and to review your answer sheet.

10      So let's begin with the jurors in the jury box standing.

11  You in the gallery may remain seated.

12      The court security officer will move that cordon out of

13  the way so it's no longer blocking those steps.  First row can

14  stand.  Yes, ma'am.  You're doing exactly right.  Follow your

15  way around here.  Find the grocery cart.  Drop your clipboard.

16  Out the side door.

17      Second row stand.

18      Third row stand.

19      Do you want to put that stack down or are you good?

20          THE CLERK:  I'm good.

21          THE COURT:  Fourth row.  And the fifth row.

22      There are no potential jurors in the courtroom.

23      Did voir dire proceed as expected by the Government to

24  this point and consistent with the manner in which was agreed

25  before trial?

```
 1          MS. MCGUINN:  Yes, Your Honor.

 2          THE COURT:  Mr. Nieto, the Defendant?

 3          MR. NIETO:  Yes, Your Honor.

 4          THE COURT:  Thank you.  We're ready for Juror No. 363.

 5  The jurors will be brought individually into the box, seated.

 6  Any reason why that microphone needs to be that far down in the

 7  box?  How about if we bring it back closer so they don't have

 8  to go as far.  And let's check and make sure the mic is on.

 9      But I don't want the juror to be obscured by the podium

10  from your view.  So is that a problem?

11          MR. NIETO:  From there, Your Honor?

12          THE COURT:  Yeah, do you see where I've got the

13  microphone now, are you going to be able to see the juror --

14          MR. NIETO:  Yes, Your Honor.

15          THE COURT:  -- or is the podium in the way?

16          MR. NIETO:  No, we can see.

17          THE COURT:  You good, Mr. Proctor?

18          MR. PROCTOR:  Yes, sir.

19          THE COURT:  Juror 363, please.  I'm going to ask those

20  in the back of the gallery to now move down to the front rows

21  because there are going to be moments where I'm going to need

22  to excuse you from the courtroom.  And I want that process to

23  be quick and efficient.  And when you're excused, please

24  quickly file out one of the side door that I'm pointing to.

25  You can stand out there in the vestibule, and the court
```

1  security officer will advise you when you may return.

2      Good afternoon, sir.  You are Juror No. 363.

3          PROSPECTIVE JUROR:  Yes, sir.

4          THE COURT:  I'm looking through your juror

5  questionnaire, and I see you have a "yes" answer to Question

6  No. 12.  Your Uncle Jeff Hughes is affiliated with Salisbury

7  police department; is that right?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  What does he do there?

10          PROSPECTIVE JUROR:  He's a detective.

11          THE COURT:  Do you see him often?

12          PROSPECTIVE JUROR:  Yeah, I'd say so.  About once a

13  week.

14          THE COURT:  Does he talk to you about his cases or

15  other subjects.

16          PROSPECTIVE JUROR:  No, he doesn't ever mention

17  anything about cases or anything.

18          THE COURT:  Got it.  Anything about the fact that he's

19  a police officer that would affect your ability to be a fair

20  and impartial juror in this case?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  And that looks like the only "yes" answer

23  that you supplied; is that correct?

24          PROSPECTIVE JUROR:  I believe so.

25          THE COURT:  Well, more than believe, you know so.

```
 1            PROSPECTIVE JUROR:  Yeah.

 2            THE COURT:  I didn't see any others so is that right?

 3            PROSPECTIVE JUROR:  Yeah, that should be the only one.

 4            THE COURT:  It was the only one that I saw.  Where do

 5    you live?

 6            PROSPECTIVE JUROR:  Pittsville, Maryland.  It's across

 7    the bridge.  Do you know where Salisbury is?

 8            THE COURT:  Yeah, what's the name of the town again?

 9            PROSPECTIVE JUROR:  Pittsville.

10            THE COURT:  Pittsville?

11            PROSPECTIVE JUROR:  Yep, it's halfway in between Ocean

12    City and Salisbury.

13            THE COURT:  Okay.  And do you work over there or go to

14    school or what do you do?

15            PROSPECTIVE JUROR:  I work actually in Delaware.  It's

16    based out of Frankfurt.  I do HVAC.  So I just work everywhere

17    in Delaware pretty much.

18            THE COURT:  Are you a certified tech?

19            PROSPECTIVE JUROR:  Not yet, in training.

20            THE COURT:  You're in training.  You're going to get

21    there eventually.

22            PROSPECTIVE JUROR:  Yep, eventually, hopefully.

23            THE COURT:  Married?

24            PROSPECTIVE JUROR:  Nope.

25            THE COURT:  Got any kids?
```

**JA260**

1        PROSPECTIVE JUROR:   Nope.

2        THE COURT:   Live by yourself?

3        PROSPECTIVE JUROR:   I live with my parents still.

4        THE COURT:   That's in Pittsville?

5        PROSPECTIVE JUROR:   Yep.

6        THE COURT:   What do your patients do?

7        PROSPECTIVE JUROR:   My dad does the same thing, HVAC,

8  and my mom does healthcare work.

9        THE COURT:   Private channel.

10    (Whereupon, the following conference was held at the

11  bench:)

12        THE COURT:   Can the Government hear me?  Ms. McGuinn,

13  can you hear me?  Ms. Hagan, can you hear me?  Help them out,

14  Becca.  Check, check, check.  Ms. McGuinn, can you hear me?

15        MS. MCGUINN:   Yes.

16        THE COURT:   You have to talk right into your

17  microphone.  You have to get right up on your mic or I won't be

18  able to hear you.

19        MS. MCGUINN:   Yes, Your Honor.

20        THE COURT:   Does the Government have any questions in

21  light of mine?

22        MS. MCGUINN:   No, Your Honor.

23        THE COURT:   Does the Defendant?

24        MR. PROCTOR:   No, Your Honor.

25        MS. MCGUINN:   None from the Government.

1    (Whereupon, the bench conference was concluded.)

2         THE COURT:  Thank you, Juror 363.  You may now proceed

3    to courtroom 1B.  The clerk will show you where to go.

4         Bring me 361.  Thank you.

5         On 361, the only "yes" answer is to 28.  Do you have any

6    hearing or sight impairment?  Yes, sight/glasses.

7         Please take a seat by that microphone.  You are Juror 361;

8    is that right?

9              PROSPECTIVE JUROR:  Correct.

10             THE COURT:  I reviewed your questionnaire.  You have a

11   "yes" answer only to Question 28:  Do you have any hearing or

12   sight impairment?  Answer:  Yes.  Sight/glasses.

13        Is that correct?

14             PROSPECTIVE JUROR:  Correct.

15             THE COURT:  But is your vision completely corrected to

16   20/20 with your glasses?

17             PROSPECTIVE JUROR:  Yes, sir.

18             THE COURT:  And you work as a commercial driver so

19   your eyes are probably pretty good, right?

20             PROSPECTIVE JUROR:  I hope so.

21             THE COURT:  So do I.

22        (Laughter.)

23             PROSPECTIVE JUROR:  Yeah.

24             THE COURT:  So tell me, you live over in Hagerstown?

25             PROSPECTIVE JUROR:  Yes, sir.

1          THE COURT:  How long you been working as a driver?

2          PROSPECTIVE JUROR:  Two years, November.

3          THE COURT:  Long haul, short haul?

4          PROSPECTIVE JUROR:  Short haul.

5          THE COURT:  Around Washington County or state of

6   Maryland?  Pennsylvania?

7          PROSPECTIVE JUROR:  Three hours radius of Frederick,

8   Maryland.

9          THE COURT:  What are you hauling?

10          PROSPECTIVE JUROR:  Groceries.

11          THE COURT:  Groceries.  Okay.  What did you do before

12   that job?

13          PROSPECTIVE JUROR:  I was a mechanic for 12 years.

14          THE COURT:  Diesel?  Regular?

15          PROSPECTIVE JUROR:  Diesel, over-the-road semis.

16          THE COURT:  Okay.

17          PROSPECTIVE JUROR:  I bumped my head, and I started

18   driving them.

19          THE COURT:  I take that as a joke, but I want to make

20   sure that the bumping the head is a joke, yes?

21          PROSPECTIVE JUROR:  It is, yes.

22          THE COURT:  Thank you very much.  You're married?

23          PROSPECTIVE JUROR:  Correct.

24          THE COURT:  Your spouse is a funeral director, a

25   mortician?

1              PROSPECTIVE JUROR:  Correct.

2              THE COURT:  I take it your spouse is female?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  And how long has she been in that line of

5      work?

6              PROSPECTIVE JUROR:  I'm going to say eight years.

7              THE COURT:  Do you have any kids?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Tell me about your educational background?

10             PROSPECTIVE JUROR:  I graduated.  I got my diploma and

11     then I went to trade school for two years.  That's about it.

12             THE COURT:  Okay.  What do you do for fun?

13             PROSPECTIVE JUROR:  I play video games.  So I play

14     video games.  I am working on my third restoration.  I work on

15     old stuff, old cars, old trucks.

16             THE COURT:  Okay.  Thank you.  Bear with me for a

17     second.  Private channel.

18         (Whereupon, the following conference was held at the

19     bench:)

20             THE COURT:  Government have any questions in light of

21     mine?

22             MS. MCGUINN:  No, Your Honor.

23             THE COURT:  Defendant?

24             MR. NIETO:  No questions, Your Honor.

25             THE COURT:  Cause?

```
 1            MR. NIETO:  No, Your Honor.

 2            MS. MCGUINN:  No, Your Honor.

 3            THE COURT:  Thank you.

 4        (Whereupon, the bench conference was concluded.)

 5            THE COURT:  Juror 361, you may proceed to courtroom

 6   1B.  Follow the clerk.

 7        We're ready for 352.

 8        Good afternoon, ma'am.  If you would sit by the

 9   microphone.  I'll be with you in just a second.

10        Those in the gallery may step out.  Gallery clear.

11        Good afternoon, ma'am.

12            PROSPECTIVE JUROR:  Hi.

13            THE COURT:  Thank you for participating in our process

14   this afternoon.  I have your juror questionnaire up here.  I

15   wanted to turn your attention to Question 16E.  That question

16   asked:  Specifically in this case the allegations include those

17   of sexual abuse.  Has any member of your immediate family or

18   closest associates ever been a victim, a witness, accused or

19   convicted of a crime of a sexual nature?  You have a "yes"

20   answer to that question.

21            PROSPECTIVE JUROR:  Correct.

22            THE COURT:  What can you tell me about that?  Can you

23   move a little closer to the mic or slide the mic down the rail

24   so it's right in front of your face.

25            THE COURT:  Can you hear me now?
```

**JA265**

```
1              THE COURT:  I can a lot better.  Thank you.
2              PROSPECTIVE JUROR:  I hate the sound of my own voice.
3              THE COURT:  It makes a loud noise, doesn't it?
4              PROSPECTIVE JUROR:  A little bit.  I, myself, am a
5      victim of it.  My fiancé was a victim of it.  A very close
6      cousin of mine was a victim of it and she has passed away
7      because of it.
8              THE COURT:  And you said and passed away because of
9      it?
10             PROSPECTIVE JUROR:  She was killed after it happened,
11     yes.
12             THE COURT:  And your own experience with this, was
13     this before you had reached the age of 18 or after you were 18?
14             PROSPECTIVE JUROR:  It was before.
15             THE COURT:  Before.
16             PROSPECTIVE JUROR:  I was a child, yes.
17             THE COURT:  Without any great detail, can you tell me
18     what was very generally the nature of the abuse?  Were actions
19     taken with respect to your body that you felt were
20     inappropriate?  If so, what were they?
21             PROSPECTIVE JUROR:  It was an older kid and it was
22     essentially posed as a game when it very much wasn't.  And I
23     was also injured as well.  I was attacked in the eye.  I did
24     not have to get stitches but they did say I was very close to
25     losing my eye when it happened.
```

1          THE COURT:  And how old were you?

2          PROSPECTIVE JUROR:  I had to have been around nine or

3  10.

4          THE COURT:  And was there any investigation?  Was

5  there any action taken?  Was it kept kind of sort of quiet and

6  under wraps?  How was it handled?

7          PROSPECTIVE JUROR:  No one was prosecuted in it.  We

8  all were technically kids, even though he was an older kid, and

9  we were all technically kids.  The parents kind of handled it.

10  My mother wanted to but she was talked out of it.  We moved you

11  shortly after though.

12          THE COURT:  I'm sorry?

13          PROSPECTIVE JUROR:  Not too long after we moved away.

14          THE COURT:  You moved away not long after.

15     You referenced someone else, someone close to you, who was

16  subject to some kind of abuse or inappropriate conduct.  And

17  then I think you indicated that they lost their life?

18          PROSPECTIVE JUROR:  Yes, that was my cousin.

19          THE COURT:  That was?

20          PROSPECTIVE JUROR:  That was my cousin, close cousin.

21          THE COURT:  How long ago did that happen?

22          PROSPECTIVE JUROR:  I was young, younger at the time.

23  I don't exactly remember how old I was, but I was younger.  But

24  it was very hard on my family, particularly my mother.  And my

25  mother was very adamant of making sure I was aware of things

1  that happened and to try to avoid those things.

2          THE COURT:  Yes.

3          PROSPECTIVE JUROR:  And I wasn't as lucky with that

4  but it was very much a talked about thing in my family.

5          THE COURT:  You heard me make reference to the nature

6  of the charges in this case when you were sitting here

7  listening, right?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Do you think that if you were called upon

10 to serve as a juror in this case that you could be a fair and

11 impartial juror in light of the experiences that you have just

12 told us about?

13         PROSPECTIVE JUROR:  It would be hard because I also

14 know other people as well that I didn't want to mention --

15         THE COURT:  I'm having a little trouble hearing you.

16 Sit closer to the mic and a little slower.

17         PROSPECTIVE JUROR:  I think it would be difficult for

18 me considering my experiences.  And there are other people that

19 I did not want to mention that have gone through it.  It's a

20 fairly touchy subject for myself, yes.

21         THE COURT:  Bear with me for a second.  Private

22 channel.

23     (Whereupon, the following conference was held at the

24 bench:)

25         THE COURT:  Counsel want to be heard?  Mr. Nieto.

1          MR. NIETO:  Your Honor, we would make a motion to

2    excuse this juror for cause.

3          THE COURT:  Granted.

4      (Whereupon, the bench conference was concluded.)

5          THE COURT:  Thank you, ma'am.  You are excused from

6    service in this case and you may depart by going through --

7    well, let's see, how are we going to do this.  It's actually

8    through this door out to that hallway and then a left turn to

9    exit the building.

10        Does she have to call in for Friday?

11         THE CLERK:  Yes, she needs to call.

12         THE COURT:  Do you know how to call on Friday to see

13   if you're needed for jury service the following week?

14         PROSPECTIVE JUROR:  Call on Friday.

15         THE COURT:  Call on Friday the regular way.  You good?

16   Okay.  Thank you, ma'am.

17        352 excused for cause on the Defendant's motion.

18        Good afternoon, Juror 347.

19         PROSPECTIVE JUROR:  Good afternoon.

20         THE COURT:  Thank you for participating in our

21   process.  I need you to move right up next to that microphone

22   otherwise we'll not be able to hear you.  I've reviewd your

23   juror questionnaire and it looks like you've given me two "yes"

24   answers.  The first one was in response to Question 28:  Do you

25   have any hearing or sight impairment?  Yes.  Wear glasses.  But

```
1   once you wear your glasses, you're able to see 20/20?

2           PROSPECTIVE JUROR:  That's correct.

3           THE COURT:  You can drive a car and you can read, all

4   that kind of stuff?

5           PROSPECTIVE JUROR:  That's correct.

6           THE COURT:  Not really an issue once you've got your

7   glasses?

8           PROSPECTIVE JUROR:  I wasn't sure so I just put it

9   down.

10          THE COURT:  No, no, it was the right answer.

11  Absolutely the right answer.  But I just want to clarify,

12  despite it being the right answer it's not really a problem for

13  you?

14          PROSPECTIVE JUROR:  Yes, that's correct.

15          THE COURT:  Okay.  No other "yes" answers until we get

16  to the very last question, number 32:  Is there anything else,

17  something I've asked you about, that I haven't asked you about,

18  that might interfere with your ability to serve as a fair and

19  impartial juror in this case?  And you answered "yes," possibly

20  view of blood and other pictures.

21          PROSPECTIVE JUROR:  Right.  So maybe that might have

22  been related to one of the other questions, but I had a -- I

23  guess a previous jury selection process that was a murder

24  trial.  And I had a hard time getting -- being able to view

25  some of the pictures and getting involved with that process.
```

1  So that had me concerned so that's why I wrote it down.

2         THE COURT:  Okay.  Thank you.  Bear with me for just a

3  second.  Okay.  Private channel.

4      (Whereupon, the following conference was held at the

5  bench:)

6         THE COURT:  Counsel, I propose that I advise the

7  prospective juror that I do not expect there to be any pictures

8  presented that are bloody or gruesome in that respect, but that

9  I do expect that there may be pictures that depict male

10 genitalia.

11     First of all, is that accurate?

12        MS. MCGUINN:  Yes.  There are video and image files.

13        THE COURT:  Okay.  And they depict male genitalia?

14        MS. MCGUINN:  Yes, male genitalia.

15        THE COURT:  What about young men, full-body nudity?

16        MS. MCGUINN:  So it's male genitalia, masturbation,

17 and you can see a full body in a couple of things that are

18 related to those.

19        THE COURT:  And Government's position on this juror so

20 far?

21        MS. MCGUINN:  So far I think we're okay.  I think if

22 Your Honor asks a clarifying question --

23        THE COURT:  I will ask some more but if there's a

24 cause objection already I want to hear it.

25     Mr. Nieto, first of all, what's your position on the Court

```
 1  explaining the likely image evidence in the way that I just
 2  sorted without with the Government?
 3            MR. NIETO:  That proposal makes sense, Your Honor.
 4            THE COURT:  Let's see what response we get to that.
 5  Fair enough, Mr. Nieto?
 6            MR. NIETO:  Absolutely.
 7            THE COURT:  During the trial in this case, I do not
 8  exptect there to be any images that I would describe as bloody
 9  or gruesome of the sort that you might have been referring to
10  and having been exposed to previously.
11       There will be images that perhaps depict male genitalia.
12  They may depict -- there may be videos that may depict male
13  masturbation.  They may depict male persons that are unclothed
14  entirely but that's the extent of it.  Nothing that I would
15  categorize as bloody or gruesome which seems to be what you
16  made specific reference to.
17            PROSPECTIVE JUROR:  Okay.
18            THE COURT:  Okay.
19            PROSPECTIVE JUROR:  All right.
20            THE COURT:  And if there were images of the sort that
21  I just described, do you think that you could nonetheless serve
22  and be a fair and impartial juror?
23            PROSPECTIVE JUROR:  I'm uncertain because of -- I
24  guess if I get uncomfortable I'm worried that I might miss
25  something, like, if the evidence I should be looking at and I
```

1   don't -- I'm not able to answer that, I guess, with full
2   confidence to say I can, you know, take a look and be impartial
3   and answer or make judgment there so . . .

4           THE COURT:  So I imagine that the display of the sort
5   of exhibits that I'm talking about here might cause some
6   distress to, you know, a person who is called for jury service.
7   I don't think anything that you're describing in terms of
8   reaction would necessary be sort of out of the sort of
9   mainstream.  It's not the sort of image that we're necessarily
10  exposed to on an everyday basis.

11          I guess the real question here is whether you think that
12  your reaction and your potential for distraction from the other
13  evidence would be unusual or greater than what you would
14  anticipate for other persons just because of your unique self
15  and your life experiences and so forth?  Do you think it would
16  be -- in other words, the distraction you're describing and so
17  forth, would you expect it to be unusually so?

18          PROSPECTIVE JUROR:  I guess I'm not sure what you mean
19  unusual?  But, I guess I might have the tendency to want to
20  avoid looking at it.  I guess that's my concern.  As part of
21  the jury, you know, it's part of it to take a look at the
22  evidence and, you know, go off of that.  And I guess looking
23  away or not taking full account, I guess that's where my
24  concern is.

25          THE COURT:  Well, if I advised you that it was your

1 responsibility as a juror to hang in there and to, you know,

2 look at the exhibits to the extent necessary so that you could

3 assess what they were and what they depicted, do you think you

4 would be able to do that without compromising your ability to

5 be a fair and impartial juror?  Or do you think that an

6 instruction for you to look at those images and those videos

7 like that would likely impact your ability to be fair and

8 impartial?

9      PROSPECTIVE JUROR:  I guess possibly the latter, I

10 guess.

11      THE COURT:  Okay.  Thank you.  Private channel.

12    (Whereupon, the bench conference was concluded.)

13      THE COURT:  Obviously we're going to have some issues

14 in the selection of this jury, and I believe I have taken

15 appropriate steps to try to help the juror understand sort of

16 context, their role, their responsibility and so forth.  But I

17 don't believe I'm achieving success to the extent that I'm

18 comfortable in terms of finding in him a juror who would be

19 able to give whatever evidence is presented during the trial

20 its appropriate sort of attention and focus without being

21 unduly distracted and impacted in his capacity to be fair and

22 impartial.

23    Government have a position?

24      MS. MCGUINN:  No objection, Your Honor.

25      MR. NIETO:  No objection.  Strike for cause.

1     THE COURT:  Objection to strike for cause?

2     MR. NIETO:  Yes, Your Honor.

3     (Whereupon, the bench conference was concluded.)

4     THE COURT:  Juror 347, you are excused.  You will not

5 serve on this jury.  You may depart through this door right

6 here.  The clerk will show you which direction to go to get out

7 of the building.  Thank you for being here today.

8     Excused on defense motion for cause.

9     Good afternoon, sir, I'll be right with you.

10     Good afternoon Juror 34.  I have reviewed your answer

11 sheet and I see just a few "yes" answers in here that I would

12 like to cover with you.  It's important that you move close to

13 that microphone, otherwise I'm not going to be able to hear you

14 while you're speaking.

15     Would the court security officer advise those who were

16 excluded that they may reenter.  I am stopping at Question No.

17 13.  And on Question 13 you answered "Yes, in about 1988 I was

18 a security guard part-time at a music hall in Baltimore.

19     PROSPECTIVE JUROR:  Yes.

20     THE COURT:  Did I get your answer correct?

21     PROSPECTIVE JUROR:  That is correct.

22     THE COURT:  Anything about that work experience that

23 would make it difficult for you to serve as a fair and

24 impartial juror in the trial of a criminal case?

25     PROSPECTIVE JUROR:  Not that I'm aware of.

```
1            THE COURT:  Now let's go to 16A.  Have you or any
2    member of your family or closest associates ever been the
3    victim of a crime?  Answer, "Yes, ex-wife hold up at ice cream
4    shop while we were married."
5        How long ago did that happen?
6            PROSPECTIVE JUROR:  Yes, that was in about 1990-ish.
7            THE COURT:  Was she injured?
8            PROSPECTIVE JUROR:  No.
9            THE COURT:  Then you also answered "yes," any close,
10   immediate family been a witness to a crime and you said it's
11   the same above.  So that's the same answer,
12           PROSPECTIVE JUROR:  Exactly.  There were other people
13   there that were also robbed and the cash register.  So she
14   witnessed all that.  So that's why the witness is a "yes" as
15   well.
16           THE COURT:  Got it.  Was anyone ever apprehended or
17   prosecuted in relation to the robbery?
18           PROSPECTIVE JUROR:  You know, I was thinking about
19   that a moment ago and I cannot remember.
20           THE COURT:  You can't remember, okay.  Do you remember
21   any stories of your ex-wife going to court or participating in
22   the court process at all?
23           PROSPECTIVE JUROR:  No, I don't remember.  Okay.
24           THE COURT:  Anything about that whole experience that
25   would affect your ability to be a fair and impartial juror if
```

1  you were picked in this case?

2          PROSPECTIVE JUROR:  Not that I'm aware of.

3          THE COURT:  Question 28:  Do you have any hearing or

4  sight impairments?  You have "No," but then you added a

5  statement "if I wear my glasses."

6          PROSPECTIVE JUROR:  If I wear my glasses I can see

7  fine this way.  If not, not as well.

8          THE COURT:  Important for you to wear your reading

9  glasses.  No other "yes" answers.

10      You live in Columbia?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  You work as a physicist?

13         PROSPECTIVE JUROR:  Yep.

14         THE COURT:  At APL?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  How long have you been there?

17         PROSPECTIVE JUROR:  Over 25 years now.

18         THE COURT:  What's your field of interest or work?

19         PROSPECTIVE JUROR:  I do research on radars.

20         THE COURT:  On radars?

21         PROSPECTIVE JUROR:  Yep.

22         THE COURT:  Always have?

23         PROSPECTIVE JUROR:  No, I've been tracking other

24  things and before that I was in particle physics.

25         THE COURT:  You were in the?

1          PROSPECTIVE JUROR:  In partical physicis.

2          THE JUDGE:  Oh, in particle physics.  I thought you

3   said I was in a park business.  You were in particle physics.

4          PROSPECTIVE JUROR:  Partical physics.  And we were

5   tracking particles and then I got into tracking other things.

6          THE COURT:  Got it.  Tell me about your educational

7   background.

8          PROSPECTIVE JUROR:  I have a Ph.D., a master's and a

9   bachelor's.

10          THE COURT:  All in physics or applied math?

11          PROSPECTIVE JUROR:  The bachelor's is physics and

12   engineering science, the master of arts in physics, and Ph.D.

13   in physics.

14          THE COURT:  You were married before but you're not

15   married now?

16          PROSPECTIVE JUROR:  That is correct.

17          THE COURT:  How long since your marriage ended?

18          PROSPECTIVE JUROR:  Decree of absolute divorce was

19   over a year now.

20          THE COURT:  Do you have children?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  How many?

23          PROSPECTIVE JUROR:  Four.

24          THE COURT:  How old are they?

25          PROSPECTIVE JUROR:  Thirty, 28, 25, and 22.

```
 1            THE COURT:   And are they all particle physicists?
 2            PROSPECTIVE JUROR:   No, none of them are.
 3            THE COURT:   None of them are.   What do they do?
 4            PROSPECTIVE JUROR:   One works for a company that does
 5   video surveillance for restaurants to make sure that people
 6   aren't skimming off the top.   One does good news, sort of
 7   scientific news and stuff and is also an artist and selling her
 8   art.
 9            THE COURT:   So a journalist?
10            PROSPECTIVE JUROR:   Sort of.   Technology news.
11            THE COURT:   Okay.
12            PROSPECTIVE JUROR:   And, let's see, one is currently
13   unemployed and getting ready to move to a new state with her
14   husband.   And the youngest is working at a hardware store right
15   now.
16            THE COURT:   Okay.   Thank you.   Private channel.
17       (Whereupon, the following conference was held at the
18   bench:)
19            THE COURT:   Government have any issues or questions in
20   light of mine?
21            MS. MCGUINN:   No, Your Honor.
22            THE COURT:   Defendant?
23            MR. NIETO:   No, Your Honor.
24            THE COURT:   Thank you.
25       (Whereupon, the bench conference was concluded.)
```

```
1              THE COURT:  Thank you, Juror 341.  You may return to
2   courtroom 1B.  The clerk will show you the way.
3              PROSPECTIVE JUROR:  Thank you.
4              THE COURT:  Be with you in just a second.
5         Good afternoon, Juror 339.  If you would move as close as
6   you can to that microphone because it doesn't pick up very
7   well.  You can move the mic.
8              PROSPECTIVE JUROR:  All right.
9              THE COURT:  It'll slide right down the rail.  I have
10  reviewed your juror questionnaire, and I have looked for "yes"
11  answers to our questions.  And I see that you have a "yes"
12  answer to Question 16A:  Have you ever been a victim of a
13  crime.  Answer:  Yes, car was broken into.
14        When was that?
15             PROSPECTIVE JUROR:  2000s.
16             THE COURT:  In the 2000s?
17             PROSPECTIVE JUROR:  2005, somewhere around there.
18             THE COURT:  Okay.  Where did that happen?
19             PROSPECTIVE JUROR:  Montgomery County.
20             THE COURT:  Anything about that that would make it
21  difficult for you to be a fair and impartial juror if you were
22  picked in this case?
23             PROSPECTIVE JUROR:  No.
24             THE COURT:  And then any member of the family or
25  yourself ever been accused of criminal conduct?  The answer:
```

```
1   Yes.   Tell us about that?
2              PROSPECTIVE JUROR:  I have.
3              THE COURT:  Okay.  One second, please.
4         Gallery has been cleared.
5         What were you accused of?
6              PROSPECTIVE JUROR:  Car theft.
7              THE COURT:  Did you get convicted?
8              PROSPECTIVE JUROR:  No.
9              THE COURT:  Did you go to trial?
10             PROSPECTIVE JUROR:  Nolle pros.
11             THE COURT:  You got a nolle pros out of it.  Where was
12  that?
13             PROSPECTIVE JUROR:  Montgomery County.
14             THE COURT:  In Montgomery County.  How long ago was
15  it?
16             PROSPECTIVE JUROR:  Ninety-six, ninety-seven.
17             THE COURT:  Were you represented by a lawyer?
18             PROSPECTIVE JUROR:  No.
19             THE COURT:  Represent yourself?
20             PROSPECTIVE JUROR:  They found the person that did it
21  before.  I just got picked up for it.  It wasn't me.  Nuts.
22             THE COURT:  Well, we have a presumption of innocence
23  in our system and you're presumed innocent and that presumption
24  stayed with you through process, true?
25             PROSPECTIVE JUROR:  Yes.
```

1          THE COURT:  Okay.  Anything about that experience that
2   would make it difficult for you to serve as a fair and
3   impartial juror if you were picked in this case?
4          PROSPECTIVE JUROR:  No.
5          THE COURT:  Okay.  I don't see any other "yes" answers
6   on your form; am I right about that?
7          PROSPECTIVE JUROR:  You're correct.
8          THE COURT:  So you are working in construction?
9          PROSPECTIVE JUROR:  (No audible response.)
10         THE COURT:  Out in Frederick?
11         PROSPECTIVE JUROR:  Rockville.
12         THE COURT:  What are you building?
13         PROSPECTIVE JUROR:  Swimming pools.  Renovations.
14         THE COURT:  What do you do?  You pour concrete?  Build
15  forms?  What do you do?
16         PROSPECTIVE JUROR:  Tile, coping, plaster.  All of
17  that.
18         THE COURT:  You do all of the tile stuff?
19         PROSPECTIVE JUROR:  Yeah, the coping, the finish, the
20  plaster.
21         THE COURT:  You're a craftsman.
22         PROSPECTIVE JUROR:  We do it all.
23         THE COURT:  How's business?
24         PROSPECTIVE JUROR:  It's not as good as last year,
25  I'll say that.

```
1              THE COURT:  Okay.  Do you own the business?
2          PROSPECTIVE JUROR:  No.
3              THE COURT:  You're an employee?
4          PROSPECTIVE JUROR:  Yes, sir.
5              THE COURT:  How long you been working there?
6          PROSPECTIVE JUROR:  Twenty-seven years.
7              THE COURT:  Tell me about your education.
8          PROSPECTIVE JUROR:  One year of college.
9              THE COURT:  Okay.  Where were you raised?
10         PROSPECTIVE JUROR:  Rockville, Maryland.
11             THE COURT:  Married?
12         PROSPECTIVE JUROR:  No.
13             THE COURT:  Not married?
14         PROSPECTIVE JUROR:  No.
15             THE COURT:  Got any kids?
16         PROSPECTIVE JUROR:  Yes.
17             THE COURT:  How old?
18         PROSPECTIVE JUROR:  27, 23, 21.
19             THE COURT:  What do your kids do.
20         PROSPECTIVE JUROR:  Work.  Go to school.
21             THE COURT:  School?  Construction?  Trades?
22         PROSPECTIVE JUROR:  Trades.  One's still in school
23  kind of, you know, waiting tables and stuff.  The other one is
24  electronics and one is in granite countertops.
25             THE COURT:  Got it.  Okay.  Bear with me a second
```

1  while I talk to the lawyers in private.

2      (Whereupon, the following conference was held at the

3  bench:)

4          THE COURT:   Government have any issues or questions in

5  light of mine?

6          MS. MCGUINN:   No, Your Honor.

7          THE COURT:   Defendant?

8          MR. NIETO:   No, Your Honor.

9          THE COURT:   Thank you.

10  (Whereupon, the bench conference was concluded.)

11          THE COURT:   Thank you, Juror 339.  We're finished and

12  you may return to courtroom 1B.

13      We'll be right with you, sir.  Make sure you're really

14  close to the microphone so we'll be able to hear you.  I've

15  review your juror questionnaire.  I see you supplied no "yes"

16  answers; is that correct?

17          PROSPECTIVE JUROR:   Correct.

18          THE COURT:   So you live in Crofton?

19          PROSPECTIVE JUROR:   Yes.

20          THE COURT:   And you're in the food and beverage

21  industry?

22          PROSPECTIVE JUROR:   Correct.

23          THE COURT:   Tell me about your work?  What do you do?

24  How are you connected, that sort of thing?

25          PROSPECTIVE JUROR:   Mostly I've been a waiter for the

1 majority of my career, bartending, managing.  I think my wife

2 and I were actually an owner of a -- small piece of an

3 ownership at one point.

4   THE COURT:  Sounds like you're having trouble

5 remembering.  Is it a bad memory?

6   PROSPECTIVE JUROR:  No, it's just getting old.

7  (Laughter.)

8   THE COURT:  Okay.  That's a bad memory, too.  So in

9 the food and beverage business pretty much your whole career?

10   PROSPECTIVE JUROR:  Yes.  I mean, I've done other --

11 other hobbies and side hustles type of a thing.  But that's the

12 focus every since college.

13   THE COURT:  Tell me about some of the side gigs?

14   PROSPECTIVE JUROR:  Home renovation.  I worked for

15 architects, landscape architects earlier in my career for

16 getting that type of a knowledge that I don't use as a

17 vocation.

18   THE COURT:  Got it.  Your wife's a bookkeeper?

19   PROSPECTIVE JUROR:  In the restaurant business as well

20 so . . .

21   THE COURT:  And she's been doing that work for a long

22 time?

23   PROSPECTIVE JUROR:  The majority of her career as

24 well, yes.

25   THE COURT:  Got any kids?

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA285**

1          PROSPECTIVE JUROR:   Three.

2          THE COURT:   How old are they?

3          PROSPECTIVE JUROR:   Thirty-seven, 35, and 27.

4          THE COURT:   What do they do?

5          PROSPECTIVE JUROR:   The oldest does business

6  development down in Florida.  I mean, he just tries different

7  things.  Not really sure what his job title is at times.

8          THE COURT:   Yep.

9          PROSPECTIVE JUROR:   Middle one, we are fairly

10 estranged from.  Does his own thing.  Has his own family.  Goes

11 his own specific way.

12         THE COURT:   Any specific reason why that happened?

13         PROSPECTIVE JUROR:   I don't believe we would know it.

14         THE COURT:   And youngest.

15         PROSPECTIVE JUROR:   Youngest is in her fourth year of

16 medical school.

17         THE COURT:   Where is she attending?

18         PROSPECTIVE JUROR:   New York University of Technology

19 up in Long Island.

20         THE COURT:   Got it.  Okay.  Bear with me for a second.

21     (Whereupon, the following conference was held at the

22 bench:)

23         THE COURT:   Government have any issues or questions in

24 light of mine?

25         MS. MCGUINN:   No, Your Honor.

1          MR. NIETO:  No, Your Honor.

2          THE COURT:  Thank you.

3      (Whereupon, the bench conference was concluded.)

4          THE COURT:  Thank you, Juror 333.  You may return to

5  courtroom 1B.

6      329 will be next.

7      Yes to 14, 16A, 16E, as in Edward.  And the global 16 yes.

8  17 is a yes.  That seems to be it.

9      Let's go see what's up.

10         THE CLERK:  She's in the restroom.

11         THE COURT:  Thank you.  I may not take these "yes"

12  answers in order.

13     Good afternoon, ma'am.  You are Jury No. 329.

14         PROSPECTIVE JUROR:  Hi, yes.

15         THE COURT:  Could you stay as close as possible to

16  that microphone.  You have some "yes" answers for me.  And I

17  want to first turn to Question 17.  Someone has legal training,

18  perhaps you, perhaps someone else in your family?  Law school,

19  law/criminal justice, legal training.

20         PROSPECTIVE JUROR:  I have two degrees.

21         THE COURT:  What are those names, ma'am?

22         PROSPECTIVE JUROR:  Criminal justice.

23         THE COURT:  Two degrees.  Both of them are in criminal

24  justice?

25         PROSPECTIVE JUROR:  Applied science and then

1  bachelor's, associate's and a bachelor's.

2      THE COURT:  Do you work in criminal justice?

3      PROSPECTIVE JUROR:  Actually, no.  I'm in finance.

4    (Laughter.)

5      THE COURT:  Probably a little more lucrative pathway.

6  Thank you.

7    You answered Question 16E:  Specifically in this case the

8  allegations include those of sexual abuse.  Has any member of

9  your immediate family or closest associates ever been a victim,

10  a witness, accused or convicted of a crime of a sexual nature

11  to which you answered "yes."  Can you tell us about that?

12      PROSPECTIVE JUROR:  My sister.  Over 40 years ago,

13  yeah, at the time.

14      THE COURT:  She was a victim?

15      PROSPECTIVE JUROR:  She was.

16      THE COURT:  Okay.  Was it within a family or stranger

17  or neighbor?

18      PROSPECTIVE JUROR:  It was a family member.  And, you

19  know, they -- you know, she's forgiven him.  They've talked

20  about it.  Today they have a good relationship, so . . .

21      THE COURT:  Do you think there's anything about that

22  experience that your sister had that would affect your ability

23  to be a fair and impartial juror in this case, having been told

24  a little bit about what this case is about?

25      PROSPECTIVE JUROR:  No.  I think should I be selected,

1  and I would base it on the evidence.  I would take a look at

2  it.

3          THE COURT:  Okay.  Very good.  You can bring in those

4  who are excluded and are standing in the vestibule.

5      You also answered "yes" to Question 16A about an uncle who

6  was a police officer who was killed in the line of duty.

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Can you tell us about that?

9          PROSPECTIVE JUROR:  In 1979, my uncle was a highway

10  patrolman and he stopped a motorcyclist for speeding, and he

11  shot him three times.

12          THE COURT:  Where did this happen?

13          PROSPECTIVE JUROR:  In South Carolina.

14          THE COURT:  Okay.  What sort of police officer was

15  your uncle?

16          PROSPECTIVE JUROR:  Highway patrolman.

17          THE COURT:  He was a highway patrolman.

18          PROSPECTIVE JUROR:  South Carolina highway patrolman.

19          THE COURT:  How old were you when this happened?

20          PROSPECTIVE JUROR:  I was nine.

21          THE COURT:  Do you remember it?

22          PROSPECTIVE JUROR:  I do vaguely, some.

23          THE COURT:  You have some recollection?

24          PROSPECTIVE JUROR:  I do.

25          THE COURT:  Do you think there's anything about that

```
 1  experience that would affect your ability to be a fair and
 2  impartial juror if you were picked to serve in this case?
 3         PROSPECTIVE JUROR:  No, not at all.
 4         THE COURT:  I don't see any other "yes" answers to our
 5  questions.  Am I right about that?
 6         PROSPECTIVE JUROR:  You are correct.
 7         THE COURT:  You live in Denton?
 8         PROSPECTIVE JUROR:  I do.
 9         THE COURT:  You work for OPM?
10         PROSPECTIVE JUROR:  I do.
11         THE COURT:  You're a budget analyst for them?
12         PROSPECTIVE JUROR:  Yes, I am.
13         THE COURT:  Do you work mainly at home?  Do you go in?
14  Is it a combination?
15         PROSPECTIVE JUROR:  A combination.
16         THE COURT:  How long have you been with OPM?
17         PROSPECTIVE JUROR:  I've been with OPM about four
18  months.  But it was a promotion from the Department of Health
19  and Human Services.  I was a GS12 and then I got promoted to
20  the 13 with OPM.
21         THE COURT:  What did you do as a 12 at HHS?
22         PROSPECTIVE JUROR:  Budget analyst.
23         THE COURT:  How long did you do that?
24         PROSPECTIVE JUROR:  I've total been in the Federal
25  Government nine years.
```

59

```
1          THE COURT:  Nine years?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Similar work?

4          PROSPECTIVE JUROR:  Similar work, yes.  I did 20 years

5   in the banking industry.

6          THE COURT:  What did you do as a banker?

7          PROSPECTIVE JUROR:  Pretty much teller coordinator,

8   teller manager.  Started as a part-time teller.  Worked my way

9   to teller coordinator and teller manager.

10         THE COURT:  Were you every in a bank when it was

11  robbed?

12         PROSPECTIVE JUROR:  Oh, actually, yes.  I forgot about

13  that.  Yes, actually in 2011, yes.

14         THE COURT:  Was anyone hurt?

15         PROSPECTIVE JUROR:  No, no.  I was actually the teller

16  coordinator at that time and we just complied.  We were trained

17  to comply and that's what we did.  No one was hurt and it was a

18  quick in and out.

19         THE COURT:  Is there anything about that experience

20  that would affect your ability to be a fair and impartial juror

21  if you were picked in this case?

22         PROSPECTIVE JUROR:  No, not at all.

23         THE COURT:  Okay.  Are you married?

24         PROSPECTIVE JUROR:  I am.

25         THE COURT:  And what does your spouse do?
```

**JA291**

1              PROSPECTIVE JUROR:   He works for the Department of
2    Agriculture.
3              THE COURT:   What does he do?  Budgeting?
4              PROSPECTIVE JUROR:   No, he is -- he mostly deal with
5    cases -- I apologize.  I don't recall his title so . . .
6              THE COURT:   Do you know his grade?
7              PROSPECTIVE JUROR:   He's a GS12.
8              THE COURT:   GS12.  How long you been married?
9              PROSPECTIVE JUROR:   I don't want to get it wrong --
10   since 1994.
11             THE COURT:   Since 1994.  That's a good way to answer.
12       (Laughter.)
13             PROSPECTIVE JUROR:   Yes.
14             THE COURT:   Do you have any children?
15             PROSPECTIVE JUROR:   I have a daughter.
16             THE COURT:   How old is she?
17             PROSPECTIVE JUROR:   She'll be 24 next week.
18             THE COURT:   Congratulations.  What does she do?
19             PROSPECTIVE JUROR:   She graduated from Penn State.  So
20   she's currently working part-time but she wants to be a doctor
21   so she's studying to take the MCAT.
22             THE COURT:   Oh, that's a big job.  Okay.
23       Bear with me for a second while a talk to the lawyers.
24             PROSPECTIVE JUROR:   Sure, sure.
25       (Whereupon, the following conference was held at the

```
 1  bench:)
 2          THE COURT:  Government have any issues or questions in
 3  light of mine?
 4          MS. MCGUINN:  No, Your Honor.
 5          MR. NIETO:  No, Your Honor.
 6          THE COURT:  Thank you.
 7      (Whereupon, the bench conference was concluded.)
 8          THE COURT:  Thank you, Juror 329.  You may return to
 9  courtroom 1B.
10      Yes to 10.  No response to nine.
11      Ma'am, I'll be right with you.  You have some "yes"
12  answers for me on your questionnaire.  I want to go over those
13  with you if that's all right.
14          PROSPECTIVE JUROR:  Sure.
15          THE COURT:  Move the microphone closer to you.
16          PROSPECTIVE JUROR:  Sorry.
17          THE COURT:  But the microphone can slide down a little
18  bit if that would make it better for you.
19      First of all, Question 9:  Some of you may have previously
20  served on a grand jury, state or federal court, if you
21  previously served on a grand jury is there anything about that
22  prior experience that would make it difficult for you,
23  influence you in your deliberations?
24      You have no answer for that?
25          PROSPECTIVE JUROR:  I've never been on a grand jury.
```

1          THE COURT:  Okay.  So it should have been a no?

2          PROSPECTIVE JUROR:  Okay, yeah.

3          THE COURT:  That's how we'll record that on the

4    record.  That should have been a no.

5       Let's go over to Question 10:  A few minutes ago you heard

6    me give a brief description in this case, is there anything in

7    that brief description that made you realize it would be

8    difficult for you to keep an open mind and serve as a fair and

9    impartial juror in the trial of this case?

10       You answered "yes," and then you scribbled "mom of two

11   boys."

12          PROSPECTIVE JUROR:  Correct.

13          THE COURT:  And then you also gave me a "yes" answer

14   kind of further down the road here.  That was 16A:  Ever been

15   the victim of a crime?  "Yes, husband held at gunpoint.  Me,

16   peeping Tom."  Two different answers there.

17          PROSPECTIVE JUROR:  Correct.  Yes, my husband was held

18   at gunpoint.  When I was in my 20s, we had a gentleman that was

19   breaking into apartments and stealing things out of women's

20   apartments and peeking through the windows and the police were

21   called.  It was like a big thing.  So that was about it.

22          THE COURT:  Witnesses.  "Husband, yes."

23          PROSPECTIVE JUROR:  Right.  He was a witness when they

24   found the man that held him at gunpoint.

25          THE COURT:  Got it.

1          Would crimes involving children make it difficult for you
2   to render a fair and impartial verdict?  Yes -- this is number
3   16H.  "Yes, crimes against children are trouble."
4          Did I read that correctly?
5              PROSPECTIVE JUROR:  Uh-huh.
6          THE COURT:  Okay.  22:  Yes, you would tend to give
7   more weight to the testimony of a law enforcement officer?
8              PROSPECTIVE JUROR:  Uh-huh.
9          THE COURT:  Okay.  So first of all, let's talk
10  about -- I appreciate your candor.  You've done exactly what
11  we've asked citizens to do, that is to come in and tell us
12  exactly what they think in response to these questions.  So
13  thank you for that.
14         But now that we are there, let's talk a little bit about
15  the fact that you are a mom of two boys, that you have a view
16  that crimes against children are trouble.
17             PROSPECTIVE JUROR:  Right.
18         THE COURT:  I think that society in general believes
19  that crimes against children are trouble --
20             PROSPECTIVE JUROR:  Right.
21         THE COURT:  -- that's why they're illegal.
22             PROSPECTIVE JUROR:  Right.
23         THE COURT:  Okay.  But in this court we're not here
24  trying to decide what policy should be and the law should be
25  and so forth.  We're here to decide whether or not the

```
 1   Government has proven a case beyond a reasonable doubt in a
 2   particular instance.  It's really not a trial on the
 3   question --
 4           PROSPECTIVE JUROR:  Okay.
 5           THE COURT:  -- of whether crimes that involve sexual
 6   exploitation of children are good or bad or right or wrong.
 7   That's not the issue.
 8       The question is whether or not the Government has
 9   presented evidence that is sufficient to convince 12 jurors
10   beyond a reasonable doubt that a person that has been accused
11   by a grand jury is, in fact, guilty beyond a reasonable
12   doubt --
13           PROSPECTIVE JUROR:  Correct.
14           THE COURT:  -- of that offense.
15       So while we try hard to find out what's in people's minds,
16   what their thoughts are as they're coming into a case, and what
17   their reactions might be to certain information and so forth,
18   we also count on citizens to put aside, to the extent that they
19   are able, feelings or views that they might have on issues.
20   And instead, while they're sitting as a juror in the trial,
21   focus on that particular part of the case and figure out
22   whether the Government has met its burden or failed to do so.
23       So my questions are really directed to the latter.  I
24   appreciate your answers to my first questions.  But the
25   question is whether you would be able to be fair and impartial
```

```
 1   and would the fact that you have the views that you have --
 2              PROSPECTIVE JUROR:  Right.
 3              THE COURT:  -- impact the ability to be fair and
 4   impartial and do the job that all jurors are required to do --
 5              PROSPECTIVE JUROR:  Right.
 6              THE COURT:  -- hold the Government to the burden of
 7   proof.  The Defendant need not prove anything.  The defendant
 8   is not required to testify.  They may testify if they wish to.
 9   It may not be held against them in any way.  This is our system
10   and these are our rules.  And this is a moment where we're
11   looking for sort of a candid sort of self-assessment.
12        And let me assure you, there's no wrong or right answer in
13   this context.  It's just the truth.
14              PROSPECTIVE JUROR:  Right.  Okay.
15              THE COURT:  No matter what the truth is, there's no
16   consequences in this forum to that.  We just need to know the
17   truth.
18              PROSPECTIVE JUROR:  Okay.
19              THE COURT:  So what do you think?  What do you think
20   about sitting as a juror in this case with these charges?  Do
21   you think that to the extent that you hold views and have some
22   boys yourself, if those were initially your mind when you heard
23   what these charges are, that you could put that out of your
24   mind and perform the role as I have otherwise described it.
25              PROSPECTIVE JUROR:  Right.  I hope so.  I'm human.
```

1  Seeing anything graphic with this material probably would pull

2  at my motions because I'm a mom.  And I would hope I would be

3  totally open to hearing both sides and making my judgment from

4  there.  I -- I just -- I hope -- I do hope that of myself in my

5  heart.  I want -- I do believe in you are innocent until proven

6  guilty.  But this is a tough subject, for me personally.

7        THE COURT:  Is it possible that people can be accused

8  of crimes in this country and, in fact, they are not guilty?

9        PROSPECTIVE JUROR:  Yes.

10       THE COURT:  Does that happen?

11       PROSPECTIVE JUROR:  Yes.  That's why we have court,

12  right?

13    (Laughter.)

14       THE COURT:  Great job.  You must have been in here

15  before and heard me go through this.

16    (Laughter.)

17       PROSPECTIVE JUROR:  No, I've never been here.

18       THE COURT:  I'm kidding with you now.  That is exactly

19  right.  What you just said to me is exactly right.  And so, you

20  know, at the end of the day I could ask questions and I can

21  probe and so forth, but at the end I'm not going to be guided

22  by your own sense of yourself and your own sense of what's on

23  your mind, and whether, you know, you are a person who is by

24  virtue of what's in your mind equipped to serve in a manner

25  that I have described, you know, with fairness and

1  impartiality.  Hold the Government to their responsibility,

2  which is they have to prove their case beyond a reasonable

3  doubt or a person accused in our country is not guilty.

4          PROSPECTIVE JUROR:  Right.  Okay.

5          THE COURT:  It doesn't end in a specific question, I'm

6  sorry to say.  It's just trying to get you talking about where

7  you think you end up with respect to all of this because the

8  one bottom of my question is, ma'am, can you be a fair and

9  impartial juror?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  You believe you can?

12          PROSPECTIVE JUROR:  Pardon me?

13          THE COURT:  Is that your answer?

14          PROSPECTIVE JUROR:  Yes, that's my answer.

15          THE COURT:  Thank you.  Let's see, did we touch on all

16  of your "yes" answers.  We took care of the grand jury matter.

17  We have mom of two of boys.  Your husband was held at gunpoint.

18  Where did that happen?

19          PROSPECTIVE JUROR:  In Atlanta, Georgia.

20          THE COURT:  How long ago?

21          PROSPECTIVE JUROR:  Thirty years ago.

22          THE COURT:  Okay.  Was he hurt?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  The peeping Tom incident, when did that

25  happen?

1              PROSPECTIVE JUROR:  Same, about the same time.  All in

2    Atlanta.

3              THE COURT:  Okay.  And was -- it sounds like someone

4    was prosecuted in relation to your husband's incident because

5    you said he was a witness.

6              PROSPECTIVE JUROR:  Uh-huh.  Yeah.

7              THE COURT:  Was there anything about that whole

8    experience that you think would impact your ability to be a

9    fair and impartial juror?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Now, the peeping Tom situation.  You said

12   that this person was maybe more specifically focused on women's

13   apartments?

14             PROSPECTIVE JUROR:  Correct.

15             THE COURT:  And would break into women's apartments?

16             PROSPECTIVE JUROR:  Yes.  He'd steal all of their

17   underwear.  That's what the thing was.

18             THE COURT:  Right.  Got it.  And then was subsequently

19   thought to be looking in windows when he shouldn't have been,

20   that sort of thing?

21             PROSPECTIVE JUROR:  Uh-huh.

22             THE COURT:  Do you think you were personally a victim

23   of these activities?

24             PROSPECTIVE JUROR:  Yes, I called the police.

25             THE COURT:  You called the police?

1          PROSPECTIVE JUROR:   Uh-huh.

2          THE COURT:   You saw him at the window?

3          PROSPECTIVE JUROR:   Uh-huh.

4          THE COURT:   Was he apprehended?

5          PROSPECTIVE JUROR:   Yes, but I'm not sure what

6   happened after that.

7          THE COURT:   Okay.  Is there anything about that

8   experience that you think would affect your ability to be a

9   fair and impartial juror in the trial of this completely

10  unrelated case, but nonetheless a criminal case?

11         PROSPECTIVE JUROR:   No.

12         THE COURT:   Okay.  I've talked to you about your

13  answer to 16H, "Yes, crimes against children are trouble."

14  We've discussed that, correct?

15         PROSPECTIVE JUROR:   Uh-huh.

16         THE COURT:   You indicated that you would tend to give

17  greater or lesser weight to the testimony of a law enforcement

18  officer simply because a person was a law enforcement officer

19  or an agent.

20      Would you tend to give greater weight?  Or lesser weight?

21  Which one is it?

22         PROSPECTIVE JUROR:   Probably greater.

23         THE COURT:   Okay.  And tell me about that?

24         PROSPECTIVE JUROR:   We have relatives that were in the

25  law enforcement, in the military.  And we have good friends --

1  so I just -- I trust those people, so . . .

2       THE COURT:  Well, I think all of us in society hope

3  that we could trust people who have taken an oath to protect us

4  and where a badge and so forth.  But here I go with my

5  questions, and you're going to be ready this time.  Does it

6  sometimes happen that people who have taken such an oath and

7  are in such roles are dishonest?

8       PROSPECTIVE JUROR:  Of course.

9       THE COURT:  Does it sometimes happen that while we

10  hope that most law enforcement officers have absolute integrity

11  that some do not?

12       PROSPECTIVE JUROR:  Correct.

13       THE COURT:  How do we know?

14       PROSPECTIVE JUROR:  Probably just from the news really

15  that -- I don't know any personal.

16       THE COURT:  Okay.  The news is one source.  What about

17  going to court?  Does that help us sometimes to figure out

18  whether someone is truthful or not truthful?

19       PROSPECTIVE JUROR:  Hopefully with evidence.

20       THE COURT:  Yeah.  And sometimes a person gets on the

21  witness stand and they give their testimony and they're

22  subjected to cross-examination.  That's to test their

23  testimony, right?

24       PROSPECTIVE JUROR:  Right.

25       THE COURT:  And are those some of the processes that

1    we use to try to ferret out instances where people are not

2    truthful, perhaps even law enforcement officers?

3            PROSPECTIVE JUROR:  Right.

4            THE COURT:  And could cross-examination perhaps reveal

5    that a law enforcement officer is not being truthful?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  And does that then make it necessary and

8    appropriate for a juror to watch and listen --

9            PROSPECTIVE JUROR:  Right.

10            THE COURT:  -- and use all of their best instincts and

11    skills, the profoundly powerful skills that one develops as a

12    mother listening to stories, testimony and et cetera, and sort

13    out the truth?

14            PROSPECTIVE JUROR:  Right.

15            THE COURT:  So I understand the answer that you gave

16    me, but if you were selected to serve as a juror in this case,

17    could you nonetheless play that role as an independent arbiter

18    on a jury, and listen to that testimony and decide what you

19    think of that testimony in that particular instance, based on

20    how it's presented to you, the other facts and issues in the

21    case, and not just automatically believe somebody or disbelieve

22    somebody just because of the job they hold or the position they

23    occupy?

24            PROSPECTIVE JUROR:  Yes.

25            THE COURT:  Now, you can hear where I'm going with my

```
 1   question.
 2              PROSPECTIVE JUROR:   Yeah.
 3         THE COURT:   They're calling leading questions.
 4              PROSPECTIVE JUROR:   Right.
 5         THE COURT:   They're questions that kind of imply the
 6   answers.  So I stop at the end of it and say, yeah, okay, the
 7   judge will ask all of the questions and lead you down the path
 8   and so forth.  But I'm sincere in what I am trying to do here.
 9       I'm trying to make you think but I also don't want to
10   overwhelm your will or what it is that you really believe so
11   I'll come back to the basic question.
12              PROSPECTIVE JUROR:   Right.
13         THE COURT:   A police officer or law enforcement agent,
14   somebody like that takes the stand in this case, just because
15   they worked for the FBI for 14 years or XYZ police department
16   for 20 years, do you automatically believe them?  Do you give
17   their testimony more weight simply because they're law
18   enforcement officer?  Or are you going to listen to it and
19   think about it critically and decide what you can?
20              PROSPECTIVE JUROR:   I think I'm going to think about
21   it critically and see what the evidence is that they have and
22   see what's presented and decide from there.
23         THE COURT:   Okay.  Bear with me a second.  I want to
24   talk to the lawyers.
25       (Whereupon, the following conference was held at the
```

```
 1   bench: )

 2          THE COURT:   Government have any issues or questions in

 3   light of mine?

 4          MS. MCGUINN:  No, Your Honor.

 5          THE COURT:   Mr. Nieto, questions or issues?

 6          MR. NIETO:   No additional questions.  I would make a

 7   motion to strike for cause.

 8          THE COURT:   I'll hear you now.  Go ahead.

 9          MR. NIETO:   Your Honor, I understand her final answers

10   after Your Honor's leading questions at the conclusion, but

11   when she initially had started, she indicated based on her past

12   experiences, but more specifically because of motherhood of two

13   children, that she hoped she would be able to be fair and

14   impartial but this kind of momentarily would be pulling on her

15   heartstrings because she's a mother.  And not to mention she

16   had an incident back in at Atlanta regarding a peeping Tom.

17   There is a voyeuristic aspect in this case and our concern

18   would be --

19          THE COURT:   Tell me about that?  Tell me about what

20   you're expecting in that regard?

21          MR. NIETO:   Your Honor, this is a case about --

22          THE COURT:   You're talking about the children running

23   without clothes on, is that the --

24          MR. NIETO:   Yes, Your Honor.

25          THE COURT:   She's gone for cause.
```

1     (Whereupon, the bench conference was concluded.)

2          THE COURT:  Thank you, Juror 321.  You are excused.

3  You will not serve on this jury.  You may go through that door

4  and then take a left turn.  You need not call back on Friday.

5          PROSPECTIVE JUROR:  Okay, thank you.

6          THE COURT:  Thank you, ma'am.  I appreciate your

7  participation.

8      Juror 318 is next.

9      Good afternoon, ma'am.  I'll be with you very shortly.

10          PROSPECTIVE JUROR:  No problem.

11          THE COURT:  Please make sure you're nice and close to

12  that microphone.

13      You have a few "yes" answers to my question.  First of

14  all, 28:  Do you have a hearing or sight impairment?  "Yes,

15  wear glasses or contacts."

16      But with correction you're fine?

17          PROSPECTIVE JUROR:  I'm fine.

18          THE COURT:  Thank you, ma'am.  Let's go back to

19  Question 16H:  Do you hold any beliefs as to crimes involving

20  children that would make it difficult for you to render a fair

21  and impartial verdict?  16H, "sensitive about children" is what

22  you say.

23      16I:  As part of the evidence in the case you may see

24  pictures of children that may be graphic, et cetera.  Your

25  answer:  "Would be difficult to see."

```
1              PROSPECTIVE JUROR:  Yes.
2              THE COURT:  22:  Tend to give greater or lesser weight
3    to the testimony of a law enforcement officer?  "Yes, I'd
4    assume more duty to tell the truth."
5              PROSPECTIVE JUROR:  Yeah, that's basically it.
6              THE COURT:  And I think those are all your "yes"
7    answers.  Does that sound right to you?
8              PROSPECTIVE JUROR:  Yes.
9              THE COURT:  Okay.  We'll sort of go back and talk
10   about a couple of them.
11             PROSPECTIVE JUROR:  Okay.
12             THE COURT:  So in response to Question 16H you
13   responded that you are sensitive about children.  Are you a
14   mother?
15             PROSPECTIVE JUROR:  Yes, I am.
16             THE COURT:  How many children do you have?
17             PROSPECTIVE JUROR:  I just have one son.  He's 10.
18             THE COURT:  He's 10 years old.  Congratulations to
19   you.
20             PROSPECTIVE JUROR:  Thank you.
21             THE COURT:  Is your son in school?
22             PROSPECTIVE JUROR:  He's enjoying summer break right
23   now.
24             THE COURT:  But school is about to start.
25             PROSPECTIVE JUROR:  With school starting he'll be
```

1  going into fifth grade.

2          THE COURT:  Is he excited or dreading?

3          PROSPECTIVE JUROR:  He's mixed emotions.

4      (Laughter.)

5          THE COURT:  Sounds like he's right where he supposed

6  to be.

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  You have heard my reference to what this

9  trial is about and what the accusations are.  Of course these

10  are just accusations at this point in time, and the role of the

11  jury is to listen to the evidence and see whether or not the

12  Government carries its burden of proofing their allegations

13  beyond a reasonable doubt to the unanimous satisfaction of the

14  jury.  That's the job of jurors.

15      Certainly there are accusations in this case that involve

16  children, adolescents, that sort of thing.  The topic has an

17  inherent sensitivity, I would think.

18          PROSPECTIVE JUROR:  Yeah, I would assume everybody

19  would be sensitive to children.  So I was kind of mixed

20  emotions on what to write for that.  I don't know if it would

21  make me impartial but I just figured I had to note that yes.

22          THE COURT:  No, no you're great.  You're zeroing in on

23  exactly where I was going, and that is, okay, sensitive

24  subject.  But the question really is whether you can discharge

25  the duties of a juror, which are to be fair and impartial.

That is to say, okay, I've heard what the charge is, but now we'll see what the evidence is.

      **PROSPECTIVE JUROR:**  Right.

      **THE COURT:**  Because that's the Government's responsibility, and we'll see if they can present the evidence that the law requires before any sort of guilty verdict is returned.  There has to be proof beyond a reasonable doubt to the unanimous satisfaction of every juror.

     So a trial can be about a sensitive subject for sure.  And yet we depend on jurors and their capacity to nonetheless apply the law as I've just described it, even in sensitive context. Even if they, themselves, are the mother of a 10-year-old child.  At the end of the day it's really, you know, a question for the individual juror in the privacy of your own heart and mind about, you know, whether you can discharge that responsibility.

     You've also told me in response to 16I that it would be difficult to see certain images and there will be images during it trial of adolescent male genitalia.  Perhaps pictures that depict nudity of young males.  And perhaps a video depiction of male masturbation.  There can be -- there could be images of that nature in this case and yet the responsibility of the juror is to sit and watch and listen and evaluate that evidence, along with all of the other evidence that may be presented in the trial, and to sift through all of it and

1  engage in this very important process of sifting through all of

2  it.  And then determining at the end of the case whether it

3  does prove beyond a reasonable doubt or it doesn't.  That's the

4  task.  That's the job.

5          PROSPECTIVE JUROR:  Right.

6          THE COURT:  And I can describe it.  I can put more

7  details out there as I have just now and so forth, but at the

8  end of the day it's really a question of your capacity for, you

9  know, sort of a bringing a discipline to your thinking process,

10  and evaluating what you see and hear, and applying the law as I

11  give it to you, and then rendering a verdict based on the law

12  and the facts, and not based on prejudice or special

13  sensitivities because you're the mother of a 10 year old, or a

14  particular sensitivity to seeing an image of male genitalia.

15  You know, something that perhaps is a vast departure from your

16  ordinary life's experience.

17      These are the things that we do call upon jurors to do if

18  they are able.

19          PROSPECTIVE JUROR:  Right.  I mean, yeah, I could

20  watch it.  I just felt weird not saying anything, like, any

21  time I have mixed motions.  But yeah, I wouldn't, like, to turn

22  away or not be able to watch it I guess is what I'm trying to

23  say, but it wouldn't be my favorite thing.  Yeah.

24          THE COURT:  Bottom line is, do you think that in such

25  a case you could discharge your duty as the juror and deliver a

1  fair and impartial verdict at the end of the process.

2          PROSPECTIVE JUROR:  Oh, yeah, yes, I would be able to.

3          THE COURT:  Not a question?  Not a problem for you?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Okay.  You assume police officers are

6  under a duty to tell the truth, but is it possible that a

7  police officer or law enforcement officer would not tell the

8  truth?

9          PROSPECTIVE JUROR:  Yes.  And I know they all -- like,

10 everyone has their own personal biases and things, too, that

11 they bring into it.  So I don't think it's impossible that they

12 would lie.  But I would just assume a cop or an agent would

13 have more of a duty to tell the truth than --

14         THE COURT:  Well --

15         PROSPECTIVE JUROR:  -- not the duty --

16         THE COURT:  They have a duty to tell the truth.

17 Everybody has a duty so . . .

18    (Laughter.)

19         PROSPECTIVE JUROR:  Right.  That's why I'm like, I

20 don't know if that's the right word.  But I would just think

21 there would be a little bit more of an --

22         THE COURT:  Inclination?

23         PROSPECTIVE JUROR:  Yes, yes, to tell the truth.

24         THE COURT:  I don't want to put words in your mouth

25 but that seemed to be where you were headed.

```
 1              PROSPECTIVE JUROR:  Yes.
 2              THE COURT:  But would you also agree that regardless
 3   of what inclinations one might ascribe to a particular
 4   profession or group of persons, that the individual might not
 5   subscribe to that and that the individual case there might not
 6   be compliance with that societal expectation?
 7              PROSPECTIVE JUROR:  Yes, I agree with that.
 8              THE COURT:  And that there need to be checks and one
 9   of those checks is a jury.
10              PROSPECTIVE JUROR:  Right.
11              THE COURT:  And the critical thinking of jurors, the
12   critical listening skills of jurors?
13              PROSPECTIVE JUROR:  Yes.  Yeah, I wouldn't take it as,
14   like, well, he's a cop so he had to be telling 100 percent
15   truth.  But I would just, again, I would be more inclined to
16   think they would be than not; but I would take the same
17   critical thinking skills and judgment for I feel like any
18   witness.
19              THE COURT:  Well, if I instructed you to do exactly
20   what you just said, and that is, evaluate their testimony like
21   you would evaluate the testimony of any witness, would you be
22   able to do that?
23              PROSPECTIVE JUROR:  Yes.
24              THE COURT:  You live in Aberdeen?
25              PROSPECTIVE JUROR:  Yes.
```

```
1              THE COURT:   You work as a claims adjustor?
2         PROSPECTIVE JUROR:   Yes.
3              THE COURT:   How long you been doing that work?
4         PROSPECTIVE JUROR:   Oh, gosh, like 10 years.
5              THE COURT:   Is there a particular type or category of
6    claims that you handle?
7         PROSPECTIVE JUROR:   So I'm a bodily jury adjustor.
8    When the other party's injured, I settle their injury claim
9    with their attorney and their attorney's office.
10             THE COURT:   Okay.  Are you married?
11        PROSPECTIVE JUROR:   No.
12             THE COURT:   Have you ever been?
13        PROSPECTIVE JUROR:   No.
14             THE COURT:   Your child is 10 years old and about to go
15   into the fifth grade?
16        PROSPECTIVE JUROR:   Yes.
17             THE COURT:   Do you have interests outside of work?
18   Things that you do?  Perhaps things that you share with your
19   child?  Things you like to do?
20        PROSPECTIVE JUROR:   Oh, gosh.  TV.  Movies.  Hiking.
21   Take my dog out to do a lot.
22             THE COURT:   Yeah.
23        PROSPECTIVE JUROR:   We have a three-year-old puppy or
24   dog.  Yeah, that's about it.
25             THE COURT:   And your educational background?
```

1          PROSPECTIVE JUROR:  I have an associate's degree in
2    social work.
3          THE COURT:  In social work?
4          PROSPECTIVE JUROR:  Uh-huh.
5          THE COURT:  Okay.  Bear with me while I talk to the
6    lawyers for a minute.
7          PROSPECTIVE JUROR:  Okay.
8        (Whereupon, the following conference was held at the
9    bench:)
10          THE COURT:  Government have any issues or questions in
11    light of mine?
12          MS. MCGUINN:  No, Your Honor.
13          THE COURT:  Mr. Nieto, have any questions or issues in
14    light of mine?
15          MR. NIETO:  No, Your Honor.
16          THE COURT:  Thank you.
17        (Whereupon, the bench conference was concluded.)
18          THE COURT:  Juror 318, you may return to courtroom 1B.
19    Thank you, ma'am.
20        Let's stop one second.
21        It's 4:00.  We're only going to go until about 5:00.
22    Let's excuse jurors that we have no chance of getting to today.
23        Ms. Cohen, go to courtroom 1B and ask all jurors with
24    numbers 234 and lower to follow you into the courtroom and
25    we'll assemble them standing in front of the jury box.  All

jurors, number 234 and lower.  The others can remain in the
courtroom.

So, Counsel, obviously I'm assembling those others to
return at 9:15 tomorrow morning.

Please come into the courtroom and we'll have you go all
the way to the stairway.  Then stop there.  Then you'll only
have to stand two or three deep because there's a large number
of you.  That's it.  Please crowd in there a little bit if you
would.  Keep filing in, thank you.  We're going to have you all
file into one corner of the courtroom here.  And I'm going to
give you some instructions and then release you for the
evening.  You're going to have to stand two or three deep.
Let's go another row in front of each other and that's it.

Okay.  You should be in the courtroom now only if your
juror number is 234 or lower.  Addressing myself to the jury
who have such numbers.

You are finished for today.  We are not going to succeed
in selecting this jury today.  This process is going to
continue tomorrow.  There's virtually no chance that we will
get to your group today so there's no point in holding you here
any longer.  Instead, I'm going to excuse you for the evening
but require you to return tomorrow to courtroom 1B where you
have just been.  And you need to return there by 9:15 tomorrow
morning.  By 9:15 tomorrow morning you need to return to
courtroom 1B where you just were.  9:15, courtroom 1B.

```
 1        I have some additional instructions for you.  Overnight,
 2   you are not to discuss this case with anyone.  You're not to
 3   discuss it with anyone that you've met today on your jury
 4   service when you were considered for potential selection as a
 5   juror in this case.  You're not to discuss it with any of your
 6   friends or family.  You may inform them only that you've been
 7   called for possible jury service in federal court, that you are
 8   being considered for selection to serve on a criminal jury,
 9   criminal trial.  But you may not tell them anything about the
10   case.  You may not tell them who the lawyers are, who the judge
11   is, who has been accused, what the charges potentially are.
12   You cannot tell them any of those details.  Why do we put you
13   under that sort of restriction?  Because if you start to talk
14   about the case, "Oh, I got called downtown for jury selection.
15   Oh, what kind of case is it?  Oh, it's a bank fraud case.  Oh
16   one time I was in the bank and I saw a fellow employee and they
17   stole the money this way," et cetera.
18        All of a sudden you're getting all kinds of information
19   pumped at you about a bank fraud, and we don't want you hearing
20   about other bank frauds if you've been called down to court to
21   serve as juror on a bank fraud case.
22        Now, this isn't a bank fraud case.  You know what it is
23   about.  But I don't want you talking about the case, what kind
24   of case it is, who's involved in the case and so forth.  And
25   it's essential to preserve the fair trial process that you
```

85

1  follow that instruction.  Obviously you're on your honor in

2  this regard, but I appeal to you as citizens to take that

3  instruction seriously.  Each of you in your own mind can

4  understand why.  We don't want you influenced by the opinions

5  of anybody else.

6      If you do end up serving on this jury, we want you to try

7  this case solely based on the evidence presented to you here,

8  not based on what your neighbors, your relatives, your kids,

9  your parents, anybody else might happen to think about this or

10  related topics.  Trying hard to give you a fair trial -- make

11  sure that there's a fair trial.

12     Okay.  I've just been corrected.  Don't kill the

13  messenger.  You have to be here at 8:30.  It's not my rule, but

14  you have to be here at 8:30.

15     And do they have to check in on the fourth floor?

16         **THE CLERK:**  Yes.

17         **THE COURT:**  Okay.  I was trying to bypass it.  You

18  can't just go to courtroom 1B.  You've got to be here by 8:30.

19  You've got to go to the fourth floor where you were before.

20  You've got to check in there.  Go through that process.  There

21  are reasons for these rules.  I don't want you to think I'm

22  thinking this is silly.  I'm sure it's important.  And then

23  you'll be brought down here to 1B.

24     So 8:30 and then you'll be brought down.

25     Okay.  Second thing, no paying attention to, watching,

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA317**

1  listening to, or reading any media, any social media, any
2  Facebook, TikTok, any of that kind of stuff that relates to
3  this case, this kind of case, the people who might be involved
4  in this case.  Something like that happens to pop up on your
5  screen, you shut it down, and you move away from it for the
6  same reason that I described earlier.  You're now under
7  responsibility to keep your mind clear of all of that kind of
8  stuff.
9       Obviously avoid all contact with any -- the participants
10 in the trial.  Any of the people that you see in this courtroom
11 whatever, by chance you go to a restaurant tonight and you
12 happen to see them, steer clear of them.  No contact.
13      Do not make any independent investigation of the law or
14 the facts that might be relevant to this case.  Do not conduct
15 internet searches with respect to the issues that might be
16 presented in this trial based on what you've heard so far.  Do
17 not consult external sources such as encyclopedias or
18 dictionaries and reference any of the issues or terms that you
19 might have heard about so far today.  Those are your
20 restrictions.  Okay.
21      Return promptly 8:30 tomorrow morning, fourth floor, check
22 in.  We'll have you back into courtroom 1B.
23      One thing you learned today, unfortunately there's a lot
24 of dead time when you're on jury duty.  I apologize to you for
25 that.  Please feel free to bring a book, a magazine, your

1  Kindle.  You can bring your phone and turn it on and read on

2  your phone.  Make sure it's well charged up.  We do allow you

3  to use your electronic devices when you're not in this

4  courtroom but when you're in the holding area.  In fact, we

5  encourage you to do it.

6         Ladies and gentlemen, you are excused until 8:30 tomorrow

7  morning.  The door is behind you, out that corner.

8         THE COURT:  Becca.

9  311.  Clear the gallery.

10  Good afternoon, ma'am.  You are Juror No. 311.

11         PROSPECTIVE JUROR:  I am.

12         THE COURT:  I've got your answer sheet up here.  I

13  have been going through it.  You have some "yes" answers.  I'm

14  not going to go in any particular order.  I'm going to zero

15  right in on Question 16E:  Specifically in this case, the

16  allegations include those of sexual abuse.  Has any member of

17  your immediate family or close associates ever been a victim

18  witness, accused or convicted of a crime of a sexual nature?

19  Answer, "Yes.  Self.  Sister."

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  What can you tell me about this?

22         PROSPECTIVE JUROR:  My stepfather sexually assaulted

23  myself and my sister at different times and in different ways.

24  So . . .

25         THE COURT:  When you were a child, an adolescent?

```
 1              PROSPECTIVE JUROR:  I was personally 16.  My sister
 2    was 19, I believe.
 3              THE COURT:  Okay.  One second while I talk to the
 4    lawyers.
 5         (Whereupon, the following conference was held at the
 6    bench:)
 7              THE COURT:  Mr. Nieto?
 8              MR. NIETO:  Your Honor, we'd ask to strike for cause.
 9              THE COURT:  Granted.
10         (Whereupon, the bench conference was concluded.)
11              PROSPECTIVE JUROR:  Thank you, ma'am.  You are excused
12    as a juror in this case.  You need not check in on Friday so
13    you can just depart.  I'd ask you to go through this door right
14    here out to the main hallway, turn left, and then you may leave
15    the building.  Thank you.
16              PROSPECTIVE JUROR:  All right.  Thank you very much.
17              THE COURT:  Gallery can come back in.  The people that
18    were excluded.
19         Front row, ma'am.  Thank you.  Looking at your
20    questionnaire here.  17, yes, your stepfather is a real estate
21    lawyer and general counsel for General Dynamics.
22              PROSPECTIVE JUROR:  That's correct.
23              THE COURT:  And no other "yes" answers, correct?
24              PROSPECTIVE JUROR:  Correct.
25              THE COURT:  Okay.  And you live out of Glen Arm.
```

```
1            PROSPECTIVE JUROR:  Yes.
2            THE COURT:  Do you work in Owings Mills or in
3    Baltimore in your role as a bond trader?
4            PROSPECTIVE JUROR:  I work downtown in Baltimore.
5            THE COURT:  How long you been doing that work?
6            PROSPECTIVE JUROR:  Twelve years.
7            THE COURT:  Tell me about your educational background?
8            PROSPECTIVE JUROR:  I have an undergraduate degree
9    from Towson University and a master's from Loyola.
10           THE COURT:  In business or finance?
11           PROSPECTIVE JUROR:  In math and finance.
12           THE COURT:  You're married?
13           PROSPECTIVE JUROR:  Yes.
14           THE COURT:  What does your spouse do?
15           PROSPECTIVE JUROR:  He's an art director for a
16   publishing company in Baltimore.
17           THE COURT:  How long has he been doing that work?
18           PROSPECTIVE JUROR:  Fifteen plus years.
19           THE COURT:  Do you have any children?
20           PROSPECTIVE JUROR:  I have one son, he's 2.
21           THE COURT:  You have a 2-year-old son?
22           PROSPECTIVE JUROR:  Yes.
23           THE COURT:  While you're working, someone is caring
24   for him?
25           PROSPECTIVE JUROR:  Yes, my mother does.
```

1          THE COURT:  Your mother takes care of him, okay.  If

2  you're the mother of a 2 year old and otherwise working full

3  time, you don't have much spare time, but if you did have spare

4  time how would do you use it?  What do you do for fun?

5          PROSPECTIVE JUROR:  I like to go hiking.  I crochet.

6  Spend time with family.

7          THE COURT:  Did you grow up in this area?

8          PROSPECTIVE JUROR:  I did, in Towson.

9          THE COURT:  In Towson.  Where did you go to high

10  school?

11          PROSPECTIVE JUROR:  Towson High.

12          THE COURT:  Towson High.  Very good.  Okay.  Bear with

13  me for a second while I talk to the lawyers.

14     (Whereupon, the following conference was held at the

15  bench:)

16          THE COURT:  Government have any issues or questions in

17  light of mine?

18          MR. NIETO:  No, Your Honor.

19          THE COURT:  Mr. Nieto, questions?

20          MR. NIETO:  No, Your Honor.  Thank you.

21          THE COURT:  Okay.  No issues?

22          MR. NIETO:  None.

23     (Whereupon, the bench conference was concluded.)

24          THE COURT:  Ma'am, thank you.  You may return to

25  courtroom 1B.

```
 1          PROSPECTIVE JUROR:  Thank you.

 2          THE COURT:  Good afternoon, ma'am.

 3          PROSPECTIVE JUROR:  Hello.

 4          THE COURT:  I'm going to ask you to scoot -- you can't

 5  move the chair but move close to the microphone because it

 6  doesn't pick up very well.  I've reviewed your jury

 7  questionnaire.  I see that you have no "yes" answers; is that

 8  correct?

 9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Okay.  Very good.  So you live in

11  Edgewood?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  How long you been living out there?

14          PROSPECTIVE JUROR:  My whole life?

15          THE COURT:  Your whole life?

16          PROSPECTIVE JUROR:  Yeah.

17          THE COURT:  You went to high school out there?

18          PROSPECTIVE JUROR:  Yeah.

19          THE COURT:  Very good.  And you're working for Amazon?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  What do you do for them?

22          PROSPECTIVE JUROR:  I'm a process assistant.

23          THE COURT:  Process assistant?

24          PROSPECTIVE JUROR:  Uh-huh.

25          THE COURT:  So do you work in one of those big, huge
```

1    Amazon facilities?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  And when you're in there you're one of

4    these people who sometimes magically instantly puts together my

5    order and somehow figures out how to get it on the right truck

6    and send it to my house?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  What specifically do you do?

9              PROSPECTIVE JUROR:  I fix, like, problems with

10   shipments.  And I train people how to do that as well.

11             THE COURT:  Okay.  So sometimes things get fouled up,

12   the wrong thing got sent to the wrong place?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Then you sort it out.  Is there a lot of

15   scanning involved in that --

16             PROSPECTIVE JUROR:  Yeah.

17             THE COURT:  -- and trying to figure out why did this

18   get misdirected and so forth?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Does it happen very often?

21             PROSPECTIVE JUROR:  All the time.

22             THE COURT:  Oh, don't tell me that.

23        (Laughter.)

24             THE COURT:  Okay.  How long you been with Amazon?

25             PROSPECTIVE JUROR:  Nine years.

```
 1              THE COURT:  Nine year.  Do you like it?
 2              PROSPECTIVE JUROR:  It's okay.
 3              THE COURT:  It's okay, all right.  Are you married?
 4              PROSPECTIVE JUROR:  No.
 5              THE COURT:  Have you ever been?
 6              PROSPECTIVE JUROR:  No.
 7              THE COURT:  Do you have any kids?
 8              PROSPECTIVE JUROR:  No.
 9              THE COURT:  What do you do in your spare time.
10              PROSPECTIVE JUROR:  Sleep.  Watch TV.
11              THE COURT:  Sleep and watch TV.  Do you have to
12  commute far for your job?
13              PROSPECTIVE JUROR:  It's about 35 minutes.
14              THE COURT:  About 35 minutes.  Okay.  Take any trips
15  recently?  Do you get any vacation from Amazon?  Or do you just
16  work all of the time?
17              PROSPECTIVE JUROR:  I just came back from vacation.
18              THE COURT:  Where did you go?
19              PROSPECTIVE JUROR:  Puerto Rico.
20              THE COURT:  How was that?
21              PROSPECTIVE JUROR:  It was fantastic.
22              THE COURT:  Would you recommend it?
23              PROSPECTIVE JUROR:  Yes.
24              THE COURT:  Did you go to like a resort down there or
25  did you go on a tour?
```

```
1              PROSPECTIVE JUROR:  No, we stayed at an Airbnb.

2              THE COURT:  Go with some girlfriends, family?

3              PROSPECTIVE JUROR:  Work friends.

4              THE COURT:  Work friends.

5              PROSPECTIVE JUROR:  Uh-huh.

6              THE COURT:  How's the air service going down there

7    from Baltimore?  Can you get there pretty easily or is it kind

8    of hard?

9              PROSPECTIVE JUROR:  It was easy.

10             THE COURT:  Just one flight or do you have to change

11   planes somewhere?

12             PROSPECTIVE JUROR:  Direct flight.

13             THE COURT:  Thank you, ma'am.  I'm going to talk to

14   the lawyers for a minute.

15        (Whereupon, the following conference was held at the

16   bench:)

17             THE COURT:  Ms. McGuinn, any issues or questions in

18   light of mine?

19             MS. MCGUINN:  No, Your Honor.

20             THE COURT:  Mr. Nieto?

21             MR. NIETO:  No, Your Honor.

22             THE COURT:  Thank you.

23        (Whereupon, the bench conference was concluded.)

24             THE COURT:  Thank you, ma'am.  You may return to

25   courtroom 1B.
```

1      PROSPECTIVE JUROR:  Okay.

2      THE COURT:  Good afternoon, sir.  I'll be with you in

3 just a minute.  So are you currently working as an overnight

4 security guard --

5      PROSPECTIVE JUROR:  No, my daughter worked there for,

6 like, three years.

7      THE COURT:  That's not you?

8      PROSPECTIVE JUROR:  No, I worked a couple night

9 shifts.  It wasn't my real job.

10      THE COURT:  Okay.  Got it.  That's just a security

11 guard at some kind of petroleum installation.

12      PROSPECTIVE JUROR:  Yeah, it's where I actually work.

13 I drive a truck out of there.  And you're basically watching

14 making sure no one gets in and messes with the trucks.

15      THE COURT:  Got it.

16      PROSPECTIVE JUROR:  It's not escorting people or

17 anything else.

18      THE COURT:  It's just perimeter security.

19      PROSPECTIVE JUROR:  Overnight security, yes.

20      THE COURT:  Out in Elkton.

21      And, Counsel, that was a yes to number 13.

22      Gallery needs to be cleared.

23      Question 16A:  Have you or a member of your immediate

24 family, close associates, ever been the victim of a crime?

25 Answer:  "Yes, daughter sexually assaulted by her bus driver."

1          PROSPECTIVE JUROR:  She was in high school, yes.

2          THE COURT:  How long ago was that?

3          PROSPECTIVE JUROR:  Ten years.

4          THE COURT:  Okay.

5          PROSPECTIVE JUROR:  He was 22, 23 and decided a

6   14-year-old is what he wanted.

7          THE COURT:  Was she alone on the bus?

8          PROSPECTIVE JUROR:  He got her alone on the bus.

9          THE COURT:  Yeah.

10         PROSPECTIVE JUROR:  Convinced her --

11         THE COURT:  I'm sorry.

12         PROSPECTIVE JUROR:  He convinced her that -- because

13  he loved her, and he wanted to --

14         THE COURT:  Okay.  So it was more coercion than

15  physical force?

16         PROSPECTIVE JUROR:  Yes, yes.

17         THE COURT:  Okay.  Was anyone prosecuted?

18         PROSPECTIVE JUROR:  Yes.  He's on sexual predator list

19  and no longer allowed around school kids.

20         THE COURT:  Okay.  And did your daughter testify?

21         PROSPECTIVE JUROR:  No.  He admitted he did it, and

22  they said she would not have to.

23         THE COURT:  Okay.  And so, "yes," victim.  Is that the

24  same?

25         PROSPECTIVE JUROR:  Yes.

```
 1            THE COURT:  That's the Question 16E.  Same event
 2  you're telling me about?
 3            PROSPECTIVE JUROR:  Yes, yes.
 4            THE COURT:  And then we get to 16H:  Do you hold any
 5  beliefs as to crimes involving children that would make it
 6  difficult for you to render a fair and impartial verdict based
 7  solely on the evidence and the law?  And you answered "yes."
 8  Tell me about that.
 9            PROSPECTIVE JUROR:  It's asking me if --
10            THE COURT:  Let me read it to you more slowly.  I went
11  very fast.
12       Do you hold any beliefs as to crimes involving children
13  that would make it difficult for you to render a fair and
14  impartial verdict based solely on the evidence and the law?
15  And your answer was "yes."
16            PROSPECTIVE JUROR:  I think I'd be swayed because of
17  that event.  I would be -- if -- I guess I would lean more
18  towards I guess not -- I don't know how to word it.
19            THE COURT:  I think you've told us.  Stop for a
20  second.  Let me talk to the lawyers.
21       (Whereupon, the following conference was held at the
22  bench:)
23            THE COURT:  Mr. Nieto?
24            MR. NIETO:  Your Honor, I'd make a motion to strike
25  for cause.
```

```
1              THE COURT:  Granted.
2         (Whereupon, the bench conference was concluded.)
3              THE COURT:  Thank you, sir.  You may depart.  You will
4    not serve on this jury.  You can go out through this door here
5    and make a left turn.  You're excused.  And you're not required
6    to call in on Friday.
7              PROSPECTIVE JUROR:  Okay.
8              THE COURT:  Thank you.  Appreciate you being here and
9    thanks for your patience today.
10        Good afternoon, ma'am.
11             PROSPECTIVE JUROR:  Good afternoon.
12             THE COURT:  Can you move up a little bit and move
13   close to that microphone.  The chair doesn't move itself so you
14   have to kind of slide yourself.  Are you okay?
15             PROSPECTIVE JUROR:  Yes, sir.
16             THE COURT:  Okay.  So you've got sleep apnea?
17             PROSPECTIVE JUROR:  Yes.
18             THE COURT:  So does it hit you sometimes during the
19   day?
20             PROSPECTIVE JUROR:  All day.
21             THE COURT:  All day long.  You fall asleep, wake up,
22   fall asleep?
23             PROSPECTIVE JUROR:  Yes.
24             THE COURT:  How long you been struggling with that?
25             PROSPECTIVE JUROR:  For about five years.
```

1          THE COURT:  That's tough, isn't it?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Are you able to work or not too much?

4          PROSPECTIVE JUROR:  I work, I stand up.  I can't have

5   a sit-down job because I fall asleep.

6          THE COURT:  Okay, ma'am.  I'm going to excuse you from

7   jury service and you'll be also removed from our jury rolls

8   because I don't think with sleep apnea you can sit in a jury

9   box all day and listen to evidence.  Do you?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  I don't think so.  I'm sorry about that.

12   I'm going to go ahead and excuse you.

13          PROSPECTIVE JUROR:  Okay, thank you.

14          THE COURT:  You may depart and you do not need to call

15   back on Friday and let's strike her from the rolls.  Thank you.

16       Hello, ma'am.  I'll be with you in just a second here.

17          PROSPECTIVE JUROR:  Okay.

18          THE JUDGE:  Gallery is clear.

19       Good afternoon to you, ma'am.

20          PROSPECTIVE JUROR:  Good afternoon.

21          THE COURT:  Thank you for joining us here.  I take it

22   that your daughter-in-law is the special assistant to the clerk

23   of this court.

24          PROSPECTIVE JUROR:  Oh, this court?  Well, she works

25   here.

```
 1              THE COURT:  In this court I mean the United States
 2   District Court.
 3              PROSPECTIVE JUROR:  That's correct, yes.
 4              THE COURT:  I don't mean this courtroom here.
 5              PROSPECTIVE JUROR:  I mean the whole place.
 6              PROSPECTIVE JUROR:  That's right, yes.
 7              THE COURT:  She works directly for the clerk?
 8              PROSPECTIVE JUROR:  That's right.
 9              THE COURT:  She is the clerk's kind of right-hand
10   person?
11              PROSPECTIVE JUROR:  That's correct.
12              THE COURT:  At least that's how I would describe it.
13              PROSPECTIVE JUROR:  Yes, that is correct.
14              THE COURT:  And she is quite competent at what she
15   does.
16              PROSPECTIVE JUROR:  Thank you.
17              THE COURT:  That's a paid political advertisement.
18         (Laughter.)
19              THE COURT:  Do you think there's anything about the
20   fact that your daughter-in-law works here that would affect
21   your ability to be a fair and impartial juror?  She wouldn't
22   have anything to do with this case.
23              PROSPECTIVE JUROR:  No, no, not at all.
24              THE COURT:  So I'll get to talking to you about your
25   work, which is obviously significant.  You're a supervisor for
```

1    the Maryland Department of Juvenile Services in Baltimore City.

2              PROSPECTIVE JUROR:    That's correct.

3              THE COURT:    But I really want to back up to Question

4    No. 10.  I gave a brief description of the case.  Is there

5    anything about it that would give you difficulty in terms of

6    maintaining an open mind, being a fair and impartial juror.

7    We've cleared the gallery.  You've told us in your response

8    that you're a survivor of rape and prior molestation.

9        Is that all true?

10             PROSPECTIVE JUROR:    That's correct.

11             THE COURT:    I want to be completely open with you and

12   while of course a deeply regret your prior victimization --

13             PROSPECTIVE JUROR:    Thank you.

14             THE COURT:    -- where does that leave you in terms of

15   your ability to be a fair and impartial juror in a trial of

16   this type?  You heard a brief description of what we're going

17   to have on trial here.  What do you think?

18             PROSPECTIVE JUROR:    It's -- it may be very hard for me

19   to give a fair decision.  When you brought it up, I noticed

20   that, you know, the trauma started coming back.  And I had to

21   ground myself and rethink, okay, because I've been through

22   therapy.  So I tried to, you know, use my skills to ground

23   myself.  And realize that this is not the case -- I am not a

24   victim and things of that nature.  But I know that I'm still

25   going through it just because of the response that everybody

1  had.

2          THE COURT:  Let me talk to the lawyers for a minute.

3      (Whereupon, the following conference was held at the

4  bench:)

5          THE COURT:  Mr. Nieto.

6          MR. NIETO:  Your Honor, respectfully I make a motion

7  to strike for cause.

8          THE COURT:  Granted.

9      (Whereupon, the bench conference was concluded.)

10          THE COURT:  Thank you, ma'am.  You are excused.  You

11  will not sit on this jury.  You need not call back on Friday.

12  You're free to go.  We'll send you out this door here, and you

13  can make a left turn at the hallway.  And if you have to drop

14  by and say hi to your daughter-in-law, why don't you tell her

15  all of the compliments that were paid to her in this courtroom.

16          PROSPECTIVE JUROR:  Thank you.

17          THE COURT:  Good afternoon.  You're juror 202; is that

18  right?

19          PROSPECTIVE JUROR:  Yes, sir.

20          THE COURT:  I'll be with you in just a second.  Those

21  who are excluded from the courtroom may be readmitted.

22      You wear glasses but that's fine, right?

23          PROSPECTIVE JUROR:  Yeah.

24          THE COURT:  All fully corrected.  You had a diagnosis

25  for ADHD.  How does that affect things?

1    **PROSPECTIVE JUROR:**  It's kind of hard to focus.  I did

2    have a treatment for a while, the Adderall, but the shortage

3    and the fact that I don't have health insurance right now.

4    **THE COURT:**  Yeah.  Well, you'll have to tell me how

5    you think it would go.  I mean, you sitting here for usually

6    two hours at a time.  Take a break.  Another couple of hours.

7    Four sessions a day.  Two in the morning, two in the afternoon.

8    You know, you're listening to evidence, testimony, looking at

9    stuff on the screens.

10    Do you think you'd be able to maintain concentration?

11    **PROSPECTIVE JUROR:**  I mean, it depends.  Usually but,

12    you know, like for example when you're reading off the

13    questions, I did zone out a little there but it's not always

14    too bad.

15    **THE COURT:**  So it is important I guess, not I guess,

16    for real, it's important that during a trial a juror be able to

17    maintain concentration and hear everything that comes in

18    because who knows when it's going to be maybe the critical

19    piece of evidence.

20    **PROSPECTIVE JUROR:**  Right.

21    **THE COURT:**  So I just really have to kind of rely on

22    your sense of it, you know.

23    **PROSPECTIVE JUROR:**  Yeah.

24    **THE COURT:**  Do you think that you got it enough under

25    control that we shouldn't worry about it?  Or do you think

```
1   that, nah, it's kind of an issue, I can't promise that I'm
2   going to be able to maintain focus like everybody else all day
3   long.
4           PROSPECTIVE JUROR:  It's a little of an issue.  I used
5   to have an accommodation when I was in high school.
6           THE COURT:  What was your accommodation?
7           PROSPECTIVE JUROR:  Actually time on tests and for
8   school work.
9           THE COURT:  Let me talk to the lawyers for a minute,
10  okay.
11      (Whereupon, the following conference was held at the
12  bench:)
13          THE COURT:  Ms. McGuinn, what do you think?
14          MS. MCGUINN:  I certainly see concerns, Your Honor.
15  At certain points it can be relatively fast-moving but it's
16  also, a lot of, as Your Honor can see, sitting and observing
17  videos and things of that nature so . . .
18          THE COURT:  Thank you.  Mr. Nieto?
19          MR. NIETO:  No issues with this prospective juror.
20          THE COURT:  Okay.  Does the Government move to
21  disqualify him?
22          MS. MCGUINN:  Yes, Your Honor.
23          THE COURT:  I'm going to grant it for the reason that,
24  first of all, he owned the issue right upfront.  I think he's
25  got some concern about it.  Then he gives an example of during
```

**JA336**

1  the process that we've already conducted today that he, quote,

2  "zoned out," a little bit.

3      And then there's the fact that, perhaps things shouldn't

4  be this way, but the reality is we're not really in a position

5  to give accommodations of the type that he might need during

6  the course of the trial, which I imagine would involve a

7  shortening the sessions and actually getting feedback from him

8  on whether or not he was able to maintain concentration or not.

9      But, you know, I'll hear from the Defendant before I rule

10 finally with respect to that issue.

11     What are your thoughts?

12     **MR. NIETO:**  Again, Your Honor, I understand the

13 Court's concerns.  And I had a little trouble hearing him

14 because he was leaning back from the microphone, but I thought

15 I understood him to say he does take medication for it.

16     **THE COURT:**  He did, but because of the Adderall

17 shortage he's not able to right now so he's not medicated and

18 that's one of his concerns.

19     **MR. NIETO:**  I'll submit, Your Honor.

20     **THE COURT:**  I think it's a close call.  And I

21 certainly don't want to be presiding over a process that's

22 unfair to someone who has a disability that's not his fault and

23 is otherwise capable of serving; but the accommodation that

24 would be needed here I think is beyond the range of reasonable.

25 We would have to alter significantly how the trial was

1  conducted in order to accommodate this juror's issues.

2  Particularly when he needs Adderall, can't get it, and is

3  expressing his own concern about it, and is already telling us

4  he's already had some difficulty with a very minimal focus that

5  has been necessary to this point in this proceeding.

6  Accordingly, he is excused for cause on the Government's

7  motion.

8       (Whereupon, the bench conference was concluded.)

9       THE COURT:  Thank you, sir.  Thanks for telling us

10 about the ADHD.  I'm going to go ahead and excuse you.  It

11 might be a little bit of a challenge for you.  I'm sorry about

12 that.  And I hope that you understand we would otherwise think

13 you would be a perfectly well-qualified juror.  But you've told

14 us about what your issues are, and not having access to the

15 Adderall, having some trouble maintaining focus on what's

16 already gone on today, I suppose that tells you and us

17 something that we should listen to.

18       PROSPECTIVE JUROR:  All right.

19       THE COURT:  So we'll go ahead and excuse you.  You can

20 depart through that door right there, and you may depart and go

21 home.  And you're not required to serve on this jury.

22       With that juror gone, let me also note for the record that

23 he had disclosed in response to Question 16, and the gallery

24 has been cleared, that his ex-roommate assaulted his landlord.

25 That his ex-roommate was arrested for possession of child

1   pornography.  He calls it child porn.

2         Excuse me.  My fault.  Step out one second.  Right behind

3   the door.  We'll need you in about 20 minutes.

4               **MS. COHEN:**  Sorry about that.

5               **THE COURT:**  No problem.  Then he goes on to explain

6   the response to Question 16E, ex-roommate was arrested for CP,

7   which I take to be child pornography given the earlier

8   reference.  And I am focusing on these answers as well in

9   excusing this juror for cause.

10        Now 276.  Thank you.

11        Ma'am, I will be with you in just a sec.  Make yourself

12  comfortable.  We will need you to be close to that microphone.

13        So the gallery has been cleared.  You gave me a "yes"

14  answer to a couple of inquiries, 16E in particular.

15  Specifically in this case, the allegation include those of

16  sexual abuse.  Has any member of your immediate family or

17  closest associates ever been a victim, a witness, accused or

18  convicted of a crime of a sexual nature?  Answer:  "Yes."  And

19  then two initials are here.  I can't tell if it's a B or a D

20  and M.

21              **PROSPECTIVE JUROR:**  Yes.  So it's a D and an M.  The D

22  stood for my dad because he was actually accused of a sexual

23  crime.  I wasn't even born yet.  It was a long time ago.  But

24  it was a false accusation.

25        And then the M today stood for my brother who was also

1  accused of a sexual crime but his was proven -- I don't know

2  what to say without making it sound bias, but he was convicted.

3          THE COURT:  He was convicted?

4      PROSPECTIVE JUROR:  Uh-huh.

5          THE COURT:  Did he receive a penalty in relation to

6  that conviction?  Did he receive a sentence?

7      PROSPECTIVE JUROR:  I know he had probation.  It was a

8  long time ago.  Again, I was very little when it happened so

9  I'm not 100 percent sure all the details of it.

10         THE COURT:  Okay.  Do you think there's anything about

11 the false accusation brought against your father and the

12 stories you've heard about that, and the proven allegation

13 brought against your brother, the little you might know about

14 that, that would affect your ability to be a fair and impartial

15 juror if you were asked to sit as a juror in a case such as

16 this one?

17     PROSPECTIVE JUROR:  I'm not 100 percent sure.  I

18 mostly just put "yes" because there is that relation to it and

19 with this case.  I would try to be fair only because the

20 accusations and the things that happened in my family in the

21 past was very much, like, I wasn't involved in it.  So I don't

22 have very much judgment on that.

23         THE COURT:  Yes.  You also answered "yes" that there

24 might be something about viewing images of a sexual nature that

25 would make it difficult for you to render a fair and impartial

1  verdict.  Do you have any additional thoughts about that?

2          PROSPECTIVE JUROR:  Yeah.  So that actually is in

3  relation to where I work because I work in childcare and so I'm

4  with kids all the time.

5      (Audio feedback)

6          PROSPECTIVE JUROR:  I don't know if I'm too close to

7  it.  Sorry.

8      I just don't -- I don't think I would be comfortable

9  viewing the images of that, especially because I take care of

10 the kids all of the time.  I prefer to see my kids happy.  I

11 don't want to see pictures like that.

12         THE COURT:  Yeah.  Then there's the schedule of the

13 trial that presents an issue or problem for you.  Tell me about

14 that.

15         PROSPECTIVE JUROR:  So, again, I do work in school.  I

16 work in a childcare facility and we're about to start our

17 school year.  So the next -- really the next, like, three to

18 four weeks I'm, like, really focused on trying to get the

19 school year started with my new classroom and the children that

20 are starting.  I'm just worried that it might get, like, the

21 conflict scheduling.  Like, it might happen the week that the

22 first day of school is starting.

23         THE COURT:  When is the first day of school?

24         PROSPECTIVE JUROR:  For my school it starts

25 September 3rd.

1    THE COURT:  Well, I think it's likely this trial will

2  extend into that time period.  You are excused for cause.  And

3  you may depart.  Thank you, ma'am.

4    So, in general, we don't require teachers to serve during

5  the school term.  I think she qualifies effectively as a

6  teacher.  She's working in a childcare center.  And coupled

7  with the other information that she supplied about what has

8  previously happened in her family, cumulatively, I think that

9  we've got too much of a burden here.  And on the court's motion

10  this juror is excused for cause.

11    267.

12  Hello.

13    PROSPECTIVE JUROR:  Hi.

14    THE COURT:  I'm looking through your juror

15  questionnaire and I'm looking for your answers.  And right away

16  I'm discovering response to Question 12 that your father was,

17  as you described it, a federal police officer.

18    And then in response to Question 14:  Yes, your father was

19  sworn as a marshal for two federal trials.

20    What did your father did or what did he do?

21    PROSPECTIVE JUROR:  Well, I -- he was -- he worked

22  security.  I know he worked out at Woodlawn at the Social

23  Security Administration.  As far as -- it wasn't until he

24  passed that I found out about the U.S. marshal because I found

25  the I.D.

1          THE COURT:  So he had a special deputy U.S. marshal
2     commission at some point?
3          PROSPECTIVE JUROR:  Yes.
4          THE COURT:  But in terms of the nature of his work in
5     that regard, do you think it was mainly security at Social
6     Security in Woodlawn?
7          PROSPECTIVE JUROR:  Yes.
8          THE COURT:  You wear glasses but they correct your
9     vision?
10          PROSPECTIVE JUROR:  Uh-huh.
11          THE COURT:  And no other "yes" answers, correct?
12          PROSPECTIVE JUROR:  Correct.
13          THE COURT:  Anything about your father's service you
14     think as a security officer there at Social Security and his
15     possible appointment as a special deputy U.S. marshal that you
16     think might affect your ability to be a fair and impartial
17     juror if you were selected in this case?
18          PROSPECTIVE JUROR:  No.
19          THE COURT:  Okay.  And you live here in Baltimore?
20          PROSPECTIVE JUROR:  I live in Baltimore County.
21          THE COURT:  In Baltimore County?
22          PROSPECTIVE JUROR:  Uh-huh.
23          THE COURT:  You work for a credit union.
24          PROSPECTIVE JUROR:  Correct.
25          THE COURT:  And you're a financial accountant?

1         PROSPECTIVE JUROR:  Yes.

2         THE COURT:  How long have you been done that kind of

3   work?  Could you move a little closer to the mic.  I'm sorry, I

4   know it's uncomfortable.

5         PROSPECTIVE JUROR:  Well, I've been in the finance for

6   over 30 years, but I've been an accountant for probably 17

7   years, 18 years.

8         THE COURT:  Okay.  All right.  And you're married?

9         PROSPECTIVE JUROR:  Yes, sir.

10         THE COURT:  What does your spouse do?

11         PROSPECTIVE JUROR:  He works for McCormick's, the

12   spice company.

13         THE COURT:  Quality control analyst or technician?

14         PROSPECTIVE JUROR:  Uh-huh.

15         THE COURT:  Does he come home smelling like spice?

16         PROSPECTIVE JUROR:  Sometimes it's good and sometimes

17   it's not so good.

18       (Laugher.)

19         THE COURT:  I happen to live in that area.  It's

20   pretty interesting some days you're out there taking a walk and

21   hmm?

22         PROSPECTIVE JUROR:  What do I smell today? or regular

23   know.

24         THE COURT:  Oregano.

25       (Laughter.)

```
 1              THE COURT:  Do you have kids?
 2              PROSPECTIVE JUROR:  I have three.
 3              THE COURT:  How old are they?
 4              PROSPECTIVE JUROR:  35, 32 and 21.
 5              THE COURT:  What do your kids do?
 6              PROSPECTIVE JUROR:  Two of them are stay-at-home moms.
 7     And my son is enrolled in Columbia University in South
 8     Carolina.
 9              THE COURT:  What's he studying?
10              PROSPECTIVE JUROR:  Engineering.
11              THE COURT:  What do you like to do in your spare time?
12              PROSPECTIVE JUROR:  I cook.  I scrapbook.  The beach
13     is like our favorite place to go and I look for seashells.
14              THE COURT:  What's your favorite beach?
15              PROSPECTIVE JUROR:  Marco Island and South Beach.
16              THE COURT:  Oh, you've got high standards.  Okay.  Let
17     me talk to the lawyers for a second.
18         (Whereupon, the following conference was held at the
19     bench:)
20              THE COURT:  Government have any issues or questions in
21     light of mine?
22              MS. MCGUINN:  No, Your Honor.
23              THE COURT:  Mr. Nieto, the Defendant?
24              MR. NIETO:  No, Your Honor.
25              THE COURT:  Thank you.
```

**JA345**

1     (Whereupon, the bench conference was concluded.)

2          THE COURT:  Thank you, ma'am.  You may return to

3     courtroom 1B.  Appreciate your participation in our process.

4     264 is next.  We've cleared the gallery.

5     Good afternoon.

6          PROSPECTIVE JUROR:  Hello.

7          THE COURT:  And I'm looking through your juror

8     questionnaire and let's turn to Question 16F:  The defendant in

9     this case is Asian American, do you hold any beliefs related to

10    race, color, religion, national origin or other personal

11    attributes that would make it difficult for you to render a

12    fair and impartial based solely on the evidence and the law?

13    Answer:  "Yes, I don't believe Asians should be in

14    America.  They bombed Pearl Harbor and killed many American

15    soldiers.  And I believe this Asian is guilty."

16    Sir, I find your views repugnant.  But you're excused.

17    You may leave.

18         PROSPECTIVE JUROR:  Which way?  This way?

19         THE COURT:  Either way is fine.  Follow the clerk.

20    264 is excused for cause based blatant hostility against

21    the Defendant solely based on the Defendant's race that has

22    absolutely no place in an American courtroom.  It is offensive

23    beyond words.

24    Hello.

25         PROSPECTIVE JUROR:  Hi.

1          THE COURT:  Give me a minute to catch up.  I'm looking
2    through your questionnaire a moment.
3          PROSPECTIVE JUROR:  Sure.
4          THE COURT:  Let the record reflect that the gallery
5    has been cleared and only the direct participants in this
6    proceeding are present.
7       Ma'am, thank you for your candid answers in response to
8    our questions on this questionnaire.  I want to just
9    immediately move to your "yes" response to Question 10.  A few
10   minutes ago you heard me give a very brief description of this
11   case.  Is there anything in that brief description that made
12   you realize it would be difficult for you to keep an open mind
13   and serve as a fair and impartial juror in the trial in this
14   case?  Your response is:  "Yes.  Sexually assaulted as a child.
15   And parent of young children."
16      Did I correctly read your response to that question?
17         PROSPECTIVE JUROR:  Yes, yes.
18         THE COURT:  And so you suffered some kind of sexual
19   assault, victimization yourself as a child.
20         PROSPECTIVE JUROR:  Yes.
21         THE COURT:  Would that make it difficult for you to
22   serve as a juror --
23         PROSPECTIVE JUROR:  Yes.
24         THE COURT:  -- as a trial in this type?
25         PROSPECTIVE JUROR:  Yes.

1          THE COURT:   Thank you.  Let me talk to the lawyers for
2  a moment.
3      (Whereupon, the following conference was held at the
4  bench:)
5          THE COURT:   Mr. Nieto.
6          MR. NIETO:   Your Honor, I make a motion to strike for
7  cause.
8          THE COURT:   Granted.
9      (Whereupon, the bench conference was concluded.)
10         THE COURT:   Thank you, ma'am.  I'm sorry for your
11  prior history.  You are excused.  You may depart right through
12  that door.  Go to the hallway, make a left turn, and you may
13  depart.
14         PROSPECTIVE JUROR:   Thank you.
15         THE COURT:   Thank you, ma'am.
16     255.  I'll be with you in just a second, ma'am.
17     You wear glasses?
18         PROSPECTIVE JUROR:   Yes.
19         THE COURT:   You don't have them on today?
20         PROSPECTIVE JUROR:   They're reading glasses.  I had
21  them on earlier.
22         THE COURT:   Your vision for distance is fine, and if
23  you need to read something you pull your glasses out?
24         PROSPECTIVE JUROR:   Yes.
25         THE COURT:   I think we have two things to discuss,

```
 1  tell me if you disagree.  First, someone who used to work here.
 2          PROSPECTIVE JUROR:  Yeah, my mother.
 3          THE COURT:  And then second, victimization.
 4          PROSPECTIVE JUROR:  Yes.
 5          THE COURT:  Let's talk about the employment first.  I
 6  want to correctly pronounce --
 7          PROSPECTIVE JUROR:  Yanlei (phonetic).
 8          THE COURT:  Your mother worked in the finance office
 9  here in the U.S. District Court?
10          PROSPECTIVE JUROR:  Yes.
11          THE COURT:  Right here in this building?
12          PROSPECTIVE JUROR:  Yes.
13          THE COURT:  She retired in 2001, about 23 years ago.
14  Sound right?
15          PROSPECTIVE JUROR:  Yes.
16          THE COURT:  Is your mother still living?
17          PROSPECTIVE JUROR:  Yes.
18          THE COURT:  I hope she's well.
19          PROSPECTIVE JUROR:  She is.
20          THE COURT:  Tell her her former colleague wishes her
21  well.
22      Anything about the fact that she worked here 23 years ago
23  and before that that you think would affect your ability to be
24  a fair and impartial juror if you were picked in this case?
25          PROSPECTIVE JUROR:  No.
```

```
 1            THE COURT:  Thank you.  Now, have you or any member of
 2   your immediate family or close associates ever been the victim
 3   of a crime?  And then three names are listed here.
 4            PROSPECTIVE JUROR:  Nicole Bizzle (phonetic), that's
 5   my sister.  She was sexually assaulted going to work.  She
 6   worked at 1 East Pratt.  My mom was mugged coming work here.
 7   And my grandmother, her house was broken into, that was in
 8   1972.
 9            THE COURT:  Your sister was assaulted?
10            PROSPECTIVE JUROR:  Yes.
11            THE COURT:  How long ago was that?
12            PROSPECTIVE JUROR:  Maybe probably close to 17 years
13   ago.
14            THE COURT:  Seventeen years ago?
15            PROSPECTIVE JUROR:  Uh-huh.
16            THE COURT:  Was anyone apprehended?
17            PROSPECTIVE JUROR:  Yes.
18            THE COURT:  Did your sister go to court?
19            PROSPECTIVE JUROR:  She filed charges.  There was a
20   second woman who was assaulted who was going to file but ended
21   up not filing so they didn't have a case.
22            THE COURT:  Okay.  So you heard generally what this
23   trial is about?
24            PROSPECTIVE JUROR:  Yes.
25            THE COURT:  These are accusations.  Nothing has been
```

1  proven.  In fact, the defendant enjoys the presumption of

2  innocence and that presumption remains with him throughout this

3  proceeding unless and until the Government over the course of

4  the trial is able to demonstrate to the satisfaction of the

5  jurors, all of them, that he's guilty beyond a reasonable

6  doubt.  Otherwise, under our law he's not guilty and needs to

7  be acquitted.

8       Is there anything about the incident with your sister in

9  particular, but the other two victimization experiences as

10  well, that you think would make it difficult for you to enforce

11  the law as I've just described it to you and serve as a fair

12  and impartial juror?  Hold the Government to their burden?

13            PROSPECTIVE JUROR:  No.

14            THE COURT:  Every case is separate and different.

15  Each case has its own facts and circumstances.  Just because

16  something happened in a particular case doesn't mean that

17  anything happened in any other case.  Do you agree with that

18  proposition?

19            PROSPECTIVE JUROR:  Yes.

20            THE COURT:  Okay.  So, bottom line, if you were

21  selected to serve, despite what experiences you've had in your

22  life and your family, do you believe you could be fair and

23  impartial?

24            PROSPECTIVE JUROR:  Yes.

25            THE COURT:  I don't see any other "yes" answers to

1    your questions.  You work at APL?

2            PROSPECTIVE JUROR:  Yes.

3            THE COURT:  So do you commute down there?

4            PROSPECTIVE JUROR:  I do.

5            THE COURT:  What kind of a position?  Are you a

6    physicist yourself?

7            PROSPECTIVE JUROR:  I'm an analyst.

8            THE COURT:  You're an analyst.  Looking at scientific

9    data --

10           PROSPECTIVE JUROR:  Looking at data.

11           THE COURT:  Looking at data.  How long you been doing

12   that sort of work?

13           PROSPECTIVE JUROR:  Thirteen years.

14           THE COURT:  Tell us about your educational background?

15           PROSPECTIVE JUROR:  I have a bachelor's from Towson

16   State in mass communication with a minor in English.  I have a

17   bachelor's from College of Notre Dame in computer information

18   systems.  I started an MBA at Loyola, and I had started MPS,

19   which is cybersecurity, at UBMC, but I haven't finished those.

20           THE COURT:  Okay.  You married?

21           PROSPECTIVE JUROR:  No.  Divorced.

22           THE COURT:  You were once married?  How long ago did

23   your marriage end?

24           PROSPECTIVE JUROR:  2016, December 14th was the

25   divorce.

```
 1              THE COURT:  Okay.  And what did your spouse do during
 2    the time of the marriage?
 3              PROSPECTIVE JUROR:  Military.
 4              THE COURT:  Uniformed service?
 5              PROSPECTIVE JUROR:  Yes.
 6              THE COURT:  Branch?
 7              PROSPECTIVE JUROR:  National Guard.
 8              THE COURT:  MOS.
 9              PROSPECTIVE JUROR:  He was a ranked as NCO at the
10    time.
11              THE COURT:  Got it.  Kids?
12              PROSPECTIVE JUROR:  Yes.
13              THE COURT:  How many?
14              PROSPECTIVE JUROR:  Two.
15              THE COURT:  How old?
16              PROSPECTIVE JUROR:  Twenty seven and 22.
17              THE COURT:  What do they do?
18              PROSPECTIVE JUROR:  My son's in the Army.  He's
19    artillery.  My daughter is a billing specialist for a doctor's
20    practice.
21              THE COURT:  Okay.  And all of the old jokes about the
22    hearing problems of people in the artillery, how is his
23    hearing?
24              PROSPECTIVE JUROR:  He just joined in September.
25              THE COURT:  Okay.  Well, I hope all that stuff is just
```

1    fodder for jokes and not really true.

2        How's he like it?

3            PROSPECTIVE JUROR:  He loves it.

4            THE COURT:  Okay.  Got it.  What do you do in your

5    spare time?  What do you do for fun?

6            PROSPECTIVE JUROR:  A lot with my family.  Garden.

7    Clean my house.  Knit.  I'm always doing something.  I go out

8    with my friends.  I'm just always going.

9            THE COURT:  You're active?

10           PROSPECTIVE JUROR:  Yes, I am.

11           THE COURT:  Pardon me for a minute while I talk with

12   the lawyers.

13       (Whereupon, the following conference was held at the

14   bench:)

15           THE COURT:  Government have any issues or questions in

16   light of mine?

17           MS. MCGUINN:  No, Your Honor.

18           THE COURT:  Mr. Nieto?

19           MR. NIETO:  No, Your Honor.

20       (Whereupon, the bench conference was concluded.)

21           THE COURT:  Thank you, ma'am.  You may return to

22   courtroom 1B.

23           PROSPECTIVE JUROR:  Okay, thank you.

24           THE COURT:  Three more and we'll quit.  246.

25       Good afternoon, I'll be with you in just a second, ma'am.

1      PROSPECTIVE JUROR:   Certainly.

2      THE COURT:   I'm looking at your questionnaire.

3      THE COURT:   Okay.  Question 10:   Yes, and the reason

4   is I'm a foster care social worker who works with

5   sex-trafficked youth.

6      PROSPECTIVE JUROR:   And sexually abused youth, yes.

7      THE COURT:   How long you been in that line of work?

8      PROSPECTIVE JUROR:   In this position for eight and a

9   half years.

10      THE COURT:   Okay.  And you have a sense of what this

11   trial is about from the very brief description that I gave you

12   on the front end?

13      PROSPECTIVE JUROR:   Yes.

14      THE COURT:   And do you think that a trial where

15   someone has been accused of the sexual exploitation of minors,

16   child pornography offenses or cyberstalking would be difficult

17   for you to sort of manage on a fair and impartial basis?

18      PROSPECTIVE JUROR:   I believe so because I'm working

19   with the victims.

20      THE COURT:   Yeah.

21      PROSPECTIVE JUROR:   Yeah.

22      THE COURT:   Do you think it might color your judgment

23   in terms of how you heard the evidence and where your --

24      PROSPECTIVE JUROR:   I would be afraid that that would

25   happen because I'm usually very impartial.  I'm a social

1  worker, but because I work with sexually abused victims and
2  sex-trafficking victims, I don't want to be partial.
3          THE COURT:  Got it.  Bear with me for a second while a
4  talk with the lawyers.
5          PROSPECTIVE JUROR:  Certainly.
6      (Whereupon, the following conference was held at the
7  bench:)
8          THE COURT:  Mr. Nieto?
9          MR. NIETO:  Your Honor, I make a strike for cause,
10 please.
11         THE COURT:  Granted.
12     (Whereupon, the bench conference was concluded.)
13         THE COURT:  Ma'am, you are excused and you're not
14 going to sit on this trial.  We'll ask you to sit on some other
15 one sometime.
16         PROSPECTIVE JUROR:  Thank you very much.
17         THE COURT:  But not this case.
18         PROSPECTIVE JUROR:  Okay.
19         THE COURT:  You may depart.
20         PROSPECTIVE JUROR:  Thank you.
21         THE COURT:  241.  I'm going to ask you to move down to
22 the microphone, couple more seats.  Thank you, sir.
23     Good afternoon to you.
24         PROSPECTIVE JUROR:  Hi.
25         THE COURT:  I'm looking at your questionnaire,

1  Question 16, Question 16A.  Answer:  "Yes."  Have you or any

2  member of your immediate family, closest associates ever been

3  the victim of a crime?  Answer:  "Yes."

4      The gallery has been cleared.

5      "Assault, abuse, sexual."  Can you tell me about that?

6      **PROSPECTIVE JUROR:**  Yes, I was -- I was sexually

7  molested when I was 12 years old, it would have been around

8  1977, by a Catholic priest.  And so it -- it was like a brief

9  incident.  It was, like, on a camping trip.  And I don't know

10  what actions were taken.  I told my mother about it.  And she

11  apparently talked to the local parish priest about it, and I

12  don't know what became of the matter after that.

13      **THE COURT:**  Okay.  Let me talk to the lawyers for a

14  minute.

15    (Whereupon, the following conference was held at the

16  bench:)

17       **THE COURT:**  Mr. Nieto?

18       **MR. NIETO:**  Yes, Your Honor.  Respectfully, I'd make a

19  motion to strike for cause.

20      **THE COURT:**  Granted.

21    (Whereupon, the bench conference was concluded.)

22      **THE COURT:**  Sir, we're not going to ask you to sit on

23  this jury.

24      **PROSPECTIVE JUROR:**  Okay.

25      **THE COURT:**  You're excused.  You can depart.  We'll

```
 1   have you sit on a jury on some other kind of case.  Thank you.
 2   Thank you for being here today.
 3              PROSPECTIVE JUROR:  Okay.
 4              THE COURT:  Good afternoon, sir.
 5              PROSPECTIVE JUROR:  Good afternoon.
 6              THE COURT:  Bear with me for just a second.  I'm
 7   looking through your questionnaire here.  So you have several
 8   "yes" answers.  First of all, you believe you've heard about
 9   this case, Question Number 2.  Tell me about that?
10              PROSPECTIVE JUROR:  Well, I do watch the news.  It's
11   been in the news.  And so I'm aware of what happened from the
12   original charging.  I knew that it was coming up.
13          And then my wife texted me this morning something that --
14   I didn't know what it was but she texted me something this
15   morning that -- why it was delayed today.  That's what she
16   knew.  Other than that, that's what I know.
17              THE COURT:  Let me talk to the lawyers for a minute.
18          (Whereupon, the following conference was held at the
19   bench:)
20              THE COURT:  Ms. McGuinn, is there any point in going
21   further with this?
22              MS. MCGUINN:  I don't think so, Your Honor.  I guess
23   you could ask if he could be fair and impartial but
24   particularly I'd be concerned if he knows the reason for the
25   delay.
```

1          THE COURT:  Which he clearly does.

2     Mr. Nieto?

3          MR. NIETO:  Your Honor, respectfully, we would make a

4    motion to strike for cause.

5          THE COURT:  Based on his disclosure of awareness of a

6    matter that I had hoped to keep away from the jury

7    circumstances attending to the Defendant's tardiness appearing

8    in court this morning.  I think that information is potentially

9    prejudicial to the Defendant.  We can't do a perfect job of

10   keeping information like that out of the information stream,

11   but he's owning it and we're here in jury selection.  I think

12   we should do what we can and so the motion to excuse for cause

13   is granted.

14        (Whereupon, the bench conference was concluded.)

15        THE COURT:  Thank you, sir.  You're excused.  We're

16   not going to ask you to sit on this jury.

17          PROSPECTIVE JUROR:  Okay.

18        THE COURT:  For the record, the juror is excused for

19   the reasons I just indicated.  But, in addition, counsel should

20   know that he responded "yes" to Question 10.  The brief

21   description of the case made him realize that it would be

22   difficult for him to keep an open mind and serve as a fair and

23   impartial juror in the case.

24        He answered "yes" to Question 16C:  Have you or any member

25   of your immediate family or closest associates ever been

1   accused of criminal conduct, been the subject of criminal

2   investigation, and convicted of committing a crime?  "Yes, both

3   kids."

4        18:   Do you hold any philosophical or religious or moral

5   views that would prevent you from judging the conduct of

6   another person?  First he answered "no," then he struck that

7   out and answered "yes."

8        23:   Do you have any concerns or beliefs about laws

9   relating to crimes that involve children or laws relating to

10  crimes that involve sexual exploitation that would affect your

11  ability to render a fair and impartial verdict in this case?

12  Answer:   Yes.

13       26:   The defendant is presumed innocent unless and until a

14  jury find him guilty beyond a reasonable doubt.  Are you unable

15  to accept that principle?  First he marked "yes," and then

16  struck it out and answered "no."  So presumably not a

17  problematic response.

18       No other "yes" answers.

19       But the totality of issues that would need to be explored

20  with him lends weight to the notion that it's likely that one

21  way or another he was not going to be qualified as a

22  prospective juror in the case.  I'm not ruling on that basis.

23  I'm not ruling on those other bases because I didn't explore

24  them.  But I do think it's relevant and counsel should know

25  about them.  He was excused for reasons stated on the record.

129

1        Okay.  That leaves us at 11, correct?

2            THE CLERK:  Yes.

3            THE COURT:  We've got to get to 36 so we need 25.

4   Hopefully we can get a jury tomorrow if we get a good, early

5   start and that will be our intention.

6        There is the matter of your client's attendance tomorrow.

7   Do you know his position?

8            MR. PROCTOR:  Can I have a moment?  Mr. Bendann does

9   not request to be absented from court tomorrow?

10           THE COURT:  He requests.

11           MR. PROCTOR:  To not be here, to be absented.

12           THE COURT:  He does not want to attend?  He

13  exercises -- well, he makes a request under Rule 43(c) to be

14  permitted to waive his right to be present during tomorrow's

15  jury trial proceedings; is that correct?

16           MR. PROCTOR:  That's correct.  And we have a paralegal

17  going to the jail tonight when he gets back.  If he changes his

18  mind, I will promptly inform chambers.

19           THE COURT:  Okay.  Very good.  And generally we will

20  rely on counsel to tell us where this stands, but, Mr. Bendann,

21  you're here yourself.  Is that your decision?

22           THE DEFENDANT:  Based on circumstances, yes.

23           THE COURT:  Okay.  Very well.  The Defendant's

24  presence is waived.  But we need to conduct one more piece of

25  business here.

1     MS. MCGUINN:  Well, and can I be heard just briefly on

2  that because depending where we end up tomorrow, and what

3  witnesses would be called, I don't want there to be any

4  confusion that the Government has not been anything but

5  forthright about the order of witnesses.

6     THE COURT:  Fair enough.  Who would be your first

7  witness?

8     MS. MCGUINN:  So I guess the first question is, does

9  Your Honor have an expectation that we might have a jury seated

10  by lunch, proceed to opening and --

11     THE COURT:  Almost impossible given that we still need

12  25 jurors and have only got 11 done.  Anything is possible, but

13  I think it's extremely unlikely.

14     MS. MCGUINN:  Okay.  So as Your Honor would -- can

15  appreciate, we're obviously now juggling a different schedule.

16  I have always told counsel the first two witnesses after

17  opening would be                and                who are the

18  parents of the minor victim.

19     THE COURT:  Yep.

20     MS. MCGUINN:  Even with the shuffling, we do

21  anticipate they would go first even if we don't start calling

22  witnesses until Monday morning or excuse me, Friday morning.

23     THE COURT:  Yep.

24     MS. MCGUINN:  But if we get started tomorrow, and he's

25  not here, I don't want there to be any confusion that the

1  Government has done anything and anybody has been not told

2  something, or if we get through two witnesses after that, I

3  just don't know.

4         THE COURT:  Well, this all falls within the scope of

5  the advisement that was given to the Defendant this morning.

6         MS. MCGUINN:  Yes.

7         THE COURT:  Trials are inherently unpredictable

8  events.  Lawyers constantly scramble telling witnesses "You

9  have to be here this time," and then telling them "Oh, no, you

10 don't have to be here this time, it's changed," and we went

11 over that at some length this morning.

12        So I think Mr. Bendann has been fully advised in that

13 regard.  I'll just say this, that a decision to not be present

14 tomorrow, to not be brought over, that applies for the full

15 day.  We don't do it in segments.  If you elect to not be here

16 tomorrow, you're not going to be here at any time tomorrow.

17        My expectation is tomorrow will be mostly, if not

18 entirely, taken up with jury selection just based on where we

19 are on numbers.  But it's possible that somehow things could

20 leap ahead and we could succeed in seating a jury.  In which

21 case I would expect counsel to be ready to move into their

22 opening statements.  And in the extremely unlikely scenario

23 where we got the opening statements done, and there was still

24 time left in the trial day, then we would move into the

25 presentation of trial evidence.  I don't think that is likely.

1  In fact, I don't think it's likely at all, but I will not rule

2  it out.  And if we find ourselves in that scenario then that's

3  where we're going to go.  That's what we're going to do.

4       Do you understand, Mr. Bendann?

5            THE DEFENDANT:  Yes.  May I make a comment?

6            THE COURT:  No.  You should talk to your lawyers

7  before you say anything in open court.  We're rolling now.

8            THE DEFENDANT:  It has to do with circumstances of my

9  attendance.

10           THE COURT:  Well, tell your lawyer and we'll see if

11 that should be aired out here in open court.

12      I do want to conduct a *Lafler-Frye* hearing, which our

13 inquiry this morning suggested had not yet occurred in this

14 case.  It is imperative.  It's something that needs to happen.

15      Mr. Bendann, during the course of your case and trial you

16 are entitled to the effective assistance of counsel under the

17 Sixth Amendment to the United States Constitution.  Our Supreme

18 Court has ruled that your right to effective assistance

19 includes representation that is effective in the time period

20 prior to when a trial actually commences, and, in fact, one of

21 the most significant things that occurs in American criminal

22 cases, particularly in federal court, during the pretrial phase

23 of a case is that there is frequently so-called plea bargaining

24 that goes on between the two sides.  It's not by no means

25 mandatory that there be plea bargaining.  It's just that it is

1  common and it frequently happens.

2      In plea bargaining, the Government will make an offer to a

3  defendant.  Generally, that offer will contain the option for

4  the defendant to plead guilty to less than all of the charges

5  that he or she is facing or a lesser-included offense.

6  Something that is thought to perhaps carry with it the

7  possibility, even the likelihood, that the consequences for the

8  defendant might be less severe than if the Defendant were to

9  proceed to trial on all of the charges and then be convicted on

10  all of the charges.

11      Now, much of this is indefinite and subject to the

12  opinions and the advice and the expertise of lawyers on both

13  sides in terms of what actually occurs; but the empirical fact

14  is that over 90 percent of federal criminal cases are resolved

15  through this sort of bargaining process and through plea

16  bargains.

17      And our Supreme Court has found that a defendant is

18  entitled not just to the effective assistance of a lawyer

19  during the in-court part of his proceedings, the trial, the

20  sentencing, the appeal and so forth, but is also entitled to

21  the effective assistance of counsel in this plea bargaining

22  process, this pretrial process.

23      Accordingly, I want to make a record here today on the

24  question of whether or not there has, in the life of this case,

25  been a plea agreement offer by the Government to the Defendant;

1  whether or not such a plea, if offered, was ever communicated

2  to the Defendant.  If it was offered, and if it was

3  communicated, was the Defendant through his attorney given an

4  opportunity to respond to that offer and to state his position

5  with respect to all of that.  There's certainly no

6  constitutional right to a plea bargain.  There's no

7  constitutional right to a particular way in which the

8  bargaining process might occur.  There's no constitutional

9  right to plea negotiations.  It's just that if that has gone on

10  in the life of a case, then the Defendant is entitled to

11  effective representation by a lawyer during that process.

12      So here's how we will proceed.  The first question is

13  this:  Listen to my questions very carefully, Counsel, I do not

14  want to violate Rule 11.  I do not want to insert myself into

15  any plea bargaining process and will absolutely endeavor not to

16  do so.  So just answer the question that you're asked and no

17  more than that.

18      Ms. McGuinn, was the Defendant extended a plea offer

19  during the life of this case?

20          MS. MCGUINN:  There was a non-written, informal offer

21  conveyed and some discussion surrounding that with defense

22  counsel.

23          THE COURT:  When did that happen, approximately?

24          MS. MCGUINN:  It was in the earlier part of the

25  spring, Your Honor, prior to motions.  It's actually the

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA366**

1    reasons we bumped motions from March to that -- when we had

2    them on May 8th or 9th.  So I would estimate it was somewhere

3    in March and April.  Maybe mostly March because at some point

4    we had to cut off and move forward with filing motions.

5              THE COURT:  Who did you extend that plea offer to?

6              MS. MCGUINN:  It was via I believe email to both

7    counsel and some phone discussions with Mr. Nieto.

8              THE COURT:  Now off the record, outside of my hearing,

9    please move to a neutral position of the courtroom, speak with

10   Mr. Nieto, and then I'll ask both of you whether you agree on

11   the nature and the terms that were offered by Ms. McGuinn to

12   Mr. Nieto.

13        We're off the record.

14        (Counsel conferring.)

15             THE COURT:  Back on the record.  Mr. Nieto, have you

16   had a confidential conversation with Ms. McGuinn outside of my

17   hearing in reference to her suggestion that she extended a plea

18   offer to your client through you earlier this year, perhaps

19   during the springtime?

20             MR. NIETO:  Yes, Your Honor.

21             THE COURT:  Did you find that in your confidential

22   conversation with Ms. McGuinn that you agreed with her summary

23   of the offer that was extended and that it was -- her comments

24   to you were accurate?

25             MR. NIETO:  Yes, Your Honor.

1      THE COURT:  And then, Mr. Nieto, did you communicate
2  the terms of that offer to your client, Mr. Bendann?
3      MR. NIETO:  Obviously, Your Honor, not to violate
4  attorney-client privilege, you know, we understand, both
5  Mr. Proctor and I, our responsibilities under professional
6  rules with regards to plea offers.
7      THE COURT:  I'm going to take that as an affirmative
8  response because you are constitutionally required to
9  communicate a plea offer from the Government to your client.
10  And you're telling me that you have discharged your
11  responsibilities under the Constitution.
12      Do you understand the inference that I'm drawing?
13      MR. NIETO:  Yes, Your Honor.
14      THE COURT:  Do you object to my drawing that
15  inference?
16      MR. NIETO:  No, Your Honor.
17      THE COURT:  To the extent it was professionally
18  appropriate in light of your assessment of where your client
19  stood, all of the circumstances and realities of this case and
20  so forth, did you take all of that into account and to the
21  extent that it was appropriate to do so professionally, did you
22  respond to the Government's plea offer?
23      MR. NIETO:  Yes, Your Honor.
24      THE COURT:  Mr. Proctor, do you have anything to say
25  in relation to the issues that we're discussing?

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA368**

1    **MR. PROCTOR:** The plea offer, Your Honor?

2    **THE COURT:** No. Just the fact that -- the *Lafler*

3 hearing -- what I'm trying to do is make a record on the

4 question of whether or not there was constitutionally

5 sufficient service provided to your client in the pretrial

6 phase of this case with specific reference to the plea

7 negotiation process.

8    **MR. PROCTOR:** Your Honor, we all know what the Rules

9 of Profession Conduct say. I think it's 1.4, the duty to have

10 a continuing disclosure with your client and convey all

11 relevant information. And I have no reason to believe that we

12 did not discharge that duty in this case.

13    **THE COURT:** Okay. Does the Government have any

14 concerns in this regard?

15    **MS. MCGUINN:** No, Your Honor.

16    **THE COURT:** Is the Government satisfied with the

17 *Lafler-Frye* hearing that the court has just conducted?

18    **MS. MCGUINN:** Yes, Your Honor.

19    **THE COURT:** Is the Defendant satisfied, Mr. Nieto, or

20 do you have any objection as to how we proceeded this evening?

21    **MR. NIETO:** Again, Your Honor, respectfully, we did

22 not request such a hearing.

23    **THE COURT:** No, you didn't. But I'm nonetheless

24 required to hold one. So it's a simple, direct question. Do

25 you have any objection to my conclusion that I have now

1  successfully conducted a *Lafler-Frye* hearing?

2         MR. NIETO:  No, Your Honor.

3         THE COURT:  Thank you.

4     Anything else before we end first evening, Ms. McGuinn?

5         MS. MCGUINN:  No, Your Honor.  Our best guess though

6  is that we will pick a jury, maybe get to opening.  The

7  Government anticipates having one or two witnesses who are

8  local on standby but I just wanted to make sure --

9         THE COURT:  Oh, my absolutely best guess is that we're

10  still going to be picking a jury on Friday morning.  I'm going

11  to do my best to make sure that that's not the situation that

12  we are in.

13         MS. MCGUINN:  Yes, Your Honor.

14         THE COURT:  But you're asking for my projection based

15  on my life experience?

16         MS. MCGUINN:  Yes, sir.

17         THE COURT:  Friday morning, still picking a jury.

18         MS. MCGUINN:  Yes, sir.

19         THE COURT:  I hope not.

20     Anything else, ma'am?

21         MS. MCGUINN:  No, Your Honor.

22         THE COURT:  Mr. Nieto, anything else?

23         MR. NIETO:  No, Your Honor.  Thank you.

24         THE COURT:  I apologize.

25     I haven't excused the jurors.  Stand by.  We've got to

1  bring them in.  Too many balls in the air.  While we're waiting

2  for them to come in, I'll see counsel at the bench.

3      Off the record.

4      (Off the record.)

5      THE COURT:  We're back on the record.  Ladies and

6  gentlemen, we've come to the end of our court day, but we have

7  not yet completed the process of selecting a jury that will

8  serve in this case.  Accordingly, you're going to be sent home

9  now and required to return tomorrow at 2:00 p.m.  Your presence

10 is not required during the morning, but we do require it at

11 2:00 p.m.

12     At 2:00 p.m. you should come to the fourth floor where you

13 checked in this morning.  Once you're checked in there, you'll

14 be brought back to courtroom 1B for further proceedings.

15     Overnight, do not discuss this case with anyone.  Do not

16 discuss it with your -- the persons that you've met on jury

17 duty today.  Do not discuss it with any of your friends, your

18 family members, your employers.  No one at all.  You may say

19 that you have been summoned for jury service in federal court.

20 That you are required to return tomorrow.  That you are a

21 candidate for selection to serve as a juror in a criminal case.

22 But you may not say what case it is, you may not say what the

23 charges are in the case, you may not identify the judge, the

24 lawyers, the parties, the defendant, anyone by name who is

25 involved in the case.  If your family or employers or whatever

1  are persistent, as would be the case in my house, you're going

2  to have to respond to them by saying, "Listen, the judge just

3  told us flat, we're not allowed to say."  The reason for this

4  is we don't want your thinking about anything relative to this

5  case to be influenced by the opinions of anyone else, even a

6  loved one that you might otherwise trust in the most important

7  affairs of life.  But that person isn't on the jury.  And they

8  haven't been called for jury service.

9      So you have to keep spouses, children, parents, neighbors,

10  employers, television personalities, whomever, out of this

11  process, out of your mind.  And the way you do that is you

12  don't tell him.  You don't tell him what you are involved in,

13  other than it's a criminal case in federal court, and other

14  than that I'm under a court order not to say anything to

15  anybody.

16      Do not allow yourselves to be exposed to any news articles

17  or reports that might touch upon this case or the issues it

18  presents or the participants in the trial.  There may well be

19  consideration or attention paid to this in the media.  I have

20  no idea.  The safest approach is, you know, I guess the O's

21  aren't playing tonight.  Do they play this afternoon?

22          **MR. PROCTOR:**  They lost.

23          **THE COURT:**  Oh, thanks.

24      (Laughter.)

25          **THE COURT:**  Well, I can't invite you to go watch the

1   Yankees game or whatever.  That would just be fundamentally

2   disloyal.  Do something else that might entertain you that has

3   nothing to do with this case, the news of the day or whatever

4   else.  And then, show up at 2:00 on the fourth floor tomorrow

5   ready to reengage with this process.

6       Avoid all contact of any kind with any of the participants

7   in the case.  Do not make any independent investigation of the

8   law or the facts relevant to the case.  Do not conduct internet

9   searches with respect to the issues present or the persons

10  participating in the trial.  Do not consult an external source

11  such as an encyclopedia or dictionary in reference to the

12  issues or the terms that have been represented to you here.

13      You are excused to return to the fourth floor jury

14  assembly area at 2:00 p.m. tomorrow afternoon.  You may depart.

15  Out you go.  You can go right out that door.

16      I understand, ma'am, you weren't present.  When you came

17  in the room, what was I saying?

18          PROSPECTIVE JUROR:  That we're not to talk about the

19  case.

20          THE COURT:  That's right.  Do not discuss the case

21  with anyone.  Do not discuss it with anybody who's on jury

22  service with you.  Do not discuss it with any of your friends

23  or your family members.  Just all you are allowed to say is

24  that you've been summoned for jury duty in federal court.

25  You're being considered for selection on a criminal case.

```
 1   You're not allowed to say the name of the case, who's
 2   participating in the case, or what the case is about.  And then
 3   just change the subject.
 4       Can you handle that, ma'am?
 5           PROSPECTIVE JUROR:  I sure can.
 6           THE COURT:  Thank you.  I appreciate you following
 7   those instructions.  You did hear what I said otherwise about
 8   news coverage and avoiding all that?
 9           PROSPECTIVE JUROR:  Yes.
10           THE COURT:  Okay, you are under that instruction.
11   You're excused.  We'll see you at 2:00 tomorrow afternoon.
12   Thank you, ma'am.
13       And your juror no. is?
14           PROSPECTIVE JUROR:  329.
15           THE COURT:  329.  Thank you, ma'am.  You may depart.
16       All jurors have left the courtroom.  The courtroom door is
17   closed.
18       Now, the Defendant is remanded to the custody of the
19   marshal.  Was there some other matter?
20           MR. PROCTOR:  Mr. Bendann would just like me to point
21   out to the court that in part his decision not to be here in
22   court is because he has sleep apnea that's untreated at the
23   jail.  He hasn't eaten or drank since 6:00 this morning.
24           THE COURT:  Was he provided with lunch?
25           THE DEFENDANT:  I'm on the cardio diet and the diet
```

1    here in jail does not match to that.

2              THE COURT:  What is a cardio diet?

3              THE DEFENDANT:  I had a heart attack last summer, Your

4    Honor, and I'm supposed to avoid things with heavy cholesterol.

5    And the lunch provided here is four slices of white bread and

6    two pieces of government meat and a carton of milk.

7              THE COURT:  Okay.

8              THE DEFENDANT:  None of which I'm allowed to receive

9    at CDF.

10             THE COURT:  What you are you fed at CDF?

11             THE DEFENDANT:  Perhaps a chicken patty, tuna, hard

12   boiled eggs.

13             THE COURT:  Hard boiled eggs?  On a cardiodiet?

14             THE DEFENDANT:  Yes.  New medicine since the 1990s,

15   Your Honor.

16             THE COURT:  Okay.  Well, what sort of meal would you

17   care to receive during the noon hour when you are here?

18             THE DEFENDANT:  Even something as simple as peanut

19   butter and jelly would be more acceptable?

20             THE COURT:  How about salad?

21             THE DEFENDANT:  That would be fine.

22             THE COURT:  How about a salad topped with chicken?

23             THE DEFENDANT:  That sounds great.

24             THE COURT:  Okay.  So unless the Government is able to

25   demonstrate to me that this information is not true, and that

1  the Defendant has not been placed on a special diet at the

2  place of detention, going forward the Defendant shall receive

3  at lunch a meal that is consistent with the diet that is

4  otherwise being followed for him in the detention facility.

5  And it strikes me that that would be achieved by a simple

6  process as going across the street to Cosi and ordering the

7  Caesar salad with chicken on top.

8       Would that meet your dietary needs?

9            THE DEFENDANT:  That would be delightful.

10           THE COURT:  Okay.  That would be the meal that I will

11  direct the marshals to provide on those days when the Defendant

12  is present.  In light of the fact that we're going to make that

13  accommodation on lunch, Mr. Bendann, do you wish to be present

14  tomorrow or not?

15           THE DEFENDANT:  Yes.  Could I add in the addition of

16  water?

17           THE COURT:  Water?

18           THE DEFENDANT:  Yes.

19           THE COURT:  Yeah, well, you should be provided with

20  water regardless.  I'm not saying it's going to be bottled

21  water.  It may be Baltimore City water.  But we will make sure

22  that you're provided with water.

23           THE DEFENDANT:  Even a cup can be great.  If I have a

24  cup I can get it from the sink.

25           THE COURT:  Yeah, well, the marshals will provide the

Defendant with the meal that I have just described, plus water.

And, in light of that, the defendant revokes his waiver of his

right to be present during the trial tomorrow.  And instead,

the marshals should plan to bring him here in time for to us

recommence jury selection -- what time did I tell those people?

9:15?  They've got to be up there by 8:30.  We'll plan to start

court by 9:15.  Have him here by 9:15.

        Anything else?

                **MR. PROCTOR:**  Nope.  No, sir.

                **THE COURT:**  Okay.  The Defendant is remanded.  Counsel

are excused for the evening.

                **THE CLERK:**  All rise.  This Honorable Court now stands

adjourned.

        (Court adjourned at 5:53 p.m.)

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA377**

```
1                CERTIFICATE OF OFFICIAL REPORTER

2

3

4        I, Ronda J. Thomas, Registered Merit Reporter, Certified

5   Realtime Reporter, in and for the United States District Court

6   for the District of Maryland, do hereby certify, pursuant to 28

7   U.S.C. § 753, that the foregoing is a true and correct

8   transcript of the stenographically reported proceedings held in

9   the above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12

13                          Dated this 19th day of March 2025.

14

15                   ____Ronda J. Thomas_____

16                   Ronda J. Thomas, RMR, CRR
                     Federal Official Reporter
17

18

19

20

21

22

23

24

25
```

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA378**

**MR. NIETO: [45]** 26/3 26/11 26/14 26/16 32/24 33/1 37/1 40/3 40/6 42/25 43/2 47/23 52/8 55/1 61/5 73/6 73/9 73/21 73/24 82/15 88/8 90/18 90/20 90/22 94/21 97/24 102/6 104/19 105/12 105/19 113/24 116/6 122/19 124/9 125/18 127/3 135/20 135/25 136/3 136/13 136/16 136/23 137/21 138/2 138/23

**MR. PROCTOR: [10]** 26/18 29/24 129/8 129/11 129/16 137/1 137/8 140/22 142/20 145/9

**MS. COHEN: [1]** 107/4

**MS. MCGUINN: [40]** 26/1 29/15 29/19 29/22 29/25 32/22 33/2 39/12 39/14 39/16 39/21 42/24 47/21 52/6 54/25 61/4 73/4 82/12 94/19 104/14 104/22 113/22 122/17 126/22 130/1 130/8 130/14 130/20 130/24 131/6 134/20 134/24 135/6 137/15 137/18 138/5 138/13 138/16 138/18 138/21

**PROSPECTIVE JUROR: [584]**

**THE CLERK: [86]** 2/4 2/7 2/9 2/11 2/13 2/15 2/17 2/19 2/21 2/23 2/25 3/2 3/4 3/6 3/8 3/10 3/12 3/14 3/16 3/18 3/20 3/22 3/24 4/1 4/3 4/5 4/7 4/9 4/11 4/13 4/15 4/17 4/19 4/21 4/23 4/25 5/2 5/4 5/6 5/8 5/10 5/12 5/14 5/16 5/18 5/20 5/22 5/24 6/1 6/3 6/5 6/7 6/9 6/11 6/13 6/15 6/17 6/19 6/21 6/23 6/25 7/2 7/4 7/6 7/8 7/10 7/12 7/14 7/16 7/18 7/20 7/22 7/24 8/1 8/3 8/5 8/7 8/9 8/11 8/16 25/20 37/11 55/10 85/16 129/2 145/12

**THE COURT: [662]**
**THE DEFENDANT: [15]** 129/22 132/5 132/8 142/25 143/3 143/8 143/11 143/14 143/18 143/21 143/23 144/9 144/15 144/18 144/23

**THE JUDGE: [2]** 46/2 99/18

**1**

**1.4 [1]** 137/9
**10 [13]** 14/17 35/3 61/10 62/5 75/17 75/18 78/13 81/4 81/14 101/4 115/9 123/3 127/20
**10-year-old [1]** 77/12
**100 percent [3]** 80/14 108/9 108/17
**101 [2]** 1/24 6/11
**107 [1]** 6/9
**108 [1]** 6/7
**11 [5]** 8/5 14/22 129/1 130/12 134/14

**117 [1]** 6/5
**12 [10]** 15/1 16/22 16/23 16/24 27/6 31/13 58/21 64/9 110/16 125/7
**126 [1]** 6/3
**128 [1]** 6/1
**13 [4]** 43/17 43/17 58/20 95/21
**130 [1]** 5/24
**14 [4]** 15/25 55/7 72/15 110/18
**14-year-old [1]** 96/6
**146 [1]** 5/22
**14th [1]** 120/24
**15 [1]** 16/9
**150 [1]** 5/20
**151 [1]** 5/18
**16 [9]** 8/3 16/21 16/25 19/18 19/20 55/7 88/1 106/23 125/1
**162 [1]** 5/16
**165 [1]** 5/14
**16A [8]** 17/9 44/1 48/12 55/7 57/5 62/14 95/23 125/1
**16B [1]** 17/20
**16C [2]** 17/23 127/24
**16D [1]** 18/6
**16E [8]** 18/10 33/15 55/7 56/7 87/15 97/1 107/6 107/14
**16F [2]** 18/17 114/8
**16G [1]** 18/22
**16H [7]** 18/25 63/3 69/13 74/19 74/21 75/12 97/4
**16I [3]** 19/3 74/23 77/17
**16J [1]** 19/8
**17 [6]** 19/21 55/8 55/17 88/20 112/6 118/12
**175 [1]** 5/12
**176 [1]** 5/10
**18 [5]** 19/24 34/13 34/13 112/7 128/4
**184 [1]** 5/8
**188 [1]** 5/6
**19 [2]** 20/2 88/2
**192 [1]** 5/4
**197 [1]** 5/2
**1972 [1]** 118/8
**1977 [1]** 125/8
**1979 [1]** 57/9
**198 [1]** 4/25
**1988 [1]** 43/17
**1990-ish [1]** 44/6
**1990s [1]** 143/14
**1994 [2]** 60/10 60/11
**19th [1]** 146/12
**1:57 [2]** 1/12 2/1
**1B [20]** 25/7 30/3 33/6 48/2 52/12 55/5 61/9 82/18 82/23 83/22 83/25 83/25 85/18 85/23 86/22 90/25 94/25 114/3 122/22 139/14

**2**

**2-year-old [1]** 89/21
**20 [7]** 12/21 20/6 30/16 38/1 59/4 72/16 107/3
**20/20 [2]** 30/16 38/1
**200 [1]** 4/23
**2000s [2]** 48/15 48/16
**2001 [1]** 117/13
**2005 [1]** 48/17
**2011 [1]** 59/13
**2016 [1]** 120/24

**2017 [1]** 8/25
**202 [2]** 4/21 102/17
**2023 [1]** 8/25
**2024 [1]** 1/12
**2025 [1]** 146/12
**204 [1]** 4/19
**205 [1]** 4/17
**20s [1]** 62/18
**21 [4]** 8/1 20/12 51/18 113/4
**21201 [1]** 1/25
**216 [1]** 4/15
**218 [1]** 4/13
**219 [1]** 4/11
**22 [7]** 1/12 20/15 46/25 63/6 75/2 96/5 121/16
**226 [1]** 4/9
**23 [6]** 20/18 51/18 96/5 117/13 117/22 128/8
**23-cr-0278-JKB [1]** 1/5
**232 [1]** 4/7
**234 [4]** 4/5 82/24 83/1 83/15
**236 [1]** 4/3
**24 [2]** 20/22 60/17
**241 [2]** 4/1 124/21
**246 [1]** 122/24
**25 [5]** 21/4 45/17 46/25 129/3 130/12
**255 [2]** 3/24 116/16
**256 [1]** 3/22
**26 [3]** 7/24 21/6 128/13
**264 [3]** 3/20 114/4 114/20
**267 [2]** 3/18 110/11
**27 [3]** 21/15 51/18 54/3
**276 [2]** 3/16 107/10
**278 [1]** 11/3
**28 [7]** 30/5 30/11 37/24 45/3 46/25 74/14 146/6
**282 [1]** 3/14
**287 [1]** 3/12
**29 [1]** 22/6
**293 [1]** 3/10
**296 [1]** 3/8
**2:00 on [1]** 141/4
**2:00 p.m [4]** 139/9 139/11 139/12 141/14
**2:00 tomorrow [1]** 142/11

**3**

**30 [2]** 22/14 112/6
**302 [1]** 3/6
**307 [1]** 3/4
**311 [3]** 3/2 87/9 87/10
**318 [3]** 2/25 74/8 82/18
**32 [3]** 24/4 38/16 113/4
**321 [2]** 2/23 74/2
**329 [6]** 2/21 55/6 55/13 61/8 142/14 142/15
**333 [2]** 2/19 55/4
**339 [3]** 2/17 48/5 52/11
**34 [1]** 43/10
**341 [2]** 2/15 48/1
**347 [3]** 2/13 37/18 43/4
**35 [4]** 54/3 93/13 93/14 113/4
**352 [3]** 2/11 33/7 37/17
**36 [1]** 129/3
**361 [5]** 2/9 30/4 30/5 30/7 33/5
**363 [5]** 2/7 26/4 26/19 27/2 30/2
**37 [1]** 7/20
**3rd [1]** 109/25

**4**

**40 [1]** 56/12
**43 [1]** 129/13
**46 [1]** 7/16
**48 [1]** 7/14
**49 [2]** 7/12 7/18
**4:00 [1]** 82/21
**4th [1]** 1/24

**5**

**51 [1]** 7/10
**56 [1]** 7/8
**5:00 [1]** 82/21
**5:53 [1]** 145/14

**6**

**62 [1]** 7/6
**65 [1]** 7/4
**67 [1]** 7/2
**6:00 this [1]** 142/23

**7**

**71 [1]** 6/25
**753 [1]** 146/7
**76 [1]** 6/23
**78 [1]** 6/21

**8**

**83 [1]** 6/19
**8:30 [4]** 85/13 85/14 85/18 145/6
**8:30 and [1]** 85/24
**8:30 tomorrow [2]** 86/21 87/6
**8th [1]** 135/2

**9**

**90 percent [1]** 133/14
**91 [1]** 6/17
**96 [1]** 6/15
**98 [1]** 6/13
**9:15 [4]** 83/25 145/6 145/7 145/7
**9:15 tomorrow [1]** 83/4 83/23 83/24
**9th [1]** 135/2

**A**

**Aberdeen [1]** 80/24
**abide [1]** 23/21
**ability [23]** 20/4 20/21 21/2 22/8 22/9 24/7 27/19 38/18 42/4 42/7 44/25 56/22 58/1 59/20 65/3 68/8 69/8 100/21 101/15 108/14 111/16 117/23 128/11
**able [29]** 10/9 21/13 22/1 23/24 26/13 29/18 37/22 38/1 38/24 41/1 42/4 42/19 43/13 52/14 64/19 64/25 73/13 78/18 78/22 79/2 80/22 99/3 103/10 103/16 104/2 105/8 105/17 119/4 143/24
**about [142]** 13/22 13/25 14/9 14/14 17/15 17/19 19/5 20/18 21/19 23/4 23/9 23/16 23/20 24/5 24/5 24/8 26/7 27/12 27/14 27/17 27/18 32/9 32/11 33/22 36/4 36/12 38/7 38/17 39/15 41/5 43/17 43/22 44/6 44/18 44/24 46/6 48/20 49/1 50/1 50/6 51/7

52/23 53/13 56/11 56/20 56/21 56/24 56/24 57/5 57/8 57/25 58/5 58/17 59/12 59/19 61/21 62/21 63/10 63/14 65/20 67/6 68/1 68/7 69/7 69/12 69/23 70/16 72/19 72/20 73/19 73/19 73/21 73/22 74/21 75/10 75/13 75/24 76/9 77/9 77/15 81/14 81/24 82/21 84/9 84/14 84/19 84/20 84/23 84/23 85/9 86/19 87/21 89/7 93/13 93/14 97/2 97/8 98/25 99/11 100/19 100/24 101/5 103/25 104/25 106/3 106/10 106/11 106/14 107/3 107/4 108/10 108/12 108/13 108/24 109/1 109/13 109/16 110/7 110/24 111/13 117/5 117/13 117/22 118/23 119/8 120/14 121/21 123/11 125/5 125/10 125/11 126/8 126/9 128/8 128/25 130/5 140/4 141/18 142/2 142/7 143/20 143/22
**above [2]** 44/11 146/9
**above-entitled [1]** 146/9
**absented [2]** 129/9 129/11
**absolute [2]** 46/18 70/10
**absolutely [5]** 38/11 40/6 114/22 134/15 138/9
**abuse [8]** 18/11 33/17 34/18 35/16 56/8 87/16 107/16 125/5
**abused [2]** 123/6 124/1
**accept [4]** 21/8 21/12 21/13 128/15
**acceptable [1]** 143/19
**access [1]** 106/14
**accommodate [1]** 106/1
**accommodation [4]** 104/5 104/6 105/23 144/13
**accommodations [1]** 105/5
**Accordingly [3]** 106/6 133/23 139/8
**account [2]** 41/23 136/20
**accountant [2]** 111/25 112/6
**accurate [2]** 39/11 135/24
**accusation [2]** 107/24 108/11
**accusations [5]** 76/9 76/10 76/15 108/20 118/25
**accused [18]** 17/24 18/3 18/12 18/15 33/18 48/25 49/5 56/10 64/10 66/7 67/3 84/11 87/18 107/17 107/22 108/1 123/15 128/1
**achieved [1]** 144/5
**achieving [1]** 42/17
**acknowledge [1]** 42/5
**acquitted [1]** 119/7
**across [2]** 28/6 144/6
**action [1]** 35/5
**actions [2]** 34/18 125/10
**active [1]** 122/9
**activities [18]** 6/8
**actually [16]** 9/21 28/15 37/7 53/2 56/3 59/2 59/12 59/13 59/15 95/12 104/7 105/7 107/22 109/2 132/20 133/13 134/25

**A**

**adamant [1]** 35/25
**add [2]** 9/15 144/15
**added [1]** 45/4
**Adderall [4]** 103/2 105/16 106/2 106/15
**addition [2]** 127/19 144/15
**additional [3]** 73/6 84/1 109/1
**Addressing [1]** 83/15
**ADHD [2]** 102/25 106/10
**adjourned [2]** 145/13 145/14
**adjustor [2]** 81/1 81/7
**administration [2]** 20/2 110/23
**admitted [1]** 96/21
**adolescent [2]** 77/19 87/25
**adolescents [1]** 76/16
**advertisement [1]** 100/17
**advice [1]** 133/12
**advise [3]** 27/1 39/6 43/15
**advised [2]** 41/25 131/12
**advisement [1]** 131/5
**advocates [2]** 20/7 20/9
**affairs [1]** 140/7
**affect [15]** 20/4 20/20 21/2 27/19 44/25 56/22 58/1 59/20 69/8 100/20 102/25 108/14 111/16 117/23 128/10
**affiliated [1]** 27/6
**affirmative [1]** 136/7
**afraid [1]** 123/24
**after [14]** 9/13 9/18 17/11 25/6 34/10 34/13 35/11 35/13 35/14 69/6 73/10 125/12 130/16 131/2
**afternoon [30]** 2/2 8/17 27/2 33/8 33/11 33/14 37/18 37/19 43/9 43/10 48/5 55/13 74/9 87/10 91/2 95/2 98/10 98/11 99/19 99/20 102/17 103/7 114/5 122/25 124/23 126/4 126/5 140/21 141/14 142/11
**again [7]** 15/10 28/8 80/15 105/12 108/8 109/15 137/21
**against [9]** 20/24 63/3 63/16 63/19 65/9 69/13 108/11 108/13 114/20
**age [1]** 34/13
**agency [7]** 15/5 15/14 15/21 16/4 16/6 16/11 16/14
**agent [12]** 1/19 12/25 13/2 13/9 13/10 16/12 16/15 20/16 20/17 69/19 72/13 79/12
**ago [9]** 14/17 35/21 44/5 44/19 49/14 56/12 62/5 67/20 67/21 96/2 107/23 108/8 115/10 117/13 117/22 118/11 118/13 118/14 120/22
**agree [5]** 21/18 80/2 80/7 119/17 135/10
**agreed [2]** 25/24 135/22
**agreement [1]** 133/25
**Agriculture [1]** 60/2
**ahead [7]** 17/3 19/18 73/8 99/12 106/10 106/19

**aid [1]** 9/4
**aided [1]** 1/22
**air [2]** 94/6 139/1
**Airbnb [1]** 94/1
**aired [1]** 132/11
**all [83]** 8/13 9/18 24/1 25/7 35/8 35/9 38/3 39/11 39/25 40/19 44/14 44/22 46/10 47/1 48/8 50/16 50/18 50/22 58/3 59/22 61/13 61/19 63/9 65/4 67/7 67/15 68/1 68/16 70/2 71/10 72/7 74/14 75/6 77/24 77/25 78/1 79/9 82/23 82/25 83/5 83/9 84/18 84/18 86/7 86/9 88/16 92/21 93/9 93/16 98/20 98/21 99/9 100/23 101/9 102/15 102/24 104/2 104/24 106/18 108/9 109/4 109/10 112/8 119/5 121/21 121/25 126/8 131/4 132/1 133/4 133/9 133/10 134/5 136/19 136/20 137/8 137/10 139/18 141/6 141/23 142/8 142/16 145/12
**allegation [2]** 107/15 108/12
**allegations [6]** 18/10 19/8 33/16 56/8 76/12 87/16
**alleged [2]** 8/24 19/9
**allow [3]** 9/15 87/2 140/10
**allowed [5]** 96/19 140/3 141/23 142/1 143/8
**Almost [1]** 130/11
**alone [2]** 96/7 96/8
**along [2]** 9/7 77/24
**already [6]** 24/4 39/24 105/1 106/3 106/4 106/16
**also [18]** 1/19 34/23 36/13 44/9 44/13 47/7 57/5 62/13 64/18 72/9 77/17 80/2 99/7 104/16 106/22 107/25 108/23 133/20
**alter [1]** 105/25
**always [5]** 45/22 103/13 122/7 122/8 130/16
**am [14]** 10/10 32/14 34/4 43/16 50/6 58/5 58/12 59/24 72/8 75/15 87/11 101/23 107/8 122/10
**Amazon [4]** 91/19 92/1 92/24 93/15
**Amendment [1]** 132/17
**AMERICA [3]** 1/4 11/2 114/14
**American [5]** 18/17 114/9 114/14 114/22 132/21
**analyst [5]** 58/11 58/22 112/13 120/7 120/8
**Angela [2]** 12/22 13/7
**another [6]** 9/21 20/1 83/13 103/6 128/6 128/21
**answer [56]** 9/7 9/10 9/13 9/14 9/17 9/23 10/8 10/12 16/14 16/20 17/2 17/3 17/5 17/5 19/17 24/18 24/21 24/23 25/9 27/5 27/22 30/5 30/11 30/12 33/20 38/10 38/11 38/12 41/1 41/3 43/10 43/20 44/3 44/14 48/13 48/25 60/11 61/24 62/13 65/12 67/13 67/14 69/13 71/15 74/25 87/12

**87/19 95/25 97/15 107/14 107/18 114/13 125/1 125/3 128/12 134/16**
**answered [13]** 38/19 43/17 44/9 56/7 56/11 57/5 62/10 97/7 108/23 127/24 128/6 128/7 128/16
**answers [34]** 9/4 9/19 9/23 10/3 10/5 19/19 37/24 38/15 43/11 45/9 48/11 50/5 52/16 55/12 55/16 58/4 61/12 62/16 64/24 67/16 72/6 73/9 74/13 75/7 87/13 88/23 91/7 107/8 110/15 111/11 115/7 119/25 126/8 128/18
**anticipate [3]** 22/14 41/14 130/21
**anticipates [1]** 138/7
**any [164]**
**anybody [5]** 85/5 85/9 113/1 140/15 141/21
**anyone [12]** 22/11 23/5 44/16 59/14 84/2 84/3 96/17 118/16 139/15 139/24 140/5 141/21
**anything [50]** 13/19 13/22 14/10 14/14 14/19 14/14 19/4 14/18 19/4 24/4 27/17 27/17 27/18 38/16 41/7 43/22 44/24 48/20 50/1 56/21 57/25 59/19 61/21 62/6 65/7 66/1 68/7 69/7 78/20 84/9 95/17 100/19 100/22 101/5 108/10 111/13 115/11 117/22 119/8 119/17 130/4 130/12 131/1 132/7 136/24 138/4 138/20 138/22 140/4 140/14 145/8
**apartments [4]** 62/19 62/20 68/13 68/15
**APL [2]** 45/14 120/1
**apnea [3]** 98/16 99/8 142/22
**apologize [3]** 60/5 86/24 138/24
**apparently [1]** 125/11
**appeal [2]** 85/2 133/20
**APPEARANCES [1]** 1/14
**appearing [1]** 127/7
**Apple [1]** 13/2
**applied [2]** 46/10 55/25
**applies [1]** 131/14
**apply [1]** 77/10
**applying [1]** 78/10
**appointment [1]** 111/15
**appreciate [7]** 63/10 64/24 74/6 98/8 114/3 130/15 142/6
**apprehended [3]** 44/16 69/4 118/16
**approach [1]** 140/20
**appropriate [5]** 42/15 42/20 71/8 136/18 136/21 142/6
**approximately [2]** 22/15 134/23
**April [1]** 135/3
**arbiter [1]** 71/17
**architects [2]** 53/15 53/15
**are [141]** 8/11 8/24 9/25 10/6 11/10 12/5 12/21 13/17 14/6 15/8 15/17 16/20 17/1 19/4 21/8 21/11 19/11 121/9 127/22 128/21 130/14 136/7

**23/22 23/23 23/24 24/24 25/19 25/22 26/13 26/21 27/2 28/18 30/7 30/19 31/9 36/18 37/5 37/7 39/8 39/12 39/17 40/13 43/4 46/24 47/1 47/2 47/3 50/8 50/12 52/24 54/2 54/9 55/13 55/21 55/23 57/4 57/4 58/6 59/23 63/3 63/14 63/23 63/16 63/19 64/6 64/16 64/19 64/23 65/4 65/10 65/23 66/5 66/8 66/23 69/13 70/7 70/7 70/25 71/1 72/18 74/2 75/6 75/13 75/13 76/9 76/10 76/15 76/25 77/12 78/17 78/18 79/5 81/10 83/17 83/17 84/2 84/7 84/10 84/11 85/21 86/19 87/6 87/10 88/11 93/3 95/3 98/14 99/3 102/10 102/21 105/11 106/14 107/19 109/20 110/2 113/3 113/6 115/6 116/11 118/3 118/25 120/5 124/13 128/14 130/17 131/7 131/19 132/16 133/14 136/8 138/7 138/12 139/20 139/20 139/23 140/1 140/12 141/3 141/23 142/10 143/10 143/17 145/11
**area [4]** 87/4 90/7 112/19 141/14
**aren't [2]** 47/6 140/21
**Arm [1]** 88/25
**Army [1]** 121/18
**around [6]** 25/15 31/5 35/2 48/17 96/19 125/7
**arrested [2]** 106/25 107/6
**art [2]** 47/8 89/15
**articles [1]** 140/16
**artillery [2]** 121/19 121/22
**artist [1]** 47/7
**arts [1]** 46/12
**as [128]** 2/4 9/5 9/12 9/20 10/9 13/13 13/15 13/19 13/21 13/24 13/25 14/2 14/11 14/16 14/20 15/22 16/4 18/22 18/25 19/3 20/5 20/14 21/3 21/16 21/18 21/23 22/9 22/21 22/23 23/1 23/6 23/16 23/22 24/7 24/25 24/25 25/1 25/23 26/8 30/18 31/1 31/9 34/2 34/22 34/23 36/3 36/10 36/14 38/18 40/8 40/15 41/20 42/1 43/23 44/14 45/7 45/12 48/5 48/5 50/2 50/24 50/24 53/16 53/19 53/23 55/7 55/15 58/21 59/6 59/8 62/8 64/16 64/20 65/20 65/24 71/11 71/16 71/17 74/19 74/23 77/11 78/7 78/10 78/25 80/13 81/1 84/4 84/21 85/2 86/17 88/12 89/3 92/10 95/3 97/5 97/12 104/16 107/8 108/15 108/15 110/5 110/7 110/19 110/23 110/23 111/14 111/15 115/13 115/14 115/19 115/22 115/24 119/19 119/11 119/11 121/9 127/22 128/21 130/14 136/7

**137/20 139/21 140/1 141/11 143/18 143/18 144/6**
**ascribe [1]** 80/3
**Asian [2]** 18/17 114/9 114/15
**Asians [1]** 114/13
**aside [3]** 13/18 14/7 64/18
**ask [18]** 9/3 9/16 16/19 17/1 26/19 39/23 66/20 72/7 82/23 88/8 88/13 91/4 124/14 124/21 125/22 126/23 127/16 135/10
**asked [9]** 9/18 24/5 24/5 33/16 38/17 38/17 63/11 108/15 134/16
**asking [4]** 10/9 12/8 97/9 138/14
**asks [1]** 39/22
**asleep [3]** 98/21 98/22 99/5
**aspect [1]** 73/17
**assault [2]** 115/19 125/5
**assaulted [7]** 87/22 95/25 106/24 115/14 118/5 118/9 118/20
**assemble [2]** 25/8 82/25
**assembling [1]** 83/3
**assembly [1]** 141/14
**assess [1]** 42/3
**assessment [2]** 65/11 136/18
**assistance [4]** 132/16 132/18 133/18 133/21
**assistant [5]** 11/8 14/24 91/22 91/23 99/22
**associate [2]** 19/11 19/14
**associate's [2]** 56/1 82/1
**associated [2]** 19/12 19/15
**associates [29]** 12/3 12/6 12/12 15/2 15/8 15/11 15/20 15/24 16/1 16/8 16/10 17/10 17/12 17/17 17/24 18/3 18/7 18/12 18/14 18/22 20/13 33/18 44/2 56/9 87/17 95/24 107/17 118/2 125/2 127/25
**associations [1]** 15/9
**assume [5]** 10/14 75/4 76/18 79/5 79/12
**assure [1]** 65/12
**Atlanta [3]** 67/19 68/2 73/16
**attack [1]** 143/3
**attacked [1]** 34/23
**attend [1]** 129/12
**attendance [2]** 129/6 132/9
**attended [3]** 19/12 19/14 19/22
**attending [2]** 54/17 127/7
**attention [5]** 22/19 33/15 42/20 85/25 140/19
**attorney [9]** 14/23 15/4 15/4 15/13 15/13 16/3 81/9 134/3 136/4
**attorney's [2]** 14/25 81/9
**attorney-client [1]** 136/4
**attorneys [3]** 11/9 14/24 23/10
**attributes [2]** 18/19 114/11
**audible [1]** 50/9
**Audio [1]** 109/5

**A**

**AUGUST [1]** 1/12
**automatically [2]** 71/21 72/16
**available [1]** 23/3
**Avenue [1]** 19/10
**avoid [5]** 36/1 41/20 86/9 141/6 143/4
**avoiding [1]** 142/8
**aware [4]** 35/25 43/25 45/2 126/11
**awareness [1]** 127/5
**away [9]** 34/6 34/8 35/13 35/14 41/23 78/22 86/5 110/15 127/6

**B**

**bachelor's [6]** 46/9 46/11 56/1 56/1 120/15 120/17
**back [24]** 9/22 9/25 17/14 25/5 25/9 26/7 26/20 72/11 73/16 74/4 74/18 75/9 86/22 88/17 93/17 99/15 101/3 101/20 102/11 105/14 129/17 135/15 139/5 139/14
**background [5]** 32/9 46/7 81/25 89/7 120/14
**backing [1]** 16/25
**bad [4]** 53/5 53/8 64/6 103/14
**badge [1]** 70/4
**bail [1]** 16/6
**balls [1]** 139/1
**Baltimore [13]** 1/25 12/9 19/10 43/18 89/3 89/4 89/16 94/7 101/1 111/19 111/20 111/21 144/21
**bank [7]** 59/10 84/15 84/16 84/19 84/20 84/21 84/22
**banker [1]** 59/6
**banking [1]** 59/5
**bargain [1]** 134/6
**bargaining [7]** 132/23 132/25 133/2 133/15 133/21 134/8 134/15
**bargains [1]** 133/16
**Barron [1]** 14/22
**bartending [1]** 53/1
**base [1]** 57/1
**based [22]** 18/20 18/24 19/2 19/6 22/24 28/16 71/19 73/11 78/11 78/12 85/7 85/8 86/16 97/6 97/14 114/12 114/20 114/21 127/5 129/22 131/18 138/14
**bases [1]** 128/23
**basic [1]** 72/11
**basically [2]** 75/5 95/13
**basis [3]** 41/10 123/17 128/22
**BCPD [1]** 12/24
**be [223]**
**beach [3]** 113/12 113/14 113/15
**Bear [11]** 32/16 36/21 39/2 51/25 54/20 60/23 72/23 82/5 90/12 124/3 126/6
**became [1]** 125/12
**because [48]** 20/17 21/4 25/5 26/21 34/7 34/8 36/13 40/23 41/14 48/6 66/2 67/7

68/4 69/18 71/22 72/14 72/17 73/12 73/15 77/4 78/13 83/7 84/13 91/5 96/12 97/16 99/5 99/8 101/21 101/25 103/18 105/14 105/16 107/22 108/18 108/19 109/3 109/9 110/24 119/15 123/18 123/25 124/1 128/23 130/2 135/3 136/8 142/22
**Becca [2]** 29/14 87/8
**been [100]** 8/18 9/7 15/2 15/11 16/1 16/10 16/13 17/10 17/21 17/24 17/25 17/25 18/13 18/4 18/4 18/7 18/12 18/15 18/15 19/12 19/12 19/15 19/15 21/5 31/1 32/4 33/18 35/2 38/22 40/9 40/10 44/2 44/10 45/16 45/23 48/12 48/25 49/4 51/5 52/25 53/21 56/9 56/23 58/16 58/17 58/24 60/8 61/25 62/1 62/4 62/14 64/10 66/14 66/17 68/19 81/3 81/12 83/23 84/6 84/11 84/20 85/17 86/17 87/17 89/5 89/17 91/13 92/24 93/5 95/24 98/24 101/21 106/5 106/24 107/13 107/17 112/2 112/5 112/6 115/5 118/2 118/25 120/11 123/7 123/15 125/2 125/4 125/7 126/11 127/25 128/1 130/4 131/1 131/12 133/25 139/19 140/8 141/12 141/24 144/1
**before [16]** 1/11 25/25 31/11 34/13 34/14 34/15 45/24 46/14 49/21 66/15 77/6 85/19 105/9 117/23 132/7 138/4
**begin [4]** 10/6 10/6 24/11 25/10
**begins [1]** 25/2
**BEHALF [1]** 1/15 1/17
**behind [3]** 25/7 87/7 107/2
**being [1]** 38/12 38/24 42/20 43/7 71/5 84/8 98/8 101/6 126/2 141/25 144/4
**beliefs [9]** 18/18 18/22 18/25 20/18 74/19 97/5 97/12 114/9 128/8
**believes [1]** 63/18
**belong [2]** 20/7 20/13
**bench [46]** 29/11 30/1 32/19 33/4 36/24 37/4 39/5 42/12 43/3 47/18 47/25 52/3 52/10 54/22 55/3 61/1 61/7 73/1 74/1 82/9 82/17 88/6 88/10 90/5 94/16 94/23 97/22 98/2 102/4 102/9 104/12 106/8 113/19 114/1 116/4 116/9 122/14 122/20 124/7 124/12 125/16 125/21 126/19 127/14 139/2
**BENDANN [14]** 1/7 11/2 11/14 11/25 12/2 12/4 129/8 129/20 131/12 132/4

132/15 136/2 142/20 144/13
**best [5]** 17/3 71/10 138/5 138/9 138/11
**better [3]** 10/12 34/1 61/18
**between [3]** 8/25 28/11 132/24
**beverage [2]** 52/20 53/9
**beyond [13]** 21/7 21/11 64/1 64/10 64/11 67/2 76/13 77/7 78/3 105/24 114/23 119/5 128/14
**bias [1]** 108/2
**biases [1]** 79/10
**big [3]** 60/22 62/21 91/25
**billing [1]** 121/19
**bit [10]** 16/17 34/4 56/24 61/18 63/14 79/21 83/8 98/12 105/2 106/11
**Bizzle [1]** 118/4
**blatant [1]** 114/20
**blocking [1]** 25/13
**blogs [1]** 23/6
**blood [1]** 38/20
**bloody [3]** 39/8 40/8 40/15
**bodily [1]** 81/7
**body [3]** 34/19 39/15 39/17
**boiled [2]** 143/12 143/13
**bombed [1]** 114/14
**bond [1]** 89/3
**book [1]** 86/25
**bookkeeper [1]** 53/18
**books [1]** 23/17
**born [1]** 107/23
**both [8]** 19/8 55/23 66/3 128/2 133/12 135/6 135/10 136/4
**bottled [1]** 144/20
**bottom [3]** 67/8 78/24 119/20
**box [8]** 11/6 11/14 11/23 25/10 26/5 26/7 82/25 99/9
**boys [4]** 62/11 63/15 65/22 67/17
**Branch [1]** 121/6
**bread [1]** 143/5
**break [4]** 17/18 68/15 75/22 103/6
**breaking [1]** 62/19
**BREDAR [2]** 1/11 10/10
**bridge [1]** 28/7
**brief [11]** 14/18 14/19 62/6 62/7 101/4 101/16 115/10 115/11 123/11 125/8 127/20
**briefly [1]** 130/1
**bring [8]** 26/7 30/4 57/3 79/11 86/25 87/1 139/1 145/4
**bringing [1]** 78/9
**broken [3]** 17/17 48/13 118/7
**brother [2]** 107/25 108/13
**brought [11]** 8/18 9/22 25/5 26/5 85/23 85/24 101/19 108/11 108/13 131/14 139/14
**budget [2]** 58/11 58/22
**Budgeting [1]** 60/3
**Build [1]** 50/14
**building [5]** 37/9 43/7 50/12 88/15 117/11
**bumped [2]** 31/17 135/1
**bumping [1]** 31/20

**burden [5]** 64/22 65/6 76/12 110/9 119/12
**bus [5]** 95/25 96/7 96/8
**business [8]** 46/3 50/23 51/1 53/9 53/19 54/5 89/10 129/25
**butter [1]** 143/19
**bypass [1]** 85/17
**Byram [2]** 12/25 13/9

**C**

**Caesar [1]** 144/7
**CALISTA [3]** 1/19 13/2 13/10
**call [13]** 2/3 2/4 37/10 37/11 37/12 37/14 37/15 74/4 78/17 98/6 99/14 102/11 105/20
**called [12]** 8/12 36/9 41/6 62/21 68/24 68/25 84/7 84/14 84/20 130/3 132/23 140/8
**calling [2]** 72/3 130/21
**calls [1]** 107/1
**came [2]** 93/17 141/16
**camping [1]** 125/9
**can [66]** 8/13 17/7 17/12 17/15 25/13 26/16 26/25 29/12 29/13 29/13 29/14 33/22 33/22 33/25 34/1 34/17 38/3 38/3 39/17 41/2 45/6 48/6 48/7 56/11 57/3 57/8 61/17 66/7 66/20 67/8 67/11 71/25 72/19 76/24 77/5 77/9 77/15 77/21 78/6 78/6 83/1 85/3 87/1 87/21 88/13 88/17 94/7 98/4 98/12 99/8 102/13 104/15 104/16 106/19 125/5 125/25 127/12 129/4 129/8 130/1 130/14 141/15 142/4 142/5 144/23 144/24 145/14
**can't [9]** 44/20 85/18 91/4 99/4 104/1 106/2 107/19 127/9 140/25
**candid [2]** 65/11 115/7
**candidate [1]** 139/21
**candor [1]** 63/10
**cannot [2]** 20/24 44/19 84/12
**capable [1]** 105/23
**capacity [2]** 42/21 77/10 78/8
**car [17]** 17/17 18/38 38/3 48/13 49/6
**cardio [2]** 142/25 143/2
**cardiodiet [1]** 143/13
**care [5]** 67/16 90/1 109/9 123/4 143/17
**career [4]** 53/1 53/9 53/15 53/23
**carefully [5]** 9/6 12/17 16/18 21/9 134/13
**caring [1]** 89/23
**Carolina [3]** 57/13 57/18 113/8
**carries [1]** 76/12
**carry [1]** 133/6
**cars [1]** 32/15
**cart [3]** 24/17 24/20 25/15
**carton [1]** 143/6
**case [144]** 8/20 8/21 9/6 10/11 11/1 11/2 11/3 11/4 11/10 11/25 12/16 13/17 13/20 13/24 14/3 14/6

14/12 14/16 14/18 14/21 18/9 18/10 18/17 19/3 19/8 20/5 20/21 21/3 21/16 22/21 22/23 22/24 23/10 23/10 23/16 23/20 23/22 24/7 27/20 33/16 36/6 36/10 37/6 38/19 40/7 43/24 45/1 48/22 50/3 56/7 56/23 56/24 58/2 59/21 62/6 62/9 64/1 64/16 64/21 65/20 67/2 69/10 69/10 71/16 71/21 72/14 73/17 73/21 74/23 76/15 77/22 78/2 78/25 80/5 84/2 84/5 84/10 84/14 84/15 84/15 84/21 84/22 84/23 84/24 84/24 85/7 86/3 86/3 86/4 86/14 87/15 88/12 100/22 101/4 101/23 107/15 108/15 108/19 111/17 114/9 115/11 115/14 117/24 118/21 119/14 119/15 119/16 119/17 124/17 126/1 126/9 127/21 127/23 128/11 128/22 131/21 132/14 132/15 132/23 133/24 134/10 134/19 136/19 137/6 137/12 139/8 139/15 139/21 139/22 139/23 139/25 140/1 140/5 140/13 140/17 141/3 141/7 141/8 141/19 141/20 141/25 142/1 142/2 142/2 **cases [2]** 13/16 27/14 27/17 60/5 132/22 133/14
**cash [1]** 44/13
**catch [1]** 115/1
**catchall [1]** 24/2
**categorize [1]** 40/15
**category [1]** 81/5
**Catholic [1]** 125/8
**cause [23]** 32/25 37/2 37/17 39/24 41/5 42/25 43/1 43/8 73/7 73/25 88/8 97/25 102/7 106/6 107/9 110/2 110/10 114/20 116/7 124/9 125/19 127/4 127/12 **CDF [2]** 143/9 143/10
**cell [2]** 23/12
**center [1]** 110/6
**certain [3]** 64/17 77/18 104/15
**certainly [6]** 76/15 104/14 105/21 123/1 124/5 134/5
**CERTIFICATE [1]** 145/16
**certified [2]** 28/18 146/4
**certify [1]** 146/6
**cetera [3]** 71/12 74/24 84/17
**chair [1]** 91/5 98/13
**challenge [1]** 106/11
**chambers [1]** 129/18
**chance [3]** 82/22 83/19 86/11
**change [3]** 20/7 94/10 142/3
**changed [1]** 131/10
**changes [1]** 129/17
**channel [6]** 29/17 32/17 36/22 39/3 42/11 47/16
**charge [1]** 77/1
**charged [2]** 8/22 87/2
**charges [10]** 9/3 36/6 65/20 65/23 84/11 118/19

**C**

**charges...** **[4]** 133/4 133/9 133/10 139/23
**charging** **[1]** 126/12
**Charlotte** **[2]** 13/4 13/11
**check** **[10]** 21/13 21/14 26/8 29/14 29/14 29/14 85/15 85/20 86/21 88/12
**checked** **[2]** 139/13 139/13
**checks** **[2]** 80/8 80/9
**chicken** **[3]** 143/11 143/22 144/7
**child** **[13]** 8/23 8/23 34/16 77/13 81/14 81/19 87/25 106/25 107/1 107/7 115/14 115/19 123/16
**childcare** **[3]** 109/3 109/16 110/6
**children** **[27]** 19/1 20/11 20/19 46/20 60/14 63/1 63/3 63/16 63/19 64/6 69/13 73/13 73/22 74/20 74/21 74/24 75/13 75/16 76/16 76/19 89/19 97/5 97/12 109/19 115/15 128/9 140/9
**cholesterol** **[1]** 143/4
**choose** **[1]** 20/22
**Chris** **[1]** 12/23
**CHRISTOPHER** **[8]** 1/7 1/17 11/12 11/14 11/17 11/25 12/1 13/7
**circuit** **[1]** 12/9
**circumstances** **[5]** 119/15 127/7 129/22 132/8 134/20
**citizens** **[3]** 63/11 64/18 85/2
**City** **[4]** 19/11 28/12 101/1 144/21
**civil** **[1]** 13/16
**claim** **[1]** 81/8
**claims** **[2]** 81/1 81/6
**clarify** **[1]** 38/11
**clarifying** **[1]** 39/22
**classroom** **[1]** 109/19
**Clean** **[1]** 122/7
**clear** **[5]** 33/10 86/7 86/12 87/9 99/18
**cleared** **[8]** 49/4 95/22 101/7 106/24 107/13 114/4 115/5 125/4
**clearly** **[1]** 127/1
**clerk** **[12]** 2/3 12/7 12/13 24/18 24/21 30/3 33/6 43/6 48/2 99/22 100/7 114/19
**clerk's** **[2]** 16/4 100/9
**client** **[7]** 135/18 136/2 136/4 136/9 136/18 137/5 137/10
**client's** **[1]** 129/6
**clipboard** **[3]** 24/19 24/19 25/15
**close** **[26]** 12/6 15/9 18/7 19/11 19/14 20/7 25/4 34/5 34/24 35/15 35/20 43/12 44/9 48/5 52/14 55/15 74/11 87/17 91/5 95/24 98/13 105/20 107/12 109/6 118/2 118/12
**closed** **[1]** 142/17
**closer** **[5]** 26/7 33/23 36/16 61/15 112/3
**closest** **[23]** 12/12 15/2

15/7 15/11 15/20 15/24 16/1 16/8 16/10 17/10 17/21 17/24 18/3 18/12 18/14 19/22 20/12 33/18 44/2 56/9 107/17 125/2 127/25
**clothes** **[1]** 73/23
**coercion** **[1]** 96/14
**Cohen** **[3]** 25/4 25/6 82/23
**colleague** **[1]** 117/20
**COLLEEN** **[2]** 1/15 11/9
**college** **[3]** 51/8 53/12 120/17
**color** **[3]** 18/18 114/10 123/22
**Columbia** **[2]** 45/10 113/7
**combination** **[2]** 58/14 58/15
**come** **[9]** 25/8 63/11 72/11 83/5 88/17 112/15 139/2 139/6 139/12
**comes** **[1]** 103/17
**comfortable** **[3]** 42/18 107/12 109/8
**coming** **[4]** 64/16 101/20 118/6 126/12
**commences** **[1]** 132/20
**comment** **[2]** 9/15 132/5
**comments** **[1]** 135/23
**commercial** **[1]** 30/18
**commission** **[2]** 8/22 111/2
**committing** **[1]** 18/1 18/5 128/2
**common** **[1]** 133/1
**communicate** **[1]** 23/4 136/1 136/9
**communicated** **[2]** 134/1 134/3
**communication** **[2]** 23/8 120/16
**commute** **[2]** 93/12 120/3
**company** **[5]** 15/21 15/22 47/4 89/16 112/12
**competent** **[1]** 100/14
**complete** **[1]** 22/20
**completed** **[1]** 139/7
**completely** **[3]** 30/15 69/9 101/11
**compliance** **[1]** 80/6
**complied** **[1]** 59/16
**compliments** **[1]** 102/15
**comply** **[3]** 23/23 23/24 59/17
**compromising** **[1]** 42/4
**computer** **[3]** 1/22 23/12 120/17
**Computer-aided** **[1]** 1/22
**concentration** **[2]** 103/10 103/17 105/8
**concern** **[5]** 41/20 41/24 73/17 104/25 106/3
**concerned** **[2]** 39/1 126/24
**concerning** **[1]** 20/2
**concerns** **[6]** 20/18 104/14 105/13 105/18 128/8 137/14
**concluded** **[23]** 30/1 33/4 37/4 42/12 43/3 47/25 52/10 55/3 61/7 74/1 82/17 88/10 90/23 94/23 98/2 102/9 106/8 114/1 116/9 122/20 124/12 125/21 127/14
**conclusion** **[2]** 73/10

137/25
**concrete** **[1]** 50/14
**condition** **[1]** 22/18
**conduct** **[13]** 17/24 18/3 19/25 23/14 35/16 48/25 86/14 128/1 128/5 129/24 132/12 137/9 141/8
**conducted** **[4]** 105/1 106/1 137/17 138/1
**conference** **[46]** 29/10 30/1 32/18 33/4 36/23 37/4 39/4 42/12 43/3 47/17 47/25 52/2 52/10 54/21 55/3 60/25 61/7 72/25 74/1 82/8 82/17 88/5 88/10 90/14 90/23 94/15 94/23 97/21 98/2 102/3 102/9 104/11 106/8 113/18 114/1 116/3 116/9 122/10 122/20 124/6 124/12 125/15 125/21 126/18 127/14 146/10
**conferring** **[1]** 135/14
**confidence** **[1]** 41/2
**confidential** **[2]** 135/16 135/21
**conflict** **[1]** 109/21
**conformance** **[1]** 146/10
**confusion** **[2]** 130/4 130/25
**Congratulations** **[2]** 60/18 75/18
**connected** **[2]** 12/8 52/24
**consequences** **[2]** 65/16 133/7
**consideration** **[1]** 140/19
**considered** **[4]** 20/24 84/4 84/8 141/25
**considering** **[3]** 22/20 23/2 36/18
**consistent** **[2]** 25/24 144/3
**constantly** **[1]** 131/8
**Constitution** **[2]** 132/17 136/11
**constitutional** **[4]** 20/23 134/6 134/7 134/8
**constitutionally** **[2]** 136/8 137/3
**construction** **[2]** 50/8 51/21
**consult** **[3]** 23/16 86/17 141/10
**contact** **[1]** 86/9 86/12 141/6
**contacts** **[1]** 74/15
**contain** **[1]** 133/3
**contained** **[1]** 16/21
**context** **[3]** 42/16 65/13 77/11
**continue** **[1]** 83/19
**continuing** **[1]** 137/10
**control** **[2]** 103/25 112/13
**conversation** **[2]** 135/16 135/22
**convey** **[1]** 137/10
**conveyed** **[1]** 134/21
**convicted** **[13]** 17/25 18/4 18/13 18/15 33/19 49/7 56/10 87/18 107/18 108/2 108/3 128/2 133/9
**conviction** **[1]** 108/6
**convince** **[1]** 64/9
**convinced** **[2]** 96/10 96/12
**cook** **[1]** 113/12
**coordinator** **[3]** 59/7 59/9

59/16
**cop** **[2]** 79/12 80/14
**coping** **[2]** 50/16 50/19
**cordon** **[1]** 25/12
**corner** **[2]** 83/10 87/7
**correct** **[41]** 27/23 30/9 30/13 30/14 31/23 32/1 33/21 38/2 38/5 38/14 43/20 43/21 46/16 50/7 52/16 52/17 52/22 58/6 62/12 62/17 64/13 68/14 69/14 70/12 88/22 88/23 88/24 91/8 100/3 100/11 100/13 101/2 101/10 111/8 111/11 111/12 111/24 129/1 129/15 129/16 146/7
**corrected** **[1]** 30/15 85/12 102/24
**correction** **[1]** 74/16
**correctly** **[3]** 63/4 115/16 117/6
**Cosi** **[1]** 144/6
**could** **[19]** 36/10 40/21 42/2 55/15 65/23 66/20 70/3 71/4 71/17 77/21 78/19 78/25 112/3 119/22 126/23 126/23 131/19 131/20 144/15
**counsel** **[22]** 11/5 11/12 11/13 11/22 36/24 55/20 83/3 88/21 95/21 127/19 128/24 129/20 130/16 131/21 132/16 133/21 134/13 134/22 135/7 135/14 139/2 145/10
**count** **[1]** 64/18
**countertops** **[1]** 51/24
**country** **[2]** 66/8 67/3
**County** **[7]** 12/10 31/5 48/19 49/13 49/14 111/20 111/21
**couple** **[6]** 39/17 75/10 95/8 103/6 107/14 124/22
**coupled** **[1]** 110/6
**course** **[6]** 70/8 76/9 101/12 105/6 119/3 132/15
**court** **[54]** 1/1 10/2 12/7 12/7 12/9 12/12 12/13 12/14 13/17 14/5 16/2 16/4 21/18 22/8 22/15 25/12 26/25 39/25 43/15 44/21 44/22 61/20 63/23 66/11 70/17 84/7 84/20 99/23 99/24 100/1 100/2 117/9 118/18 127/8 129/9 132/7 132/11 132/18 132/22 133/17 133/19 137/17 139/6 139/19 140/13 140/14 141/24 142/21 142/22 145/7 145/12 145/14 146/5
**court's** **[3]** 21/17 105/13 110/9
**court-related** **[1]** 16/4
**courtroom** **[44]** 8/18 9/20 9/21 9/22 9/25 22/25 24/14 25/3 25/6 25/9 25/22 26/22 30/3 33/5 48/2 52/12 55/5 61/9 82/18 82/23 82/24 83/2 83/5 83/10 83/14 83/22 83/25 83/25 85/18 86/10 86/22 87/4 90/25 94/25 100/4 102/15 102/21 114/3 114/22 122/22 135/9 139/14 142/16 142/16

**courts** **[1]** 20/3
**cousin** **[4]** 34/6 35/18 35/20 35/20
**cover** **[1]** 43/12
**coverage** **[1]** 142/8
**CP** **[1]** 107/6
**cr** **[1]** 1/5
**craftsman** **[1]** 50/21
**cream** **[1]** 44/3
**credit** **[2]** 10/15 111/23
**crime** **[21]** 17/11 17/22 18/1 18/5 18/13 18/16 20/13 33/19 44/3 44/10 48/13 56/10 62/15 87/18 95/24 107/18 107/23 108/1 118/3 125/3 128/2
**crimes** **[16]** 8/22 18/25 20/19 20/20 63/1 63/3 63/16 63/19 64/6 63/6 69/13 74/19 97/5 97/12 128/9 128/10
**criminal** **[29]** 1/5 8/20 13/16 16/3 17/24 17/25 18/3 18/4 18/8 19/23 20/3 20/8 20/8 43/24 48/25 55/19 55/22 55/23 56/2 69/10 84/8 84/9 128/1 132/21 133/14 139/21 140/13 141/25
**critical** **[4]** 80/11 80/12 80/17 103/18
**critically** **[2]** 72/19 72/21
**crochet** **[1]** 90/5
**Crofton** **[1]** 52/18
**cross** **[2]** 70/22 71/4
**cross-examination** **[2]** 70/22 71/4
**crowd** **[1]** 83/8
**CRR** **[2]** 1/23 146/16
**cumulatively** **[1]** 110/8
**cup** **[2]** 144/23 144/24
**currently** **[3]** 47/12 60/20 95/3
**custody** **[1]** 142/18
**cut** **[1]** 135/4
**cybersecurity** **[1]** 120/19
**cyberstalking** **[1]** 8/24 123/16

**D**

**dad** **[2]** 29/7 107/22
**Dame** **[1]** 120/17
**data** **[3]** 120/9 120/10 120/11
**Dated** **[1]** 146/12
**dates** **[1]** 8/25
**daughter** **[8]** 60/15 95/5 95/25 96/20 99/22 100/20 102/14 121/19
**day** **[18]** 1/7 11/12 66/20 77/13 78/8 98/19 98/20 98/21 99/9 103/7 104/2 109/22 109/23 131/15 131/24 139/6 141/3 146/12 144/11
**days** **[3]** 24/25 112/20 144/11
**dead** **[1]** 86/24
**deal** **[1]** 60/4
**dealings** **[4]** 11/11 11/19 11/20 12/1
**DeAnna** **[3]** 13/1 13/9
**December** **[1]** 120/24
**December 14th** **[1]** 120/24
**decide** **[8]** 8/20 21/16 22/24 63/24 63/25 71/18

**D**

**decide... [2]** 72/19 72/22
**decided [1]** 96/5
**decision [5]** 21/1 101/19
129/21 131/13 142/21
**Decree [1]** 46/18
**deep [2]** 83/7 83/12
**deeply [1]** 101/12
**defendant [48]** 1/8 1/17
8/21 9/2 11/13 11/23 11/24
12/1 18/17 19/9 20/22 21/4
21/6 21/10 26/2 29/23
32/23 47/22 52/7 65/7 65/7
105/9 113/23 114/8 114/21
119/1 127/9 128/13 131/5
133/3 133/4 133/8 133/8
133/17 133/25 134/2 134/3
134/10 134/18 137/19
139/24 142/18 144/1 144/2
144/11 145/1 145/2 145/10
**defendant's [5]** 21/1 37/17
114/21 127/7 129/23
**defender [1]** 16/2 16/3
**defense [4]** 16/3 18/8 43/8
134/21
**define [1]** 15/8
**degree [2]** 82/1 89/8
**degrees [2]** 55/20 55/23
**Delaware [2]** 28/15 28/17
**delay [1]** 126/25
**delayed [1]** 126/15
**deliberations [6]** 13/24
14/2 14/11 14/16 20/25
61/23
**delightful [1]** 144/9
**deliver [1]** 78/25
**demonstrate [2]** 119/4
143/25
**Denton [1]** 58/7
**depart [14]** 37/6 43/5
88/13 98/3 99/14 106/20
106/20 110/3 116/11
116/13 124/19 125/25
141/14 142/15
**department [8]** 15/3 15/12
16/6 27/7 58/18 60/1 72/15
101/1
**departure [1]** 77/10
**depend [1]** 77/10
**depending [1]** 130/2
**depends [1]** 103/11
**depict [7]** 39/9 39/13
40/11 40/12 40/12 40/13
77/20
**depicted [1]** 42/3
**depiction [1]** 77/20
**deputy [2]** 111/1 111/15
**describe [4]** 17/13 40/8
78/6 100/12
**described [8]** 40/21 65/24
66/25 77/11 86/6 110/17
119/11 145/1
**describes [1]** 21/18
**describing [2]** 41/7 41/16
**description [10]** 14/18
14/19 62/6 62/7 101/4
101/16 115/10 115/11
123/11 127/21
**desktop [1]** 23/13
**despite [2]** 38/12 119/21
**destination [1]** 24/17
**detail [2]** 17/19 34/17
**details [3]** 78/7 84/12
108/9

**detective [3]** 12/24 13/8
27/10
**detention [2]** 144/2 144/4
**determining [1]** 78/2
**development [1]** 54/6
**develops [1]** 71/11
**device [1]** 23/13
**devices [1]** 87/3
**DF [2]** 12/24 13/8
**diagnosis [1]** 102/24
**dictionaries [2]** 23/17
86/18
**dictionary [1]** 141/11
**did [54]** 25/23 31/11 34/23
34/24 35/21 36/19 43/20
44/5 48/18 49/7 49/9 49/20
57/12 58/21 58/23 59/4
59/6 59/17 63/4 67/15
67/18 67/24 90/3 90/7 90/8
90/9 92/17 93/18 93/24
93/25 96/20 96/21 103/1
103/13 105/16 108/5 108/6
110/20 110/20 110/20
115/16 118/18 120/22
121/1 134/23 135/5 135/21
136/1 136/20 136/21
137/12 137/21 142/7 145/5
**didn't [6]** 28/2 36/14
118/21 126/14 128/23
137/23
**Diesel [2]** 31/14 31/15
**diet [5]** 142/25 142/25
143/2 144/1 144/3
**dietary [1]** 144/8
**different [8]** 16/17 21/20
54/6 62/16 87/23 87/23
119/14 130/15
**difficult [29]** 13/23 14/1
14/10 14/15 14/19 18/20
18/23 19/1 19/5 22/19
36/17 43/23 48/21 50/2
61/22 62/8 63/1 74/24
74/25 77/18 97/6 97/13
108/25 114/11 115/12
115/21 119/10 123/16
127/22
**difficulty [3]** 22/6 101/5
106/4
**diploma [1]** 32/10
**dire [2]** 1/11 25/23
**direct [4]** 94/12 115/5
137/24 144/11
**directed [1]** 64/23
**direction [1]** 43/6
**directly [1]** 100/7
**director [2]** 31/24 89/15
**disability [1]** 105/22
**disagree [1]** 117/1
**disbelieve [1]** 71/21
**discharge [4]** 76/24 77/15
78/25 137/12
**discharged [1]** 136/10
**discipline [1]** 78/9
**disclosed [1]** 106/23
**disclosure [2]** 127/5
137/10
**discovering [1]** 110/16
**discuss [11]** 23/4 84/2
84/3 84/5 116/25 139/15
139/16 139/17 141/20
141/21 141/22
**discussed [1]** 69/14
**discussing [1]** 136/25
**discussion [1]** 134/21
**discussions [2]** 23/6

135/7
**dishonest [1]** 70/7
**disloyal [1]** 141/2
**display [1]** 41/4
**dispute [2]** 16/11 16/13
**disqualify [1]** 104/21
**distance [1]** 116/22
**distracted [1]** 42/21
**distraction [2]** 41/12
41/16
**distress [1]** 41/6
**district [10]** 1/1 1/1 12/14
12/14 14/23 14/24 100/2
117/9 146/5 146/6
**DIVISION [1]** 1/2
**divorce [2]** 46/18 120/25
**Divorced [1]** 120/21
**do [229]**
**doctor [1]** 60/20
**doctor's [1]** 121/19
**documents [1]** 22/9
**does [38]** 27/9 27/14 29/7
29/8 29/20 29/23 37/10
47/4 47/6 54/5 54/10 59/25
60/3 60/18 66/10 70/5 70/9
70/17 71/7 75/7 78/3 89/14
89/25 92/20 98/18 100/15
101/14 102/25 104/20
105/15 112/10 112/15
127/1 129/18 129/12 130/8
137/13 143/1
**doesn't [8]** 27/16 34/3
48/6 67/5 78/3 91/6 98/13
119/16
**dog [2]** 81/21 81/24
**doing [8]** 15/15 25/14
53/21 81/3 89/5 89/17
120/11 122/7
**don't [61]** 15/16 17/7
17/13 26/7 26/9 35/23 41/1
41/7 42/17 44/23 50/5
53/16 54/13 58/4 60/5 60/9
70/15 72/9 76/20 79/11
79/20 79/24 84/19 84/23
85/4 85/12 85/21 90/3
92/22 97/18 99/8 99/11
100/4 102/14 103/3 105/21
108/1 108/21 109/6 109/8
109/8 109/11 110/4 114/13
116/19 119/25 124/2 125/9
125/12 126/22 130/3
130/21 130/25 131/3
131/10 131/15 131/25
132/1 140/4 140/12 140/12
**done [6]** 53/10 63/10
112/2 130/12 131/1 131/23
**door [17]** 24/14 24/17
24/20 25/16 26/24 37/8
43/5 74/3 87/7 88/13 98/4
102/12 106/20 107/3
116/12 141/15 142/16
**doubt [11]** 21/7 21/11 64/1
64/10 64/12 67/3 76/13
77/7 78/3 119/6 128/14
**down [24]** 9/12 10/18
12/18 13/14 25/19 26/6
26/20 33/23 38/9 39/1 48/9
54/6 61/17 62/14 72/7
84/20 85/23 85/24 86/5
93/24 94/6 99/5 120/3
124/21
**downtown [2]** 84/14 89/4
**drank [1]** 142/23
**drawing [2]** 136/12 136/14
**dreading [1]** 76/2

**drive [2]** 38/3 95/13
**driver [3]** 30/18 31/1 95/25
**driving [1]** 31/18
**drop [2]** 25/15 102/13
**dropped [1]** 24/19
**during [22]** 10/11 23/3
23/14 40/7 42/19 77/18
98/18 103/16 104/25 105/5
110/4 121/1 129/14 132/15
132/22 133/19 134/11
134/19 135/19 139/10
143/17 145/3
**duties [1]** 76/25
**duty [13]** 57/6 75/4 78/25
79/6 79/13 79/15 79/16
79/17 86/24 137/9 137/12
139/17 141/24
**Dynamics [1]** 88/21

**E**

**each [7]** 9/2 9/7 9/13 17/3
83/13 85/3 119/15
**earlier [7]** 13/20 53/15
86/6 107/7 116/21 134/24
135/18
**early [1]** 129/4
**easily [1]** 94/7
**East [1]** 118/6
**easy [1]** 94/9
**eaten [1]** 142/23
**Edgewood [1]** 91/11
**education [1]** 51/7
**educational [5]** 32/9 46/6
81/25 89/7 120/14
**Edward [1]** 55/7
**effective [6]** 132/16
132/18 132/19 133/18
133/21 134/11
**effectively [1]** 110/5
**efficient [1]** 26/23
**eggs [2]** 143/12 143/13
**eight [3]** 13/15 32/6 123/8
**either [7]** 10/19 11/19
11/20 13/16 14/5 19/9
114/19
**elaborate [1]** 10/20
**elaboration [1]** 17/12
**elect [1]** 131/15
**electronic [2]** 23/13 87/3
**electronics [1]** 51/24
**elects [1]** 20/23
**Elkton [1]** 95/20
**else [16]** 23/5 24/4 35/15
38/16 55/18 85/5 85/9
95/17 104/2 138/4 138/20
138/22 140/5 141/2 141/4
145/8
**email [1]** 135/6
**emotions [2]** 76/3 76/20
**empirical [1]** 133/13
**employed [7]** 13/1 15/2
15/12 16/1 19/9 19/12
19/15
**employee [2]** 51/3 84/16
**employees [1]** 14/25
**employers [3]** 139/18
139/25 140/10
**employment [1]** 117/5
**encourage [1]** 87/5
**encyclopedia [1]** 141/11
**encyclopedias [2]** 23/17
86/17
**end [17]** 17/4 21/15 66/20
66/21 67/5 67/7 72/6 77/13
78/2 78/8 79/1 85/6 120/23

123/12 130/2 138/4 139/6
**endeavor [1]** 134/15
**ended [2]** 46/17 118/20
**enforce [1]** 119/10
**enforcement [19]** 15/5
15/14 16/11 16/12 16/14
16/15 20/16 20/17 63/7
69/17 69/18 69/25 70/10
71/2 71/5 72/13 72/18 75/3
79/7
**engage [1]** 78/1
**engineering [2]** 46/12
113/10
**English [4]** 22/7 22/12
22/12 120/16
**enjoying [1]** 75/22
**enjoys [1]** 119/1
**enough [3]** 40/5 103/24
130/6
**enrolled [1]** 113/7
**entered [1]** 9/2
**entertain [1]** 141/2
**entirely [2]** 40/14 131/18
**entitled [5]** 132/16 133/18
133/20 134/10 146/9
**equipped [1]** 66/24
**Erek [1]** 14/22
**Eric [2]** 13/1 13/9
**escorting [1]** 95/16
**especially [1]** 109/9
**ESQUIRE [4]** 1/15 1/16
1/17 1/18
**essential [1]** 84/25
**essentially [1]** 34/22
**estate [1]** 88/20
**estimate [1]** 135/2
**estranged [1]** 54/10
**et [3]** 71/12 74/24 84/17
**evaluate [3]** 77/23 80/20
80/21
**evaluating [1]** 78/10
**even [13]** 20/24 21/17 35/8
71/2 77/11 77/12 107/23
130/20 130/21 133/7 140/5
143/18 144/23
**evening [5]** 83/12 83/21
137/20 138/4 145/11
**event [2]** 97/1 97/17
**events [2]** 17/14 131/8
**eventually [2]** 28/21 28/22
**ever [33]** 11/3 11/4 15/2
15/11 15/20 16/11 16/10
16/13 17/10 17/21 17/24
18/3 18/7 18/12 18/15
19/22 27/16 33/18 44/2
44/16 48/12 48/25 56/9
62/14 81/12 87/25 93/5
95/24 107/17 118/2 125/2
127/25 134/1
**every [5]** 12/20 53/12
59/10 77/8 119/14
**everybody [4]** 76/18 79/17
101/25 104/2
**everyday [1]** 41/10
**everyone [1]** 79/10
**everything [1]** 103/17
**everywhere [1]** 28/16
**evidence [31]** 18/21 18/24
19/2 19/3 19/7 22/10 23/1
40/1 40/25 41/13 41/22
42/19 57/1 64/9 70/19
72/21 74/23 76/11 77/2
77/5 77/24 77/24 85/7 97/7
97/14 99/9 103/8 103/19
114/12 123/23 131/25

**E**

**ex [5]** 44/3 44/21 106/24 106/25 107/6
**ex-roommate [3]** 106/24 106/25 107/6
**ex-wife [2]** 44/3 44/21
**exactly [9]** 25/14 35/23 44/12 63/10 63/12 66/18 66/19 76/23 80/19
**examination [2]** 70/22 71/4
**example [2]** 103/12 104/25
**excited [1]** 76/2
**exclude [1]** 10/4
**excluded [4]** 43/16 57/4 88/18 102/21
**excuse [1]** 26/22 37/2 82/22 83/21 99/6 99/12 106/10 106/19 107/2 127/12 130/22
**excused [25]** 26/23 37/5 37/17 43/4 43/8 74/2 87/6 88/11 98/5 102/10 106/6 110/2 110/10 114/16 114/20 116/11 124/13 125/25 127/15 127/18 128/25 138/25 141/13 142/11 145/11
**excusing [1]** 107/9
**exercise [1]** 20/22
**exercises [1]** 129/13
**exhibits [3]** 23/1 41/5 42/2
**exit [1]** 37/9
**expect [4]** 39/7 39/9 41/17 131/21
**expectation [3]** 80/6 130/9 131/17
**expected [1]** 25/23
**expecting [1]** 73/20
**experience [16]** 13/22 13/25 14/10 14/14 34/12 43/22 44/24 50/1 56/22 58/1 59/19 61/22 68/8 69/8 78/16 138/15
**experiences [6]** 36/11 36/18 41/15 73/12 119/9 119/21
**expertise [1]** 133/12
**explain [2]** 9/17 107/5
**explaining [1]** 40/1
**explanatory [1]** 17/6
**exploitation [5]** 8/23 20/20 64/6 123/15 128/10
**explore [1]** 128/23
**explored [1]** 128/19
**exposed [3]** 40/10 41/10 140/16
**expressing [1]** 106/3
**expect [1]** 40/8
**extend [2]** 110/2 135/5
**extended [3]** 134/18 135/17 135/23
**extent [7]** 40/14 42/2 42/17 64/18 65/21 136/17 136/21
**external [2]** 86/17 141/10
**extremely [2]** 130/13 131/22
**eye [2]** 34/23 34/25
**eyes [1]** 30/19

**F**

**F-E-I-S-S [1]** 12/23

**face [4]** 11/6 11/13 11/23 33/24
**Facebook [2]** 23/7 86/2
**facilities [1]** 92/1
**facility [2]** 109/16 144/4
**facing [1]** 133/5
**fact [16]** 27/18 63/15 64/11 65/1 66/8 87/4 100/20 103/3 105/3 117/22 119/1 132/1 132/20 133/13 137/2 144/12
**facts [6]** 23/15 71/20 78/12 86/14 119/15 141/8
**failed [1]** 64/22
**fair [59]** 14/20 18/20 18/23 19/1 19/6 20/4 20/21 21/2 22/19 24/7 27/19 36/10 38/18 40/5 40/22 42/5 42/7 42/21 43/23 44/25 48/21 50/2 56/23 58/1 59/20 62/8 63/2 64/25 65/3 67/8 68/9 69/9 73/13 74/20 76/25 79/1 84/25 85/10 85/11 97/6 97/13 100/21 101/6 101/15 101/19 108/14 108/19 108/25 111/16 114/12 115/13 117/24 119/11 119/22 123/17 126/23 127/22 128/11 130/6
**fairly [2]** 36/20 54/9
**fairness [1]** 66/25
**fall [3]** 98/21 98/22 99/5
**falls [1]** 131/4
**false [2]** 107/24 108/11
**family [55]** 10/12 10/13 10/14 10/17 12/2 12/6 12/11 15/2 15/7 15/11 15/19 15/24 15/25 16/8 16/10 17/10 17/21 17/23 18/2 18/6 18/11 18/14 19/11 19/14 19/21 20/6 20/12 23/5 33/17 35/24 36/4 44/2 44/10 48/24 54/10 55/18 56/9 56/16 56/18 84/6 87/17 90/6 94/2 95/24 107/16 108/20 110/8 118/2 119/22 122/6 125/2 127/25 139/18 139/25 141/23
**fantastic [1]** 93/21
**far [8]** 26/6 26/8 39/20 39/21 86/16 86/19 93/12 110/23
**fast [2]** 97/11 104/15
**fast-moving [1]** 104/15
**father [4]** 108/11 110/16 110/18 110/20
**father's [1]** 111/13
**fault [2]** 105/22 107/2
**favorite [5]** 78/23 113/13 113/14
**FBI [6]** 1/19 12/25 12/25 13/1 13/2 72/15
**February [1]** 8/25
**February 3 [1]** 8/25
**fed [1]** 143/10
**federal [20]** 1/24 12/7 12/13 13/17 14/5 15/5 15/14 16/2 16/2 58/24 61/20 84/7 110/17 110/19 132/22 133/14 139/19 140/13 141/24 146/16
**feedback [2]** 105/7 109/5
**feel [2]** 80/17 86/25

**feelings [1]** 64/19
**Feiss [2]** 12/23 13/8
**fellow [2]** 9/25 84/16
**felt [2]** 34/19 78/20
**female [1]** 32/2
**ferret [1]** 71/1
**few [5]** 14/17 43/11 62/5 74/13 115/9
**fiancé [1]** 34/5
**field [1]** 45/18
**Fifteen [1]** 89/18
**fifth [3]** 25/21 76/1 81/15
**figure [3]** 64/21 70/17 92/17
**figured [1]** 76/21
**figures [1]** 92/5
**file [4]** 24/14 26/24 83/10 118/20
**filed [1]** 118/19
**files [1]** 39/12
**filing [3]** 83/9 118/21 135/4
**final [1]** 73/9
**finally [1]** 105/10
**finance [5]** 56/3 89/10 89/11 112/5 117/8
**financial [1]** 111/25
**find [6]** 25/15 64/15 114/16 128/14 132/2 135/21
**finding [1]** 42/18
**finds [2]** 21/7 21/11
**fine [7]** 45/7 74/16 74/17 102/22 114/19 116/22 143/21
**finish [1]** 50/19
**finished [3]** 52/11 83/17 120/19
**firm [5]** 11/16 11/18 11/19 11/21 15/22
**first [28]** 10/8 11/6 24/17 25/3 25/5 25/13 37/24 39/11 39/25 55/17 61/19 63/9 64/24 74/13 104/24 109/22 109/23 117/1 117/5 126/8 128/6 128/15 130/6 130/8 130/16 130/21 118/2 119/22 122/6 125/2 127/23 139/18 139/25 141/23
**five [3]** 25/3 25/6 98/25
**fix [1]** 92/9
**flat [1]** 140/3
**flight [2]** 94/10 94/12
**floor [7]** 1/24 85/15 85/19 86/21 139/12 141/4 141/13
**Florida [1]** 54/6
**focus [7]** 42/20 53/12 64/21 103/1 104/2 106/4 106/15
**focused [2]** 68/12 109/18
**focusing [1]** 107/8
**fodder [1]** 122/1
**follow [14]** 9/6 21/16 21/17 21/21 21/24 21/24 22/1 23/24 25/6 25/14 33/6 82/24 85/1 114/19
**followed [1]** 144/4
**following [25]** 12/15 29/10 32/18 36/23 37/13 39/4 47/17 52/2 54/21 60/25 72/25 82/8 88/5 90/14 94/15 97/21 102/3 104/11 113/18 116/3 122/13 124/6 125/15 126/18 142/6
**food [2]** 52/20 53/9
**forbidden [1]** 23/2

**force [1]** 96/15
**foregoing [1]** 146/7
**forgive [1]** 22/3
**forgiven [1]** 56/19
**forgot [1]** 57/12
**form [1]** 50/6
**format [1]** 146/9
**former [1]** 117/20
**forms [1]** 50/15
**forth [13]** 41/15 41/17 42/16 63/25 64/17 66/21 70/4 72/8 78/7 84/24 92/18 133/20 136/20
**forthright [1]** 130/5
**forum [1]** 65/16
**forward [2]** 135/4 144/2
**foster [1]** 123/4
**fouled [1]** 92/11
**found [5]** 49/20 62/24 110/24 110/24 133/17
**four [5]** 46/23 58/17 103/7 109/18 143/5
**fourth [8]** 25/21 54/15 85/15 85/19 86/21 139/12 141/4 141/13
**Frankfurt [1]** 28/16
**frankly [1]** 23/19
**fraud [4]** 84/15 84/19 84/21 84/22
**frauds [1]** 84/20
**Frederick [2]** 31/7 50/10
**free [2]** 86/25 102/12
**frequently [2]** 132/23 133/1
**Friday [13]** 22/17 37/10 37/12 37/14 37/15 74/4 88/12 98/6 99/15 102/11 130/22 138/10 138/17
**friends [10]** 12/3 20/7 23/5 69/25 84/6 94/3 94/4 122/8 139/17 141/22
**front [6]** 26/20 33/24 82/25 83/13 88/19 123/12
**Frye [3]** 132/12 137/17 138/1
**full [7]** 22/19 39/15 39/17 41/1 41/23 90/2 131/14
**full-body [1]** 39/15
**fully [2]** 102/24 131/12
**fun [3]** 32/12 90/4 122/5
**functions [1]** 15/22
**fundamentally [1]** 141/1
**funeral [1]** 31/24
**further [4]** 16/22 62/14 126/21 139/14

**G**

**G-O-D-I-N-E [1]** 13/3
**gallery [18]** 11/7 11/14 11/24 25/11 26/20 33/10 33/10 49/4 87/9 88/17 95/22 99/18 101/7 106/23 107/13 114/4 115/4 125/4 game [2]** 34/22 141/1
**games [2]** 32/13 32/14
**Garden [1]** 122/6
**GARY [3]** 1/18 11/15 11/16
**gave [5]** 62/13 71/15 101/4 107/13 123/11
**general [4]** 63/18 88/21 88/21 110/4
**General's [2]** 15/4 15/13
**generally [4]** 34/18 118/22 129/19 133/3
**genitalia [7]** 39/10 39/13

**39/14 39/16 40/11 77/19 78/14
**gentleman [1]** 62/18
**gentlemen [11]** 8/18 11/24 12/5 12/15 16/16 19/17 22/14 22/22 24/1 87/6 139/6
**Georgia [1]** 67/19
**get [30]** 10/12 28/20 29/17 34/24 38/15 40/4 40/24 43/6 43/20 49/7 60/9 67/6 83/20 92/5 92/11 92/18 93/15 94/7 97/4 100/24 106/2 109/18 109/20 129/3 129/4 129/4 130/24 131/2 138/6 144/24
**gets [5]** 70/20 95/14 129/17
**getting [8]** 38/24 38/25 47/13 53/6 53/16 82/22 84/18 105/7
**gigs [1]** 53/13
**Gilman [3]** 19/10 19/13 19/15
**girlfriends [1]** 94/2
**give [21]** 10/15 14/17 20/15 22/19 24/12 42/19 62/6 63/6 69/16 69/20 70/21 72/16 75/2 78/11 83/11 85/10 101/5 101/19 105/5 115/1 115/10
**given [5]** 37/23 107/7 130/11 131/5 134/3
**gives [1]** 104/25
**glasses [3]** 30/6 30/12 30/16 37/25 38/1 38/7 45/5 45/6 45/9 74/15 102/22 111/8 116/17 116/20 116/23
**Glen [1]** 88/25
**global [1]** 55/7
**go [56]** 12/20 17/3 17/9 19/18 24/25 26/8 28/13 30/3 41/22 43/6 44/1 49/9 51/20 55/9 58/13 61/12 62/5 66/15 70/4 73/8 74/3 74/18 75/9 81/14 82/21 82/23 83/5 83/13 83/18 85/19 85/20 86/11 87/14 88/10 90/5 90/9 93/18 93/24 93/25 94/2 98/4 99/12 102/12 103/5 106/10 106/19 106/20 113/13 116/12 118/18 122/7 130/21 132/3 140/25 141/15 141/15
**Godine [3]** 13/3 13/3 13/11
**goes [3]** 54/10 107/5 132/24
**going [70]** 9/3 10/14 10/22 10/23 12/21 13/6 16/19 17/1 26/13 26/19 26/21 26/21 28/20 32/6 37/6 37/7 42/13 43/13 44/21 66/21 70/5 70/17 71/25 72/18 72/20 76/1 76/23 82/21 83/9 83/10 83/12 83/17 83/18 83/21 87/13 87/14 87/14 91/4 94/6 94/13 99/6 99/12 101/16 101/25 103/18 104/2 104/23 106/10 118/5 118/20 122/8 124/14 124/21 125/22 126/20 127/16 128/21

**G**

**going... [13]** 129/17
131/16 132/3 132/3 136/7
138/10 138/10 139/8 140/1
144/2 144/6 144/12 144/20
**gone [5]** 36/19 73/25
106/16 106/22 134/9
**good [45]** 2/2 8/17 15/18
25/19 25/20 26/17 27/2
30/19 33/8 33/11 37/15
37/18 37/19 43/9 43/10
47/6 48/5 50/24 55/13
56/20 57/3 60/11 64/6
69/25 74/9 87/10 90/12
91/2 91/10 91/19 95/2
98/10 98/11 99/19 99/20
102/17 112/16 112/17
114/5 122/25 124/23 126/4
126/5 129/4 129/19
**Google [1]** 23/15
**gosh [2]** 81/4 81/20
**got [40]** 26/12 27/18 28/25
32/10 38/6 44/16 46/5 46/6
49/11 49/21 51/15 51/25
53/18 53/25 54/20 58/19
62/25 68/18 84/14 85/18
85/19 85/20 87/12 92/12
95/10 95/15 96/8 98/16
103/24 104/25 110/9
113/16 121/11 122/4 124/3
129/3 130/12 131/23
138/25 145/6
**government [40]** 11/5
11/8 16/11 16/13 25/23
29/12 29/20 29/25 32/20
40/2 42/23 47/19 52/4
54/23 58/25 61/2 64/1 64/8
64/22 65/6 67/1 73/2 76/12
82/10 90/16 104/20 113/20
119/3 119/12 122/15 130/4
131/1 133/2 133/25 136/9
137/13 137/16 138/7 143/6
143/24
**Government's [4]** 39/19
77/4 106/6 136/22
**grade [3]** 60/6 76/1 81/15
**graduated [2]** 32/10 60/19
**grand [10]** 8/21 14/5 14/8
14/9 14/13 61/20 61/21
61/25 64/11 67/16
**grandmother [1]** 118/7
**granite [1]** 51/24
**grant [1]** 104/23
**granted [8]** 37/3 88/9 98/1
102/8 116/8 124/11 125/20
127/13
**graphic [3]** 19/4 66/1
74/24
**great [5]** 34/17 66/14
76/22 143/23 144/23
**greater [7]** 17/19 20/15
41/13 69/17 69/20 69/22
75/2
**Groceries [2]** 31/10 31/11
**grocery [3]** 24/17 24/20
25/15
**ground [2]** 101/21 101/22
**group [5]** 9/20 20/7 20/9
80/4 83/20
**groups [1]** 20/14
**grow [1]** 90/7
**gruesome [3]** 39/8 40/9
40/15
**GS12 [3]** 58/19 60/7 60/8

**guard [4]** 43/18 95/4 95/11
121/7
**guess [21]** 38/23 40/24
41/1 41/11 41/18 41/19
41/20 41/22 41/23 42/9
42/10 78/22 97/17 97/18
103/15 103/15 126/22
130/8 138/5 138/9 140/20
**guided [1]** 66/21
**guidelines [1]** 20/9
**guilty [14]** 9/2 21/5 21/7
21/11 64/11 66/6 66/8 67/3
77/6 114/15 119/5 119/6
128/14 133/4
**gunpoint [2]** 62/15 62/18
62/24 67/17

**H**

**had [36]** 10/21 11/11
11/18 11/20 12/1 19/17
19/19 19/23 34/13 35/3
38/22 38/24 39/1 56/22
62/18 73/11 73/16 76/21
80/14 101/20 102/1 102/24
105/13 106/4 106/23 108/7
111/1 116/20 119/21
120/18 127/6 132/13 135/1
135/4 135/16 143/3
**HAGAN [4]** 1/16 11/9
11/11 29/13
**Hagerstown [1]** 30/24
**half [1]** 123/9
**halfway [1]** 28/11
**hall [1]** 43/18
**hallway [4]** 37/8 88/14
102/13 116/12
**Halpert [4]** 12/23 13/5
13/8 13/12
**hand [4]** 8/13 11/15 24/21
100/9
**handle [2]** 81/6 142/4
**handled [2]** 35/6 35/9
**hang [1]** 42/1
**happen [17]** 35/21 44/5
48/18 57/12 66/10 67/18
67/25 70/6 70/9 85/9 86/12
92/20 109/21 112/19
123/25 132/14 134/23
**happened [14]** 13/19 14/8
34/10 34/25 36/1 54/12
57/19 69/6 108/8 108/20
110/8 119/16 119/17
126/11
**happens [2]** 86/4 133/1
**happy [1]** 109/10
**Harbor [1]** 114/14
**hard [10]** 35/24 36/13
38/24 64/15 85/10 94/8
101/18 103/1 143/11
143/13
**hardware [1]** 47/14
**has [57]** 8/21 9/2 9/7 15/1
15/10 16/9 16/17 17/9
17/20 18/2 18/11 19/21
21/4 21/19 32/4 33/17 34/6
49/4 54/10 55/17 56/8 64/1
64/8 64/10 64/22 76/16
77/7 79/10 79/17 84/11
87/16 89/17 105/22 106/5
106/24 107/13 107/16
110/7 114/21 115/5 118/25
119/15 123/15 125/4 130/4
131/1 131/1 131/12 132/8
132/18 133/17 133/24
134/9 137/17 141/2 142/22

144/1
**hasn't [1]** 142/23
**hate [1]** 34/2
**haul [3]** 31/3 31/3 31/4
**hauling [1]** 31/9
**have [221]**
**haven't [4]** 38/17 120/19
138/25 140/8
**having [7]** 36/15 40/10
53/4 56/23 106/14 106/15
110/8 117/20 117/20
**he [83]** 20/23 21/5 27/9
27/14 27/16 35/8 54/6
57/10 57/10 57/17 60/1
60/3 60/4 60/4 62/23 67/22
68/5 68/19 69/4 76/2 76/5
80/14 89/17 96/5 96/6 96/8
96/12 96/13 96/13 96/21
96/21 104/24 104/25 105/1
105/5 105/8 105/14 105/15
105/16 106/2 106/6 106/8
107/1 107/5 107/22 108/2
108/3 108/5 108/6 108/7
110/20 110/21 110/21
110/22 110/23 111/1
112/11 112/15 113/9 121/9
121/24 122/2 122/3 126/23
126/24 127/1 127/20
127/24 128/6 128/6 128/15
128/21 128/25 129/10
129/12 129/12 129/13
129/17 129/17 129/17 133/5
142/22 142/23 142/24
**He'd [1]** 68/16
**he'll [1]** 75/25
**he's [21]** 27/10 27/18 60/7
75/17 75/18 75/22 76/3
76/5 80/14 89/15 89/20
96/18 104/24 105/17
105/17 106/4 106/19 119/6
121/18 127/11 130/24
**head [2]** 31/17 31/20
**headed [1]** 79/25
**health [2]** 58/18 103/3
**healthcare [1]** 29/8
**hear [24]** 8/19 10/2 12/21
17/19 22/8 22/25 23/16
23/20 29/12 29/13 29/13
29/14 29/18 33/25 37/22
39/24 43/13 52/14 71/25
73/8 78/10 103/17 105/9
142/7
**heard [20]** 11/3 11/4 12/19
14/17 36/5 36/25 62/5
65/22 66/15 76/8 77/1
86/16 86/19 101/16 108/12
115/10 118/22 123/23
126/8 130/1
**hearing [21]** 10/4 22/4
22/5 30/6 30/11 36/15
37/25 45/3 66/3 74/14
84/19 105/13 121/22
121/23 132/12 135/8
135/17 137/3 137/17
137/22 138/1
**heart [3]** 57/13 77/14 143/3
**heartstrings [1]** 73/15
**heavy [1]** 143/4
**held [29]** 20/24 29/10
32/18 36/23 39/4 47/17
52/2 54/21 60/22 61/14
62/17 62/24 65/9 67/17
72/25 82/8 88/5 90/14
94/15 97/21 102/3 104/11
113/18 116/3 122/13 124/6

125/15 126/18 146/8
**Hello [5]** 91/3 99/16
110/12 114/6 114/24
**help [4]** 17/6 29/13 42/15
70/17
**Henry [2]** 12/23 13/7
**her [23]** 47/7 47/13 53/23
54/15 73/9 73/11 73/14
95/25 96/8 96/10 96/12
96/13 99/15 102/14 102/15
110/8 117/20 117/20
117/20 118/7 135/17
135/22 135/23
**here [150]**
**here's [3]** 10/8 23/21
134/12
**hereby [1]** 146/6
**HHS [1]** 58/21
**hi [6]** 33/12 55/14 102/14
110/13 114/25 124/24
**high [7]** 90/9 90/11 90/12
91/7 96/1 104/5 113/16
**highest [1]** 24/24
**highway [4]** 57/9 57/16
57/17 57/18
**hiking [2]** 81/20 90/5
**him [26]** 8/22 20/24 21/7
21/11 27/11 42/18 56/19
57/11 62/24 69/2 89/24
90/1 104/21 105/7 105/13
105/15 119/2 127/21
127/22 128/14 128/20
140/12 140/12 144/4 145/4
145/7
**his [34]** 11/19 11/20 12/2
12/2 12/3 20/23 27/14
42/21 54/7 54/10 54/10
54/11 60/5 60/6 105/18
105/22 106/3 106/24
106/24 106/25 108/1 114/4
111/14 121/22 127/5 129/7
129/14 129/17 133/19
134/3 134/4 142/21 145/2
145/2
**history [1]** 116/11
**hit [1]** 98/18
**hmm [1]** 112/21
**hobbies [1]** 53/11
**Hoffberger [2]** 13/4 13/12
**hold [16]** 18/18 18/22
18/25 19/24 44/3 65/6
65/21 67/1 71/22 74/19
97/4 97/12 114/9 119/12
128/4 137/24
**holding [2]** 83/20 87/4
**home [53]** 13/14 58/13
106/21 112/15 113/6 139/8
**honor [73]** 26/1 26/3 26/11
26/14 29/19 29/22 29/24
32/22 32/24 33/1 33/2 37/1
39/22 40/3 42/24 43/2
47/21 47/23 52/6 52/8
54/25 55/1 61/4 61/5 73/4
73/9 73/21 73/24 82/12
82/15 85/1 88/8 90/18
90/20 94/19 94/21 97/24
102/6 104/14 104/16
104/22 105/12 105/19
113/22 113/24 116/6
122/17 122/19 124/9
125/18 126/22 127/3 130/9
130/14 134/25 135/20
135/25 136/3 136/13
136/16 136/23 137/1 137/8
137/15 137/18 137/21

138/2 138/5 138/13 138/21
138/23 143/4 143/15
**Honor's [1]** 73/10
**HONORABLE [2]** 1/11
145/12
**hope [11]** 30/20 65/25
66/2 66/4 66/4 70/2 70/10
106/12 117/18 121/25
138/19
**hoped [2]** 73/13 127/6
**hopefully [3]** 28/22 70/19
129/4
**hostility [1]** 114/20
**hour [1]** 143/17
**hours [3]** 31/7 103/6 103/6
**house [4]** 92/6 118/7
122/7 140/1
**how [59]** 26/7 31/1 32/4
35/1 35/6 35/21 35/23 37/7
37/12 44/5 45/16 46/17
46/22 46/24 49/14 51/5
51/17 52/24 54/2 57/19
58/16 58/23 60/8 60/16
62/3 67/20 70/13 71/20
75/6 81/3 89/5 89/17 90/4
91/13 92/5 92/10 92/20
93/20 96/2 97/18 98/24
100/12 102/25 103/4
105/25 112/2 113/3 118/11
121/15 121/22 123/7
123/23 134/12 137/20
143/20 143/22
**How's [3]** 50/23 94/6
122/2
**however [1]** 15/8
**huge [2]** 17/13 91/25
**Hughes [1]** 27/6
**huh [15]** 63/5 63/8 68/6
68/21 69/1 69/3 69/15 82/4
91/24 94/5 108/4 111/10
111/22 112/14 118/15
**human [2]** 58/19 65/25
**hurt [3]** 59/14 59/17 67/22
62/17 62/22 67/17
**husband [5]** 47/14 62/15
62/17 62/22 62/17
**husband's [1]** 68/4
**hustles [1]** 53/11
**HVAC [2]** 28/16 29/7

**I**

**I'd [7]** 27/12 75/3 88/13
97/16 97/24 125/18 126/24
**I'll [19]** 12/22 33/9 43/9
50/25 61/11 72/11 73/8
74/9 95/2 99/16 100/24
102/20 105/9 105/19
116/16 122/25 131/13
135/10 139/2
**I'm [99]** 9/3 10/9 10/14
12/7 12/21 13/6 15/15
15/15 16/19 17/1 25/20
26/19 26/21 26/24 27/4
32/6 35/12 36/15 40/23
40/24 41/1 41/5 41/18
42/17 42/17 43/13 43/25
45/2 56/3 65/25 66/2 66/18
66/21 67/5 69/5 71/25 72/8
72/9 72/20 74/17 78/22
79/19 81/7 83/3 83/10
83/21 85/21 85/22 87/13
87/14 91/4 92/24 92/13
96/11 99/6 99/11 99/12
101/24 104/1 104/23
106/10 106/11 108/9

**I**

**I'm... [36]** 108/17 109/3 109/6 109/18 109/20 110/14 110/15 110/16 112/3 114/7 115/1 116/10 120/7 122/7 122/8 123/2 123/4 123/18 123/25 123/25 124/21 124/25 126/6 126/11 128/22 128/23 136/7 136/12 137/3 137/23 138/10 140/14 142/25 143/4 143/8 144/20
**I've [22]** 24/5 26/12 37/22 38/17 45/23 52/14 52/25 53/10 58/17 58/24 61/25 66/17 69/12 77/1 77/11 85/12 87/12 91/6 101/21 112/5 112/6 119/11
**I.D [1]** 110/25
**ice [1]** 44/3
**idea [1]** 140/20
**identify [1]** 139/23
**illegal [1]** 63/21
**image [4]** 39/12 40/1 41/9 78/14
**images [11]** 19/4 19/5 40/8 40/11 40/20 42/6 77/18 77/18 77/21 108/24 109/9
**imagine [2]** 41/4 105/6
**immediate [25]** 15/1 15/7 15/11 15/19 15/24 15/25 16/7 16/9 17/10 17/21 17/23 18/2 18/6 18/11 18/14 19/21 33/17 44/10 56/9 87/17 95/23 107/16 118/2 125/2 127/25
**immediately [1]** 115/9
**impact [3]** 42/7 65/3 68/8
**impacted [1]** 42/21
**impair [2]** 22/7 22/9
**impairment [6]** 22/5 22/5 30/6 30/12 37/25 74/14
**impairments [1]** 45/4
**impartial [55]** 14/21 18/20 18/24 19/2 19/6 20/4 20/21 21/2 22/20 24/7 27/20 36/11 38/19 40/22 41/2 42/5 42/8 42/22 43/24 44/25 48/21 50/3 56/23 58/2 59/20 62/9 63/2 64/25 65/4 67/9 68/9 69/9 73/14 74/21 76/21 76/25 79/1 97/6 97/14 100/21 101/6 101/15 108/14 108/25 111/16 114/12 115/13 117/24 119/12 119/23 123/17 123/25 126/23 127/23 128/11
**impartiality [1]** 67/1
**imperative [1]** 132/14
**imply [1]** 72/5
**important [8]** 24/22 43/12 45/8 78/1 85/22 103/15 103/16 140/6
**impossible [2]** 79/11 130/11
**inappropriate [2]** 34/20 35/16
**incident [5]** 67/24 68/4 73/16 119/8 125/9
**Inclination [1]** 79/22
**inclinations [1]** 80/3
**inclined [1]** 80/15

128/10
**involved [9]** 16/10 16/13 38/25 84/24 86/3 92/15 108/21 139/25 140/12
**involving [6]** 18/25 20/10 63/1 74/19 97/5 97/13
**is [237]**
**ish [1]** 44/6
**Island [2]** 54/19 113/15
**isn't [3]** 84/22 99/1 140/7
**issue [7]** 38/6 64/7 104/1 104/4 104/24 105/10 109/13
**issues [29]** 10/5 23/10 23/19 42/13 47/19 52/4 54/23 61/2 64/19 71/20 73/2 73/5 82/10 82/13 86/15 86/18 90/16 90/21 94/17 104/19 106/1 106/14 113/20 122/15 128/19 136/25 140/17 141/9 141/12
**it [260]**
**it'll [2]** 17/15 48/9
**it's [70]** 9/21 24/22 25/8 25/13 28/6 28/11 28/15 33/24 36/19 37/7 38/12 39/16 41/9 41/21 43/12 44/10 50/24 53/6 64/2 65/13 67/6 71/20 77/13 78/8 79/11 82/21 84/15 84/25 85/13 85/22 87/2 93/2 93/3 93/13 95/12 95/16 95/18 97/9 101/18 103/1 103/13 103/16 103/18 104/1 104/4 104/15 105/20 107/19 107/21 110/1 112/4 112/16 112/17 112/19 126/10 128/20 128/24 130/13 131/10 131/19 132/1 132/14 132/24 132/25 134/9 134/25 137/2 137/9 140/13 140/15
**its [4]** 42/20 64/22 76/12 119/15
**itself [1]** 98/13

**J**

**Jack [2]** 13/3 13/11
**jail [3]** 129/17 142/23 143/1
**JAMES [4]** 1/11 10/10 13/2 13/10
**Jeff [3]** 12/25 13/9 27/6
**jelly [1]** 143/19
**JKB [2]** 1/5 11/3
**JKB-23-278 [1]** 1/1
**job [12]** 31/12 54/7 60/22 65/4 66/14 71/22 76/14 78/4 93/12 95/9 99/5 127/9
**John [2]** 12/25 13/9
**Johnson [2]** 12/23 13/7
**joined [1]** 121/24
**joining [1]** 99/21
**joke [2]** 31/19 31/20
**jokes [2]** 121/21 122/1
**journalist [1]** 47/9
**judge [8]** 10/10 12/6 12/8 12/12 72/7 84/10 139/23 140/2
**judge's [4]** 21/20 21/21 21/25 22/1
**judging [1]** 19/25 128/5
**judgment [2]** 41/3 66/3

80/17 108/22 123/22
**Judicial [1]** 146/10
**juggling [1]** 130/15
**juror [181]**
**juror's [1]** 106/1
**jurors [23]** 2/3 8/11 9/5 9/25 13/16 21/16 25/10 25/22 26/5 64/9 65/4 76/14 77/10 78/17 80/11 80/12 82/22 82/23 83/1 119/5 130/12 138/25 142/16
**jury [75]** 1/11 2/4 5/4 8/15 8/19 8/21 11/6 11/6 11/14 11/23 14/5 14/8 14/9 14/13 21/7 21/10 21/15 25/10 37/13 38/23 41/6 41/21 42/14 43/5 55/13 61/20 61/21 61/25 64/11 67/16 71/18 74/3 76/11 76/14 80/9 81/7 82/25 83/15 83/18 84/3 84/7 84/8 84/14 85/6 86/24 91/6 98/4 99/7 99/7 99/8 102/11 106/21 125/23 126/1 127/6 127/11 127/16 128/4 129/4 129/1 131/3 131/20 133/4 138/10 138/17 139/6 139/16 139/19 140/7 140/8 141/3 141/21 141/24 141/25
**just [86]** 17/14 17/18 21/4 24/13 24/25 28/16 33/9 36/11 38/8 38/11 39/2 40/1 40/21 41/14 43/11 48/4 49/21 53/6 54/6 59/16 65/13 65/16 66/4 66/19 67/6 70/1 70/14 71/21 71/22 72/14 75/17 76/10 76/21 77/1 78/7 78/20 79/12 79/20 80/15 80/20 83/23 83/25 85/12 85/18 88/13 93/15 93/17 94/10 95/3 95/10 95/18 99/16 101/25 102/20 103/21 107/11 108/18 109/8 109/20 115/8 116/16 119/11 119/15 121/24 121/25 122/18 122/25 126/6 127/19 130/1 131/3 131/13 131/18 132/25 134/9 134/16 137/2 137/17 138/8 140/21 141/9 142/3 142/20 145/1
**justice [9]** 15/3 15/12 19/23 20/3 20/8 55/19 55/22 55/24 56/2
**Juvenile [1]** 101/1

**K**

**K-O-M-B-E-R [1]** 13/1
**keep [9]** 14/20 24/25 62/8 83/9 86/7 115/12 127/6 127/22 140/9
**keeping [1]** 127/10
**KENJI [5]** 1/7 11/2 11/14 11/25 12/1
**kept [1]** 35/5
**kid [2]** 34/21 35/8
**kidding [1]** 66/18
**kids [17]** 28/25 32/7 35/8 35/9 51/15 51/19 53/25 85/8 93/7 96/19 109/4 109/10 109/10 113/1 113/5 121/11 128/3
**kill [1]** 85/12

**killed [3]** 34/10 57/6 114/14
**KIM [2]** 1/16 11/9
**kind [26]** 35/5 35/9 35/16 43/4 51/23 62/14 72/5 73/14 76/19 84/15 84/23 86/2 86/3 86/7 94/7 95/11 98/14 100/9 103/1 103/21 104/1 112/2 115/18 120/5 126/1 141/6
**Kindle [1]** 87/1
**kinds [4]** 84/18
**knew [2]** 126/12 126/16
**Knit [1]** 122/7
**know [68]** 10/12 10/13 10/14 10/17 10/17 11/10 11/18 11/19 11/25 12/8 12/19 13/14 14/22 27/25 28/7 36/14 37/12 41/2 41/6 41/21 41/22 42/1 44/18 51/23 54/13 56/19 56/19 60/6 65/16 66/20 66/23 66/25 70/13 70/15 76/20 77/13 77/15 78/9 78/15 79/9 79/20 84/22 97/18 101/20 101/22 101/24 103/8 103/12 103/22 105/9 108/1 108/7 108/13 109/6 110/22 112/4 112/23 125/9 125/12 126/14 126/16 127/20 128/24 129/7 131/3 136/4 137/8 140/20
**knowledge [2]** 12/2 53/16
**knows [2]** 103/18 126/24
**Komber [2]** 13/1 13/9

**L**

**Labor [1]** 22/16
**ladies [11]** 8/17 11/24 12/5 12/15 16/16 19/17 22/14 22/22 24/1 87/6 139/5
**Lafler [4]** 132/12 137/2 137/17 138/1
**Lafler-Frye [3]** 132/12 137/17 138/1
**landlord [1]** 106/24
**landscape [1]** 53/15
**language [1]** 22/7
**laptop [1]** 23/13
**large [2]** 17/13 83/7
**last [6]** 22/15 24/1 24/11 38/16 50/24 143/3
**later [1]** 9/16 17/6 17/19
**latter [2]** 42/9 64/23
**Laugher [1]** 112/18
**Laughter [13]** 10/16 30/22 53/7 56/4 60/12 66/13 66/16 76/4 79/18 92/23 100/18 112/25 140/24
**law [57]** 11/16 11/16 11/17 11/18 11/20 12/7 12/12 15/5 15/14 16/11 16/12 16/14 16/14 18/21 18/24 20/16 20/17 21/14 21/16 21/17 21/18 21/19 21/21 21/24 22/1 55/18 55/19 63/7 63/24 69/17 69/18 69/25 70/10 71/2 71/5 72/13 72/17 75/3 77/6 77/11 78/10 78/11 79/7 86/13 97/7 97/14 99/22 100/20 102/14 114/12 119/6 119/11 141/8
**law/criminal [1]** 55/19

**include [5]** 18/10 33/16 56/8 87/16 107/15
**included [1]** 133/5
**includes [3]** 23/5 23/11 132/19
**including [3]** 20/3 20/9 23/17
**indefinite [1]** 133/11
**independent [3]** 71/17 86/13 141/7
**indicated [5]** 9/10 35/17 69/16 73/11 127/19
**indicted [2]** 8/21 21/5
**individual [4]** 10/3 77/14 80/4 80/5
**individually [2]** 10/22 26/5
**industry [2]** 52/21 59/5
**inference [2]** 136/12 136/15
**influence [5]** 13/23 14/1 14/11 14/15 61/23
**influenced [4]** 13/18 14/7 85/4 140/5
**inform [2]** 84/6 129/18
**informal [1]** 134/20
**information [10]** 23/2 64/17 84/18 110/7 120/17 127/8 127/10 127/10 137/11 143/25
**inherent [1]** 76/17
**inherently [1]** 131/7
**initially [2]** 65/22 73/11
**initials [1]** 107/19
**injured [3]** 34/23 44/7 81/8
**injury [1]** 81/8
**innocence [2]** 49/22 119/2
**innocent [5]** 21/6 21/10 49/23 66/5 128/13
**inquiries [1]** 107/14
**inquiry [1]** 132/13
**insert [1]** 134/14
**Instagram [1]** 23/7
**installation [1]** 95/11
**instance [4]** 17/17 23/14 64/2 71/19
**instances [1]** 71/1
**instantly [1]** 92/4
**instead [3]** 64/20 83/21 145/3
**instincts [1]** 71/10
**instruct [1]** 21/15
**instructed [1]** 80/19
**instruction [6]** 21/24 23/24 42/6 85/1 85/3 142/10
**instructions [19]** 21/17 21/20 21/22 21/25 22/1 24/13 83/11 84/1 142/7
**insurance [1]** 103/3
**integrity [1]** 70/10
**intention [1]** 129/5
**interest [1]** 45/18
**interesting [1]** 112/20
**interests [1]** 81/17
**interfere [2]** 24/6 38/18
**internet [4]** 23/6 23/11 86/15 141/8
**investigation [7]** 17/25 18/4 18/8 35/4 86/13 128/2 141/7
**investigative [2]** 15/21 15/22
**invite [1]** 140/25
**involve [7]** 20/19 20/20 64/5 76/15 105/6 128/9

**L**

**laws [4]** 20/18 20/19 128/8 128/9
**lawyer [5]** 49/17 88/21 132/10 133/18 134/11
**lawyers [23]** 10/1 11/10 52/1 60/23 72/24 82/6 84/10 88/4 90/13 94/14 97/20 102/2 104/9 113/17 116/1 122/12 124/4 125/13 126/17 131/8 132/6 133/12 139/24
**lead [1]** 72/7
**leading [2]** 72/3 73/10
**lean [1]** 97/17
**leaning [1]** 105/14
**leap [1]** 131/20
**learned [1]** 86/23
**least [1]** 100/12
**leave [5]** 9/19 25/3 88/14 101/14 114/17
**leaves [1]** 129/1
**leaving [1]** 24/14
**left [9]** 25/4 37/8 74/4 88/14 98/5 102/13 116/12 131/24 142/16
**legal [5]** 16/10 16/13 19/23 55/17 55/19
**lends [1]** 128/20
**length [1]** 131/11
**lengthened [1]** 20/11
**less [2]** 133/4 133/8
**lesser [5]** 20/15 69/17 69/20 75/2 133/5
**lesser-included [1]** 133/5
**let [12]** 15/6 65/12 97/10 97/20 102/2 104/9 106/22 113/16 115/4 116/1 125/13 126/17
**let's [18]** 25/10 26/8 37/7 40/4 44/1 47/12 55/9 62/5 63/9 63/14 67/15 74/18 82/20 82/22 83/13 99/15 114/8 117/5
**lettered [1]** 17/1
**lie [1]** 79/12
**life [10]** 35/17 41/15 91/14 91/15 119/22 133/24 134/10 134/19 138/15 140/7
**life's [1]** 78/16
**light [17]** 29/21 32/20 36/11 47/20 52/5 54/24 61/3 73/3 82/11 82/14 90/17 94/18 113/21 122/16 136/18 144/12 145/2
**like [42]** 12/10 27/22 37/23 40/25 42/7 43/12 53/4 62/21 68/3 72/14 76/5 78/20 78/21 79/9 79/19 80/14 80/17 80/20 81/4 81/19 86/4 90/5 92/9 93/1 93/24 95/6 103/12 104/2 108/21 109/11 109/17 109/18 109/20 109/21 112/15 113/11 113/13 122/2 125/8 125/9 127/10 142/20
**likelihood [1]** 133/7
**likely [6]** 40/1 42/7 110/1 128/20 131/25 132/1
**line [6]** 24/16 32/4 57/6 78/24 119/20 123/7
**LinkedIn [1]** 23/8

**list [2]** 12/20 96/18
**listed [1]** 118/3
**listen [13]** 9/6 12/17 16/17 21/9 71/8 71/18 72/18 76/11 77/23 99/9 106/17 134/13 140/2
**listening [5]** 36/7 71/12 80/12 86/1 103/8
**little [23]** 10/20 16/17 17/6 17/13 33/23 34/4 36/15 36/16 56/5 56/24 61/17 63/14 79/21 83/8 98/12 103/13 104/4 105/2 105/13 106/11 108/8 108/13 112/3
**LIU [1]** 1/20
**live [13]** 28/5 29/2 29/3 30/24 45/10 52/18 58/7 80/24 88/25 91/10 111/19 111/20 112/19
**living [2]** 91/13 117/16
**local [4]** 15/5 15/14 125/11 138/8
**Lombard [1]** 1/24
**long [34]** 22/23 31/1 31/3 32/4 35/13 35/14 35/21 44/5 45/16 46/17 49/14 51/5 53/21 54/19 58/16 58/23 60/8 67/20 81/3 89/5 89/17 91/13 92/24 96/2 98/21 98/24 104/3 107/23 108/8 112/2 118/11 120/11 120/22 123/7
**longer [3]** 25/13 83/21 96/19
**look [7]** 10/18 41/2 41/21 42/2 42/6 57/1 113/13
**looked [1]** 48/10
**looking [19]** 23/2 27/4 40/25 41/20 41/22 65/11 68/19 88/19 103/8 110/14 110/15 114/7 115/1 120/8 120/10 120/11 123/2 124/25 126/7
**looks [2]** 27/22 37/23
**losing [1]** 34/25
**lost [2]** 35/17 140/22
**lot [6]** 34/1 81/21 86/23 92/14 104/16 122/6
**loud [1]** 34/3
**loved [2]** 96/13 140/6
**loves [1]** 122/3
**lower [3]** 82/24 83/1 83/15
**lowest [1]** 24/24
**Loyola [2]** 89/9 120/18
**lucky [1]** 36/3
**lucrative [1]** 56/5
**lunch [5]** 130/10 142/24 143/5 144/3 144/13

**M**

**ma'am [40]** 25/14 33/8 33/11 37/5 37/16 55/13 55/21 61/11 67/8 74/6 74/9 74/18 82/19 87/10 88/11 88/19 90/24 91/2 94/13 94/24 98/10 99/6 99/16 99/19 102/10 107/11 103/13 114/2 115/7 116/10 116/15 116/16 122/21 122/25 124/13 138/20 141/16 142/4 142/12 142/15
**made [5]** 14/19 40/16 62/7 115/11 127/21
**magazine [1]** 86/25
**magazines [1]** 23/18

**magically [1]** 92/4
**main [1]** 88/14
**mainly [2]** 58/13 111/5
**mainstream [1]** 41/9
**maintain [2]** 103/10 103/17 104/2 105/8
**maintaining [2]** 101/6 106/15
**majority [2]** 53/1 53/23
**make [57]** 13/22 14/1 14/10 14/14 18/19 18/23 19/1 19/5 22/18 25/1 26/8 31/19 36/5 37/1 41/3 43/23 47/5 48/20 50/2 52/13 61/18 61/22 63/1 71/7 72/9 73/6 74/1 74/20 76/21 85/10 86/13 87/2 97/5 97/13 97/24 98/5 102/6 102/13 107/11 108/25 114/11 115/21 116/6 116/12 119/10 124/9 125/18 127/3 132/5 133/2 133/23 137/3 138/8 138/11 141/7 144/12 144/21
**makes [3]** 34/3 40/3 129/13
**making [4]** 35/25 66/3 88/18 108/2
**male [10]** 39/9 39/13 39/14 39/16 40/11 40/12 40/13 77/19 77/22 78/14
**males [1]** 77/20
**man [1]** 62/24
**manage [1]** 123/17
**manager [2]** 59/8 59/9
**managing [1]** 53/1
**mandatory [1]** 132/25
**manner [2]** 25/24 66/24
**many [7]** 15/17 16/17 46/22 75/16 114/14 121/13 139/1
**March [4]** 135/1 135/3 135/3 146/12
**Marco [1]** 113/15
**mark [14]** 10/19 10/19 12/18 13/14 16/21 16/24 19/18 19/20 21/25 22/2 23/23 23/25 24/8 24/9
**marked [1]** 128/15
**Markel [2]** 12/24 13/8
**marriage [3]** 46/17 120/23 121/2
**married [15]** 28/23 31/22 44/4 46/14 46/15 51/11 51/13 59/23 60/8 81/10 89/12 93/3 112/8 120/20 120/22
**marshal [5]** 110/19 110/24 111/1 111/15 142/19
**marshal's [1]** 16/5
**marshals [3]** 144/11 144/25 145/4
**MARYLAND [13]** 1/1 1/25 9/1 12/14 14/23 15/4 15/13 28/6 31/6 31/8 51/10 101/1 146/6
**mass [1]** 120/16
**master [1]** 46/12
**master's [2]** 46/8 89/9
**masturbation [3]** 39/16 40/13 77/21
**match [1]** 143/1
**material [2]** 23/17 66/1
**math [2]** 46/10 89/11
**matter [7]** 65/15 67/16

**magically** ... 125/12 127/6 129/6 142/19 146/9
**may [71]** 8/16 9/15 11/12 11/22 12/4 12/16 12/16 13/14 13/15 14/4 19/3 20/22 20/22 23/4 23/9 23/14 23/16 25/11 27/1 30/2 33/5 33/10 37/6 39/9 40/12 40/12 40/12 40/13 43/5 43/16 48/1 52/12 55/4 55/11 61/8 61/19 65/8 65/9 74/3 74/23 74/24 77/24 82/18 84/6 84/9 84/10 88/14 90/24 94/24 98/3 99/14 101/18 102/21 106/20 110/3 114/2 114/17 116/11 116/12 122/21 124/19 132/5 135/2 139/18 139/22 139/22 139/23 140/18 141/14 142/15 144/21
**May 8th [1]** 135/2
**maybe [7]** 17/17 38/21 68/12 103/18 118/12 135/3 138/6
**MBA [1]** 120/18
**MCAT [1]** 60/21
**McCormick's [1]** 112/11
**MCGUINN [13]** 1/15 11/9 11/11 29/12 29/14 94/17 104/13 126/20 134/18 135/11 135/16 135/22 138/4
**me [93]** 8/13 9/4 9/4 9/15 9/22 10/12 10/13 10/17 10/21 14/17 15/6 17/15 22/3 24/8 29/12 29/13 29/13 29/14 30/4 30/24 32/9 32/16 33/22 33/25 34/17 36/5 36/18 36/21 37/23 39/1 39/2 46/6 49/21 51/7 51/25 52/23 53/13 54/20 55/16 60/23 61/12 62/6 62/13 62/15 65/12 66/6 66/15 66/19 67/12 69/23 71/16 72/23 73/19 73/19 76/21 77/17 82/5 87/21 89/7 90/10 92/17 97/2 97/8 97/9 97/10 97/20 101/18 102/2 103/4 104/9 109/13 113/17 115/1 115/10 116/1 117/1 122/11 124/3 125/5 125/13 126/6 126/9 126/13 126/14 126/17 130/22 136/10 142/20 143/25 144/5 **meal [4]** 143/16 144/3 144/10 145/1 **mean [10]** 41/18 53/10 54/6 78/19 100/1 100/4 100/5 103/5 103/11 119/16 **means [2]** 23/8 132/24 **meat [1]** 143/6 **mechanic [1]** 31/13 **media [3]** 86/1 86/1 140/19 **medical [2]** 22/17 54/16 **medicated [1]** 105/17 **medication [1]** 105/15 **medicine [1]** 143/14 **meet [4]** 9/16 9/22 24/9 144/8 **member [36]** 10/12 10/13 10/17 12/2 12/5 12/11 15/1

125/12 127/6 129/6 142/19 146/9
**members [6]** 2/4 10/1 10/14 15/7 139/18 141/23
**memory [4]** 9/16 17/15 53/5 53/8
**men [1]** 39/15
**mention [4]** 27/16 36/14 36/19 73/15
**mentioned [1]** 12/16
**Merit [1]** 146/4
**messenger [1]** 85/13
**messes [1]** 95/14
**met [6]** 64/22 84/3 139/16
**mic [7]** 26/8 29/17 33/23 33/23 36/16 48/7 112/3
**microphone [18]** 26/6 26/13 29/17 30/7 33/9 37/21 43/13 48/6 52/14 55/16 61/15 61/17 74/12 91/5 98/13 105/14 107/12 124/22
**middle [2]** 16/24 54/9
**might [31]** 12/19 38/18 38/21 40/9 40/24 41/5 41/19 64/17 64/19 80/3 80/4 80/5 85/9 86/3 86/14 86/15 86/19 105/5 106/11 108/13 108/24 109/20 109/21 111/16 123/22 130/9 133/8 134/8 140/6 140/17 141/2
**military [2]** 69/25 121/3
**milk [1]** 143/6
**Mills [1]** 89/2
**mind [14]** 14/20 62/8 65/22 65/24 66/23 66/24 77/15 85/3 86/7 101/6 115/12 127/22 129/18 140/11
**minds [1]** 64/15
**mine [14]** 29/21 32/21 34/6 47/20 52/5 54/24 61/3 73/23 82/11 82/14 90/17 94/18 113/21 122/16
**minimal [1]** 106/4
**minor [2]** 120/16 130/18
**minors [1]** 123/15
**minute [9]** 82/6 94/14 95/3 102/2 104/9 115/1 122/11 125/14 126/17
**minutes [6]** 14/17 62/5 93/13 93/14 107/3 115/10
**misdirected [1]** 92/18
**miss [1]** 40/24
**mixed [3]** 76/3 76/19 78/21
**molestation [1]** 101/8
**molested [1]** 125/7
**mom [6]** 29/8 62/10 63/15 66/2 67/17 118/6
**moment [5]** 44/19 65/10 115/2 116/2 129/8
**momentarily [1]** 73/14
**moments [1]** 26/21
**moms [1]** 113/6
**Monday [2]** 22/17 130/22
**money [1]** 84/17
**Montgomery [3]** 48/19 49/13 49/14

**JA387**

**M**

**months [1]** 58/18
**moral [2]** 19/24 128/4
**more [22]** 10/22 22/22 27/25 39/23 56/5 63/7 68/12 72/17 73/12 75/4 78/6 79/13 79/21 80/15 96/14 97/10 97/17 122/24 124/22 129/24 134/17 143/19
**morning [19]** 83/4 83/24 83/24 86/21 87/7 103/7 126/13 126/15 127/8 130/22 130/22 131/5 131/11 132/13 138/10 138/17 139/10 139/13 142/23
**mortician [1]** 31/25
**MOS [1]** 121/8
**most [3]** 70/10 132/21 140/6
**mostly [5]** 52/25 60/4 108/18 131/17 135/3
**mother [5]** 35/10 35/24 35/25 71/12 73/15 75/14 77/12 78/13 89/25 90/1 90/2 117/2 117/8 117/16 125/10
**motherhood [1]** 73/12
**motion [12]** 37/1 37/17 43/8 73/7 97/24 102/6 106/7 110/9 116/6 125/19 127/4 127/12
**motions [5]** 66/2 78/21 134/25 135/1 135/4
**motorcyclist [1]** 57/10
**mouth [1]** 79/24
**move [25]** 10/23 10/24 25/12 26/20 33/23 37/21 43/12 47/13 48/5 48/7 61/15 86/5 91/5 91/5 98/12 98/12 98/13 104/20 112/3 115/9 124/21 131/21 131/24 135/4 135/9
**moved [3]** 35/10 35/13 35/14
**Movies [1]** 81/20
**moving [1]** 104/15
**MPS [1]** 120/18
**Mr [1]** 11/15
**Mr. [39]** 11/19 11/20 12/4 26/2 26/17 36/25 39/25 40/5 73/5 82/13 88/7 90/19 94/20 97/23 102/5 104/18 113/23 116/5 122/18 124/8 125/17 127/2 129/8 129/20 131/12 132/4 132/15 135/7 135/10 135/12 135/15 136/1 136/2 136/5 136/24 137/19 138/22 142/20 144/13
**Mr. Bendann [9]** 12/4 129/8 129/20 131/12 132/4 132/15 136/2 142/20 144/13
**Mr. Nieto [26]** 11/20 26/2 36/25 39/25 40/5 73/5 82/13 88/7 90/19 94/20 97/23 102/5 104/18 113/23 116/5 122/18 124/8 125/17 127/2 135/7 135/10 135/12 135/15 136/1 137/19 138/22
**Mr. Proctor [4]** 11/19

**N**

26/17 136/5 136/24
**Ms. [16]** 11/11 11/11 25/4 25/6 29/12 29/13 29/14 82/23 94/17 104/13 126/20 134/18 135/11 135/16 135/22 138/4
**Ms. Cohen [3]** 25/4 25/6 82/23
**Ms. Hagan [2]** 11/11 29/13
**Ms. McGuinn [11]** 11/11 29/12 29/14 94/17 104/13 126/20 134/18 135/11 135/16 135/22 138/4
**much [14]** 28/17 31/22 34/22 36/4 53/9 57/9 88/16 90/3 99/3 108/21 108/22 110/9 124/16 133/11
**mugged [1]** 118/6
**murder [1]** 38/23
**music [1]** 43/18
**must [4]** 21/5 21/16 21/17 66/14
**my [90]** 9/18 10/10 10/13 10/17 21/24 24/15 29/3 29/7 29/8 31/17 32/10 32/14 34/2 34/5 34/25 35/10 35/18 35/20 35/24 35/24 35/24 36/4 36/18 41/20 41/23 45/5 45/6 53/1 53/1 53/15 56/12 57/9 59/8 62/17 62/18 64/23 64/24 66/2 66/3 66/4 67/8 67/14 70/4 71/25 74/13 76/8 78/23 81/21 85/13 87/22 87/23 88/1 89/25 91/14 92/4 92/6 95/5 95/9 101/22 107/2 107/22 107/25 108/20 109/10 109/19 109/24 113/7 117/2 118/5 118/6 118/7 121/18 121/19 122/6 122/7 122/8 125/10 126/13 131/17 132/8 134/13 135/16 135/16 136/14 137/25 138/9 138/11 138/14 138/15 140/1
**myself [8]** 34/4 36/20 66/4 83/15 87/23 101/21 101/23 134/14

**nah [1]** 104/1
**name [6]** 10/10 12/18 13/14 28/8 139/24 142/1
**names [7]** 12/18 12/21 12/21 13/6 13/13 55/21 118/3
**national [3]** 18/18 114/10 121/7
**nature [15]** 18/13 18/16 19/4 33/19 34/18 36/5 56/10 77/22 87/18 101/24 104/17 107/18 108/24 111/4 135/11
**NCO [1]** 121/9
**nearby [1]** 9/20
**necessarily [1]** 41/9
**necessary [4]** 41/8 42/2 71/7 106/5
**need [20]** 10/20 26/21 37/21 65/7 65/16 74/4 80/8 83/23 83/24 88/12 99/14 102/11 105/5 107/3 107/12 116/23 128/19 129/3 129/24 130/11

**needed [2]** 37/13 105/24
**needs [7]** 26/6 37/11 95/22 106/2 119/6 132/14 144/8
**negotiation [1]** 137/7
**negotiations [1]** 134/9
**neighbor [1]** 56/17
**neighborhood [2]** 20/14
**neighbors [2]** 85/8 140/9
**neutral [1]** 135/9
**never [2]** 61/25 66/17
**new [4]** 47/13 54/18 109/19 143/14
**news [10]** 47/6 47/7 47/10 70/14 70/16 126/10 126/11 140/16 141/3 142/8
**newspapers [1]** 23/18
**next [15]** 10/23 10/25 15/17 16/16 16/19 22/3 22/22 24/11 37/21 55/6 60/17 74/8 109/17 109/17 138/22
**nice [1]** 74/11
**Nicole [1]** 118/4
**NIETO [29]** 1/17 11/17 11/18 11/20 26/2 36/25 39/25 40/5 73/5 82/13 88/7 90/19 94/20 97/23 102/5 104/18 113/23 116/5 122/18 124/8 125/17 127/2 135/7 135/10 135/12 135/15 136/1 137/19 138/22
**night [1]** 95/8
**nine [8]** 14/4 35/2 57/20 58/25 59/1 61/10 92/25 93/1
**ninety [2]** 49/16 49/16
**ninety-seven [1]** 49/16
**Ninety-six [1]** 49/16
**no [229]**
**No.number [1]** 5/20
**noise [1]** 34/3
**nolle [2]** 49/10 49/11
**non [1]** 134/20
**non-written [1]** 134/20
**none [5]** 29/25 47/2 47/3 144/13
**nonetheless [5]** 40/21 69/10 71/17 77/10 137/23
**noon [1]** 143/17
**Nope [3]** 28/24 29/1 145/9
**NORTHERN [1]** 1/2
**not [181]**
**note [6]** 10/21 17/6 17/7 17/13 76/21 106/22
**notes [1]** 1/22
**nothing [3]** 40/14 118/25 141/3
**noticed [1]** 101/19
**notion [1]** 128/20
**Notre [1]** 120/17
**November [1]** 31/2
**now [46]** 9/3 9/9 10/4 10/18 10/22 10/23 10/24 12/21 12/22 15/6 19/17 22/3 23/21 24/11 26/13 26/20 30/2 33/25 44/1 45/17 46/15 46/19 47/15 47/22 86/6 103/15 107/10 107/10 118/1 130/15 132/7 133/11 135/8 137/25 139/9 142/18 145/12

**nudity [2]** 39/15 77/20
**number [20]** 2/5 5/4 8/12 9/9 9/11 10/10 11/1 11/2 11/5 12/15 19/18 24/24 25/6 38/16 63/2 83/1 83/7 83/15 95/21 126/9
**numbers [4]** 24/24 82/24 83/16 131/19
**Nuts [1]** 49/21

**O**

**O's [1]** 140/20
**oath [2]** 70/3 70/6
**Oberly [2]** 13/1 13/9
**object [1]** 136/14
**objection [6]** 39/24 42/24 42/25 43/1 137/20 137/25
**obligation [2]** 13/18 14/7
**obscured [1]** 26/9
**observing [1]** 104/16
**obviously [8]** 22/16 42/13 83/3 85/1 86/9 100/25 130/15 136/3
**occupy [1]** 71/23
**occur [1]** 134/8
**occurred [3]** 8/24 19/8 132/13
**occurs [2]** 132/21 133/13
**Ocean [2]** 28/11
**off [8]** 41/22 47/6 103/12 135/4 135/8 135/13 139/3 139/4
**offense [2]** 64/14 133/5
**offenses [3]** 8/24 20/10 123/16
**offensive [1]** 114/22
**offer [13]** 133/2 133/3 133/25 134/4 134/18 134/20 135/5 135/18 135/23 136/2 136/9 136/22 137/1
**offered [3]** 134/1 134/2 135/11
**offers [1]** 136/6
**office [11]** 14/25 15/3 15/4 15/12 15/13 16/4 16/5 16/5 16/6 81/9 117/8
**officer [21]** 16/12 16/15 20/16 20/17 25/12 27/1 27/19 43/15 57/6 57/14 63/7 69/18 69/18 71/5 72/13 72/18 75/3 79/7 79/7 110/17 111/14
**officers [3]** 70/10 71/2 79/5
**Offices [2]** 11/16 11/18
**Official [3]** 1/24 146/1 146/16
**often [2]** 27/11 92/20
**Oh [16]** 46/2 59/12 60/22 79/2 81/4 81/20 84/14 84/15 84/15 84/15 92/22 99/24 113/16 131/9 138/9 140/23
**okay [124]** 15/25 16/16 17/8 17/20 28/13 31/11 31/16 32/12 32/16 37/16 38/15 39/2 39/3 39/13 39/21 40/17 40/18 42/11 44/20 44/23 47/11 47/16 48/18 49/3 50/1 50/5 51/1 51/9 51/25 53/8 54/20 56/16 57/3 57/14 59/23 60/22 62/1 62/2 63/6 63/9 63/23 64/4 65/14 65/18

67/4 67/22 68/3 69/7 69/12 69/23 70/16 72/6 72/23 74/5 75/9 75/11 76/23 77/1 79/5 81/10 82/5 82/7 83/14 85/12 85/17 85/25 86/20 88/3 88/25 90/1 90/12 90/21 91/10 92/11 92/24 93/2 93/9 93/14 95/1 95/10 96/4 96/14 96/17 96/20 96/23 98/7 98/14 98/16 99/6 99/13 99/17 101/21 104/10 104/20 108/10 111/19 112/8 113/16 118/22 119/20 120/20 121/1 121/21 121/25 122/4 122/23 123/3 123/10 124/18 125/13 125/24 126/3 127/17 129/1 129/19 129/23 130/14 137/13 142/10 143/7 143/16 143/24 144/10 145/10
**old [23]** 32/15 32/15 32/15 35/1 35/23 46/24 51/17 53/6 54/2 57/19 60/16 75/18 77/12 78/13 81/14 81/23 89/21 90/2 96/6 113/3 121/15 121/21 125/7
**older [2]** 34/21 35/8
**oldest [1]** 54/5
**once [8]** 2/2 9/25 15/10 27/12 38/1 38/6 120/22 139/13
**one [51]** 9/22 9/22 10/10 13/13 17/3 22/11 22/23 26/24 28/3 28/4 35/7 37/24 38/22 47/4 47/6 47/12 49/3 51/8 51/23 51/24 53/3 54/9 59/17 67/8 69/21 70/16 71/11 75/17 80/3 80/8 82/20 83/10 84/16 86/23 88/3 89/20 91/25 92/3 94/10 95/14 105/18 107/2 108/16 124/15 128/20 129/24 132/20 137/24 138/7 139/18 140/6
**one's [2]** 22/22 51/22
**ones [1]** 25/5
**online [2]** 23/5 23/18
**only [14]** 15/6 16/23 27/22 28/3 28/4 30/5 30/11 82/21 83/6 83/14 84/6 108/19 115/5 130/12
**open [10]** 10/8 14/20 62/8 66/3 101/6 101/11 115/12 127/22 132/7 132/11
**opening [5]** 130/10 130/17 131/22 131/23 138/6
**opinion [2]** 21/19 21/20
**opinions [3]** 85/4 133/12 140/5
**OPM [4]** 58/9 58/16 58/17 58/20
**opportunity [2]** 12/20 134/4
**option [1]** 133/3
**orally [1]** 2/5
**order [9]** 24/22 24/23 25/1 55/12 87/14 92/5 106/1 130/5 140/14
**ordering [1]** 144/6
**orderly [1]** 24/12
**ordinary [1]** 78/16
**Oregano [1]** 112/24
**organization [1]** 16/7
**organizations [1]** 20/14

**O**

**orientation** [1] 18/22
**origin** [2] 18/19 114/10
**original** [1] 126/12
**other** [43] 8/11 14/25
18/19 22/18 23/3 27/15
36/14 36/18 38/15 38/20
38/22 41/12 41/14 41/16
44/12 45/9 45/23 46/5 50/5
51/23 53/10 53/11 58/4
71/20 77/24 81/8 83/13
84/20 88/23 110/7 111/11
114/10 119/9 119/17
119/25 124/14 126/1
126/16 128/18 128/23
140/13 140/13 142/19
**others** [4] 23/4 28/2 83/1
83/3
**otherwise** [13] 19/12
19/15 22/17 37/22 43/13
65/24 90/2 105/23 106/12
119/6 140/6 142/7 144/4
**our** [26] 20/8 20/8 21/14
24/22 33/13 37/20 48/11
49/23 58/4 65/9 65/10 67/3
73/17 99/7 109/16 113/13
114/3 115/8 119/6 129/5
132/12 132/17 133/17
136/5 138/5 139/6
**ourselves** [1] 132/2
**out** [54] 24/14 25/12 25/16
26/24 26/25 28/16 29/13
33/10 35/10 37/8 41/8 43/6
49/11 50/10 59/18 62/19
64/15 64/21 65/23 70/17
71/1 71/13 78/7 81/21 87/7
88/14 88/25 91/13 91/17
92/5 92/14 92/17 95/13
95/20 98/4 102/12 103/13
105/2 107/2 110/22 110/24
112/20 116/23 122/7
127/10 128/7 128/16 132/2
132/11 140/10 140/11
141/15 141/15 142/21
**outside** [3] 81/17 135/8
135/16
**over** [16] 16/23 24/15
28/13 30/24 31/15 45/17
46/19 56/12 61/12 62/5
105/21 112/6 119/3 131/11
131/14 133/14
**overnight** [4] 84/1 95/3
95/19 139/15
**overwhelm** [1] 72/10
**Owings** [1] 89/2
**own** [15] 10/14 23/9 34/2
34/12 51/1 54/10 54/10
54/11 66/22 66/22 77/14
79/10 85/3 106/3 119/15
**owned** [1] 104/24
**owner** [1] 53/2
**ownership** [1] 53/3
**owing** [1] 127/11

**P**

**p.m** [7] 1/12 2/1 139/9
139/11 139/12 141/14
145/14
**page** [6] 16/22 16/23
16/24 16/25 24/11 146/9
**page 12** [2] 16/23 16/24
**page 9** [1] 16/25
**pages** [1] 16/22
**paid** [3] 100/17 102/15

140/19
**paintings** [1] 25/7
**paralegal** [2] 1/20 129/16
**Pardon** [2] 67/12 122/11
**parent** [1] 115/15
**parents** [5] 29/3 35/9 85/9
130/18 140/9
**parish** [1] 125/11
**park** [1] 46/3
**parole** [1] 16/5
**part** [12] 19/3 24/11 41/20
41/21 43/18 59/8 60/20
64/21 74/23 133/19 134/24
142/21
**part-time** [3] 43/18 59/8
60/20
**partial** [1] 124/2
**partical** [2] 46/1 46/4
**participants** [4] 86/9
115/5 140/18 141/6
**participate** [2] 8/19 20/13
**participating** [5] 33/13
37/20 44/21 141/10 142/2
**participation** [2] 74/7
114/3
**particle** [4] 45/24 46/2
46/3 47/1
**particles** [1] 46/5
**particular** [11] 64/2 64/21
71/19 78/14 80/3 81/5
87/14 107/14 119/9 119/16
134/7
**particularly** [5] 10/5 35/24
106/2 126/24 132/22
**parties** [3] 10/1 23/10
139/24
**parts** [1] 16/17
**party's** [1] 81/8
**passed** [3] 34/6 34/8
110/24
**past** [2] 73/11 108/21
**path** [1] 72/7
**pathway** [1] 56/5
**patience** [1] 98/9
**patients** [1] 29/6
**patrolman** [4] 57/10 57/16
57/17 57/18
**patty** [1] 143/11
**Paulemon** [2] 12/24 13/9
**paying** [1] 85/25
**peanut** [1] 143/18
**Pearl** [1] 114/14
**peeking** [1] 62/20
**peeping** [4] 62/16 67/24
68/11 73/16
**penalty** [1] 108/5
**Penn** [1] 60/19
**Pennsylvania** [1] 31/6
**people** [21] 12/15 15/16
15/17 23/19 36/14 36/18
44/12 47/5 66/7 70/1 70/3
70/6 71/1 86/3 86/10 88/17
92/4 92/10 95/16 121/22
145/5
**people's** [1] 64/15
**percent** [4] 80/14 108/9
108/17 133/14
**perfect** [1] 127/9
**perfectly** [1] 106/13
**perform** [1] 65/24
**perhaps** [13] 40/11 55/18
55/18 71/2 71/4 77/19
77/20 78/15 81/18 105/3
133/6 135/18 143/11
**perimeter** [1] 95/18

**period** [2] 110/2 132/19
**permitted** [1] 129/14
**persistent** [1] 140/1
**person** [15] 9/16 20/1
20/17 24/9 41/6 49/20
64/10 66/23 67/3 68/12
69/18 70/20 100/10 128/6
140/7
**personal** [7] 9/10 10/5
18/19 23/9 70/15 79/10
110/14
**personalities** [1] 140/10
**personally** [4] 21/18 66/6
68/22 88/1
**personnel** [2] 12/7 12/13
**persons** [7] 9/5 23/15
40/13 41/14 80/4 139/16
141/9
**pertains** [1] 15/6
**petit** [1] 2/4
**petroleum** [1] 95/11
**Ph.D** [2] 46/8 46/12
**phase** [2] 132/22 137/6
**philosophical** [2] 19/24
128/4
**phone** [4] 23/12 87/1 87/2
135/7
**phonetic** [2] 117/7 118/4
**physical** [2] 22/18 96/15
**physicis** [1] 46/1
**physicist** [2] 45/12 120/6
**physicists** [1] 47/1
**physics** [8] 45/24 46/2
46/3 46/4 46/10 46/11
46/12 46/13
**pick** [3] 48/6 91/6 138/6
**picked** [7] 45/1 48/22
49/21 50/3 58/2 59/21
117/24
**picking** [2] 138/10 138/17
**pictures** [7] 38/20 38/25
39/7 39/9 74/24 77/19
109/11
**piece** [3] 53/2 103/19
129/24
**pieces** [1] 143/6
**Pittsville** [4] 28/6 28/9
28/10 29/4
**place** [6] 10/18 92/12
100/5 113/13 114/22 144/2
**placed** [1] 144/1
**places** [1] 23/19
**Plaintiff** [2] 1/5 1/15
**plan** [2] 145/4 145/6
**planes** [1] 94/11
**plaster** [2] 50/16 50/20
**play** [4] 32/13 32/13 71/17
140/21
**playing** [1] 140/21
**please** [26] 2/2 2/5 2/6
8/13 8/14 9/6 9/9 9/12 11/5
11/13 11/23 12/17 16/17
16/21 19/18 22/12 26/19
26/23 30/7 49/3 74/11 83/5
83/8 86/25 124/10 135/9
**plead** [1] 133/4
**pleas** [1] 9/2
**plus** [2] 89/18 145/1
**podium** [2] 26/9 26/15

**point** [10] 17/18 25/24
53/3 76/10 83/20 106/5
111/2 126/20 135/3 142/20
**pointing** [1] 26/24
**points** [1] 104/15
**police** [13] 15/21 27/7
27/19 57/6 57/14 62/20
68/24 68/25 72/13 72/15
79/5 79/7 110/17
**policy** [1] 63/24
**political** [1] 100/17
**pools** [1] 50/13
**pop** [1] 86/4
**porn** [1] 107/1
**pornography** [4] 8/23
107/1 107/7 123/16
**posed** [2] 9/13 34/22
**position** [11] 20/9 39/19
39/25 42/23 71/22 105/4
120/5 123/8 129/7 134/4
135/9
**positive** [1] 22/13
**possession** [2] 8/23
106/25
**possibility** [1] 133/7
**possible** [8] 25/1 55/15
66/7 79/6 84/7 111/15
130/12 131/19
**possibly** [2] 38/19 42/9
**postings** [1] 23/6
**potential** [4] 2/3 25/22
41/12 84/4
**potentially** [3] 23/3 84/11
127/8
**pour** [1] 50/14
**powerful** [1] 71/11
**practice** [1] 121/20
**practices** [2] 11/16 11/17
**Pratt** [1] 118/6
**predator** [1] 96/18
**prefer** [1] 109/10
**prejudice** [1] 78/12
**prejudicial** [1] 127/9
**presence** [2] 2/6 129/24
139/9
**present** [2] 1/19 8/11
10/1 77/5 115/6 129/14
131/13 141/9 141/16
144/12 144/13 145/3
**presentation** [1] 131/25
**presented** [9] 23/1 39/8
42/19 64/9 71/20 72/22
77/25 85/7 86/16
**presents** [2] 109/13
140/18
**preserve** [1] 84/25
**presiding** [2] 10/11 105/21
**presumably** [1] 128/16
**presumed** [2] 21/6 21/10
49/23 128/13
**presumption** [4] 49/22
49/23 119/11 119/21
**pretrial** [4] 16/6 132/22
133/22 137/5
**pretty** [6] 28/17 30/19 53/9
59/7 94/7 112/20
**prevent** [2] 19/25 128/5
**prevention** [1] 20/13
**previous** [1] 38/23
**previously** [9] 13/15 13/21
14/4 14/9 14/13 40/10
61/19 61/21 110/8
**priest** [2] 125/8 125/11
**principle** [4] 21/8 21/12
21/13 128/15

**print** [1] 23/18
**printed** [1] 23/17
**prior** [10] 13/22 13/25
14/10 14/14 61/22 101/8
101/12 116/11 132/20
134/25
**prison** [1] 20/10
**privacy** [1] 77/14
**private** [10] 15/20 15/22
16/3 29/9 32/17 36/21 39/3
42/11 47/16 52/1
**privilege** [1] 136/4
**probably** [8] 17/3 30/19
56/5 66/1 69/22 70/14
112/6 118/12
**probation** [2] 16/5 108/7
**probe** [1] 66/21
**problem** [6] 26/10 38/12
74/10 79/3 107/5 109/13
**problematic** [1] 128/17
**problems** [2] 92/9 121/22
**proceed** [7] 24/16 25/23
30/2 33/5 130/10 133/9
134/12
**proceeded** [1] 137/20
**proceeding** [3] 106/5
115/6 119/3
**proceedings** [5] 1/11
129/15 133/19 139/14
146/8
**process** [36] 9/4 10/6 24/3
24/12 24/22 24/25 25/2
26/22 33/13 37/21 38/23
38/25 44/22 49/24 78/1
78/9 79/1 83/18 84/25
85/20 91/22 91/23 105/1
105/21 114/3 133/15
133/22 133/22 134/8
134/11 134/15 137/7 139/7
140/11 141/5 144/6
**processes** [1] 70/25
**PROCTOR** [8] 1/18 11/15
11/15 11/17 11/19 26/17
136/5 136/24
**profession** [2] 80/4 137/9
**professional** [1] 136/5
**professionally** [2] 136/17
136/21
**profoundly** [1] 71/11
**prohibition** [1] 23/11
**projection** [1] 138/14
**promise** [1] 104/1
**promoted** [1] 58/19
**promotion** [1] 58/18
**prompt** [2] 9/15 10/21
**promptly** [2] 86/21 129/18
**pronounce** [1] 117/6
**proof** [2] 65/7 77/7
**proofing** [1] 76/12
**proposal** [1] 40/3
**propose** [1] 39/6
**proposition** [1] 119/18
**pros** [2] 49/10 49/11
**prosecute** [1] 11/10
**prosecuted** [4] 35/7 44/17
68/4 96/17
**prosecution** [1] 18/7
**prospective** [3] 39/7
104/19 128/22
**protect** [1] 70/3
**prove** [3] 65/7 67/2 78/3
**proven** [5] 64/1 66/5 108/1
108/12 119/1
**provide** [2] 144/11 144/25
**provided** [7] 9/7 9/23

**JA389**

**P**

**provided... [5]** 137/5 142/24 143/5 144/19 144/22
**provides [1]** 15/23
**public [4]** 10/2 10/4 16/2 16/2
**publishing [1]** 89/16
**Puerto [1]** 93/19
**pull [2]** 66/1 116/23
**pulling [1]** 73/14
**pumped [1]** 84/19
**puppy [1]** 81/23
**pursuant [1]** 146/6
**pushing [1]** 24/18
**put [10]** 13/18 14/7 25/19 38/8 64/18 65/23 78/6 79/24 84/12 108/18
**puts [1]** 92/4

**Q**

**qualified [2]** 106/13 128/21
**qualifies [1]** 110/5
**Quality [1]** 112/13
**Quantico [1]** 12/25
**question [84]** 9/13 9/14 10/8 10/9 10/23 10/25 12/5 12/10 12/11 13/15 14/4 14/17 14/22 15/1 15/6 15/17 16/9 16/16 16/21 16/25 17/9 17/20 19/21 20/10 21/9 22/3 23/21 24/1 24/2 27/5 30/11 33/15 33/15 33/20 37/24 38/16 39/22 41/11 43/16 43/17 45/3 48/12 55/17 56/7 57/5 61/19 62/5 64/3 64/8 64/25 67/5 67/8 72/1 72/11 74/13 74/19 75/12 76/24 77/13 78/8 79/3 87/15 95/23 97/1 101/3 106/23 107/6 110/16 110/18 114/8 115/9 115/16 123/3 125/1 125/1 126/9 127/20 127/24 130/8 133/24 134/12 134/16 137/4 137/24
**questionnaire [16]** 27/5 30/10 33/14 37/23 48/10 52/15 61/12 88/20 91/7 110/15 114/8 115/2 115/8 123/2 124/25 126/7
**questions [44]** 9/3 9/4 9/6 9/12 9/18 10/3 10/7 16/19 16/20 19/18 22/22 29/20 32/20 32/24 38/22 47/19 48/11 52/4 54/23 58/5 61/2 63/12 64/23 64/24 66/20 70/5 72/3 72/5 72/7 73/2 73/5 73/6 73/10 82/10 82/13 90/16 90/19 94/17 103/13 113/20 115/8 120/1 122/15 134/13
**quick [3]** 17/11 26/23 59/18
**quickly [1]** 26/5
**quiet [1]** 35/5
**quit [1]** 122/24
**quite [1]** 100/14
**quote [1]** 105/1

**R**

**race [3]** 18/18 114/10 114/21

**radars [2]** 45/19 45/20
**radius [1]** 31/7
**rail [2]** 33/23 48/9
**raise [2]** 8/13 11/15
**raised [1]** 51/9
**random [1]** 24/25
**range [1]** 105/24
**ranked [1]** 121/9
**rape [1]** 101/8
**reached [1]** 34/13
**reaction [2]** 41/8 41/12
**reactions [1]** 64/17
**read [13]** 9/12 11/3 11/4 12/22 17/14 17/14 22/9 38/3 63/4 87/1 97/10 115/16 116/23
**reading [5]** 22/6 45/8 86/1 103/12 116/20
**readmitted [1]** 102/21
**ready [10]** 10/6 10/6 10/24 24/11 26/4 33/7 47/13 70/5 131/21 141/5
**real [4]** 41/11 88/20 95/9 103/16
**realities [1]** 136/19
**reality [1]** 105/4
**realize [5]** 14/19 62/7 101/23 115/12 127/21
**really [17]** 38/6 38/12 52/13 54/7 64/2 64/23 70/14 72/10 76/24 77/13 78/8 101/3 103/21 105/4 109/17 109/18 122/1
**Realtime [1]** 146/5
**reason [9]** 22/18 26/6 54/12 86/6 104/23 123/3 126/24 137/11 140/3
**reasonable [12]** 21/7 21/11 64/1 64/10 64/11 67/2 76/13 77/7 78/3 105/24 119/5 128/14
**reasons [4]** 85/21 127/19 128/25 135/1
**recall [1]** 60/5
**receive [6]** 24/23 108/5 108/6 143/8 143/17 144/2
**recently [1]** 93/15
**recognize [2]** 12/17 13/13
**recollection [1]** 57/23
**recommence [1]** 145/5
**recommend [1]** 93/22
**record [15]** 10/24 62/3 62/4 106/22 115/4 127/18 128/25 133/23 135/8 135/13 135/15 137/3 139/3 139/4 139/5
**recorded [1]** 9/19
**reengage [1]** 141/5
**reenter [1]** 43/16
**reference [9]** 23/19 36/5 40/16 76/8 86/18 107/8 135/17 137/6 141/11
**referenced [1]** 35/15
**referring [1]** 40/9
**reflect [1]** 115/4
**reflection [1]** 24/6
**regard [5]** 73/20 85/2 111/5 131/13 137/14
**regarding [1]** 73/16
**regardless [2]** 80/2 144/20
**regards [1]** 136/6
**register [1]** 44/13
**Registered [1]** 146/4
**regret [1]** 101/12
**regular [3]** 31/14 37/15

112/22
**regulations [1]** 146/10
**related [8]** 12/6 12/12 16/4 18/18 38/22 39/18 85/10 114/9
**relates [1]** 86/2
**relating [2]** 20/19 20/19 128/9 128/9
**relation [6]** 44/17 68/4 108/5 108/18 109/3 136/25
**relationship [1]** 56/20
**relative [1]** 140/4
**relatively [1]** 104/15
**relatives [2]** 69/24 85/8
**release [1]** 83/11
**relevant [4]** 86/14 128/24 137/11 141/8
**religion [2]** 18/18 114/10
**religious [2]** 19/24 128/4
**rely [2]** 103/21 129/20
**remain [2]** 25/11 83/1
**remains [1]** 119/2
**remanded [2]** 142/18 145/10
**remember [6]** 35/23 44/19 44/20 44/20 44/23 57/21
**remembering [1]** 53/5
**remind [2]** 10/21 15/6
**removed [1]** 99/7
**render [13]** 18/20 18/23 19/1 19/6 20/4 20/21 63/2 74/20 97/6 97/13 108/25 114/11 128/11
**rendering [1]** 78/11
**renovation [1]** 53/14
**Renovations [1]** 50/13
**reported [2]** 1/23 146/8
**Reporter [5]** 1/24 146/1 146/4 146/5 146/16
**reports [1]** 140/17
**Represent [1]** 49/19
**representation [2]** 132/19 134/11
**represented [4]** 11/8 11/15 49/17 141/12
**repugnant [1]** 114/16
**request [3]** 129/9 129/13 137/22
**requests [1]** 129/10
**require [3]** 83/22 110/4 139/10
**required [12]** 11/21 22/24 65/4 65/8 98/5 106/21 136/8 137/24 139/9 139/10 139/20
**requires [1]** 77/6
**research [3]** 23/9 23/11 45/19
**resolved [1]** 133/14
**resort [1]** 93/24
**respect [7]** 34/19 39/8 67/7 86/15 105/10 134/5 141/9
**respectfully [4]** 102/6 125/18 127/3 137/21
**respective [1]** 9/19
**respond [3]** 134/4 136/22 140/2
**responded [2]** 75/13 127/20
**response [20]** 8/12 37/24 40/4 50/9 61/10 63/12 75/12 77/17 101/7 101/25 106/23 107/6 110/16 110/18 115/7 115/9 115/14

115/16 128/17 136/8
**responses [1]** 22/13
**responsibilities [2]** 136/5 136/11
**responsibility [7]** 42/1 42/16 67/1 77/5 77/16 77/22 86/7
**restaurant [2]** 53/19 86/11
**restaurants [1]** 47/5
**restoration [1]** 32/14
**restriction [1]** 84/13
**restrictions [2]** 23/22 86/20
**restroom [1]** 55/10
**rethink [1]** 101/21
**retired [1]** 117/13
**return [18]** 27/1 48/1 52/12 55/4 61/8 82/18 83/4 83/22 83/23 83/24 86/21 90/24 94/24 114/2 122/21 139/9 139/20 141/13
**returned [1]** 77/7
**reveal [1]** 71/4
**reverse [1]** 24/24
**review [3]** 9/23 25/9 52/15
**reviewed [1]** 37/22
**reviewed [4]** 30/10 43/10 48/10 91/6
**revokes [1]** 145/2
**Rico [1]** 93/19
**right [95]** 8/13 9/9 10/13 10/23 17/4 17/11 20/23 24/1 24/15 25/14 27/7 28/2 29/16 29/17 30/8 30/19 33/24 36/7 37/21 38/10 38/11 38/12 38/21 40/19 43/5 43/9 47/14 48/8 48/9 50/6 52/13 58/5 61/11 61/13 62/23 63/17 63/20 63/22 64/6 65/2 65/5 65/12 65/14 65/25 66/12 66/19 66/19 67/4 68/19 70/23 70/24 71/3 71/9 71/14 72/4 72/12 75/7 75/22 76/5 77/3 78/5 78/19 79/19 79/20 80/10 87/15 88/13 88/16 92/5 93/3 100/6 100/8 100/9 102/18 102/22 103/3 103/20 104/24 105/17 106/18 106/20 107/2 110/15 112/8 116/11 117/11 117/14 129/14 132/18 134/6 134/7 134/9 141/15 141/20 145/3
**right-hand [1]** 100/9
**Riley [2]** 13/5 13/12
**rise [4]** 11/6 11/13 11/23 145/12
**RMR [2]** 1/23 146/16
**road [2]** 31/15 62/14
**robbed [2]** 44/13 59/11
**robbery [1]** 44/17
**Rockville [2]** 50/11 51/10
**Roland [1]** 91/9
**role [6]** 2/3 42/16 65/24 71/17 76/10 89/3
**roles [1]** 70/7
**rolling [1]** 132/7
**rolls [2]** 99/7 99/15
**Ronda [1]** 1/23 146/4 146/16
**room [3]** 9/20 25/4 141/17
**roommate [2]** 106/24 106/25 107/6
**row [7]** 25/13 25/17 25/18

25/21 25/21 83/13 88/19
**rows [1]** 26/20
**rule [6]** 23/25 85/13 105/9 129/13 132/1 134/14
**ruled [1]** 132/18
**rules [5]** 23/23 65/10 85/21 136/6 137/8
**ruling [2]** 128/22 128/23
**running [1]** 73/22

**S**

**S-E-E-L-E-R-T [1]** 13/5
**S-T-U-Z-I-N [1]** 13/4
**safest [1]** 140/20
**said [10]** 10/4 34/8 44/10 46/3 66/19 68/5 68/11 80/20 96/22 142/7
**salad [3]** 143/20 143/22 144/7
**Salisbury [3]** 27/6 28/7 28/12
**same [3]** 29/7 44/11 44/11 68/1 68/1 80/16 86/6 96/24 97/1
**satisfaction [3]** 76/13 77/8 119/4
**satisfied [2]** 137/16 137/19
**saw [3]** 28/4 69/2 84/16
**say [26]** 10/22 13/6 27/12 32/6 34/24 41/2 50/25 67/6 72/6 74/22 77/7 78/23 102/14 105/15 108/2 131/13 132/7 136/24 137/9 139/18 139/22 139/22 140/3 140/14 141/23 142/1
**saying [4]** 78/20 140/2 141/17 144/20
**scanning [1]** 92/15
**scenario [2]** 131/22 132/2
**schedule [2]** 109/12 130/15
**scheduling [1]** 109/21
**school [27]** 19/10 19/13 19/16 19/22 28/14 32/11 55/18 75/21 51/22 54/16 90/10 91/17 96/7 96/19 104/5 104/8 109/15 109/17 109/19 109/22 109/23 109/24 110/5
**Schroeder [2]** 13/3 13/10
**science [2]** 46/12 55/25
**scientific [2]** 47/7 120/8
**scoot [1]** 91/4
**scope [1]** 131/4
**scramble [1]** 131/8
**scrapbook [1]** 113/12
**screen [1]** 86/5
**screens [1]** 103/9
**scribble [3]** 10/20 12/18 13/14
**scribbled [1]** 62/10
**search [1]** 23/15
**searches [2]** 86/15 141/9
**searching [1]** 15/8
**seashells [1]** 113/13
**seat [1]** 30/7
**seated [9]** 2/2 2/6 8/16 11/12 11/22 12/4 25/11 26/5 130/9
**seating [1]** 131/20
**seats [1]** 124/22
**sec [1]** 107/11
**second [28]** 13/6 24/13

**S**

**second... [26]** 25/17 32/17 33/9 36/21 39/3 48/4 49/3 51/25 54/20 60/23 72/23 82/20 85/25 88/3 90/13 97/20 99/16 102/20 107/2 113/17 116/16 117/3 118/20 122/25 124/3 126/6
**security [16]** 15/21 15/23 25/12 27/1 43/15 43/18 95/4 95/10 95/18 95/19 110/22 110/23 111/5 111/6 111/14 111/14
**see [46]** 10/9 12/17 15/15 16/23 19/3 24/18 26/12 26/13 26/16 27/5 27/11 28/2 37/7 37/12 38/1 39/17 40/4 43/11 45/6 47/12 48/11 50/5 52/15 55/9 58/4 67/15 72/21 72/22 74/23 74/25 76/11 77/2 77/5 77/18 78/10 86/10 86/12 91/7 104/14 104/16 109/10 109/11 119/25 132/10 139/2 142/11
**seeing [2]** 66/1 78/14
**Seelert [2]** 13/5 13/12
**seemed [1]** 79/25
**seems [2]** 40/15 55/8
**segments [1]** 131/15
**selected [11]** 13/17 14/6 20/5 21/23 22/20 22/23 23/22 56/25 71/16 111/17 119/21
**selecting [3]** 9/5 83/18 139/7
**selection [11]** 8/19 38/23 42/14 84/4 84/8 84/14 127/11 131/18 139/21 141/25 145/5
**self [3]** 41/14 65/11 87/19
**self-assessment [1]** 65/11
**selling [1]** 47/7
**semis [1]** 31/15
**send [2]** 92/6 102/12
**sense [5]** 40/3 66/22 66/22 103/22 123/10
**sensitive [6]** 74/21 75/13 76/19 76/23 77/9 77/11
**sensitivities [1]** 78/13
**sensitivity [2]** 76/17 78/14
**sent [2]** 92/12 139/8
**sentence [3]** 17/4 17/12 108/6
**sentences [1]** 20/10
**sentencing [2]** 20/8 133/20
**separate [2]** 24/18 119/14
**September [3]** 8/25 109/25 121/24
**September 1 [1]** 8/25
**September 3rd [1]** 109/25
**series [1]** 9/3
**seriously [1]** 85/3
**seriousness [1]** 24/2
**serve [31]** 9/5 13/17 14/6 14/20 20/5 21/23 22/21 24/7 36/10 38/18 40/21 43/5 43/23 50/2 58/2 62/8 66/24 71/16 74/3 84/8 84/21 98/4 106/21 110/4 115/13 115/22 119/11 119/21 127/22 139/8 139/21

**served [13]** 13/15 13/19 13/21 13/24 14/2 14/5 14/8 14/9 14/11 14/13 14/16 61/20 61/21
**service [31]** 37/6 37/13 41/6 84/4 84/7 94/6 99/7 111/13 121/4 137/5 139/19 140/8 141/22
**services [4]** 15/23 16/6 58/19 101/1
**serving [3]** 21/2 85/6 105/23
**sessions [2]** 103/7 105/7
**settle [1]** 81/8
**seven [5]** 12/15 49/16 51/6 54/3 121/16
**Seventeen [1]** 13/13
**several [2]** 16/19 126/7
**severe [1]** 133/8
**sex [2]** 123/5 124/2
**sex-trafficked [1]** 123/5
**sex-trafficking [1]** 124/2
**sexual [24]** 8/22 18/11 18/13 18/16 18/22 19/24 20/20 33/17 33/19 56/8 56/10 64/5 87/16 87/18 96/18 107/16 107/18 107/22 108/1 108/24 115/18 123/15 125/5 128/10
**sexually [7]** 87/22 95/25 115/14 118/5 123/6 124/1 125/6
**shall [1]** 144/2
**Shannon [2]** 12/24 13/8
**share [1]** 81/18
**she [43]** 21/5 32/4 34/6 34/10 35/10 37/10 37/11 44/7 44/13 54/17 56/14 56/15 60/16 60/18 60/19 60/20 73/11 73/11 73/13 73/13 73/15 96/1 96/7 96/22 99/24 100/7 100/9 100/14 100/14 100/21 110/5 110/7 117/13 117/19 117/22 118/5 118/5 118/19 125/10 126/14 126/15 133/5 135/17
**She'll [1]** 60/17
**she's [9]** 53/21 55/10 56/19 60/20 60/21 73/15 73/25 110/6 117/18
**sheet [10]** 9/7 9/10 9/24 10/8 17/5 24/18 24/21 25/9 43/11 87/12
**sheets [1]** 24/23
**sheriff's [1]** 16/4
**shifts [1]** 95/9
**shipments [1]** 92/10
**shop [1]** 44/4
**short [2]** 31/3 31/4
**shortage [2]** 103/2 105/17
**shortened [1]** 20/11
**shortening [1]** 105/7
**shortly [2]** 35/11 74/9
**shot [1]** 57/11
**should [22]** 17/2 20/11 21/19 21/25 28/3 40/25 56/25 62/1 62/4 63/24 63/24 83/14 106/17 114/13 127/12 127/19 128/24 132/6 132/11 139/12 144/19 145/4
**shouldn't [3]** 68/19 103/25 105/3

**show [4]** 30/3 43/6 48/2 141/4
**shows [1]** 24/2
**shuffling [1]** 130/20
**shut [1]** 86/5
**side [4]** 25/16 26/24 53/11 53/13
**sides [3]** 66/3 132/24 133/13
**sift [1]** 77/25
**sifting [1]** 78/1
**sight [9]** 22/4 22/5 30/6 30/6 30/12 30/12 37/25 45/4 74/14
**sight/glasses [2]** 30/6 30/12
**significant [2]** 100/25 132/21
**significantly [1]** 105/25
**silly [1]** 85/22
**similar [4]** 16/6 23/8 59/3 59/4
**Similarly [1]** 14/4
**simple [3]** 137/24 143/18 144/5
**simply [4]** 19/20 20/16 69/18 72/17
**since [6]** 46/17 53/12 60/10 60/11 142/23 143/14
**sincere [1]** 72/8
**sink [1]** 144/24
**sir [22]** 26/18 27/2 27/3 30/17 30/25 43/9 51/4 52/13 95/2 98/3 98/15 102/19 106/9 112/9 114/16 124/22 125/22 126/4 127/15 138/16 138/18 145/9
**sister [9]** 56/12 56/22 87/19 87/23 88/1 118/5 118/9 118/18 119/8
**sit [15]** 22/15 22/16 22/17 33/8 36/16 77/23 99/5 99/8 102/11 108/15 124/14 124/14 125/22 126/1 127/16
**sit-down [1]** 99/5
**sites [1]** 2/3
**sitting [5]** 36/6 64/20 65/20 103/5 104/16
**situated [1]** 2/3
**situation [2]** 68/11 138/11
**six [2]** 12/5 49/16
**Sixth [1]** 132/17
**skills [5]** 71/11 71/11 80/12 80/17 101/22
**skimming [1]** 47/6
**sleep [5]** 93/10 93/11 98/16 99/8 142/22
**slices [1]** 143/5
**slide [4]** 33/23 48/9 61/17 98/14
**slower [1]** 36/16
**slowly [2]** 24/13 97/10
**small [1]** 53/2
**smart [1]** 23/12
**smartphone [1]** 23/12
**smell [1]** 112/22
**smelling [1]** 112/15
**Smyth [2]** 12/23 13/7
**Snapchat [1]** 23/7
**so [144]** 10/24 12/20 15/10 15/17 16/16 17/9 17/14 24/12 24/23 25/10 25/13 26/7 26/10 27/12 27/24

27/25 28/2 28/16 30/18 30/20 30/21 30/24 32/13 33/24 34/20 38/8 38/21 39/1 39/1 39/16 39/19 39/21 41/3 41/4 41/15 41/16 41/17 42/2 42/16 44/11 44/13 44/14 47/9 50/8 52/14 52/18 53/8 53/20 56/20 60/5 60/9 60/21 62/1 62/5 63/9 63/12 63/25 64/5 64/15 64/17 64/22 64/23 65/19 65/25 66/9 66/21 70/1 70/1 70/4 71/15 72/6 72/8 72/10 75/12 76/19 77/9 78/7 79/11 79/17 80/14 81/7 83/3 83/20 84/24 85/24 86/16 86/19 87/24 88/12 91/10 91/25 92/11 92/18 95/3 96/14 96/23 98/13 98/16 98/18 99/11 100/24 101/22 103/15 103/21 104/17 105/17 106/19 107/13 107/21 108/8 108/21 109/2 109/3 109/15 109/17 110/4 111/1 112/17 115/18 118/21 118/22 119/20 120/3 123/18 125/8 126/7 126/11 126/22 127/12 128/16 129/3 129/8 130/8 130/14 131/12 132/23 133/20 134/12 134/16 134/16 135/2 136/20 136/21 137/24 140/9 143/24
**so-called [1]** 132/23
**social [8]** 82/2 82/3 86/1 110/22 111/5 111/14 123/4 123/25
**societal [1]** 80/6
**society [2]** 63/18 70/2
**soldiers [1]** 114/15
**sole [1]** 18/24
**solely [9]** 18/21 19/2 19/6 22/24 85/7 97/7 97/14 114/12 114/21
**some [36]** 13/15 14/4 17/12 17/17 35/16 38/25 39/23 41/5 42/13 53/13 55/16 57/22 57/23 61/11 61/19 65/21 70/11 70/25 83/11 84/1 87/13 94/2 95/11 104/25 106/4 106/15 111/2 112/20 115/18 124/14 126/1 131/11 134/21 135/3 135/7 142/19
**somebody [3]** 71/21 71/22 72/14
**somehow [2]** 92/5 131/19
**someone [12]** 12/9 13/13 35/15 35/15 55/17 55/18 68/3 70/18 89/23 105/22 117/1 123/15
**something [25]** 10/20 10/21 12/10 17/14 21/5 24/4 24/5 24/8 24/9 38/17 40/25 78/15 86/4 106/17 108/24 116/23 119/16 122/7 126/13 126/14 131/2 132/14 133/6 141/2 143/18
**sometime [1]** 124/15
**sometimes [9]** 70/6 70/9 70/17 70/20 92/4 92/11 98/18 112/16 112/16
**somewhere [3]** 48/17

94/11 135/2
**son [5]** 75/17 75/21 89/20 89/21 113/7
**son's [1]** 121/18
**sorry [10]** 35/12 61/16 67/6 96/11 99/11 106/11 107/4 109/7 112/3 116/10
**sort [27]** 35/5 40/9 40/20 41/4 41/8 41/8 41/9 42/15 42/20 47/6 47/10 52/24 57/14 65/11 65/11 66/8 71/12 75/9 76/16 77/6 78/9 84/13 92/14 120/12 123/17 133/15 143/16
**sorted [1]** 40/2
**sound [4]** 34/2 75/7 108/2 117/14
**sounds [4]** 53/4 68/3 76/5 143/23
**source [2]** 70/16 141/10
**sources [2]** 23/3 86/17
**South [4]** 57/13 57/18 113/7 113/15
**space [1]** 9/14
**spare [5]** 90/3 90/3 93/9 113/11 122/5
**speak [5]** 10/22 22/3 22/11 22/12 135/9
**speaking [1]** 43/14
**special [6]** 1/19 78/12 99/22 111/1 111/15 144/1
**specialist [1]** 121/19
**specific [7]** 16/12 16/14 40/16 54/11 54/12 67/5 137/6
**specifically [8]** 18/10 33/16 56/7 68/12 73/12 87/15 92/8 107/15
**speeding [1]** 57/10
**Spend [1]** 90/6
**spice [2]** 112/12 112/15
**spot [1]** 16/24
**spouse [5]** 31/24 32/2 59/25 89/14 112/10 121/1
**spouses [1]** 140/9
**spring [1]** 134/25
**springtime [1]** 135/19
**stack [1]** 25/19
**Stacy [2]** 12/23 13/8
**staff [1]** 10/2
**stairway [1]** 83/6
**stand [13]** 2/5 8/13 22/12 25/14 25/17 25/18 26/25 70/21 72/14 83/7 83/12 99/4 138/25
**standards [1]** 113/16
**standby [1]** 138/8
**standing [3]** 25/10 57/4 82/25
**stands [2]** 129/20 145/12
**start [8]** 12/22 15/16 75/24 84/13 109/16 129/5 130/21 145/6
**started [8]** 31/17 59/8 73/11 101/20 109/19 120/18 120/18 130/24
**starting [3]** 75/25 109/20 109/22
**starts [1]** 109/24
**state [14]** 13/16 14/5 15/4 15/5 15/13 15/14 16/1 16/2 31/5 47/13 60/19 61/20 120/16 134/4
**State's [2]** 15/4 15/13
**stated [1]** 128/25

**JA391**

**S**

**statement [1]** 45/5
**statements [2]** 131/22
131/23
**STATES [15]** 1/1 1/4 11/2
11/8 11/9 12/14 14/23
14/24 14/25 15/3 16/5
100/1 132/17 146/5 146/11
113/6
**stay [4]** 24/22 25/1 55/15
**stayed [2]** 49/24 94/1
**steal [1]** 68/16
**stealing [1]** 62/19
**steer [1]** 86/12
**stenographically [1]**
146/8
**stenotype [1]** 1/22
**step [3]** 22/11 33/10 107/2
**stepfather [1]** 87/22 88/20
**steps [2]** 25/13 42/15
**still [9]** 15/17 29/3 51/22
101/24 117/16 130/11
131/23 138/10 138/17
**stitches [1]** 34/24
**stole [1]** 84/17
**stood [3]** 107/22 107/25
136/19
**stop [6]** 9/9 25/4 72/6
82/20 83/6 97/19
**stopped [2]** 15/16 57/10
**stopping [1]** 43/16
**store [1]** 47/14
**stories [3]** 44/21 71/12
108/12
**stranger [1]** 56/16
**stream [1]** 127/10
**street [2]** 1/24 144/6
**strike [11]** 42/25 43/1 73/7
88/8 97/24 99/15 102/7
116/6 124/9 125/19 127/4
**strikes [1]** 144/5
**struck [2]** 128/6 128/16
**struggling [1]** 98/24
**student [1]** 19/10
**studied [1]** 19/22
**studying [2]** 60/21 113/9
**stuff [9]** 32/15 38/4 47/7
50/18 51/23 86/2 86/8
103/9 121/25
**Stuzin [2]** 13/3 13/11
**styled [1]** 11/1
**subject [10]** 17/25 18/4
35/16 36/20 66/6 76/24
77/9 128/1 133/11 142/3
**subjected [1]** 70/22
**subjects [2]** 23/15 27/15
**submit [1]** 105/19
**submitted [1]** 22/9
**subquestions [2]** 17/1
19/20
**subscribe [1]** 80/5
**subsequently [1]** 68/18
**succeed [2]** 83/17 131/20
**success [1]** 42/17
**successfully [1]** 138/1
**such [16]** 15/22 16/4 19/5
20/14 22/7 22/8 23/6 70/6
70/7 78/24 83/16 86/17
108/15 134/1 137/22
141/11
**sudden [1]** 84/18
**suffered [1]** 115/18
**sufficient [2]** 64/9 137/5
**suggested [1]** 132/13

**suggestion [1]** 135/17
**summary [1]** 135/22
**summer [2]** 75/22 143/3
**summoned [2]** 139/19
141/24
**supervisor [1]** 100/25
**supplied [4]** 9/14 27/23
52/15 110/7
**suppose [1]** 106/16
**supposed [2]** 76/5 143/4
**Supreme [2]** 132/17
133/17
**sure [26]** 25/1 26/8 31/20
35/25 38/8 41/18 47/5
52/13 54/7 60/24 60/24
61/14 69/5 74/11 77/9
85/11 85/22 87/2 95/14
108/9 108/17 115/3 138/8
138/11 142/5 144/21
**surrounding [1]** 134/21
**surveillance [1]** 47/5
**survivor [1]** 10/18
**swayed [1]** 97/16
**Swimming [1]** 50/13
**switch [1]** 24/25
**sworn [3]** 8/15 22/24
110/19
**system [4]** 20/3 20/8
49/23 65/9
**systems [1]** 120/18

**T**

**tables [1]** 51/23
**tablet [1]** 23/13
**take [23]** 22/11 24/3 30/7
31/19 32/2 41/2 41/21
55/11 57/1 60/21 74/4
80/13 80/16 81/21 85/2
93/14 99/21 103/6 105/15
107/7 109/9 136/7 136/20
**taken [7]** 34/19 35/5 42/14
70/3 70/6 125/10 131/18
**takes [2]** 72/14 90/1
**taking [2]** 41/23 112/20
**talk [25]** 27/14 29/16 52/1
60/23 63/19 64/14 72/24
75/9 82/5 84/13 88/3 90/13
94/13 97/20 102/2 104/9
113/17 116/1 117/5 122/11
124/4 125/13 126/17 132/6
141/18
**talked [5]** 35/10 36/4
56/19 69/12 125/11
**talking [5]** 41/5 67/6 73/22
84/23 100/24
**tardiness [1]** 127/7
**task [1]** 78/4
**teacher [1]** 110/6
**teachers [1]** 110/4
**tech [1]** 28/18
**technically [2]** 35/8 35/9
**technician [1]** 112/13
**Technology [2]** 47/10
54/18
**television [1]** 140/10
**tell [44]** 17/15 24/8 30/24
32/9 33/22 34/17 46/6 49/1
51/7 52/23 53/13 56/11
57/8 63/11 69/23 73/19
73/19 75/4 79/6 79/7 79/13
79/16 79/23 84/9 84/10
84/12 87/21 89/7 92/22
97/8 102/14 103/4 107/19
109/13 117/1 117/20
120/14 125/5 126/9 129/20

132/10 140/12 140/12
145/5
**teller [6]** 59/7 59/8 59/8
59/9 59/9 59/15
**telling [7]** 80/14 97/2
106/3 106/9 131/8 131/9
136/10
**tells [1]** 106/16
**Ten [1]** 96/3
**tend [5]** 20/15 63/6 69/16
69/20 75/2
**tendency [1]** 41/19
**term [1]** 110/5
**terms [11]** 41/7 42/18
86/18 101/5 101/14 111/4
123/23 133/13 135/11
136/2 141/12
**test [1]** 70/22
**testify [8]** 20/22 20/23
20/24 21/1 21/2 65/8 65/8
96/20
**testimony [14]** 20/16
22/25 63/7 69/17 70/21
70/23 71/12 71/18 71/19
72/17 75/3 80/20 80/21
103/8
**tests [1]** 104/7
**texted [2]** 126/13 126/14
**than [11]** 27/25 41/13
79/13 80/16 96/14 126/16
133/4 133/8 134/17 140/13
140/14
**thank [83]** 8/16 11/22 12/4
26/4 30/2 30/4 31/22 32/16
33/3 33/13 34/1 37/5 37/16
37/20 39/2 42/11 43/7
47/16 47/24 48/1 48/3 52/9
52/11 55/2 55/4 55/11 56/6
61/6 61/8 63/13 67/15 74/2
74/5 74/6 74/18 75/20
82/16 82/19 83/9 88/11
88/15 88/16 88/19 90/20
90/24 91/1 94/13 94/22
94/24 98/3 98/8 98/9 99/13
99/15 99/21 100/16 101/13
112/10 102/16 104/18
112/4 115/7 116/1 116/10
116/14 116/15 118/1
122/21 122/23 124/16
124/20 124/22 126/1 126/2
127/15 138/3 138/23 142/6
142/12 142/15
**thanks [3]** 98/9 106/9
140/23
**that [596]**
**that's [63]** 12/10 16/7 25/8
29/4 32/11 38/2 38/5 38/14
39/1 40/14 41/20 41/23
44/11 44/14 53/8 53/11
59/17 60/11 60/22 61/13
62/3 63/21 64/7 66/11
67/14 68/17 70/22 75/5
76/14 77/4 78/3 78/4 79/9
79/20 81/24 83/8 83/13
88/22 95/7 95/10 97/1 99/1
100/6 100/8 100/8 100/11
100/12 100/17 101/2
101/10 102/22 105/18
105/21 105/22 118/4
126/15 126/16 129/16
132/2 132/3 138/11 141/20
142/22
**theft [1]** 49/6
**their [22]** 10/1 35/17 42/16

42/16 64/16 64/17 67/1
67/2 68/16 70/21 70/22
71/10 72/17 76/12 77/10
79/10 80/20 81/8 81/9 81/9
119/12 131/21
**them [28]** 29/13 31/18
47/2 47/3 55/23 58/11 65/9
72/16 75/10 82/25 84/6
84/9 84/10 84/12 86/12
86/12 91/21 113/6 116/19
116/21 119/5 128/24
128/25 131/9 135/2 139/1
139/2 140/2
**they're [9]** 23/18 63/21
64/16 64/20 70/21 72/3
72/5 72/17 116/20
**They've [2]** 56/19 145/6
**thing [13]** 29/7 36/4 52/24
53/11 54/10 62/21 68/17
68/20 76/16 78/23 85/25
86/23 92/12
**things [22]** 35/25 36/1
39/17 45/24 46/5 54/7
62/19 78/17 79/10 81/18
81/18 81/19 92/11 101/24
102/25 104/17 105/3
108/20 116/25 131/19
132/21 143/4
**think [79]** 12/19 12/19
13/13 15/17 35/17 36/9
36/17 39/21 39/21 40/21
41/7 41/11 41/15 42/3 42/5
52/18 56/21 56/25 57/25
63/12 63/18 65/19 65/19
65/21 67/7 68/8 68/22 69/8
70/2 71/19 72/9 72/19
72/20 72/20 75/6 76/17
78/24 79/1 79/20 80/16
85/9 85/21 97/16 97/19
99/8 99/11 100/19 101/17
103/5 103/10 103/24
105/20 105/24 106/12
106/10 109/8 110/1 110/5
110/8 111/5 111/14 111/16
116/25 117/23 119/10
123/14 123/22 126/22
126/7 128/11 128/24
130/13 131/12 131/25
132/1 137/9
**thinking [6]** 44/18 78/9
80/11 80/17 85/22 140/4
**third [2]** 25/18 32/14
**Thirteen [2]** 15/19 120/13
**Thirty [3]** 46/25 54/3 67/21
**Thirty-seven [1]** 54/3
**this [218]**
**Thomas [3]** 1/23 146/4
146/16
**those [34]** 13/13 18/11
23/23 25/6 25/13 26/9
33/10 33/16 36/1 39/18
42/6 42/6 43/15 55/21 56/8
57/3 61/12 65/22 70/1
70/25 75/6 80/9 83/3 84/12
86/19 87/16 91/25 102/20
107/15 120/19 128/23
142/7 144/11 145/5
**though [3]** 35/8 35/11
138/5
**thought [4]** 46/2 68/19
105/14 133/6
**thoughts [3]** 64/16 105/11
109/1
**three [15]** 11/5 16/22 31/7
54/1 57/11 81/23 83/7
83/12 95/6 109/17 113/2
118/3 122/24

**T**

**three-year-old [1]** 81/23
**through [31]** 12/20 22/17 24/14 27/4 36/19 37/6 37/8 43/5 49/24 62/20 66/15 74/3 77/25 78/21 85/20 87/13 88/13 98/4 101/21 101/25 106/20 110/14 114/7 115/2 116/11 126/7 131/2 133/15 133/15 134/3 135/18
**throughout [1]** 119/2
**TikTok [1]** 23/7 86/2
**tile [2]** 50/16 50/18
**time [41]** 13/6 24/16 35/22 38/24 43/18 53/22 56/3 59/8 59/16 60/20 68/1 70/5 76/10 78/21 84/16 86/24 90/3 90/3 90/4 90/6 92/21 93/9 93/16 103/6 104/7 107/23 108/8 109/4 109/10 110/2 113/11 121/2 121/10 122/5 131/9 131/10 131/16 131/24 132/19 145/4 145/5
**times [3]** 54/7 57/11 87/23
**title [2]** 54/7 60/5
**titled [1]** 11/1
**today [20]** 24/23 43/7 56/20 82/22 83/17 83/18 83/20 84/3 86/19 86/23 98/9 105/1 106/16 107/25 112/22 116/19 126/2 126/15 133/23 139/17
**together [2]** 16/19 92/4
**told [10]** 36/12 56/23 77/17 97/19 101/7 106/13 125/10 130/16 131/1 140/3
**Tom [2]** 62/16 67/24 68/11 73/16
**tomorrow [23]** 83/4 83/19 83/22 83/23 83/24 86/21 87/6 129/4 129/6 129/9 130/2 130/24 131/14 131/16 131/16 131/17 139/9 139/20 141/4 141/14 142/11 144/14 145/3
**tomorrow's [1]** 129/14
**tonight [3]** 86/11 129/17 140/21
**too [8]** 35/13 53/8 79/10 99/3 103/14 109/6 110/9 139/1
**took [1]** 67/16
**top [2]** 47/6 144/7
**topic [1]** 76/16
**topics [2]** 10/5 85/10
**topped [1]** 143/22
**total [1]** 58/24
**totality [1]** 128/19
**totally [1]** 66/3
**touch [2]** 67/15 140/17
**touchy [1]** 36/20
**tough [2]** 66/6 99/1
**tour [1]** 93/25
**towards [2]** 24/16 97/18
**town [1]** 28/8
**Towson [6]** 89/9 90/8 90/9 90/11 90/12 120/15
**tracking [3]** 45/23 46/5 46/5
**trade [1]** 32/11
**trader [1]** 89/3
**Trades [2]** 51/21 51/22
**trafficked [1]** 123/5

**trafficking [1]** 124/2
**train [1]** 92/10
**trained [1]** 59/16
**training [5]** 19/23 28/19 28/20 55/17 55/19
**transcript [1]** 1/11 146/8 146/9
**transcription [1]** 1/22
**trauma [1]** 101/20
**treatment [1]** 103/2
**trial [52]** 10/11 14/21 18/8 21/15 22/14 23/3 23/4 23/14 25/25 38/24 40/7 42/19 43/24 49/9 62/9 64/2 64/20 69/6 70/9 77/19 77/25 84/9 84/25 85/10 85/11 86/10 86/16 101/15 101/17 103/16 105/6 105/25 109/13 110/1 115/13 115/24 118/23 119/4 123/11 123/14 124/14 129/15 131/24 131/25 132/15 132/20 133/9 133/19 140/18 141/10 145/3
**trials [3]** 13/16 110/19 131/7
**tried [1]** 101/22
**tries [1]** 54/6
**trigger [1]** 17/15
**trip [1]** 125/9
**trips [1]** 93/14
**trouble [8]** 36/15 53/4 63/3 63/16 63/19 69/13 105/13 106/15
**truck [2]** 92/5 95/13
**trucks [2]** 32/15 95/14
**true [5]** 49/24 101/9 122/1 143/25 146/7
**trust [3]** 70/1 70/3 140/6
**truth [11]** 65/13 65/15 65/17 71/13 75/4 79/6 79/8 79/13 79/16 79/23 80/15
**truthful [4]** 70/18 70/18 71/2 71/5
**try [7]** 17/13 36/1 42/15 64/15 71/1 85/6 108/19
**trying [10]** 63/24 67/6 72/8 72/9 78/22 85/10 85/17 92/17 109/18 137/3
**tuna [1]** 143/11
**turn [14]** 11/6 16/23 25/8 33/15 37/8 55/17 74/4 78/21 87/1 88/14 98/5 102/13 114/8 116/12
**TV [3]** 81/20 93/10 93/11
**Twelve [1]** 89/6
**Twenty [2]** 51/6 121/16
**Twenty-seven [1]** 51/6
**twice [1]** 12/20
**Twitter [1]** 23/7
**two [30]** 9/15 11/1 22/15 22/22 31/2 32/11 37/23 55/20 55/23 62/10 62/16 63/15 67/17 73/12 83/7 83/12 103/6 103/7 103/7 107/19 110/19 113/6 116/25 119/9 121/14 130/16 131/2 132/24 138/7 143/6
**Tyler [2]** 13/4 13/11
**type [7]** 23/11 53/11 53/16 81/5 101/16 105/5 115/24

**U**

**U.S [5]** 15/12 110/24 111/1 111/15 117/9
**U.S.C [1]** 146/7
**UBMC [1]** 120/19
**Uh [15]** 63/5 63/8 68/6 68/21 69/1 69/3 69/15 82/4 91/24 94/5 108/4 111/10 111/22 112/14 118/15
**Uh-huh [15]** 63/5 63/8 68/6 68/21 69/1 69/3 69/15 82/4 91/24 94/5 108/4 111/10 111/22 112/14 118/15
**unable [8]** 21/8 21/12 21/12 21/23 21/24 23/21 23/23 128/14
**unanimous [2]** 76/13 77/8
**unanimously [2]** 21/7 21/11
**uncertain [1]** 40/23
**uncle [4]** 27/6 57/5 57/9 57/15
**unclothed [1]** 40/13
**uncomfortable [4]** 40/24 112/4
**under [14]** 19/18 19/20 35/6 79/6 84/13 86/6 103/24 119/6 129/13 132/16 136/5 136/11 140/14 142/10
**undergraduate [1]** 89/8
**understand [12]** 22/4 22/8 42/15 71/15 73/9 85/4 105/12 106/12 132/4 136/4 136/12 141/16
**understanding [1]** 22/7
**understood [1]** 105/15
**underwear [1]** 68/17
**unduly [1]** 42/21
**unemployed [1]** 47/13
**unfair [1]** 105/22
**unfortunately [1]** 86/23
**Uniformed [1]** 121/4
**union [1]** 111/23
**unique [1]** 41/14
**UNITED [15]** 1/1 1/4 11/1 11/8 11/9 12/13 14/22 14/24 14/25 15/3 16/5 100/1 132/17 146/5 146/11
**University [3]** 54/18 89/9 113/7
**unless [5]** 21/6 21/10 119/3 128/13 143/24
**unlikely [2]** 130/13 131/22
**unpredictable [1]** 131/7
**unrelated [1]** 69/10
**until [11]** 21/6 21/10 25/8 38/15 66/5 82/21 87/6 110/23 119/3 128/13 130/22
**untreated [1]** 142/22
**unusual [3]** 22/11 41/13 41/19
**unusually [1]** 41/17
**up [33]** 10/8 16/25 22/3 24/16 24/20 29/17 33/14 37/21 44/3 48/6 49/21 54/19 55/9 67/7 85/6 86/14 87/2 87/12 90/7 91/6 92/11 98/12 98/21 99/4 101/3 101/19 115/1 118/21 126/12 130/2 131/18 141/4 145/6

**upfront [1]** 104/24
**upon [4]** 24/6 36/9 78/17 104/17
**us [20]** 36/12 49/1 56/11 57/8 63/11 70/2 70/3 70/17 97/19 99/21 101/7 106/3 106/9 106/14 106/16 120/14 129/1 129/20 140/3 145/4
**use [6]** 53/16 71/1 71/10 87/3 90/4 101/22
**used [2]** 104/4 117/1
**using [1]** 24/24
**usually [3]** 103/5 103/11 123/25

**V**

**vacation [2]** 93/15 93/17
**vaguely [1]** 57/22
**various [1]** 8/25
**vast [1]** 78/15
**venire [2]** 8/15 11/6
**verdict [15]** 18/20 18/24 19/2 19/6 20/5 20/21 63/2 74/21 77/6 78/11 79/1 97/6 97/14 109/1 128/11
**very [36]** 14/17 24/12 24/22 25/4 31/22 34/5 34/18 34/22 34/24 35/24 35/25 36/4 38/16 48/6 57/3 74/9 78/1 88/16 90/12 91/6 91/10 91/19 92/20 97/11 101/18 106/4 108/8 108/21 108/22 115/10 123/11 123/25 124/16 129/19 129/23 134/13
**very impartial [1]** 123/25
**vestibule [2]** 26/25 57/4
**via [1]** 135/6
**victim [22]** 17/11 18/12 18/15 19/9 33/18 34/5 34/5 34/6 44/3 48/12 56/9 56/14 62/15 68/22 87/17 95/24 96/23 101/24 107/17 118/2 125/3 130/18
**victimization [4]** 101/12 115/19 117/3 119/9
**victims [2]** 123/19 124/1 124/2
**VICTORIA [1]** 1/20
**video [5]** 32/13 32/14 39/12 47/5 77/20
**videos [3]** 40/12 42/6 104/17
**view [4]** 26/10 38/20 38/24 63/15
**viewing [3]** 19/5 108/24 109/9
**views [7]** 19/25 20/2 64/19 65/1 65/21 114/16 128/13
**violate [2]** 134/14 136/3
**virtually [1]** 83/19
**virtue [1]** 66/24
**vision [3]** 30/15 111/9 116/22
**vocation [1]** 53/17
**voice [1]** 34/2
**voir [2]** 1/11 25/23
**voyeuristic [1]** 73/17
**vs [1]** 1/6

**W**

**wait [1]** 9/20
**waiter [1]** 52/25
**waiting [2]** 51/23 139/1

**waive [1]** 129/14
**waived [1]** 129/24
**waiver [1]** 145/2
**wake [1]** 98/21
**walk [2]** 24/20 112/20
**WALKER [1]** 1/19 13/2 13/10
**wall [1]** 25/7
**Wallace [2]** 13/4 13/12
**want [39]** 15/16 17/7 25/19 26/9 26/22 31/19 36/14 36/19 36/25 38/11 39/24 41/19 55/17 60/9 61/12 66/5 72/9 72/23 79/24 84/19 84/23 85/4 85/6 85/21 101/3 101/11 105/21 109/11 115/8 117/6 124/2 129/12 130/3 130/25 132/12 133/23 133/24 134/14 140/4
**wanted [5]** 33/15 35/10 96/6 96/13 138/8
**wants [1]** 60/20
**was [210]**
**wasn't [8]** 34/22 36/3 38/8 49/21 95/9 107/23 108/21 110/23
**watch [10]** 20/14 23/13 71/8 77/23 78/20 78/22 93/10 93/11 126/10 140/25 145/13
**watching [3]** 15/15 85/25 95/13
**water [7]** 144/16 144/17 144/20 144/21 144/21 144/22 145/1
**way [21]** 24/12 25/13 25/15 26/15 37/15 40/11 45/7 48/2 54/11 59/8 60/11 65/9 83/6 84/17 105/4 114/18 114/18 114/19 116/25 123/4 130/17 134/21 140/11
**ways [1]** 87/23
**we [110]** 9/16 10/4 10/5 15/8 16/25 17/9 17/18 22/11 22/16 24/22 24/23 24/25 24/13 24/24 24/23 24/25 26/7 26/16 35/7 35/9 35/10 35/13 37/1 37/7 38/15 40/4 44/4 46/4 49/22 50/22 54/9 54/13 59/16 59/16 59/17 62/18 63/14 64/15 64/18 65/6 66/11 67/15 67/16 67/17 69/24 69/25 77/10 78/17 81/23 82/22 83/17 83/19 84/12 84/19 85/4 85/6 87/2 87/4 94/1 97/4 103/25 105/25 106/12 106/17 107/12 110/4 116/25 127/3 127/7 127/12 127/12 129/3 129/4 129/4 129/16 129/19 129/24 129/16 130/11 130/20 130/21 130/24 131/2 131/10 131/15 131/18 131/20 131/23 131/24 132/2 134/12 135/1 135/1 135/4 136/4 137/8 137/11 138/12 138/13 138/14 138/6 138/12 139/6 139/10 140/4 144/21
**we'd [1]** 88/8
**we'll [22]** 10/2 12/20 24/12 37/22 52/13 52/14 62/3

**W**

**we'll... [15]** 75/9 77/2 77/5
82/25 83/5 86/22 102/12
106/19 107/3 122/24
124/14 125/25 132/10
142/11 145/6
**we're [34]** 10/22 10/23
10/24 15/18 24/11 26/4
33/7 39/21 41/9 42/13
52/11 63/23 63/25 65/10
82/21 83/9 101/16 105/4
109/16 125/22 127/11
127/15 130/15 132/3 132/3
132/7 135/13 136/25 138/9
139/1 139/5 140/3 141/18
144/12
**we've [9]** 63/11 69/14
101/7 105/1 110/9 114/4
129/3 138/25 139/6
**wear [9]** 37/25 38/1 45/5
45/6 45/8 74/15 102/22
111/8 116/17
**week [4]** 27/13 37/13
60/17 109/21
**weekends [1]** 22/16
**weeks [2]** 22/15 109/18
**weight [8]** 20/15 63/7
69/17 69/20 69/20 72/17
75/2 128/20
**weird [1]** 78/20
**well [42]** 8/17 23/16 27/25
34/23 36/14 37/7 41/25
44/15 45/7 48/7 49/22
53/19 53/24 70/2 79/14
80/14 80/19 87/2 91/6
92/10 99/24 103/4 106/13
107/8 110/1 110/21 112/5
117/18 117/21 119/10
121/25 126/10 129/13
129/23 130/1 131/4 132/10
140/18 140/25 143/16
144/19 144/25
**well-qualified [1]** 106/13
**went [42]** 32/11 91/17 97/10
131/10
**were [56]** 16/25 19/9 20/5
22/20 34/13 34/18 34/19
34/20 35/1 35/8 35/9 36/6
36/9 40/20 42/3 43/15 44/4
44/12 44/13 45/1 45/25
46/3 46/4 46/14 48/21 49/5
49/17 50/3 51/9 53/2 57/19
58/2 59/10 59/16 59/21
62/20 65/22 68/22 69/24
71/16 79/25 83/25 84/4
85/19 87/25 88/18 102/15
108/15 111/17 117/24
119/20 120/22 125/10
133/8 135/11 135/24
**weren't [1]** 141/16
**what [125]** 15/15 21/19
21/20 22/8 27/9 28/14 29/6
31/9 31/11 32/12 33/22
34/18 34/20 39/15 40/4
40/15 41/13 41/18 42/3
42/3 47/3 49/5 50/12 50/14
50/15 51/19 52/23 54/4
54/7 55/21 56/24 57/14
58/21 59/6 59/17 59/25
60/3 60/18 63/10 63/12
63/24 64/16 64/16 65/15
65/19 65/25 66/19
68/17 69/5 70/16 71/18
72/8 72/10 72/19 72/21

73/19 74/21 76/8 76/9
76/20 77/1 77/2 78/10
78/22 80/3 80/20 84/11
84/15 84/22 84/23 85/8
86/16 87/21 89/14 90/4
91/21 92/8 93/9 96/6
100/14 101/16 101/17
104/6 104/13 105/11
106/14 108/2 110/7 110/20
110/20 112/10 112/22
113/5 113/11 118/22
119/21 120/5 121/1 121/17
122/4 122/5 123/10 125/10
125/12 126/11 126/14
126/15 126/16 127/12
130/2 132/3 133/13 137/3
137/8 139/22 139/22
140/12 141/17 142/2 142/7
143/2 143/10 143/16 145/5
**what's [11]** 28/8 39/25
45/18 55/9 64/15 66/22
66/24 72/22 106/15 113/9
113/14
**whatever [5]** 42/19 86/11
139/25 141/1 141/3
**when [42]** 9/16 13/19 14/8
19/8 24/8 24/16 26/23 27/1
34/22 34/25 36/6 48/14
57/19 59/10 62/18 62/23
65/22 67/24 68/19 73/11
81/8 84/4 86/24 87/3 87/4
87/25 92/3 101/19 103/12
103/18 104/5 106/2 108/8
109/23 125/7 129/17
132/20 134/23 135/1
141/16 143/17 144/11
**where [39]** 16/25 25/8
26/12 26/21 28/4 28/7 30/3
41/23 48/18 49/11 51/9
54/17 57/12 65/10 67/6
67/18 70/4 71/1 71/25 76/5
76/23 79/25 83/22 83/25
85/19 90/9 93/18 95/12
101/14 109/3 123/14
123/23 129/20 130/2
131/18 131/23 132/3
136/18 139/12
**Whereupon [45]** 29/10
30/1 32/18 33/4 36/23 37/4
39/4 42/12 43/3 47/17
47/25 52/2 52/10 54/21
55/3 60/25 61/7 72/25 74/1
82/8 82/17 88/5 88/10
90/14 90/23 94/15 94/23
97/21 98/2 102/3 102/9
104/11 106/8 113/18 114/1
116/3 116/9 122/13 122/20
124/6 124/12 125/15
125/21 126/18 127/14
**whether [22]** 9/12 12/11
20/10 23/12 23/18 41/11
63/25 64/5 64/8 64/22
64/25 66/23 70/18 76/11
76/24 77/15 78/2 105/8
133/24 134/1 135/10 137/4
**which [23]** 9/7 16/22 20/9
24/2 25/4 25/7 25/24 40/15
43/6 56/11 67/2 69/21
76/25 100/25 105/6 107/7
114/18 120/19 127/1
131/20 132/12 134/7 143/8
**while [18]** 15/17 22/3
43/14 44/4 52/1 60/23
64/15 64/20 70/9 82/5 88/3
89/23 90/13 101/12 103/2

122/11 124/3 139/1
**white [1]** 143/5
**who [35]** 9/5 10/11 11/10
11/16 11/17 12/9 35/15
41/6 42/18 43/15 57/4 57/5
57/6 66/23 70/3 70/6 83/16
84/10 84/10 84/11 86/3
92/4 102/21 103/18 105/22
107/25 117/1 118/20
118/20 123/4 130/6 130/17
135/5 138/7 139/24
**who's [3]** 84/24 141/21
142/1
**whole [6]** 44/24 53/9 68/7
91/14 91/15 100/5
**whomever [1]** 140/10
**whose [1]** 8/11
**why [13]** 22/4 26/6 39/1
44/14 54/12 63/21 66/11
79/19 84/12 85/4 92/17
102/14 126/15
**wife [4]** 44/3 44/21 53/1
126/13
**wife's [1]** 53/18
**will [62]** 2/3 2/5 8/19 9/4
9/5 9/15 9/19 9/20 9/21
10/1 10/2 10/4 10/11 10/21
11/10 13/3 13/10 21/15
22/15 22/15 22/24 23/1
24/13 24/17 24/19 25/4
25/6 25/8 25/12 26/5 27/1
30/3 39/23 40/11 43/4 43/6
48/2 55/6 72/7 72/10 74/3
77/18 83/19 98/3 102/11
107/11 107/12 110/1 129/5
129/18 129/19 131/17
132/1 133/2 133/3 134/12
134/15 138/6 139/7 144/10
144/21 144/25
**William [2]** 12/24 13/8
**window [1]** 69/2
**windows [2]** 62/20 68/19
**wish [3]** 9/15 65/8 144/13
**wishes [1]** 117/20
**Witherspoon [2]** 13/4
13/11
**within [3]** 16/21 56/16
117/2
**without [6]** 34/17 40/2
42/4 42/20 73/23 120/2
**witness [16]** 17/21 18/7
18/12 18/15 33/18 44/10
44/14 56/10 62/23 68/5
70/21 80/18 80/21 87/18
107/17 130/7
**witnessed [1]** 44/14
**witnesses [11]** 12/16
12/16 22/25 62/22 130/3
130/5 130/16 130/22 131/2
131/8 138/7
**woman [1]** 118/20
**women's [3]** 62/19 68/12
68/15
**won't [2]** 22/16 29/17
**wondering [1]** 15/15
**Woodlawn [2]** 110/22
111/6
**word [2]** 79/20 97/18
**words [3]** 41/16 79/24
114/23
**work [50]** 28/13 28/15
28/16 29/8 30/18 32/5
32/14 43/22 45/12 45/18
51/20 52/23 53/21 56/2
58/9 58/13 59/3 59/4 81/1

81/3 81/7 82/2 82/3 89/2
89/4 89/5 89/17 91/25
93/16 94/3 94/4 95/12 99/3
99/4 100/25 104/8 109/3
109/3 109/15 109/16 111/4
111/23 112/3 117/1 118/5
118/6 120/1 120/12 123/7
124/1
**worked [11]** 15/20 53/14
59/8 72/15 95/5 95/8
110/21 110/22 117/8
117/22 118/6
**worker [2]** 123/4 124/1
**working [12]** 31/1 32/14
47/14 50/8 51/5 60/20
89/23 90/2 91/19 95/3
110/6 123/18
**works [8]** 12/9 47/4 60/1
99/24 100/7 100/20 112/11
123/4
**worried [2]** 40/24 109/20
**worry [1]** 103/25
**would [152]**
**wouldn't [4]** 78/21 78/23
80/13 100/21
**wraps [1]** 35/6
**write [8]** 9/9 9/12 17/4
17/7 17/11 17/13 17/18
76/20
**writing [3]** 15/16 15/17
22/6
**written [1]** 134/20
**wrong [5]** 60/9 64/6 65/12
92/12 92/12
**wrote [1]** 39/1

**X**

**XYZ [1]** 72/15

**Y**

**Yankees [1]** 141/1
**Yanlei [1]** 117/7
**yeah [37]** 26/12 27/12 28/1
28/3 28/8 30/23 50/19
56/13 62/2 68/6 70/20 72/2
72/6 75/5 76/18 78/19
78/21 78/23 79/2 80/13
81/22 81/24 91/16 91/18
92/16 95/12 96/9 102/23
103/4 103/23 109/2 109/12
117/2 123/20 123/21
144/19 144/25
**year [14]** 46/19 50/24 51/8
54/15 77/12 78/13 81/23
89/21 90/2 93/1 96/6
109/17 109/19 135/18
**years [32]** 31/2 31/13 32/6
32/11 45/17 51/6 56/12
58/25 59/1 59/4 67/21
72/15 72/16 75/18 81/4
81/14 89/6 89/18 92/25
95/6 96/3 98/25 112/6
112/7 112/7 117/13 117/22
118/12 118/14 120/13
123/9 125/7
**Yep [8]** 28/11 28/22 29/5
45/13 45/21 54/8 130/19
130/23
**yes [247]**
**yet [6]** 28/19 77/10 77/22
107/23 132/13 139/7
**York [1]** 54/18
**you [903]**
**you'd [1]** 103/10
**you'll [15]** 10/9 16/23 22/4

23/20 24/14 24/18 24/20
24/20 25/5 83/6 85/23
85/24 99/7 103/4 139/13
**you're [79]** 12/8 15/15
21/12 21/24 21/25 25/14
26/23 28/20 28/20 31/22
37/13 38/1 41/7 41/16
43/14 46/14 49/23 50/7
50/21 51/3 52/13 52/20
53/4 58/11 70/5 73/20
73/22 74/11 74/16 76/22
76/22 78/13 83/12 84/2
84/5 84/18 85/1 86/6 86/24
87/3 87/4 89/12 89/23 90/2
91/19 92/3 92/3 95/13 97/2
98/5 98/5 100/25 101/8
102/12 102/17 103/8
103/12 106/21 111/25
112/8 112/20 114/16 120/8
122/9 124/13 125/25
127/15 129/21 131/16
134/16 136/10 138/14
139/8 139/13 140/1 141/25
142/1 142/11 144/22
**you've [23]** 8/18 9/23
37/23 38/6 63/10 77/17
84/3 84/6 84/20 85/18
85/19 85/20 86/16 97/19
98/16 101/7 106/13 108/12
113/16 119/21 126/8
139/16 141/24
**young [4]** 35/22 39/15
77/20 115/15
**younger [2]** 35/22 35/23
**youngest [3]** 47/14 54/14
54/15
**your [367]**
**yourself [10]** 29/2 48/25
49/19 65/22 66/22 98/14
107/11 115/19 120/6
129/21
**yourselves [1]** 140/16
**youth [2]** 123/5 123/6
**YouTube [1]** 23/7

**Z**

**zero [1]** 87/14
**zeroing [1]** 76/22
**zone [1]** 103/13
**zoned [1]** 105/2

( 162)

**JA394**

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION


 3   _____
                                    )
 4   UNITED STATES OF AMERICA,      )
                                    )
 5        Plaintiff,                )
                                    )Criminal No. 23-cr-0278-JKB
 6   vs.                            )
                                    )
 7   CHRISTOPHER KENJI BENDANN,     )
                                    )
 8        Defendant.                )
     _____)
 9

10

11        TRANSCRIPT OF PROCEEDINGS - JURY VOIR DIRE DAY 2
              BEFORE THE HONORABLE JAMES K. BREDAR
12                 AUGUST 22, 2024 AT 9:38 a.m.

13

14   APPEARANCES:

15        ON BEHALF OF THE PLAINTIFF:
             COLLEEN E. MCGUINN, ESQUIRE
16           KIM Y. HAGAN, ESQUIRE

17        ON BEHALF OF THE DEFENDANT:
             CHRISTOPHER C. NIETO, ESQUIRE
18           GARY E. PROCTOR, ESQUIRE

19        ALSO PRESENT:
             CALISTA WALKER, FBI SPECIAL AGENT
20           VICTORIA LIU, PARALEGAL

21

22        (Computer-aided transcription of stenotype notes)

23                     Reported by:
                   Ronda J. Thomas, RMR, CRR
24                 Federal Official Reporter
                 101 W. Lombard Street, 4th Floor
25                  Baltimore, Maryland 21201
```

```
1  (9:38 a.m.)

2          THE COURT:  Good morning.  Be seated, please.  We're

3  ready to resume the process of picking the jury in this matter.

4  United States of America v. Christopher Kenji Bendann.

5  JKB-23-0278.

6      Is the Government ready for us to continue?

7          MS. MCGUINN:  Yes, Your Honor.

8          THE COURT:  Is the Defendant ready?

9          MR. NIETO:  Yes, Your Honor.

10         THE COURT:  Thank you.  Let's bring in our next juror.

11 And I think, where are we, 234.

12     Good morning, Becca.  And good morning, Ronda.

13     For the record, the Defendant is present.

14     Ma'am.

15         PROSPECTIVE JUROR:  Good morning.

16         THE COURT:  I'll be with you in just a second.  Good

17 morning to you.  Thank you for participating in our process.

18 We'll clear the gallery.  I've been reviewing your juror

19 questionnaire, and I appreciate the care that you took in

20 completing it and listening carefully yesterday.  You have

21 several "Yes" answers for the court.  But let's go immediately

22 to probably the most difficult topic, Question Number 16, and

23 it's 16E:  Specifically in this case, the allegations include

24 those of sexual abuse.  Has any member of your immediate family

25 or closest associates ever been a victim, witness, accused or
```

1   victim of a crime of a sexual nature?  And you answered:  "Yes,
2   victim."
3        Can you tell me a little bit about your "Yes" answer?
4             PROSPECTIVE JUROR:  Yes.  That was me when I was a
5   child so, like, 8, 9.  And then my mom as well when she was a
6   child.
7             THE COURT:  And you were yourself a victim --
8             PROSPECTIVE JUROR:  Yes.
9             THE COURT:  -- of sexual abuse or sexual misconduct?
10            PROSPECTIVE JUROR:  Yes.
11            THE COURT:  Okay.  Did this involve a family member or
12   someone else in the world or your community?
13            PROSPECTIVE JUROR:  Yeah, it was a family member.
14            THE COURT:  Okay.  Would it be difficult for you to
15   serve as a juror in a case where there were allegations of
16   sexual misconduct?
17            PROSPECTIVE JUROR:  Yes.
18            THE COURT:  Let me talk to the lawyers for just a
19   moment, okay, ma'am.
20       (Whereupon, the following conference was held at the
21   bench:)
22            THE COURT:  Mr. Nieto?
23            MR. NIETO:  Yes, Your Honor.  We make a motion to
24   strike for cause.
25            THE COURT:  I was moving quickly yesterday not really

4

1   asking for the Government's position because it's pretty clear

2   what my ruling was going to be, Ms. McGuinn.  I don't mean any

3   disrespect by that but that's probably what my practice is

4   going to continue to be today.  Do you want to be heard?

5            MS. MCGUINN:  Your Honor, I will let you know if we

6   need to be heard but I have no objection to proceed that way.

7            THE COURT:  That's the response of a good advocate.

8   Thank you, ma'am.

9            MS. MCGUINN:  Thank you.

10           THE COURT:  Motion is granted.

11       (Whereupon, the bench conference was concluded.)

12           THE COURT:  Thank you, ma'am.  I'm not going to have

13  you serve on this jury in light of those circumstances, and

14  you're excused and you may depart.  And thank you so much for

15  coming down here and responding to your juror summons.  We

16  appreciate it.

17       We'll select you to serve on a different jury some time.

18  You may leave right through that door.

19           PROSPECTIVE JUROR:  Okay.

20           THE COURT:  The gallery will remain clear.

21       Good morning, ma'am.

22           PROSPECTIVE JUROR:  Good morning.

23           THE COURT:  Thank you for joining us again today in

24  this jury selection process.  I appreciate it.  Are you able to

25  hearing me okay?

5

1          PROSPECTIVE JUROR:  Yes, sir.

2          THE COURT:  Will you stay close to that microphone so

3  that I can hear you?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Thank you very much.  I have reviewed your

6  juror questionnaire and I see that you have supplied no

7  answers, that is N-O, to all of the questions that I've asked

8  except one, and that was Question Number 10.  And my question

9  there was:  A few minutes ago you heard me give a very brief

10 description of this case, is there anything in that brief

11 description that made you realize it would be difficult for you

12 to keep an open mind and serve as a fair and impartial juror in

13 this case?  And then you answered "yes."  And then you wrote to

14 me, "I have been previously molested when I was a child."

15      I imagine this is quite difficult for you to discuss,

16 especially in this setting with strangers, and I apologize to

17 you for that.  But can you tell me even a little bit about your

18 experience, feelings, and how that might impact your ability to

19 be a fair juror if you were selected?

20         PROSPECTIVE JUROR:  So when I was a kid, I was

21 molested by two different men.  One was my babysitter's son,

22 and the other person was my cousin's best friend.

23         THE COURT:  Would these experiences make it difficult

24 for you to serve as a fair and impartial juror?

25         PROSPECTIVE JUROR:  I'm not sure.  I think it would be

**JA399**

```
 1   very difficult for me to be on a jury just because of my past

 2   experience and I don't -- I don't know -- I'm not sure.  I'm

 3   sorry.

 4           THE COURT:  Let's stop there for a moment and let me

 5   talk to the lawyers for a minute, okay.

 6       (Whereupon, the following conference was held at the

 7   bench:)

 8           THE COURT:  Mr. Nieto.

 9           MR. NIETO:  Your Honor, respectfully, I make a motion

10   to strike for cause.  Although she was equivocal, just the

11   emotional outpouring and her difficulty telling the story gives

12   us pause.

13           THE COURT:  So right away, Ms. McGuinn, my reaction is

14   also more on the side of the personal consequences for her as

15   opposed to her objectivity.

16           MS. MCGUINN:  I completely agree.

17           THE COURT:  Okay.  Motion to excuse her for cause is

18   granted.

19       (Whereupon, the bench conference was concluded.)

20           THE COURT:  Ma'am, we're not going to have you serve

21   on this jury. I don't think it's the right assignment for you.

22   We'll have you come back to court some other time and serve on

23   a jury on a different kind of case.  But not this one.  You're

24   excused.  You may depart. I wish you the best.

25           PROSPECTIVE JUROR:  Thank you.
```

1      THE COURT:  Thank you, ma'am.

2   We'll keep the gallery clear.

3   Good morning, sir.

4      PROSPECTIVE JUROR:  Good morning.

5      THE COURT:  Thank you for rejoining us again today as

6   part of this jury selection process.  I appreciate it.  I know

7   it's not easy.  I also appreciate that you completed your juror

8   questionnaire yesterday and I now have that in front of me.

9   You have supplied me with some "Yes" answers to some of

10  the questions that I put out there, and I want to review some

11  of those "Yes" answers with you if you're willing to

12  participate.

13     PROSPECTIVE JUROR:  Yes.

14     THE COURT:  Question No. 10:  A few minutes ago you

15  heard me give a very brief description of this case.  Is there

16  anything in that brief description that made you realize it

17  would be difficult for you to keep an open mind and serve as a

18  fair and impartial juror in the trial of this case?  Answer:

19  "Yes.  I have a family member that was involved in something

20  like this."

21  Question Number 16B:  Have you or any member of your

22  immediate family or closest associates ever been a witness to a

23  crime?  Answer:  "Yes.  Friends saw people breaking into other

24  friend's apartment."

25     16E:  Specifically in this case, the allegations include

1   those of sexual abuse.  Has any member of your immediate family

2   or closest associates ever been a victim, a witness, accused or

3   convicted of a crime of a sexual nature?  Answer:  "Yes.  My

4   son."

5       Question 16H:  Do you hold any beliefs as to crimes

6   involving children that would make it difficult for you to

7   render a fair and impartial verdict based solely on the

8   evidence and the law?  Answer:  "Yes."

9       16I:  As part of the evidence in this case, you may see

10  images of a sexual nature that are graphic.  Is there anything

11  about viewing such images that would make it difficult for you

12  to render a fair and impartial verdict based solely on the

13  evidence of the law?  Answer:  "Yes, brings up memories of my

14  son.  Makes me angry."

15      20:  Do you, any members of your family and closest

16  associates belong to any group that advocates a change in our

17  criminal justice system, et cetera?  Answer:  "Yes."

18      Would you give greater or lesser weight to the testimony

19  of a law enforcement officer?  Question 22.  "Yes."

20      24:  Would the defendant's decision to testify or not to

21  testify affect your ability to be fair and impartial in serving

22  as a juror in this case?  Answer:  "Yes."

23      And then you tell us about some lower back pain that you

24  suffer from.

25      Can you talk to me about the situation with your son?

9

1      **PROSPECTIVE JUROR:**  Yes.  My mother is a daycare

2  provider pretty much all of my life up until 2007, and she also

3  provided for my son.  At that time, he was in third grade.  And

4  one of her clients, toddler, accused my son of touching her.

5  And that was not the case at all.  It turned out to be another

6  family member of hers.  But my mom lost her daycare license.

7  Pretty much had to struggle to find work.  My son went through

8  some mental issues because of that.  And, you know, it just --

9  it put my family through a rough time and all because of false

10  accusations.

11      But at the same time, it was a very serious matter just

12  because my mom being a daycare provider, it was pretty much her

13  whole life.  That was her bread-and-butter and she enjoyed

14  doing that and pretty much destroyed her life.

15      **THE COURT:**  Thanks for sharing that.

16      Tell me also about your views about testimony from a

17  defendant?  Under the Constitution of the United States, no

18  Defendant is required to testify during their trial.  It's

19  completely up to them.  And if they elect not to testify

20  because of this fundamental right they have under the Fifth

21  Amendment to remain silent, and because of this fundamental

22  principle we have that the burden in a criminal case is on the

23  Government to prove someone's guilt beyond a reasonable doubt.

24  It's never on a defendant to prove that they're not guilty.

25      That's why we have the rule.  But nonetheless, I

1  appreciate your candid answer to the question that it would
2  affect -- that you would be unable to necessarily follow that
3  principle or rule.
4      Can you talk to me a little bit about that?
5          PROSPECTIVE JUROR:  As far as testifying?
6          THE COURT:  Yes.
7          PROSPECTIVE JUROR:  I just feel that if someone wasn't
8  to testify it might mean that they weren't willing to talk or
9  they were hiding something or didn't want to reveal certain
10 truths.  When you're on the stand, you have to pretty much tell
11 the truth, right.  So if someone doesn't want to testify, that
12 might mean to me that they don't want to talk or tell the truth
13 about something.
14         THE COURT:  So that's the principle or -- a view that
15 you would hold onto, even though we have this principle in the
16 law that I was talking about a minute ago where the law just
17 flat says, nobody is require to testify in their own case and
18 they're entitled to a presumption of innocence and no adverse
19 inference can be drawn against them if they don't testify.
20 This would still bother you?
21         PROSPECTIVE JUROR:  That would leave a question in my
22 mind, why didn't they testify.  What would be stopping them
23 from testifying?
24         THE COURT:  Okay.  Let me talk to the lawyers for a
25 minute, okay.

 1          (Whereupon, the following conference was held at the

 2     bench:)

 3          I'll hear from the Government first?

 4              MS. MCGUINN:   Your Honor, I don't know that we need to

 5     strike him for cause.  I certainly see the court's -- and

 6     understand and the court's concerns.  I think given -- I know

 7     this is probably unfair in a way, but the defendant has made it

 8     known that he wishes to testify.  So I think there's something

 9     to be said that maybe this doesn't apply.  And part of the

10     reason I'm not moving to strike for cause now is I'm just

11     slightly concerned about our numbers and maybe this is someone

12     we should flush out a little bit more first.  That's just the

13     Government's position.  I certainly would defer to Your Honor

14     if you feel differently.

15              THE COURT:   Well, I'm deeply concerned about our

16     numbers, but I can't let that affect --

17              MS. MCGUINN:   I understand.

18              THE COURT:   -- how I make the call in the individual

19     instance and want.

20          Mr. Nieto?

21              MR. NIETO:   Your Honor, our concern would be based on

22     his answer.

23              THE COURT:   For some reason the volume is not up.  Can

24     you bring the volume a little bit more on those mics?  Or maybe

25     they're back from their mics.  Try again, Mr. Nieto.  I had the

1    same problem with Ms. McGuinn though.

2              MR. NIETO:  Is this better, Your Honor?

3              THE COURT:  Yeah, that's better.

4              MR. NIETO:  With regards to his answer for Question

5    Number 24, our concern would be, despite Mr. Bendann's

6    indication and desire to testify, depending on how the trial

7    goes that may change.  And so if Mr. Bendann were to change his

8    mind, with that deeply-held belief from this particular

9    prospective juror, that would create an issue for us at the

10   time.

11             THE COURT:  So do you move that he be excused for

12   cause?

13             MR. NIETO:  I do, Your Honor.

14             THE COURT:  Yeah, I think it's fundamental.  He's

15   taken a position on an important constitutional issue.  I did

16   take a run at explaining the underlying value.  He gets it, but

17   he's also candidly telling you what's in his head.  I don't

18   think that he would have the self-discipline to sort of

19   overcome that.

20             MS. MCGUINN:  Understood, Your Honor.

21             THE COURT:  Accordingly, the motion to excuse for

22   cause from the defense is granted.

23        (Whereupon, the bench conference was concluded.)

24             THE COURT:  Thank you, sir.  We're not going to ask

25   you to serve on this jury.  You're excused.  You may depart

```
 1   through that door right there.  Thank you.
 2            PROSPECTIVE JUROR:  Thank you.
 3        Good morning, Juror 219.
 4            PROSPECTIVE JUROR:  Good morning.
 5            THE COURT:  Thank you for continuing to participate in
 6   our process.  I now reviewed your juror questionnaire and note
 7   that you have no "Yes" answers to any of our questions; is that
 8   correct?
 9            PROSPECTIVE JUROR:  That's correct.
10            THE COURT:  So you live out in Hagerstown?
11            PROSPECTIVE JUROR:  Yes.
12            THE COURT:  And you're employed out there?
13            PROSPECTIVE JUROR:  Yes.
14            THE COURT:  You work at what I would call Mack Truck,
15   but I guess it's Volvo, right?
16            PROSPECTIVE JUROR:  Yeah, Volvo Mack Truck.
17            THE COURT:  All right.  Well, what do you call it?
18            PROSPECTIVE JUROR:  Most of the time we call it Mack
19   Truck because that's always what it's been in Hagerstown area.
20            THE COURT:  Yeah, it was always Mack Truck.
21        How long you been working at the plant?
22            PROSPECTIVE JUROR:  Nine years.
23            THE COURT:  Okay.  What do you do in there?
24            PROSPECTIVE JUROR:  I'm an assembler.
25            THE COURT:  Okay.  What part of the vehicle do you
```

1  work on?

2          PROSPECTIVE JUROR:  Engines.  Put parts on the engine.

3          THE COURT:  Is it a regular line?

4          PROSPECTIVE JUROR:  Yes, it's an assembly line that

5  moves down the line and you just add the parts that's at your

6  station?

7          THE COURT:  Got it.  Have you always sort of worked at

8  the same station?  Or do you move around a little bit?

9          PROSPECTIVE JUROR:  I can move around.  Most of the

10  time I'm at the same station.

11          THE COURT:  Do you like your job?

12          PROSPECTIVE JUROR:  Yes, I do.

13          THE COURT:  And good jobs like that are kind of harder

14  and harder to get?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  And hold onto?

17          PROSPECTIVE JUROR:  Yes, they are.

18          THE COURT:  You're one of fortunate ones.

19          PROSPECTIVE JUROR:  Thank you.

20          THE COURT:  What did you do before you worked for Mack

21  Truck?

22          PROSPECTIVE JUROR:  I was employed at what they called

23  Good Humor-Breyers, Unilever Company, in Hagerstown.

24          THE COURT:  How many years did you work there?

25          PROSPECTIVE JUROR:  Eighteen and a half.

```
1              THE COURT:  Some kind of mechanical position?

2              PROSPECTIVE JUROR:  No, I was a machine operator.  Or,

3   actually, I was a wrap operator.  I wrapped Klondike bars.

4              THE COURT:  Oh, that's one of my favorites, especially

5   the dark chocolate ones.

6         Did you grow up in Hagerstown?

7              PROSPECTIVE JUROR:  Yes, sir.

8              THE COURT:  Did you go to high school?

9              PROSPECTIVE JUROR:  Williamsport High School.

10             THE COURT:  Did you graduate?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Any schooling after that?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Straight to work at 18?

15             PROSPECTIVE JUROR:  Yes, farming.

16             THE COURT:  Farming?  Oh, that's a tough life.

17             PROSPECTIVE JUROR:  Yes, it is.

18             THE COURT:  Married?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  What's your wife do?

21             PROSPECTIVE JUROR:  She's retired now.

22             THE COURT:  What was she doing when she was working?

23             PROSPECTIVE JUROR:  She was in the school as health

24  assistant.

25             THE COURT:  Health assistant?
```

1           PROSPECTIVE JUROR:   Yes.

2           THE COURT:   Kids?

3           PROSPECTIVE JUROR:   Yes, two.

4           THE COURT:   How old are they?

5           PROSPECTIVE JUROR:   My son is 32 and my daughter is

6    34.

7           THE COURT:   Do they work?

8           PROSPECTIVE JUROR:   Yes.

9           THE COURT:   What do they do?

10          PROSPECTIVE JUROR:   My son works as a forklift

11   operator for F&M Supplies in Chambersburg.   And my daughter is

12   currently working at a facility over at Fort Detrick.

13          THE COURT:   You got grandkids?

14          PROSPECTIVE JUROR:   Nope.   Neither one of them.

15          THE COURT:   No grandkids.

16          PROSPECTIVE JUROR:   Nope.

17          THE COURT:   All right.   I'm going to talk with the

18   lawyers for just a minute.   Okay?

19          PROSPECTIVE JUROR:   Okay.

20      (Whereupon, the following conference was held at the

21   bench:)

22          THE COURT:   Government have any issues or questions in

23   light of mine?

24          MS. MCGUINN:   No, Your Honor.

25          THE COURT:   Defendant?

1          **MR. NIETO:**  No, Your Honor.

2       (Whereupon, the bench conference was concluded.)

3          **THE COURT:**  Thank you, sir.  You may return to

4    courtroom 1B.

5          **PROSPECTIVE JUROR:**  Okay, thank you.

6          **THE COURT:**  Thank you.

7       For your notes:  Yes to 16A, car break-in, second assault;

8    yes to 16E, yes, mother, best friend; yes to 16J, Gilman

9    School; yes, little cousin.  That's it.

10      To you, sir.

11         **PROSPECTIVE JUROR:**  Good morning.

12         **THE COURT:**  Thanks for completing the jury

13   questionnaire and continuing to participate in this process.  I

14   looked through your questionnaire and I found a few "Yes"

15   answers in there.

16      The first one is at 16A:  Have you or any member of your

17   immediate family or closest associates ever been the victim of

18   a crime?  Answer:  "Yes.  Car break-in.  Second assault."

19      Tell me about that?

20         **PROSPECTIVE JUROR:**  So the car break-in was me.  The

21   car break-in was me when I was in high school.  Parked at

22   school actually and somebody took and broke into my car.  That

23   was the whole thing.  They never found the guy.

24         **THE COURT:**  What school?

25         **PROSPECTIVE JUROR:**  Curley.

1          THE COURT:  Curley.  Yep.  Okay.

2          PROSPECTIVE JUROR:  Then the sexual assault was my

3   mother -- this is before I was born and everything.

4          THE COURT:  Before you were born.  How old are you

5   now?

6          PROSPECTIVE JUROR:  Thirty-two.

7          THE COURT:  You're 32, so before you were born.

8          PROSPECTIVE JUROR:  Yeah, before I was born she told

9   me about how she had been raped before.

10         THE COURT:  I'm sorry, I misread your handwriting.  I

11  read second assault, it says "sexual assault."

12         PROSPECTIVE JUROR:  Yeah, sorry.

13         THE COURT:  No, that's my fault.  I apologize.  Sexual

14  assault.  So your mother was raped.

15         PROSPECTIVE JUROR:  Yes.  And then a friend of mine

16  was molested when he was younger.

17         THE COURT:  Okay.  All right.  Let's see.  Tell me

18  about there was some connection to the Gilman School.  You said

19  little cousin?

20         PROSPECTIVE JUROR:  Yeah.  So my little cousin, he

21  played football for Gilman.  He graduated -- he's a senior in

22  college now, so however long that was.

23         THE COURT:  Do you talk to him much?

24         PROSPECTIVE JUROR:  Yeah, so he's my aunt's son.  So

25  it's -- I haven't seen him in the past year just because of

1  that.  But usually we have family functions or whatever if he's

2  able to come, so . . .

3         THE COURT:  Do you remember talking to him much about

4  his time at Gilman?

5         PROSPECTIVE JUROR:  No, other than football that was

6  pretty much it.

7         THE COURT:  Is that kind of the focus of his life and

8  time there, football?

9         PROSPECTIVE JUROR:  Yeah, pretty much.

10        THE COURT:  Was he good?

11        PROSPECTIVE JUROR:  Yeah, he was good.  He got a

12  scholarship to V Tech but now he transferred to Kent State.

13        THE COURT:  Okay.  Is that still D1, Kent state?

14        PROSPECTIVE JUROR:  Yeah, still D1 but kind of a

15  regression.

16        THE COURT:  That's what happens.  Hard to stay at the

17  top of that game.

18        PROSPECTIVE JUROR:  Yeah.

19        THE COURT:  Okay.  So, let's see, what do you do now?

20  You are an engineer?

21        PROSPECTIVE JUROR:  Yeah.  So I'm engineer with

22  Homeland Security.  Well, as a contractor, but with Homeland

23  Security.  So, yeah, I just work in the requirements division

24  there.

25        THE COURT:  How long you been doing that?

```
1              PROSPECTIVE JUROR:  Three years.  Three years now.
2   Before that I was with -- I was a contractor with the DoD.
3              THE COURT:  Tell me about your educational background?
4              PROSPECTIVE JUROR:  So after high school went to
5   college in -- it's a small school called Hampden-Sydney
6   Virginia.
7              THE COURT:  How do you spell that?
8              PROSPECTIVE JUROR:  Like, H-A-M-P-D-E-N.
9              THE COURT:  Hampden City?
10             PROSPECTIVE JUROR:  Sydney.
11             THE COURT:  Oh, Sydney.  I got it.
12             PROSPECTIVE JUROR:  Yeah.  Went there, transferred out
13  after a couple years and then came back to CCBC.
14             THE COURT:  Yeah.
15             PROSPECTIVE JUROR:  Then from there went to North
16  Carolina A&T in Greensboro, that's where I graduated with my
17  degree in mechanical engineering.
18             THE COURT:  Bachelor's.
19             PROSPECTIVE JUROR:  Yes, just got my master's from
20  George Washington in engineering management.
21             THE COURT:  MS?
22             PROSPECTIVE JUROR:  Yes.
23             THE COURT:  Congratulations.
24             PROSPECTIVE JUROR:  Thank you.
25             THE COURT:  Married?
```

1      PROSPECTIVE JUROR:  No, about to be next year.

2      THE COURT:  Congratulations.  Got any kids?

3      PROSPECTIVE JUROR:  No, not yet.

4      THE COURT:  What's your fiancée do?

5      PROSPECTIVE JUROR:  She's an accountant with the state

6  of Virginia for the Health Department, I believe.  Yeah, Health

7  Department.

8      THE COURT:  Got it.  This experience of your mother's,

9  do you think it would affect your ability to be a fair and

10  impartial juror if you were selected in this case?  I mean, it

11  sounds like it was certainly a very negative event, on the

12  other hand, long time ago.

13      PROSPECTIVE JUROR:  Right.

14      THE COURT:  And it has nothing to do with this

15  particular case.

16      PROSPECTIVE JUROR:  I don't think it would affect my

17  ability to really judge anything.

18      THE COURT:  You can keep the two things kind of

19  straight in your mind, one separate from the other one?

20      PROSPECTIVE JUROR:  Yeah.

21      THE COURT:  All right.  There may be some testimony

22  during this trial, in fact I'm sure there will be, about the

23  Gilman School.

24      PROSPECTIVE JUROR:  Uh-huh.

25      THE COURT:  People who worked there, people who

1  attended school there, events that occurred there, or in

2  relation to that institution.  Do you think that you could be

3  fair and impartial with respect to all of that information even

4  though your cousin attended the Gilman School and played

5  football there?

6          PROSPECTIVE JUROR:  Yeah, I think so.  Even though he

7  went there, it was just football conversation.  I never really

8  had a connection with them, other than sports.

9          THE COURT:  Do you remember him ever talking to you

10 about any particular teachers or administrators or people that

11 he knew there that he was particularly close to or had issues

12 or problems with?  Anything like that?

13         PROSPECTIVE JUROR:  Not that I recall, no.

14         THE COURT:  Okay.  All right.  Let me talk to the

15 lawyers for a minute.

16         PROSPECTIVE JUROR:  Okay.

17    (Whereupon, the following conference was held at the

18 bench:)

19         THE COURT:  Government have any issues or questions in

20 light of the ones that I asked?

21         MS. MCGUINN:  No, Your Honor.

22         THE COURT:  Mr. Nieto?

23         MR. NIETO:  Your Honor, if the court would be able to

24 ask this prospective juror what grades his cousin attended

25 Gilman.  They have pre-K through 12.  And Mr. Bendann was a

1   teacher of the middle school.

2           THE COURT:  Right.  I will ask him.

3       (Whereupon, the bench conference was concluded.)

4           THE COURT:  When your cousin went to Gilman, do you

5   remember what years he attended?  I mean, must have been high

6   school because he was playing football.

7           PROSPECTIVE JUROR:  Yeah, yeah, it was high school.

8           THE COURT:  Do you remember when he started there?

9           PROSPECTIVE JUROR:  Like I said, four years ago --

10          THE COURT:  Only if you know, perhaps you don't know.

11  But if you do know.

12          PROSPECTIVE JUROR:  I've got to think back on the

13  years.  He went there for high school.

14          THE COURT:  So nine, 10, 11, 12, you think?

15          PROSPECTIVE JUROR:  Yeah, it was definitely 9, 10, 11,

16  12.  He started his freshman year there.

17          THE COURT:  He had gone somewhere else to grade school

18  and middle school?

19          PROSPECTIVE JUROR:  Right.  He was in Harford County.

20          THE COURT:  Got it.  I'm going to talk to the lawyers

21  again for a second.

22      (Whereupon, the following conference was held at the

23  bench:)

24          THE COURT:  Mr. Nieto?

25          MR. NIETO:  Thank you, Your Honor.  No other

1  questions.

2          THE COURT:  And no concerns?

3          MR. NIETO:  No, Your Honor.

4          THE COURT:  Thank you.

5      (Whereupon, the bench conference was concluded.)

6          THE COURT:  Thank you, sir.  Thank you for answering

7  our questions.  You can return to courtroom 1B.

8          PROSPECTIVE JUROR:  Okay.

9          THE COURT:  In the hard benches in there.  Sorry about

10 that.

11         PROSPECTIVE JUROR:  No problem.

12         THE COURT:  Good morning, Juror 216.  Thank you for

13 returning today.  I've been through your juror questionnaire

14 and see that you have just one "Yes" answer.  I think only one.

15 Does that the sound right to you?

16         PROSPECTIVE JUROR:  Yes, sir.

17         THE COURT:  And that had to do with Question 16J, and

18 you tell us that you have some knowledge of the Gilman School

19 by virtue of the fact that you worked at the Bryn Mawr school

20 for 29 years.  And my knowledge of north Baltimore geography

21 tells me that the Bryn Mawr school is on the other side of

22 Northern Parkway from the Gilman School, and that the schools

23 have some relationship with each other, and sometimes the

24 students in one school will attend classes at the other and

25 that sort of thing.  Am I right about that?

1           PROSPECTIVE JUROR:  Yes, and Roland Park Country.  All
2    three schools interchange classes.
3           THE COURT:  So what did you do at Bryn Mawr school?
4           PROSPECTIVE JUROR:  I was an in-house carpenter.
5           THE COURT:  Okay.  And twenty-nine years?
6           PROSPECTIVE JUROR:  Yes, sir.
7           THE COURT:  Did you ever work over at Gilman?
8           PROSPECTIVE JUROR:  Now and then.  We do our
9    graduations through their parking lots with buses.  We bus the
10   parents in for graduation.  I been over there a couple times to
11   deliver things.  And that's about it.
12          THE COURT:  But you really worked for Bryn Mawr?
13          PROSPECTIVE JUROR:  Yeah, I work directly for Bryn
14   Mawr school.
15          THE COURT:  And in-house carpenter, is that basically
16   you're making repairs of things, minor modifications?
17          PROSPECTIVE JUROR:  They break it, I fix it basically.
18      (Laughter.)
19          THE COURT:  They break it, I fix it.  Got it.  I'm
20   sure you had that emblazoned on your toolbox.
21      Did you retire out of there?
22          PROSPECTIVE JUROR:  Yes, sir.  Retired in February.
23          THE COURT:  Just in February?  Do you miss it?  Or are
24   you good with it?
25          PROSPECTIVE JUROR:  It's kind of hard getting adjusted

1  being retired.  That's such an active job and trying to find

2  things to do and get into other things.

3          THE COURT:  Yeah.  Are you married?

4          PROSPECTIVE JUROR:  Yes, sir.

5          THE COURT:  What's your spouse do?

6          PROSPECTIVE JUROR:  She retired from sales.

7          THE COURT:  Got any kids?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  Okay.  Do you think there's anything about

10  your employment at Bryn Mawr and your occasional going over to

11  Gilman for one thing or another that would affect your ability

12  to be a fair and impartial juror in this case where there will

13  be many references to the Gilman school, to people who work at

14  Gilman, to students who attended Gilman, maybe even events that

15  occurred around or in connection with Gilman, do you think any

16  of that affects your ability to be a fair and impartial juror?

17  Or do you think you can function in the way that we ask of

18  jurors?

19          PROSPECTIVE JUROR:  I don't think it would affect

20  anything.

21          THE COURT:  Okay.  I'm going to talk to the lawyers

22  for a minute, okay.

23      (Whereupon, the following conference was held at the

24  bench:)

25          THE COURT:  Government have any issues or questions in

1  light of the ones I asked?

2          MS. MCGUINN:  No, Your Honor.

3          THE COURT:  Mr. Nieto?

4          MR. NIETO:  Your Honor, one of the Government

5  witnesses is a graduate of Bryn Mawr during the tenure in which

6  this prospective juror was working there.  If Your Honor would

7  be so kind as to ask about that, if that would affect his

8  ability?

9          THE COURT:  Okay.  So if there was testimony from a

10 former student of the Bryn Mawr school, who had graduated in

11 the relatively recent past, could he remain objective about

12 that as well?

13         MR. NIETO:  Please, Your Honor.

14         THE COURT:  Okay.

15     (Whereupon, the bench conference was concluded.)

16         THE COURT:  As it happens, during the course of the

17 trial, we actually might hear the testimony of one former

18 student of the Bryn Mawr school, a student there.

19     Pause for one minute.

20     (Whereupon, the following conference was held at the

21 bench:)

22         THE COURT:  Really, if possible, we should name the

23 person to find out if he would have any connection.

24         MR. NIETO:  Yes.  And that would be Charlotte

25 Hoffberger.

28

1          THE COURT:  Charlotte Hoffberger.  And you're
2  specifically asking that I quiz him about that?
3          MR. NIETO:  Yes, Your Honor.
4      (Whereupon, the bench conference was concluded.)
5          THE COURT:  As I said, we're going to potentially hear
6  the testimony of one former graduate of the Bryn Mawr school.
7  I'm just curious whether you would know a former student there
8  named Charlotte Hoffberger.  That's her name.  The name doesn't
9  ring any bells?
10         PROSPECTIVE JUROR:  No.
11         THE COURT:  And the fact that -- and I see you shaking
12 your head "no."
13     But would the fact that someone testified during this
14 trial, and they were a graduate of the Bryn Mawr school, would
15 that affect your ability to be a fair and impartial juror?
16         PROSPECTIVE JUROR:  I wouldn't think so, sir.
17         THE COURT:  Okay.  Thank you.
18     (Whereupon, the following conference was held at the
19 bench:)
20         THE COURT:  Mr. Nieto?
21         MR. NIETO:  Nothing additional, Your Honor.
22         THE COURT:  And no motion for cause?
23         MR. NIETO:  No, Your Honor.
24     (Whereupon, the bench conference was concluded.)
25         THE COURT:  Thank you, sir.  You may return to

**JA422**

1  courtroom 1B.  Thank you for participating.  We'll speak with

2  you more later.

3      Get him to hold up.

4      (Off the record.)

5          THE COURT:  We're back on the record.  There are no

6  potential jurors in the courtroom.  The public is present.  I'm

7  looking at the rate at which we are finding that jurors are

8  qualified, and we're really right on a razor's edge based on

9  the number of jurors that we initially summonsed.  We've done

10 the math up here.

11     At this point, we've qualified 14.  Hopefully your numbers

12 agree.  We have found 17 not to be qualified.  If you run that

13 out, that's about 45 percent.  We had 78 jurors appear

14 yesterday from the number that we summonsed.  That would bring

15 us 35 qualified jurors if the current ratio holds.  We need 36

16 to satisfy our need for 12 jurors, four alternates, 10

17 defendant peremptories, six government peremptories, and two

18 peremptories per side for the alternates.  That number, what we

19 refer to casually around here as the magic number, is 36.  In

20 this case we've got to get 36 qualified jurors before we can

21 move to the next step.

22     Because of my calculation that we are right on the razor's

23 edge, I've just directed court staff to summons an additional

24 20 jurors, potential jurors, for 8:30 tomorrow morning.  If

25 we're successful today and get our 36, we can tell those 20

1   they otherwise need not appear by a communication that we'll

2   have with them this evening.

3        Government want to be heard?

4            MS. MCGUINN:  No, Your Honor.

5            THE COURT:  Defendant?

6            MR. NIETO:  No, Your Honor.

7        Next.

8        Good morning, ma'am.

9            PROSPECTIVE JUROR:  Good morning.

10           THE COURT:  I'm reviewing your answer sheet.  We'll

11  clear the gallery.

12       Thank you for participating in our process today.  Thank

13  you for returning.  Thank you for faithfully completing this

14  long form yesterday.  I'm grateful for that.

15       And as I look through it, I see that you have some "Yes"

16  answers to some of our questions.  And I would like to review

17  with you some of those questions if you don't mind.

18           PROSPECTIVE JUROR:  Sure.

19           THE COURT:  In particular you told us that you have a

20  first cousin who is an attorney and an aunt who is a retired

21  patrol officer?

22           PROSPECTIVE JUROR:  Yes.

23           THE COURT:  And then Question 16A:  Have you or a

24  member of your immediate family or your closest associates ever

25  been the victim of a crime?  Your answer was:  "Yes.  Myself,

1    (SA)."  Can you tell about that?

2            PROSPECTIVE JUROR:  Yes.  In October of 2017, I was

3    drugged and sexually assaulted by a group of fraternity

4    brothers.

5            THE COURT:  By a fraternity brother did you say?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  Was this matter pursued in any kind of

8    official way?  It's just an event that happened in your life?

9            PROSPECTIVE JUROR:  Yes, Your Honor.

10           THE COURT:  And is it fair to assume that something of

11    that nature is still with you in terms of your emotions, your

12    memory?

13           PROSPECTIVE JUROR:  To a degree.  I think a good

14    amount of time has passed, and I'm pretty emotionally removed

15    from the situation.

16           THE COURT:  Okay.  So you heard me describe what this

17    trial is about, what the accusations are in the case.  When you

18    experienced the sort of trauma that you have, it raises the

19    question of whether you believe you would have the capacity to

20    separate out that experience and not allow it to unduly

21    influence you in your performance of your duties as a juror in

22    this case.  And the bottom line question is:  Could you remain

23    a fair and impartial juror despite the experience that you have

24    very courageously shared with us?

25           PROSPECTIVE JUROR:  I do feel like I could be unbiased

Ronda J. Thomas, RMR, CRR – Federal Official Reporter

**JA425**

1  and impartial.

2          THE COURT:  Would that be rooted in a principle or

3  belief in yourself that while there are many traumas in this

4  world and some of them are very difficult, at the end of the

5  day instances and cases are completely separate from each

6  other.

7          PROSPECTIVE JUROR:  (No audible response.)

8          THE COURT:  And what happened in one instance really

9  doesn't tell us anything at all about what may or may not have

10 happened in some other unrelated instance.

11         PROSPECTIVE JUROR:  Absolutely.

12         THE COURT:  Is that what's at the root of your

13 thinking about all of this?

14         PROSPECTIVE JUROR:  That.  And I just believe that

15 everybody deserves a fair chance.

16         THE COURT:  Thank you, ma'am.

17     You have another answer for us that I want to talk to you

18 about, 16H:  Do you hold any beliefs as to crimes involving

19 children that would make it difficult for you to render a fair

20 and impartial verdict based solely on the evidence and the law?

21 And you answered:  "Yes."

22     Do you want to talk to me further about that?

23         PROSPECTIVE JUROR:  Specifically disabled children.

24 That's what I do.  It's part of my children.  I just hold

25 strong values that they deserve great care.  Yeah.

1          THE COURT:  Yeah.  And tell us about your work?

2          PROSPECTIVE JUROR:  I work in pediatric feeding

3    disorders program.

4          THE COURT:  Pediatric feeding?

5          PROSPECTIVE JUROR:  Feeding disorders.

6          THE COURT:  Like eating?

7          PROSPECTIVE JUROR:  Yes.  I use behavior analytic --

8          THE COURT:  I'm going to get you to move a little

9    closer to the microphone.

10          PROSPECTIVE JUROR:  I use behavior analytic principles

11   to help children with developmental delays or genetic

12   abnormalities learn how to eat.

13          THE COURT:  Wow.  Tell us about your educational

14   background?

15          PROSPECTIVE JUROR:  I have my bachelor's in

16   psychology, focused on neuropsychology.  I was two semesters

17   short before finishing a behaviors analysis master's program

18   and now I'm pursuing speech and language pathology.

19          THE COURT:  Where do you work?

20          PROSPECTIVE JUROR:  Kennedy Krieger Institute.

21          THE COURT:  How long you been at Kennedy Krieger?

22          PROSPECTIVE JUROR:  On and off for about three or four

23   years.

24          THE COURT:  Do you find that rewarding?

25          PROSPECTIVE JUROR:  Yes.

```
1              THE COURT:  Tell us about the rest of your life?  Do
2   you have another person in your life?  Partner?  Spouse?
3   Anything like that.
4              PROSPECTIVE JUROR:  I'm single, and I live with my dog
5   who I love very much.
6              THE COURT:  This is very important, what kind of dog
7   do you have?
8              PROSPECTIVE JUROR:  She's a Border Collie and
9   Retriever mix.
10             THE COURT:  That's the right answer.  I have a Border
11  Collie, too.  If you have a Border Collie in your life, how do
12  you have any time to go to work or get anything else
13  accomplished?
14             PROSPECTIVE JUROR:  I have a strong support system
15  around me.  I have a lot of friends and neighbors who help out.
16             THE COURT:  Okay.  Very good.
17      Do you think that your engagement with disabled children
18  and your commitment to them would affect your ability to be a
19  fair and impartial juror here where some of the allegations
20  will pertain to alleged minor victims?
21             PROSPECTIVE JUROR:  I don't think so for the same
22  reasons that we've stated before.  I just feel that I'm able to
23  remove myself from what's in front of me and see things for
24  what they are.
25             THE COURT:  So you claim a real special ability to
```

1  hold onto objectivity and to evaluate each situation for

2  itself?

3          PROSPECTIVE JUROR:  Yes, that is part of my job so

4  that's what I do all day.  I do feel that that's something I'm

5  able to do.

6          THE COURT:  So you deal with one case that has one set

7  of circumstances and complications and tugs at your heart and

8  pulls at your brain --

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  -- and then you move on to the next case?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  And the circumstances and conditions and

13  so forth are different from the one that you were just

14  managing?

15          PROSPECTIVE JUROR:  Yes.  I also look at data and

16  I'm -- I look at what is objective and it's not anecdotal or

17  subjective in any way, shape or form, and that's what we use to

18  make our decisions.

19          THE COURT:  Got it.  Let me talk with the lawyers for

20  just a minute, ma'am.

21          PROSPECTIVE JUROR:  Sure.

22      (Whereupon, the following conference was held at the

23  bench:)

24          THE COURT:  Government have any questions in light of

25  mine or issues they want to raise?

1           MS. MCGUINN:  No, Your Honor.

2           THE COURT:  Defendant?

3           MR. NIETO:  No, Your Honor.

4           THE COURT:  Thank you.

5      (Whereupon, the bench conference was concluded.)

6           THE COURT:  Thank you, ma'am.  We're finished asking

7   you questions.  You may return I guess now to the fourth floor

8   to the jury assembly area.  Thank you.

9      Thank you for asking.  We will keep the gallery clear.

10     Thanks for joining us here in the courtroom.  And I've

11  been reviewing your juror questionnaire and you are Juror No.

12  204, correct?

13          PROSPECTIVE JUROR:  Yes, sir.

14          THE COURT:  Thank you for participating in this

15  process and for faithfully completing the questionnaire.  I

16  know this is not the easiest process.  And I appreciate your

17  candor and what you have shared with us.

18     You have some "Yes" answers for me, right?

19          PROSPECTIVE JUROR:  That's correct.

20          THE COURT:  Question No. 10:  A few minutes ago, you

21  heard me give a very brief description of this case, is there

22  anything in that brief description that made you realize it

23  would be difficult for you to keep an open mind and serve as a

24  fair and impartial juror in the trial of this case?  You

25  answered:  "Yes."  And then you wrote to me, "my sister's" -- I

1   can't see if it says "were" or "was assaulted."  Okay.

2        And then I continue on with your questionnaire and I turn

3   to Question 16A:  Have you or has any member of your immediate

4   family, closest associates ever been the victim of a crime?

5   "Yes.  Burned.  Sisters assaulted."

6        And then 16E:  This case includes allegations of sexual

7   abuse.  Any member of your immediate family, closest associates

8   ever been a victim?  And you circled the word "victim" and then

9   wrote the word "yes" after that.

10       Do you hold any beliefs -- this is 16H:  Do you hold any

11  beliefs as to crimes involving children that make it difficult

12  for you to render a fair and impartial verdict?  Answer:

13  "Yes."

14       So tell me about your "Yes" answers.

15            PROSPECTIVE JUROR:  Sure.

16            THE COURT:  What happened with your sister, that sort

17  of thing?

18            PROSPECTIVE JUROR:  I have six -- seven siblings.

19            THE COURT:  I'm going to have you move closer to the

20  mic.

21            PROSPECTIVE JUROR:  I have six -- seven siblings, six

22  sisters.  One was involved in what probably would have led to a

23  rape instance if someone didn't intervene.

24       And then I don't think it's unique, personally unique, but

25  they've all had their own encounters with some type of sexual

1  misconduct.

2          THE COURT:  Okay.  So knowing about your sisters'

3  experiences, especially the one, and absolutely appreciate

4  you're telling us about that matter, the bottom line question

5  is whether that knowledge and that experience you've had would

6  make it difficult for you to be a fair and impartial juror if

7  you were selected to serve on this case?

8          Understanding that every case and situation and accusation

9  is different and unique and the truthful resolution of a matter

10  depends on the particular facts and circumstances and evidence

11  in that particular case.  Something could be true in one case

12  and then the next be utterly untrue, and then in the third case

13  some variation of, you know, what happened in the first and

14  second could be true.

15          The question that we're trying to tease out here is what

16  do you think your ability is, your capacity is to distinguish,

17  to put aside maybe matters that have happened in your own life

18  and being fair and impartial with respect to a particular

19  situation presented to you if you served on this jury?

20          PROSPECTIVE JUROR:  Yeah, it's understood that,

21  obviously all of the facts and the details and nuances of the

22  case, I would say that if I had -- I consider myself very

23  subjective.

24          THE COURT:  Very subjective?

25          PROSPECTIVE JUROR:  Objective.

1          THE COURT:  Very objective.

2          PROSPECTIVE JUROR:  And willing to listen and trying

3   to get to the facts.  In saying that, I would say if I had a

4   trigger it would be abuse of women and children.  That

5   wouldn't -- that would be -- I'm not very -- it's pretty black

6   and white for me morally.

7       So without knowing anything about the evidence of the

8   case, I would approach my position as a juror wanting to get to

9   the roots of the facts.  I would say it would be very --

10  wouldn't need a very compelling argument from the plaintiff if

11  there was any type of factual evidence that -- that would kind

12  of lean me one direction or the other.

13         THE COURT:  Would you say that you find in yourself

14  probably a predisposition to believe an accuser if the subject

15  is in the area that you described where you have a trigger,

16  that is, abuse of a minor?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  I don't want to put words in your mouth,

19  but that's how I would summarize what I think you told me a

20  minute ago.

21         PROSPECTIVE JUROR:  Yeah, I'm happy to participate.

22  I'm just, you know, trying to answer those questions as openly

23  and honest as possible.  Anything that has to do with children,

24  women or sexual abuse, I probably automatically would have -- I

25  don't know if I'm alone with that pre--

```
1              THE COURT:  Predisposition.

2              PROSPECTIVE JUROR:  -- disposition.  And then it would

3    be up to the defense team to then persuade me otherwise.  And

4    just to be entirely truthful.

5              THE COURT:  Got it.

6              PROSPECTIVE JUROR:  Provided that I've seen evidence

7    that suggested what the plaintiff's arguments are.

8              THE COURT:  I got it.  Let me talk to the lawyers for

9    just a minute.

10             PROSPECTIVE JUROR:  Sure.

11        (Whereupon, the following conference was held at the

12   bench:)

13             THE COURT:  Mr. Nieto?

14             MR. NIETO:  Your Honor, we make a motion to strike

15   this particular juror at this point for cause.

16             THE COURT:  Ms. McGuinn, it's a little closer then

17   some of ours, but -- and I don't think I really led him.  I

18   think I summarized what he was telling us.  I think he's got a

19   predisposition.  He's not going to go there instantly, but then

20   he did use the word "automatic" if there's some evidence in

21   support of the prosecution's position.  And then he's going

22   to -- then there's going to be a burden shift in his mind.

23             MS. MCGUINN:  Right.  Well, that was what Ms. Hagan

24   and I caught and felt would certainly be concerning for the

25   court, the burden shift.
```

```
 1              THE COURT:  So no objection from the Government?
 2         MS. MCGUINN:  No.
 3              THE COURT:  Thank you.  Motion is granted.
 4       (Whereupon, the bench conference was concluded.)
 5              THE COURT:  Thank you, sir.  We're not going to have
 6    you serve on this jury.  You're excused.  Thank you so much for
 7    your candor and being just as clear and truthful as you can be.
 8    That's your obligation as a citizen in here.  You've discharged
 9    it and I'm grateful.  We'll get you back some other time and
10    put you on some other kind of jury.
11              PROSPECTIVE JUROR:  Thank you.
12              THE COURT:  Thank you, sir.  You're excused.
13         Readmit the public.
14         Good morning, ma'am.
15              PROSPECTIVE JUROR:  Good morning, Judge.
16              THE COURT:  Thank you for coming back and being with
17    us again for a second day.
18              PROSPECTIVE JUROR:  Thank you.
19              THE COURT:  You completed your juror questionnaire
20    yesterday.
21              PROSPECTIVE JUROR:  Yes.
22              THE COURT:  I have that in front of me now.  And I
23    want to review it with you.  I saw that you had a "Yes" answer
24    in here.  And if it's okay with you, I'd like to review that
25    with you.  Just making sure I get on the right page here.  And
```

1    I have found it once again.

2        And it was Question 25:  Do you believe that just because

3    a defendant has been indicted he or she must be guilty of

4    something?  At first you answered "no" but then you crossed

5    that out and you answered "yes."  And then you underlined the

6    word "yes."

7        Can you tell me about that?

8            PROSPECTIVE JUROR:  I guess --

9            THE COURT:  I'm going to have you move up in your

10   chair so you're a little bit closer to the microphone.  The

11   chair won't move, I'm sorry about that.

12           PROSPECTIVE JUROR:  I guess because it wasn't going to

13   bring forward.

14           THE COURT:  I didn't hear you.

15           PROSPECTIVE JUROR:  That something was done --

16           THE COURT:  Yes.

17           PROSPECTIVE JUROR:  And it has to be brought forward

18   and then to decide.

19           THE COURT:  Okay.  So let's talk a little bit about

20   how our law works, okay?

21           PROSPECTIVE JUROR:  Okay.

22           THE COURT:  Under our Constitution, we say and we

23   require that if someone is going to be accused of a crime in

24   this country then we presume them innocent until the Government

25   proves their guilt beyond a reasonable doubt to the unanimous

43

1  satisfaction of a jury.  And if that doesn't happen then the

2  presumption that that person is not guilty, that they are

3  innocent, stays with them and under our law they are innocent.

4      So when someone has been accused of something by a grand

5  jury indictment, we certainly will move forward and hold a

6  trial.  But our starting point in that trial is that we all,

7  the jurors, the judge, we presume that the person who's accused

8  is not guilty.  We presume that they are innocent.  We hold

9  onto that presumption unless and until the Government proves

10  the person guilty beyond a reasonable doubt.  The defendant

11  doesn't have to prove anything.

12          PROSPECTIVE JUROR:  Okay.

13          THE COURT:  That's not how our system works.  So the

14  burden is on the Government.

15      So my question to you is, with that further instruction

16  from me and that further explanation, do you feel like you

17  understand that rule of our system?

18          PROSPECTIVE JUROR:  I think so.

19          THE COURT:  Do you think it's fair and correct?  Do

20  you think it's a good idea that we have that rule?

21          PROSPECTIVE JUROR:  Yeah.

22          THE COURT:  And if you were a juror in the case, do

23  you believe that you would have the self-discipline to follow

24  that rule as I've explained it to you and apply the rule in the

25  way that I described?

```
 1          PROSPECTIVE JUROR:  Hopefully.  Can I say something?
 2          THE COURT:  Absolutely.  That's what we're here for.
 3          PROSPECTIVE JUROR:  I'm a diabetic --
 4          THE COURT:  Get a little closer to the microphone.
 5          PROSPECTIVE JUROR:  Okay.  I'm a diabetic.
 6          THE COURT:  You're a diabetic.  Yes, ma'am.
 7          PROSPECTIVE JUROR:  I'm at the stage where I have
 8   problems, like, with memory?
 9          THE COURT:  With memory?
10          PROSPECTIVE JUROR:  Yeah.  You know, what I mean is
11   like if you explain everything to me, whatever, I may not to
12   really understand everything.  And I know myself and I would
13   not like to have to judge somebody and because depends on their
14   life, their future, and I would not like to make a mistake.
15          THE COURT:  It is a hard job.
16          PROSPECTIVE JUROR:  Yes.  And to be fair to both
17   parties, it's my civic duty to serve and that's why I'm here
18   but at the same time it's a very serious case.
19          THE COURT:  Yes.
20          PROSPECTIVE JUROR:  And should be people who could,
21   you know, really relate with what's going on.
22          THE COURT:  People who could do what?
23          PROSPECTIVE JUROR:  The jurors should be able to
24   relate --
25          THE COURT:  Should be able to relate.
```

```
 1            PROSPECTIVE JUROR:  For the case, to do the correct
 2     judging.
 3            THE COURT:  Are you afraid that your diabetes and the
 4     memory issues you're describing might affect your ability to do
 5     that?
 6            PROSPECTIVE JUROR:  I think it will.  And I also have
 7     a hearing problem.  Like, sometimes, you know, you talk a
 8     sentence and I may not hear the end.
 9            THE COURT:  Yes, yes.
10            PROSPECTIVE JUROR:  And I want to be truthful to
11     myself, and the Lord, and people's life is at stake on both
12     sides, okay.
13            THE COURT:  Yes.  So, ma'am, let me tell you that I
14     respect you for your candor and truthfulness here in court.
15     And I admire the seriousness with which you have taken your
16     juror summons and this process.  And I agree that I think that
17     maybe this is not the best role for you.
18            PROSPECTIVE JUROR:  Yes.
19            THE COURT:  Because of the diabetes, your memory, your
20     hearing, and you might just not have quite the physical
21     capacity --
22            PROSPECTIVE JUROR:  That's right.
23            THE COURT:  -- to perform the duties --
24            PROSPECTIVE JUROR:  Yes.
25            THE COURT:  -- that we're asking you to perform.
```

```
 1              PROSPECTIVE JUROR:  That's right.  Okay.

 2              THE COURT:  So I'm going to excuse you.  And I'm going

 3    to excuse you from further juror service.  We're going to

 4    strike you from our juror rolls.

 5              PROSPECTIVE JUROR:  Okay.

 6              THE COURT:  It doesn't seem like it's a good fit for

 7    you now at this point in your life.

 8              PROSPECTIVE JUROR:  At this point, yeah.

 9              THE COURT:  Thank you for being such a good citizen.

10              PROSPECTIVE JUROR:  Thank you, everybody.  Good luck.

11              THE COURT:  Thank you for coming today.  You are

12    excused.

13              PROSPECTIVE JUROR:  Thank you.

14              THE COURT:  On 202, excused for cause.  Court's

15    motion.  Lack of physical capacity.  She's got medical issues

16    that will interfere with her capacity to listen and --

17              MR. PROCTOR:  Judge, would you mind between jurors if

18    you stand up and stretch?  My legs are going to sleep.

19              THE COURT:  You can do it this one time since you

20    asked.  Stretch til your heart's content.

21              MR. PROCTOR:  Can I have a continuing motion to

22    stretch?

23              THE COURT:  No, you can't.  You've got to ask.

24          Everyone can take a break.

25          But, no, hold on just a second Mr. Gerstell.  Beyond that
```

1  I'm not content to have everybody standing up and stretching

2  and walking around the courtroom.  But you need a stretch

3  break, take it now.

4      Next.  200.

5      Good morning, ma'am.

6          PROSPECTIVE JUROR:  Good morning.

7          THE COURT:  I am in the midst of reviewing your juror

8  questionnaire.  Thank you for completing it and thank you for

9  returning today.

10      I have reviewed it, and I see that you have no "Yes"

11  answers for me; is that correct?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Very good.  And you work for the Maryland

14  Port Administration?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  How long you been working at the port?

17          PROSPECTIVE JUROR:  Six years.  But I've been with the

18  state for 25.

19          THE COURT:  For 25.  And what's your current job?

20          PROSPECTIVE JUROR:  I work in the accounting office in

21  accounts payable.

22          THE COURT:  In accounts payable?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  And is your training in accounting,

25  bookkeeping, that sort of thing?

```
1              PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Tell me about your educational background?

3          PROSPECTIVE JUROR:  Just graduation from high school.

4          THE COURT:  Okay.  Other jobs that you have with the

5   state before you worked at the port?

6          PROSPECTIVE JUROR:  I was at the MVA for 18 and a half

7   years in the accounting office.

8          THE COURT:  Also basically doing the same sort of

9   thing, accounts receivable or some kind of financial

10  administration?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Do you like your job?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Okay.  Do you have a person in life or

15  anything like that?

16         PROSPECTIVE JUROR:  I'm married.

17         THE COURT:  You're married?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  What does your spouse do?

20         PROSPECTIVE JUROR:  He is a realtor.

21         THE COURT:  He's a realtor.  And how long has he been

22  doing that?

23         PROSPECTIVE JUROR:  Twenty-five years.

24         THE COURT:  Twenty-five years.  Commercial,

25  residential?
```

49

```
 1          PROSPECTIVE JUROR:  Residential.

 2          THE COURT:  Do you have any kids?

 3          PROSPECTIVE JUROR:  A stepson.

 4          THE COURT:  You have a stepson.  How old is your

 5  stepson?

 6          PROSPECTIVE JUROR:  He is 22.

 7          THE COURT:  What does he do?

 8          PROSPECTIVE JUROR:  He works for Northrop Grumman.

 9          THE COURT:  For Northrup Grumman.  What does he do

10  there?

11          PROSPECTIVE JUROR:  He can't tell me.

12          THE COURT:  He can't tell you.  That's it.

13      (Laughter.)

14          THE COURT:  He drives beyond that fence and --

15          PROSPECTIVE JUROR:  Exactly.

16          THE COURT:  -- and that's it.

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Are you close to your stepson?

19          PROSPECTIVE JUROR:  Yes, we have a great relationship,

20  yes.

21          THE COURT:  What do you and your family do in your

22  spare time?  What are your interests?

23          PROSPECTIVE JUROR:  We boat.  We camp.

24          THE COURT:  You boat.

25          PROSPECTIVE JUROR:  And we camp.
```

**JA443**

```
1              THE COURT:  Power or sail?

2              PROSPECTIVE JUROR:  Power.

3              THE COURT:  Power, okay.

4              PROSPECTIVE JUROR:  Sailing is too much work.

5              THE COURT:  Too much work.  It's too hot out there to

6   be sitting there drifting around at 3 knots.  I get it.  You

7   also said you camp?

8              PROSPECTIVE JUROR:  Camp, yes.

9              THE COURT:  Got any pets?

10             PROSPECTIVE JUROR:  Two dogs.  And they're both

11  huskies.

12             THE COURT:  What kind of dogs?

13             PROSPECTIVE JUROR:  One's a Puggle mix and one is a

14  Jack Russell Rat Terrier.

15             THE COURT:  Oh, well, you're very busy.

16             PROSPECTIVE JUROR:  My Rat-Terrier has the energy of

17  100 dogs.

18             THE COURT:  Keep you busy.  Ma'am, I'm going to talk

19  to the lawyers for a minute, okay?

20             PROSPECTIVE JUROR:  Okay.

21     (Whereupon, the following conference was held at the

22  bench:)

23             THE COURT:  Government have any issues or questions in

24  light of mine?

25             MS. MCGUINN:  No, Your Honor.
```

```
 1              THE COURT:  Defendant?
 2              MR. NIETO:  Your Honor, based on her job at the
 3   Maryland Port Administration, it's our understanding that two
 4   of the witnesses, the Halperts and the Hoffbergers, have some
 5   involvement with shipping.  I understand that she works within
 6   accounts and that's why if the court would be inclined just to
 7   simply ask her if she had any professional dealings with anyone
 8   of the Halpert family or the Hoffberger family.
 9              THE COURT:  I'll do it.
10        (Whereupon, the bench conference was concluded.)
11              THE COURT:  In your work with the port administration,
12   have you ever had any dealings with companies or families that
13   include the name Halpert or Hoffberger?
14              PROSPECTIVE JUROR:  No.
15              THE COURT:  Those names don't mean anything to you?
16              PROSPECTIVE JUROR:  No.
17              THE COURT:  Thank you.  Back with you in a second.
18        (Whereupon, the following conference was held at the
19   bench:)
20              THE COURT:  Mr. Nieto?
21              MR. NIETO:  Nothing else, Your Honor.
22              THE COURT:  Okay.  Thank you.
23        (Whereupon, the bench conference was concluded.)
24              THE COURT:  Thank you, ma'am.  You may turn to the
25   fourth floor.  We're finished with your assistance.  We'll talk
```

1   to you more later.

2            PROSPECTIVE JUROR:  Okay, thank you.

3            THE COURT:  Good morning, ma'am.

4            PROSPECTIVE JUROR:  Good morning.

5            THE COURT:  I'm reviewing your juror questionnaire and

6   I'll be with you in just a second.

7            PROSPECTIVE JUROR:  Sure.

8        You provided me with "Yes" answers to two questions.  Does

9   that sound right to you?

10           PROSPECTIVE JUROR:  Sounds about right.

11           THE COURT:  The first one was 16C:  Have you or has

12  any member of your immediate family or closest associates ever

13  been accused of criminal conduct, been the subject of a

14  criminal investigation, or been convicted of committing a

15  crime?  And you have an answer of "yes."

16           PROSPECTIVE JUROR:  Yes.

17           THE COURT:  "Brother" and then looks like the letters

18  "DV" but I'm not sure.

19           PROSPECTIVE JUROR:  Yes, so some domestic violence.

20           THE COURT:  Okay.

21           PROSPECTIVE JUROR:  I think he maybe is in the process

22  of -- he's been charged or hasn't been --

23           MS. MCGUINN:  Your Honor, gallery.

24           THE COURT:  I understand.  You may continue, ma'am.

25           PROSPECTIVE JUROR:  I think he was involved in an

1   incident with his partner and I think recently went to court

2   for it.  I don't know what the -- I think he's in some classes

3   now, but I don't think it's -- I'm not sure exactly what

4   happened.  I assume that's some kind of criminal thing.  Maybe

5   not.

6         THE COURT:  Sounds like you have some distance from it

7   but also some awareness of it.

8         PROSPECTIVE JUROR:  Yep.  He lives in another state.

9         THE COURT:  So you've heard something about this but

10  not all of the details; is that a fair statement?

11        PROSPECTIVE JUROR:  Yes, correct.

12        THE COURT:  Okay.  How often do you talk with your

13  brother?

14        PROSPECTIVE JUROR:  Weekly.

15        THE COURT:  Yeah.

16        PROSPECTIVE JUROR:  Probably.  But I heard this from

17  my mom.  I don't think he wants to tell me about it.

18        THE COURT:  Is your mom local?

19        PROSPECTIVE JUROR:  She's not.  She also lives in

20  another state, in the same state as him.

21        THE COURT:  Okay.  Got it.  And somebody that you're

22  close to, your best friend has legal training or criminal

23  justice work?

24        PROSPECTIVE JUROR:  Yes, my best friend is a -- passed

25  the bar and is not a practicing attorney, but is -- but passed

1     the bar.

2              THE COURT:   But is a licensed attorney?

3              PROSPECTIVE JUROR:   Yes.

4              THE COURT:   What does the person do instead of

5     practicing law?

6              PROSPECTIVE JUROR:   Takes care of her children.

7              THE COURT:   That's the toughest occupation of all,

8     right?

9              PROSPECTIVE JUROR:   Yes, it is.

10             THE COURT:   Yep.  I don't disagree with that.

11             PROSPECTIVE JUROR:   But contract law I think is next.

12             THE COURT:   So tell me what you do for a living?

13    You're a website designer and developer?

14             PROSPECTIVE JUROR:   Yep.

15             THE COURT:   How long you been doing that kind of work?

16             PROSPECTIVE JUROR:   About 30 years.

17             THE COURT:   Thirty years?

18             PROSPECTIVE JUROR:   Yep.

19             THE COURT:   So you go back multiple generations in

20    sort of the tech world?

21             PROSPECTIVE JUROR:   Yes, back when the internet began.

22             THE COURT:   You were back there with the originators

23    of the internet?

24             PROSPECTIVE JUROR:   That's right.  Yep.  Yep.

25             THE COURT:   Have you always been with the same firm?

```
 1            PROSPECTIVE JUROR:  I haven't.  I worked for
 2   companies, I've owned my own business, I've done freelance.
 3   But I been for a year working with a nonprofit organization as
 4   an employee.
 5            THE COURT:  Okay.  And how's that going?
 6            PROSPECTIVE JUROR:  Great.  I love it.
 7            THE COURT:  Love the job?
 8            PROSPECTIVE JUROR:  Love the job.
 9            THE COURT:  Do you have a spouse or a partner in life?
10            PROSPECTIVE JUROR:  I have a partner.  I'm not
11   married.  Yep.
12            THE COURT:  And any children in your life?
13            PROSPECTIVE JUROR:  I have a son.  And that's it.
14            THE COURT:  How old is your son?
15            PROSPECTIVE JUROR:  He's 13.
16            THE COURT:  In school?
17            PROSPECTIVE JUROR:  Starting Monday.
18            THE COURT:  That's a great day for parents.
19            PROSPECTIVE JUROR:  Or Tuesday.
20            THE COURT:  Great day for parents and a bad day for
21   kids.
22            PROSPECTIVE JUROR:  Yes.  He's a good kid though.
23            THE COURT:  What kind of school?  Public school?
24   Private school?  Religious school?
25            PROSPECTIVE JUROR:  Public.
```

56

1          THE COURT:  Public, okay.  When you're not designing

2    websites and parenting a 13-year-old, how do you spend your

3    time?

4          PROSPECTIVE JUROR:  There's not much left.

5        (Laughter.)

6          PROSPECTIVE JUROR:  But we like to travel, like, to

7    national parks.  We kind of have a national park thing going.

8    So we like to visit national parks.  And we have our passport

9    and we like to get it stamped off.  So we like to travel and do

10   outdoors kind of things.  I also like art.  I do a lot of art

11   and design outside of my job.  But similar work.

12         THE COURT:  But not a surprise.  What you do

13   professionally it sort of shows an interest that carries on

14   into your personal life?

15         PROSPECTIVE JUROR:  Yep, exactly.

16         THE COURT:  Got it.  I'm going to talk with the

17   lawyers for a second.  Will you give me a moment to speak with

18   them?

19         PROSPECTIVE JUROR:  Sure.  No problem.

20       (Whereupon, the following conference was held at the

21   bench:)

22         THE COURT:  Government have any issues or questions in

23   light of mine?

24         MS. MCGUINN:  No, Your Honor.

25         THE COURT:  Defendant?

1          MR. NIETO:  No, Your Honor.

2          THE COURT:  Thank you.  And, Ms. McGuinn, I'm walking

3    a fine line here.  Whether I've got it exactly right, I don't

4    know, but for me this was one that was okay to share --

5          MS. MCGUINN:  That's fine, Your Honor.  I wasn't sure.

6    I lost track.

7          THE COURT:  And don't be afraid to note for me if you

8    think I have not noticed, and that goes to both sides.  We're

9    trying to balance a lot of things here.  I take no offense if

10   you're pointing something out, and if I don't agree with you, I

11   hope you won't take any offense from that.

12         MS. MCGUINN:  Sounds good, Your Honor.  Thank you.

13         THE COURT:  Thank you, ma'am.  You may return to the

14   fourth floor.  We'll talk to you more later.

15         PROSPECTIVE JUROR:  Thank you, Your Honor.

16         THE COURT:  Good morning, sir.

17         PROSPECTIVE JUROR:  Good morning.

18         THE COURT:  Thank you for returning today and

19   continuing to participate in our jury selection process.  Thank

20   you for completing your juror questionnaire yesterday which I

21   have now carefully reviewed.  I, upon that review, find that

22   you have no "Yes" answers.  You didn't have any "Yes" answers

23   to the questions.

24      Is that fair and correct?

25         PROSPECTIVE JUROR:  Well, I don't have any "Yes"

```
 1   answers, but I thought more --
 2             THE COURT:  Yeah.
 3             PROSPECTIVE JUROR:  -- about the last --
 4             THE COURT:  Yeah, is there anything else that maybe
 5   you think you should tell us, et cetera?
 6             PROSPECTIVE JUROR:  My wife has been having cancer
 7   treatments and she had gone through the 12 weeks of intensive
 8   treatments and have gone through it pretty well.
 9             THE COURT:  Yeah.
10             PROSPECTIVE JUROR:  So I thought, okay, it's going to
11   be okay.
12             THE COURT:  Yeah.
13             PROSPECTIVE JUROR:  Now she has another year of every
14   three weeks of immunotherapy treatments, and she's having some
15   reactions to that with fatigue and nausea.
16             THE COURT:  Yeah.
17             PROSPECTIVE JUROR:  And she had a double mastectomy
18   and she has to have that middle of September.  I don't know how
19   long this is going to go --
20             THE COURT:  In the middle of September she has to have
21   more immunotherapy?
22             PROSPECTIVE JUROR:  Well, immunotherapy through May of
23   next year every three weeks.
24             THE COURT:  Every three weeks.
25             PROSPECTIVE JUROR:  Every three weeks instead of once
```

```
1   a week like she had the intense chemo.
2              THE COURT:  When's the next treatment?
3              PROSPECTIVE JUROR:  Thursday.
4              THE COURT:  Of next week?
5              PROSPECTIVE JUROR:  Yes.  Every other.  And then she
6   has --
7              THE COURT:  So a week from today?
8              PROSPECTIVE JUROR:  Yep, a week from today.
9              THE COURT:  And you typically take her?
10             PROSPECTIVE JUROR:  I do.  And I've been -- I work for
11  the federal government and I've been able to, essentially, I
12  was at home during the pandemic, and we were supposed to go
13  back in April and I was given permission to stay at home
14  extended.  So last week was the first week I was back in the
15  office three days a week.  I've been at home five days a week
16  for four and a half years.  And she told me this morning that
17  was a really tough thing, me being gone and with her getting
18  ready for this final reconstructive surgery in September.  I
19  need to be with her during the surgery and then coming back.  I
20  knew this when I was filling out the forms but I thought, okay,
21  it's going to be over.  It's going to be fine.  It's not going
22  to be an issue.  But she's very concerned and I'm concerned.
23             THE COURT:  And would you say you're the sole
24  provider?
25             PROSPECTIVE JUROR:  Yes, yes.
```

1          THE COURT:  No adult children in the picture or

2    someone else who could sort of step in and be the number one

3    advocate, care provider, assistant during the period?

4          PROSPECTIVE JUROR:  No.  She is a new citizen.  She's

5    from Canada so her daughters are in Canada.  She can't -- well,

6    can't travel anyway.  She just got her citizenship.  Doesn't

7    have her new passport yet.  But so I am -- I am the provider.

8          THE COURT:  Got it.

9          PROSPECTIVE JUROR:  And I've been at home.  I thought

10   much more about it.  Even yesterday, I thought, okay, I can do

11   this.  But I can see in her eyes and thinking, getting ready

12   for this treatment, and she also has the thyroid cancer that

13   she has to get the thyroid removed in October.

14         THE COURT:  Okay.  So let me talk to the lawyers for a

15   second.  We'll get back to you.

16      (Whereupon, the following conference was held at the

17   bench:)

18         THE COURT:  Ms. McGuinn, what do you think?

19         MS. MCGUINN:  My only hesitation, again, is the number

20   issue.

21         THE COURT:  Yeah.

22         MS. MCGUINN:  I could see him being someone that we

23   would ultimately strike if we can spare it.  Maybe we can

24   reserve on him.  It's not -- the human being in me is not

25   answering this question, it's the prosecutor, but maybe we can

1  reserve and just see how we're doing and then let him go later

2  if we can.

3         THE COURT:  Mr. Nieto?

4         **MR. NIETO:**  Your Honor, respectfully, we make a motion

5  to strike for cause.  Specifically, with her pending surgery

6  you can see how all-encompassing it is for him and his life

7  talking about looking at his wife's eyes.  My concern would be

8  that he'd spend the trial focused more on her health.

9         THE COURT:  That's more my worry.

10        MS. MCGUINN:  Sure.

11        THE COURT:  I mean, we inconvenience people horribly

12  to serve on juries for sure.  We have to be tough about that

13  sometimes.  I'm more worried about the distraction factor and

14  Mr. Nieto's point.  I think if he's not here, he's going to be

15  preoccupied with how soon are we getting out of here, how soon

16  can I call her, how she's feeling today; oh, yesterday was a

17  bad day, I really shouldn't have participated, et cetera.  And

18  for those reasons, despite Ms. McGuinn's concern, which I share

19  deeply, we're going to excuse him.

20        (Whereupon, the bench conference was concluded.)

21        THE COURT:  Thank you, sir.  We're going to excuse you

22  because I'm afraid that your demands at home, which are

23  completely legitimate, have priority over what you're needed

24  for here.  So you may depart and you pass right through this

25  door to your left.  Thank you so much.

1    Good morning, sir.  I'm just looking through your "Yes"

2  answers here.

3          **PROSPECTIVE JUROR:**  Good morning.

4          **THE COURT:**  Thank you for returning today and

5  continuing to participate in this process.  I'm going to need

6  you to speak right into that microphone.  You might have to

7  scoot yourself forward to be able to do that.

8      You tell us in response to Question No. 8 that, no, you

9  haven't served on a jury of the type that we ask you about

10  there, but you do point out that you were in a civil trial in

11  1992.

12          **PROSPECTIVE JUROR:**  Correct.

13          **THE COURT:**  Do you remember what that case was about?

14          **PROSPECTIVE JUROR:**  Yes, I do.

15          **THE COURT:**  What was it about?

16          **PROSPECTIVE JUROR:**  It was about a reported injury

17  that occurred in a supermarket.  This is when I lived in

18  southern California.

19          **THE COURT:**  Okay.

20          **PROSPECTIVE JUROR:**  So they chase a shoplifter out of

21  the store and then somebody who was sitting on a bench claimed

22  that they had a heart attack as a result of the action of the

23  employees.

24          **THE COURT:**  I see.

25      And did the jury reach a verdict?

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA456**

1          PROSPECTIVE JUROR:  Yes, they did.

2          THE COURT:  And you were a member of that jury so it

3    was a unanimous verdict I take it?

4          PROSPECTIVE JUROR:  Correct.

5          THE COURT:  Did you feel like the process worked as it

6    should have worked?

7          PROSPECTIVE JUROR:  Yeah, it did.  People were

8    thorough.

9          THE COURT:  Okay.  Very good.  So anything about that

10   experience that would make it difficult for you to serve as a

11   fair and impartial juror if you were picked on this case?

12         PROSPECTIVE JUROR:  Not that experience.

13         THE COURT:  Then in response to the grand jury

14   question you wrote:  "No," and then wrote, "Never been on a

15   grand jury."

16         PROSPECTIVE JUROR:  Correct.  Never been on a grand

17   jury.

18         THE COURT:  Then we continue on with your

19   questionnaire until we come to Question 16A:  Have you or any

20   member of your immediate family or closest associates ever been

21   the victim of a crime?  Answer, "Yes."

22      Tell me about that?

23         PROSPECTIVE JUROR:  I had my car stolen.

24         THE COURT:  You had your car stolen?

25         PROSPECTIVE JUROR:  Yes, from the parking lot of an

```
1   apartment complex I lived.
2            THE COURT:  When did that happen?
3            PROSPECTIVE JUROR:  About 1990 or '91 in San Diego.
4            THE COURT:  Do you ever get the car back?
5            PROSPECTIVE JUROR:  I did.
6            THE COURT:  Was it okay or damaged?
7            PROSPECTIVE JUROR:  Other than the ignition damaged
8   from pulling out the ignition and a couple of items that were
9   stolen it was returned.
10           THE COURT:  Okay.  Were the police involved?
11           PROSPECTIVE JUROR:  Yes, they were.
12           THE COURT:  Was anybody ever apprehended.
13           PROSPECTIVE JUROR:  No.
14           THE COURT:  Did you feel like the police, the system,
15  handled the situation appropriately?
16           PROSPECTIVE JUROR:  Yeah, I was lucky to get the car
17  back without any damage or without much damage.
18           THE COURT:  Okay.  And then in response to Question
19  16I:  As part of the evidence, you may see images of a sexual
20  nature that are graphic.  Is there anything about viewing such
21  images that would make it difficult for you to render a fair
22  and impartial verdict based solely on the evidence?  To which
23  you responded, "not sure," underlined.
24           PROSPECTIVE JUROR:  Yeah, not sure.  It would depend
25  on the nature of those.  Whether there's violence, whether
```

```
 1    there's injury or trauma to those.
 2            THE COURT:  Okay.  So I suppose none of us knows how
 3    we're going to react to any particular piece of evidence or
 4    information until we actually see it or hear it, that sort of
 5    thing.  So I would put kind of a finer point on the question
 6    and ask you whether you think there might be something about
 7    you or your life experience that would cause you to have a
 8    notably different reaction, one way or another, than you might
 9    predict or expect for the broad community?
10            PROSPECTIVE JUROR:  No, I don't think so.
11            THE COURT:  So you're not claiming, like, oh, I have
12    some special sensitivity that I want to tell you about here.
13            PROSPECTIVE JUROR:  No, no.
14            THE COURT:  You're saying, look, I'm a regular
15    person --
16            PROSPECTIVE JUROR:  And I'm unsure how I'd react.
17            THE COURT:  Okay.  All right.  Then after the general
18    question, now if you have a "Yes" answer to any of the
19    questions I just posed, please, you know, mark accordingly.
20    You answered:  "Yes," and then you wrote down there, "A, stolen
21    vehicle."
22        We already heard about that, right?
23            PROSPECTIVE JUROR:  Right.
24            THE COURT:  Then we got pickpocketed.
25            PROSPECTIVE JUROR:  In Barcelona.
```

Ronda J. Thomas, RMR, CRR – Federal Official Reporter

**JA459**

1        THE COURT:  I'm afraid that was going to be in
2   California too.
3           PROSPECTIVE JUROR:  No, that was in another country.
4        THE COURT:  Did you lose a lot?
5           PROSPECTIVE JUROR:  I didn't lose anything.  They were
6   caught in the act.
7        THE COURT:  On, okay.  So that's the outcome of that.
8      And then you went back to your response to Question I, and
9   this has to do with the images, I think.
10          PROSPECTIVE JUROR:  Correct.
11       THE COURT:  And you said, "Not sure.  Have not seen
12  graphic sexual assault evidence.  Not sure how I'll react."
13     So pretty much an elaboration of what we were talking
14  about a minute ago?
15          PROSPECTIVE JUROR:  Right.  Correct.
16       THE COURT:  But I have the same question or, you know,
17  same inquiry based on what you said, you know, are you
18  predicting something different for you or yourself because of
19  your life, your experience, your perceptions, or are you just
20  simply saying, you know -- are you telling us you're other than
21  sort of a mainstream person, or you think I'm in the mainstream
22  but I can't tell you --
23          PROSPECTIVE JUROR:  Yeah, I think I'm at the
24  mainstream and don't know how I'd react to something graphic.
25       THE COURT:  Okay.  Regardless of what your reaction

1  might be to evidence that's presented to you in this trial, the

2  bottom line question is do you believe and would it be your

3  commitment to be a fair and impartial juror to the best of your

4  ability?

5          PROSPECTIVE JUROR:  Yes, it would.

6          THE COURT:  And do you believe that it would pose an

7  extraordinary or different challenge for you as compared to

8  other people as you might assess other people in our community?

9          PROSPECTIVE JUROR:  No, I don't think any different

10  than other people.

11          THE COURT:  Okay.  Thank you.

12      So you live out in Middletown.

13          PROSPECTIVE JUROR:  Correct.

14          THE COURT:  You're a process engineer.  I'm not sure I

15  understand what a process engineer does.

16          PROSPECTIVE JUROR:  We evaluate processes in the

17  manufacturing plant.  We make ceramics for wireless

18  communications.  So it's technical pottery.

19          THE COURT:  Again, as a process engineer, are you

20  always sort of looking at how we're doing it and can we do it

21  better, more efficiently, more safely?

22          PROSPECTIVE JUROR:  Cheaper.

23          THE COURT:  Cheaper.

24          PROSPECTIVE JUROR:  Cost-effective.

25          THE COURT:  Cost-effective is the right word.  How

1  long you been doing that kind of work?

2          PROSPECTIVE JUROR:  Since 1988.

3          THE COURT:  Since 1988.

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  And how many different companies have you

6  worked for in that time?

7          PROSPECTIVE JUROR:  Four different companies.

8          THE COURT:  And tell us about your educational

9  background?

10         PROSPECTIVE JUROR:  I went to Rutgers University, both

11 undergraduate and graduate school, in ceramic engineering which

12 is a specialized material science.  Went to work for three

13 years in Australia at the university as a research assistant.

14 And then worked at a startup company in Southern California and

15 then a larger manufacturer in Oregon.  And then been in

16 Middletown since 1993 working with the same company.

17         THE COURT:  Got it.  Married or have a person in your

18 life?

19         PROSPECTIVE JUROR:  Married.

20         THE COURT:  How long?

21         PROSPECTIVE JUROR:  This time?  Second time ten years.

22         THE COURT:  Ten years.  And then you were married

23 before that.  How long were you married the first time?

24         PROSPECTIVE JUROR:  Thirteen years.

25         THE COURT:  Okay.  And what does your current spouse

1  do?

2         PROSPECTIVE JUROR:  She has retired, so . . .

3         THE COURT:  What did she do?

4         PROSPECTIVE JUROR:  She worked as a financial analyst

5  for third-party administrators for benefits.

6         THE COURT:  Got it.  And your first spouse?  What did

7  she do?

8         PROSPECTIVE JUROR:  She works for the Frederick County

9  court system.

10         THE COURT:  For?

11         PROSPECTIVE JUROR:  Frederick County court system.

12         THE COURT:  What does she do in the court system?

13         PROSPECTIVE JUROR:  I think she's a clerk.  She swears

14  people in.

15         THE COURT:  She works in the courtroom or works in the

16  office?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  Works in the courtroom?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Was she doing that work when you were

21  married to her?

22         PROSPECTIVE JUROR:  No, she was working credit card

23  servicing.

24         THE COURT:  Do you have much contact with her or have

25  you had much contact with her since she started working in the

1  courts?

2          PROSPECTIVE JUROR:  Yeah.  I don't have any contact

3  with her through the courts.  She still lives in the area and

4  our children are still in the area so we all get together.

5          THE COURT:  You interact?

6          PROSPECTIVE JUROR:  That's right.

7          THE COURT:  In those interactions does she tell you

8  about her work?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:  Not a topic of conversation?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  You referenced kids.  How many you got?

13          PROSPECTIVE JUROR:  I have three.

14          THE COURT:  How old are they?

15          PROSPECTIVE JUROR:  Thirty-three, 32 and 28.

16

17          THE COURT:  What do they do?

18          PROSPECTIVE JUROR:  One is a -- does benefits, mergers

19  and acquisitions; and the other one is a real estate agent; and

20  then the other works for -- I think it's Mini Mobile here in

21  Baltimore.

22          THE COURT:  Doing what?

23          PROSPECTIVE JUROR:  She works for inside sales.

24          THE COURT:  Okay.

25          PROSPECTIVE JUROR:  So she services people and

```
1   contracts for prefab trailers for construction sites, schools.
2              THE COURT:  Got it.  Any grandchildren?
3        PROSPECTIVE JUROR:  Not yet.
4              THE COURT:  I'm going to talk to the lawyers for a
5   minute and I'll get back to you, okay.
6        (Whereupon, the following conference was held at the
7   bench:)
8              THE COURT:  Government have any issues or questions in
9   light of mine?
10             MS. MCGUINN:  No, Your Honor.
11             THE COURT:  Mr. Nieto, questions or issues?
12             MR. NIETO:  Your Honor, with regards to this
13  prospective juror's relative hesitancy about the nature of the
14  imagery.  I would ask the court to explain the nature of the
15  images we anticipate coming forth in this trial and ask him if
16  based on that he would have any problems being fair and
17  impartial?
18             THE COURT:  Okay.  I will do that.
19        (Whereupon, the bench conference was concluded.)
20             THE COURT:  So let me just get specific about the kind
21  of images that I think you're going to see during the course of
22  this trial.  I haven't seen the evidence but it's been
23  described to me so I have a certain expectation.
24        And my expectation is that there will be images, both
25  still and video, that will perhaps depict male genitalia, that
```

1  will perhaps depict male nudity, perhaps of males who are

2  minors and that they are nude, and there may be a depiction or

3  depictions of male masturbation.  But I think that that's the

4  sort of scope of what we're talking about here.

5      Does that cause you to change any of your answers or have

6  anything further to say about your ability to be a fair and

7  impartial juror?

8           PROSPECTIVE JUROR:  I think the thing that would

9  bother me if there was violence involved or traumatic injury

10 during those scenes.  That'd be my main concern.

11         THE COURT:  Well, I've described them as faithfully as

12 I believe I can, based on what I know at this point, so I

13 really don't have a further description than that.

14     So the question is, do you think you can be fair and

15 impartial in light of what I have disclosed to you?

16          PROSPECTIVE JUROR:  Yeah, I believe I can.

17         THE COURT:  Thank you.

18    (Whereupon, the following conference was held at the

19 bench:)

20         THE COURT:  Mr. Nieto, any issues or questions?

21        MR. NIETO:  No, Your Honor.  Thank you.

22        THE COURT:  Government?  None from the Government

23 either.  Thank you.

24    (Whereupon, the bench conference was concluded.)

25        THE COURT:  Thank you, sir.  You may return to the

1  fourth floor to the jury assembly area.  Thank you for
2  participating in this.
3      Good morning, we're appreciative of your returning for
4  further discussion today.  I'm reviewing your juror
5  questionnaire.
6      We'll clear the gallery.
7      Thank you for your thoroughness and completion of this
8  juror questionnaire.  We asked you a lot of questions
9  yesterday, and you were very diligent in providing us with lots
10 and lots of information.  And I'm grateful for the seriousness
11 with which you have taken this task.
12     Let's go ahead and get started and plow through the many,
13 many "Yes" answers that you have provided.  Are we good?
14         PROSPECTIVE JUROR:  Yes.  I thank you for your
15 discretion.
16         THE COURT:  Yes.  Absolutely.  So the first question:
17 A few minutes ago, you heard me give a very brief description
18 in this case, is there anything in that brief description that
19 made you realize it may be difficult for you to keep an open
20 mind and serve as a fair and impartial juror in this case?  You
21 answered "yes."  No elaboration on that particular answer, but
22 you did answer "yes."
23     Anything you want to tell me further about that?  Or would
24 you prefer I get into the other questions first?  Or do you
25 want to just tell me what's on your mind?

```
1           PROSPECTIVE JUROR:  I'm having trouble remembering.

2           THE COURT:  Why you answered --

3           PROSPECTIVE JUROR:  -- that particular question.  Is

4  that --

5           THE COURT:  Why don't we keep going here.  I think,

6  based on the answers you've given me elsewhere, it may just

7  cover it.  Is that okay with you?

8           PROSPECTIVE JUROR:  I believe the one that was

9  answered by the end question, the one that was really long on

10  the last page.

11          THE COURT:  Yeah, okay.  I'll go back to that one.

12  The really long one.  Fair enough.  Let me turn to that

13  question and maybe work backwards from there.

14          PROSPECTIVE JUROR:  Okay.

15          THE COURT:  Does that work for you?

16          PROSPECTIVE JUROR:  That's fine.

17          THE COURT:  Question 32:  Is there anything else or

18  something I've asked you about or something I've not asked you

19  about that upon reflection you believe would interfere with

20  your ability to serve as a fair and impartial juror in this

21  case?  Answer, "Yes."  And then you've written to me, "I am

22  aware of cases in the past presented on social media unfairly

23  where sexual offenders were given lighter than expected

24  sentences and of police officers and judges abusing their

25  power.  And I believe this makes it difficult to remain
```

1  impartial."

2       That says a lot right there.  And I appreciate your candor

3  in doing your best to expose your own personal views and how

4  you sort of react to the experience of being called in here to

5  potentially serve on a jury.

6       That said, do you want to tell us more about that or

7  elaborate on your feelings in that regard, that general

8  statement?

9       PROSPECTIVE JUROR:  Without any specific question, I

10  don't really have anything else to add for that.

11       THE COURT:  Okay.  And that's fair enough.  You told

12  us a lot already.  So no concerns.

13       Let's go back to the individual "Yes" answers that you've

14  supplied.  Let's go to Question 16A:  Have you or any member of

15  your immediate family or your closest associates ever been the

16  victim of a crime?  You answered "Yes.  My mother and my cousin

17  were separately victims of sexual abuse."

18       PROSPECTIVE JUROR:  Yes.

19       THE COURT:  Are you able to talk to us about one or

20  both of those experiences?

21       PROSPECTIVE JUROR:  Briefly I can comment on those.

22  My mother was assaulted at her place of work when I was about

23  17 years old.  And I wasn't a part of the trial or anything.  I

24  just kind of got bits and pieces.  And it kind of -- it led to

25  a divorce in my family and it wasn't pleasant to watch.  So

1  that kind of hits home for me.

2      And in the same way, my cousin, later in life when I was,

3  I don't know, 25 or 26, was similarly victimized.  And I was

4  only informed later by my family.  We kind of had a silly

5  little meeting where they said this happened and it's already

6  dealt with and there's going to be a protective order.  Like,

7  very little detail.  And that kind of just hangs over so this

8  case kind of brought that one back.

9          THE COURT:  Okay.  Do you think that experience would

10  affect your ability to be a fair and impartial juror if you

11  were seated on this jury which is charged with responsibility

12  of assessing a completely different case and set of

13  circumstances?

14          PROSPECTIVE JUROR:  I think it would make it very

15  difficult for me to separate my personal feelings and things

16  that I haven't dealt with in the past, from this case.

17          THE COURT:  Okay.  Thank you.  Let me talk to the

18  lawyers for a minute.

19      (Whereupon, the following conference was held at the

20  bench:)

21          THE COURT:  Counsel, it goes on from here to, again,

22  telling me in response to Question E, "My mother and my female

23  cousins were separately victims of sexual abuse."

24      He makes a point of saying "I hold no racial prejudice

25  against Asian Americans," that's to F -- G, "I hold no

1  prejudice against a particular orientation of any kind.

2      H:  "Yes, I believe that crimes against children are

3  worse."

4      Yes to I:  "Viewing such images would be greatly upsetting

5  and may make it difficult for me to remain impartial."

6      Do you have views concerning the administration of the

7  criminal justice system, including the courts, that would

8  affect your ability to render a fair and impartial verdict?

9  "Yes."  That's 19.

10     Do you or any members of your family, close associates

11 belong to any group that advocates a change in our criminal

12 justice system, et cetera?  That's 20.   "Yes."

13     22:   Would you tend to give greater or lesser weight to

14 the testimony of law enforcement officer?  Question 22.

15 Answer: "Yes," and then "lesser" is written.

16     Those are the "Yes" answers that I haven't yet explored.

17 But do counsel have concerns relative to the responses already

18 given that they want me to address right now, perhaps in the

19 interest of efficiency and time?

20     Ms. McGuinn, Government first.

21         MS. MCGUINN:  Your Honor, the Government would move to

22 strike this juror for any variety of reasons, but I think even

23 the first answer that you had explored with him which he said

24 it would be hard to be impartial.  On one hand he thinks crimes

25 against children or sex offenders are treated too lightly but

```
 1  on the other hand he believes, I believe it was the court
 2  system, the judges --
 3           THE COURT:  Judges and police officers.
 4           MS. MCGUINN:  -- are not or are dishonest.  I don't
 5  remember which word it was but words to that effect.
 6           THE COURT:  Let's see where the defense is on this
 7  potential juror.
 8           MR. NIETO:  We would concur with the Government, Your
 9  Honor.
10           THE COURT:  This juror is excused for those reasons.
11  Thank you.
12      (Whereupon, the bench conference was concluded.)
13           THE COURT:  Thank you, Juror 188.  We appreciate your
14  participation in this process.  I appreciate the candor that
15  you've brought to the questions.  I'm going to excuse you from
16  serving on this jury and you may depart.
17           PROSPECTIVE JUROR:  All right.  Thank you.
18           MR. PROCTOR:  Your Honor, before the next juror comes
19  in.
20           THE COURT:  Yes.
21           MR. PROCTOR:  Mr. Bendann would request a quick
22  bathroom break.
23           THE COURT:  We're going to take one more juror and
24  then we're going to take a break for everyone.  One more.
25      Can we make it that far?
```

1          THE DEFENDANT:  Yes.  Thank you, Your Honor.

2          THE COURT:  Thank you.

3      Thank you, sir, for joining us.

4      Okay.  Thanks again for being with us.  You're a teacher I

5  take it?

6          PROSPECTIVE JUROR:  Yes, sir.

7          THE COURT:  Which school system do you work in?

8          PROSPECTIVE JUROR:  Harford County, sir.

9          THE COURT:  What do you teach?

10          PROSPECTIVE JUROR:  Computer program sixth, seventh

11  and eighth grade.

12          THE COURT:  Okay.  Middle school?

13          PROSPECTIVE JUROR:  Yes, sir.

14          THE COURT:  That starts, the kids are back the Tuesday

15  after Labor Day?

16          PROSPECTIVE JUROR:  Yes, sir.

17          THE COURT:  I want to start with, you've supplied

18  several "Yes" answers, but I want to start with the last

19  question where I ask is there anything else.  And you marked

20  "yes," and then you wrote me kind of a note.  It said, "It

21  would be difficult to be impartial because of past experiences

22  as a teacher.  Several teachers I have taught with were accused

23  of sexual misconduct.  All cases were dismissed before they got

24  to court.  I feel like that this case is -- I feel that if this

25  case is this serious, I tend to be partial towards guilty."

1          Did I catch that right?

2              PROSPECTIVE JUROR:  Yes, sir.

3              THE COURT:  And just interpreting your handwriting.

4    And first of all, there's no need for you to shrug or have any

5    concerns whatsoever.  We are just interested in your candid

6    responses to this situation.  There's no right or wrong

7    answers.  There's just what's on your heart and what's in your

8    mind.  So if we could have that understanding --

9              PROSPECTIVE JUROR:  Yes, sir.

10             THE COURT:  -- tell me what you're thinking?

11             PROSPECTIVE JUROR:  I've been in this field for 33

12   years.  Situations come up.  A teacher gets accused of

13   something and they work it out.  That it either didn't happen

14   or they move the teacher.  It's never been serious.  It's

15   always been he said/she said kind of stuff.  And when you

16   started talking about the amount of witnesses and the porn

17   and -- I know I should have marked this question differently,

18   but if you've been indicted, and there's all that evidence, I

19   tend to believe that because in the past I haven't seen

20   anything this serious that if it wasn't serious, and there

21   wasn't something there, it would have gone away by now.

22         And I -- I actually feel really guilty about that because

23   I know I should be open-minded but I'm not.  I mean, it just

24   comes to a point in my mind where if it wasn't serious it

25   wouldn't be here.  And that's -- I should have marked "Yes" to

1  the indicted questions.  I don't know, my brain is going, yeah,

2  you're guilty.  And I know it's not right.  I know it's not

3  right.

4          THE COURT:  I appreciate your candor.  You're excused.

5  I'm not going to ask you to serve on this jury.  And you can

6  step out.  And, if nothing else, I hope you'll take from this

7  the fact that this process is interested in one thing and one

8  thing only and that's the truth.  And part of that truth is

9  what's on the minds of persons who are called in on jury duty.

10  And given that our system insists on honoring the presumption

11  of innocence, and how core that is to our values and to our

12  Constitution, I agree, I don't think that you're necessarily a

13  good match for this role.  So I want to send you back to

14  teaching computer science, which I bet you're really good at.

15          Thanks so much for your public service as a teacher and

16  thanks for coming down here on jury service.  You are excused.

17          PROSPECTIVE JUROR:  Thank you, sir.

18          Close the door, Mr. Gerstell.

19          184 is excused on the Court's motion because I listened

20  very carefully to his statement, but I especially listened to

21  the passion with which it was expressed, and I don't think that

22  this gentleman possesses the capacity at this point in his life

23  and his career to fully live up to the promise of the

24  presumption of innocence.

25          He has life experience in teaching.  He professes to know

1  about other cases that have been handled in certain ways and

2  the circumstance that there was an indictment in this case and

3  in his mind took this case across a line.  And that spoke to me

4  loud and clear.  I do appreciate his candor, but I also think

5  that he is not suitable for jury service because I don't think

6  he would live up to that principle.

7     Counsel, if you want to make your record you can.

8         MS. MCGUINN:  No, Your Honor.

9         MR. NIETO:  No, Your Honor.  Thank you.

10        THE COURT:  Very well.  All right.  Now, one last

11  thing.  How many have we got?

12        THE CLERK:  Your Honor, we have 18 jurors that can sit

13  and 22 strikes for cause.

14        THE COURT:  So we're pretty much hanging in there at

15  about that 45 percent.  18 and 22.

16        MR. PROCTOR:  Yes, 45 percent exactly.

17        THE COURT:  What did you say?

18        MR. PROCTOR:  45 percent exactly.

19        THE COURT:  Got it.  10-minute recess.  10 minutes.

20        THE CLERK:  All rise.  This Honorable Court now stands

21  in recess.

22     (A recess was taken from 11:33 a.m. to 11:57 a.m.)

23        THE COURT:  All counsel and Defendant are present.

24  We're ready to resume.

25     What number was next?

1              THE CLERK:  176, Judge.

2              THE COURT:  Let's see, we started at 11 and we're at

3     18.  We picked up seven in the last session.  Okay.  Let's go.

4     You can admit the public.

5         Good morning.

6              PROSPECTIVE JUROR:  Good morning.

7              THE COURT:  Thanks for joining us.  I'm looking

8     through your questionnaire and it'll just take me one more

9     minute.

10             PROSPECTIVE JUROR:  Okay.

11             THE COURT:  Okay.  I see a very few "Yes" answers to

12    my questions.  And I'm going to go back over them with you if

13    that's okay.

14             PROSPECTIVE JUROR:  Okay.

15             THE COURT:  So the first one is 16A:  Ever been the

16    victim of a crime?  Answer:  "Yes.  Car broken in."

17        Was that you, your car?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  How long ago did that happen?

20             PROSPECTIVE JUROR:  That was like a year ago.

21             THE COURT:  Did you get any resolution out of it?  Did

22    they find anybody who did it?

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  Did you get your stuff back?

25             PROSPECTIVE JUROR:  No.

```
 1              THE COURT:  Okay.  Have you or any member of your
 2   immediate family or closest associates ever been a witness to
 3   any crime?  Answer, "Yes."
 4              PROSPECTIVE JUROR:  Yes.
 5              THE COURT:  Tell me about that?
 6              PROSPECTIVE JUROR:  It was a robbery going -- not --
 7              THE COURT:  Could you move a little bit closer to the
 8   mic.  I'm sorry about that.  The mic doesn't pick up very well.
 9              PROSPECTIVE JUROR:  It was a robbery going on at --
10   what is it?  Game Stop.
11              THE COURT:  At a Game Stop store?
12              PROSPECTIVE JUROR:  Yes.  It was being robbed.  And my
13   mom seen it when she was across the street at the market.  She
14   seen it going on and I was inside.
15              THE COURT:  You didn't see it but your mom did?
16              PROSPECTIVE JUROR:  Yes.
17              THE COURT:  How long ago did that happen?
18              PROSPECTIVE JUROR:  That was, like, two years ago.
19              THE COURT:  Okay.  Just doublechecking and I don't see
20   any other "Yes" answers except to the last question.  Is there
21   anything else?  Something I've asked you about or something
22   that I've not asked you about that upon reflection you believe
23   would interfere with your ability to serve as a fair and
24   impartial in this case?  Answer, "Yes."
25        Can you tell me about that?
```

1          PROSPECTIVE JUROR:  Yes, I have little children.  I

2    just had two little children.  And also someone that's close to

3    me has been molested.

4          THE COURT:  Okay.  So that's on your mind as you're

5    hearing about the charges in this case; is that right?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  How old are your kids?

8          PROSPECTIVE JUROR:  They both just turned 1.

9          THE COURT:  Are they twins?

10         PROSPECTIVE JUROR:  You can kind of say that.

11         THE COURT:  Both just turned 1.  Okay.  Do you care

12    for those kids?

13         PROSPECTIVE JUROR:  Yes, me and my wife watch them.

14         THE COURT:  Got it.  It's understandable that anyone,

15    especially a parent, is going to have a reaction to the

16    suggestion that a person who's a minor may have been harmed in

17    the way that the accusation in this indictment reads.  But of

18    course it's only an accusation.  We don't know, at this point,

19    whether the government can prove their case beyond a reasonable

20    doubt.  I mean, that's one of the jobs of the jury is to decide

21    that.

22         So I understand the reaction of -- it's upsetting to hear

23    that kind of a charge or an accusation.  The question is

24    whether or not a person is able to say, okay, that's the charge

25    and that's the accusation, but I have to be fair and impartial

1   here and that means let's see if the Government can prove their

2   case beyond a reasonable doubt.  You have to be able to hold

3   them to that standard even in a case where the charge itself is

4   kind of disturbing.  That's what I'm asking whether you not you

5   think you would be able to do or because you have the little

6   kids you don't think you could do that.

7             PROSPECTIVE JUROR:  No, I just -- too much on my mind.

8             THE COURT:  Let me talk to the lawyers for a minute.

9       (Whereupon, the following conference was held at the

10   bench:)

11             THE COURT:  So, Counsel, I took a shot.  Ms. McGuinn?

12             MS. MCGUINN:  The Government would move for cause,

13   Your Honor.

14             THE COURT:  Mr. Nieto?

15             MR. NIETO:  We agree, Your Honor.

16             THE COURT:  You agree?

17             MR. NIETO:  Strike for cause.

18             THE COURT:  Thank you.  Granted.

19       (Whereupon, the bench conference was concluded.)

20             THE COURT:  Sir, you are excused.  We're not going to

21   have you sit on this jury.  You may depart.  You may leave.

22   Thank you.  Go right out that door.

23       Good afternoon, thank you for joining us.  I've been

24   reviewing your juror questionnaire.  I see you have some "Yes"

25   answers.  I'd like to review them with you if that's all right?

1          **PROSPECTIVE JUROR:**  Sure.

2          **THE COURT:**  Keep your voice up.  Sit close to the

3    microphone so we can be sure to hear you.  Question 12.

4          Excuse me, Question 13:  Have you or any member of your

5    immediate family, closest associates ever worked for a private

6    agency or company such a private investigative firm or a

7    company that provides security services?  Answer, "Yes."

8          Can you tell me about that?

9          **PROSPECTIVE JUROR:**  It did say either yourself or

10   your -- someone else?

11         **THE COURT:**  Yeah, yeah, absolutely.

12         **PROSPECTIVE JUROR:**  So I work for D.C. Adult

13   Protective Services and I conduct investigations into solely

14   now financial exploitation.

15         **THE COURT:**  Got it.  In that role, have you had other

16   responsibilities, other areas that you've been charged with

17   investigating?

18         **PROSPECTIVE JUROR:**  Like, prior to the pandemic, so

19   prior to 2020, I did the other allegations, so neglect,

20   self-neglect and abuse.

21         **THE COURT:**  And abuse?

22         **PROSPECTIVE JUROR:**  Yes.

23         **THE COURT:**  Did you have abuse cases?

24         **PROSPECTIVE JUROR:**  Yes.

25         **THE COURT:**  What kind of stuff did you see?

1          PROSPECTIVE JUROR:  I did have some sexual abuse

2  cases.

3          THE COURT:  You did or didn't?

4          PROSPECTIVE JUROR:  I did.

5          THE COURT:  Thank you, ma'am.

6          PROSPECTIVE JUROR:  And then some physical abuse

7  cases.

8          THE COURT:  Okay.  And when you are assigned this kind

9  of a case in the Protective Services role, you find out about

10  it, get the person the services they need, make reports to

11  other allied partners that might have legal responsibilities?

12          PROSPECTIVE JUROR:  Yes.  And I primarily am assessing

13  their level of capacity to give consent.

14          THE COURT:  Got it.  Anything about that role that you

15  think would affect your ability to be a fair and impartial

16  juror if you were picked in this case?

17          PROSPECTIVE JUROR:  No, sir.  No, Judge.

18          THE COURT:  You can separate out whatever happens at

19  work from what you're asked to assess in your role as a juror

20  because the two things are completely separate from each other?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Fair summary on my part?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  Okay.  14, yes:  Any member of your

25  immediate family, close associates been employed by a state or

1  federal court, federal public defender, state public defender,

2  private criminal defense attorney, court-related agency such as

3  sheriff's office, clerk's office, probation and parole office,

4  United States marshal's office, pretrial services, bail agency

5  or similar department or organization?  Answer, "Yes."

6        PROSPECTIVE JUROR:  Yes.

7        THE COURT:  What can you tell me?

8        PROSPECTIVE JUROR:  I have a cousin, so this would be

9  my aunt's stepson, who is an attorney in Prince George's

10  County, Maryland.

11        THE COURT:  And what kind of work does this attorney

12  do?

13        PROSPECTIVE JUROR:  He doesn't say.

14     (Laughter.)

15        THE COURT:  Okay.  Private or public?

16        PROSPECTIVE JUROR:  I think he's private.  I think

17  he's retired now.  So he mainly does, like, estate planning.

18        THE COURT:  Okay.  You ever talk to him about his

19  cases?

20        PROSPECTIVE JUROR:  No.

21        THE COURT:  Anything about that that would affect your

22  ability to be fair and impartial?

23        PROSPECTIVE JUROR:  No.

24        THE COURT:  Crimes, victims, you were a victim, yes.

25  Car break-in?

```
1              PROSPECTIVE JUROR:  Yes.

2         THE COURT:  Somebody broke in your car?

3              PROSPECTIVE JUROR:  Yes.

4         THE COURT:  Took your stuff?

5              PROSPECTIVE JUROR:  Yes.  I can't remember what was

6   taken but it was some time ago.

7         THE COURT:  Some time ago.  They apprehend anybody?

8              PROSPECTIVE JUROR:  I don't think so.

9         THE COURT:  Have you or any member of your immediate

10  family or your closest associates ever been accused of criminal

11  conduct, been the subject of a criminal investigation, or been

12  convicted of committing a crime?  Just give me the headline on

13  that one?

14             PROSPECTIVE JUROR:  My husband got a DUI before I met

15  him.

16        THE COURT:  Okay.  That's it?

17             PROSPECTIVE JUROR:  That was it.

18        THE COURT:  How long ago was that?

19             PROSPECTIVE JUROR:  I don't know.  Maybe 20 years ago

20  now.

21        THE COURT:  Anything about his experience as related

22  to you that would affect your ability to be a fair and

23  impartial juror if you were picked in the case?

24             PROSPECTIVE JUROR:  No.

25        THE COURT:  17:  The question about family or close
```

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA484**

1  associates have legal training, law school, criminal justice,
2  that sort of thing.  Was that the cousin?
3          PROSPECTIVE JUROR:  Yes, the cousin.
4          THE COURT:  In Prince George's?
5          PROSPECTIVE JUROR:  Uh-huh.
6          THE COURT:  Okay.  How long have you worked for the
7  D.C. government?
8          PROSPECTIVE JUROR:  Ten years.  August 14th it's been
9  10 years.
10         THE COURT:  Always within the same agency but with the
11 different roles that you described?
12         PROSPECTIVE JUROR:  Correct.
13         THE COURT:  Tell us about your educational background?
14         PROSPECTIVE JUROR:  I got my bachelor's in
15 communications studies from Morgan State University.  And then
16 I got my master's in social work from Howard University.  And I
17 got my clinical licensure in 2018.
18         THE COURT:  2018.
19         PROSPECTIVE JUROR:  Uh-huh.
20         THE COURT:  Got it.  Do you have a partner or a
21 spouse?  Somebody in your life?
22         PROSPECTIVE JUROR:  Yes, I have a spouse.  I've been
23 married for seven years.
24         THE COURT:  What's your spouse do?
25         PROSPECTIVE JUROR:  He is now a licensed contractor.

1          THE COURT:  Construction?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  A particular area of construction?

4          PROSPECTIVE JUROR:  Just home renovation and

5   improvement.

6          THE COURT:  Got it.  Any kids?

7          PROSPECTIVE JUROR:  I have two.

8          THE COURT:  How old are your kids?

9          PROSPECTIVE JUROR:  I have a seven and I have a four

10  year old.

11         THE COURT:  Seven and four?

12         PROSPECTIVE JUROR:  Uh-huh.

13         THE COURT:  That's keeping you busy.

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Okay.  School's about to start I guess for

16  the seven year old.

17         PROSPECTIVE JUROR:  Yes, sir.

18         THE COURT:  Is that K or 1?

19         PROSPECTIVE JUROR:  She'll be going into the 2nd

20  grade.

21         THE COURT:  2nd grade.  Okay.  Got it.  I'm going to

22  talk to the lawyers for a minute, ma'am.  Thank you.

23     (Whereupon, the following conference was held at the

24  bench:)

25         THE COURT:  Government have any issues or questions in

Ronda J. Thomas, RMR, CRR – Federal Official Reporter

**JA486**

1    light of mine?

2              MS. MCGUINN:  No, Your Honor.

3              THE COURT:  Defendant?

4              MR. NIETO:  No, Your Honor.

5              THE COURT:  Thank you.

6         (Whereupon, the bench conference was concluded.)

7              THE COURT:  Thank you, ma'am.  You may return to the

8    fourth floor.  Thank you for speaking with me.

9              PROSPECTIVE JUROR:  Sure.

10             THE COURT:  165 is next.

11        Good afternoon.

12             PROSPECTIVE JUROR:  Howdy.

13             THE COURT:  I'm reviewing your juror questionnaire.

14   I'll be with you in just a second.

15             PROSPECTIVE JUROR:  Okay.

16             MS. MCGUINN:  Your Honor, I believe this is Juror 162,

17   not Juror 165.

18             THE COURT:  Okay.

19             MS. MCGUINN:  Which is fine.  We can do what we need

20   to do while she's here but I just want to make sure.

21             THE COURT:  So you are Juror 162?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  And we have not yet seen Juror 165.  We'll

24   reverse the order and go ahead.

25             MS. MCGUINN:  Thank you.

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA487**

1          THE COURT:  Since you're here, we're not going to send
2    you back out if that's okay with you.
3          PROSPECTIVE JUROR:  Great.
4          THE COURT:  Clear the gallery.
5    Okay.  We've got a number of "Yes" answers here and we'll
6    review them, maybe not exactly in order if that's okay with
7    you.
8          Starting, though, with the very last question, which was:
9    Is there anything else, something I've already asked you about,
10   or something I've not asked you about, that upon reflection you
11   believe would interfere with your ability to serve as a fair
12   and impartial juror in this case?  Answer:  "Yes."
13         Can you tell me about what was on your mind --
14         PROSPECTIVE JUROR:  My paternal grandfather molested
15   children and it ruined families.
16         THE COURT:  Okay.  This is something that you're aware
17   of from your life and the family lure and your own --
18         PROSPECTIVE JUROR:  Skeleton in the family closet.
19         THE COURT:  Okay.  Thank you.  And do you think that
20   would probably have an impact on your ability to be a fair and
21   impartial juror in the trial of this case?
22         PROSPECTIVE JUROR:  Yes.
23         THE COURT:  Okay.  Thank you.  Bear with me for one
24   second while I talk to the lawyers.  Thank you, ma'am.
25         (Whereupon, the following conference was held at the

1  bench:)
2        THE COURT:  Mr. Nieto?
3        MR. NIETO:  Your Honor, make a motion to strike for
4  cause?
5        THE COURT:  Any objection from the Government?
6        MS. MCGUINN:  No, Your Honor.
7        THE COURT:  Granted.
8     (Whereupon, the following conference was held at the
9  bench:)
10        THE COURT:  Thank you, ma'am.  We'll ask you to come
11 back some other time to serve maybe on a different jury than
12 this case.  You are excused and you can depart through the door
13 that you came in through.  Thank you, ma'am.
14        PROSPECTIVE JUROR:  Thank you.
15        THE COURT:  Now 165.
16     Good afternoon, sir.  I'll be with you in just a second.
17 I am reviewing your juror questionnaire.  Readmit the public.
18     And you're juror 165.
19        PROSPECTIVE JUROR:  Yes.
20        THE COURT:  And you have just one "Yes" answer for me.
21 It's in response to Question 16J, in reference to any
22 affiliation, experience with the Gilman School on Roland Avenue
23 in Baltimore City.  And you answered "Yes" that you attended
24 for my son's baseball game.  So you've been to a baseball game
25 at the Gilman School; is that it?

96

1          PROSPECTIVE JUROR:  Yes, my son plays travel baseball

2     and he had a game.

3          THE COURT:  He had a game there.  Can you move closer

4     to the mic.  So he had a game at the Gilman School, but other

5     than that, any other affiliation or connection with the school?

6          PROSPECTIVE JUROR:  No, no.

7          THE COURT:  Thank you for your candid response.  So

8     you live in Baltimore?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  And you are a senior bioprocess associate.

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Tell me what that work involves?

13          THE WITNESS:  We make pharmaceuticals for companies

14     and all like that.  So I'm a process associate.  I set up for

15     fills, infiltration of product that get distributed out to

16     clients.

17          THE COURT:  Okay.  How long you been doing that kind

18     of work?

19          PROSPECTIVE JUROR:  Well, I been with the company 13

20     years, but I been doing that process for three years now.

21          THE COURT:  Okay.  And tell me about your educational

22     background?

23          PROSPECTIVE JUROR:  I graduated from Parkville High

24     School.

25          THE COURT:  From?

```
1              PROSPECTIVE JUROR:  Parkville.

2              THE COURT:  Parkville, yep.  All right.  And then went

3     right to work?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  Okay.  Do you have a partner in life or a

6     spouse?  Anything like that?

7              PROSPECTIVE JUROR:  Yes, been married for 12 years.

8              THE COURT:  You've been married for 12 years?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  What does your spouse do?

11             PROSPECTIVE JUROR:  She works for Baltimore City.

12             THE COURT:  What does she do for the city?

13             PROSPECTIVE JUROR:  Maryland Department of Health.

14             THE COURT:  At the Maryland Department of Health?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  Do you know what she does there?

17             PROSPECTIVE JUROR:  Not really.

18             THE COURT:  That's just fine.  Do you have any kids?

19             PROSPECTIVE JUROR:  Yes, three.

20             THE COURT:  How old are they?

21             PROSPECTIVE JUROR:  24, 19 and 15.

22             THE COURT:  And what are your kids involved with?

23     What do they do?

24             PROSPECTIVE JUROR:  Two are working and one is in high

25     school, 10th grade right now.
```

98

```
1              THE COURT:  Where is the 10th grader in high school?
2              PROSPECTIVE JUROR:  Parkville High School.
3              THE COURT:  Yes.  Following in her father's footsteps.
4              PROSPECTIVE JUROR:  He is, yes.
5              THE COURT:  And the older two are working?
6              PROSPECTIVE JUROR:  Yes.
7              THE COURT:  What do they do?
8              PROSPECTIVE JUROR:  One works for Toyota, he deal with
9   rental cars and stuff like that.
10             THE COURT:  Yep.
11             PROSPECTIVE JUROR:  And my daughter works for FedEx.
12  So I have two sons and a daughter.
13             THE COURT:  Two sons and a daughter?
14             PROSPECTIVE JUROR:  Yes.
15             THE COURT:  What do you do in your spare time?  What
16  do you do for fun?
17             PROSPECTIVE JUROR:  Relax.  I'm also a drummer, too.
18  I play drums in church.
19             THE COURT:  Oh, you do?
20             PROSPECTIVE JUROR:  Yes.
21             THE COURT:  Church a big part of your life?
22             PROSPECTIVE JUROR:  Yes.
23             THE COURT:  Got it.  Bear with me a second while I
24  talk to the lawyers, okay?
25             PROSPECTIVE JUROR:  Okay.
```

**JA492**

```
1        (Whereupon, the following conference was held at the
2   bench:)
3            THE COURT:  Ms. McGuinn, any issues or requested
4   questions in light of mine?
5            MS. MCGUINN:  No, Your Honor.
6            THE COURT:  Mr. Nieto?
7            MR. NIETO:  No, Your Honor.
8            THE COURT:  Thank you.
9        (Whereupon, the bench conference was concluded.)
10           THE COURT:  Thank you, sir.  We are finished asking
11  you questions.  You may depart the courtroom and go back to the
12  fourth floor.  We'll talk to you more later.
13           PROSPECTIVE JUROR:  All right.
14           THE COURT:  Thank you, sir.
15       Becca, I've put these back in the correct order so does
16  that mean 151 is next?  Yes.
17       Good afternoon.  I'm looking through your juror
18  questionnaire.  I'll be with you in just a second.
19           PROSPECTIVE JUROR:  Sure.
20           THE COURT:  Thanks for completing your statement,
21  okay.  So school starts on the 26th?
22           PROSPECTIVE JUROR:  Yes, next Monday I believe.
23           THE COURT:  You're all registered and ready to go?
24           PROSPECTIVE JUROR:  I am, yes.
25           THE COURT:  What's your curriculum looking like this
```

1  semester?

2          PROSPECTIVE JUROR:  I have mostly history classes.

3  I'm in my last semester.  I'm a senior at Towson University.

4          THE COURT:  So does that mean you're just nose to the

5  grindstone, working as hard as you can, or you're on cruise

6  control and about to slide out of there.

7          PROSPECTIVE JUROR:  It's a lot of reading and writing.

8          THE COURT:  You're in the first category, you are

9  still grinding away?

10          PROSPECTIVE JUROR:  Yes, sir.

11          THE COURT:  Well, if you're sitting down here on a

12  jury and not at school Monday through Friday of next week, what

13  are the implications of that for you?

14          PROSPECTIVE JUROR:  I believe I would miss a lot of

15  introductory information that would help me later in the course

16  navigating some of the more complicated tasks I'd have to

17  complete.

18          THE COURT:  So it would be a problem?

19          PROSPECTIVE JUROR:  I believe so, yes.

20          THE COURT:  You're excused.  We don't require students

21  to miss class, especially full-time college students.  We'll

22  get you on a jury on summer vacation or something like that or

23  after you've graduated from college.

24          PROSPECTIVE JUROR:  Yes, sir.  I appreciate it.

25          THE COURT:  You're excused.

```
1              PROSPECTIVE JUROR:   Thank you very much.
2              THE COURT:   Yep.
3         Either counsel want to be heard?
4              MS. MCGUINN:   No, Your Honor.
5              MR. NIETO:   No, Your Honor.
6              THE COURT:   150 is temporarily indisposed.   We will
7    bring 150 in due course.   Let's go with 146.
8         Good afternoon, ma'am.
9              PROSPECTIVE JUROR:   Hello.   Good afternoon.
10             THE COURT:   Are you number 146?
11             PROSPECTIVE JUROR:   Yes, sir.
12             THE COURT:   We're still looking through your
13   questionnaire.   I'll be with you in just a second.
14        Okay.   I see a couple of "Yes" answers in here.   Not
15   really very many.   Question No. 14 is the first one that comes
16   to my attention.   Anybody work for the public defender?   You
17   answered:   "Yes, Office of Public Defender Annapolis, Maryland.
18   Your daughter around 2011 for an internship."
19             PROSPECTIVE JUROR:   Correct.
20             THE COURT:   Your daughter later became an attorney?
21             PROSPECTIVE JUROR:   No, she's a legal assistant.
22             THE COURT:   A legal assistant.
23             PROSPECTIVE JUROR:   Yeah, paralegal assistant and then
24   she transitioned to paralegal.   She lives in Vegas now.
25             THE COURT:   She's?
```

**JA495**

1           PROSPECTIVE JUROR:  She lives in Las Vegas now.

2           THE COURT:  She lives in Las Vegas now.

3      I'm going to ask you to scoot up closer to that

4  microphone.  Sorry about that.

5      But way back in 2011 she worked at the public defender's

6  in Annapolis for an internship?

7           PROSPECTIVE JUROR:  Correct.

8           THE COURT:  Do you know about how long she was there?

9           PROSPECTIVE JUROR:  Maybe a little over a year because

10  she was still in college at the time.

11          THE COURT:  Got it.  Do you think there's anything

12  about your daughter having worked there that would impact your

13  ability to be a fair and impartial juror if you got picked on

14  this case?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Victim of a crime?  "Yes, home invasion."

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Tell us about that?

19          PROSPECTIVE JUROR:  That was any spouse.

20          THE COURT:  Your spouse?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Before you were married to your spouse?

23          PROSPECTIVE JUROR:  Yes, correct.

24          THE COURT:  Okay.  But you heard about it?

25          PROSPECTIVE JUROR:  Right.

```
 1            THE COURT:  Did you know your spouse when it happened?
 2            PROSPECTIVE JUROR:  No.
 3            THE COURT:  Was your spouse injured?
 4            PROSPECTIVE JUROR:  No, he was not injured.  No.
 5            THE COURT:  Okay.
 6            PROSPECTIVE JUROR:  He wasn't home at the time.
 7            THE COURT:  Somebody broke in the house?
 8            PROSPECTIVE JUROR:  Broke in, yes.
 9            THE COURT:  Took things?
10            PROSPECTIVE JUROR:  Yes, yes.
11            THE COURT:  Were they ever apprehended?
12            PROSPECTIVE JUROR:  Not that I know of.
13            THE COURT:  Anything about that experience of your
14   husband's, as related to you, that would affect your ability to
15   be a fair and impartial juror if you were selected?
16            PROSPECTIVE JUROR:  No, sir.
17            THE COURT:  Once again, 17.  Anybody with legal
18   training?  "Daughter, yes."  And that's the legal
19   assistant-paralegal that we've heard about?
20            PROSPECTIVE JUROR:  Correct.
21            THE COURT:  Anybody else?
22            PROSPECTIVE JUROR:  Nobody else.
23            THE COURT:  And it looks like no other "Yes" answers?
24            PROSPECTIVE JUROR:  That's correct.
25            THE COURT:  That's correct.  Okay.  So you work for
```

```
 1   HHS?

 2            PROSPECTIVE JUROR:   Yes.

 3            THE COURT:   What do you do for them?

 4            PROSPECTIVE JUROR:   I'm -- I'm an office manager.

 5   It's called -- the position kind of -- the name doesn't fit the

 6   job.

 7            THE COURT:   Try me, let's see how it sounds.

 8            PROSPECTIVE JUROR:   It's a divisional management

 9   analyst.

10            THE COURT:   Okay.

11            PROSPECTIVE JUROR:   And I work, like, in the Office of

12   the Director and for the National Institutes of Health.  It's

13   like a catchall center for grant reviews and funding.

14            THE COURT:   Got it.  Do you like your work?

15            PROSPECTIVE JUROR:   I get a little frustrated but it's

16   okay.  It's work.  Just, like, you know, everybody have their

17   days.

18            THE COURT:   You got to do something, right?

19            PROSPECTIVE JUROR:   Yeah.

20            THE COURT:   How long you been working there?

21            PROSPECTIVE JUROR:   I've been working there for 30

22   years or so.  So it's like, you know, with the Government your

23   time counts so I've been there for 22.  But a total of, like,

24   33 in the Government.

25            THE COURT:   Where were you before HHS?
```

1    PROSPECTIVE JUROR:  I was -- I been at the Naval
2 Academy and I worked at Fort Meade at the commissary.  And when
3 I worked at the Naval Academy I did like the -- in the -- like
4 in the bleep hall where they have the lunch and everything and
5 kind of ordering their food.  If there's -- I guess it was like
6 for their banquets and different events that they had.

7    THE COURT:  I got it.  Okay.  Do you have a spouse or
8 a partner in life?

9    PROSPECTIVE JUROR:  Yes, I have a spouse.

10    THE COURT:  And how long have you been married?

11    PROSPECTIVE JUROR:  We've been married for 20 years.

12    THE COURT:  What does your spouse do?

13    PROSPECTIVE JUROR:  He's audiovisual lead and he works
14 at the Fort Meade at DISA, defense intelligence agency.

15    THE COURT:  Any kids?

16    PROSPECTIVE JUROR:  Yes.  I have two daughters.  The
17 one that lives in Vegas is older and then I have an 18 year
18 old.

19    THE COURT:  That's right.  And you told us about the
20 older one.  Younger, what does that one do?

21    PROSPECTIVE JUROR:  My younger one?

22    THE COURT:  Yes.

23    PROSPECTIVE JUROR:  Oh, she just started working at
24 Fort Meade at the child daycare center.  And she's part-time.
25 She's been there maybe two weeks.  She's going to be going to

1    the community college.  So she's going to work there part-time.

2            THE COURT:  Got it.  Thank you for talking to me.  Let

3    me talk to the lawyers for a minute.

4        (Whereupon, the following conference was held at the

5    bench:)

6            THE COURT:  Government have any issues or questions in

7    light of mine?

8            MS. MCGUINN:  No, Your Honor.

9            THE COURT:  Mr. Nieto?

10           MR. NIETO:  No, Your Honor.

11           THE COURT:  Thank you.

12       (Whereupon, the bench conference was concluded.)

13           THE COURT:  Thank you, ma'am.  You may go back to the

14   fourth floor jury assembly area, and we'll talk with you more

15   later.

16           PROSPECTIVE JUROR:  Okay.  Thank you.

17           THE COURT:  Thank you.  Now, 150.

18       Good afternoon, ma'am.

19           PROSPECTIVE JUROR:  Good afternoon.

20           THE COURT:  Thank you for coming into the courtroom.

21   Thank you for completing your juror questionnaire yesterday

22   which I have now been reviewing.  I think I see only one "Yes"

23   answer --

24           PROSPECTIVE JUROR:  Right.

25           THE COURT:  -- on your form.  Does that sound right to

```
1   you?
2            PROSPECTIVE JUROR:  Yes, sir.
3            THE COURT:  It was 16D, asking about whether you've
4   been a witness for the prosecution or the defense or anyone in
5   your family has done and so forth.  And your answer was:  "Yes,
6   employment description case against my employer."
7            PROSPECTIVE JUROR:  Correct.
8            THE COURT:  So are you telling me that you brought a
9   lawsuit against your employer?
10            PROSPECTIVE JUROR:  No, I was a witness.
11            THE COURT:  You were a witness in an employment
12   action --
13            PROSPECTIVE JUROR:  Yes --
14            THE COURT:  -- that someone brought against your
15   employer?
16            PROSPECTIVE JUROR:  Correct.
17            THE COURT:  How long ago was this?
18            PROSPECTIVE JUROR:  Twenty-five years ago.
19            THE COURT:  Did you go to court and testify?
20            PROSPECTIVE JUROR:  I did.
21            THE COURT:  Was there anything about that experience
22   that you think would affect your ability to be a fair and
23   impartial juror if you were seated on this jury?
24            PROSPECTIVE JUROR:  No.
25            THE COURT:  Okay.  You are retired now?
```

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA501**

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Living in Annapolis?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  And before you retired, what was your

5   work?

6          PROSPECTIVE JUROR:  I was a university professor.

7          THE COURT:  And what was your field in which you

8   taught?

9          PROSPECTIVE JUROR:  Human resource management.

10         THE COURT:  Okay.  And tell us for how many years you

11  were teaching in that field?

12         PROSPECTIVE JUROR:  Thirty.

13         THE COURT:  Very well.  Can you tell us the

14  institution or institutions where you were so employed?

15         PROSPECTIVE JUROR:  I started at the University of

16  Minnesota and after four years I left for Miami University in

17  Ohio.

18         THE COURT:  And then did you complete your career

19  at Miami University in Ohio?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  What department would you say your field

22  fell into or how did they categorize it at Miami U?

23         PROSPECTIVE JUROR:  Department of management in the

24  school of business.

25         THE COURT:  It's a business function, you know, I

```
 1  don't know.  Other terms, do they ever call that like
 2  industrial psychology?  There are all kinds of terms that apply
 3  to that historically, fair enough?
 4          PROSPECTIVE JUROR:  Yes.
 5          THE COURT:  In addition to teaching, did you write and
 6  publish in your area?
 7          PROSPECTIVE JUROR:  Yes.
 8          THE COURT:  What brought you to Annapolis?
 9          PROSPECTIVE JUROR:  Retirement.  Wanted to live near
10  the Chesapeake.
11          THE COURT:  Well, that's a very good reason.
12      Do you have a spouse or partner in life?
13          PROSPECTIVE JUROR:  Yes, my husband lives in Annapolis
14  also.  Also retired.
15          THE COURT:  He's retired?
16          PROSPECTIVE JUROR:  Yes.
17          THE COURT:  What did he do before he retired?
18          PROSPECTIVE JUROR:  University professor.  Same
19  department.
20          THE COURT:  In the same department?
21          PROSPECTIVE JUROR:  Yes.
22          THE COURT:  Pretty much the same field?
23          PROSPECTIVE JUROR:  More or less.
24          THE COURT:  Were you academic collaborators or work on
25  things together or happen to be in the same department?
```

1          PROSPECTIVE JUROR:  Only collaborated occasionally.

2          THE COURT:  How long have you been married?

3          PROSPECTIVE JUROR:  Forty years.

4          THE COURT:  Do you have children?

5          PROSPECTIVE JUROR:  Yes, two children.

6          THE COURT:  How old are they?

7          PROSPECTIVE JUROR:  Daughter is 35 and our son is 33.

8          THE COURT:  What do they do?

9          PROSPECTIVE JUROR:  Our daughter is an academic

10   advisor at Community College of Baltimore County, I think.  And

11   son is a physician.

12          THE COURT:  Okay.  And what is his field of practice?

13          PROSPECTIVE JUROR:  Internal medicine and palliative

14   care.

15          THE COURT:  Do you have grandchildren?

16          PROSPECTIVE JUROR:  Yes, three.

17          THE COURT:  How old are they?

18          PROSPECTIVE JUROR:  Eight, six and two months.

19          THE COURT:  Oh, new one.  Got it.  Since you're

20   retired, you have a little more free time than you used to

21   have.

22          PROSPECTIVE JUROR:  I do.

23          THE COURT:  Do you spend all your time reading

24   professional journals in your prior field, or have you moved on

25   to other interests?

```
 1          PROSPECTIVE JUROR:  Other interests.

 2          THE COURT:  What would they it include?

 3          PROSPECTIVE JUROR:  I do like to read.  And I do

 4   various fiber arts, weaving and felting and papermaking.

 5          THE COURT:  Got it.  I'm going to talk with the

 6   lawyers for a minute if you'll pardon me.

 7       (Whereupon, the following conference was held at the

 8   bench:)

 9          THE COURT:  Does the Government have any issues or

10   questions in light of mine?

11          MS. MCGUINN:  No, Your Honor.

12          THE COURT:  Mr. Nieto, do you?

13          MR. NIETO:  No, Your Honor.

14          THE COURT:  Thank you.

15       (Whereupon, the bench conference was concluded.)

16          THE COURT:  Thank you, ma'am.  We're finished with

17   this part of the process.  You may return to the jury assembly

18   area up on the fourth floor.  We'll speak to you more later.

19   Thank you very much.

20       So 130.

21       Good afternoon.

22          PROSPECTIVE JUROR:  Good afternoon.

23          THE COURT:  I'm still looking at your juror

24   questionnaire.  I'll be with you in just a minute.

25          PROSPECTIVE JUROR:  No problem.
```

```
 1        THE COURT:  Okay.  We've got some matters to discuss
 2  by virtue of your "Yes" answers, but I want to jump ahead to
 3  one question in particular.  Question Number 26:   A Defendant
 4  is presumed innocent unless and until the jury unanimously
 5  finds him guilty beyond a reasonable doubt.  Are you unable to
 6  accept that principle?
 7        And I have markings here that I have trouble following.  I
 8  see "Yes" is marked with an X.  Then there's an arrow drawn
 9  over to another X marking "no."  And then "no" is circled.  And
10  then the word "unable" is underlined and circled.
11        And so perhaps there was sort of a process that your mind
12  is going through as you were interpreting what we were asking
13  you, so I'm just going to ask you again straight up.
14        Here's the question:   A defendant is presumed innocent
15  unless and until a jury unanimously find him guilty beyond a
16  reasonable doubt.
17        Are you unable to accept that principle or you are able to
18  accept that principle?
19             PROSPECTIVE JUROR:  I'm able to accept the principle.
20             THE COURT:  It was just the wording of the questions
21  that might have been a little confusing?
22             PROSPECTIVE JUROR:  Correct.
23             THE COURT:  Okay.  So this is a principle of our law
24  and comes to us from our Constitution and you accept that and
25  believe that that's correct and would apply that?
```

1          **PROSPECTIVE JUROR:**   Yes.

2          **THE COURT:**   Okay.   Thank you very much.   Let's back

3     up.   Question 10:   A few minutes ago you heard me give a very

4     brief description of this case.   Is there anything in that

5     brief description that made you realize it would be difficult

6     for you to keep an open mind and serve as a fair and impartial

7     juror in the trial in this case?   Answer:   "Yes, my niece was

8     abused by her caregiver.   And it is currently in the Virginia

9     courts awaiting trial.   She was three years old."

10          All right.   Let's stop there for a second.   You obviously

11     did hear me make reference to what the charges are in this

12     case.   Do you believe that the circumstances related to your

13     family, your niece and so forth, would interfere with your

14     ability to be a fair and impartial juror in this case, which of

15     course is a completely separate and different matter from the

16     one that may be pending in Virginia that relates to your

17     family.   But there may be, in your mind at least, some overlap

18     in terms of the venire on these cases.

19          I just would like to hear you speak a little bit more

20     about it?

21          **PROSPECTIVE JUROR:**   Certainly.   And, yes, I think it

22     would affect my judgment.   And as you say, the way I was

23     interpreting it as a position of trust, someone who was given

24     trust and care over this person took advantage of that

25     relationship and inflicted harm upon someone else.   So it

1  may -- I think it would have an affect on my ability to fairly

2  determine an outcome.

3      THE COURT:  Okay.  And you say that with great candor,

4  which I appreciate immensely.  But in a context where we're

5  always advising you that the defendant in this case, as is true

6  of every defendant in every criminal case in this country, is

7  presumed to be innocent despite a charge or accusation having

8  been made against them.  And it's for the Government to prove

9  beyond a reasonable doubt a charge that they have brought, and

10 if they can't do that then that presumption of innocence stays

11 with the Defendant.  They remain innocent and they're

12 discharged.

13     PROSPECTIVE JUROR:  I don't disagree with that.  I

14 just answered the question with my thoughts.

15     THE COURT:  Yes.  And that's exactly what I'm trying

16 to get at.  Even though you know what the principle is and you

17 believe is the principle, the question is:  Would you be able

18 to apply it here in an unfettered way without influence from

19 the circumstances of your own family?  Or are you reporting to

20 us that, no, you understand the responsibility, you agree with

21 the principle, but in candor you're reporting that you might

22 or, well, would be influenced by the circumstances in your own

23 family situation?

24     PROSPECTIVE JUROR:  Right, I think the door is open,

25 without knowing the full facts of the case, it may leave the

1  door open is all I'm trying to say.  There might be something

2  that comes up that may affect my judgment, my bias that I would

3  otherwise rather not have the door been opened on is I suppose

4  what I'm saying.

5        THE COURT:  Okay.  Thank you.  Let me talk to the

6  lawyers a minute.

7     (Whereupon, the following conference was held at the

8  bench:)

9        THE COURT:  Okay.  It's another close one, but he just

10 used the word "bias."  I don't like that.  Ms. McGuinn?

11       MS. MCGUINN:  Your Honor, the Government will move for

12 cause.

13       THE COURT:  Mr. Nieto?

14       MR. NIETO:  We would join.

15       THE COURT:  Granted.

16    (Whereupon, the bench conference was concluded.)

17       THE COURT:  Thank you, sir, for your candor.  You are

18 excused and we're not going to have you sit in this case.

19 Maybe you'll be called to sit on a different jury at a

20 different time.  You may depart.  You may go through the door

21 that you entered over your left shoulder there.  Thank you.

22    128.

23    Good afternoon, sir.  I'll be with you in just a second.

24       PROSPECTIVE JUROR:  Okay.

25       THE COURT:  Clear the gallery.  Says here you're a

1  radio announcer?

2          PROSPECTIVE JUROR:  I am.

3          THE COURT:  So you are one person that I'm going to

4  talk to today I don't have any doubt I'm going to be able to

5  hear when they speak into that microphone.

6          PROSPECTIVE JUROR:  You'll hear me just fine.

7          THE COURT:  Is that a good bet?

8          PROSPECTIVE JUROR:  Pretty good bet.

9          THE COURT:  All right.  Already proven true.  All

10  right.

11      We have some topics to discuss here.  You have responded

12  "Yes" to some of the court's questions.  Specifically, a few

13  minutes ago you heard me -- Number 10:  A few minutes ago you

14  heard me give a very brief description of this case.  Is there

15  anything in that brief description that made you realize it

16  would be difficult for you to keep an open mind and serve as a

17  fair and impartial juror in the trial of this case?  Answer:

18  "Yes."

19          PROSPECTIVE JUROR:  Correct.

20          THE COURT:  But not an elaboration here.  Although you

21  did write me a note later in response to another question that

22  perhaps is related to this or perhaps it's different.

23          PROSPECTIVE JUROR:  No, it's related to that.

24          THE COURT:  Okay.  So let's just jump ahead to that

25  answer.  We'll skip past -- well, you were answering that, yes,

1 somebody worked for the Department of Justice, State's

2 Attorney, AG's Office, state, local or law enforcement agency.

3          PROSPECTIVE JUROR:  I have several friends who are in

4 law enforcement, yes.

5          THE COURT:  These are friends of yours.  They happen

6 to be police officers?

7          PROSPECTIVE JUROR:  Yes, yes.

8          THE COURT:  Okay.  But let's really focus our

9 attention for the moment, 16A, a victim of a crime, "My father

10 was assaulted and robbed."

11          PROSPECTIVE JUROR:  Correct.

12          THE COURT:  16B, "My wife and I witnessed an assault."

13          PROSPECTIVE JUROR:  Correct.

14          THE COURT:  And then 16E:  Specifically, in this case

15 the allegations include those of sexual abuse.  Has any member

16 of your immediate family or closest associates ever been a

17 victim or witness accused or convicted of a crime of sexual

18 nature?

19     Answer:  "Yes, my father-in-law convicted."  Tell me about

20 that?

21          PROSPECTIVE JUROR:  My father-in-law was convicted.

22 He pled guilty actually for possession of child pornography.

23          THE COURT:  Okay.

24          PROSPECTIVE JUROR:  And was -- and served time.

25          THE COURT:  Okay.  How long ago was that?

1          PROSPECTIVE JUROR:  I was just thinking about that.
2     It's probably about 10 years.
3          THE COURT:  He's been released at this point?
4          PROSPECTIVE JUROR:  He's deceased.
5          THE COURT:  He's deceased?
6          PROSPECTIVE JUROR:  Yes.
7          THE COURT:  Tell me about your relationship with your
8     father-in-law both before these charges came to light and then
9     through that experience and after?
10         PROSPECTIVE JUROR:  It wasn't very close.  He had
11    abandoned the family.  My wife's family when -- he owned a
12    nightclub in Libertytown, Maryland, and he evaded tax and so he
13    left the country.  He came back into the U.S., I guess he
14    thought that the statute of limitations had run out or
15    whatever.  And he had kind of a relationship with his daughter,
16    my wife.  They -- he stayed with us for a little while until he
17    could find his own apartment.  And then he got a job.  He was
18    in sales.  He was in -- he was a car salesman.
19         And he was really, really close to the other sibling, the
20    brother.  But basically we found out later that he had -- the
21    FBI had been tracking him and his email and chat groups,
22    chatrooms he had been in.  So he was -- he was arrested.  He
23    pled guilty.  He did time.  And this of course completely
24    destroyed my wife.
25         THE COURT:  In Maryland?

```
 1           PROSPECTIVE JUROR:  In Maryland, yeah.

 2           THE COURT:  Was he convicted in this courthouse?

 3           PROSPECTIVE JUROR:  No, no.  It was -- where was it?

 4   Was it Washington County, I think.

 5           THE COURT:  So the FBI was involved, but it ultimately

 6   yielded a state conviction?

 7           PROSPECTIVE JUROR:  I believe so, yes.  Yeah.  It's

 8   state of Maryland.  Yes, state of Maryland conviction, yes.

 9           THE COURT:  Okay.

10           PROSPECTIVE JUROR:  So it's adversely affected my wife

11   obviously, and the siblings, two brothers and a sister.  And

12   it's been -- it literally just came up last week because we had

13   some of the court papers up where we keep things, Social

14   Security cards and stuff like, and I said, "Do we still have

15   that paperwork with all of the charges and the description of

16   all of the -- what he possessed?"  She said, "Yeah."  I said,

17   "We need to shred that.  We need to get rid of that."  She

18   said, "That's the day my life changed forever because he used

19   her name in chatrooms posing as a young girl to talk to young

20   girls."

21           THE COURT:  Okay.

22           PROSPECTIVE JUROR:  So that's my experience.

23           THE COURT:  I got it.

24           PROSPECTIVE JUROR:  So I wasn't very close with him.

25   Not, not a great guy.
```

1        THE COURT:  Tell me then about how, if at all, that

2    experience would impact your ability to serve as a fair and

3    impartial juror in this case which is unrelated to your

4    father-in-law's case?

5        PROSPECTIVE JUROR:  I don't think I can be fair.  I

6    already have formed an opinion just from the accusation,

7    unfortunately.  That's -- that's where I am.  Crimes of this

8    nature, given the background that I've had, I don't -- I don't

9    think I can be fair.

10        THE COURT:  I probably just couldn't -- by the

11   conviction with which you're saying that, it sounds like a

12   discussion with me is unlikely to sort of move you off of that?

13        PROSPECTIVE JUROR:  No, not really.  I'm probably

14   going in with a tainted opinion already.

15        THE COURT:  Let me talk to the lawyers for a minute.

16    (Whereupon, the following conference was held at the

17   bench:)

18        THE COURT:  Mr. Nieto?

19        MR. NIETO:  Your Honor, on behalf of the defense we

20   make a motion to strike for cause.

21        THE COURT:  Any objection?

22        MS. MCGUINN:  No, Your Honor.

23        THE COURT:  The motion is granted.

24    (Whereupon, the bench conference was concluded.)

25        THE COURT:  Okay.  You're excused.  Thank you for your

```
 1  candid answers, appreciate it.
 2            PROSPECTIVE JUROR:  Thank you very much.
 3            THE COURT:  Good luck to you.  You can step out that
 4  door there.
 5       126.
 6       Good afternoon, ma'am.
 7            PROSPECTIVE JUROR:  Hi.
 8            THE COURT:  Thank you for coming back into the jury
 9  room.  I'll review with you your answer sheet which I have just
10  gone through.  Let me start with your "Yes" answer back here to
11  Question 16A:  "Victim of a crime, yes."
12            PROSPECTIVE JUROR:  Yes.
13            THE COURT:  "Car break-in."  Excuse me, someone broke
14  into your car?
15            PROSPECTIVE JUROR:  Not my car, my fiancé's car.  He
16  left it unlocked.
17            THE COURT:  I'm going to ask you to move a little
18  closer to that microphone.  The chair won't move.  So you just
19  have to scoot up.  It's uncomfortable.  I'm sorry.
20            PROSPECTIVE JUROR:  Yes, my fiancé's car got broken
21  into.  He left the car unlocked.
22            THE COURT:  How long ago did that happen?
23            PROSPECTIVE JUROR:  About a year ago.
24            THE COURT:  Stuff got stolen?
25            PROSPECTIVE JUROR:  Yes.
```

| | |
|---|---|
| 1 | THE COURT:  Ever get it back? |
| 2 | PROSPECTIVE JUROR:  No. |
| 3 | THE COURT:  Gone? |
| 4 | PROSPECTIVE JUROR:  Yeah, gone. |
| 5 | THE COURT:  Where did that happen? |
| 6 | PROSPECTIVE JUROR:  At our home in Howard. |
| 7 | THE COURT:  Outside your house in Howard County? |
| 8 | PROSPECTIVE JUROR:  Uh-huh. |

9        THE COURT:  Okay.  Thank you.  Anything about that

10   that would make it difficult for you to serve as a fair and

11   impartial juror if you were picked?

12        PROSPECTIVE JUROR:  No, he shouldn't have left his car

13   unlocked.

14        THE COURT:  Now, sadly I guess that's right.

15     Now, Question 26:  A defendant is presumed innocent unless

16   and until a jury unanimously finds him guilty beyond a

17   reasonable doubt.

18     Are you unable to accept that principle?  And your answer

19   was "yes."  So let me go -- I see a confused look.

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  Let's go over it again.  A defendant is

22   presume innocent unless and until a jury unanimously finds him

23   guilty beyond a reasonable doubt?

24     Let me ask it this way:  Do you accept that principle?  Do

25   you agree with that or do you not agree with that?

1          **PROSPECTIVE JUROR:**  I agree that he is innocent until

2    everyone comes to a unanimous decision, yes.

3          **THE COURT:**  Okay.  So a defendant is presumed innocent

4    unless and until a jury unanimously finds him guilty beyond a

5    reasonable doubt.  Do you agree with that or disagree with

6    that?

7          **PROSPECTIVE JUROR:**  Correct, I agree.

8          **THE COURT:**  You agree with that?

9          **PROSPECTIVE JUROR:**  I agree.

10          **THE COURT:**  So perhaps you had a little

11    misunderstanding because the wording is a little awkward with

12    this question.  You're kind of having to go back and forth.

13          **PROSPECTIVE JUROR:**  Yes.

14          **THE COURT:**  But that doesn't reflect any ambivalence

15    in your own mind about the principle I take it?

16          **PROSPECTIVE JUROR:**  No.

17          **THE COURT:**  No ambivalence at all?

18          **PROSPECTIVE JUROR:**  No.

19          **THE COURT:**  You agree with the principle?

20          **PROSPECTIVE JUROR:**  Yes.

21          **THE COURT:**  Okay.  So you work as an administrative

22    assistant out there in Howard County?

23          **PROSPECTIVE JUROR:**  No.  Actually I work part-time in

24    Virginia.

25          **THE COURT:**  Oh.

1              PROSPECTIVE JUROR:  But I work from home.

2              THE COURT:  All right.  At one time -- oh, I got it.

3    That's where you -- that's where you live.

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  But the employer is somewhere else.  This

6    is a virtual world and we're a little slow to catch up with our

7    form, is that the deal?

8              PROSPECTIVE JUROR:  Yes, I lived in Virginia until

9    about three years ago.  And then I moved up here in the middle

10   of the pandemic to be with my fiancé.

11             THE COURT:  The CSO can admit the public.  Court

12   security officer.  Mr. CSO?  No members of the public?  There's

13   no one out there?  You can admit the members of the public who

14   we excluded previously.  Thank you for doing that.  Okay.

15        So you work virtually from your home?

16             PROSPECTIVE JUROR:  Uh-huh.

17             THE COURT:  Tell me about your work?

18             PROSPECTIVE JUROR:  I'm the admin for a real estate

19   company.  So I help send the contracts over to the different

20   title companies, schedule the termites --

21             THE COURT:  Schedule the termites.  That's an

22   interesting terminology.  Schedule the termite check.

23             PROSPECTIVE JUROR:  Termite inspection or septic or

24   well.

25             THE COURT:  Got it, okay.

```
1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  And how long have you been doing that

3    work?

4              PROSPECTIVE JUROR:  With this company I've been doing

5    it for 24 years.

6              THE COURT:  Okay.  Long time.

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Do you have a spouse or partner in life?

9              PROSPECTIVE JUROR:  I have a fiancé.

10             THE COURT:  A fiancé.

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Is your fiancé employed?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  What does your fiancé do.

15             PROSPECTIVE JUROR:  He's a defense contractor.

16             THE COURT:  So beyond that, can we have any

17   information or we don't know?

18             PROSPECTIVE JUROR:  I told him not to tell me.

19             THE COURT:  Okay.  Got it.  And how long have you been

20   engaged?

21             PROSPECTIVE JUROR:  Five years.

22             THE COURT:  Have you ever been married before?

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  Do you have any children?

25             PROSPECTIVE JUROR:  No.
```

1          THE COURT:   How do you spend your spare time?  Do you
2  have interests outside of your work?
3          PROSPECTIVE JUROR:   Sewing, watching TV.   I like
4  YouTube, streaming so . . .
5          THE COURT:   Got it.   Thank you.   Bear with me for a
6  second while I talk to the lawyers for a minute.   Okay.
7          PROSPECTIVE JUROR:   Okay.
8      (Whereupon, the following conference was held at the
9  bench:)
10          THE COURT:   Government have any issues or questions in
11  light of mine?
12          MS. MCGUINN:   No, Your Honor.
13          THE COURT:   Mr. Nieto?
14          MR. NIETO:   No, Your Honor.
15          THE COURT:   Thank you.
16      (Whereupon, the bench conference was concluded.)
17          THE COURT:   Thank you, ma'am.   We're finished asking
18  you questions and you may now return to the fourth floor jury
19  assembly area.   And we'll speak with you more later.
20          PROSPECTIVE JUROR:   Do I exit this door?
21          THE COURT:   You follow this gentleman right here and
22  he will show you where to go.
23          PROSPECTIVE JUROR:   Thank you.
24          THE COURT:   It's 1:00.   It's time for the court to
25  take a lunch break.   Let's see where we are.   How many we got?

Ronda J. Thomas, RMR, CRR – Federal Official Reporter

**JA520**

1          THE CLERK:  Your Honor, we have 23 jurors now that can
2   sit and 27 strikes for cause.
3          THE COURT:  Mr. Proctor?
4          MR. PROCTOR:  Forty-six percent success rate.
5          THE COURT:  Forty-six?
6          MR. PROCTOR:  Yes, sir.
7          THE COURT:  So we've improved.  What did you say, 23?
8          MR. PROCTOR:  Twenty-three out of 50.
9          THE COURT:  Twenty-three, we need 13.  Okay.  Well,
10  it's going to be close.  But as I say, we have summoned an
11  additional 20 for first thing tomorrow morning if we're
12  unsuccessful today with this group.  We're going to keep the
13  lunch break to just 45 minutes, and we're going to resume at
14  1:45.  And we'll make sure that the jurors know that and so
15  that the next ones in the queue are ready to go.  And after
16  lunch at 1:45 we will start with number 117.
17      Any issues before we break for lunch?  Ms. McGuinn?
18          MS. MCGUINN:  Not from the Government, Your Honor.
19          THE COURT:  Mr. Nieto?
20          MR. NIETO:  Court's indulgence.
21          THE COURT:  Yes.
22          MR. PROCTOR:  Your Honor, my client is on medication.
23  He mentioned a heart issue yesterday.
24          THE COURT:  Yes.
25          MR. PROCTOR:  He did not get it at the jail either

1  yesterday or today.  We emailed the warden to ask that it

2  doesn't happen again.  It's not an issue yet.  I'm just

3  flagging it.  It may well be.

4          THE COURT:  Okay.  And he -- what are you telling me

5  about today?  Has he received the medication today?

6          MR. PROCTOR:  No, sir.

7          THE COURT:  Is this once a day medication?

8          MR. PROCTOR:  Yes, he's nodding.

9          THE COURT:  It's in the morning or evening?

10         THE DEFENDANT:  Morning.

11         MR. PROCTOR:  It's six medications total given usually

12 in the morning.  In fact, when I visit him in the morning, they

13 sometimes pull him out to give it to him.  And there's a second

14 one in the evening.

15     So we have written to the warden and asked him to make

16 accommodations.  They're typically usually helpful when we do

17 such things, but I just don't know if it's going to be an issue

18 going forward.

19         THE COURT:  My recent experience has been positive

20 with CDF in terms of these sorts of issues.  I would urge you

21 to keep that channel of communication open with the warden, but

22 also bring the matter to the attention of the supervisors in

23 the marshal's service who are responsible for detainees.  We've

24 also got two deputies in the courtroom who will take this

25 message back to the sixth floor.

1    Obviously, the Defendant's medication needs to be managed

2    in a manner consistent with the standard of care, even on those

3    days when he is being transported to court.  So I need the

4    marshal service to follow up on this and confirm that we're

5    going to get back on track in terms of that administration.

6         **MR. PROCTOR:**  Thank you, sir.  That's all we have.

7         **THE COURT:**  The Defendant is remanded.  We're in

8    recess until 1:45 for lunch.

9         **THE CLERK:**  All rise.  This Honorable Court now stands

10   in recess.

11   (A recess was taken from 1:03 p.m. to 1:52 p.m.)

12        **THE CLERK:**  All rise.

13        **THE COURT:**  Be seated, please.

14   Are we ready to resume, Ms. McGuinn?

15        **MS. MCGUINN:**  Yes, Your Honor.

16        **THE COURT:**  Mr. Nieto?

17        **MR. NIETO:**  Yes, Your Honor.

18        **THE COURT:**  Let's bring in 117.

19   Good afternoon.  I'll be with you in just a second.  I'm

20   reviewing your questionnaire.  You're Juror No. 117.

21        **PROSPECTIVE JUROR:**  Yes.

22        **THE COURT:**  Thank you for joining us again this

23   afternoon and thank you for faithfully completing your

24   questionnaire yesterday when you were with us.  I know this

25   process requires a lot of patience and we appreciate yours.

```
 1        You tell us you wear glasses.  With your glasses though
 2   you can see just fine?
 3             PROSPECTIVE JUROR:  Yes.
 4             THE COURT:  Okay.  Very good.  So let's go to some of
 5   your other "Yes" answers.  Number 15:  Have you or has any
 6   member of your immediate family or closest associates ever been
 7   involved in a legal dispute with the government, with a law
 8   enforcement agency or a specific law enforcement officer or
 9   agent?  Answer:  "Yes."  Then it says "My father."
10             PROSPECTIVE JUROR:  Yes.
11             THE COURT:  Tell us about that?
12             PROSPECTIVE JUROR:  I am not exactly sure what his
13   charges were.  We don't really have a great relationship.  I
14   just knew that he was arrested and placed in jail, so I'm
15   assuming he went through the trial everything, and so I marked
16   it on there just in case.
17             THE COURT:  Absolutes.  And thank you so much.  And
18   I'm sorry that we pry --
19             PROSPECTIVE JUROR:  That's okay.
20             THE COURT:  -- into personal matters like we do but
21   it's a necessary part of this process.  So when did all of this
22   happen?
23             PROSPECTIVE JUROR:  This was, I believe, March 2020,
24   2021 area during COVID time.
25             THE COURT:  You say you're not so close to your
```

```
 1   father.   Is your mother in the picture?
 2              PROSPECTIVE JUROR:   Yes.
 3              THE COURT:   What's your relationship with her?
 4              PROSPECTIVE JUROR:   Very good.   That's actually who
 5   I've lived with my entire life and been with, so . . .
 6              THE COURT:   Do your father and mother not live with
 7   each other?
 8              PROSPECTIVE JUROR:   No, they have been separated since
 9   birth.
10              THE COURT:   Okay.   For all of your life?
11              PROSPECTIVE JUROR:   Yes.
12              THE COURT:   Okay.   So it sounds like you're not really
13   sure what your father was accused of?
14              PROSPECTIVE JUROR:   I believe it was in the realm of,
15   like, domestic violence or something like that.
16              THE COURT:   Not involving you or your mother?
17              PROSPECTIVE JUROR:   No, no, no.
18              THE COURT:   And your source of information, is it your
19   mother?   Some other person?
20              PROSPECTIVE JUROR:   It's actually my half brother who
21   does live with my father.
22              THE COURT:   Okay.   And are you on any kind of
23   reasonable terms with your half brother?
24              PROSPECTIVE JUROR:   We get along.   We don't speak
25   regularly.   He kind of just updates me with major life events
```

1  like that.

2      THE COURT:  Okay.  Got it.  So here's what we're

3  driving at.  Again, we're not trying to pry into your personal

4  affairs.  What I need to know is whether there's anything about

5  the situation with your father that would affect your ability

6  to be a fair and impartial juror if you were selected to serve

7  in this case?

8      PROSPECTIVE JUROR:  I don't believe so, no.

9      THE COURT:  Okay.  It's a matter that's completely

10  separate and distinct from whatever has brought you into this

11  courtroom, right?

12      PROSPECTIVE JUROR:  Yeah, absolutely.

13      THE COURT:  You'll be able to keep the two separate

14  and one would not influence the other?

15      PROSPECTIVE JUROR:  Yeah.

16      THE COURT:  Okay.  And I'm just verifying but I don't

17  think we have any other "Yes" answers.  Do you agree with me?

18      PROSPECTIVE JUROR:  I believe there was one other one,

19  but it was the same instance, my father.

20      THE COURT:  True enough.  I'm sorry.  I did sort of

21  lump those together.  But it was both in relation to that?

22      PROSPECTIVE JUROR:  Yes, yes.

23      THE COURT:  And then your glasses?

24      PROSPECTIVE JUROR:  Yep.

25      THE COURT:  Very good.  You live in North East?

```
1              PROSPECTIVE JUROR:  Yes.
2         THE COURT:  And have you lived there a long time?
3              PROSPECTIVE JUROR:  Yeah, I would say about six or
4    seven years now.
5         THE COURT:  And where did you live before that?
6              PROSPECTIVE JUROR:  Elkton.  Right up the street.
7         THE COURT:  That's a big move.
8         (Laughter.)
9              PROSPECTIVE JUROR:  Right.
10        THE COURT:  Have you lived anywhere else in your life
11   besides sort of Elkton, North East, Cecil County?
12             PROSPECTIVE JUROR:  No, I have not.
13        THE COURT:  Are you working as a dental assistant?
14             PROSPECTIVE JUROR:  Yes.
15        THE COURT:  How long have you been in that profession?
16             PROSPECTIVE JUROR:  I have been working for him
17   full-time for about five years.
18        THE COURT:  Did you go to school to receive training
19   to perform that job?
20             PROSPECTIVE JUROR:  I actually have been trained under
21   the dentist that I work for?
22        THE COURT:  Okay.  And you've been working for the
23   same dentist for five years?
24             PROSPECTIVE JUROR:  Yes.
25        THE COURT:  Okay.  Do you have a partner or spouse or
```

1  a person -- a special person in your life?

2      PROSPECTIVE JUROR:  I have a partner, yes.

3      THE COURT:  And what does that person do?

4      PROSPECTIVE JUROR:  He is a welder.

5      THE COURT:  A welder?

6      PROSPECTIVE JUROR:  Yes.

7      THE COURT:  Also working up there in the Cecil County?

8      PROSPECTIVE JUROR:  I believe right now he's working

9  in Delaware.

10     THE COURT:  Got it.  Do you have any children?

11     PROSPECTIVE JUROR:  I do have one, yes.

12     THE COURT:  How old is your child?

13     PROSPECTIVE JUROR:  She's two.

14     THE COURT:  And someone cares for her while you are

15 working as a dental assistant, presumably?

16     PROSPECTIVE JUROR:  Yes, yes.

17     THE COURT:  What does your mom do?

18     PROSPECTIVE JUROR:  She actually is an administrator

19 for Kona Ice of Elkton.

20     THE COURT:  Okay.  Very good.  What do you like to do

21 for fun?

22     PROSPECTIVE JUROR:  I enjoy reading or just being

23 outside.  Anything quiet and relaxing.

24     THE COURT:  Got it.  Bear with me one second while I

25 talk with the lawyers.

1           PROSPECTIVE JUROR:   No problem.

2       (Whereupon, the following conference was held at the

3   bench:)

4           THE COURT:   Government have any issues or questions in

5   light of mine?

6           MS. MCGUINN:   No, Your Honor.

7           THE COURT:   Mr. Nieto?

8           MR. NIETO:   No, Your Honor.

9           THE COURT:   Thank you.

10       (Whereupon, the following conference was held at the

11  bench:)

12          THE COURT:   Thank you, ma'am.   We're finished asking

13  you questions and you may now return to the fourth floor and

14  we'll speak with you more later.   Thank you.

15       Good afternoon, ma'am.

16          PROSPECTIVE JUROR:   Good afternoon.

17          THE COURT:   Thank you for joining us in the courtroom.

18  Thank you for completing the juror questionnaire.   I appreciate

19  the care and attention that you brought to that task.

20          PROSPECTIVE JUROR:   You're welcome.

21          THE COURT:   So now it's time to talk with you about

22  your particular questionnaire, but other than your telling me

23  that you wear glasses, which I can see, I don't see any "Yes"

24  answers on your questionnaire.   Does that sound right to you?

25          PROSPECTIVE JUROR:   Yes.

```
 1              THE COURT:  Well, help me as we try to get to know you
 2   just a little bit.  You live out in Hagerstown; is that right?
 3              PROSPECTIVE JUROR:  That's right.
 4              THE COURT:  And you are work at Mack Truck?
 5              PROSPECTIVE JUROR:  Yes.
 6              THE COURT:  What do you do over there?
 7              PROSPECTIVE JUROR:  I work on the assembly line
 8   building transmissions.
 9              THE COURT:  You're in the transmission area?
10              PROSPECTIVE JUROR:  Yes.
11              THE COURT:  How long you been on the line at Mack
12   Trucks?
13              PROSPECTIVE JUROR:  It's been about a year and a half.
14              THE COURT:  How is that job?
15              PROSPECTIVE JUROR:  It's pretty good.  It's very
16   fast-paced.
17              THE COURT:  They keep it moving?
18              PROSPECTIVE JUROR:  Oh, yes.  They don't want it to
19   stop.
20              THE COURT:  Yes.  Get those trucks out of the door.
21              PROSPECTIVE JUROR:  Yes.
22              THE COURT:  It's not good if you have to stop the
23   line.
24              PROSPECTIVE JUROR:  No, my manager is not happy if you
25   have to do that.
```

**JA530**

1     THE COURT:  What did you do before you worked for Mack
2  Trucks?
3     PROSPECTIVE JUROR:  Before that for 20 years I was
4  homeschooling, I have four kids.  They're all grown and the
5  youngest was 19.  And I homeschooled them, and we did a bunch
6  of activities as a family.  And then for about two years I
7  worked for the Hagerstown Canteen, and I was filling two
8  markets full of product and a bunch of vending machines around
9  FedEx facilities in Hagerstown.  So that was very heavy-duty
10 work for me so that's why I went to Volvo.
11    THE COURT:  And so you're carting crates around and
12 that sort of thing?
13    PROSPECTIVE JUROR:  Yes.  I had a big thing that I had
14 to push up a ramp.  I had to stack it full of soda and snacks
15 and all kinds of things and take it to a couple different
16 markets.
17    THE COURT:  Sounds tough?
18    PROSPECTIVE JUROR:  It was tough.
19    THE COURT:  You have four kids.  What are they doing
20 now?  The youngest is 19.
21    PROSPECTIVE JUROR:  The youngest is 19.  He's right
22 now just trying to figure out what kind of job he wants.  My
23 21-year-old son works at Volvo in the engine department.
24    THE COURT:  Some people call it Volvo, some people
25 call it Mack Trucks.

1    PROSPECTIVE JUROR:  Oh, yes, I'm sorry.  I think Volvo
2    had kind of -- they're starting to take over Mack Truck.  It
3    used to be just Mack Truck.
4    THE COURT:  So he works in the same plant that you
5    work in?
6    PROSPECTIVE JUROR:  He does but in a different
7    department.  He works on the engines.
8    Then I have a 23-year-old daughter who lives in
9    Chambersburg, Pennsylvania.  She just got married two years ago
10   and works at a bank.
11   And then I have a 26 year old, and she lives in
12   Parkersburg, West Virginia with her three-year-old autistic
13   daughter.  She's a single mom.
14   THE COURT:  Got it.  Let's see, did we talk about a
15   spouse or partner?
16   PROSPECTIVE JUROR:  Divorced.  I've been divorced for
17   about five years now.
18   THE COURT:  Okay.  And during the marriage, what did
19   your spouse or partner do for a living?
20   PROSPECTIVE JUROR:  He mainly was in retail management
21   and then towards the last five years of our marriage he was
22   working at Ventura Foods, which is a -- they manufactured
23   things like sauces and ketchups and everything for restaurants.
24   THE COURT:  Okay.  So obviously grandchildren are part
25   of your life, but what else do you do in your spare time when

```
 1   you're not on the assembly line?
 2           PROSPECTIVE JUROR:  I try to spend as much time as I
 3   can with my kids because they're getting older and I don't see
 4   them as often anymore.  Other than that, I like to read, watch
 5   TV.  I like to do things like knit and make baskets.
 6           THE COURT:  Got it.  Give me a second to talk with the
 7   lawyers, okay?
 8       (Whereupon, the following conference was held at the
 9   bench:)
10           THE COURT:  Government have any issues or questions?
11           MS. MCGUINN:  No, Your Honor.
12           THE COURT:  Mr. Nieto?
13           MR. NIETO:  If I may ask the court about
14   homeschooling.  It's a bit of a unique decision for a family to
15   make given this case involves private schools and high schools.
16           THE COURT:  So what would you have me to ask.
17           MR. NIETO:  Not to put too fine a point on it, but why
18   the decision to homeschool in lieu of a more traditional
19   educational system?
20           THE COURT:  What are you trying to do, get me run out
21   of town?  It's a sensitive subject.  I'll try to get into it in
22   a very general way.
23       Ms. McGuinn, any objection to my going there?
24           MS. MCGUINN:  No objection.  I'm interested to see how
25   you approach it.
```

1          THE COURT:  Me too.

2      (Whereupon, the bench conference was concluded.)

3          THE COURT:  I must say I'm fascinated by your earlier

4  occupation.

5          PROSPECTIVE JUROR:  Oh, yes.

6          THE COURT:  Homeschooling four children.  How did that

7  go?

8          PROSPECTIVE JUROR:  It was good.  It was hard.  There

9  are a lot of days you wonder why you're doing it at all.  But

10  it's very rewarding.

11          THE COURT:  So much time with your own kids and you

12  probably can be sure you really left your imprint on them.

13          PROSPECTIVE JUROR:  I hope I did.  I hope it was a

14  good imprint.

15          THE COURT:  I'm sure it was.  What did motivate you to

16  go down that road?

17          PROSPECTIVE JUROR:  Well, my kids, my oldest actually

18  started going to kindergarten and first grade, and I think when

19  I took her out she had just finished second grade.  And then my

20  second oldest had gone to kindergarten.  And it just -- it

21  seemed like they were doing -- they have three recesses, they

22  would watch TV.  And they would do different things like.  They

23  weren't really learning a lot of basics that I thought kids

24  should be learning.  And so I just decided to take it upon

25  myself to -- at first I put them in a virtual school.  And it

1  was still very hands on for me but it seemed like they were

2  learning a whole lot more in that environment than they were in

3  the brick and mortar school.  And we got a lot of fun

4  experiences along the way, too.

5          THE COURT:  Very interesting.  And fascinating

6  actually.  Good for you.

7          PROSPECTIVE JUROR:  Thank you.

8          THE COURT:  Thank you, ma'am.  I need to talk with the

9  lawyers one more time.  Thank you.

10     (Whereupon, the following conference was held at the

11  bench:)

12          THE COURT:  All right.  Ms. McGuinn, what grade are

13  you going to give me?

14          MS. MCGUINN:  I thought that was a B plus.

15          THE COURT:  B plus.

16          MS. MCGUINN:  Yes, sir.

17          THE COURT:  It's a little tough.  I guess I have to

18  accept that.

19     Mr. Nieto?

20          MR. NIETO:  That was perfect, Your Honor.

21          THE COURT:  You're fine?

22          MR. NIETO:  Yes, Your Honor.

23     (Whereupon, the bench conference was concluded.)

24          THE COURT:  Thank you, ma'am.  We don't have anymore

25  questions for you and you can go up to the fourth floor and

1   we'll tell you when we need to talk to you further.

2              PROSPECTIVE JUROR:  Thank you.

3         THE COURT:  Thank you so much.

4       Good afternoon, ma'am.

5              PROSPECTIVE JUROR:  Good afternoon.

6         THE COURT:  I am still looking at your questionnaire

7   but I'm going to be with you very shortly.

8              PROSPECTIVE JUROR:  Take your time.

9         THE COURT:  If you'll bear with me.  I see a few

10  topics.  You have a travel plan.  You plan to leave the

11  country?

12             PROSPECTIVE JUROR:  To Mexico.

13        THE COURT:  Okay.

14             PROSPECTIVE JUROR:  On the 5th of September.

15        THE COURT:  Okay.  And then let's see, what is that,

16  Labor Day --

17             PROSPECTIVE JUROR:  Just leisure, yes.

18        THE COURT:  I'm trying to figure out which day of the

19  week is that?

20             PROSPECTIVE JUROR:  Oh, that's a Thursday.  Thursday

21  is the week after Labor Day.

22        THE COURT:  So that's a vacation you have planned.

23             PROSPECTIVE JUROR:  Yes.

24        THE COURT:  But you are also a teacher I see.

25             PROSPECTIVE JUROR:  Yes, well -- I just got a new

```
 1   position in July.  So I'm community school facilitator for the
 2   school, yes.
 3            THE COURT:  And so it's okay for you to be --
 4            PROSPECTIVE JUROR:  It's okay.  I don't have a class.
 5            THE COURT:  You don't have a class?
 6            PROSPECTIVE JUROR:  Yes.
 7            THE COURT:  Okay.  Got it.  You have an aunt who was a
 8   state trooper for the last 30 years?
 9            PROSPECTIVE JUROR:  Yes.
10            THE COURT:  You close to her --
11            PROSPECTIVE JUROR:  Not close.
12            THE COURT:  You ever talk to her about her work, the
13   cases she works on?
14            PROSPECTIVE JUROR:  No.  No, I don't.
15            THE COURT:  So more family sort of?
16            PROSPECTIVE JUROR:  Yes, family.
17            THE COURT:  Anything about the fact that your aunt was
18   a state trooper that you think would affect your ability to be
19   a fair and impartial juror if you were picked in this case?
20            PROSPECTIVE JUROR:  No.
21            THE COURT:  Okay.  So 16A, you were robbed at gunpoint
22   at an ATM.  When did that happen?
23            PROSPECTIVE JUROR:  About 18 years ago.
24            THE COURT:  Were you physically injured?
25            PROSPECTIVE JUROR:  No, I was not physically injured.
```

1           THE COURT:  Was anyone apprehended in connection with
2   that incident?
3           PROSPECTIVE JUROR:  Yes.
4           THE COURT:  Did you then participate in any subsequent
5   prosecution or court activity?
6           PROSPECTIVE JUROR:  Yes, I had to be a witness.
7           THE COURT:  Did you go to court?
8           PROSPECTIVE JUROR:  Yes.
9           THE COURT:  Did you testify?
10          PROSPECTIVE JUROR:  Yes.
11          THE COURT:  Did you have to try to identify the
12   person?
13          PROSPECTIVE JUROR:  Yes.
14          THE COURT:  Is there anything about that experience
15   that would affect your ability to be fair and impartial if you
16   were picked as a juror?
17          PROSPECTIVE JUROR:  No.
18          THE COURT:  11:  Do you hold any beliefs as to crimes
19   involving children that would make it difficult for you to
20   render a fair and impartial verdict based solely on the
21   evidence and the law?  Your answer was:  "Yes, teacher."
22       So tell me about that?  We're interested to hear about
23   your thoughts in that regard?
24          PROSPECTIVE JUROR:  I guess I checked "Yes" because I
25   work with children and it's due diligence as a teacher to,

1  like, report any, you know, any wrongdoings to a child so . . .

2       THE COURT:  Okay.  So I understand that very important

3  responsibility, and it's clear to me you take that

4  responsibility very seriously, as you should.  But my question

5  is a little bit different from that, and that is, even though

6  you do have that responsibility and you do take it very

7  seriously and so forth, do you think there's anything about

8  that viewpoint that you have or that duty that you have in your

9  work that would affect your ability to be fair and impartial as

10  you sat as a juror?

11       PROSPECTIVE JUROR:  No.

12       THE COURT:  Do you think you're able to sit on a jury

13  and evaluate the evidence with an open mind and be fair and

14  impartial based on whatever is presented to you, and then

15  decide this particular case on its particular evidence and the

16  law as I instruct you?

17       PROSPECTIVE JUROR:  Yes.

18       THE COURT:  And nothing about your work as a teacher

19  or your devotion to children would interfere with that; is that

20  a fair statement?

21       PROSPECTIVE JUROR:  That is a fair statement, Your

22  Honor.

23       THE COURT:  You have a sister who's a lawyer?

24       PROSPECTIVE JUROR:  Yes.

25       THE COURT:  What kind of practice does she have?

```
 1          PROSPECTIVE JUROR:  I have no clue.

 2          THE COURT:  Where does she practice?

 3          PROSPECTIVE JUROR:  She's actually in Louisiana.  But

 4   she used to practice here but not anymore.

 5          THE COURT:  Ever talk to her about her cases?

 6          PROSPECTIVE JUROR:  No.

 7          THE COURT:  More family stuff?

 8          PROSPECTIVE JUROR:  Yes.

 9          THE COURT:  You've told us about your work.  It's

10   actually with the Baltimore County Public Schools that you

11   perform this role.

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Before you had your current position, were

14   you also with the county or some other job?

15          PROSPECTIVE JUROR:  Yes, no, I was a teacher.  I was a

16   special ed inclusion teacher for the past 14 years.

17          THE COURT:  And at what grade level?

18          PROSPECTIVE JUROR:  So I've taught actually all of --

19   no, not all of them.  K through 5.

20          THE COURT:  So elementary school environment?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Different schools around the county?

23          PROSPECTIVE JUROR:  Yes, two schools.  Two schools.

24          THE COURT:  Which schools?

25          PROSPECTIVE JUROR:  Edmondson Heights Elementary was
```

1    my first school, and my second school was Chadsworth, and

2    currently I'm at Winand Elementary.

3            THE COURT:  Do you have a partner or spouse?  Someone

4    who is a special person in your life?

5            PROSPECTIVE JUROR:  No.

6            THE COURT:  Do you have any kids?

7            PROSPECTIVE JUROR:  No kids.

8            THE COURT:  Okay.  What do you like to do in your

9    spare time?

10           PROSPECTIVE JUROR:  Travel, and I like to exercise.

11   Let's see.  Hang out.  I take care of my mom.  She has

12   dementia.  That's pretty much where a lot of my time rests.

13           THE COURT:  Okay.  Thank you.  I'm going to talk with

14   the lawyers for a second.

15      (Whereupon, the following conference was held at the

16   bench:)

17           THE COURT:  All right.  She said September 4th.

18           MS. MCGUINN:  I think she said September 5th.

19           THE COURT:  Two weeks from today and that's a

20   Thursday.  Ms. McGuinn, what's your position?

21           MS. MCGUINN:  I think she's fine.  I think we can just

22   all be aware that it's September 5th when we get to her to make

23   a decision.

24           THE COURT:  Mr. Nieto?

25           MR. NIETO:  Your Honor, one question.  And I know she

```
 1  had indicated that as a teacher she had previously dealt in
 2  elementary school.  Now with her new role as an administrator,
 3  I don't know if I couldn't hear her whether she still deals
 4  with elementary schools or if it's upperclassmen as well.
 5          THE COURT:  Thank you.
 6      (Whereupon, the bench conference was concluded.)
 7          THE COURT:  In your current role, are you still
 8  dealing with children in sort of the elementary school age band
 9  or all the way to 18?
10          PROSPECTIVE JUROR:  Yes, elementary.
11          THE COURT:  Thank you.
12      (Whereupon, the following conference was held at the
13  bench:)
14          THE COURT:  Anything else, Mr. Nieto?
15          MR. NIETO:  No, Your Honor.  Thank you.
16          THE COURT:  So I'm going to take the court's
17  suggestion of potential cause to exclude her under advisement
18  and with the help of counsel we'll remember to make a final
19  determination at the end of this process, hopefully later
20  today, with the sole concern being that I'm not really certain
21  exactly how long this trial is going to last.  And then we of
22  course we can't control how long a jury is going to deliberate.
23  And I never want a situation where a member of the jury has got
24  some kind of a time pressure bearing down on them if we can
25  avoid it.
```

1    For that reason, with the clerk's assistance, we are going

2  to put the question of whether Juror 107 should be qualified on

3  hold to see how things play out.  I think she's otherwise

4  qualified.

5    (Whereupon, the bench conference was concluded.)

6       THE COURT:  Thank you, ma'am.  You may return to the

7  fourth floor and we'll speak more with you later.

8       PROSPECTIVE JUROR:  Okay, thank you.

9       THE COURT:  Good afternoon to you, ma'am.  Thank you

10  for participating in our jury selection process and for

11  completing our questionnaire.  You have some "Yes" answers but

12  my suggestion is they all kind of fall into one lane, would you

13  agree with that general statement?

14       PROSPECTIVE JUROR:  Yes, sir.

15       THE COURT:  Question 12, you worked for the FBI until

16  2017.  You don't say you were an agent.  Were you an analyst?

17  What did you do?

18       PROSPECTIVE JUROR:  I was an intelligent analyst.

19       THE COURT:  Okay.  Headquarters, here in Maryland?

20       PROSPECTIVE JUROR:  I was in headquarters.  I actually

21  served in a couple of different capacities.  Can you hear me?

22       THE COURT:  Pretty good, yep.

23       PROSPECTIVE JUROR:  So I served in a couple different

24  capacities.  I started out in asset forfeiture and money

25  laundering.  I moved on to counterterrorism.  While in

1  counter-terrorism, I served the Violate Crimes Against Children

2  Section as a TDY assignment for 30 days.

3          THE COURT:  When was that?

4          PROSPECTIVE JUROR:  That was in 2010.

5          THE COURT:  Okay.

6          PROSPECTIVE JUROR:  Then I did a joint duty assignment

7  with the NSA as a dual-hatted --

8          THE COURT:  With the NSA?

9          THE CLERK:  The NSA, correct.  I was dual-hatted as a

10 SIGINT and intel analyst.

11         THE COURT:  Was that foreign counterintelligence?

12         PROSPECTIVE JUROR:  It was all counterterrorism

13 related.

14         THE COURT:  Counter-terrorism.

15         PROSPECTIVE JUROR:  Yes.  I was in a very specific

16 assignment for the NSA.  Then I moved on.  I promoted back to

17 headquarters to a specialized project unit, counterterrorism

18 advanced projects, doing open source and social media and

19 targeting individuals of interest in support of

20 counterterrorism.

21     Then I promoted to the National Security branch as the

22 unit chief where I ultimately resigned.

23         THE COURT:  Okay.  And you left the bureau, was there

24 any particular reason?

25         PROSPECTIVE JUROR:  Yes.  I had an opportunity with

1  the Hilton Corporation.  I set up a global intelligence program

2  for the corporation that supported any threats or incidents

3  that would impact operations down to the front door of the

4  lobby in all 1,900 countries.

5          THE COURT:  Is that still your goal or have you moved

6  on from that?

7          PROSPECTIVE JUROR:  It is not.  I stayed there for

8  about three and a half years.  Then during the pandemic I was

9  of a director.  And as the hotel industry was having a lot of

10  financial difficulty, my position -- I was laid off for about

11  six weeks where I ultimately got recruited by Amazon web

12  services to stand up a supply chain risk management program.

13          THE COURT:  Still doing that work now?

14          PROSPECTIVE JUROR:  I am not.

15      (Laughter.)

16          PROSPECTIVE JUROR:  Would you like my résumé?

17          THE COURT:  This is a book with many chapters.  Keep

18  going.

19          PROSPECTIVE JUROR:  So now I have work for a software

20  company out of New York.  So I'm a global head.  I build out

21  software in support of supply chain risk management.  So

22  anything from forced labor to 89 violations, to sanctions, to

23  legislation, foreign intercept control and influence.  So we

24  run our customers against our intelligence that I develop to

25  ensure that they're compliant against all regulations,

1  operationally globally.  And then I actually manifest those

2  lists so I run a team in U.S., Canada and Romania.

3          THE COURT:  Okay.  Got it.  So let me stop right here

4  and ask you this question:  With some focus on that 30-day TDY

5  that you did on crimes against children, but, more broadly,

6  just in reference to your career on the analysis side or the

7  intelligence-gathering side of law enforcement and not all that

8  was straight domestic law enforcement, I get that.  But when

9  you think about that, do you think that would affect your

10 ability to be a fair and impartial juror if you were picked on

11 this case?

12         PROSPECTIVE JUROR:  Absolutely not.  That's not my

13 training.  That's not my background.

14         THE COURT:  So in this case, which is separate from

15 any and all other cases on which you've ever engaged -- true,

16 first of all?  You never heard of this case?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  It has to be evaluated on its own merits

19 and demerits.

20         PROSPECTIVE JUROR:  Yeah, absolutely.  You know, my

21 husband just retired as a U.S. Secret Service agent after 24

22 years and part of the lifestyle that we've lived is to be

23 apolitical and to not get involved either way.  Neither one of

24 us have social media for that exact reason.  We like to make

25 our own decisions based on facts and not based on any bias.

153

1          THE COURT:  Okay.  Let's pivot over to your husband
2    which you also disclosed in your questionnaire.  And he just
3    retired?
4          PROSPECTIVE JUROR:  In July.  Last year.  After 24
5    years.
6          THE COURT:  And what was his most recent post?
7          PROSPECTIVE JUROR:  He was special agent in charge of
8    the Baltimore office.
9          THE COURT:  Okay.  And the mission in Baltimore is
10   maybe less about protection and more about some of the
11   investigative responsibilities of the Secret Service or not
12   really?
13         PROSPECTIVE JUROR:  It's a combination.  So as a
14   special agent in charge, he was responsible for protective
15   intelligence.  They also do their own background
16   investigations.  And then they also do cyber crime.
17     There's a little bit more of a sprinkling but that's
18   pretty high level.
19         THE COURT:  Was your husband over the course of his
20   career ever in a role where he was involved in the
21   investigation of crimes against children?
22         PROSPECTIVE JUROR:  No.
23         THE COURT:  But you did indicate cyber crime.  What --
24   of what nature?
25         PROSPECTIVE JUROR:  Yeah, so he primarily did -- he

**JA547**

1  started in counterfeiting early in 1999, but he mostly did

2  protection.  So he went from the counterassault team to doing

3  First Lady detail, President's detail, back to the field

4  office.  And then he went back -- a lot of Secret Service

5  career path is in protection, even though they do a variety of

6  different programs and violations.  He really specialized in

7  protection.  Even today, his job now.

8          THE COURT:  Okay.  So he has retired from the Secret

9  Service but moved to a different employment.

10          PROSPECTIVE JUROR:  Yes.  He's now the head of

11  security for the Baltimore Ravens.

12          THE COURT:  And he's been in that position since he

13  left the Secret Service?

14          PROSPECTIVE JUROR:  Yeah, about 14 months.  So he did

15  a bit of a transition, a retirement thing you can do if you

16  have -- I think you have about a year of sick leave built up,

17  so he was able to overlap.

18          THE COURT:  Okay.  Got it.

19      16A, you were robbed at gunpoint in 2003?

20          PROSPECTIVE JUROR:  Yes, sir.

21          THE COURT:  Anything about that experience that you

22  think would affect your ability to be fair and impartial in the

23  trial of a criminal case?

24          PROSPECTIVE JUROR:  No.  It was -- it was a very

25  specific experience.  I was in my senior year of college

1    working as a bank teller, and I was robbed at gunpoint as a
2    bank teller.
3         THE COURT:  Okay.  You or your husband or some family
4    member has been a witness in criminal cases?
5         PROSPECTIVE JUROR:  I indicated that because of my
6    husband.  He's definitely been involved in criminal cases.
7         THE COURT:  Yep.  And appeared before grand juries and
8    had juries in trials, that's that sort of thing?
9         PROSPECTIVE JUROR:  That's my assumption.  But based
10   on your speech to us last night, I didn't speak to him.
11        THE COURT:  You didn't ask him?
12        PROSPECTIVE JUROR:  Uh-uh.
13        THE COURT:  Okay.  Very good.
14       Yes to the question about training or education relating
15   to law, criminal justice, legal training.  Would that be you
16   and your husband's, in relation to your professional careers?
17        PROSPECTIVE JUROR:  That's correct.  I went through
18   Quantico, Intelligence Basic course for 13 weeks.
19        THE COURT:  Do you know any of the lawyers in this
20   case?
21        PROSPECTIVE JUROR:  I do not.
22        THE COURT:  You live in Gambrills?
23        PROSPECTIVE JUROR:  I do.
24        THE COURT:  Have kids?
25        PROSPECTIVE JUROR:  I do.

1          THE COURT:  How old are they?

2          PROSPECTIVE JUROR:  13 and 12.

3          THE COURT:  So that would put them in the seventh and

4    sixth grades?

5          PROSPECTIVE JUROR:  Very close.  Seventh and eighth.

6          THE COURT:  What kind of school setting are they in?

7          PROSPECTIVE JUROR:  They both go to public school by

8    choice.

9          THE COURT:  Not sure how you would have any spare

10   time, but if you did, how would you use it?

11         PROSPECTIVE JUROR:  I'm an avid runner so I do

12   distance running.  My best friend and I, we travel to states

13   every other month and we do a half marathon.  The goal to

14   accomplish all 50 states by the time I turn 50.  I also do

15   Orange Theory and CrossFit.  I'm very much into health and

16   fitness.

17         THE COURT:  Got it.  Bear with me while I talk to the

18   lawyers for a minute.

19       (Whereupon, the following conference was held at the

20   bench:)

21         THE COURT:  Government have any issues or questions in

22   light of the ones I asked?

23         MS. MCGUINN:  No, Your Honor.

24         THE COURT:  Mr. Nieto?

25         MR. NIETO:  Your Honor, no additional questions.  But,

1  respectfully, I would make a motion to strike for cause based

2  on her extensive training and work both with the FBI and

3  cybersecurity in that brief 30 days where she's there.

4      Your Honor, this case is going to involve the testimony of

5  FBI cybersecurity, but computer forensic members of the CART

6  team, they're going to be talking about social media and

7  different data taken from computers and electronic devices.

8      My concern is that this particular prospective juror just

9  has too much of a wealth of law enforcement backed knowledge

10 with regards to those issues.  She may be bringing more to the

11 discussion than the court would ordinarily allow based on her

12 professional experiences.  So we would ask that she be struck.

13     THE COURT:  Thank you.  The motion's denied for the

14 reason that the issues are there to be explored for sure in

15 light of her professional background and that of her husband.

16 But the court did explore that background with her.  And this

17 witness or this potential juror strikes me as someone who has

18 given careful thought to the role of a juror and what the

19 responsibility is.  She was careful to emphasize that in her

20 work the obligation is one of complete objectivity and to treat

21 each case separately on its own merits and demerits.

22     And my view is that by virtue of the fact that someone has

23 professional experience in law enforcement, that doesn't

24 automatically disqualify them from service as a juror in a

25 criminal case.  It absolutely requires the court to explore

1  whether there isn't some inherent bias by virtue of the life's

2  work and the experience; but I've made that exploration and

3  I've satisfied myself that this juror can and will be fair and

4  impartial and objective.

5      The objection is overruled.  The motion to excuse the

6  potential juror for cause is denied.

7      (Whereupon, the bench conference was concluded.)

8          THE COURT:  Okay.  Thank you, ma'am.  We don't have

9  anymore questions for you.  You can go back up to the fourth

10 floor and we'll talk to you more later.  Thank you.

11     Good afternoon to you.  Thank you for completing the juror

12 questionnaire and participating in the jury selection process.

13 I've reviewed your questionnaire and would like to review it

14 with you now if that's okay.

15     The first "Yes" answer you've given me is response to

16 Question No. 12 where you reported that your sister-in-law was

17 a Baltimore County police officer but is now retired.

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Do you know what her assignment was when

20 she was a police officer?  What sort of work she did?

21          PROSPECTIVE JUROR:  She worked in the Dundalk

22 precinct.  She's probably been retired eight, nine years.

23          THE COURT:  Okay.

24          PROSPECTIVE JUROR:  She ran the POW program.  I think

25 she was just a regular policewoman.

1          THE COURT:  Got it.  Did you ever talk to her about
2  her cases?
3          PROSPECTIVE JUROR:  Not really.  No.  No.  Nothing
4  that --
5          THE COURT:  If you have conversations, the discussion
6  is elsewhere?
7          PROSPECTIVE JUROR:  Yeah, and she took in some foster
8  kids once in a while when people -- when kids were displaced or
9  what have you.  So that's about it.  But that was, gosh, before
10  I even knew her.  Probably 20 years ago, 30 years ago.
11          THE COURT:  Okay.  So couple of references to that
12  here and there in conversations?
13          PROSPECTIVE JUROR:  Yeah, that's about it.
14          THE COURT:  Okay.  Thank you.  You have kids?
15          PROSPECTIVE JUROR:  Son and daughter.
16          THE COURT:  Your son plays lacrosse?
17          PROSPECTIVE JUROR:  Yes.
18          THE COURT:  Your son goes to Loyola Blakefield?
19          PROSPECTIVE JUROR:  Yes.
20          THE COURT:  And he's on lacrosse team?
21          PROSPECTIVE JUROR:  Yes.
22          THE COURT:  And some of the other kids on that team
23  attend the Gilman School?
24          PROSPECTIVE JUROR:  Yes.
25          THE COURT:  And how old is your son?

```
 1              PROSPECTIVE JUROR:  Going into 11th grade.  16 years
 2  old.
 3         THE COURT:  So is this sort of an additional team
 4  outside of school?
 5              PROSPECTIVE JUROR:  Yes, True.  It's just a club
 6  lacrosse group.
 7         THE COURT:  Summertime?
 8              PROSPECTIVE JUROR:  Yes.  Spring/summer and then
 9  sometimes in the fall.  But he was out for a year because of an
10  injury.
11         THE COURT:  Got it.  I don't see any other "Yes"
12  answers.  Does that sound right to you?
13              PROSPECTIVE JUROR:  Yep.
14         THE COURT:  Okay.  You live in Joppa?
15              PROSPECTIVE JUROR:  Yes.
16         THE COURT:  Tell me about your work?
17              PROSPECTIVE JUROR:  I worked for CenturyLink, now
18  Lumen telecom company under the federal government.  So my
19  accounts were treasury, DHS.  Left there five years ago.  Now
20  I'm with Comcast selling to the federal government but in kind
21  of a different capacity because I didn't have a government
22  sector.  So they just started it five years ago when I moved
23  over there.  And I'm in sales.  Basically in sales.
24         THE COURT:  Can you tell me about your educational
25  background?
```

Ronda J. Thomas, RMR, CRR – Federal Official Reporter

**JA554**

```
 1              PROSPECTIVE JUROR:  Went to college.  Graduated '89
 2   from Kent State University in Ohio and grew up in Pittsburgh.
 3              THE COURT:  Got it.  Do you have a spouse or a
 4   partner?
 5              PROSPECTIVE JUROR:  Yes, husband.
 6              THE COURT:  Husband, okay.  What does he do?
 7              PROSPECTIVE JUROR:  Sales also.  He works for a sales
 8   force software company.
 9              THE COURT:  Got it.  So when you're not working, what
10   do you do in your spare time?  I know you go to lacrosse games.
11              PROSPECTIVE JUROR:  Yes.  Spare time we boat.  We live
12   up on Rumsey Island so we're on the boat a lot on the weekend.
13   And -- let's see, what else do we do?  Kind of just vacation.
14   Do stuff.  Take the kids skiing.  My daughter is in college so
15   she doesn't really hang out with us too much anymore.
16              THE COURT:  Got it.  Let me talk to the lawyers for a
17   minute.
18         (Whereupon, the following conference was held at the
19   bench:)
20              THE COURT:  Ms. McGuinn, any issues or questions in
21   light of the ones I asked?
22              MS. MCGUINN:  No, Your Honor.
23              THE COURT:  Mr. Nieto?
24              MR. NIETO:  Your Honor, after having spoken with my
25   client, I think he's indicated that he thinks he knows her son
```

1  from the lacrosse community in Gilman.  Obviously this case

2  involves many witnesses that played lacrosse at Gilman.  So

3  that's our concern that there's an overlap here.

4      THE COURT:  Well, do you want me to ask her

5  specifically, although we have implicitly already done that,

6  but do you want me to ask her specifically whether she knows

7  the Defendant?

8      MR. NIETO:  That would be satisfactory.  Again, Your

9  Honor, if the court felt comfortable, Mr. Bendann had provided

10  the names of four different I'm going to call them club teams

11  through lacrosse through which he thinks he knows her daughter.

12      THE DEFENDANT:  Her son.

13      MR. NIETO:  Son.  Yes, my apologies.

14      THE COURT:  Well, it was True, I think, was the club.

15      MR. NIETO:  Currently.

16      THE COURT:  So the question would be, are there any

17  other lacrosse clubs that her son has participated in?  And

18  then, number two, does she know the Defendant?

19      MR. NIETO:  Yes, Your Honor.

20      THE COURT:  And those are the specific questions you

21  want mean to ask her?

22      MR. NIETO:  Please.

23      THE COURT:  Okay.

24      (Whereupon, the following conference was held at the

25  bench:)

163

1          THE COURT:  Did your son participate in lacrosse clubs
2    other than the one you referenced which I think was called
3    True?

4          PROSPECTIVE JUROR:  No.  I mean, he played for Loyola
5    Blakefield.  He sat out the entire tenth grade year.  Played a
6    little bit at the end of tenth grade for like three weeks
7    because the injury was over.  But, no, it was called Coopers
8    and then True bought Coopers so, yeah.

9          THE COURT:  So it was always one club but got it got a
10   new identity?

11         PROSPECTIVE JUROR:  Yes.  And he played for Fallston
12   Lacrosse Club like up until fifth or sixth grade.

13         THE COURT:  Fallston lacrosse club out in Harford
14   County?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  And then specifically, do you know the
17   Defendant Christopher Benji Bendann?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Thank you.  Another minute.  Thank you.
20      (Whereupon, the following conference was held at the
21   bench:)

22         THE COURT:  Mr. Nieto?

23         MR. NIETO:  Your Honor, forgive me one last question.

24         THE COURT:  Yes.

25         MR. NIETO:  Mr. Bendann believes that she might have

**JA557**

1   played with --

2           THE COURT:  That he, you said "she."

3           MR. NIETO:  My apologies -- this prospective juror's

4   son, my client believes that he had played lacrosse with a

5   friend of the witness Zack Oddo, O-D-D-O.  I would just ask

6   that the Court -- if she knows anyone from the Oddo family.

7           THE COURT:  Spelled O-D-O?

8           MR. NIETO:  O-D-D-O.

9           THE COURT:  O-D-D-O.  Ms. McGuinn?

10          MS. MCGUINN:  Your Honor, the Government is not

11  calling Zack Oddo.  He's not a listed witness.

12          THE COURT:  So what's the relevance of the inquiry,

13  Mr. Nieto?

14          MR. NIETO:  Your Honor, again, I'm not quite sure how

15  the witnesses are going to testify.  But Zack Oddo was part of

16  this investigation both from the state --

17          THE COURT:  Let's hear what the Government is prepared

18  to say.  I think she just said it.  Is the Government advising

19  the court at this time that it's not going to call Zack Oddo as

20  a witness during this trial?

21          MS. MCGUINN:  He is not a witness during this trial.

22  There's an off-chance his name may be mentioned when we say

23  "And who went to --

24          THE COURT:  An event?

25          MS. MCGUINN:  Right.  And his name might be listed

| | |
|---|---|
| 1 | among a list of five other boys who are not even being called |
| 2 | as witnesses.  There are a lot of kids who cross paths with |
| 3 | different club teams and things like that.  But we are not |
| 4 | calling Zack Oddo.  He's not listed. |
| 5 | THE COURT:  Well, would there be harm running the name |
| 6 | by her and if she recognizes the name, asking her whether the |
| 7 | fact that that name is in play would have any impact on her |
| 8 | ability to be fair and impartial? |
| 9 | MS. MCGUINN:  That's fine. |
| 10 | THE COURT:  And is this Oddo individual currently a |
| 11 | minor or now an adult?  It has to do with whether I'm going to |
| 12 | clear the courtroom. |
| 13 | MS. MCGUINN:  I believe he is now an adult. |
| 14 | Unfortunately, he is not someone I've met with and spoken to. |
| 15 | I know his name.  I know he's in reference to the kids that we |
| 16 | met with.  We're pretty confident he's an adult and not one of |
| 17 | the ones who is still currently a minor. |
| 18 | THE COURT:  Got it.  In that circumstance I don't feel |
| 19 | compelled to clear the courtroom.  Do you agree? |
| 20 | MS. MCGUINN:  Yes, Your Honor. |
| 21 | THE COURT:  Thank you. |
| 22 | (Whereupon, the bench conference was concluded.) |
| 23 | THE COURT:  Ma'am, I want to ask you whether in the |
| 24 | youth lacrosse circles in which you have traveled you are |
| 25 | familiar with a family, the last name is Oddo, O-D-D-O?  Have |

1  you ever heard that name?

2          PROSPECTIVE JUROR:   No.

3          THE COURT:   Ever heard of a young man by the name of

4  Zack Oddo?

5          PROSPECTIVE JUROR:   No.

6          THE COURT:   Thank you, ma'am.   Another minute.   Thank

7  you.

8      (Whereupon, the following conference was held at the

9  bench:)

10          THE COURT:   Mr. Nieto, your position with respect to

11  this juror?

12          MR. NIETO:   Nothing additional, Your Honor.

13          THE COURT:   Thank you.

14      (Whereupon, the bench conference was concluded.)

15          THE COURT:   Thank you, ma'am.   You've answered our

16  questions.   I'm grateful.   You may return to the fourth floor

17  and we'll speak with you more later.

18          PROSPECTIVE JUROR:   Okay.   Thank you.

19          THE COURT:   What's our number?

20          THE CLERK:   Twenty-eight.

21          THE COURT:   Twenty-eight, thank you.   We've cleared

22  28, eight to go.

23      96 will be next.

24      Bear with me, ma'am.   I'm still reviewing your

25  questionnaire.   I'll be with you in just a second.

1    Thank you for continuing to participate in our jury

2  selection process.  And I have now reviewed your jury

3  questionnaire.  In looking through it, I'm looking for "Yes"

4  answers to the questions that were posed.  In your case, I have

5  found just one "Yes" answer and it was to Question Number 16C.

6    And we'll go ahead and clear the courtroom.

7    16C asks:  Have you or any member of your immediate family

8  or closest associates ever been accused of criminal conduct,

9  been the subject of a criminal investigation or been convicted

10 of committing a crime?  Answer:  "Yes."

11   Can you tell me about that?

12       PROSPECTIVE JUROR:  Back in 2018 --

13       THE COURT:  A little closer to the microphone.

14       PROSPECTIVE JUROR:  Back in 2018 -- 2008, I'm sorry,

15 my husband was arrested for possession of marijuana

16 paraphernalia.

17       THE COURT:  Okay.  How was that matter ultimately

18 resolved?

19       PROSPECTIVE JUROR:  I'm not exactly sure.  We weren't

20 married at the time.  That's the only thing that I could think

21 of.

22       THE COURT:  Okay.  Is there anything about that

23 experience that you think would affect your ability to be a

24 fair and impartial juror?

25       PROSPECTIVE JUROR:  No, sir.

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA561**

```
 1          THE COURT:  Thank you.  The court security officer
 2  will readmit the public.
 3      And do you agree there are no other "Yes" answers?
 4          PROSPECTIVE JUROR:  Agree.
 5          THE COURT:  Okay.  So you live in Churchton, Maryland.
 6          PROSPECTIVE JUROR:  I do.
 7          THE COURT:  And I pronounce it like I know exactly
 8  where that is but I don't.
 9          PROSPECTIVE JUROR:  Okay.
10          THE COURT:  Where is Churchton, Maryland?
11          PROSPECTIVE JUROR:  We call it South County, it's
12  closer to Calvert County.
13          THE COURT:  South Anne Arundel?
14          PROSPECTIVE JUROR:  Yes.
15          THE COURT:  Okay.  And how long have you lived down
16  there?
17          PROSPECTIVE JUROR:  I lived down there nine years
18  maybe.
19          THE COURT:  Nine years.
20          PROSPECTIVE JUROR:  Nine years.
21          THE COURT:  And you work as a registered nurse?
22          PROSPECTIVE JUROR:  I do.
23          THE COURT:  In what kind of a setting?
24          PROSPECTIVE JUROR:  I work in the emergency
25  department.
```

**JA562**

```
 1              THE COURT:  In the emergency department at Anne
 2    Arundel?
 3              PROSPECTIVE JUROR:  Yes.
 4              THE COURT:  I'm sure that's a very busy and taxing
 5    job.
 6              PROSPECTIVE JUROR:  Uh-huh.
 7              THE COURT:  Tell me about your educational background?
 8              PROSPECTIVE JUROR:  I went to Anne Arundel Community
 9    College and got my associate's there as a registered nurse.
10              THE COURT:  And then you went on from there and got
11    your R.N.?
12              PROSPECTIVE JUROR:  Yes.
13              THE COURT:  And where did you do that?
14              PROSPECTIVE JUROR:  At Anne Arundel Community College.
15              THE COURT:  Got it.  And do you have a spouse or a
16    partner?
17              PROSPECTIVE JUROR:  I do.
18              THE COURT:  What does your spouse or partner do?
19              PROSPECTIVE JUROR:  He works for Allied Well Drilling.
20    It's a geothermal well company.
21              THE COURT:  Oh yeah, geothermal projects.  They drill
22    a lot of deep holes.
23              PROSPECTIVE JUROR:  Yes.
24              THE COURT:  How long has he been doing that kind of
25    work?
```

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

**JA563**