# 25-4033

# United States Court of Appeals for the Fourth Circuit



UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

-against-

CHRISTOPHER KENJI BENDANN,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

## BRIEF FOR DEFENDANT-APPELLANT CHRISTOPHER KENJI BENDANN

ALLEN H. ORENBERG, ESQ.
THE ORENBERG LAW FIRM, LLC
200-A Monroe Street, Suite 233
Rockville, Maryland 20850
(301) 807-3847
*aorenberg@orenberglaw.com*

*Counsel for Defendant-Appellant*



Dick Bailey Service INC
APPELLATE SERVICES
www.dickbailey.com

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *v*

JURISDICTIONAL STATEMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1.   Miranda Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      2.   Unable to Assist in Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      3.   Evidence at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      4.   Mr. Halpert's Trial Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      5.   Victims' Parents' Testimony at Sentencing . . . . . . . . . . . . . . . . . . 20

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

I.    THE DISTRICT COURT ABUSED ITS DISCRETION IN
     DENYING MR. BENDANN'S MOTION TO DETERMINE
     MR. BENDANN'S COMPETENCY.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      a.   Standard of  Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      b.   The "Reasonable Cause" Standard Is Satisfied. . . . . . . . . . . . . . . 25

      c.   The "Mental Disease or Defect" Is Suicidal Ideation.  . . . . . . . . . 26

      d.   Mr. Bendann Was Unable To "Assist Properly In His Defense"
          Because He Was Preoccupied with Suicidal Ideation.  . . . . . . . . . 27

*i*

e.      A Psychiatric Examination Was Required. . . . . . . . . . . . . . . . . . . . 28

f.      The Remedy Is Vacating Mr. Bendann's Conviction And
        Remanding This Case To The District Court.  . . . . . . . . . . . . . . . . 30

II.     THE DISTRICT COURT ERRED IN DENYING MR. BENDANN'S
        MOTION TO SUPPRESS EVIDENCE OBTAINED FROM
        ELECTRONIC DEVICES WITH THE PASS CODE 070184
        BECAUSE DETECTIVE MARKEL CONDUCTED THE
        FUNCTIONAL EQUIVALENT OF INTERROGATION IN
        VIOLATION OF MIRANDA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

a.      Detective Markel Violated Mr. Bendann's Fifth Amendment
        Right To Remain Silent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        i.      Detective Markel Approached Mr. Bendann Holding
                An Iphone To Mr. Bendann's Face As The Iphone
                Instructed  Mr. Bendann To Enter His Passcode. . . . . . . . . . 34

        ii.     Detective Markel's Action Of Holding An Iphone To
                Mr. Bendann's Face After The Biometrics Failed Was
                Not Normally Attendant To Arrest and Custody.  . . . . . . . . 36

        iii.    Detective Markel Knew That An Instruction For
                Mr. Bendann To Enter His Pass Code Would Result in
                Mr. Bendann Entering His Pass Code. . . . . . . . . . . . . . . . . . 37

        iv.     Mr. Bendann's Perspective Is Having Already Been Told
                By Detective Markel That She'd Need His Hands To
                Access His Iphone, And Now Mr. Bendann Has Been
                Instructed To Enter His Passcode. . . . . . . . . . . . . . . . . . . . . 38

        v.      The Coercive Police Practice Is Detective Markel Having
                A Sealed Warrant And Failing To Accurately Inform
                Mr. Bendann What His Legal Obligations Are Under
                The Sealed Warrant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

vi.    It Was Foreseeable That Mr. Bendann Would Enter His Passcode After Detective Markel Continued to Hold The Iphone To Mr. Bendann's Face After Seeing The Iphone Instruct Mr. Bendann To Enter His Passcode. . . . . . 42

vii.   Detective Markel's Conduct Was Designed To Elicit A Response Because She Did Not Remove The Iphone From Mr. Bendann's Face After Biometrics Failed. . . . . . . . 43

b.    Inevitable Discovery Exception Does Not Apply. . . . . . . . . . . . . . 44

c.    The Remedy Is Vacating Mr. Bendann's Convictions And Remanding The Case To The District Court For Further Fact Finding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

III.   THE GOVERNMENT WITHHELD THE STATEMENT OF A TRIAL WITNESS—MR. HALPERT—IN VIOLATION OF JENCKS. . 48

a.    Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

b.    Mr. Halpert Made A Jencks Statement . . . . . . . . . . . . . . . . . . . . . . . 48

c.    The Remedy Is Remand To The District Court . . . . . . . . . . . . . . . 50

IV.   IT WAS AN ABUSE OF DISCRETION FOR THE DISTRICT COURT TO ALLOW INFLAMMATORY TESTIMONY FROM THE VICTIM'S PARENTS AT MR. BENDANN'S SENTENCING. . . . . 52

a.    The Victims' Parents Criticized Mr. Bendann For Exercising His Constitutional Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

b.    The Victims' Mother Testified To Harm Unrelated To The Victim. 54

c.    Harmless Error Does Not Apply. . . . . . . . . . . . . . . . . . . . . . . . . . . 54

d.    The Remedy Is Vacating Mr. Bendann's Sentence And Remanding This Case For Re-sentencing. . . . . . . . . . . . . . . . . . . . 55

*iii*

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . 56

CERTIFICATION PURSUANT TO Fed. R. App. P. 32(a)(7)(B) and (c) . . . . . . 57

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Berkemer v. McCarty,*
    468 U.S. 420, 428 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Campbell v. United States,*
    373 U.S. 487, 493, 83 S. Ct. 1356, 1360, 10 L. Ed. 2d 501 (1963) . . . . . . . . . 51

*Cutter v. Wilkinson,*
    544 U.S. 709, 718 n.7 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Herring v. United States,*
    555 U.S. 135, 147 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Johnson v. Zerbst,*
    304 U.S. 458 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Lovelace v. Lee,*
    472 F.3d 174, 203 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Maggio v. Fulford,*
    462 U.S. 111 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 30

*Miranda v. Arizona,*
    384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Nix v. Williams,*
    467 U.S. 431, 444 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Pennsylvania v. Muniz,*
    496 U.S. 582, 601 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Rhode Island v. Innis,*
    446 U.S. 291 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Tolliver v. Sheets,*
    594 F.3d 900, 917 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Allen,*
159 F.3d 832, 840 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Banks,*
482 F.3d 733, 742 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Bentley,*
1994 U.S. App. LEXIS 20662 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Bernard,*
708 F.3d 583, 592-93 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

*United States v. Bernard,*
927 F.3d 799 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33, 36

*United States v. Blake,*
571 F.3d 331, 338 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*United States v. Boyd,*
53 F.3d 631, 634 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

*United States v. Brooks,*
524 F.3d 549, 564 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Brown,*
2023 U.S. App. LEXIS 2438, *3 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Collins,*
43 Fed. Appx. 99, 101 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Council,*
77 F.4th 240, 246 (4th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Davis,*
99 F.4th 647, 653 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Dillard,*
891 F.3d 151, 158 (4th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*vi*

*United States v. Downing,*
665 F.2d 404, 407 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 47

*United States v. Familetti,*
878 F.3d 53, 56 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Ferguson,*
752 F.3d 613, 618 (4th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Grubbs,*
2008 U.S. App. LEXIS 16206, *6 (2008) . . . . . . . . . . . . . . . . . . . . . . . 32, 43

*United States v. Hung,*
629 F.2d 908, 920 (4th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Jackson,*
852 F.3d 764, 772 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 41

*United States v. Jenkins,*
22 F.4th 162, 167 (4th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Johnson,*
734 F.3d 270, 276 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 44

*United States v. Kimbrough,*
477 F.3d 144, 147 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Moore,*
562 F.2d 106, 113-14 (1st Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Moussaoui,*
591 F.3d 263, 291 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Padilla,*
387 F.3d 1087, 1093 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Perez,*
2025 U.S. App. LEXIS 20396, *36 (2025) . . . . . . . . . . . . . . . . . . . . . . . 50, 51

*United States v. Roof,*
   10 F.4th 314, 341 (4th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Roseboro,*
   87 F.3d 642, 645-646 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

*United States v. Smith,*
   31 F.3d 1294, 1302 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Vazquez,*
   857 F.2d 857, 862 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Wagstaff,*
   1987 U.S. App. LEXIS 18779, *10 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*United States v. Webb,*
   755 F.2d 382, 389 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 41, 47

*United States v. Wheeler,*
   130 F.4th 406, 415 (2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Williams,*
   842 F.3d 1143, 1147 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 45

### *Statutes/Regulations/Miscellaneous*

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3500(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

18 U.S.C. § 3500(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

18 U.S.C. § 4241(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 24, 25

18 U.S.C. § 4241(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25

18 U.S.C. § 4247(b) and (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2254(d)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Fed. R. Evid. 801(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of conviction and sentencing in the District Court for the District of Maryland (at Baltimore) rendered on January 23, 2025. JA 1682-89. Mr. Bendann filed a timely Notice of Appeal on January 24, 2025. JA 1690.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231: "The district courts of the United States shall have original jurisdiction of all offenses against the laws of the United States." This Court has jurisdiction pursuant to 28 U.S.C. § 1291: "The Court of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States."

## STATEMENT OF ISSUES

1. Was Mr. Bendann Unable to Assist in His Defense under 18 U.S.C. § 4241(a) When Mr. Bendann Had a Documented History of Suicidal Ideation and Expressed Suicidal Ideation on the Morning of Trial?

