**No. 25-4033**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### UNITED STATES OF AMERICA,

**Plaintiff - Appellee,**

**v.**

### CHRISTOPHER KENJI BENDANN,

**Defendant - Appellant.**

*Appeal from the United States District Court for the*
*District of Maryland, Northern Division*
*Honorable James K. Bredar, District Judge*

### RESPONSE BRIEF OF APPELLEE
### UNITED STATES OF AMERICA

**Kelly O. Hayes**
**United States Attorney**

**David C. Bornstein**
**Assistant United States Attorney**
**Chief, Appellate Division**

**M.J. Kirsch Muñoz**
**Assistant United States Attorney**
**6406 Ivy Lane, 8th Floor**
**Greenbelt, Maryland 20770**
**(410) 736-8276**

**January 21, 2026**          *Attorneys for the Appellee*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUES.....................................................................1

STATEMENT OF THE CASE .......................................................................2

    A.    Bendann's Criminal Conduct .................................................2

    B.    Procedural History.................................................................4

        1.    The Suppression Motion ..............................................4

        2.    Trial ..............................................................................8

        3.    Sentencing ..................................................................10

SUMMARY OF THE ARGUMENT ..............................................................11

ARGUMENT ...............................................................................................14

I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DE-
CLINING TO ORDER A COMPETENCY HEARING..............................14

    A.    Standard of Review .............................................................14

    B.    Nothing in Bendann's Demeanor or Behavioral History Created a
Bona Fide Doubt as to His Competence .............................14

    C.    Bendann's Remaining Arguments Are Unavailing ............21

II.    THE DISTRICT COURT DID NOT ERR IN DENYING BENDANN'S
MOTION TO SUPPRESS THE EVIDENCE FROM HIS CELL PHONE .26

    A.    Standard of Review .............................................................26

    B.    The Admission of Evidence Obtained From Bendann's iPhone Did
Not Violate His Fifth Amendment Rights ..........................26

        1.    Bendann Did Not Unambiguously Invoke His Fifth
Amendment Rights ...................................................28

2.     Markel Had No Reason to Believe That Holding Bendann's Phone Up to His Face Was Likely to Elicit His Unprompted Response .............................................. 32

3.     Bendann's Act of Entering His Passcode Was Not a Testimonial Communication That Incriminated Him ................... 36

4.     Bendann's Act of Entering His Passcode Was Voluntary, and the Exclusionary Rule Does Not Apply to the Derivative Evidence of Voluntary Communications ........................... 39

5.     Bendann's Passcode Would Have Been Inevitably Discovered Anyway ....................................................... 42

C.     Bendann's Remaining Arguments Do Not Persuade ......................... 44

III.    THE DISTRICT COURT DID NOT CLEARLY ERR IN DENYING DEFENSE COUNSEL'S JENCKS ACT REQUEST FOR INTERVIEW NOTES WITH WALLACE HALPERT ...................................... 46

A.     Standard of Review ................................................. 46

B.     Defense Counsel Failed to Provide a Sufficient Foundation for His Jencks Act Request for the Halpert Interview Notes ......................... 46

C.     Any Error in Declining to Require Production of Halpert's Interview Notes Was Harmless ............................................... 49

IV.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN HEARING FROM THE VICTIM'S PARENTS AT SENTENCING .......... 50

A.     Standard of Review ................................................. 50

B.     The Court Was Entitled to Consider the Statements of the Victim's Parents ................................................... 51

C.     Any Error in Considering the Parents' Statements Was Harmless ..... 54

CONCLUSION ..................................................................... 56

CERTIFICATE OF COMPLIANCE ................................................ 57

CERTIFICATE OF SERVICE ...................................................... 58

iii

# TABLE OF AUTHORITIES

## CASES

*Beck v. Angelone*,
    261 F.3d 377 (4th Cir. 2001) ................................................................18, 19

*Burket v. Angelone*,
    208 F.3d 172 (4th Cir. 2000) ................................................................19, 24

*Coleman v. Singletary*,
    30 F.3d 1420 (11th Cir. 1994) ....................................................................30

*Correll v. Thompson*,
    63 F.3d 1279 (4th Cir. 1995) ......................................................................31

*Doe v. United States*,
    487 U.S. 201 (1988)......................................................................................36

*Fisher v. United States*,
    425 U.S. 391 (1976)................................................................................36, 38

*Grayson O Co. v. Agadir Int'l LLC*,
    856 F.3d 307 (4th Cir. 2017) ......................................................................54

*Grueninger v. Dir., Va. Dep't of Corr.*,
    813 F.3d 517 (4th Cir. 2016) ................................................................28, 32

*Jermyn v. Horn*,
    266 F.3d 257 (3d Cir. 2001) ........................................................................25

*Lord v. Duckworth*,
    29 F.3d 1216 (7th Cir. 1994) ......................................................................29

*Maggio v. Fulford*,
    462 U.S. 111 (1983)......................................................................................25

*Murray v. Quarterman*,
    243 F. App'x 51 (5th Cir. 2007)..................................................................24

*Nix v. Williams*,
    467 U.S. 431 (1984)......................................................................................42

iv

*Oregon v. Elstad*,
    470 U.S. 298 (1985)............................................................41

*Orellana v. Madden*,
    789 F. App'x 34 (9th Cir. 2019) (mem.) ......................................30

*Payne v. Tennessee*,
    501 U.S. 808 (1991)........................................................51, 53

*Pepper v. United States*,
    562 U.S. 476 (2011)............................................................51

*Rhode Island v. Innis*,
    446 U.S. 291 (1980).........................................32, 37, 40, 41, 44

*Sechrest v. Ignacio*,
    549 F.3d 789 (9th Cir. 2008) ................................................31

*United States v. Abdallah*,
    911 F.3d 201 (4th Cir. 2018) .............................................28, 32

*United States v. Anzaldi*,
    800 F.3d 872 (7th Cir. 2015) ................................................19

*United States v. Banks*,
    482 F.3d 733 (4th Cir. 2007) .............................................14, 20

*United States v. Bernard*,
    708 F.3d 583 (4th Cir. 2013) .............................................15, 25

*United States v. Boyd*,
    53 F.3d 631 (4th Cir. 1995) .................................................47

*United States v. Brown*,
    287 F.3d 965 (10th Cir. 2002) ...............................................31

*United States v. Brown*,
    701 F.3d 120 (4th Cir. 2012) .............................................26, 31

*United States v. Cabrera-Rivas*,
    142 F.4th 199 (4th Cir. 2025)................................................23

*United States v. Collins*,

v

834 F. App'x 537 (11th Cir. 2020) (per curiam)...........................................24

*United States v. Craig*,
321 F. App'x 322 (4th Cir. 2009) (per curiam)...........................................56

*United States v. Curry*,
158 F.4th 153 (3d Cir. 2025) ......................................................................42

*United States v. Davis*,
61 F.3d 291 (5th Cir. 2002) ................................................................20, 24

*United States v. Davis*,
801 F. App'x 80 (4th Cir. 2020) (per curiam)..............................................25

*United States v. Doe*,
170 F.3d 1162 (9th Cir. 1999) ...................................................................29

*United States v. Dorsey*,
27 F.3d 564 (4th Cir. 1994) (per curiam) (table)..........................................50

*United States v. Fauntleroy*,
508 F. App'x 238 (4th Cir. 2013) (per curiam)............................................24

*United States v. Ferj-Inostroza*,
129 F.3d 1261 (4th Cir. 1997) (per curiam) (table)......................................45

*United States v. Fulks*,
454 F.3d 410 (4th Cir. 2006) ...............................................................51, 53

*United States v. Gavegnano*,
305 F. App'x 954 (4th Cir. 2009) (per curiam).......................................38, 39

*United States v. Graham*,
4 F.3d 987 (4th Cir. 1993) (per curiam) (table)...........................................49

*United States v. Jackson*,
126 F.4th 847 (4th Cir. 2025) .....................................................................2

*United States v. Johnson*,
400 F.3d 187 (4th Cir. 2005) .....................................................................29

*United States v. Johnson*,
734 F.3d 270 (4th Cir. 2013) ..........................................................32, 35, 36

vi

*United States v. Kennedy*,
    61 F.3d 494 (6th Cir. 1995) ........................................................... 44

*United States v. Kimbrough*,
    477 F.3d 144 (4th Cir. 2007) ......................................................... 42

*United States v. Landers*,
    564 F.3d 1217 (10th Cir. 2009) ............................................... 19, 20

*United States v. Lewis*,
    35 F.3d 148 (4th Cir. 1994) ........................................................... 50

*United States v. Leyva*,
    No. 18-2440, 2020 WL 2614617 (6th Cir. 2020) ......................... 31

*United States v. Meyers*,
    402 F. App'x 844 (4th Cir. 2010) (per curiam) ..................... 50, 54

*United States v. Moon*,
    513 F.3d 527 (6th Cir. 2008) ......................................................... 53

*United States v. Morales*,
    775 F.2d 559 (4th Cir. 1985) ......................................................... 46

*United States v. Moussaoui*,
    591 F.3d 263, 291 (4th Cir. 2010) ......................................... 15, 18, 20

*United States v. Neal*,
    776 F.3d 645 (9th Cir. 2015) ......................................................... 19

*United States v. Oloyede*,
    933 F.3d 302 (4th Cir. 2019) ................................... 36, 37, 38, 42

*United States v. Patane*,
    542 U.S. 630 (2004) ...................................................................... 42

*United States v. Payne*,
    954 F.2d 199 (4th Cir. 1992) ....................................... 33, 35, 40,

*United States v. Rakestraw*,
    No. 21-4436, 2023 WL 1519518 (4th Cir. Feb. 3, 2023) ............. 23

*United States v. Roseboro*,

87 F.3d 642 (4th Cir. 1996) ........................................................47

*United States v. Rush*,
808 F.3d 1007 (4th Cir. 2015) ..................................................26

*United States v. Savage*,
885 F.3d 212 (4th Cir. 2018) ..............................................46, 48

*United States v. Shabaz*,
708 F.3d 938 (7th Cir. 2009) ....................................................29

*United States v. Solis-Rodriguez*,
144 F.4th 617 (4th Cir. 2025) ...................................................50

*United States v. Smith*,
31 F.3d 1294 (4th Cir. 1994) ....................................................47

*United States v. Smith*,
967 F.3d 198 (2d Cir. 2015) ...............................................50, 54

*United States v. Spiwak*,
377 F. App'x 319 (4th Cir. 2010) (per curiam).........................54

*United States v. Stitt*,
250 F.3d 878 (4th Cir. 2001) ....................................................50

*United States v. Sweets*,
526 F.3d 122 (4th Cir. 2007) ........................................36, 38, 39

*United States v. Tucker*,
404 U.S. 443 (1972)..................................................................51