2. Did Detective Markel Conduct the Functional Equivalent of Interrogation in Violation of *Miranda* When Mr. Bendann Exercised His Right to Remain Silent and Then Detective Markel Gave a Self-Incriminating Instruction to Mr. Bendann to Enter His Pass Code?

3. Did the Government Withhold the Statement of a Trial Witness—Mr. Halpert—in Violation of *Jencks*?

1

4. Was Victims' Parents' Testimony at Sentencing Criticizing Mr. Bendann for Exercising His Constitutional Rights and Testifying About Harm Only Experienced by the Parents—Not the Victim—an Abuse of Discretion?

## **STATEMENT OF CASE**[1]

Mr. Bendann was charged in a nine-count superceding indictment with five counts of exploitation of a child, three counts of possession of child pornography, and one count of cyberstalking. JA 32-42. Mr. Bendann pleaded not guilty to all nine counts. JA 241. A jury found Mr. Bendann guilty on all nine counts. JA 80-81. The District Court sentenced Mr. Bendann to thirty-five years of incarceration. JA 1684. This appeal follows.

### 1. *Miranda* **Violation**

On February 12, 2024, Mr. Bendann filed a motion to suppress evidence from his electronic devices with the passcode 070184.[2] JA 49-52. The District Court conducted a suppression hearing on May 9, 2024. JA 1505-1610.

During the May 9, 2024 suppression hearing, the government called Detective Markel from Baltimore County Police Department to testify. JA 1510-

---

[1] For the purpose of this appeal, Mr. Bendann accepts that the charges against him were true. But, this is neither a concession of guilt nor a waiver of any prior or subsequent challenge that Mr. Bendann has or will bring against his convictions.

[2] Mr. Bendann also filed a motion to suppress evidence obtained from the search warrant, the ruling of which he does not appeal.

58. The government also called two other witnesses, neither of whom are material to the analysis in this appeal. JA 1559-74 (FBI Forensics Examiner Jon Shumway); JA 1575-78 (FBI Special Agent Patrick Winn). Detective Markel, at the time of the suppression hearing, was "employed with Baltimore County Police Department" for "17 years" and was "currently a corporal in the Towson precinct in the patrol division." JA 1511. However, on the day Detective Markel executed the search warrant on Mr. Bendann's home, she was the "lead detective." JA 1520.

Detective Markel testified that she obtained a search warrant for Mr. Bendann's "cell phone, iPad, [and] things of that nature." JA 1516. The search warrant "also authorize[d] the seizure of Mr. Bendann's biometric data in order to unlock any electronic devices." JA 1516. As Detective Markel explained, "Biometric data would include facial recognition, which would be his [Mr. Bendann's] facial image, fingerprint, and his eyes." JA 1516. Detective Markel's affidavit in support of her search warrant requested permission for law enforcement to "hold the device in front of Christopher Kenji Bendann to activate the facial recognition feature," among other methods not at issue. JA 1519.

On the day law enforcement executed the search warrant of Mr. Bendann's home, Detective Markel testified that the "Baltimore County Tactical Unit was utilized for this execution of this warrant." JA 1521. "[O]ver a dozen" SWAT team

members dressed in "military fatigues and possessing fairly large firearms" raided Mr. Bendann's small townhome. JA 1546. Detective Markel testified that Mr. Bendann "came to the door and was secured at the front door of the location." JA 1521. By the time that Detective Markel entered Mr. Bendann's home, Mr. Bendann "was seated in a chair in the dining room." JA 1523. Detective Markel told a patrol officer not to transport Mr. Bendann because "we [law enforcement] may have needed him for his biometrics, facial recognition, fingerprint, and eyes." JA 1528. Detective Markel testified that she "advise[d] Mr. Bendann of his Miranda warnings." JA 1528.

According to Detective Markel, "Mr. Bendann stated that his attorney had advised him not to talk about the case or not to speak with anyone" and then Detective Markel "told him [Mr. Bendann] that that was fine and that if, you know, if he would like, he could make contact with his attorney and then we could set up an interview for a later date and time. JA 1529. Detective Markel testified that Mr. Bendann had "invoke[d] his right to have his attorney present." JA 1552.

Detective Markel testified that she "showed Mr. Bendann a copy of the sealing order." JA 1530. Detective Markel testified that she also "had the search warrant itself" during the execution of the search warrant. JA 1530. Detective Markel, however, testified that she did not show the search warrant to Mr. Bendann

4

because "it was sealed and we didn't want pertinent facts of the case to be out at th[at] time." JA 1557. Detective Markel testified that, despite not showing Mr. Bendann the sealed search warrant, she told Mr. Bendann that she "had court authorization to use his face or his fingerprint to be able to get into the electronic devices." JA 1552. Detective Markel confirmed that she didn't explain the part of the sealed warrant authorizing use of Mr. Bendann's biometrics "the way in which you [Detective Markel] explained the sealed warrant," which was in detail. JA 1553.

Detective Markel testified that "[w]e retrieved a cell phone from the night stand in Mr. Bendann's bedroom." JA 1532. Detective Markel confirmed that she held the iPhone to Mr. Bendann's face "after telling him that pursuant to the warrant, right, pursuant to the Court authorization you're [Detective Markel] going to need his [Mr. Bendann's] face at some point." JA 1553. Detective Markel testified that

> I had the cell phone that I recovered from his [Mr. Bendann's] bedroom. I approached the defendant and I presented the cell phone to his face, at which time it didn't immediately recognize his face and it automatically prompted for a passcode to be entered. Mr. Bendann, without prompting, put his passcode into the phone while I was standing next to him.

JA 1533. Detective Markel testified that she continued to hold the iPhone to Mr.

Bendann's face despite biometrics not working[3]:

> Q. Okay. But that doesn't work, right? The phone -- it is not able to get into the phone?
> A. Right.
> Q. But you're still holding the phone when the portion for the keypad pops up?
> A. Correct.
> Q. And when the keypad pops up on the iPhone, that's an opportunity for someone to enter in their pass code to get into the phone, right?
> A. Correct.
> Q. And this is, of course, the passcode that you want?
> A. Right.
> Q. And in order to enter into -- I guess in order to enter the pass code into the phone, most people use their hands, don't they?
> A. Yes.
> Q. All right. And so while you're still holding the phone in front of his face, that prompt comes up, and then Mr. Bendann, pursuant to your testimony, enters in the passcode, right?
> A. Right.
> Q. You didn't say anything at that moment, did you?
> A. No.
> Q. No. But, again, previously you had explained to him that you had court authorization to use his hands for certain things while he's there, right?
> A. Right, correct.
> Q. And you had just put the phone in front of his face without requesting or explaining to him what you were doing, right?
> A. Correct.

---

[3] Detective Markel's answers are represented by the letter "A," and Mr. Benann's attorney's questions are represented by the letter "Q."

6

Q. And so it's not unreasonable for law enforcement to think that in that context, the suspect might think that they have to comply and enter in the passcode, right?
A. Yes.

JA 1553-55. Detective Markel confirmed that she did not "say anything at all out loud" as she held the iPhone to Mr. Bendann's face. JA 1534 Detective Markel also testified that it was her "intention . . . to obtain the date of birth and passcode for that cell phone." JA 1540.

Detective Markel testified that "as Mr. Bendann entered the passcode," she "could clearly see the first four digits," and that they were "0701." JA 1535. Detective Markel testified that she "recognized it [0701] as his – the first four digits of his birthday, but I wasn't completely certain at that time." JA 1535. Detective Markel testified that, "after he [Mr. Bendann] entered the passcode," that she "brought it to [Forensic Examiner] Shumway." JA 1535. After bringing the phone to Forensic Examiner Shumway, Detective Markel testified that she looked at her "operations plan to verify the defendant's date of birth." JA 1536. Detective Markel testified that she "approached the defendant and I was directing a statement in his direction and I said '070184' and he [Mr. Bendann] confirmed 'Yes.'" JA 1529-30. Detective Markel clarified that she was "directing it [the 070184 passcode] at Mr. Bendann." JA 1538.

After witness testimony at the suppression hearing concluded, defense counsel clarified during argument to the District Court that Mr. Bendann's phone contained "all the different passwords for every other count that would be accessed from that phone." JA 1586. Based on that, the district court crafted the phrased, "Once you have that [the 070184 pass code], you have the keys to the kingdom." JA 1586.

In a written order, the court made findings of fact regarding Detective Markel's obtaining the passcode for Mr. Bendann's cell phone. *See generally* JA 25-31. The court found that "Detective Markel advised the Defendant of his rights and explained that they were executing a sealed warrant and that, while Defendant would not be permitted to review the warrant at that time, the warrant extended to the use of Defendant's face and hands to unlock his electronic devices." JA 28. The court found that "Defendant invoked his right to remain silent." JA 28. The court found that Detective Markel "placed it [Mr. Bendann's iPhone] in front of the Defendant's face" and that "Detective Markel did not say anything to the Defendant at that time and Defendant, unprompted, entered the six-digit passcode into the cellphone within Detective Markel's view." JA 28. The court found that "Detective Markel ascertained the first four digits of the code and, based on those four digits, was able to deduce the final two digits of the passcode because the six-

digit code comprised the Defendant's date of birth." JA 28. In a footnote, the court found that "Detective Markel confirmed the passcode with the Defendant by saying it aloud, prompting Defendant to confirm." JA 28. In the same footnote, the court also found that it "need not decide if this subsequent exchange was lawful (and it likely was not) because Detective Markel had already deduced the passcode based on having viewed the Defendant type it in." JA 28.