*United States v. Velasquez-Rivera*,
581 F. App'x 238 (4th Cir. 2014) (per curiam).........................30

*United States v. Walker*,
272 F.3d 407 (7th Cir. 2001) ....................................................30

*United States v. Williams*,
113 F.3d 1155 (10th Cir. 1997) ................................................20

*United States v. Williams*,
46 F. App'x 587 (4th Cir. 2011) (per curiam)...........................31

viii

*United States v. Younger,*
    398 F.3d 1179 (9th Cir. 2005) ....................................................29, 31

*United States v. Ziegler,*
    1 F.4th 219 (4th Cir. 2021) .................................................................14

*Smith v. Illinois,*
    469 U.S. 91 (1984)..............................................................................28

*West v. Grounds,*
    708 F. App'x 476 (9th Cir. 2018) (mem.) ..........................................24

## STATUTES

18 U.S.C. § 2251(a) ..............................................................................4

18 U.S.C. § 2252A(a)(5)(B) ..................................................................4

18 U.S.C. § 2261A(2) ...........................................................................4

18 U.S.C. § 3231 ...................................................................................1

18 U.S.C. § 3500(e)(1) ...................................................................13, 47

18 U.S.C. § 3500(e)(2) .........................................................................13

18 U.S.C. § 3553(a)(2)(A) ....................................................................53

18 U.S.C. § 3553(a)(1) ..........................................................................54

18 U.S.C. § 3661 ...........................................................13, 51, 52, 54

18 U.S.C. § 3771(e)(2)(A) ....................................................................52

18 U.S.C. § 3771(e)(2)(B) ....................................................................52

18 U.S.C. § 4241(a) ........................................................................14, 24

18 U.S.C. § 4241(b) ..............................................................................20

28 U.S.C. § 1291 ...................................................................................1

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over defendant-appellant Christopher Kenji Bendann's federal offenses pursuant to 18 U.S.C. § 3231. It entered a judgment of conviction against him on January 23, 2025, J.A.1682, and Bendann timely appealed that same day, J.A.1690. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.      Whether the district court abused its discretion in declining to order a competency hearing when nothing in Bendann's demeanor or behavioral history created a bona fide doubt as to his mental fitness to be tried.

II.     Whether the district court erred in denying Bendann's motion to suppress the evidence obtained from his cell phone when Bendann failed to unambiguously invoke his Fifth Amendment right to remain silent or right to an attorney, and when he thereafter entered his phone passcode voluntarily; alternatively, whether the evidence from Bendann's phone was admissible under the inevitable discovery doctrine.

III.    Whether the district court clearly erred in denying Bendann's Jencks Act request for the Government's interview notes for witness Wallace Halpert, when Bendann's counsel furnished no reason to believe that the interview notes contained a Jencks statement; alternatively, whether any error was harmless.

1

IV.    Whether the district court abused its discretion in allowing the victim's parents to make statements at Bendann's sentencing; alternatively, whether any error was harmless.

## STATEMENT OF THE CASE

### A.    Bendann's Criminal Conduct[1]

Christopher Kenji Bendann "is a violator of public and private trust.  He's a criminal.  He's a sexual predator."  J.A.1668 (district court at sentencing).  And for years, he wielded his position as a teacher at Gilman School in Baltimore, Maryland, to prey on his student, Minor Victim, who was a high school sophomore when the sexual abuse started—but who had been groomed for much longer than that.

In Minor Victim's sophomore year, Bendann—who had already become close with the boy, taking him on social outings, J.A.1847-1848, J.A.1851-1852, cultivating a relationship with his parents, J.A.1842, and babysitting or housesitting for his friends, J.A.924-925; J.A.1218-1221—decided to step up his relationship with the teenager.  He at first persuaded Minor Victim to run "naked laps" by himself or with other students while Bendann watched.   J.A.929-931; J.A.944-947; J.A.1217-1218;

---

[1]    Most of the following facts are derived from the evidence at trial, taken in the light most favorable to the jury's guilty verdict.  *United States v. Jackson*, 126 F.4th 847, 852 n.1 (4th Cir. 2025).   The remaining facts come from other sources, including motions briefing and the PSR, since the full trial record is not included in the joint appendix.   Bendann does not challenge the evidence here.

2

J.A.1243-1246; J.A.1257-1259.    This became a routine occurrence.    Then, Bendann agreed to pick up Minor Victim from parties, but only if the boy stripped naked in Bendann's car.    J.A.3299.    This, too, became a normal part of Minor Victim's life.    J.A.57.    Eventually, Bendann coerced Minor Victim into masturbating in front of him while Bendann recorded the act.    *E.g.*, J.A.1073, 1079.    The sexual contact between them escalated from there.

Every time Minor Victim tried to get out from under his thumb, Bendann became enraged and tyrannical, terrorizing him with exposure.    J.A.58.    He threatened to share Minor Victim's photos with his family and friends if the teenager resisted Bendann's demands.    J.A.3300.    Feeling trapped, Minor Victim complied even as those demands increased—both in the number of videos and images required of Minor Victim, as well as in their level of explicitness.    By the end of his high school career, Bendann was regularly molesting Minor Victim, masturbating him in showers and otherwise touching the boy's genitals.    These acts occurred while Minor Victim was still a minor.    *E.g.*, J.A.1090, J.A.1095.

Minor Victim graduated from Gilman in 2020, J.A.1858, and tried to move on with his life, leaving the state to attend college.    But even from afar, Bendann continued his stranglehold.    J.A.59; J.A.713, J.A.724-726; J.A.1319-1322.    Every day, multiple times a day, Bendann would demand Minor Victim's attention,

gaslighting him into believing he had no way out.   J.A.1352-J.A.1408.   It was not until years after he graduated, when other students reported similar grooming behaviors to Gilman administrators, that Minor Victim wrenched free of Bendann's abuse, exploitation, harassment, and stalking.   J.A.59-60.   Bendann was exposed as a child predator and arrested in January 2023.

### B.     Procedural History

A federal grand jury returned a superseding indictment charging Bendann with five counts of sexual exploitation of a child, 18 U.S.C. § 2251(a); three counts of possessing child pornography, 18 U.S.C. § 2252A(a)(5)(B); and one count of cyberstalking, 18 U.S.C. § 2261A(2).   J.A.32-42.

### 1.     The Suppression Motion

**a.**   Half a year before trial, Bendann filed a motion to suppress the evidence obtained from his cell phone.   He argued that during the search of his house, the lead detective, Shannon Markel of the Baltimore County Police Department, "compelled Mr. Bendann to enter his passcode into [his cell] phone" when she "placed the phone in front of Mr. Bendann's face."   J.A.49-50.   In response, the Government agreed that Detective Markel held the phone up to Bendann's face, but argued that she did so in a lawful attempt—as explicitly authorized by the search warrant—to unlock his phone using facial recognition.   When facial recognition failed,

4

Bendann entered his passcode voluntarily, which made suppression inapplicable. J.A.71-74.   Alternatively, the Government argued, Bendann's passcode would have been inevitably discovered anyway, since the passcode was his date of birth—a commonly used passcode for electronic devices.   J.A.74-75.

**b.**   The court held a suppression hearing in May 2024.   Markel and two other law enforcement officers—FBI forensic analyst Jon Shumway and FBI agent Patrick Winn—testified at the hearing.   Winn's testimony was brief, confirming that police interactions with Bendann were nonthreatening.   J.A.1576-1578.   Shumway's testimony, which overlapped with Markel's in significant part, did not make it into the court's subsequent findings.   *See* J.A.1559-1574.

As for Markel, she explained that she obtained a sealed search warrant for Bendann's house after an investigation.   J.A.1514-1516.   The search warrant expressly allowed officers to use Bendann's "biometric data," including "his facial image, fingerprint, and his eyes," to unlock any electronic devices they found. J.A.1516, J.A.1519-1520.   Around 5:20 a.m. on February 3, 2023, the police executed the search warrant at Bendann's house.   J.A.1517, J.A.1520.   When Markel arrived, Bendann was seated in the dining room, uncuffed, and apparently calm. J.A.1523, J.A.1526-1527.   Markel informed Bendann of his *Miranda* rights and asked if he wanted to talk to her, to which Bendann responded "that his attorney had

advised him not to talk about the case." J.A.1528-1529. Markel also informed Bendann of the contents of the sealed search warrant, J.A.1530, specifically telling him that the police "may need his face or hands" for "certain things," J.A.1552. *See* J.A.1558. She did not show Bendann the warrant, since it was still under seal and she did not want to expose "pertinent facts of the case." J.A.1557.

Later, the police found an iPhone on the nightstand in Bendann's bedroom. J.A.1532. Consistent with her authority under the search warrant, Markel held the phone up to Bendann's face to trigger facial recognition. J.A.1533. "[T]he screen bounced, indicating that it did not recognize his face[,] and then … the number pad came up with the six digits prompting for a passcode." J.A.1534. Markel did not give Bendann "any direction or any commands" and said nothing "at all out loud." J.A.1534. Yet Bendann, "without prompting, put his passcode into the phone while [Markel] was standing next to him." J.A.1533. Markel gave the unlocked phone to Shumway. J.A.1535-1536.

Markel did not see the full six-digit passcode when Bendann typed it in. She saw only the first four digits, which she recognized as the day and month of his birth (0701). J.A.1534-1535. From there, Markel inferred that the passcode was his full birthday (070184) and went to her "operations plan to verify the defendant's date of birth." J.A.1536. At this point, Shumway was trying to access the password bank

6

on Bendann's phone, which again required unlocking.   J.A.1540, J.A.1563-1565.
To Shumway, Markel said aloud, "070184."   J.A.1536-J.A.1538.   Then, to
Bendann, she said for a second time, "070184."   J.A.1536.   In response to Markel's
second statement, Bendan "confirmed 'Yes.'"   J.A.1537.   By then, however, Mar-
kel had deduced the passcode as 070184 and had already "relay[ed] [it] to Mr. Shum-
way" before Bendann chimed in.   J.A.1538-1539.

    **c.**   At the hearing, J.A.1608-1609, and as memorialized in its later written
order, J.A.27-30, the court denied the motion to suppress.   It found that Bendann
had acted "voluntarily, perhaps even reflexively," when he entered the passcode into
his phone.   J.A.30.   It also made a number of other relevant findings:   Markel ad-
vised Bendann that "the warrant extended to the use of Defendant's face and hands
to unlock his electronic devices."   J.A.28.   Markel "did not lie to or mislead"
Bendann in making this representation.   J.A.30.   Markel "did not say anything to"
Bendann when "the phone requested entry of [his] passcode."   J.A.28.   Bendann,
"unprompted, entered the six-digit passcode into the cellphone."   J.A.28.   And
Markel's actions were "not unlawfully calculated to elicit information."   J.A.30.