In the same written order, the court held that Mr. Bendann "voluntarily entered his pass code into his phone and therefore the exclusionary rule does not apply." JA 29. The court explained that "Detective Markel's behavior, while it may have been intended to take advantage of an opportunity, was not unlawfully calculated to elicit information." JA 30. In a footnote, the court stated that "the pass code was the Defendant's birthday, and it was reasonably likely that law enforcement would have tried such a commonly used pass code when attempting to unlock the phone." JA 30. In the same footnote, the court also stated that "because the Court has concluded that the Defendant entered the pass code voluntarily, the Court need not make any factual findings regarding the inevitable discovery exception." JA 30.

Interestingly, the Court in its written order did not make any findings of fact as to whether Mr. Bendann was in custody for the purpose of *Miranda*. *Miranda*

applies only to custodial interrogations, so the District Court needed to make findings of fact both as to custody and interrogation in order for *Miranda's* protections to be triggered. This appears to be an oversight in the District Court's order because no party disputed that Mr. Bendann indeed was in custody during the execution of the search warrant. Detective Markel herself testified that she had control over Mr. Bendann, telling patrol officers that "I didn't want the patrol officer to transport him just yet because we may have needed him for his biometrics, facial recognition, fingerprint, and eyes." JA 1521.

### 2.    <u>Unable to Assist in Defense.</u>

On the morning of August 21, 2024, immediately prior to commencement of jury *voir dire*, the court "received a communication from the U.S. Marshal Service that when they [the U.S. Marshall Service] traveled to the Chesapeake Detention Facility this morning to collect your client [Mr. Bendann] for trial that he declined to accompany them and to come to the courthouse." JA 1752. Defense counsel explained that "[j]ust last week, Mr. Nieto [one of Mr. Bendann's defense counsels] contacted the jail and asked that Mr. Bendann be screened for suicidal ideation." JA 1754. The court stated that "anyone who is contemplating suicide is in terrible straits and I am deeply concerned about that, but the legal question is whether he's competent to proceed." JA 1754-55. The court stated that "[m]y

intention is to now direct the Marshal Service to send deputy U.S. marshals to his cell and to deliver to him direct instruction to get up, we're going." JA 1755. Upon receiving court's instruction, Mr. Bendann left his jail cell. JA 1756.

The same morning Mr. Bendann refused to leave his jail cell, the government also shared with Mr. Bendann's defense counsels statements from a phone call that Mr. Bendann made to his father. JA 1769. Those statements were "I'm going to pass with a clear conscience," "I can't do it," and "Don't bother coming to court. I'm not going to last that long." JA 1769. Defense counsel confirmed that Mr. Bendann's statements in the phone call was only brought to defense counsels' attention "today." JA 1759.

Mr. Bendann's defense counsels moved that the District Court "order that a psychiatric examination of the Defendant be conducted and that a report be filed with the Court pursuant to the provisions of 18 U.S.C.S. § 4241 (b)." JA 77. When Mr. Bendann arrived at the District Court, the parties addressed Mr. Bendann's motion for a competency examination. Mr. Nieto, one of Mr. Bendann's two defense counsels, stated that "between Mr. Proctor [Mr. Bendann's other defense counsel] and myself and our paralegal, we've been meeting with him on a regular basis," approximately "[w]eekly" and "[i]n person." JA 1758.

11

Then the district court asked Mr. Bendann a few questions, "start[ing] with some very basic things." JA 1759. The District Court asked the following questions:

THE COURT: Tell me where you are this morning?

THE DEFENDANT: I'm in the courthouse, federal courthouse in Baltimore.

THE COURT: Okay. Why are you here today?

THE DEFENDANT: Because this is jury selection at the start of the trial. And I was told by a court order this morning that I had to attend jury selection.

THE COURT: Okay. And tell me what you are on trial for?

THE DEFENDANT: I am on trial for what is possession of child pornography and extortion of a child and cyberstalking. Yes.

THE COURT: Okay. And speaking strictly with reference to the indictment, at what time period do the charges seem to reference?

THE DEFENDANT: Ms. McGuinn has made it seem as if they're referencing 2017 and 2018, but she has been very misleading.

THE COURT: Okay. I don't want to get into that sort of thing. I'm just trying to talk with you about the documents that have been filed in the case and what you have been exposed to.

THE DEFENDANT: Oh, sure. I've read the indictments.

THE COURT: Have you read the indictments?

THE DEFENDANT: Yes, I have. Multiple times.

THE COURT: Okay. And you have previously appeared in court; is that right?

THE DEFENDANT: Yes, I have.

THE COURT: Those court proceedings were in relation to advisements so that you could be told what your rights were; is that right?

THE DEFENDANT: That is correct.

THE COURT: And was there also a hearing where certain motions

12

were heard by the court and then ultimately decided?

THE DEFENDANT: Yes, there were.

THE COURT: Were you present during that proceeding?

THE DEFENDANT: Yes, I was.

THE COURT: Did you have any difficulty following what was transpiring, understanding that you're not an attorney and probably needed legal advice but in general --

THE DEFENDANT: Oh, yes. Absolutely.

THE COURT: Were you tracking?

THE DEFENDANT: I found it very difficult to follow. I find it difficult to understand how prosecution can directly lie and that can be reported as evidence.

THE COURT: Okay. But putting that aside, just the more superficial elements of what's transpiring. Did you understand that the Government had filed charges against you?

THE DEFENDANT: Yes.

THE COURT: Did you understand that your lawyers in response to those charges had filed certain motions on your behalf?

THE DEFENDANT: Yes.

THE COURT: And that in those motions they were attacking some of the proof that had been proffered against you?

THE DEFENDANT: To some degree, but not the full extent that I discussed with them.

THE COURT: But you did discuss with them?

THE DEFENDANT: Yes.

THE COURT: Tell me how you are feeling today, physically?

THE DEFENDANT: I'm physically fine.

THE COURT: Okay. Tell me how you are doing mentally and emotionally?

THE DEFENDANT: Mentally, emotionally stable. I'm frustrated with our judicial system as a whole, but I think anybody in my position would be. I'm disappointed with the media as well for listening to the prosecution solely. And I am slightly disappointed with my legal team

13

for not allowing me to speak to the media directly, which I've requested several times.

THE COURT: Okay. Thank you. You may be seated. What should be apparent by now is that I am conducting a hearing on the motion, Mr. Nieto, that you and Mr. Proctor have filed within the last hour, suggesting that your client is suffering from a mental disease or defect that renders him incompetent to assist in his defense and otherwise meaningfully participate in this proceeding.

JA 1759-62. Mr. Bendann's defense counsels re-emphasized that the motion for a competency hearing is based in "the third prong to the [competency] analysis, which is, being able to meaningfully assist trial counsel in this case." JA 1762-63. Mr. Bendann's defense counsel also asserted that they are "not a mental healthcare professional" and therefore "not in the best position to opine as to the mental defect or issue." JA 1764.

After questioning Mr. Bendann, the District Court inquired into the phone call wherein Mr. Bendann expressed suicidal ideation. The recording of the phone call was moved into evidence and played in open court from the defense counsel's laptop. JA 1766. The government gave to defense counsel a copy of a recording of a phone call "between Mr. Bendann and his father." JA 1759. Then the District Court asked defense counsel "based on what you have heard . . . what in that recording gives rise to your belief that it is evidence of mental disease or defect?" JA 1768-69. Defense counsel responded:

14

I can tell the court that throughout the pendency of this case, the tone, the pallor of that conversation is -- it's inconsistent with any conversation that I've had with my client. Some of the things that were said in there was that 'I can't do it,' meaning I can't be at trial. 'Don't bother coming to court. I'm not going to last that long.' His father responds, 'I hope that's not the case.' And the 'I'm going to pass with a clear conscience.' The tone is defeated. It's indicative of the loss of the will to move forward. Obviously, there's nothing about helping the legal team or participating to assist properly in the defense. Again, Your Honor, just in the stark shift from what I have grown accustomed to understanding from my client verse this particular call. It just gave us reasonable cause, respectfully, to believe that there's something amiss. And that moving forward for him to be able to assist properly in the defense of this case, we felt there's a risk that's not going to happen.

JA 1769.

The District Court denied defense's motion for a psychiatric evaluation to determine competency to stand trial, stating the following:

Upon the hearing that has been conducted this morning, I find that there is not sufficient evidence in this record or before me now to indicate that further proceedings need be undertaken to inquire as to whether the Defendant is competent to proceed. Based on my colloquy with the Defendant, and the overall circumstances that are apparent in the record and in the court this morning, the Defendant and his team have not demonstrated that -- or created a colorable indication in the court's mind that the Defendant is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he's unable to understand the nature and consequences of the proceeding against him or to assist properly in his defense.

15

JA 1777-79.

### 3.    **Evidence at Trial**

The evidence at trial demonstrated the following. Mr. Bendann was an eighth-grade teacher and student advisor at the Gilman School in Baltimore County, Maryland. JA 1897. Mr. Bendann was the victim's eighth-grade teacher and advisor. JA 1897. The victim socialized with and considered Mr. Bendann to be friend. JA 1899. The two frequently communicated in person, via cell phone, and via social media. JA 1903-05.