    Importantly, the court also found "that whether the code was obtained law-
fully depend[ed] entirely on the initial exchange between Detective Markel and the
Defendant."   J.A.28 n.2 (noting that Bendann "did not disagree with this assessment

7

… during the [suppression] hearing"). For that reason, the court declined to "decide if th[e] subsequent exchange" between Bendann and Markel—in which Markel, after confirming 070184 with Shumway, separately confirmed it with Bendann—"was lawful." In the court's view, Markel had already been "able to deduce" the full passcode before that second exchange with Bendann. J.A.28 n.2.

The court therefore concluded that the exclusionary rule did not apply to bar admission of the evidence obtained from the phone. "[I]n the totality of the circumstances," it wrote, Bendann's "choice to enter his passcode was the product of an essentially free and unconstrained choice." J.A.30 (cleaned up).

### 2. Trial

**a.** Bendann's case went to trial in August 2024. J.A.15-17. On the morning of the first day (August 21), Bendann declined to be transported from the jail to the courthouse. J.A.1752. When the court asked whether Bendann's counsel had any insight on this refusal, counsel replied that they had asked the jail to screen Bendann for suicidal ideation "[j]ust last week." J.A.1754. But "[w]e don't have any basis to raise" competency concerns, counsel added, J.A.1755, and ultimately they agreed with the court's proposal to order (but not drag) Bendann to court.

Ninety minutes later, proceedings resumed with Bendann present. J.A.1755-1756. But the court faced yet another delay. During the recess, Bendann's counsel

8

filed a "motion for psychiatric examination for the determination of mental competency." J.A.77. In that motion, counsel said that the Government had forwarded the recording of a jail call between Bendann and his father in which Bendann, counsel asserted, expressed suicidal thoughts. J.A.77. Now apparently concerned with competency, and backpedaling from their statements less than two hours earlier, Bendann's counsel moved the court for a competency hearing premised on "suicidal ideation." J.A.1762-1764. After a colloquy with Bendann, J.A.1759-1762, J.A.1774-1777, as well as argument from Bendann's counsel and the Government, the court denied the motion, J.A.1777-1778. In the court's view, Bendann had not "colorabl[y] indicat[ed]" that he was "suffering from a mental disease or defect rendering him … unable to understand the nature and consequences of the proceeding against him or to assist properly in his defense. J.A.1778. "On the contrary," the court concluded, "I find that the Defendant mentally is deeply engaged with this process and this proceeding." J.A.1778.

**b.** Over the six-day trial, the Government introduced nearly 200 exhibits and 17 witnesses. Among the witnesses were Minor Victim himself, as well as Minor Victim's Gilman peers, like Wallace Halpert. Halpert testified that Bendann frequently babysat and housesat for his family, who were part of the Gilman community. J.A.1210-1211. He explained that Bendann came off as a friend and would

9

regularly hang out and drink with his students.   Halpert's Gilman classmates, in-cluding Jack Stuzin, James Schloeder, and Tyler Witherspoon—all of whom also testified—confirmed the same.   Halpert also briefly spoke about an incident on Au-gust 26, 2018, when Bendann was housesitting for Halpert, during which Bendann and Minor Victim disappeared for "a little too long."   J.A.1224.   An agent likewise testified about the August 26 incident, and a video of Minor Victim on that date was introduced into evidence.   J.A.1113-1114.

In the middle of Halpert's cross, defense counsel requested a sidebar to ask for the Government's interview notes for Halpert.   J.A.1230-1231.   Counsel said that he had Jencks material from the Government's interview with Halpert's parents, but not from its interview with Halpert.   J.A.1231.   The Government confirmed that it had produced all Jencks material for that witness.   J.A.1231.   Defense coun-sel offered no other basis for seeking the production of the Government's interview notes with Halpert.   J.A.1230-1231.

On August 28, 2024, the jury found Bendann guilty of all counts.

### 3.   Sentencing

Bendann's sentencing was held in January 2025.   The court permitted Minor Victim's parents to make statements at the hearing, to which defense counsel ob-jected.   In its lengthy evaluation of the Section 3553(a) factors, the district court

10

noted the "collateral harms on a nuclear family" from Bendann's conduct but did not specifically mention the parents' statements.   J.A.3282.   Bendann was sentenced to a total term of imprisonment of 35 years.

This timely appeal followed.

## SUMMARY OF THE ARGUMENT

I.    The district court acted well within its discretion in declining to order a competency hearing.   Nothing in Bendann's demeanor or behavioral history gave the court reason to believe that he was unable to understand the charges against him or assist in his defense.   Quite the opposite.   Bendann's crimes required long-term thinking and the ability to manipulate.   His appearances in court revealed someone who was intelligent and attentive.   He displayed more than adequate awareness of his surroundings, as well as a history of consulting with his attorneys.   He disclosed no history of mental illness.   And until the morning of trial, no one, including Bendann's counsel, ever cast doubt on his competence to be tried.

The only evidence of his supposed incompetence was Bendann's newfound suicidal ideation.   But that infirmity does not imply a mental capacity so deficient that trial is impossible.   And the court's conclusion on this front—after an extensive dialogue with Bendann and his attorneys—is owed deference.

II.    The district court did not err in declining to suppress the evidence

11

obtained from Bendann's cell phone after he entered his passcode unprompted.   An "interrogation" for Fifth Amendment purposes includes police actions that the police should know are likely to elicit an incriminating response.   But the police were perfectly free to conduct an interrogation because Bendann did not unambiguously invoke his right to remain silent or right to counsel.   Nor, for that matter, was Bendann under interrogation in the first place.   When Markel held the phone up to his face to unlock it using facial recognition—an action that the search warrant expressly permitted—she had no reason to expect that Bendann would enter his passcode unsolicited.   On top of that, the simple act of entering his passcode was not a testimonial communication that incriminated Bendann, since by itself, it merely established that Bendann owned the phone and used it—neither of which were incriminating admissions in this case.   At any rate, the court's finding that Bendann entered his passcode voluntarily was not clearly erroneous; and that being so, the fruit of this voluntary communication—the evidence obtained from his phone—was admissible at trial.

III.   The district did not clearly err in denying defense counsel's Jencks Act request to compel production of Government interview notes for Wallace Halpert. Counsel did not lay a sufficient foundation for believing that any such notes contained a Jencks Act statement.   Counsel told the court nothing about whether Halpert reviewed the notes and "adopted or approved" them, 18 U.S.C. § 3500(e)(1);

12

whether the notes were a "substantially verbatim recital" of Halpert's statements, *id.* § 3500(e)(2); or even whether counsel had reason to believe they contained impeachment-worthy material.   Instead, counsel said only that it had received the Government's notes from its interview with Halpert's parents, but not from its interview with Halpert.   This was insufficient to trigger an in camera review for Jencks material, much less compel the notes' production.   Regardless, since it did not prejudice Bendann's case (and Bendann barely argues otherwise), any error in the court's decision was harmless.

IV.   Lastly, the district court properly exercised its discretion in allowing the victim's parents to make statements at Bendann's sentencing.   Regardless of whether the parents were themselves "victims" as the Crime Victims' Rights Act contemplates, the court was entitled to hear what they had to say consistent with its latitude under 18 U.S.C. § 3661, which places "[n]o limitation" on the information a court can consider when determining a defendant's sentence.   The parents' statements—describing the cruelty of Bendann's actions and the family's emotional harms—fell comfortably within these liberal bounds.   At any rate, even if the court abused its discretion in considering the parents' remarks, the error was harmless.

This Court should affirm.

13

## ARGUMENT

I.  **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DE-CLINING TO ORDER A COMPETENCY HEARING**

A.  **Standard of Review**

A district court's decision not to order a competency hearing is reviewed for an abuse of discretion, "under which standard this Court may not substitute its judgment for that of the district court; rather, [it] must determine whether the court's exercise of discretion … was arbitrary or capricious."  *United States v. Banks*, 482 F.3d 733, 743 (4th Cir. 2007).

B.  **Nothing in Bendann's Demeanor or Behavioral History Created a Bona Fide Doubt as to His Competence**

The district court properly exercised its discretion in declining to order a competency hearing when nothing in Bendann's demeanor or behavioral history suggested competency problems.   The relevant standard is found in 18 U.S.C. § 4241(a), which requires a court to order a competency hearing "if there is reasonable cause to believe" the defendant is "suffering from a mental disease or defect rendering him mentally incompetent."   In turn, a defendant is mentally incompetent only if he is "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  *Id.*

The Section 4241(a) standard leaves the district court with considerable discretion.  *See United States v. Ziegler*, 1 F.4th 219, 226, 229 (4th Cir. 2021).   What

14

constitutes "reasonable cause" is not subject to a "precise formula," *id.*, nor are there "fixed or immutable signs which invariably indicate the need for further inquiry" into a defendant's competence, *United States v. Moussaoui*, 591 F.3d 263, 291 (4th Cir. 2010) (cleaned up). Rather, competency determinations—including whether to initiate a competency hearing in the first place—require "individualized assessments." *United States v. Bernard*, 708 F.3d 583, 589 (4th Cir. 2013). And those assessments "rely not only on a defendant's behavioral history and relevant medical opinions, but also on the district court's first-hand interactions with, and observations of, the defendant and the attorneys at bar." *Id.* at 593.

Here, the district court's "first-hand interactions with, and observations of," Bendann led it to conclude that no competency hearing was required. *Id.* And nothing in the record offends that conclusion, which is owed this Court's deference.

**1.** On the morning of the first day of trial, the court informed the assembled attorneys that Bendann had "declined to accompany" the U.S. Marshals when they arrived "to collect [Bendann] for trial." J.A.1752. When the court explored with Bendann's counsel the reason for his absence, counsel advised that "[j]ust last week, [counsel] contacted the jail and asked that Mr. Bendann be screened for suicidal ideation." J.A.1754. Nevertheless, counsel added, a defendant "can be competent [yet] be contemplating suicide," and they "d[id]n't have any basis to raise" concerns

15

with Bendann's competence.   J.A.1754-1755.   The court then asked the Marshals "to deliver to [Bendann] a direct instruction" to come to court; an hour-and-a-half later, proceedings resumed with Bendann present.   J.A.1755-1756.

In that hour-and-a-half interim, however, defense counsel filed a "motion for psychiatric examination for the determination of mental competency."   J.A.77. The only reason given for counsel's sudden change of heart was a jail call from the previous day, a recording of which the Government had forwarded.   In that recording, Bendann—as his counsel put it—"alludes to suicide."   J.A.77.   So when proceedings resumed, the court examined defense counsel about this.   It asked how they would "distinguish between the effects of a mental disease or defect and … understandable distress, even resistance to the circumstances."   J.A.1763-1764.   It questioned whether "being stuck on an issue or flat opposed to a certain proposition"—counsel's explanation for why Bendann was unable to assist with his defense—was truly "evidence of mental disease or defect."   J.A.1764-1765.   It probed the "11th hour and 59th minute" timing of counsel's motion, finding that it "reflect[ed] on the credibility" of the competency issues alleged, especially since both attorneys had been representing Bendann for at least eight months.   J.A.1765-1766.   And after listening to the jail call—and after "accepting for purposes of argument" that it was "indicative of suicidal ideation"—the court again asked whether

16

"the mere fact that someone is thinking about suicide" really gave reasonable cause to order a competency hearing.   J.A.1768-1770.   Bendann's counsel offered no good answers to these questions.