The government's theory of the case was that Mr. Bendann had a relationship with the victim starting when the victim was fifteen years old when the victim was in eighth grade. The government introduced the victim's testimony at trial that he was fifteen years old when the exploitation started.[4] JA 2250 ("fifteen"); *see generally* JA 1893-2022 (the victim's testimony at trial). Moreover, the government introduced circumstantial evidence from the victim's peers and

---

[4] Although this issue is not appropriate for direct appeal because there is no record for counsel to cite, per Mr. Bendann's representation to counsel, the government at trial used a picture of the victim when the victim was fourteen years old. The government, in contrast, established at trial that the exploitation happened when the victim was fifteen years old. JA 2250. There is no record establishing if the victim looked significantly younger at fourteen years old compared to fifteen years old. Moreover, there is no record if the exploitation allegedly occurred later in the victim's later days of fifteen year old compared to the victim's earlier days of fifteen years old. Mr. Bendann, therefore, reserves the right to address this argument about an unfairly prejudicial demonstrative that the government used at trial (in addition to other arguments) in a habeas petition after Mr. Bendann has exhausted his direct appeal.

members of the community that the victim and Mr. Bendann had a close relationship in which they were often alone with each other when the victim was between fifteen and seventeen years old. *See, e.g.*, JA 2888 ("Q: How long were the two of them [Mr. Bendann and the victim] gone? A: I don't remember for certain but kind of remember in the moment it feeling like a little too long."). Lastly, the government introduced the videos themselves and the videos' EXIF data documenting dates allegedly when the victim was a minor. JA 1017 (explaining that EXIF data has the "date and time of when the specific file or picture or video was taken as well as potentially GPS coordinates. . . ."). The instances of exploitation and creation of child porn, per the government's theory of the case, thus happened when the victim was a minor.

Mr. Bendann's defense to the child exploitation and child pornography charges was that the victim and Mr. Bendan only had a consensual adult relationship.[5] The defense highlighted the fact that the victim and Mr. Bendann were in frequent contact with each other when the victim was above the age of eighteen years old, and the undisputed evidence that the two had a relationship when the victim was an adult. JA 1826 ("When this friendship evolved into a

---

[5] Mr. Bendann asked the jury during its opening statement to find Mr. Bendann guilty as to the count of harassment, and presented no defense as to that charge because it did not rely on the victim being a minor. JA 722.

17

romantic relationship, [the victim] was over the age of eighteen."). The defense sought to rebut the government's theory of the case by alleging that there was a culture of hostility toward homosexuality at the Gilman School and the victim's community post-graduation and, therefore, the victim and his friends were motivated to lie about the victim's age and nature of their relationship. JA 2936-37 (establishing that students at Gilman "would use the words 'gay' or 'fag' in a derogatory fashion"). Moreover, to rebut the EXIF data from the videos, Mr. Bendann argued that the data was corrupted and therefore unreliable. JA 1106. The instances of sexual contact and creation of pornography, per the defense's theory of the case, thus happened when the victim was an adult.

The jury found Mr. Bendann guilty as to all nine counts. JA 80-81.

### 4.    Mr. Halpert's Trial Testimony

At trial, the government in its case-in-chief called a witness to testify, Wallace Halpert. Mr. Halpert was in the "graduating class" with the victim. JA 1209.

Mr. Halpert testified that he was in "third grade" when Mr. Bendann first babysat for his family. JA 1210. Mr. Halpert testified that Mr. Bendann would "stay over and sleep" at his house when he babysat for his family. JA 1210. Mr. Halpert also testified that Mr. Bendann would "babysit" and "house-sit" for other

"families at Gilman." JA 1210.

Mr. Halpert testified that Mr. Bendann was "my advisor" when Mr. Halpert "got to middle school at Gillman." JA 1211. Mr. Halpert also testified that Mr. Bendann, as his advisor, "would sometimes, like, take a group of us out to dinner or to a movie or something like that." JA 1212. Moreover, Mr. Halpert testified that he befriended Mr. Bendann on "Snapchat and Instagram." JA 1213. Mr. Halpert would "text him in addition to Snapchat or Instagram-type relationship." JA 1215.

Mr. Halpert testified that when Mr. Bendann babysat him when he was in high school, they would "drink alcohol when you were together at your house in high school. . . ." JA 1218-19. Mr. Halpert also testified that, on one occasion, Mr. Bendann sent Mr. Halpert a text to "come up here real quick" because the victim "had too much to drink and maybe was, like, throwing up or something." JA 1221. Mr. Halpert also testified that on another occasion, the victim "had a little too much to drink, and he was escorted upstairs by Mr. Bendann" and that it felt "like a little too long." JA 1224.

On cross-examination, Mr. Halpert confirmed that Mr. Bendann "never touched" Mr. Halpert and had no knowledge of Mr. Bendann filming Mr. Balpert "in a surreptitious manner." JA 1226. Mr. Halpert also confirmed that another

19

witness "was very interested in finding anyone else with a case against Mr. Bendann" and that the witness had "reach[ed] out to you [Mr. Halpert] and others because -- to try and get people to assist in the prosecution." JA 1229.

After cross-examination, defense counsel approached the court and asked to go on a private channel. There, the following exchange relating to Jencks occurred:

> THE COURT: Ms. McGuinn, have you produced all of the Jencks in the Rule 16 in relation to the August 26th incident and any discussions that you or agents had with this witness, Mr. Wallace Halpert?
> MS. MCGUINN: Yes, Your Honor.
> THE COURT: Mr. Proctor.
> MR. PROCTOR: Your Honor, I just want to preserve the issue. I have notes of interviews with his parents but I have none with him.
> THE COURT: Anything else, Ms. McGuinn?
> MS. MCGUINN: No, Your Honor.
> THE COURT: Thank you. Next question.

JA 1231.The "August 26th incident" to which the court referred to was the "time that Mr. Bendann Housesat" Mr. Halpert's house and allegedly exploited and recorded a video of the victim during the housesitting. JA 2606.

### 5.  Victims' Parents' Testimony at Sentencing

At sentencing, the government requested that the victim's mother and father "address the Court on behalf of their child." JA 1620. Mr. Bendann also objected to the introduction of the parents' victim impact letters, citing Mr. Bendann's "motion to strike impermissible victim impact." JA 1620. Mr. Bendann requested a "continuing objection as outlined in our earlier pleading," which the District Court

granted, stating "[y]ou can have a continuing objection, Mr. Proctor, and I certainly understand your point." JA 1620.

The mother testified first. JA 1622. As to Mr. Bendann's choice to exercise his constitutional rights, the mother testified that Mr. Bendann's choice to exercise his right to a trial "was not just a legal maneuver; it was personal retribution, continuing the cycle of power and control." JA 1624. The mother also testified that Mr. Bendann's "choice to hold press conferences in order to proclaim his innocence" was "a calculated assertion of power" to make "sure our son felt powerless and vulnerable." JA 1624. Then the mother testified that Mr. Bendann "and his legal team hired private investigators to try to discredit and smear our son's character while employing intimidatin tactics towards family and friends." JA 1624. As to the impact on the mother, she testified that after "learning of our son's abuse at the hands of the defendant, I was unable to return to work." JA 1625. As to name-calling, the mother testified that "the defendant is a depraved narcissist," "his defense highlights the depths of narcissism and his complete lack of remorse," and that Mr. Bendann is a "monster." JA 1626. The mother told the District Court that "[l]ocking up the defendant for the maximum time permitted would not only be an act of justice for our son but also a necessary step to ensure the safety of our children." JA 1626.

21

The father testified second. JA 1627. As to Mr. Bendann's choice to exercise his constitutional rights, the father testified that Mr. Bendann "could have admitted his guilt and spared us further pain from public scrutiny, but instead he chose to maintain control just as he always has." JA 1629. As to name-calling, the father testified that the Gilman community now know Mr. Bendann as a "narcissistic pedophile" and "master manipulator." JA 1628. The father did not ask the District Court for a particular sentence, but asked that the District Court "should not reward of forgive those who don't admit mistakes" and that Mr. Bendann "be held fully accountable for his unfathomable breach of trust and the immeasurable pain he has caused." JA 1630.

Mr. Bendann was sentenced by the District Court on January 23, 2025 to a total term of 35 years' incarceration, followed by a life term of supervised release, and a special assessment of $900.00. JA 1682-89.

## SUMMARY OF ARGUMENT

It was an abuse of discretion for the District Court to deny Mr. Bendann's motion to determine his mental competency. He had a history of suicidal ideation leading up to his trial, as Mr. Bendann was screened for suicidal ideation about a week before trial. On the morning of trial, Mr. Bendann expressed suicidal ideation in a phone call with his father, stating "I'm going to pass with a clear conscience,"

"I can't do it," and "Don't bother coming to court. I'm not going to last that long." Given Mr. Bendann's documented history of suicidal ideation and expressions of suicidal ideation on the morning of trial, the District Court abused its discretion in denying the motion to determine mental competency to determine whether Mr. Bendann was currently able to assist in his defense.

It was error for the District Court to determine that Detective Markel did not conduct the functional equivalent of interrogation. Detective Markel told Mr. Bendann that she had a sealed warrant that required Mr. Bendann's hands. Then Detective Markel physically handed Mr. Bendann a self-incriminating instruction on Mr. Bendann's iPhone for Mr. Bendann to enter his pass code, all of which happened after he exercised his right to remain silent and his right to an attorney. Detective Markel saw the self-incriminating instruction and continued holding the instruction up to Mr. Bendann's face despite seeing it. Application of the exclusionary rule here would deter police officers from misrepresenting suspect's obligations under sealed warrants to suspects, and then designing a situation where suspects self-incriminate themselves.