The court also heard from Bendann himself.   In a colloquy that spans roughly eight pages of the record, J.A.1759-1762, J.A.1774-1777, the court ensured that Bendann was aware of his surroundings, understood why he was there, and had read the indictments ("Yes, I have.   Multiple times.").   J.A.1759-1760.   The court discussed Bendann's previous appearances in court and confirmed that he had "follow[ed] what was transpiring."   J.A.1760-1761.   It established that Bendann had discussed the case with his attorneys, J.A.1761, which counsel—who had been meeting with Bendann weekly, in person, for the last few months, J.A.1757-1758—likewise validated.   And the court confirmed two other facts with Bendann before ruling on his motion: first, that Bendann presently felt (in his words) "[m]entally, emotionally stable," J.A.1762, and second, that Bendann's alleged difficulties in assisting his lawyers were "because of my detention," not anything else, J.A.1776.

After all this, the court denied defense counsel's motion for a psychiatric examination.   It concluded that "[b]ased on my colloquy with the Defendant, and the overall circumstances that are apparent in the record," Bendann and his counsel had not "created a colorable indication … that the Defendant is suffering from a mental

17

disease or defect rendering him mentally incompetent." J.A.1778. Quite the reverse: "[T]he Defendant here in court is demonstrating a mind that is razor sharp and quite aware of his circumstances and the issues" in his case. J.A.1778.

**2.** The court's conclusion on this front was not an abuse of discretion—it was exactly right. And all three of the relevant considerations show why.

*First*, Bendann's "history of irrational behavior" is nonexistent. *Moussaoui*, 591 F.3d at 291 (cleaned up). At no point until the week before trial, when his counsel asked the jail to screen Bendann for suicidal ideation, had Bendann manifested any kind of mental ailment. For that matter, at no point until 11 a.m. on the first day of trial (and not a minute earlier, J.A.1755, J.A.1756, J.A.1765) had anyone disputed Bendann's competence to be tried—not Bendann's attorneys, not the Government, not the district court, and not any of the magistrate judges who had also interacted with him. On the contrary, his counsel explicitly told the court less than two hours earlier that they did *not* "have a basis" to doubt Bendann's competence, regardless of any suicidal ideation. J.A.1755. This blanket failure by any person to question Bendann's mental capacity—at least, not until the morning of trial—is "powerful evidence" that Bendann was indeed "competent to stand trial." *Beck v. Angelone*, 261 F.3d 377, 389 (4th Cir. 2001).

More than that, the very circumstances of Bendann's crimes—the grooming,

18

scheming, bullying, and stalking—subvert the narrative that his behavioral history involved something less than coherent rational conduct. If anything, they reveal the opposite: that Bendann "was fully capable of cogent thought and complex planning," as well as the "ability to manipulate." *United States v. Landers*, 564 F.3d 1217, 1222 (10th Cir. 2009). These circumstances, too, are "relevant to [the] competency determination." *Beck*, 261 F.3d at 388; *see id.* (circumstances of police interview relevant where defendant "gave rational, responsive answers" and "was cooperative and able to recall and describe events in detail"); *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000) (same); *see United States v. Anzaldi*, 800 F.3d 872, 879 (7th Cir. 2015) (circumstances of offense relevant given "the level of sophistication required to commit the crimes of which [defendant] was convicted").

*Second*, Bendann's demeanor in every court appearance was responsive, attentive, respectful, and composed. He "followed courtroom rules and protocol." *United States v. Neal*, 776 F.3d 645, 657 (9th Cir. 2015). He was never "hysterical or out of control," *Landers*, 564 F.3d at 1222, or even minimally disruptive. Instead, as Bendann himself confirmed on the morning that counsel filed his competency motion, he was "[m]entally and emotionally stable"—and acted like it. J.A.1762. Such behavior seldom creates reasonable doubt about a defendant's incompetence, even with indicia of incapacity that are absent in Bendann's case.

19

*Compare*, *e.g.*, *United States v. Williams*, 113 F.3d 1155, 1160 (10th Cir. 1997) ("hysteria" and uncontrolled sobbing should have created doubt about competence), *with Banks*, 482 F.3d at 743 (obstreperousness and refusal to participate in proceedings did not create doubt about competence); *Landers*, 564 F.3d at 1220, 1222 (behavior that "necessitated [defendant's] physical removal from the courtroom" did not create doubt about competence); *United States v. Davis*, 61 F.3d 291, 304 (5th Cir. 2002) (ingesting 50 anti-depressant pills in suicide attempt during trial did not create doubt about competence).    Needless to say, the behavior exhibited in these cases is far afield from Bendann's cooperative demeanor below.

*Finally*, the court had no "prior medical opinion" on which to rely indicating that Bendann suffered from mental illness.    *Moussaoui*, 591 F.3d at 291 (cleaned up).    This is true even though his counsel had asked the jail's healthcare professionals to screen Bendann for suicidal ideation—with nothing, apparently, to show for that request.    And while Bendann now argues that the absence of any such medical opinion means that he should win, he has it exactly backwards.    A court must find reasonable cause to doubt the defendant's competence *before* ordering the "psychiatric or psychological examination" that Section 4241(b) contemplates.    18 U.S.C. § 4241(b).    It should not, as Bendann declares, "order[] a psychiatric examination for the purpose of [generating] a medical opinion" that does not already exist in the

20

record, Br. 28, only for the court to *then* find (or not find) the requisite reasonable cause.   As with any motion, the burden was on the movant (Bendann) to introduce evidence supporting his request for a competency hearing.   The fact that he lacked a prior medical opinion that might have done so was Bendann's problem, not the court's.

### C.    Bendann's Remaining Arguments Are Unavailing

Bendann's remaining arguments are easily dispatched.   He first insists that the "'reasonable cause' standard [was] met" because he had "a documented history of suicidal ideation before … the morning of trial."   Br. 26.   If by "documented history," Bendann means his counsel's request that he be screened for suicidal ideation the week before trial, that is true.[2]   But that is not the sort of longstanding history that should have triggered a bona fide doubt as to Bendann's competence, nor was it particularly well documented.   After all, counsel's screening request—as far as the record shows—did not lead to any finding by a healthcare professional that Bendann was actually suffering from suicidal ideation.   Nor, as Bendann elsewhere points out, was his counsel "qualified" to make that diagnosis in the first place.   Br. 30.

---

[2]   Bendann misreads the record when he says that counsel's screening request came "the week prior to the suppression hearing."   Br. 26; *see* J.A.1754.

21

As for Bendann's suggestion that the Government, too, was worried about his competence—hence why it forwarded the jail call recording to defense counsel—the Government clarified otherwise at the hearing. It "forwarded that one call" mostly because "we were curious … if [Bendann] had made any comments" to counsel "about whether he was planning to show up today." J.A.1771. It was not concerned about Bendann's fitness to stand trial—and indeed, from the Government's perspective, the recording all but confirmed that Bendann "[was], in fact, competent." J.A.1771.

Bendann next contends that suicidal ideation "is a mental disease or defect," Br. 26, and that "no party doubted Mr. Bendann's current battle with suicidal ideation," Br. 27. Even if the former is true, the latter is just wrong. As already discussed, no one, except his counsel, thought Bendann was suffering from suicidal ideation. Certainly Bendann did not think he was, having told the court that he was "[m]entally and emotionally stable." J.A.1762. No healthcare professional confirmed counsel's concern, either. And the court only "accept[ed] for purposes of argument" that the jail call was "indicative of suicidal ideation." J.A.1769-1770. It did not swallow that theory whole, much less swallow the notion that suicidal ideation translates into incompetence. *See* J.A.1754-1755 (in dialogue with counsel before competency motion, observing that "anyone who is contemplating suicide is

22

in terrible straits[,] … but the legal question is whether he's competent").

And rightly so.   Although Bendann claims that his suicidal ideation—which the Government, too, now "accept[s] for purposes of argument," J.A.1769—left him unable "to consult with his attorneys effectively," Br. 28, the record contains no indication of this.   If anything, as Bendann himself professed, it was his pretrial detention—and his diminished access to documents and a laptop—that was "directly hampering my ability to assist."   J.A.1776.   His counsel, meanwhile, confirmed that they had been visiting Bendann frequently in the months before trial, J.A.1758, and had been "discussing and preparing for this case," J.A.1764.   They said nothing *during* trial, either, indicating that Bendann was unable to assist.   These facts belie the notion that Bendann—whether or not he "work[ed] well with his lawyers"—lacked what the competency standard requires: "the *capacity* to understand, the *capacity* to assist, and the *capacity* to communicate with his counsel."   *United States v. Cabrera-Rivas*, 142 F.4th 199, 210-211 (4th Cir. 2025).

Worse for Bendann, the cases are legion rejecting the argument that suicidal ideation, without more—and sometimes even a suicide attempt—is enough to call a defendant's competency into question.   *See United States v. Rakestraw*, No. 21-4436, 2023 WL 1519518, at *4 (4th Cir. Feb. 3, 2023) (no reasonable cause despite defendant's "recent suicide attempt," since "[p]reviously, we have found a defendant

23

incompetent only when his attempted suicide coincided with additional factors"); *United States v. Fauntleroy*, 508 F. App'x 238, 241 (4th Cir. 2013) (per curiam) (no reasonable cause despite "previously attempted suicide," as well as mild mental retardation).[3]  This makes sense.  "Not every manifestation of mental illness demonstrates incompetence to stand trial," nor does "low intelligence, mental deficiency, []or bizarre, volatile, and irrational behavior."  *Burket*, 208 F.3d at 192 (cleaned up). The relevant question remains not whether Bendann was mentally ill, but whether the court was furnished with "reasonable cause" to believe that such illness impaired his ability "to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(a).  Bendann's suicidal ideation did not supply that cause.