The government withheld Mr. Halpert's *Jencks* Act statement. Evidence that Mr. Halpert gave a Jencks Act statement is the fact that the government took—and produced—a *Jencks* Act statement from both of Mr. Halpert's parents. The remedy

is remanding this case to the district court to make findings of fact as to whether Mr. Halpert's *Jencks* Act statement contains exculpatory evidence, impeachment evidence, or neither of the two. Even if the government is correct that it does not have a *Jencks* Act statement from Mr. Halpert, a remand would add certainty to the fact that the government did not fail to produce any *Jencks* Act statement and, thus, further the administration of justice.

The victim's parents criticized Mr. Bendann for exercising his constitutional rights and the victim's parents testified about harm about themselves that was unrelated to the victim. The remedy is vacating Mr. Bendann's sentence and remanding this case to the District Court for re-sentencing.

## **ARGUMENT**

## I.   **THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING MR. BENDANN'S MOTION TO DETERMINE MR. BENDANN'S COMPETENCY.**

### a.   **Standard of Review.**

This court reviews a district court's failure to order a competency hearing for abuse of discretion. *See United States v. Council*, 77 F.4th 240, 246 (4th Cir. 2023); *see also United States v. Banks*, 482 F.3d 733, 742 (4th Cir. 2007).

Mr. Bendann moved for a competency hearing under 18 U.S.C. § 4241(a), which states the following:

At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, or at any time after the commencement of probation or supervised release and prior to the completion of the sentence, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is [a] reasonable cause to [b] believe that the defendant may presently be suffering from a mental disease or defect [c] rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

Prior to the date of the hearing, the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247(b) and (c) [18 USCS § 4247(b) and (c)].

18 U.S.C. § 4241(a)-(b) (lettering added; last alteration in original).

**b.     The "Reasonable Cause" Standard Is Satisfied.**

"Reasonable cause may be established through evidence of irrational behavior, the defendant's demeanor at trial, and medical opinions concerning the defendant's competence." *United States v. Bernard*, 708 F.3d 583, 592-93 (4th Cir. 2013) (citation and internal quotation marks omitted) "To prevail, the defendant must establish that the trial court ignored facts raising a bona fide doubt regarding [his] competency." *United States v. Moussaoui*, 591 F.3d 263, 291 (4th Cir. 2010) (alteration added; citation omitted).

25

The "reasonable cause" standard is met here because the week prior to the suppression hearing, "Mr. Nieto contacted the jail and asked that Mr. Bendann be screened for suicidal ideation." JA 1754. Thus, Mr. Nieto (District Court counsel) who interacted with Mr. Bendann "weekly" suspected suicidal ideation prior to trial. On the day of trial, Mr. Bendann made comments in a phone call with his father that "I am going to pass with a clean conscious" and "Don't bother showing up to court." JA 1769. These statements are consistent with Mr. Neito's earlier suspicions of suicidal ideation. Lastly, on the day of trial, the government—not Mr. Nieto or his defense counsel—alerted Mr. Bendann's counsel to suicidal ideation, believing that these statements warranted judicial notice. JA 1759. Given Mr. Bendann's documented history of suicidal ideation before and the morning of trial, reasonable cause, therefore, is met.

Moreover, given the history of suicidal ideation before the morning of trial, JA 1754, it does not appear that Mr. Bendann's statements on the day of trial were a rouse for the purpose of delay.

### c.    The "Mental Disease or Defect" Is Suicidal Ideation.

Suicidal ideation, or wanting to die, is a mental disease or defect that interferes with a person's ability to function. *See* Mayo Clinic, *Suicide or Suicidal Ideation*,    https://www.mayoclinic.org/diseases-conditions/suicide/symptoms-causes/syc-20378048 ("Suicidal thoughts and attempted suicide take an emotional

toll. For instance, you may be so consumed by suicidal thoughts that you can't function in your daily life.").

Mr. Bendann was preoccupied with suicidal ideation such that he was not able to assist in his defense. Even the District Court expressed its concern for someone with suicidal ideation, stating "anyone who is contemplating suicide is in terrible straits and I am deeply concerned about that . . . ." JA 1754-55. It appears that no party doubted Mr. Bendann's current battle with suicidal ideation.

### d.   Mr. Bendann Was Unable To "Assist Properly In His Defense" Because He Was Preoccupied with Suicidal Ideation.

"The presence of some degree of mental illness is not to be equated with incompetence." *Bernard*, 708 F.3d at 593 (citation modified). Instead, "the legal test for competency is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Id.*; *see also United States v. Roof*, 10 F.4th 314, 341 (4th Cir. 2021). "[B]ecause district courts are in the best position to make competency determinations, which at bottom rely not only on a defendant's behavioral history and relevant medical opinions, but also on the district court's first-hand interactions with, and observations of, the defendant and the attorneys at bar, we appropriately afford them wide latitude." *Roof* at 341 n.8 (internal quotation marks

27

omitted).

Mr. Bendann lacked the present ability to consult with his defense counsels. Mr. Bendann in the morning of trial was initially unwilling to leave his jail cell, indicating a breakdown of the attorney-client relationship. JA 1752. After Mr. Bendann left his jail cell, although Mr. Bendann was physically present, it was an open question whether Mr. Bendann was able to consult with his attorneys effectively given his suicidal ideation. Wanting to die does not a defendant to assist his attorneys with a defense. If a person wants to die, they have no incentive to care about the future determined by the litigation at hand. As this Court has explained, District Courts are in the best position to make competency determinations because of "medical opinions" and the district courts' ability to order them. *See Roof* at 341 n.8. The District Court should have ordered a psychiatric examination for the purpose of a medical opinion in order to determine whether Mr. Bendann was able to assist in his defense, but did not.

### e.    A Psychiatric Examination Was Required.

In *Maggio v. Fulford*, 462 U.S. 111 (1983), the defendant's lawyer moved to inquire into the defendant's competency to stand trial based on a limited psychiatric evaluation. After reviewing a limited psychiatric evaluation, the trial judge relied on the defendant's "conduct during and after the trial" among other factors and determined that he was "'oriented as to time, date and place and was

28

cognizant of everything around him.'" *Maggio,* 462 U.S. at 113. The request for further psychiatric evaluation was denied, and the Defendant was found competent to stand trial. The defendant was both tried and convicted. Mr. Maggio appealed his conviction on the basis that the trial judge violated his constitutional rights by failing to order further competency testing and finding he was competent to stand trial based on observations of him in court and an incomplete psychiatric evaluation.

The Court of Appeals held in favor of Mr. Maggio, and the case was appealed to the Supreme Court. Ultimately, the Supreme Court held that the factual determinations made by the trial judge were "'fairly supported by the record.' 28 U.S.C. § 2254(d)(8)." *Id* at 117. The Court then details all the facts on the record that supported the trial judge's determination:

> The trial judge's observation of [the defendant's] conduct, both prior to and during trial; his observation of the testimony of Dr. McCray and the statements of respondent's counsel regarding his refusal to cooperate with them; his inferences regarding the fact that [the defendant's] alleged refusal to disclose his alibi witness either never occurred, or was remedied; the weight he attributed to the unannounced, last-minute timing of the motion for appointment of a competency commission; and the inferences to be drawn from the failure of the defense to pursue a psychiatric examination beyond the 'tentative' stage, despite ample time and opportunity to do so . . . ."

*Id*. (alterations and omissionadded). Based on all of this evidence, the Supreme

Court found that the trial judge's determination was fairly supported by the record and could therefore not be overturned by the Court of Appeals.

Unlike in *Maggio*, here there was no psychiatric evaluation and no time to observe Mr. Bendann's behavior. When comparing this case to *Maggio*, there is a question as to whether or not the evidence on the record is sufficient enough to support a finding of competency. It is especially important to consider that nowhere on the record is any expert opinion as to whether or not the Defendant was suffering from a mental disease or defect. When asked by the Court, defense counsel noted that he was not qualified to speak as to whether or not the Defendant's suicidal ideation and his inability to assist in his own defense was due to mental disease or defect because he is "not a mental healthcare professional." JA 1764.

The statute states that a psychiatric examination might be necessary. Here that should have been utilized by the District Court. Without any psychiatric examination, the District Court abused its discretion.

### f.   The Remedy Is Vacating Mr. Bendann's Conviction And Remanding This Case To The District Court.

Given that there is no medical opinion in the record as to Mr. Bendann's ability to assist in his defense during his trial since there was no psychiatric evaluation, this court cannot find that any error is harmless. The court, therefore,

should vacate Mr. Bendann's conviction and remand to the District Court. If there remains a question as to Mr. Bendann's suicidal ideation on remand, the District Court at that time could exercise its discretion in ordering a psychiatric evaluation.

## II. THE DISTRICT COURT ERRED IN DENYING MR. BENDANN'S MOTION TO SUPPRESS EVIDENCE OBTAINED FROM ELECTRONIC DEVICES WITH THE PASS CODE 070184 BECAUSE DETECTIVE MARKEL CONDUCTED THE FUNCTIONAL EQUIVALENT OF INTERROGATION IN VIOLATION OF *MIRANDA*.

Detective Markel's functional equivalent of interrogation violated Mr. Bendann's Fifth Amendment *Miranda* rights. Inevitable discovery does not apply because the government's witnesses at the suppression hearing did not testify that they would have inevitably discovered Mr. Bendann's passcode, and the District Court did not make any inevitable discovery findings. The appropriate remedy is vacating Mr. Bendann's convictions—all of which rested on evidence obtained from electronic devices with the pass code 070184—and remanding this case to the District Court for fact finding to determine application of the inevitable discovery doctrine.