Lastly, Bendann doubles-down on his insistence that "a psychiatric examination was required" because, without it, "there is a question as to whether or not the evidence on the record is sufficient enough to support a finding of competency." Br. 28, 30.  But medical opinions are never "required" before a court can adjudge a

---

[3]  *Accord Davis*, 61 F.3d at 304 (no reasonable cause despite "suicide attempt"); *United States v. Collins*, 834 F. App'x 537, 541 (11th Cir. 2020) (per curiam) ("[A] defendant is not incompetent based solely on suicidal ideations[.]"); *West v. Grounds*, 708 F. App'x 476, 478 (9th Cir. 2018) (mem.) ("Suicide attempts do not … necessitate a bona fide doubt as to competence[.]"); *Murray v. Quarterman*, 243 F. App'x 51, 54 (5th Cir. 2007) (no reasonable cause despite "depression and suicidal ideation").

defendant's competency.   *See United States v. Davis*, 801 F. App'x 80, 85 (4th Cir. 2020) (per curiam) ("evidence [of incompetence] *may* include … relevant medical opinions" (cleaned up) (emphasis added)); *cf. Jermyn v. Horn*, 266 F.3d 257, 298 (3d Cir. 2001) (finding that "the information the trial court possessed was enough to" deny competency hearing, despite "there [being] no medical opinions").   No doubt they are helpful if they exist—and incidentally, their absence in Bendann's case should come as no surprise, given the novelty of his purported issues.   But at the end of the day, medical opinions are just one piece of the puzzle.

An equally relevant piece of the puzzle, as Bendann's own cited case recognizes, is "the trial judge's observation of [the defendant's] conduct." *Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (cited at Br. 28-30).   And this, too, makes sense. "[D]istrict courts are in the best position to make competency determinations" because they have a superior vantage point from which "to observe [a defendant's] demeanor and make judgments about his mental abilities," often through repeated interactions over many months or years.  *Bernard*, 708 F.3d at 591, 593.   This front-row perspective is all the more valuable where, as here, a defendant introduces almost nothing into the record to corroborate his newfound claim.   And in Bendann's case, drawing from an extensive dialogue with Bendann and his counsel, multiple pretrial hearings, and an otherwise uneventful docket, the court saw no

25

reason to believe that a competency hearing was necessary. This "first-hand" determination is entitled to considerable deference. *Id.* at 593.

## II. THE DISTRICT COURT DID NOT ERR IN DENYING BENDANN'S MOTION TO SUPPRESS THE EVIDENCE FROM HIS CELL PHONE

### A. Standard of Review

"When reviewing a ruling on a suppression motion," this Court "review[s] the district court's legal determinations de novo and factual findings for clear error." *United States v. Rush*, 808 F.3d 1007, 1010 (4th Cir. 2015). The evidence must be viewed in the light most favorable to the Government, *id.*, and the Court may affirm "on any ground supported by the record," *United States v. Brown*, 701 F.3d 120, 125 (4th Cir. 2012) (cleaned up).

### B. The Admission of Evidence Obtained From Bendann's iPhone Did Not Violate His Fifth Amendment Rights

The district court did not err in refusing to suppress the evidence obtained from Bendann's cell phone. As the court itself recounted, the police showed up to Bendann's house after 5:00 a.m. J.A.27; J.A.1542. They had a sealed search warrant that, among other things, allowed the police to use Bendann's biometric data—his face and fingerprints—to unlock his electronic devices. J.A.1516, J.A.1518-1519.[4] When Detective Markel arrived, she Mirandized Bendann, who "stated that

---

[4] Bendann does not contest this search warrant. Br. 2 n.2.

his attorney had advised him not to talk about the case." J.A.1529. Markel also explained that the warrant "extended to the use of Defendant's face and hands," J.A.28, which "was true and accurate," J.A.1609. Later, the police found an iPhone on Bendann's bedroom nightstand, so Markel held the phone up to Bendann's face for facial recognition. J.A.1532-1533. When the screen bounced and the number pad appeared, Bendann, "without prompting, put his passcode into the phone." J.A.1533; *see* J.A.28. Markel "did not say anything to the Defendant," J.A.28, let alone "direct Mr. Bendann to supply" the passcode, J.A.1609. And because she "was standing next to him," Markel "could clearly see the first four digits" of the passcode, J.A.1532, J.A.1534, which allowed her "to deduce the final two digits … because the six-digit code comprised the Defendant's date of birth," J.A.28.

After a two-plus hour suppression hearing, J.A.1507-1609, and in a written order that followed, J.A.27-30, the court concluded that these circumstances did not require exclusion. For at least five reasons, that result was entirely correct. One, Bendann did not unambiguously invoke his right to remain silent, so Markel was free to interrogate him. Two, Markel's act of holding Bendann's phone up to his face was not an "interrogation" to begin with, because Markel had no reason to believe it would lead Bendann to enter his passcode unsolicited. Three, Bendann's act of entering his passcode was not a testimonial communication that incriminated

27

him, so his Fifth Amendment rights did not cover that act.   Four, the entry of his passcode was plainly voluntary, and the exclusionary rule does not apply to evidence derived from voluntary communications.   And five, the inevitable discovery doctrine alternatively kicks in to support the denial of suppression here.

### 1.    Bendann Did Not Unambiguously Invoke His Fifth Amendment Rights

To begin with, Bendann did not unambiguously invoke his right to remain silent or have his attorney present, so he cannot now complain of a Fifth Amendment violation.   "To invoke the right to remain silent or the right to counsel and thereby cut off questioning, the suspect's invocation must be 'unambiguous.'"   *United States v. Abdallah*, 911 F.3d 201, 210 (4th Cir. 2018) (cleaned up).   "An invocation is unambiguous when a reasonable police officer under the circumstances would have understood the suspect intended to invoke his Fifth Amendment rights."   *Id.* (cleaned up).   This "objective inquiry," *id.*, looks not only at the suspect's words but also "the circumstances leading up to the request," which can likewise "render it ambiguous," *Smith v. Illinois*, 469 U.S. 91, 98 (1984).   A suspect's equivocations ("maybe," "I think," "I might," "I don't know"), clarifying questions, and comments that "merely mention[] an attorney" are not enough to invoke the right.   *Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 529 (4th Cir. 2016); *see United States v.*

28

*Johnson*, 400 F.3d 187, 195 (4th Cir. 2005); *United States v. Younger*, 398 F.3d 1179, 1187-1188 (9th Cir. 2005).

Bendann's statements fall into this camp. He told Markel only that "his attorney had advised him not to talk about the case." J.A.25. He did not ask for the attorney, nor did he say anything about whether *he* did not want to talk about the case. And the full exchange between Bendann and Markel only confirms that he did not clearly invoke either his right to remain silent or his right to counsel.[5]

---

[5] Simultaneous with its response, the Government is moving for leave to file a supplemental appendix that includes the bodycam footage that was introduced as an exhibit and played at the suppression hearing. As heard in that footage, the full exchange after Markel advised Bendann of his *Miranda* rights goes:

> Markel: Obviously, I would like to talk to you in reference to this investigation. I think there's a lot to be learned on both ends here. Is that something you're willing to do?
>
> Bendann: Can I do it with my attorney? She said not to say anything to anyone, and I don't know, you know, what the circumstances … [trails off]
>
> Markel: Sure, sure. So in circumstances like that, what we'll do is we'll probably just make contact with your attorney and make arrangements at a later date to set a time to speak.

S.A.8:32-9:03 (bodycam). This context underscores the ambiguity of Bendann's request. His question ("Can I do it with my attorney?") with the comment ("I don't know … the circumstances") suggest more that he was exploring his options or seeking a better understanding of his rights than anything else. *Cf. United States v. Shabaz*, 708 F.3d 938, 815 (7th Cir. 2009) (finding ambiguous invocation with: "Am I going to be able to get an attorney?"); *United States v. Doe*, 170 F.3d 1162, 1166 (9th Cir. 1999) (same, with: "What time will I see a lawyer?"); *Lord v. Duckworth*, 29 F.3d 1216, 1220-1221 (7th Cir. 1994) (same, with: "I can't afford a lawyer but is there anyway I can get one?").

Instead, Bendann's statements were "clear on [only] two facts: (1) [Bendann] had retained counsel, and (2) [Bendann]'s counsel told him not to [talk]." *Orellana v. Madden*, 789 F. App'x 34, 35 (9th Cir. 2019) (mem.). "No other information was conveyed in the statement[s]," *id.*, much less the sort of invocation that should have alerted a reasonable officer that he was requesting his lawyer (or requesting to remain silent until his lawyer was present).

Other cases agree. In *Sechrest v. Ignacio*, 549 F.3d 789, 806 (9th Cir. 2008), the statement "that his lawyer had advised him to 'keep his mouth shut'… was not a clear invocation of the right to remain silent." "Although [the defendant] was indicating what his lawyer had advised him to do," the Ninth Circuit reasoned, "it was not clear that [the defendant] was explaining his own intentions." *Id.* In a similar case, the defendant asserted "that 'he wasn't sure whether he should talk to [the agent] because he was afraid it would piss his lawyer off.'" *United States v. Walker*, 272 F.3d 407, 412 (7th Cir. 2001). This, too, the Seventh Circuit ruled, was "not … an unambiguous or unequivocal request for a lawyer." *Id.* In yet another case, a defendant who said, "I don't know. But if [my lawyer] said to stop it I don't want to do what he said not to do[,]" was likewise unclear in his desire to remain silent. *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994). This was especially true, the Eleventh Circuit noted, given that the defendant kept talking

30

despite his lawyer's advice—a case that only emphasizes, for Bendann's purposes, that a statement about what his *attorney* desired should not be taken as a statement about what *he* desired.

In short, Bendann's statements did not qualify as a decisive, unambiguous invocation of his Fifth Amendment rights. And the court's contrary conclusion below, which it reached without any examination, is no bar to holding otherwise now. *See Brown*, 701 F.3d at 125 (the Court may "affirm on any ground supported by the record" (cleaned up)); *Correll v. Thompson*, 63 F.3d 1279, 1286 (4th Cir. 1995) ( "whether a defendant has unambiguously invoked his right to counsel" has been "apparently treat[ed] … as [a question] of law" in this Circuit, although no panel has "directly addressed" it).[6] Nor is Markel's own reaction to Bendann's statements an impediment here, since the invocation inquiry asks what "an objective listener" would conclude about the statements, not what the officer concluded in real life. *United States v. Williams*, 446 F. App'x 587, 590 (4th Cir. 2011) (per curiam); *see*

---

[6] Other courts of appeals also treat the question as one of law, reviewing the district court's "factual findings concerning the words a defendant used … for clear error," while reviewing "de novo" the ultimate question of "whether the words actually invoked the right to counsel." *Younger*, 398 F.3d at 1185 (9th Cir.); *see United States v. Brown*, 287 F.3d 965, 971 (10th Cir. 2002) (same); *see also United States v. Leyva*, No. 18-2440, 2020 WL 2614617, at *4 (6th Cir. 2020) (discerning "no clear error in the district court's interpretation" of defendant's utterance, and "[w]ith the utterance so understood," finding no error in the court's "conclu[sion] that [the utterance] failed to unambiguously invoke the right").

*Abdallah*, 911 F.3d at 210.   Accordingly, because Markel was free to question Bendann, she did not do anything wrong when she held the cell phone up to his face.