31

### a.     Detective Markel Violated Mr. Bendann's Fifth Amendment Right To Remain Silent.

"When reviewing a denial of a motion to suppress, we review factual findings for clear error and legal conclusions de novo." *See United States v. Blake*, 571 F.3d 331, 338 (2009) (citing *United States v. Kimbrough*, 477 F.3d 144, 147 (4th Cir. 2007)).

Several of the U.S. Courts of Appeals have determined that police officers conducted the functional equivalent of interrogation, and Mr. Bendann asks this court to do the same.[6] *See, e.g.*, *United States v. Bernard*, 927 F.3d 799 (2019); *United States v. Familetti*, 878 F.3d 53, 56 (2017); *United States v. Jackson*, 852 F.3d 764, 772 (2017); *Tolliver v. Sheets*, 594 F.3d 900, 917 (2010); *United States v. Padilla*, 387 F.3d 1087, 1093 (2004); *United States v. Webb*, 755 F.2d 382, 389 (1985); *United States v. Downing*, 665 F.2d 404, 407 (1981). Several of the U.S. Courts of Appeals have done the same in unpublished opinions. *See, e.g.*, *United States v. Grubbs*, 2008 U.S. App. LEXIS 16206, *6 (2008); *United States v. Collins*, 43 Fed. Appx. 99, 101 (2002); *United States v. Bentley*, 1994 U.S. App. LEXIS 20662 (1994); *United States v. Wagstaff*, 1987 U.S. App. LEXIS 18779, *9-10 (1987). This court has determined that a police officer conducted the

---

[6] The purpose of these string-cites is to illustrate that the appellant is not asking this court to do anything unprecedented. The cases that appellant encourages this court to focus on are those cases cited and analyzed in detail in sections i-vii.

functional equivalent of interrogation in *United States v. Bernard*, 927 F.3d 799, 806 (2019) and *United States v. Wagstaff*, 1987 U.S. App. LEXIS 18779, *10 (1987).

In *Miranda v. Arizona*, 384 U.S. 436 (1966), "the Supreme Court afforded protection to the Fifth Amendment privilege against compelled self-incrimination 'from the coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation.'" *Blake*, 571 F.3d at 338 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984)). "Part of the protection afforded by *Miranda* is the requirement that prior to any custodial interrogation, the police inform the suspect that he has the right to remain silent and the right to the presence of an attorney." *Blake*, 571 F.3d at 338 (citing *Miranda*, 384 U.S. at 479).

In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court explained that interrogation within the meaning of *Miranda* also includes interrogation's "functional equivalent":

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to [i] any words or actions on the part of the police [ii] (other than those normally attendant to arrest and custody) [iii] that the police should know are reasonably likely to elicit an incriminating response from the suspect. [iv] The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the

police. [v] This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. [vi] But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 300-302 (1980) (added lettering; emphasis in original). In a footnote in *Innis*, the Supreme Court also explained that it is of consequence whether [vii] "[t]he record in no way suggests that the officers' remarks were *designed* to elicit a response." *Id.* (alteration added; emphasis in original).

### i. Detective Markel Approached Mr. Bendann Holding An Iphone To Mr. Bendann's Face As The Iphone Instructed Mr. Bendann To Enter His Passcode.

The functional equivalent of interrogation are "any words or actions on the part of the police. . ." *Innis*, 446 U.S. at 301 (omission added).

Here those words and actions are Detective Markel holding an iPhone to Mr. Bendann's face as the iPhone instructs Mr. Bendann to enter his pass code. JA 1526.

The fact that Detective Markel initiated the interaction distinguishes this case from the conclusion (not the legal framework) in *Rhode Island v. Innis*. There, Patrolmen Gleckman and McKenna had a "dialogue" among themselves and did not direct a question or assertion to the defendant sitting in the back seat of the patrol car. *See Innis*, 446 U.S. at 302. Here Detective Markel held the iPhone to Mr. Bendann's face. JA 1533. Detective Markel did not direct the iPhone and its assertions to "enter passcode" to another police officer, like in *Innis*. Moreover, the fact that the iPhone instructed Mr. Bendann to "enter pass code" distinguishes this case from the conclusion in *Rhode Island v. Innis* because a "response from the respondent was invited." *See Innis*, 446 U.S. at 302. That response was Mr. Bendann's pass code.

The government might argue that Detective Markel's words and actions appeared to be friendly and, therefore, did not conduct the functional equivalent of interrogation. However, this court has recently explained in another functional-equivalent-to-interrogation case that a conversation with a friendly tone did not negate the functional equivalent of interrogation:

> In light of the extensive friendly conversation between Officer Willis and Bernard, the Government contends, the statement lost the sting of a traditionally coercive custodial interrogation. We find this argument unpersuasive. The American idiom, "You can catch more flies with honey than with vinegar" seems apt here.

35

*Bernard*, 927 F.3d at 806.

Lastly, Miranda applies to mitigate the dangers of a police-dominated atmosphere such as station house questioning. Here "[o]ver a dozen" police officers in "military fatigues" swarmed Mr. Bendann's small townhome to secure his house and then search it, turning Mr. Bendann's house into a police-dominated atmosphere. JA 1546. Moreover, police officers detained Mr. Bendann in a chair, JA 1523, much like how police officers detain a suspect in interrogation rooms in a station house.

### ii. Detective Markel's Action Of Holding An Iphone To Mr. Bendann's Face After The Biometrics Failed Was Not Normally Attendant To Arrest and Custody.

The functional equivalent of interrogation does not include words or actions "normally attendant to arrest and custody. . ." *Innis*, 446 U.S. at 301 (omission added).

Here Detective Markel's action of holding an iPhone to Mr. Bendann's face after the biometrics failed was not normally attendant to arrest and custody. Detective Markel had a warrant to seize Mr. Bendann's electronic devices. JA 1557. However, Detective Markel did not testify that the warrant instructed Mr. Bendann to reveal his pass code using the contents of Mr. Bendann's mind. Therefore, after the biometrics failed, Detective Markel's decision to continue

36

holding the iPhone to Mr. Bendann's face is an action *not* normally attendant to arrest and custody, and, thus, was not an action permitted under the search warrant Detective Markel had. JA 1516.

### iii. Detective Markel Knew That An Instruction For Mr. Bendann To Enter His Pass Code Would Result in Mr. <u>Bendann Entering His Pass Code.</u>

The functional equivalent of interrogation includes words or actions "that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301.

Here Detective Markel knew that the instruction for Mr. Bendann to enter his pass code would result in Mr. Bendann entering his pass code. Detective Markel testified in response to the question "[w]as it your intention, Detective Markel, to obtain the date of birth and pass code for that cell phone?" the answer "Yes."JA 1540.

Moreover, it does not matter here that the instruction to "enter pass code" was phrased as an assertion rather than a question. "There are questions that are not reasonably likely to elicit incriminating responses just as there are declarative statements or actions that are. The *Miranda* analysis does not turn on the form of an officer's articulation." *United States v. Johnson*, 734 F.3d 270, 276 (2013)

### iv.  Mr. Bendann's Perspective Is Having Already Been Told By Detective Markel That She'd Need His Hands To Access His Iphone, And Now Mr. Bendann Has Been Instructed To <u>Enter His Passcode.</u>

The functional equivalent of interrogation analysis "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Innis*, 446 U.S. at 301.

Here Mr. Bendann's perspective is having been told by Detective Markel that she'd need his hands to access his iPhone, and now Mr. Bendann has been instructed to enter his passcode.

The appellee might argue that the functional equivalent of interrogation did not occur because the instruction to "enter passcode" was an isolated incident rather than a "lengthy harangue." *See Innis*, 446 U.S. at 303. Detective Markel, however, explained to Mr. Bendann in detail how she would need his hands to access Mr. Bendann's iPhone in a "lengthy harangue" with Mr. Bendann where the two discussed the sealing order and Mr. Bendann invoked his Fifth Amendment rights. JA 1552 ("Q: And then in the process of explaining to him what was going on, you also told him that pursuant to the warrant you may need his face or hands at some point for certain things?" A: Correct, yes.). The instruction to "enter passcode," therefore, is part of the "lengthy harangue" that included Detective

Markel's previous statements to Mr. Bendann about needing his hands to access his iPhone.

> ### v.     The Coercive Police Practice Is Detective Markel Having A Sealed Warrant And Failing To Accurately Inform Mr. Bendann What His Legal Obligations Are Under The <u>Sealed Warrant.</u>

The functional equivalent of interrogation analysis "vest[s] a suspect in custody with an added measure of protection against coercive police practices. . . ." *Innis*, 446 U.S. at 301 (alteration and omission added).

Here the coercive police practice is Detective Markel having a sealed warrant and failing to accurately inform Mr. Bendann what his legal obligations are under the sealed warrant. "[T]he deterrent effect of suppression must be substantial and outweigh any harm to the justice system." *Herring v. United States*, 555 U.S. 135, 147 (2009) (alteration added). When a judge issues a sealed warrant, it places the suspect in a precarious position: the suspect must comply with the sealed warrant without being able to read it. The suspect is wholly reliant on the police officer executing the sealed warrant to accurately describe the suspect's legal responsibilities to the suspect under the sealed warrant. So when that officer inaccurately describes the legal obligations of the suspect, application of the Fifth Amendment's suppression remedy would cause police officers executing sealed

warrants to accurately describe legal obligations of the suspect to the suspect, lest the evidence be suppressed.

By suppressing the contents of Mr. Bendann's electronic devices with the passcode 070184, the court will deter police officers from inaccurately informing suspects during searches under sealed warrants about how police are authorized to access their electronic devices—biometrics, or disclosing the passcode via contents of suspects' mind.