> **2.** **Markel Had No Reason to Believe That Holding Bendann's Phone Up to His Face Was Likely to Elicit His Unprompted Response**

At any rate, Bendann was not subject to an "interrogation" to begin with, because Markel had no reason to expect that holding the iPhone up to his face would elicit the response that it did: the unprompted entry of his passcode.   An "interrogation" for Fifth Amendment purposes "includes not only 'express questioning' but also its 'functional equivalent'—'words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response,'" *Grueninger*, 813 F.3d at 527 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980)).   The "focus" of this inquiry is "on foreseeability": whether the officer "should reasonably have foreseen th[e] result" of her interaction with the defendant. *United States v. Johnson*, 734 F.3d 270, 277, 278 (4th Cir. 2013).   "The suspect's subjective experience of the questioning is relevant," but "only to the extent that it should have been anticipated by the officers." *Id.* at 276.   Otherwise, the exclusionary rule would have no point.   "[T]o suppress evidence due to a question's … coercive effect on a suspect, when that effect could not reasonably have been foreseen, would have no desirable deterrent effect at all." *Id.* at 278.

Markel could not have reasonably foreseen that Bendann would enter his passcode unprompted.   She did not ask Bendann to do so.   She did not say anything to Bendann, or to her colleagues, or aloud to herself.   She did not hold the phone up to his face for more than a few seconds before Bendann went to key in the passcode. *See* S.A.29:19-29:25 (bodycam showing that, between Markel holding the phone up to Bendann's face and her taking it away, six seconds elapsed at most).   Her entire purpose in holding up the phone was to unlock it using Bendann's biometrics, not his passcode.   J.A.1533-1534.   And the court expressly found that Markel's actions were "not objectively calculated to elicit that information," J.A.1609, a factual finding paid deference on appeal.   *See United States v. Payne*, 954 F.2d 199, 203 (4th Cir. 1992).

Even so, Bendann reckons that Markel "knew" that Bendann would enter his passcode when facial recognition did not work.   Br. 37.   Barring that, he reckons that she at least "designed" her actions to have that effect.   Br. 43.   But both arguments rest on a misreading of the record, as well as the court's factual findings. When Markel said "yes" to the prosecutor's question at the suppression hearing— "Was it your intention … to obtain the date of birth and passcode[?]"—neither Markel nor the prosecutor were referring to Markel's act of holding up the phone. J.A.1540.   At that point in the hearing, the Government was eliciting testimony

33

about what Markel would have done in the inevitable-discovery world, *infra* at 42, had Bendann not volunteered his passcode.   As for the court's comment that Markel "may have … intended to take advantage of an opportunity," J.A.30, the court was not surmising that she had "designed" the opportunity, Br. 43—only that when it arose, she did not quell it, for example, by suddenly dropping the phone (which she was not required to do).   At any rate, in the same breath, the court denied that Markel's actions were "calculated to elicit information," J.A.30—a finding that Bendann fails to even mention.

Bendann also boldly submits that "the *only* foreseeable answer" to Markel's actions was that Bendann would enter his passcode.   Br. 42 (emphasis added).   At least part of this argument seems to be that anyone in Bendann's shoes would have done so, since few can resist obeying an iPhone's passcode prompt—a prompt that Markel "adopted" when she "continue[d] to hold the iPhone to [his] face," Br. 42. But for one thing, to whatever extent Markel "continue[d]" to hold up the phone, it was for no longer than a few seconds, given the sequence of events to which Markel testified.   *See* J.A.1533-1535; J.A.1553-1554; S.A.29:19-29:25 (bodycam).   That sequence suggests the whole episode unfolded in rapid succession.   Nor was the "continu[ation]" of Markel's actions (if at all) any less explained by an attempt to

34

re-trigger facial recognition or reposition the camera, than it is by an attempt to in-veigle Bendann into entering his passcode.

More to the point, the idea that Bendann's unprompted, unsolicited act of entering his passcode was "the only foreseeable" outcome of Markel's actions ignores the bevy of outcomes that would have been far more foreseeable in this situation—one of them being that the facial recognition feature worked, and that Bendann's biometrics unlocked his phone. Surely this was the outcome Markel actually expected as she held the phone up to his face. And failing that, Bendann could have responded in any number of nonincriminating ways. He could have just sat there. He could have waited for Markel to say something. He could have shifted the phone or his face to retry the facial recognition option.

In other words, Markel's act of holding up the phone "was not [an act] that sought or required" an incriminating response, much less the specific incriminating response that Bendann insists was the only foreseeable outcome. *Payne*, 954 F.2d at 203. At best, the gratuitous entry of his passcode was a "possible" outcome. *Johnson*, 734 F.3d at 277. It might have even been an outcome that "law enforcement," broadly speaking, would have viewed as "not unreasonable." J.A.1555. But what *other* officers might have thought (or what Markel imagined other officers might have thought) says nothing about what *Markel* thought, especially when she

35

elsewhere made clear that she believed that Bendann's biometrics would be enough. *See* J.A.1533-1534 ("the reason" Markel included "authorization to seize biometric data" in the warrant was "to unlock this cell phone"). At any rate, "not unreasonable" is not the standard, nor is "possibility." *Johnson*, 734 F.3d at 277. An interaction does not become an interrogation merely because a suspect might "possibly" offer a response that was neither bargained for nor invited.

### 3. Bendann's Act of Entering His Passcode Was Not a Testimonial Communication That Incriminated Him

Even if Markel should have known that holding the phone up to Bendann's face was likely to elicit the entry of his passcode, that response was not a testimonial communication that incriminated him. The self-incrimination clause "applies only when the accused is compelled [1] to make a testimonial communication [2] that is incriminating." *Fisher v. United States*, 425 U.S. 391, 411 (1976). "While a testimonial communication is most often in verbal or written form, it may also be made by an act." *United States v. Oloyede*, 933 F.3d 302, 309 (4th Cir. 2019). Either way, the "testimonial communication '*must itself*, explicitly or implicitly, relate a factual assertion or disclose information' that is incriminating" before the privilege against self-incrimination attaches. *United States v. Sweets*, 526 F.3d 122, 127 (4th Cir. 2007) (quoting *Doe v. United States*, 487 U.S. 201, 210 (1988)). "This requirement removes from the Fifth Amendment's protection a myriad of compelled acts

36

that, while leading to the discovery of incriminating evidence, do not themselves make an incriminating factual assertion." *Id.*

In Bendann's case, the simple act of typing in his passcode did not incriminate him. No doubt it "le[d] to the discovery of incriminating evidence"—including text messages with and video files of the victim[7]—but it did not itself "make an incriminating factual assertion." *Id.* The only factual assertion it made was not incriminating at all, or at least, not relevantly so. Bendann's act "of unlocking the iPhone" communicated that the phone "belonged to [him]"; yet "the ownership of the phone was neither an issue before the district court at the suppression hearing nor an issue before the jury." *Oloyede*, 933 F.3d at 309; *see also Innis*, 446 U.S. at 301 n.5 ("By 'incriminating response' we refer to any response … that the *prosecution* may seek to introduce at trial.").

Nor was Bendann's act a testimonial one. True, this Court in *Oloyede* observed that the defendant had entered her phone's passcode "out of the FBI[] agent's view" before finding this act nontestimonial. *Oloyede*, 933 F.3d at 309. But on

---

[7] None of the videos was actually found on Bendann's phone, since he purported to delete them. They were instead recovered from other caches of data, like Bendann's iCloud account, which law enforcement accessed using the same cell phone passcode or another password that they discovered on his phone. Regardless, the evidence admitted at trial was derivative evidence from Bendann's entry of the passcode, not the passcode itself or any of the facts communicated by its use.

the sliding scale between "g[iving] the passcode to the agent for the agent to enter" and "typing in the passcode out of the [] agent's view," *id.*, Bendann's case is far closer to the latter scenario than the former.    Bendann did not verbalize his passcode to anyone, or write it down, or even intentionally disclose it.    As in *Oloyede*, he "simply used the unexpressed contents of [his] mind to type in the passcode [him]self."  *Id.*  The fact that Markel was present and was able to catch the first four digits of his passcode (but not the last two) should not transform his act into a communicative one.

At any rate, equally (if not more) dispositive in *Oloyede* was the fact that—there, as much as here—the only assertion communicated by the act of unlocking the phone was the defendant's "ownership" of it, which was not at issue.  *Id.*   This rule—that an act is not an incriminating testimonial communication if it does not provide relevant facts—intersects with the doctrine of "foregone conclusion." *Fisher*, 425 U.S. at 411.    That doctrine focuses on whether the Government already knows the testimony that is implicit in the defendant's act, such that the act "adds little or nothing to the sum total of the Government's information."  *Id.*; *accord Sweets*, 526 F.3d at 128.    So when, for example, "after invoking his right to consult with an attorney," a defendant "reveal[s] the password" to his device, no Fifth Amendment problem arises.  *United States v. Gavegnano*, 305 F. App'x 954, 956

38

(4th Cir. 2009) (per curiam). "Any self-incriminating testimony that he may have provided by revealing the password was already a 'foregone conclusion' because the Government independently … [knew] that [the defendant] was the sole user and possessor" of the device. *Id.*

So it is here. Bendann did not dispute in his suppression motion, did not protest at trial, and does not now resist that the only testimony latent in his act of unlocking the phone—that he owned and controlled the phone—concerned facts that the Government already knew and were irrelevant to its proof at trial. After all, the police found the phone on his nightstand, in his bedroom, in the house that he owned, and where he lived alone. J.A.1532-1532; J.A.3309. Since "neither admission substantially incriminate[d]" him, Bendann's act did not implicate the self-incrimination clause. *Sweets*, 526 F.3d at 128.

### 4. Bendann's Act of Entering His Passcode Was Voluntary, and the Exclusionary Rule Does Not Apply to the Derivative Evidence of Voluntary Communications

Regardless, Bendann's act of unlocking his phone was unquestionably voluntary. The district court expressly so found, and nothing about its finding was clearly erroneous. Bendann's only argument otherwise—albeit not in so many words—is that after a "lengthy harangue," Markel used "coercive" police tactics to induce Bendann into volunteering his passcode. Br. 38-40. But these contentions again

ignore the "substantial deference" owed the lower court, particularly when it comes to "the circumstances in which [a defendant's] statements are made." *Payne*, 954 F.2d at 203.

More than that, they run afoul of the record. Markel did not "inaccurately describe[]" the contents of the sealed warrant, Br. 39, when she told Bendann that she "may need his face or hands" to unlock his devices, J.A.1552. *Compare* J.A.1552, *with* J.A.28. That was exactly what the warrant allowed. *See* J.A.1518-1519. And while Bendann ascribes villainy to Markel's use of the word "hands" instead of "fingerprints," nothing in the record suggests her word choice was intended to fool Bendann into thinking that he was obligated to enter his passcode (using his "hands," apparently, which is also an odd choice of words if it meant to convey pecking an iPhone screen). Nor does the record suggest that Bendann himself clocked that hyperliteral distinction, or "would suddenly be moved" to enter his passcode because of it. *Innis*, 446 U.S. at 303. Far more believable is that Bendann entered his passcode "reflexively," J.A.30, or even because he thought the police would find nothing inculpatory on there, given that he had deleted the videos from his phone (but not, as it turned out, permanently expunged them). *Supra* note 7.