Moreover, applying the exclusionary rule to deter bad police behavior is appropriate here because, as the district court found, Detective Markel "likely" violated 5A by confirming defendant's passcode with him. JA 28 at n.2. This is not a case where police officers innocently acted and that the court's decision to suppress evidence would needlessly deter law enforcement.

An analogous situation to police officers abusing the sealed warrant process is when police officers abuse the booking-questions exception to *Miranda*. "The so-called 'booking questions exception' exempts 'from *Miranda*'s coverage [express] questions to secure the biographical data necessary to complete booking or pretrial services.'" *United States v. Williams*, 842 F.3d 1143, 1147 (9th Cir. 2016) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion)). As the First Circuit explained, "the police may not adopt interrogation

techniques as 'standard operating procedure' simply to avoid the *Miranda* requirements. A practice that was not necessary to the smooth functioning of the arrest process would not be eligible for a 'waiver' from the *Miranda* requirements." *United States v. Vazquez*, 857 F.2d 857, 862 (1988). For example, in *United States v. Webb*, 755 F.2d 382, 389 (1985), the Fifth Circuit held that police conducted the functional equivalent of interrogation when it was not "normal procedure to ask a defendant the charge against him since that information was on the booking card." In another example, the Eighth Circuit had a situation where the police officer was trying to get the suspect to self-incriminate himself using the booking exception:

> The question regarding Jackson's last haircut crossed the line into improper interrogation. At the suppression hearing, Agent Coulter testified that prior to interviewing Jackson, he and Agent Bennett went to the apartment where Jackson was arrested, interviewed witnesses, and discussed the case with other officers. At the apartment, there "was discussion about recently cut hair" and the officers learned that the murder suspect "had his hair cut that evening at that apartment." Because the officers had prior knowledge about the murder suspect having recently cut his hair, they should have known that the question regarding Jackson's last haircut "was reasonably likely to elicit an incriminating response" from Jackson regarding the murder. Innis, 446 U.S. at 301 (footnote omitted).

*United States v. Jackson*, 852 F.3d 764, 772 (2017).

41

Here it was not standard operating procedure to continue to hold the iPhone to Mr. Bendann's face since that was not procedure for biometrics on the sealed warrant after the biometrics did not work. And, Detective Markel abused the sealed warrant by inaccurately describing Mr. Bendann's legal responsibilities under the sealed warrant. Application of the exclusionary rule here will instruct law enforcement in the future to correctly state suspect's legal obligations under sealed warrants to suspects.

> **vi. It Was Foreseeable That Mr. Bendann Would Enter His Passcode After Detective Markel Continued to Hold The Iphone To Mr. Bendann's Face After Seeing The Iphone Instruct Mr. Bendann To Enter His Passcode.**

The functional equivalent of interrogation definition "can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301 (emphasis in original).

Here the only foreseeable answer that Mr. Bendann could give to Detective Markel holding the iPhone to Mr. Bendann's face as the iPhone instructs Mr. Bendann to enter his passcode is Mr. Bendann entering his passcode. This situation is not one where a police officer asks a general question and the defendant unexpectedly provided an incriminating response.

42

### vii. Detective Markel's Conduct Was Designed To Elicit A Response Because She Did Not Remove The Iphone From Mr. Bendann's Face After Biometrics Failed.

It is the functional equivalent of interrogation when the record "suggests that the officers' remarks were *designed* to elicit a response." *Innis*, 446 U.S. at 303 (emphasis in original).

Here Detective Markel's conduct was designed to elicit a response because she did not remove the iPhone from Mr. Bendann's face after biometrics failed. The District Court's Order denying Mr. Bendann's motion to suppress finds that Detective Markel "intended to take advantage" of the situation to make it appear as if Mr. Bendann was required to enter his passcode. JA 30. Make no mistake, "intended to take advantage" is "designed to elicit a response."

It does not matter that the iPhone's instruction adopted by Detective Markel to "enter passcode" is phrased as an assertion instead of a question. "[A]n assertion can be the functional equivalent of a question if it is reasonably likely to elicit an incriminating response." *United States v. Grubbs*, 2008 U.S. App. LEXIS 16206, *6 (2008) (alteration added). "To limit the ambit of *Miranda* to express questioning would 'place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of *Miranda.*'" *Innis*, 446 U.[S. at 299 n.3 (citation omitted).

43

Moreover, as the Federal Rules of Evidence recognize, silence itself can be a statement. *See* Fed. R. Evid. 801(a) ("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."). Detective Markel's silence here while holding an instruction to "enter passcode" up to Mr. Bendann is Detective Markel instructing Mr. Bendann through the iPhone to "enter passcode."

The government will probably argue that Detective Markel did not instruct Mr. Bendann to enter his passcode; the iPhone did. But the Supreme Court in *Innis* defined interrogation to have a "functional equivalent" rather than limit the definition of interrogation to "express questioning" from the police officer. *See Innis*, 446 U.S. at 301. Mr. Bendann had already exercised his Fifth Amendment right to remain silent. [Motion to Suppress Transcript at 48] The Supreme Court "has always set high standards of proof for the waiver of constitutional rights, and we re-assert these standards as applied to in-custody interrogation." *Miranda*, 384 U.S. at 475 (citing *Johnson* v. *Zerbst*, 304 U.S. 458 (1938)).

### b.    <u>Inevitable Discovery Exception Does Not Apply.</u>

The appellee might argue that even if there is a Miranda violation, the inevitable discovery doctrine applies because Mr. Bendann used his birthday as his passcode, and law enforcement might guess the suspect's birthday as his passcode.

The inevitable discovery exception applies "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984) (alteration added). The inevitable discovery exception "involves no speculative elements but focuses on demonstrated historical facts." *Nix*, 467 U.S. at 444 n.5. "'A finding of inevitable discovery necessarily rests on facts that did not occur,' but 'by definition the occurrence of these facts must have been likely, indeed 'inevitable,' absent the government's misconduct.'" *Alston*, 941 F.3d at 137-138 (quoting *United States v. Allen*, 159 F.3d 832, 840 (4th Cir. 1998)). "Inevitable discovery demands that the prosecution prove by a preponderance of the evidence: first, that police legally *could* have uncovered the evidence; and second, that police *would* have done so." *Alston*, 941 F.3d at 137-138 (emphasis in original; citations omitted). A "question too close to decide on the evidentiary record may require remand." *Alston*, 941 F.3d at 139 (citation omitted).

Here there was no testimony whatsoever at the suppression hearing about law enforcement's standard operating procedures for getting access to an electronic device to which law enforcement does not have the passcode. None of the government's three witnesses testified that they might try to guess the code based on numbers that are in some way meaningful to the suspect. Instead, testimony at

the suppression hearing focused on the fact that the government already had the 070184 passcode, and the legality of how the government acquired the 070184 passcode. Therefore, the inevitable discovery doctrine does not apply because there were no facts whatsoever about law enforcement's standard operating procedure for trying to access an electronic device to which they do not have the passcode. And there were no facts whatsoever about law enforcement guessing the suspect's birthday as the passcode.

In the District Court's Order denying Mr. Bendann's motion to suppress, the District Court did not make findings of fact as to whether the inevitable discovery doctrine applied. *See generally* JA 25-32. In a footnote in the District Court's Order, the District Court stated that "because the Court has concluded that the Defendant entered the passcode voluntarily, the Court need not make any factual findings requiring the inevitable discovery doctrine." JA 30. Despite stating that it "need not make any factual findings" about the inevitable discovery doctrine, the District Court also stated that "it was reasonably likely that law enforcement would have tried such a commonly used passcode when attempting to unlock the phone." JA 30. This statement is factually baseless, because at no point during factfinding at the suppression hearing did any witness testify as to their standard operating

procedures for guessing a passcode. The District Court, therefore, did not make any factual findings about the inevitable discovery doctrine.

### c. The Remedy Is Vacating Mr. Bendann's Convictions And Remanding The Case To The District Court For Further Fact <u>Finding.</u>

When a Court of Appeals determines that a district court allowed introduction of inadmissible evidence at trial but the district court did not make findings of fact as to whether an exception to the exclusionary rule applies, the Court of Appeals will remand the case to the district court to make findings of fact as to whether an exception to the exclusionary rule applies. *See e.g.*, *Webb*, 755 F.2d at 390 (remanding the case to the district court after finding the district court's introduction of certain evidence at trial inadmissible because "the issue of whether the physical evidence alone was admissible under some other theory was never presented at trial"); *Downing*, 665 F.2d at 409 ("Because the independent discovery issue was raised but not focused upon below and the district court did not address it, we remand this case to allow the court to determine the issue.") (citing *United States v. Moore*, 562 F.2d 106, 113-14 (1st Cir. 1977)).

It is a legitimate question whether law enforcement would have legally accessed Mr. Bendann's phone via the inevitable discovery doctrine. A remand to the District Court for further findings of fact to determine application of the

inevitable discovery doctrine, therefore, is appropriate.

### III. THE GOVERNMENT WITHHELD THE STATEMENT OF A TRIAL WITNESS—MR. HALPERT—IN VIOLATION OF JENCKS.

#### a. <u>Standard Of Review</u>

"'Whether, and to what extent, the material sought must be produced are questions of fact to be decided by the district court and will not be overturned unless clearly erroneous.'" *United States v. Roseboro*, 87 F.3d 642, 645-646 (1996) (quoting *United States v. Boyd*, 53 F.3d 631, 634 (4th Cir. 1995)).