Bendann's additional contention that Markel's behavior constituted a "lengthy harangue," Br. 38 (quoting *Innis*, 446 U.S. at 303), borders on the absurd. Markel's entirely silent, seconds-long act of holding the phone up to Bendann's face could not be more different from a "lengthy harangue," even assuming it directly followed Markel's "detail[ed]" explanation of the sealed search warrant, Br. 38. It did not, of course. Markel did not present the phone to Bendann's face until more than 20 minutes had passed from the sealed warrant discussion. J.A.71-72. Regardless, his interactions with Markel from start to finish were defined by courtesy. Bendann was not "subjected to shocking scare tactics." J.A.30. He was not cuffed. J.A.28. And he was "sitting peacefully, speaking calmly with Detective Markel" both before and after volunteering his passcode. J.A.30. Bendann does not contest these facts.

The upshot is that the court did not err, much less clearly err, in finding that Bendann entered his passcode voluntarily. And that being so, Bendann was not entitled to suppress the evidence found on his phone. That evidence was not derivative of a constitutional violation because Bendann voluntarily entered his passcode, and the "Fifth Amendment prohibits use by the prosecution … only of *compelled* testimony." *Oregon v. Elstad*, 470 U.S. 298, 306-307 (1985). Put differently, the self-incrimination clause is simply "not implicated by the admission into evidence

of the physical fruit of a voluntary statement." *United States v. Patane*, 542 U.S. 630, 636 (2004) (plurality). And "because the fruit of that *voluntary* communication," though elicited after Bendann invoked the right to remain silent, is "nonetheless … admissible into evidence," that ends the game for Bendann. *Oloyede*, 933 F.3d at 309; *see United States v. Kimbrough*, 477 F.3d 144, 147 n.1 (4th Cir. 2007); *see also United States v. Curry*, 158 F.4th 153, 159 (3d Cir. 2025) ("fruit of the poisonous tree" doctrine does not apply to evidence derived from voluntary statements elicited after a suspect invokes *Miranda* rights). The court was right to conclude that "the exclusionary rule does not apply." J.A.29.

### 5. Bendann's Passcode Would Have Been Inevitably Discovered Anyway

Lastly, the evidence obtained from Bendann's phone was admissible under the inevitable discovery doctrine. That exception to the exclusionary rule allows the Government to use illegally obtained evidence so long as it has shown "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). The Government meets this standard in two different ways.

*First*, pursuant to the same search warrant that led Markel to hold the phone up to Bendann's face initially, the police would have unlocked Bendann's phone using facial recognition. The warrant expressly authorized them to do so, and it did

not set a limit on how many times they could try. As Markel testified, it was her "intention … to obtain the date of birth and passcode for that cell phone" even if Bendann had not volunteered it, J.A.1540, and so she would have. Bendann—who does not mention the possibility of additional attempts at facial recognition let alone the warrant authorizing them—offers no reason to doubt Markel's counterfactual efforts.

*Second*, while purporting to disavow any factfinding, the district court observed that because "the passcode was the Defendant's birthday," "it was reasonably likely that law enforcement would have tried such a commonly used passcode when attempting to unlock the phone." J.A.30. This fact, too, undergirds inevitability. At the hearing, Markel agreed that a birthday is "not [an] uncommon" passcode for an electronic device, J.A.1555-1556, relayed (again) her "intention … to obtain the date of birth and passcode for that cell phone," J.A.1540, and also extensively testified to her belief that Bendann's passcode was indeed his birthday (albeit after she saw the first four digits), J.A.1535-1538. Although Bendann bemoans the lack of any testimony about the "standard operating procedure for trying to access an electronic device to which [police] do not have the passcode," J.A. 46, such testimony is not always needed. Where, as here, "compelling facts establish[] that the

disputed evidence inevitably would have been discovered," the Government has sat-isfied its burden.   *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995).

### C.    Bendann's Remaining Arguments Do Not Persuade

None of Bendann's remaining contentions moves the needle.   In fact, some of them the Government has no quarrel with.   The Government does not dispute that Bendann was "in custody" for *Miranda* purposes.   *See* Br. 9-10.   The Govern-ment likewise does not dispute that Markel's act of placing the phone in front of Bendann's face was, strictly speaking, a police action.   *See Innis*, 446 U.S. at 301. It was a *lawful* police action—for all the reasons already discussed, as well as for the fact that the search warrant expressly permitted it—but a police action nonetheless. As for the smattering of other arguments not already addressed, they do not help Bendann.

*First*, in insisting that "Markel's action … was not normally attendant to arrest and custody," Br. 36-37, Bendann reprises the same definitional error that infects his whole argument.   The relevant "action," he says, is not the act of holding the phone up to his face, but the act of continuing to hold the phone up after facial recognition failed.   But as elsewhere discussed, those acts are not separate; they comprise the same, single episode.   The testified-to sequence of events suggests that a few sec-onds, at most, elapsed between the facial recognition failure and Bendann's

44

unprompted entry of his passcode. *See also* S.A.29:19-29:25 (bodycam suggesting

that six seconds elapsed at most).

So in fact, there is every reason to view the episode—the single act of holding

the phone up to Bendann's face—as an act "normally attendant" to custody. Cer-

tainly it was an act "attendant to [the] legitimate police procedures" surrounding the

custody of *Bendann*, since Markel had a warrant that specifically provided for the

use of Bendann's biometrics. *United States v. Ferj-Inostroza*, 129 F.3d 1261, *1

(4th Cir. 1997) (per curiam) (table).

*Second*, Bendann dedicates a few lines of his brief decrying the "bad police

behavior" displayed in the second exchange between Bendann and Markel after she

held the phone up to his face. Br. 40. As a refresher, Markel—who had only seen

Bendann key in the first four digits of his six-digit passcode—went back to her files

to confirm Bendann's date of birth, surmising that it made up his full passcode. She

did so and said aloud to her colleague, "070184." She then turned to Bendann and

said aloud, "070184," to which he replied, "Yes." Bendann now cries foul on this

second exchange, asking the Court to apply the exclusionary rule because his "is not

a case where police officers acted innocently." J.A.40.

But the court below found as a matter of fact—and his counsel below did not

contest, J.A.28; J.A.1583-1584—that "Markel had already deduced the passcode"

by the time of the second exchange, J.A.28.   As this finding is not clearly erroneous,
Bendann offers no reason (besides rhetoric) to sweep in Markel's later conduct as a
basis for revisiting the court's suppression ruling here.   At any rate, the second ex-
change was not nearly as problematic as Bendann makes it seem.   As far as the
record shows, Markel was not confirming Bendann's passcode when she voiced
"070184" aloud; she was confirming his birthday, which was not an inquiry that
invited an incriminating response.   J.A.1537-1538.   Any which way it is sliced,
Bendann's suppression request falls short.

## III. THE DISTRICT COURT DID NOT CLEARLY ERR IN DENYING DE-FENSE COUNSEL'S JENCKS ACT REQUEST FOR INTERVIEW NOTES FOR WALLACE HALPERT

### A. Standard of Review

A district court's denial of a request for purported Jencks material is reviewed
for clear error.   *United States v. Savage*, 885 F.3d 212, 220 (4th Cir. 2018).
"Jencks Act violations constitute harmless error when they result in no prejudice to
the defense."   *United States v. Morales*, 775 F.2d 559, 567 (4th Cir. 1985).

### B. Defense Counsel Failed to Provide a Sufficient Foundation for His Jencks Act Request for the Halpert Interview Notes

The district court did not clearly err in declining to require production of the
Government's interview notes for one of its witnesses, Wallace Halpert, without first
conducting an in camera review of the notes.   This is because defense counsel failed

to lay a "proper foundation" for his Jencks Act request, *id.*, which obligates a defendant to "make a sufficiently specific request and provide some indication" that the witness actually gave a Jencks statement, *United States v. Roseboro*, 87 F.3d 642, 645 (4th Cir. 1996). In turn, "[n]otes taken by … government agents during a pretrial interview of a witness" do not qualify as a Jencks statement unless "the witness has reviewed them in their entirety" and "formally and unambiguously approved them—either orally or in writing—as an accurate record of what he said during the interview." *United States v. Smith*, 31 F.3d 1294, 1301 (4th Cir. 1994); *see* 18 U.S.C. § 3500(e)(1). In other words, a defendant seeking to compel production of interview notes must establish—"typically … through cross examination of the witness whose statements the defendant is attempting to obtain"—that the witness reviewed and approved such notes, making them a discoverable Jencks statement. *United States v. Boyd*, 53 F.3d 631, 634 (4th Cir. 1995). Bendann's counsel did no such thing.

Before counsel made his Jencks Act request for Halpert's interview notes, the only relevant question he asked of Halpert was whether the Government agents who interviewed him were "taking notes." J.A.1230. Halpert's answer—"I'm not sure. Probably."—lays almost no foundation for counsel's request, J.A.1230, much less "the required foundation under the Jencks Act to require the court to conduct an

47

*in camera* review," *Savage*, 885 F.3d at 222.    Counsel did not "question [Halpert] on cross-examination about whether [he] reviewed these notes or adopted any statements contained within."    *Id.* at 221-222.    He did not ask Halpert if "the notes include[d] a substantially verbatim recital of [Halpert's] statements."    *Id.* at 222. He certainly did not "ma[k]e any representations" that Halpert "adopted or approved … these notes."    *Id.*    And counsel did not suggest that the notes contained "inconsistent statements" worthy of impeachment, *id.*—or for that matter, that the notes existed at all, since Halpert could only say they "probably" did.

Counsel's only representation when making his Jencks Act request was that he had received "notes of interviews with [Halpert's] parents," J.A.1231—Mrs. Halpert also testified for the Government, J.A.895—but not with Halpert himself. That was not enough.    The mere fact that the Government had a Jencks statement from Halpert's mother, who was interviewed separately from her son, told the court nothing about whether the Government had a Jencks statement from Halpert, who may have been interviewed by different investigators on different days, and may have otherwise experienced different interview circumstances.    More than that, the Government confirmed that it "produced all of the Jencks" for Halpert, and Bendann has furnished no reason, either then or now, to believe this was untrue.    J.A.1231.

48

Without more information of the kind that the Jencks Act requires, the court did not clearly err in declining to grant defense counsel's request.