#### b. <u>Mr. Halpert Made A *Jencks* Statement</u>

"At its core, the Jencks Act provides that after a witness called by the government has testified on direct examination, the court must grant a motion to produce 'any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.'" *Roseboro*, 87 F.3d 642, 646 (quoting 18 U.S.C. § 3500(b)). "The Act defines 'statement' to include a written statement 'signed or otherwise adopted or approved' by the witness as well as a 'recording' of a witness' oral statement that is a 'substantially verbatim recital.'" *See id.* (quoting 18 U.S.C. § 3500(e)).

"To invoke a court's duty under the [Jencks] Act, a defendant must, after the direct testimony of a government witness, first make a sufficiently specific request

48

and provide some indication that the witness gave a pretrial statement to a government agent generally related to the witness' direct testimony." *Roseboro*, 87 F.3d at 646. "The defendant's showing need not be great, but it must be more than a mere automatic demand for government witness' statements." *Id.* (citing *Boyd*, 53 F.3d at 634. "An inadequate foundation may be grounds alone on which the court can properly deny further inquiry." *Id.* (citing *United States v. Smith*, 31 F.3d 1294, 1302 (4th Cir. 1994)).

Here defense counsel noted the absence of any statement made by Mr. Halpert, stating to the district court "I just want to preserve the issue. I have notes of interviews with his [Mr. Halpert's] parents but I have none with him [Mr. Halpert]." JA 1231. The government confirmed that it did not have any Jencks statement, responding to the district court's question "have you produced all of the Jencks" the answer "Yes." JA 1231. Because the government had and produced Jencks materials from Mr. Halpert's parents, it seems dubious that the government would not have Jencks materials from Mr. Halpert. The bar for laying a Jencks foundation is not high—all defense counsel must do is "provide some indication that the witness," here Mr. Halpert, "gave a pretrial statement to a government agent generally related to the witness' direct testimony." *Roseboro*, 87 F.3d at 646.

That is met here through defense counsel's statement to the district court that the government had Jencks statements from Mr. Halpert's parents but not Mr. Halpert.

If produced, a Jencks statement would allow defense counsel to impeach Mr. Halpert with prior inconsistent statements. As noted in the fact section, *see* "Evidence at Trial" section of opening brief, the government had three categories of evidence in this case: the victim's testimony, circumstantial evidence from members of the community who noted the behavior between Mr. Bendann and the victim, and EXIF data. Here that impeachment would attack the circumstantial evidence from members of the community—here Mr. Halpert—who noted the behavior between Mr. Bendann and the victim. Given that Mr. Bendannn had a defense at trial that the victim's testimony was biased and that EXIF data was corrupted, lack of impeachment with a *Jencks* statement prejudices Mr. Bendann by not allowing Mr. Bendann to attack the circumstantial evidence from members of the community.

### c.   The Remedy Is Remand To The District Court

This court has recently stated that "we perform our best work as 'a court of review, not of first view.'" *United States v. Perez*, 2025 U.S. App. LEXIS 20396, *36 (2025) (citing *Lovelace v. Lee*, 472 F.3d 174, 203 (4th Cir. 2006) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)).

When the district court did not make findings of fact, "remanding for further inquiry in a criminal case is a recognized remedy." *Perez*, 2025 U.S. App. LEXIS 20396 at *36 (citing *United States v. Hung*, 629 F.2d 908, 920 (4th Cir. 1980) (remanding so district court could screen whether documents contained a Jencks Act statement)). In *Hung*, 629 F.2d at 920, this court explained that remand to the district court is necessary to screen documents for a Jencks Act violation:

> there is no clear finding, on the existing record, of whether the last group of documents contained statements which should have been produced under the *Jencks* Act. They were not given the careful scrutiny the district court felt was necessary to make a confident decision. However, we decline the district judge's invitation to inspect the documents ourselves, and, instead, remand the case so that the district court can carefully screen the documents. We leave this task to the district judge because the district courts, not the appellate courts, are entrusted with the duty of examining documents for *Jencks* Act material, *Campbell v. United States*, 373 U.S. 487, 493, 83 S. Ct. 1356, 1360, 10 L. Ed. 2d 501 (1963) (*Campbell II)*. In addition, since the district judge is intimately familiar with the other *Jencks* Act material produced at trial, he is better equipped than we to decide whether any *Jencks* Act statements included within the documents are merely cumulative so that the failure to produce them at trial was not prejudicial to the defendants.
> *Hung*, 629 F.2d at 920 (1980).

Here it is not clear what Mr. Halpert's *Jencks* Act statement would demonstrate. Therefore, the appropriate remedy is remanding this case to the district court to explore what the substance of the *Jencks* Act statement reveals: exculpatory evidence, impeachment evidence, or neither of the two. The district

court would then make findings of fact which, if necessary, this court would review.

Even if the government is correct that it does not have a *Jencks* Act statement from Mr. Halpert, a remand would add certainty to the fact that the government did not fail to produce any *Jencks* Act statement and, thus, further the administration of justice.

**IV.     IT WAS AN ABUSE OF DISCRETION FOR THE DISTRICT COURT TO ALLOW INFLAMMATORY TESTIMONY FROM THE VICTIM'S PARENTS AT MR. BENDANN'S SENTENCING.**

This court reviews "rulings regarding the admissibility of evidence and introduction of witnesses at sentencing for abuse of discretion." *United States v. Brown*, 2023 U.S. App. LEXIS 2438, *3 (2023) (citing *United States v. Brooks*, 524 F.3d 549, 564 (4th Cir. 2008); then *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018)). "A district court abuses its discretion when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law." *United States v. Davis*, 99 F.4th 647, 653 (2024) (citing *United States v. Jenkins*, 22 F.4th 162, 167 (4th Cir. 2021) (quoting *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018))).

The victim's parents criticized Mr. Bendann for exercising his constitutional rights and the victim's parents testified about harm about themselves that was unrelated to the victim. The remedy is vacating Mr. Bendann's sentence and remanding this case to the District Court for resentencing.

### a. The Victims' Parents Criticized Mr. Bendann For Exercising His Constitutional Rights.

A mother of a victim testified first. JA 1622. As to Mr. Bendann's choice to exercise his constitutional rights, the mother testified that Mr. Bendann's choice to exercise his right to a trial "was not just a legal maneuver; it was personal retribution, continuing the cycle of power and control." JA 1624. The mother also testified that Mr. Bendann's "choice to hold press conferences in order to proclaim his innocence" was "a calculated assertion of power" to make "sure our son felt powerless and vulnerable." JA 1624. Then the mother testified that Mr. Bendann "and his legal team hired private investigators to try to discredit and smear our son's character while employing intimidation tactics towards family and friends." JA 1624.

The victim's father testified second. JA 1627. As to Mr. Bendann's choice to exercise his constitutional rights, the father testified that Mr. Bendann "could have admitted his guilt and spared us further pain from public scrutiny, but instead he chose to maintain control just as he always has." JA 1629.

**b.    The Victims' Mother Testified To Harm Unrelated To The Victim.**

The mother testified that after "learning of our son's abuse at the hands of the defendant, I was unable to return to work." JA 1625. This harm has no impact whatsoever on the victim.

**c.    Harmless Error Does Not Apply.**

"Even if the district court erred, we need not vacate its judgment if the error was harmless." *United States v. Wheeler*, 130 F.4th 406, 415 (2025) (citing *United States v. Ferguson*, 752 F.3d 613, 618 (4th Cir. 2014)). "And error is harmless if it 'had no substantial and injurious effect or influence on the outcome.'" *See id.* (internal quotation marks omitted).

The victim's mother told the District Court that "[l]ocking up the defendant for the maximum time permitted would not only be an act of justice for our son but also a necessary step to ensure the safety of our children." JA 1626. Then the District Court did exactly that, sentencing Mr. Bendann to a variant statutory maximum sentence of 35 years. Therefore, the error was not harmless, because the District Court did exactly what the mother asked.

54

### d.      The Remedy Is Vacating Mr. Bendann's Sentence And Remanding This Case For Re-sentencing.

The remedy is vacating Mr. Bendann's sentence, and remanding this case to the District Court for re-sentencing. Although district courts typically enjoy broad discretion to hear testimony at sentencing, application of this remedy would encourage district courts to channel witness's testimony away from disparaging defendants for exercising their constitutional rights and testifying as to unrelated matters. Then sentencing would have more substance and less inflammatory statements.

### CONCLUSION

For the foregoing reasons and such other reasons which may appear just and proper, Appellant Christopher Kenji Bendann respectfully requests that this Court: (1) dismiss all counts of the superseding indictment, (2) reverse the District Court convictions and remand for a new suppression hearing and/or trial, (3) remand to the District Court to make *Jencks* Act findings of fact, (4) vacate his sentence and remand for re-sentencing, and/or (5) any other relief appropriate under the facts and circumstances.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant, by counsel, respectfully requests oral argument on all issues presented herein.

Respectfully submitted,


/s/ Allen H. Orenberg

Allen H. Orenberg
The Orenberg Law Firm, LLC
200-A Monroe Street, Suite 233
Rockville, Maryland 20850
Tel. No. 301-807-3847
Fax No. 240-238-6701
aorenberg@orenberglaw.com

Counsel for Christopher K. Bendann
(Appointed by the Court)

## CERTIFICATION PURSUANT TO
## Fed. R. App. P. 32(a)(7)(B) and (C)

The undersigned hereby certifies that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and (C) because the brief contains 12,825 words of text.

The brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word 2018, Times New Roman, Size 14.

Dated: October 1, 2025
      Rockville, Maryland

                /s/
                Allen H. Orenberg

*db*