### C. Any Error in Declining to Require Production of Halpert's Interview Notes Was Harmless

Regardless, any error in not requiring the production of Halpert's interview notes was harmless. For one thing, even if Bendann's counsel had laid a sufficient foundation for believing that a Jencks statement existed, that would not have inevitably led to production of the Halpert interview notes. It would have led the court to conduct an in camera review to decide whether the notes were Jencks material. And on this record, it is hard to imagine they were. Even assuming the in camera counterfactual, counsel's cross-examination of Halpert—who could not remember if notes were taken and could barely remember his interviewers—is devoid of any whiff that he reviewed and approved those notes.

More to the point, the reasons that Bendann offers on appeal for why the Halpert notes should have been disclosed—reasons, incidentally, that his counsel did not offer below—are so vague they cannot possibly "demonstrate … any resulting prejudice," *United States v. Graham*, 4 F.3d 987, *2 (4th Cir. 1993) (per curiam) (table). Indeed, though Bendann claims he would have used the notes to "impeach[]" Halpert and therefore "attack the circumstantial evidence from members of the community," Br. 50, he offers no reason to think the notes had impeachment

49

value in the first place. Elsewhere he concedes that "it is not clear what Mr. Halpert's Jencks Act statement would demonstrate." Br. 51. And while Bendann wields this uncertainty to urge a remand, "remand would be a futile exercise." *United States v. Lewis*, 35 F.3d 148, 152 (4th Cir. 1994). Any error in failing to produce interview notes (that may or may not exist) containing alleged Jencks statements (that may or may not have impeachment value) of a witness whose 20-page testimony (out of a nearly 3,400-page record on appeal) was largely cumulative of his mother's, his Gilman classmates', and the overwhelming digital evidence is "unlikely to have affected [the] outcome" of Bendann's case. *United States v. Dorsey*, 27 F.3d 564, *2 (4th Cir. 1994) (per curiam) (table).

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN HEARING FROM THE VICTIM'S PARENTS AT SENTENCING

### A. Standard of Review

This Court "review[s] the procedural reasonableness of a criminal sentence under a deferential abuse-of-discretion standard." *United States v. Solis-Rodriguez*, 144 F.4th 617, 626 (4th Cir. 2025). Accordingly, a district court's decision to permit statements at a sentencing hearing is also reviewed for an abuse of discretion. *See United States v. Stitt*, 250 F.3d 878, 896 (4th Cir. 2001) (applying abuse-of-discretion standard to the admission of victim-impact testimony in capital case); *United States v. Myers*, 402 F. App'x 844, 845 (4th Cir. 2010) (per curiam) (relying

on *Stitt* for abuse-of-discretion standard in non-capital sentencing); *accord United States v. Smith*, 967 F.3d 198, 215 (2d Cir. 2015).

## B. The Court Was Entitled to Consider the Statements of the Victim's Parents

The district court did not abuse its discretion in hearing from the victim's parents at Bendann's sentencing.   Sentencing courts are "permit[ted] … to consider the widest possible breadth of information about a defendant" when determining his punishment.   *Pepper v. United States*, 562 U.S. 476, 488 (2011).   This includes information about the defendant's "background, character, and conduct"; in fact, "[n]o limitation" is to be placed on it.   18 U.S.C. § 3661.   It also includes information about "the gravity of an offense," which "depends in part on the harm caused" not just to the victim but "to the victim's family[] and to society." *United States v. Fulks*, 454 F.3d 410, 435-436 (4th Cir. 2006); *see Payne v. Tennessee*, 501 U.S. 808, 817, 825 (1991) (even in death penalty cases, sentencing juries may consider "victim impact evidence relating to … the emotional impact of the crimes on the victim's family").   And the information may come from any "source," *United States v. Tucker*, 404 U.S. 443, 446 (1972), even when the source is not a "victim" within the meaning of the Crime Victims' Rights Act (CVRA).

Bendann does not contest these principles.   In fact, he does not even contest that the victim's parents were themselves victims, or at least victim representatives,

51

under the CVRA. *See* 18 U.S.C. § 3771(e)(2)(A) (defining "victims" as those "directly and proximately harmed as a result of" offenses charged); *id.* § 3771(e)(2)(B) (allowing victim representatives).[8]   If true, that ends the matter, since a court cannot abuse its discretion by allowing victim-impact statements from those statutorily entitled to present them.   But the district court declined to weigh in on that question, J.A.1620-1621; J.A.230-232, and this Court need not do so either.   Regardless of the parents' victim status, the court was entitled to hear what they had to offer "for the purpose of imposing an appropriate sentence."   18 U.S.C. § 3661.

This rule holds in Bendann's case.   And while purporting to agree with it, Bendann contends that some of the parents' remarks were so inflammatory and irrelevant that the court should have disregarded them.   He specifically takes issue with remarks falling into two categories: those that allegedly criticized Bendann "for exercising his constitutional rights" in going to trial, and those that spoke to the mother's own harms instead of her son's.   Br. 53-54.   Assuming (for now, *infra* at 54) that the court gave weight to these remarks in fashioning Bendann's sentence, it

---

[8]   Below, Bendann's counsel all but conceded that the parents were victim representatives when counsel expressly declined to object to victim-impact statements from "relatives," since relatives "appropriately express the harm that the victim continues to experience."   J.A.3329.   That said, counsel did preemptively object to the parents' statements at the hearing, although given this earlier admission, it was not clear why.   Counsel did not lodge any objection to the parents' statements after they were heard.

was no abuse of discretion.   The parents' statements presented exactly the kind of information allowed by Section 3661.

Take, for starters, the mother's statement that she "was unable to return to work" after discovering her son's unimaginable trauma.   J.A.1625.   Although Bendann says this was impermissible because it spoke to the mother's suffering, not the son's, courts are *required* to consider "the seriousness of the offense" when imposing a sentence.   18 U.S.C. § 3553(a)(2)(A).   And as already explained, the "seriousness" inquiry at least partially turns on "the harm done" to the people who were close to the victim, particularly family members.   *Payne*, 501 U.S. at 825; *see Fulks*, 454 F.3d at 435-436.   Surely the hardships of a loving mother struggling to shoulder her child's emotional wounds fall under this rubric.   *Cf. United States v. Moon*, 513 F.3d 527, 543 (6th Cir. 2008) (holding that "[t]he testimony of the family members" who described their "emotional harm" "was clearly relevant to the nature and circumstances of Defendant's … offenses").

As for the parents' other remarks, Bendann insists that they inappropriately faulted him for "exercis[ing] his constitutional rights" instead of pleading guilty. Br. 53.   Read in context, the remarks did no such thing.   As the parents saw it, Bendann's decision to go to trial was not about exercising his rights, or even about "legal maneuver[ing]."   J.A.1624.   It was about using the trial, and all the tools and

53

publicity that came with it, as an opportunity "to escalate and double down" on his abuse of the victim.   J.A.1623-1624.   It was about flaunting his "complete lack of remorse" and lack of responsibility, while simultaneously deriding "the one whining anonymous victim" for daring to speak out.   J.A.1624; *see* J.A.1628-1629.   This perspective, which both parents shared, was amply relevant to Bendann's "character[] and conduct," 18 U.S.C. § 3661, as well as his "characteristics," *id.* § 3553(a)(1).   Bendann—who offers almost no argument at all for his position here—certainly offers no reason to think that these observations about him and his conduct exceeded the bounds of what the law (nearly unlimitedly) permits.[9]

## C.   Any Error in Considering the Parents' Statements Was Harmless

Even if the court acted outside its discretion in allowing the parents' statements, the error was harmless.   The record contains no indication that the court gave

---

[9]   The only limitation on accepting information that is otherwise authorized by Section 3661 is the due process requirement that it be sufficiently reliable and that "a defendant has a fair opportunity to respond."   *Smith*, 967 F.3d at 216; *accord United States v. Salutric*, 775 F.3d 948, 952 (11th Cir. 2015).   Bendann has not alleged a due process violation, so he has waived any argument that he lacked an opportunity to rebut the parents' presumptively accurate statements.   *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).   At any rate, Bendann cannot argue that he had no opportunity to respond—he did so with his own allocution.   And to whatever extent more was required, Bendann did not ask for it:   He "did [not] ask for an opportunity to cross-examine [the parents] or argue that [their] statement was somehow unreliable."   *Myers*, 402 F. App'x at 845; *see United States v. Spiwak*, 377 F. App'x 319, 324 (4th Cir. 2010) (per curiam).

the statements significant (if any) weight in sentencing Bendann to a within-Guide-lines sentence of 35 years.   The statements "did not affect the district court's deter-mination of the range of imprisonment under the Sentencing Guidelines," since the parents did not allocute until after the Guidelines had been calculated.   *United States v. Velasquez-Rivera*, 581 F. App'x 238, 239 (4th Cir. 2014) (per curiam). The court did not mention the parents' remarks in its lengthy consideration of the Section 3553(a) factors, J.A.1659-1670, instead gesturing—in one line out of almost 300—only to "collateral harms on a nuclear family," J.A.1668.   Certainly it did not mention any of the remarks about Bendann's decision to go to trial, with which he takes the most umbrage on appeal.   And although—as Bendann points out—his re-sulting sentencing was indeed the "maximum time permitted" for which the victim's mother had implored, J.A.1626, the Government, too, had entreated that same sen-tence, J.A.1639.   The mother's request—understandable and predictable to begin with—was also nothing new.

Instead, the record shows that the court did exactly what it told the parties it would do before the parents got up to speak.   "[I] will listen carefully to all of the submissions that are made orally during the sentencing hearing," the court said. J.A.1621.   But "you can be sure" that submissions "with less corroboration," and that are "not subject to cross-examination, will be accorded appropriately less weight

than … that considerable volume of evidence that I heard" at trial. J.A.1621. So they were. The court was not "substantially swayed" by the parents' testimony. *United States v. Craig*, 321 F. App'x 322, 324 (4th Cir. 2009) (per curiam) (cleaned up).

## CONCLUSION

For the reasons stated, this Court should affirm Bendann's convictions and sentence.

Kelly O. Hayes
United States Attorney

David C. Bornstein
Assistant United States Attorney
Chief, Appellate Division

/s/ M.J. Kirsch Muñoz
Assistant United States Attorney
United States Attorney's Office
6406 Ivy Lane, 8th Floor
Greenbelt, Maryland 20770
(410) 736-8276

January 21, 2026

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION
AND TYPEFACE AND TYPE-STYLE REQUIREMENTS**

This brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,999 words, excluding the parts of the document exempted by Fed. R. App. 32(f).

This brief also complies with the typeface and type-style requirements in Fed. R. P. 23(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ M.J. Kirsch Muñoz
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 21, 2026, I electronically filed the fore-going with the Clerk of Court using the CM/ECF System, which will send notice of the filing to Bendann's counsel of record, who is an ECF filer.

/s/ M.J. Kirsch Muñoz
Assistant United States Attorney
